1

**JOHNSON FISTEL, LLP**
Brett M. Middleton (SBN 199427)

2

BrettM@johnsonfistel.com
501 West Broadway, Suite 800

3

San Diego, CA  92101
Telephone: (619) 230-0063

4

Facsimile: (619) 255-1856

5

*Counsel for Plaintiff Sandra Waswick*

6

7

8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

SANDRA WASWICK, on behalf of all
others similarly situated

11

12

Plaintiffs,

13

v.

14

TORRID HOLDINGS INC., ELIZABETH
MUNOZ, GEORGE WEHLITZ, STEFAN

15

L. KALUZNY, DARY KOPELIOFF,
LISA HARPER, THEO KILLION,

16

MORGAN STANLEY & CO. LLC,
BOFA SECURITIES, INC., GOLDMAN

17

SACHS & CO. LLC, JEFFERIES LLC,
ROBERT W. BAIRD & CO.

18

INCORPORATED, COWEN AND
COMPANY, LLC, WILLIAM BLAIR &

19

COMPANY, L.L.C., TELSEY
ADVISORY GROUP LLC, SYCAMORE

20

PARTNERS MANAGEMENT, L.P.,
SYCAMORE PARTNERS TORRID,

21

L.L.C., SYCAMORE PARTNERS, L.P.,
SYCAMORE PARTNERS

22

ASSOCIATES-C, L.P., SYCAMORE
PARTNERS ASSOCIATES, L.P.,

23

SYCAMORE PARTNERS ASSOCIATES
INVESTMENTS, L.P., SYCAMORE

24

PARTNERS (CO-INVEST), L.L.C., and
SYCAMORE PARTNERS ASSOCIATES

25

CO-INVEST, L.P.,

26

Defendants.

27

28

Case No.:  2:22-cv-8375

**CLASS ACTION COMPLAINT**

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff Sandra Waswick ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, (i) a review of U.S. Securities and Exchange Commission ("SEC") filings of Torrid Holdings Inc. ("Torrid" or the "Company"); (ii) the Company's press releases; and (iii) analyst reports, media reports, and other publicly disclosed reports and information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   JURISDICTION AND VENUE

1.     The claims alleged herein arise under §§11 and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§77k and 77o. This Court has jurisdiction over the subject matter of this action pursuant to §22 of the 1933 Act, 15 U.S.C. §77v.

2.     Venue is proper in this District pursuant to §27 of the 1933 Act and 28 U.S.C. §1391(b), as the Company maintains its headquarters in this District and conducts business in this District and many of the acts and conduct that constitute the violation of the law complained of herein occurred in this District.

3.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## II.  NATURE OF THE ACTION

4.     This is a securities class action on behalf of all persons who purchased Torrid common stock in or traceable to the Company's July 2021 initial public offering (the "IPO") seeking to pursue remedies under the 1933 Act.

## III.  **PARTIES**

5.     Plaintiff Sandra Waswick, as set forth in the certification attached hereto and incorporated by reference herein, purchased Torrid common stock traceable to the IPO and suffered damages as a result.

6.     Defendant Torrid, a wholly owned subsidiary of Torrid Holdings LLC, is a Delaware corporation headquartered in City of Industry, California.  Torrid is a direct-to-consumer brand of women's plus-size apparel and intimates.  Torrid common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CURV."

7.     Defendant Elizabeth Muñoz ("Muñoz") was the Chief Executive Officer ("CEO"), President, and a director of Torrid at the time of the IPO.  Following the IPO, in May 2022, Torrid announced that defendant Muñoz had resigned her CEO position and from the Torrid Board of Directors (the "Board"), and was instead assuming a new role as the Company's Chief Creative Officer.  Defendant Muñoz sold approximately $5 million worth of her personal Torrid shares in the IPO.

8.     Defendant George Wehlitz ("Wehlitz") was the Chief Financial Officer ("CFO") of Torrid at the time of the IPO.  Shortly after the IPO, in December 2021, Torrid announced defendant Wehlitz was retiring, effective May 2022.  Defendant Wehlitz sold approximately $5 million worth of his personal Torrid shares in the IPO.

9.     Defendant Stefan L. Kaluzny ("Kaluzny") was a director of Torrid at the time of the IPO.  Defendant Kaluzny is a co-founder and Managing Director of defendant Sycamore Partners Management, L.P.  As described in more detail below, defendant Sycamore Partners Management, L.P. sold over $210 million worth of Torrid shares in the IPO through its subsidiaries and was the Company's controlling shareholder before, during, and after the IPO.

10.     Defendant Dary Kopelioff ("Kopelioff") was a director of Torrid at the time of the IPO.  Defendant Kopelioff is a Managing Director of defendant Sycamore. As described in more detail below, defendant Sycamore Partners Management, L.P.

1    sold over $210 million worth of Torrid shares in the IPO through its subsidiaries and
2    was the Company's controlling shareholder before, during, and after the IPO.

3       11.     Defendant Lisa Harper ("Harper") was a director of Torrid at the time of
4    the IPO.  Defendant Harper became Torrid's CEO in May 2022, following the
5    transition of defendant Muñoz to a different role at the Company.  She was previously
6    the CEO of another retailer, Belk, owned by defendant Sycamore Partners
7    Management, L.P.  Defendant Harper sold over $14 million worth of her personal
8    Torrid shares in the IPO.

9       12.     Defendant Theo Killion ("Killion") was a director of Torrid at the time of
10    the IPO.

11       13.     The defendants referenced above in ¶¶7-12 are collectively referred to
12    herein as the "Individual Defendants."  Each of the Individual Defendants signed the
13    Registration Statement (as defined below) issued in connection with the IPO and
14    solicited and sold shares in the IPO for their own benefit and the benefit of Torrid
15    and/or Sycamore.

16       14.     Defendants Morgan Stanley & Co. LLC, BofA Securities, Inc., Goldman
17    Sachs & Co. LLC, Jefferies LLC, Robert W. Baird & Co. Incorporated, Cowen and
18    Company, LLC, William Blair & Company, L.L.C., and Telsey Advisory Group LLC
19    are referred to herein as the "Underwriter Defendants."  Pursuant to the 1933 Act, the
20    Underwriter Defendants are liable for the materially false and misleading statements in
21    the Registration Statement as follows:

22             (a)     The Underwriter Defendants are investment banking houses that
23                 specialize in, *inter alia*, underwriting public offerings of securities.
24                 They served as the underwriters of the IPO and shared over $17
25                 million in fees collectively for their services.  The Underwriter
26                 Defendants determined that in return for their share of the IPO
27                 proceeds, they were willing to solicit purchases of Torrid securities
28                 in the IPO.  Each of the Underwriter Defendants designated

personnel to the IPO working group, including investment bankers, analysts, associates, and counsel, to market Torrid securities, and those personnel worked on and approved the content of Torrid's Registration Statement and other offering materials.

(b)     The Underwriter Defendants demanded and obtained an agreement from Torrid that Torrid would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)     Representatives of the Underwriter Defendants also assisted Torrid and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of Torrid, an undertaking known as a "due diligence" investigation.   The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Torrid's operations and financial prospects.

(d)     The Underwriter Defendants solicited and sold in the IPO Torrid securities to Plaintiff and other members of the Class (defined herein).   The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

15.     Defendant Sycamore Partners Management, L.P. ("Sycamore") is a New York-based private equity firm.  Defendant Sycamore was the controlling shareholder of Torrid before, during, and after the IPO.  Defendant Sycamore also controlled the management and the Board and ensured that two of its director nominees sat on the Board, defendants Kaluzny and Kopelioff.  Defendant Sycamore also caused Torrid to enter into numerous agreements with it prior to the IPO that further cemented

CLASS ACTION COMPLAINT

Sycamore's control over the Company, including an advisory services agreement, various business agreements with Hot Topic (a Sycamore portfolio company and another fashion retailer), a stockholder's agreement, a registration rights agreement, and an agreement to pay a June 2021 $285.6 million special cash distribution to Sycamore (in addition to millions more paid to certain of the Individual Defendants, including defendants Muñoz, Wehlitz, and Harper).  Defendant Sycamore sold $210 million worth of Torrid stock through its subsidiaries, defendants the Sycamore Entities (defined below) in the IPO.

16.    Defendants Sycamore Partners Torrid, L.L.C., Sycamore Partners, L.P., Sycamore Partners Associates-C, L.P., Sycamore Partners Associates, L.P., Sycamore Partners Associates Investments, L.P., Sycamore Partners (Co-Invest), L.L.C., and Sycamore Partners Associates Co-Invest, L.P. are referred to herein as the "Sycamore Entities."  Defendant Sycamore held its investment in Torrid through the Sycamore Entities and sold shares in the IPO through the Sycamore Entities.

17.    Defendant Sycamore and the Sycamore Entities are referred to collectively herein as the "Sycamore Defendants."

## IV.  SUBSTANTIVE ALLEGATIONS

18.    Based in City of Industry, California, Torrid is a fashion retailer specializing in plus-size apparel and intimates.  The Company is majority owned and controlled by New York private equity firm defendant Sycamore.  Torrid sells direct to consumers through its e-commerce platform and via more than 600 physical stores located throughout North America.

19.    Leading up to the IPO, Torrid claimed to be experiencing rapid sales growth and an impressive recovery following a temporary downturn in the face of the initial phases of the COVID-19 pandemic, which began in March 2020.  For example, the Company stated that its net sales had enjoyed an 8% CAGR between 2017 and 2020 but that this had accelerated to a 108% net sales growth for the three months

ended May 1, 2021 compared to the comparable prior year period.[1]  The Company claimed to have successfully navigated the COVID-19 pandemic and that it had put in place numerous logistical advantages, such as an enhanced and flexible supply chain, to avoid or substantially mitigate future disruptions caused by the pandemic.

20.    On June 7, 2021, Torrid filed with the SEC a registration statement on Form S-1 for the IPO, which, after several amendments, was declared effective on June 30, 2021 (the "Registration Statement").  On July 2, 2021, the Company filed with the SEC a prospectus on Form 424B4 which incorporated and formed part of the Registration Statement.  Defendants used the Registration Statement to sell 12.65 million shares (including the full exercise of the Underwriter Defendants' overallotment option) of Torrid at $21 per share, generating over $265 million in gross offering proceeds.  Notably, all of the shares sold were by Torrid insiders, including several of the Individual Defendants and the Sycamore Defendants, and none of the proceeds went to the Company.  Moreover, in June 2020, prior to the IPO, these same insiders caused Torrid to pay out tens of millions of dollars to themselves, including $285.6 million paid to funds managed by defendant Sycamore, $1.3 million to defendant Muñoz, $1.1 million to defendant Wehlitz, and $7.9 million to defendant Harper, which further drained the Company of cash.

## V.  MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT

21.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

---

[1]    Torrid's fiscal year ends on the Saturday nearest to January 31 of the following calendar year.

22. Specifically, the Registration Statement created the misleading impression that Torrid's impressive growth trajectory leading up to the IPO was then continuing and expected to continue following the offering. For example, for the three months ended May 1, 2021, the Registration Statement highlighted a 108% year-over-year increase in comparable sales, a 108% year-over-year increase to $326 million in net sales, a 5% year-over-year increase to $13 million in net income, a 254% year-over-year increase to $144.9 million in gross profit, a 6% year-over-year increase in total active customers to 3.4 million, and an 850% year-over-year increase to $76 million in adjusted EBITDA. The Registration Statement further stated that Torrid "believe[s it is] uniquely positioned to capture outsized share in the highly attractive and growing women's plus-size apparel category."

23. Further, the Registration Statement claimed that, by May 2020, "net sales growth began to rebound" after an initial pandemic-induced lull, "demonstrat[ing] the strong inherent demand for our differentiated product and the resiliency of our business model." Additionally, the Registration Statement stated that the Company's "fit-focused product strategy, direct-to-consumer model and passionate team have resulted in high growth and a leading market position over the last several years."

24. The Registration Statement discussed the COVID-19 pandemic but claimed that Torrid was "well positioned to serve our customers through our robust e-Commerce platform and accelerated investments in omni-channel offerings." According to the Registration Statement, this strong positioning was the result of, among other things, "targeted investments and changes to our process to improve the speed and flexibility of our supply chain." The Registration Statement further stated that Torrid had "created a highly scalable foundation for growth through significant infrastructure investments." The Registration Statement also claimed that Torrid was in the process of further "enhance[ing] supply chain flexibility" in order to grow, stating that the Company had "developed internal processes that we refer to as our 'speed model,' including pre-positioning fabrics with our third-party factory partners

7

1   to accelerate product replenishment cycles, improve inventory turnover and drive
2   higher margin sales."

3       25.   In addition, the Registration Statement represented that Torrid had the
4   ability to rapidly source product to meet evolving customer demand and preferences.
5   For example, the Registration Statement stated that Torrid utilizes a "data-driven, low-
6   risk merchandising model," "employ[s] a data-driven approach to design,
7   merchandising and inventory planning and allocation," and "ha[s] excellent visibility
8   into our customer's preferences."  The Registration Statement further stated that Torrid
9   leverages this customer data "to inform all purchasing decisions" and, through its
10  vertical sourcing model, has "the flexibility to respond quickly to the latest sales trends
11  and make adjustments to our current offering."  The Registration Statement similarly
12  stated that the Company "utilize[s] a read-and-react testing approach with shallow
13  initial buys and data-driven repurchasing decisions to iterate our New product offering,
14  thus minimizing fashion and inventory risk."  The Registration Statement added that
15  "[u]nlike brands that do not focus exclusively on plus-size, we have the requisite scale
16  to order in sufficient quantities and effectively manage a continuously refreshed plus-
17  size inventory."

18      26.   Further, the Registration Statement highlighted the Company's "excellent
19  visibility into our customers' preferences," which purportedly allowed Torrid to better
20  manage inventory, stating in pertinent part as follows:

21      We regularly use the depth and breadth of our data to assess sales, market
22      trends and new product development to inform purchasing decisions. *As a
        result, we have the flexibility to react quickly to product performance, make
23      in-season inventory purchasing adjustments where possible and to respond
        to the latest sales trends by ordering or re-ordering as appropriate.* Further,
24      we utilize a read-and-react testing approach, with small purchase quantities,
25      to introduce our New product offering, minimizing fashion risk. *This
        strategy also allows us to mitigate inventory risk, particularly for new
26      products or styles, while simultaneously providing our customers access to
27      current fashion.* Lastly, 86% of our sales in 2020 were from our Basic and
        Core categories, which we define as product that is either sold year round or
28

8

a variation of a style sold in previous seasons. *We believe this nature of our assortment enables us to more effectively predict demand for our product and better manage inventory risk.*

27.     The Registration Statement also highlighted the importance of Torrid's senior management, including defendant Wehlitz, to the Company's business and prospects, stating in pertinent part as follows:

We depend on the leadership and experience of key members of our executive management team. The loss of the services of any of our executive management could have a material adverse effect on our business and prospects, as we may not be able to find suitable individuals to replace such personnel on a timely basis or without incurring increased costs, or at all. In addition, we believe that our future success will depend greatly on our continued ability to attract and retain highly skilled and qualified personnel.

28.     These statements in ¶¶22-27 were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time of the IPO:

(a)     that in the first half of 2021 Torrid had experienced a temporary surge in demand as a result of changed consumer behaviors in response to the COVID-19 pandemic and government stimulus and that such ephemeral demand trends had dissipated and were not internally projected to continue following the IPO;

(b)     that Torrid was suffering from severe supply chain disruptions caused by the emergence of the Delta variant of COVID-19, which had first emerged in May 2021;

(c)     that Torrid was running materially below historical inventory levels as a result of supply chain disruptions;

(d)     that, as a result of (b)-(c) above, Torrid did not have sufficient inventory to meet expected consumer demand for its fiscal third quarter of 2021;

CLASS ACTION COMPLAINT

(e)    that, as a result of (b)-(d) above, late inventory arrival had materially impaired the Company from effectively matching consumer buying trends, creating an undisclosed risk of increased markdowns and promotional activities necessary to sell undesirable inventory;

(f)    that Torrid's CFO, defendant Wehlitz, planned to retire shortly after the IPO; and

(g)    that, as a result of (a)-(f) above, the Registration Statement's representations regarding Torrid's historical financial and operational metrics and purported market opportunities did not accurately reflect the actual business, operations, financial results, and trajectory of the Company at the time of the IPO, and were materially false and misleading and lacked a reasonable factual basis.

29.    Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303") required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

30.    The failure of the Registration Statement to disclose that Torrid was suffering from the loss of temporary demand stimulus, supply chain disruptions, and the impending loss of its CFO violated Item 303, because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. This failure also violated Item 105, because these adverse facts created significant risks that were not

1    disclosed even though they were some of the most significant factors that made an

2    investment in Torrid stock speculative or risky.

3         31.    Indeed, the risk factors that were provided in the Registration Statement

4    were themselves materially misleading because they provided generic statements of

5    potential or contingent risk, yet failed to disclose that the potential future adverse

6    impacts described therein were already occurring. For example, the Registration

7    Statement stated that the "COVID-19 outbreak *has the potential* to cause a disruption

8    in our supply chain and *may* adversely impact economic conditions in North America,

9    Europe, China and elsewhere," but failed to disclose the supply chain disruptions as a

10   result of the Delta variant that were *already* impacting the Company's business,

11   financial results, and prospects. Similarly, the Registration Statement stated that "the

12   loss of the services of any of our executive management *could* have a material adverse

13   effect on our business and prospects," yet it failed to disclose that CFO defendant

14   Wehlitz planned to retire shortly after the IPO. The Registration Statement's failure to

15   disclose adverse facts rendered the discussion of future, potential risks contained

16   therein themselves materially misleading.

17   **VI.  EVENTS FOLLOWING THE IPO**

18        32.    On September 8, 2021, Torrid issued a release announcing the Company's

19   financial results for its second fiscal quarter ended July 31, 2021 – *i.e.*, the quarter *at*

20   *the end of which* the IPO was conducted. In the release, defendant Wehlitz claimed

21   that the quarter had "delivered strong financial results" but acknowledged Torrid was

22   "carefully monitoring the global supply chain challenges that are expected to persist

23   into the back half of the year." The release also stated that Torrid expected net sales of

24   between $305 million and $315 million for the third quarter and between $1.29 billion

25   and $1.31 billion for the year.

26        33.    That same day, Torrid held an investor conference call to discuss the

27   results, hosted by defendants Muñoz and Wehlitz. In their remarks, defendants Muñoz

28   and Wehlitz mentioned global supply chain challenges facing the Company as a result

of the Delta COVID-19 variant.  In addition, in her prepared remarks, defendant Muñoz acknowledged that the challenges existed *during the second quarter*, blaming supply chain disruptions for an inventory shortfall by quarter's end.  However, Muñoz did not reveal the scope, true nature, or severity of the issues, or the expected adverse impact to Torrid's financial and operational results, and instead claimed that Torrid was experiencing "extraordinary" financial and operational results and that the Company's "collection is so vast that we do have a lot of opportunities to flex in different directions" and was therefore "in a good position to continue on the road that we're on."

34.   On December 8, 2021, Torrid announced that defendant Wehlitz would be retiring shortly after the IPO.

35.   Also on December 8, 2021, Torrid issued a release announcing the Company's financial results for its third fiscal quarter ended October 30, 2021.  The release revealed a further decline of the reported key financial and operating metrics. In the third quarter, comparable sales increased only 14% year-over-year, a drastic decline from the 108% year-over-year increase reported in the Registration Statement for the first quarter of 2021.  Further, the release stated that Torrid had achieved an adjusted EBITDA margin of just 18%, a sharp decline from the 26% adjusted EBITDA margin Torrid had reported for the second quarter of 2021.  The release also lowered Torrid's annual guidance, reducing the top end of net sales guidance to $1.3 billion.

36.   That same day, Torrid held an investor conference call to discuss the results, hosted by defendants Muñoz and Wehlitz.  In their remarks, defendants Muñoz and Wehlitz highlighted the severity of the global supply chain challenges facing the Company as a result of the Delta COVID-19 variant.  In response to an analyst question, defendant Wehlitz stated that the failure to timely source inventory had resulted in the Company being unable to meet customer demand effectively and that the Company planned to employ more aggressive promotional activities to sell products.

CLASS ACTION COMPLAINT

37.    On January 10, 2022, Torrid issued a press release lowering the Company's already disappointing sales and earnings guidance.  The release reduced Torrid's net sales guidance to a range of $1.265 billion to $1.27 billion (compared to a range of $1.29 billion to $1.3 billion previously) and adjusted EBITDA guidance to a range of $240 million to $242 million (compared to a range of $252 million to $257 million previously).

38.    On March 17, 2022, Torrid issued a release announcing the Company's financial results for its fourth fiscal quarter and year ended January 29, 2022.  The release stated that Torrid's sales growth continued to decelerate to just 4.5% growth during the quarter.  The release also stated that Torrid's adjusted EBITDA margin had fallen to just 9% of net sales largely as a result of continued supply chain disruptions and increased transportation and product costs.  The release provided annual 2022 net sales guidance of between $1.3 billion and $1.365 billion and annual 2022 adjusted EBITDA guidance of between $195 million and $220 million.

39.    That same day, Torrid held an investor conference call to discuss the results, hosted by defendants Muñoz and Wehlitz.  In their remarks, defendants Muñoz and Wehlitz highlighted the continued severity of the global supply chain challenges facing the Company as a result of the Delta COVID-19 variant.  Defendant Wehlitz also acknowledged that Torrid had been enjoying unusual and transitory demand in the lead up to the IPO as a result of "both stimulus and pent-up demand from consumers initially emerging from the pandemic."

40.    On May 3, 2022, Torrid issued a release announcing that defendant Muñoz would be stepping down as CEO of the Company and as a member of the Board and transition into a new role as Chief Creative Officer.  The release also stated that defendant Harper would become the new CEO of Torrid, effective immediately, among other management changes.

41.    On June 7, 2022, Torrid issued a release announcing the Company's financial results for its first fiscal quarter ended April 30, 2022.  The release stated that Torrid's comparable store sales actually *declined 2%* during the quarter.

42.    That same day, Torrid held an investor conference call to discuss the results, hosted by defendant Harper and new Interim CFO Tanner MacDiarmid. During the call, defendant Harper stated that Torrid was engaged in numerous strategic shifts to turn the business around, including an increase in promotional activity in the short term to sell excess inventory.

43.    On August 3, 2022, Torrid issued a release announcing additional management changes and revising downward earnings and net sales guidance for the second fiscal quarter ended July 30, 2022.

44.    On September 7, 2022, Torrid issued a release announcing the Company's financial results for its second fiscal quarter ended July 30, 2022.  The release revised downward Torrid's annual 2022 net sales guidance from a range of $1.3 billion to $1.365 billion to a range of $1.26 billion to $1.3 billion, which would be essentially *flat* year-over-year, and revised downward Torrid's annual 2022 adjusted EBITDA guidance from a range of $195 million to $220 million to a range of $160 million to $175 million, which would be significantly *worse* than Torrid's fiscal 2021 adjusted EBITDA of $246 million.

45.    By the end of September 2022, the price of Torrid stock fell to a low of just $4.06 per share, over *80% below* the IPO price.  At the time of the filing of this complaint, the price of Torrid common stock has remained significantly below the IPO price.

## VII.    CLASS ACTION ALLEGATIONS

46.    Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Torrid common stock in or traceable to the IPO (the "Class").  Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their

1  immediate families, and their legal representatives, heirs, successors, or assigns, and
2  any entity in which defendants have or had a controlling interest.

3      47.    The members of the Class are so numerous that joinder of all members is
4  impracticable.  Torrid common stock is actively traded on the NYSE and millions of
5  shares were sold in the IPO.  While the exact number of Class members is unknown to
6  Plaintiff at this time and can only be ascertained through appropriate discovery,
7  Plaintiff believes that there are hundreds of members in the proposed Class.  Record
8  owners and other members of the Class may be identified from records maintained by
9  Torrid or its transfer agent and may be notified of the pendency of this action by mail,
10 using the form of notice similar to that customarily used in securities class actions,
11 including being given an opportunity to exclude themselves from the Class.

12     48.    Plaintiff's claims are typical of the claims of the members of the Class, as
13 all members of the Class are similarly affected by defendants' wrongful conduct in
14 violation of federal law that is complained of herein.

15     49.    Plaintiff will fairly and adequately protect the interests of the members of
16 the Class and has retained counsel competent and experienced in class and securities
17 litigation.

18     50.    Common questions of law and fact exist as to all members of the Class
19 and predominate over any questions solely affecting individual members of the Class.
20 Among the questions of law and fact common to the Class are:

21             (a)    whether defendants violated the 1933 Act;
22             (b)    whether statements made by defendants to the investing public in
23                    the Registration Statement misrepresented material facts about the
24                    business, operations, and risks of investing in Torrid; and
25             (c)    to what extent the members of the Class have sustained damages
26                    and the proper measure of damages.

27     51.    A class action is superior to all other available methods for the fair and
28 efficient adjudication of this controversy since joinder of all members is impracticable.

1   Furthermore, as the damages suffered by individual Class members may be relatively

2   small, the expense and burden of individual litigation make it impossible for members

3   of the Class to individually redress the wrongs done to them.  There will be no difficulty

4   in the management of this action as a class action.

### COUNT I

**For Violation of §11 of the 1933 Act**
**Against Torrid, the Individual Defendants, and the Underwriter Defendants**

52.   Plaintiff repeats and realleges ¶¶1-51 by reference.

53.   This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against Torrid, the Individual Defendants, and the Underwriter Defendants.

54.   This Count does not sound in fraud.  Plaintiff does not allege that any of the defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

55.   The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

56.   The defendants named herein were responsible for the contents and dissemination of the Registration Statement as signatories and/or directors of the Company or as the underwriters of the IPO.

57.   Torrid is the registrant for the IPO.  As the issuer of the shares, Torrid is strictly liable to Plaintiff and the Class for the misstatements and omissions.

58.   None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

59.   By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

CLASS ACTION COMPLAINT

60.     Plaintiff purchased Torrid common stock registered pursuant to the Registration Statement and traceable to the IPO.

61.     Plaintiff and the Class have sustained damages.  The value of Torrid common stock has declined substantially subsequent to and due to defendants' violations.

62.     At the time of their purchases of Torrid common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff filed this complaint.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this complaint.

## COUNT II

### For Violation of §15 of the 1933 Act
### Against Torrid, the Individual Defendants, and the Sycamore Defendants

63.     Plaintiff repeats and realleges ¶¶1-62 by reference.

64.     This Count is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o, against Torrid, the Individual Defendants, and the Sycamore Defendants.

65.     The Individual Defendants controlled Torrid at the time of the IPO by virtue of their dominant voting power and status as the Company's major shareholders, directors, and/or senior officers.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders or principals of Torrid and Sycamore.

66.     Torrid controlled the Individual Defendants and all of its employees.

67.     The Sycamore Defendants were the controlling shareholders of Torrid before, during, and after the IPO.  The Sycamore Defendants further cemented their control over the Company by installing loyalists to the Board and Torrid's senior

management ranks and by causing the Company to enter into a variety of agreements prior to the IPO, that favored the Sycamore Defendants.

68. The defendants named herein each were culpable participants in the violations of §11 of the 1933 Act alleged in the Count above, based on their participation in the Company's reporting on financial and operational results to investors, having signed or authorized the signing of the Registration Statement, selling Torrid common stock in the IPO, and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

## VIII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Designating Plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## IX.  <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.

CLASS ACTION COMPLAINT

1         Respectfully submitted,

2   Dated:  November 16, 2022       **JOHNSON FISTEL, LLP**

3                              By:   *s/ Brett M. Middleton*

4                                  BRETT M. MIDDLETON

5                                 501 West Broadway, Suite 800

6                                 San Diego, CA 92101
                                      Telephone: (619) 230-0063

7                                 Facsimile: (619) 255-1856
                                        BrettM@johnsonfistel.com

8                                 *Counsel for Plaintiff Sandra Waswick*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

Sandra Waswick ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 09 day of November 2022.

DocuSigned by:

ED44DF2E76DC4F1...

Sandra Waswick

<u>Schedule A</u>

Sandra Waswick
Torrid Holdings Inc. (CURV)

| Date<br><u>Acquired</u> | Amount of<br><u>Shares Acquired</u> | <u>Price*</u> |
|---|---|---|
| 8/10/2021 | 25 | $29.38 |

\* Rounded to two decimal places