1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  LAURIE L. LARGENT (153493)
   STEPHEN JOHNSON (347822)
3  655 West Broadway, Suite 1900
   San Diego, CA 92101
4  Telephone: 619/231-1058
   619/231-7423 (fax)
5  llargent@rgrdlaw.com
   sjohnson@rgrdlaw.com
6
   Lead Counsel for Lead Plaintiff
7
                    UNITED STATES DISTRICT COURT
8
                  CENTRAL DISTRICT OF CALIFORNIA
9
   SANDRA WASWICK, on Behalf of All )   Case No. 2:22-cv-08375-JLS(ASx)
10 Others Similarly Situated,         )
                                      )   CONSOLIDATED CLASS ACTION
11                      Plaintiff,    )   COMPLAINT FOR THE VIOLATION
                                      )   OF FEDERAL SECURITIES LAWS
12       vs.                          )
                                      )   DEMAND FOR JURY TRIAL
13 TORRID HOLDINGS INC.,              )
   ELIZABETH MUÑOZ, GEORGE            )
14 WEHLITZ, STEFAN L. KALUZNY,        )
   DARY KOPELIOFF, LISA HARPER,       )
15 THEO KILLION, MORGAN               )
   STANLEY & CO. LLC, BOFA            )
16 SECURITIES, INC., GOLDMAN          )
   SACHS & CO. LLC, JEFFERIES LLC, )
17 ROBERT W. BAIRD & CO.              )
   INCORPORATED, COWEN AND            )
18 COMPANY, LLC, WILLIAM BLAIR        )
   & COMPANY, L.L.C., TELSEY          )
19 ADVISORY GROUP LLC,                )
   SYCAMORE PARTNERS                  )
20 MANAGEMENT, L.P., SYCAMORE         )
   PARTNERS TORRID, L.L.C.,           )
21 SYCAMORE PARTNERS, L.P.,           )
   SYCAMORE PARTNERS                  )
22 ASSOCIATES-C, L.P., SYCAMORE       )
   PARTNERS ASSOCIATES, L.P.,         )
23 SYCAMORE PARTNERS                  )
   ASSOCIATES INVESTMENTS, L.P., )
24 SYCAMORE PARTNERS (CO-             )
   INVEST), L.L.C., and SYCAMORE      )
25 PARTNERS ASSOCIATES CO-            )
   INVEST, L.P.,                      )
26                      Defendants.   )
                                      )
27 _____)
28

4854-9104-7523.v1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF THE CASE ................................ 1

II.   JURISDICTION AND VENUE ........................................................... 4

III.  SECURITIES ACT CLAIMS ............................................................ 4

    A.   The Securities Act Parties ........................................................ 4

        1.   Securities Act Plaintiffs ................................................ 4

        2.   Securities Act Defendants ............................................. 5

            a.   Torrid and the Individual Defendants ........................... 5

            b.   The Underwriter Defendants ....................................... 6

            c.   The Sycamore Defendants ......................................... 7

    B.   Relevant Non-Parties ............................................................ 8

        1.   CW-1 ....................................................................... 8

        2.   CW-2 ....................................................................... 9

    C.   Factual Allegations ............................................................... 11

        1.   Company Background and Information .................................... 11

        2.   Prior to the IPO, Torrid Abandoned an Earlier IPO Due to Inventory Management Issues .............................................. 12

        3.   Torrid's Data Driven, Low-Risk Merchandising Model .......... 14

        4.   Torrid's Receipt of Large Quantities of Inventory Ordered Prior to the IPO but Not Received Until After Due to Severe Shipment Delays Caused a Significant Build-Up of Excess Inventory Throughout the Class Period ...................................................................... 16

        5.   Torrid's Abandonment of Its Low-Risk Merchandising Model Exacerbated the Build-Up of Excess Inventory ........... 17

        6.   Torrid's IPO .............................................................. 19

    D.   False and Misleading Statements and Omissions Made in Connection with the IPO ....................................................... 20

        1.   False and Misleading Statements and Omissions Regarding the Company's Data-Driven, Low-Risk Merchandising Model ...................................................... 20

**Page**

2.      False and Misleading Statements and Omissions Regarding the Distribution Center .............................. 23

3.      False and Misleading Statements and Omissions Regarding the Company's Response to and the Impact on the Company of the COVID-19 Pandemic .............................. 24

E.      Omissions Based on Violations of Items 105 and 303 of Regulation S-K ........................................................................ 26

F.      Securities Act Counts ................................................................ 27

COUNT I ......................................................................................................... 27

Violations of §11 of the Securities Act (Against All Defendants) .......................... 27

COUNT II ........................................................................................................ 29

Violation of §12(a)(2) of the Securities Act (Against All Defendants) .................. 29

COUNT III ....................................................................................................... 30

Violations of §15 of the 1933 Act (Against the Individual Defendants and Sycamore Defendants) ........................................................................ 30

IV.    EXCHANGE ACT CLAIMS ..................................................................... 31

A.      The Exchange Act Parties ........................................................ 31

1.      Exchange Act Plaintiffs .............................................. 31

2.      Exchange Act Defendants .......................................... 31

B.      Defendants' False and Misleading Statements and Omissions During the Class Period ...................................... 32

1.      Torrid's IPO Registration Statement ....................... 32

2.      2Q 2021 Form 10-Q and Earnings Call .................. 33

C.      The Truth Is Revealed over Several Partially Corrective Disclosures, While Defendants Continue to Mislead Investors ......... 37

1.      3Q 2021 Form 10-Q and Earnings Call .................. 37

2.      January 10, 2022 Press Release ................................ 42

3.      March 17, 2022 Earnings Call and FY 2021 SEC Form 10-K .................................................................... 42

- ii -

4854-9104-7523.v1

**Page**

4.  1Q 2022 SEC Form 10-Q and Earnings Call ............................ 48

5.  August 3, 2022 Press Release ....................................................... 52

6.  2Q 2022 SEC Form 10-Q and Earnings Call ........................... 53

7.  December 8, 2022 Earnings Call ................................................. 57

D.  Additional Scienter Allegations ............................................................ 58

1.  Torrid's Prior Abandonment of an Earlier IPO Due to the Same Inventory Issues that Existed at the Time of the July 2021 IPO Supports Scienter .................................................. 58

2.  Defendants' Admissions that They "Carefully Monitored" and Reviewed Torrid's Inventory Levels and Other Financial Metrics ........................................................... 59

3.  Defendants' Class Period Admissions Regarding Torrid's Undisclosed Abandonment of Its Low-Risk Merchandising Model, Steep Inventory Discounts and Incapable Distribution Center ....................................................... 60

4.  Defendants' Detailed Responses to Pointed Analysts Questions Supports Their Actual Knowledge of the Facts About Which They Spoke ........................................................... 61

5.  Defendants Were Aware of Increasing Inventory Levels from Access to, or Receipt of, Inventory Count and in-Bound Receiving Log Reports and the KPI Dashboard ........... 64

6.  Torrid's Lack of Internal Controls Supports Scienter ............. 65

7.  Executive Departures Support a Strong Inference of Scienter ............................................................................................ 65

8.  Defendants' Insider Sales During the Class Period Further Support an Inference of Scienter ................................. 66

9.  Defendants' Class Period Compensation Including IPO Incentive Awards Constitutes Additional Evidence of Scienter ............................................................................................ 67

E.  Loss Causation ......................................................................................... 67

F.  The Presumption of Reliance ................................................................ 70

G.  Exchange Act Counts ............................................................................. 72

COUNT IV ............................................................................................................... 72

- iii -

4854-9104-7523.v1

**Page**

Violations of §10(b) of the Exchange Act and SEC Rule 10b-5 (Against the
    Exchange Act Defendants)...........................................................72

COUNT V ...................................................................................74

Violations of §20(a) of the Exchange Act (Against Sycamore and the
    Individual Exchange Act Defendants) ............................................74

COUNT VI ..................................................................................75

Violations of §20A of the Exchange Act (Against the Sycamore Defendants
    and Defendants Muñoz, Wehlitz, and Harper)................................75

V.     SAFE HARBOR PROVISION DOES NOT APPLY...............................78

VI.    CLASS ACTION ALLEGATIONS ...............................................79

VII.   PRAYER FOR RELIEF .............................................................80

VIII.  JURY DEMAND ....................................................................81

4854-9104-7523.v1

## I.      INTRODUCTION AND SUMMARY OF THE CASE

1.      Court-appointed Lead Plaintiff City of Warren Police and Fire Retirement System ("Lead Plaintiff") and additional plaintiff Erika Schroth (collectively, "Plaintiffs"), bring this action individually against Defendants (defined below) based upon the investigation of counsel, which included, without limitation, the review and analysis of: (a) public filings made with the United States Securities and Exchange Commission ("SEC"); (b) news releases and other publications disseminated by Defendants; (c) securities analyst reports, news articles, media reports, websites, and other information concerning Defendants and other related non-parties; and (d) an investigation conducted by Plaintiffs' attorneys, including interviews with former Torrid Holdings Inc. ("Torrid" or the "Company") employees.  Plaintiffs believe that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      This securities class action alleges claims under §§11, 12(a)(2), and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act"), on behalf of all persons or entities that purchased Torrid's common stock pursuant or traceable to the public offering conducted on or about July 1, 2021 ("IPO") and claims under §§10(b), 20(a), and 20(A) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), on behalf of all persons or entities that purchased or acquired common stock of Torrid between July 1, 2021, and December 8, 2022, inclusive (the "Class Period"), and who were damaged thereby.

3.      Torrid is a fashion retailer headquartered in City of Industry, California specializing in plus-size apparel.  Torrid sells direct to consumers through its e-Commerce platform and over 600 physical stores located throughout the United

4854-9104-7523.v1

States, Puerto Rico, and Canada.   The Company is controlled by its majority shareholder, defendant Sycamore Partners Management, L.P. ("Sycamore").

4.      On July 1, 2021, Torrid was led to market by defendant Sycamore, the Company's top executive officers and director Lisa Harper.   The IPO was a great success, selling 12,650,000 shares of Torrid common stock to the public at $21 per share and collecting over $265 million in proceeds from investors.   However, unlike most IPOs, none of the $265 million in proceeds raised by Torrid's IPO went to the Company.   Instead, the vast majority of the proceeds went directly to defendants Sycamore, Elizabeth Muñoz ("Muñoz"), Chief Executive Officer ("CEO"), George Wehlitz ("Wehlitz"), Chief Financial Officer ("CFO"), and Lisa Harper ("Harper"), director and CEO as of May 2022.   Unbeknownst to investors, Defendants used the IPO to take Torrid public by making untrue claims about the Company, then pocketing millions in proceeds, leaving investors damaged.

5.      In selling investors on the IPO, Defendants assured the market that Torrid's business model was resilient and largely immune to the effects of COVID-19 related disruptions.   Defendants claimed that the Company's "data driven, low-risk merchandising" model, which included a less trend-driven inventory of Basic and Core styles, data-driven merchandising decisions, a highly flexible and quick to react merchandising strategy, and a condensed product development cycle, contributed to the Company's ability to sell >80% of its products at full price, limited inventory risk, and resiliency against the macroeconomic conditions that were weighing on and impacting other retailers in the fashion industry.   These claims, however, were far from the truth.

6.      In fact, prior to the IPO, internal conditions existed at the Company that were impacting Torrid's inventory levels and gross margins, that would continue well after the IPO.   In the months leading up to the IPO, Torrid was experiencing increasingly delayed shipments of inventory from its Asia–Pacific manufacturers, due to increased port congestion and COVID-19 related factory closures, that were

- 2 -

causing a cascade effect on the Company's business.  Because of a lack of storage capacity, resource constraints and high employee turnover at the Company's Ohio Distribution Center (defined below), these shipment delays were causing a massive accumulation of excess inventory that could not be timely processed into the Company's inventory management system, or be used to fulfill customer orders.  In addition, Torrid's inability to process the incoming inventory resulted in an artificial boost to the Company's gross margins, net income, and Adjusted EBITDA (earnings before interest, taxes, depreciation, and amortization) that were reported in Torrid's Registration Statement because the trailer inventory was not being received or accounted for in the Company's inventory management system at the time of the IPO.

7.     Compounding this problem, was the fact that at the time of the IPO Torrid had also abandoned its data driven, low risk merchandising model and, instead was increasing purchase orders for inventory because of supply chain inconsistences and dramatically increasing manufacturing lead-times for its products.  As a result of these undisclosed internal conditions, after the IPO and into 2022, the Company was forced to sell its products at higher discounts to clear a glut of excess inventory that resulted from these conditions, driving down the Company's margins and profitability.

8.     After Defendants handsomely profited from the IPO, they continued to mislead investors by failing to disclose the full truth about Torrid's continuing glut of unprocessed inventories and declining margins during the Class Period.  Through a series of partial disclosures beginning in December 2021, investors began to learn the truth about the Company's supply chain and inventory issues as Torrid publicly reported its financial results and the downward trajectory of its gross margins and increasing inventory.  By the end of the Class Period on December 9, 2022, Torrid's stock had declined to $3.35 per share, an 84% fall from the $21 IPO price and the price at which Defendants sold more than $265 million of Torrid stock.

## II.   JURISDICTION AND VENUE

9.     The claims asserted herein arise under §§11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2), and 77(o)), and §§10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder.

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act (15 U.S.C. §77v) and §27 of the Exchange Act (15 U.S.C. §78aa).

11.    Venue is properly laid in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District.

12.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange (the "NYSE").

## III.   SECURITIES ACT CLAIMS

### A.   The Securities Act Parties

#### 1.   Securities Act Plaintiffs

13.    Lead Plaintiff City of Warren Police and Fire Retirement System is a public pension fund in Warren, Michigan, managed by a board of elected and appointed officials, comprising pension and retirement plans for the benefit of the personnel of the Police and Fire Departments of Warren, Michigan, and for the widows and children of such members.  Lead Plaintiff has approximately $275 million in assets under management and hundreds of plan participants.  Lead Plaintiff, as set forth in its certification previously filed with the Court, incorporated by reference herein, purchased or otherwise acquired Torrid common stock during

- 4 -

the Class Period at artificially inflated prices pursuant and/or traceable to the IPO, and was damaged thereby. ECF 15-2.

14. Plaintiff Erika Schroth, as set forth in the attached certification, incorporated by reference herein, purchased or otherwise acquired Torrid common stock at artificially inflated prices pursuant and/or traceable to the IPO, and was damaged thereby.

### 2. Securities Act Defendants

#### a. Torrid and the Individual Defendants

15. Defendant Torrid, a wholly owned subsidiary of Torrid Holdings LLC, is a Delaware corporation headquartered in City of Industry, California. Torrid is a direct-to-consumer brand of women's plus-size apparel and intimates. Torrid common stock trades on the NYSE under the ticker symbol "CURV."

16. Defendant Elizabeth Muñoz was the CEO, President, and a director of Torrid at the time of the IPO. Following the IPO, in May 2022, Torrid announced that defendant Muñoz had resigned as CEO and from the Torrid Board of Directors (the "Board") and was assuming a new role as the Company's Chief Creative Officer. Defendant Muñoz sold approximately $5 million worth of her personal Torrid shares in the IPO.

17. Defendant George Wehlitz was the CFO of Torrid at the time of the IPO. Shortly after the IPO, in December 2021, Torrid announced defendant Wehlitz was retiring, effective May 2022. Defendant Wehlitz sold over $4 million worth of his personal Torrid shares in the IPO.

18. Defendant Stefan L. Kaluzny ("Kaluzny") was a director of Torrid at the time of the IPO. Defendant Kaluzny is a co-founder and Managing Director of defendant Sycamore Partners Management, L.P. As described below, defendant Sycamore sold over $210 million worth of Torrid shares in the IPO through its

4854-9104-7523.v1

subsidiaries and was the Company's controlling shareholder before, during, and after the IPO.

19.    Defendant Dary Kopelioff ("Kopelioff") was a director of Torrid at the time of the IPO.   Defendant Kopelioff is a Managing Director of defendant Sycamore.  As described below, defendant Sycamore sold over $210 million worth of Torrid shares in the IPO through its subsidiaries and was the Company's controlling shareholder before, during, and after the IPO.

20.    Defendant Lisa Harper was a director of Torrid at the time of the IPO and had served as a member of the Company's Board and its predecessor since 2008. Defendant Harper became Torrid's CEO in May 2022, following defendant Muñoz's transition to a different role at the Company.  Defendant Harper sold over $14 million worth of her personal Torrid shares in the IPO.

21.    Defendant Theo Killion ("Killion") was a director of Torrid at the time of the IPO.

22.    The defendants referenced above in ¶¶16-21 are collectively referred to herein as the "Individual Defendants."

**b.    The Underwriter Defendants**

23.    Defendants Morgan Stanley & Co. LLC, BofA Securities, Inc., Goldman Sachs & Co. LLC, Jefferies LLC, Robert W. Baird & Co. Incorporated, Cowen and Company, LLC, William Blair & Company, L.L.C., and Telsey Advisory Group LLC acted as underwriters of the IPO.

24.    The Defendants referenced in ¶23 are referred to herein as the "Underwriter Defendants."

25.    The Underwriter Defendants acted together as an underwriting syndicate and participated in drafting and disseminating the Registration Statement in connection with the IPO.

4854-9104-7523.v1

26. The Underwriter Defendants were responsible for ensuring the completeness and accuracy of the various statements contained in, or incorporated by reference into, the Registration Statement used in connection with the IPO.

27. The Underwriter Defendants participated in the sale of more than $265 million of Torrid common stock to the Class.

28. The Underwriter Defendants collectively received more than $17 million for their participation in the IPO.

### c.   The Sycamore Defendants

29. Defendant Sycamore Partners Management, L.P. is a private equity firm based in New York, specializing in retail, distribution, and consumer investments, with brands like Belk, Express, Ann Taylor, Lane Bryant, The Limited, and Staples, Inc. among its investment portfolio at the time of the IPO. Sycamore acquired Torrid in 2013 and was the majority shareholder of Torrid at the time of the IPO, controlling its operations and any actions requiring approval of Torrid shareholders. Sycamore sold over $210 million of its Torrid common stock shares in the IPO. In connection with IPO, Torrid entered a "Stockholders' Agreement" with Sycamore, entitling Sycamore to nominate a majority of Torrid's Board so long as it maintains its majority share of Torrid common stock. Sycamore continues to be Torrid's controlling, majority shareholder.

30. Defendants Sycamore Partners Torrid, L.L.C., Sycamore Partners, L.P., Sycamore Partners Associates-C, L.P., Sycamore Partners Associates, L.P., Sycamore Partners Associates Investments, L.P., Sycamore Partners (Co-Invest), L.L.C., and Sycamore Partners Associates Co-Invest, L.P. are referred to herein as the "Sycamore Entities." Defendant Sycamore held its investment in Torrid through the Sycamore Entities and sold shares in the IPO through the Sycamore Entities.

31. Each of the Sycamore Entities were controlled, at all times relevant, directly or indirectly by defendant Kaluzny.

- 7 -

32.     Defendant Sycamore and the Sycamore Entities are referred to collectively herein as the "Sycamore Defendants."

33.     Torrid, Individual Defendants, Underwriter Defendants, and Sycamore Defendants are referred to herein, collectively, as "Defendants" or the "Securities Act Defendants."

**B.     Relevant Non-Parties**

     **1.     CW-1**

34.     CW-1 worked at Torrid's Distribution Center from December 2019 until March 2022 as an Inventory Control ("IC") and Audit Specialist. CW-1's role was primarily concerned with database management of inventory and CW-1 was tasked with tracking inventory that was received at the Distribution Center. CW-1 also worked with the Company's Warehouse Management System Administrator to identify and reconcile errors in the Company's warehouse management system ("WMS"). CW-1 had access to the WMS, which included detailed inventory accounting. CW-1 monitored the WMS on a daily basis, sending daily adjustment and error summaries to upper-level management at the Distribution Center as well as various members of management located at the Company's headquarters in City of Industry, California. In addition to CW-1's WMS responsibilities, CW-1 was tasked with creating employee identification cards for each newly arriving employee at the Distribution Center, receiving emails each week with spreadsheets listing employees that needed identification cards.

35.     According to CW-1, in the months leading up to the IPO, Torrid had been late in receiving merchandise orders from its manufacturers and suppliers – in some cases up to three months after scheduled deliveries. CW-1 also reported that before the IPO, inventory flow into the Distribution Center was a constant problem and created increasingly growing customer order backlogs, to the point that millions of customer orders remained unfulfilled, because of the delayed shipments and not

4854-9104-7523.v1

1  enough human resources at the Distribution Center to process the inventory as it was

2  delivered.  At certain points during CW-1's tenure as many 50 or 60 trailers full of

3  unprocessed inventory were parked in the Distribution Center parking lot.  CW-1

4  stated that when the trailer inventory was eventually processed into the Distribution

5  Center, it did not move until promotional activities, including "flash sales," which

6  were limited time sales (*e.g.*, 24 to 48 hours) at deeply discounted prices, were used

7  to sell the inventory.

8      36.    Compounding the effects of the Company's delayed and newly arriving

9  merchandise shipments was high and increasing turnover at the Distribution Center.

10  CW-1 stated that rates of employee turnover – which CW-1 was aware of as CW-1

11  was required to create a new badge for each incoming employee – more than doubled

12  following the IPO, to the point that the Company was hiring roughly 30 to 40 new

13  Distribution Center employees per week.  According to CW-1, the Company was

14  forced to hire "literally everyone," regardless of experience and without imposing

15  basic skills testing or drug testing.  According to CW-1, the high employee turnover

16  rates negatively impacted the performance at the Distribution Center and were

17  occurring at the same time customer order backlogs were growing.  According to

18  CW-1, backlogged orders were taking up to two to three months to fill.

19          **2.    CW-2**

20      37.    CW-2 worked at Torrid's Distribution Center from April 2019 until

21  November 2022.  CW-2 first held the role of Operations Supervisor from February

22  2020 through December 2020, then transitioning to the position of WMS

23  Administrator/IC Supervisor from December 2020 until CW-2's departure in

24  November 2022.

25      38.    As an IC Supervisor, CW-2 oversaw a team that performed daily counts

26  of inventory in the Distribution Center.  These daily counts were designed to ensure

27  that inventory was in the right place and that the Distribution Center conformed to

28  certain targets set by Torrid's corporate office.  CW-2 submitted periodical reports

- 9 -

1  of these counts to employees at Torrid headquarters.  CW-2 also monitored incoming
2  inventory, creating reports called "In-Bound Receiving logs," which were sent
3  periodically to corporate headquarters.  The logs sent to the Company's headquarters
4  included detailed information about the flow of inventory from Torrid's suppliers to
5  the Distribution Center, including the number of trailers received and incoming,
6  whether those trailers had not been processed into the Distribution Center, and
7  identification numbers for those trailers.

8      39.    Following the IPO, Torrid's inventory levels at the Distribution Center
9  had almost doubled and included late deliveries of inventory.  An influx of inventory
10  was delivered later than it had been expected.   The Distribution Center had
11  insufficient capacity to handle these increased levels.   CW-2 reported that because
12  of capacity constraints more than 500,000 units of inventory were stacked on pallets
13  on the floor of the Distribution Center.   In addition there were around 40 truck
14  trailers parked outside with unprocessed inventory.   According to CW-2, a single
15  trailer could hold up to 1,000 cartons.   A carton, on average, held 30 units of
16  inventory.  Thus, while CW-2 stated it was hard to say exactly how many units of
17  inventory the 40 trailers parked outside the Distribution Center accounted for, the
18  units of inventory held in the trailers was potentially over one million.  These trailers
19  would remain un-received for weeks, and in some cases not formally received in the
20  Distribution Center until the following quarter.  CW-2 confirmed that inventory was
21  not formally received until it was unloaded, physically brought into the Distribution
22  Center, and scanned into Torrid's systems.

23      40.    The trailers not being brought into and formally received into the
24  Distribution Center in a timely manner was problematic for the Company, as CW-2
25  stated.  The lack of capacity and delayed deliveries, according to CW-2, prevented
26  the Company from getting ready and being able to receive new seasonal inventory.

27      41.    CW-2 echoed CW-1's account that employee turnover at the
28  Distribution Center was high.  CW-2 noted that the high rates of turnover impacted

4854-9104-7523.v1

the Distribution Center as the Company was constantly having to train new personnel, leading to inventory inaccuracies and errors.  These constant waves of new employees often placed products in the wrong locations, causing further inefficiencies at the Distribution Center

**C.    Factual Allegations**

**1.    Company Background and Information**

42.    Torrid was a plus-size clothing brand sold by its former parent company Hot Topic, Inc., for more than a decade, until the Torrid brand was acquired, along with parent company Hot Topic, by defendant Sycamore in 2013 and became a stand-alone company in March 2015 when it opened its flagship store.

43.    In the years leading up to the IPO, according to Defendants, Torrid was one of the fastest growing direct-to-consumer brands in the plus-size apparel and intimates market, growing net sales at an annual compounded rate of over 8% from 2017 to 2020.

44.    In 2018, Torrid acquired its only distribution facility located in West Jefferson, Ohio (the "Distribution Center"), where Torrid maintains all its inventory.

45.    At the time of the IPO, the Distribution Center managed receipt and storage of the Company's inventory, and sorting, packing and distribution of merchandise for e-Commerce orders and its retail stores.  All of Torrid's e-Commerce order fulfillment was handled at the Distribution Center.  In FY 2020, 70% of Torrid's sales were through e-Commerce.

46.    For Torrid to successfully operate and grow its business (merchandise sales to customers), it was critical that Torrid's Distribution Center have adequate capacity to support the Company's operations and inventory flow.  The Registration Statement assured investors that the Distribution Center was a fully-functional, state-of-the-art facility capable of handling the Company's existing and future needs.

4854-9104-7523.v1

47.     Torrid has certain "Basic" and "Core" products it sells throughout the year and introduces new lines of merchandise (assortments) approximately 16 times per year, which provide a consistent flow of new inventory that helps maintain product freshness, in-stock availability, customer engagement, and repeat business, as well as attracting new customers.  Torrid's merchandise fell into three categories: Basic styles, which were proven silhouettes, in basic colors that were year-around-best-sellers; Core styles, which were seasonal best-sellers with similar silhouettes to the Basic styles; and new products, which leveraged proven silhouettes but had a more dramatic pattern or embellishment.  Torrid's Basic, Core, and new products made up 19%, 67%, and 14% of Torrid's merchandise, respectively.

48.     Torrid's Distribution Center used a WMS, known as Highjump, to track and manage the Company's inventory and order fulfillment.  The WMS had a 25-part Key Performance Indicator ("KPI") dashboard that generated inventory related reports, including inventory valuation reports, and order fulfillment reports, to which Torrid's executives had access.  When new inventory arrived at the Distribution Center, Torrid's standard process for receiving the inventory was to scan the incoming inventory into the WMS so it could be tracked and managed from the time it was scanned through sale.  Most of the newly arrived inventory stock arrived at the Distribution Center in trailer trucks.

49.     At the time of the IPO, approximately 96% of Torrid's merchandise was sourced outside of the United States, primarily from manufacturers in Asia-Pacific.

### 2.    Prior to the IPO, Torrid Abandoned an Earlier IPO Due to Inventory Management Issues

50.     Prior to the IPO, the Company had been experiencing supply chain and inventory problems for years.  In fact, in July 2017 Defendants attempted to take Torrid public and filed a registration statement with the SEC ("2017 Registration Statement"), but because of inventory management problems, Defendants withdrew

4854-9104-7523.v1

the 2017 Registration Statement in April 2019, stating: "The Company believes that the withdrawal of the Registration Statement would be consistent with the public interest and the protection of investors."

51.     In a news article published on the day of Torrid's IPO, the author summarized Muñoz's explanation for Torrid's withdrawal of the 2017 Registration Statement, "Torrid had experienced skyrocketing growth year over year but, as sometimes happens, it had skipped some critical steps that would become important at some point," and "Among other things, the chain had an inventory problem. And its IT functions were still being handled by Hot Topic."[1]

52.     In the article, Muñoz also stated that Defendants withdrew the 2017 Registration Statement because of the inventory management issues, including lack of discipline and an unmanageable depth/breadth of product offerings (identified by stock-keeping-units ("SKUs")).  In the article, Muñoz was quoted, stating:

> We didn't have our head around inventory management.  We had no targets or disciplines around how we acquired inventory.  And as a product person, I felt there was a constant proliferation of SKUs.  So with not having our inventory problem sorted out, and not having all the right leadership in place, we pulled the filing. It just didn't feel like the right time.

53.     Quoting Muñoz, the article also stated that the Company had purportedly implemented the changes needed to correct the inventory management issues and make Torrid the "fully-functioning independent company that it is today," including putting in a new leadership team to deploy core disciplines and targets and reduce SKUs by 20%, which improved margins.

---

[1]     *See* Marianne Wilson, *Exclusive: Torrid CEO sees plenty of room for growth*, Chain Store Age (July 1, 2021), https://chainstoreage.com/exclusive-torrid-ceo-sees-plenty-room-growth.

54.     During the interview, Muñoz also assured investors that "the timing was right this time around for our IPO, both culturally as well as where we are as a company," thereby assuring investors that the Company's operations, specifically inventory management, were no longer presenting problems.

### 3.     Torrid's Data Driven, Low-Risk Merchandising Model

55.     Torrid's IPO took place during the COVID-19 pandemic.  In selling investors on the IPO, Defendants emphasized that Torrid's business model had demonstrated resiliency to COVID-19-related disruptions and allowed the Company to grow sales despite industry-wide supply chain headwinds.  Torrid differentiated itself from other women's plus-size retailers through its focus on a better fitting proprietary product, and through the Company's "data-driven, low-risk merchandising model," claiming both were driving Torrid's growing profits and margins.

56.     Defendants told investors that Torrid's "data-driven, low-risk merchandising model" utilized a robust collection of data from its customer loyalty program to assess sales, market trends and new product development to inform purchasing decisions.  As a result, the Company had the flexibility to react quickly to product performance, make in-season inventory purchasing adjustments and respond to the latest sales trends, all of which lowered inventory risk.

57.     Defendants also told investors that Torrid's low-risk merchandising model utilized a "read-and-react" testing approach, in which it purchased and produced small quantities of a new style before ramping up production in case the product was unpopular, thereby minimizing inventory risk.

58.     Defendants told investors that Torrid's low-risk merchandising strategy allowed the Company to generate approximately 80% of its net sales from products sold at regular price and assured investors that the execution of the low-risk merchandising model drove the Company's substantial growth and healthy gross

4854-9104-7523.v1

1  profit margin performance in the quarters leading up to the IPO and would continue
2  to do so thereafter.

3       59.    Defendants also told investors that another factor in Torrid's impressive
4  pre-IPO growth rates was its enhanced supply chain flexibility, referred to as the
5  "speed model."   Traditionally, the process of bringing new fashion products to
6  market can take months.   The purpose of Torrid's speed model was to drastically
7  reduce this time by using data and technology to make faster decisions and optimize
8  the Company's supply chain to accelerate product replenishment cycles, improve
9  inventory turnover and drive higher margin sales.

10      60.    In fact, Defendants told investors that in response to COVID-19 supply
11 chain issues, the Company implemented initiatives to enhance its speed model to
12 "shorten [its] development cycle by two weeks" through "targeted investments and
13 changes to [its] process to improve the speed and flexibility of [its] supply chain."

14      61.    The Company's IPO Roadshow Presentation reiterated Torrid's
15 claimed resiliency to the COVID-19 related industry disruptions other retailers were
16 experiencing.   Torrid told investors that its "agile" response to COVID-19 before
17 the IPO led the Company to dramatically improve comparable sales in 3Q 2020 to
18 1Q 2021.[2]   While 1Q and 2Q 2020 (February through July 2020) saw negative
19 comparable sales growth ((38%) and (2%), respectively) amidst steep demand
20 declines and temporary store closures due to COVID-19, initiatives implemented by
21 Torrid during COVID-19, including investment in omni-channel offerings and
22 shortened product development cycle ("speed" approach), accelerated comparable
23 sales growth trajectory over the next 3 quarters leading up to the IPO (3Q 2020, 4Q
24 2020, and 1Q 2021): 4%, 8%, and 24% (compared to 1Q 2019 and 108% vs 1Q
25 2020), respectively.

26
27 [2]   As used herein, "Q" means the Company's fiscal quarter and "FY" means the
    Company's fiscal year (e.g., 1Q 2020 means the first fiscal quarter of 2020, and FY
28 2020 mean fiscal year 2020).

4854-9104-7523.v1

62.     Defendants' claims regarding Torrid's data driven, low-risk merchandising model were important to investors.  Following the IPO, analysts from investment research firms initiated coverage on the Company, describing Torrid's data driven, low-risk merchandising model as key to Torrid's stock price valuation moving forward.

63.     For example, analysts from Cowen Equity Research initiated coverage on July 26, 2021, with a rating of "Outperform," citing Torrid's "data-driven merchandising strategy that enables the [C]ompany to read-and-react to consumer demand" thus "decreasing promotional risk," naming Torrid's inventory management systems as among the Company's "top 3 competitive advantages."

64.     Similarly, analysts from Jefferies initiated coverage with a rating of "Buy," also touting Torrid's "sourcing and merchandising model," describing it as, "highly flexible" and "contributing to strong full-price selling."

65.     Analysts from Telsey Advisory Group also initiated coverage with an "Outperform" rating, stating Torrid's "enhanced supply chain flexibility" has positioned the Company for "operating margin expansion as the topline grows."

66.     Analysts from William Blair initiated coverage with a rating of "Outperform" stating: "The [C]ompany's proprietary merchandise model is a key differentiator that sets the [C]ompany apart from other retailers" providing "minimal inventory risk."  William Blair also repeated Torrid's claims that the Company had "swiftly recovered following pandemic-related disruptions."

**4.     Torrid's Receipt of Large Quantities of Inventory Ordered Prior to the IPO but Not Received Until After Due to Severe Shipment Delays Caused a Significant Build-Up of Excess Inventory Throughout the Class Period**

67.     Beginning in late 2020 and continuing to the time of the IPO and after, Torrid was experiencing increased merchandise shipment delays - in some cases up to three months - due to port congestion in Long Beach and Los Angles, and factory closures of its Asia-Pacific manufacturers.  As CW-1 reported, before the IPO,

- 16 -

inventory flow into the Distribution Center was a constant problem.  The delayed shipments, coupled with not enough human resources at the Distribution Center to process the inventory as it was eventually delivered, created increasingly growing customer order backlogs, to the point that millions of customer orders remained unfulfilled in the months before the IPO.  CW-1 confirmed backlogged orders were taking up to 2 to 3 months to fill.

68.     The delayed shipments were also causing Torrid to miss seasonal launches, such as spring/summer, which created excess inventory that either didn't move or could not be sold at full price because it was seasonally stale.  As CW-1 reported, when the delayed inventory was eventually processed into the Distribution Center, it did not sell until promotional activities, including "flash sales," which were limited time sales (*e.g.*, 24 to 48 hours) at deeply discounted prices, were used to move the inventory.

### 5.  Torrid's Abandonment of Its Low-Risk Merchandising Model Exacerbated the Build-Up of Excess Inventory

69.     The inventory issues resulting from the delayed shipments and the Distribution Center's lack of resources, were compounded by the fact that prior to the IPO, Torrid had abandoned its data driven, low risk merchandising model.  In the months leading up to the IPO, lead-time for the manufacture of Torrid's products had dramatically increased, severely limiting Torrid's ability to quickly respond to consumer demand, and forcing Torrid to abandon it low-risk merchandising model in favor of purchasing large quantities of product up front.

70.     Also, at the time of the IPO Torrid was not expanding its assortment of new products, but instead was over positioning itself and exceeding planned merchandise levels for certain styles, including Basics and Core styles and Curve inventory.  Thus, by the time of the IPO, Torrid had completely lost its ability to accurately monitor demand and adjust inventory levels in real-time, to ensure it had the right products on hand to meet customer needs without carrying excess

4854-9104-7523.v1

inventory.  These conditions resulted in Torrid being over-stocked in many of the Company's Basic, Core, and Curve line styles by the time of the IPO and continuing after, the IPO.

71.    Indeed, following the IPO, the impact of abandoning the low-risk merchandising model, including data driven merchandise decisions, read-and-react testing and using the speed model to reduce product development time, was dramatic as Torrid's inventory-to-sales ratio skyrocketed.  By the beginning of 2022, Torrid's inventory had increased 61% from the prior year while sales had only increased 7.81%.  The following charts demonstrate this trend in the quarters following the IPO:



4854-9104-7523.v1

| Torrid – Key Financial Metrics |
|---|
| (Figures in thousands of dollars, except percentages, ratios, and days sales outstanding) |

| Quarter | 2Q'20 | 3Q'20 | 4Q'20 | 1Q'21 | 2Q'21 | 3Q'21 | 4Q'21 | 1Q'22 | 2Q'22 | 3Q'22 |
|---|---|---|---|---|---|---|---|---|---|---|
| Inventory | 128,139 | 131,100 | 105,843 | 111,929 | 110,330 | 159,499 | 170,608 | 178,831 | 180,738 | 199,877 |
| Revenue | 249,226 | 270,129 | 308,338 | 325,747 | 332,870 | 306,241 | 332,413 | 328,409 | 340,876 | 290,034 |
| Cost of Revenue | 169,245 | 174,601 | 183,834 | 180,815 | 183,150 | 181,094 | 214,767 | 203,263 | 222,030 | 198,263 |
| Gross Profit | 79,981 | 95,528 | 124,504 | 144,932 | 149,720 | 125,147 | 117,646 | 125,146 | 118,846 | 91,771 |
| Gross Margin | 32.10% | 35.40% | 40.40% | 44.50% | 45% | 40.90% | 35.40% | 38.10% | 34.90% | 31.60% |
| Inventory Turnover Ratio | 1.388 | 1.418 | 1.526 | 1.682 | 1.63 | 1.592 | 1.231 | 1.271 | 1.103 | 1.077 |
| Days Sales of Inventory | 67.7 | 67.6 | 58.6 | 54.8 | 55.2 | 67.8 | 69.9 | 78.2 | 73.7 | 87.3 |
| Inventory-to-Sales Ratio | 0.5 | 0.5 | 0.4 | 0.3 | 0.3 | 0.4 | 0.5 | 0.5 | 0.5 | 0.7 |

**6.    Torrid's IPO**

72.    On June 7, 2021, Torrid publicly filed a registration statement on Form S-1 with the SEC in connection with the planned sale of Torrid common stock.

73.    On June 23, 2021, Torrid announced the launch of the Company's roadshow.  To raise interest in Torrid stock in the week leading up to the IPO, Torrid and the Underwriter Defendants made presentations to investors (the "Roadshow") using a prepared slide deck (the "Roadshow Presentation") that pitched the Company, including its past and projected financial performance.

74.    Following two amendments, the registration statement was deemed effective on June 30, 2021 (collectively referred to as "Registration Statement"), and was then used to sell more than $265 million of Torrid common stock in Torrid's July 1, 2021 IPO.

75.    Torrid's IPO, however, did not serve the usual purpose of an initial public offering – raising money for the issuing business, to fund continued operations, potential growth, or strategic transactions.  In fact, while Torrid paid at least $6 million in costs related to the IPO, Torrid did not make any money at all from the IPO of its common stock.  Rather, each of the 12,650,000 shares of Torrid

- 19 -

common stock sold in the IPO were sold by insiders, including current and former members of the Board and Company executives, and its parent company Sycamore. More than 10.8 million of those shares were sold by Defendants to this action, netting Defendants more than $230 million in proceeds.

### D. False and Misleading Statements and Omissions Made in Connection with the IPO[3]

#### 1. False and Misleading Statements and Omissions Regarding the Company's Data-Driven, Low-Risk Merchandising Model

76.    The Roadshow Presentation repeated the Company's false statements regarding its purported nimble merchandising model.  Defendants called the Company's "***[d]ata-[d]riven, [l]ow-[r]isk [m]erchandising [m]odel***" one of the IPO's "Investment Highlights."  Defendants also referred to the Company's merchandising model as "***highly responsive***" and promoted the "***read-and-react testing approach***" in their pitch to investors.

77.    Throughout the Registration Statement, Defendants touted Torrid's "[d]ata-[d]riven, [l]ow-[r]isk merchandising [m]odel," emphasized its importance to Torrid's success, and represented that the Company's strategies were working as planned:

> ***We employ a data-driven approach to design, merchandising and inventory planning and allocation to deliver high quality products . . . .  We leverage this robust customer data along with market trends to inform all purchasing decisions.  Through our vertical sourcing model, we have the flexibility to respond quickly to the latest sales trends and make adjustments to our current offering based on customer feedback to deliver product our customer wants***.

---

[3]    Plaintiffs assert that all of the statements set forth below that are bolded and italicized were materially false and or misleading for the reason set forth therein. Non-bolded and non-italicized statements are included for context.

78.     The Registration Statement claimed that as part of the low-risk merchandising model, the Company's "read-and-react testing approach" was being utilized and was "minimizing fashion and inventory risk" among the Company's new product offerings, stating:

> *Further, we utilize a read-and-react testing approach with shallow initial buys to iterate our New product offering, thus minimizing fashion and inventory risk.  Our merchandising strategy has enabled us to generate approximately 80% of our net sales from products sold at regular price, which we define as products sold at initial ticket price or with a standard marketing promotion (e.g., "Buy One Get One 50% Off").  We believe our data-driven approach will continue to drive market growth and market share gains with our rapidly growing and underserved customer base*.

79.     The Registration Statement also told investors that Torrid had:

> *[A] rigorous discipline around inventory performance by establishing clear guidelines on in-season product performance, item-level assortment planning and formal product hindsight reviews.  As we have executed on these [merchandise] strategies, we have seen substantial growth across all major product categories, as shown in the graph below, and healthy gross profit margin performance.  Our disciplined planning and product lifecycle management strategies enable effective in-season inventory management to maximize inventory turn and productivity.  Through these practices, we are able to limit markdowns, which we define as permanent price reductions, allowing us to maximize our gross profit margin*.

80.     The Registration Statement also called investors' attention to the Company's "Enhanc[ed] Supply Chain Flexibility" as a result of the "speed model"

4854-9104-7523.v1

which purportedly allowed the Company to "*accelerate product replenishment cycles, improve inventory turnover and drive higher margins sales*."

81.     The Registration Statement discussed in detail the potential risks and harms associated with Torrid's potential failure to successfully implement its data-driven merchandise management systems.  The items listed merely as "Risk Factors" in the Registration Statement included the following:

> *Inventory levels for certain merchandise styles may exceed planned levels*, leading to higher markdowns to sell through excess inventory and, therefore, lower than planned margins.  Conversely, *if we underestimate consumer demand for our merchandise, or if our manufacturers fail to supply quality products in a timely manner, we may experience inventory shortages*, which may negatively impact customer relationships, diminish brand loyalty and result in lost sales.

*     *     *

> *If the distribution facilities servicing our business were to encounter difficulties . . . we could face shortages of inventory in our stores, delayed shipments to our e-Commerce customers* and harm to our reputation.

82.     The statements detailed in ¶¶76-81 regarding Torrid's data-driven, low-risk merchandising model, were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts:

(a)     Beginning in late 2020 and continuing to the time of the IPO and after, Torrid was experiencing increased merchandise shipment delays – in some cases up to three months – due to port congestion in Long Beach and Los Angeles, and factory closures of its Asia-Pacific manufacturers.  As CW-1 reported, before the IPO, inventory flow into the Distribution Center was a constant problem.  The delayed shipments, coupled with not enough human resources at the Distribution

- 22 -

Center to process the inventory as it was eventually delivered, created increasingly growing customer order backlogs, to the point that millions of customer orders remained unfulfilled in the months before the IPO.  CW-1 confirmed backlogged orders were taking up to 2 to 3 months to fill.

(b)     The delayed shipments were also causing Torrid to miss seasonal launches, such as spring/summer, which created excess inventory that either didn't move or could not be sold at full price because it was seasonally stale.  As CW-1 reported, when the delayed inventory was eventually processed into the Distribution Center, it did not sell until promotional activities, including "flash sales," which were limited time sales (*e.g.*, 24 to 48 hours) at deeply discounted prices, were used to move the inventory.

(c)     Because of these conditions, the Company had to abandon it's low-risk merchandising model and was unable to make data driven merchandise decisions, perform read-and-react testing on its products, or use its speed model to reduce product development time in the months leading to the IPO.

(d)     As a result of the loss of these capabilities, Torrid was purchasing large quantities of product upfront and exceeding planned merchandise levels, which left the Company unable to quickly respond to customer demand; and this resulted in the Company not having the right products on hand to meet consumer demand and a build-up of excess, stale and obsolete seasonal inventory that was not selling.

## 2.     False and Misleading Statements and Omissions Regarding the Distribution Center

83.     The Registration Statement also falsely claimed the Distribution Center had sufficient capacity to "***handl[e] our existing and future needs***" and facilitate continued growth:

We acquired the operations of the fully-functional, ***state-of-the-art distribution center*** in West Jefferson, Ohio in 2018.  This 750,000 square foot facility is highly automated and we believe is ***capable of***

- 23 -

1  *handling our existing and future needs*.   Additionally, the West

2  Jefferson facility is . . . continuing to drive efficient online returns and

3  position us to execute on our unified commerce strategy.

4  84.   The statements detailed in ¶83 regarding Torrid's Distribution Center,

5  were materially false and/or misleading or omitted material information necessary

6  to make them not misleading based on the following facts:

7  (a)   At the time of the IPO, the Distribution Center lacked the storage

8  capacity and human resources to timely process the large volume of incoming

9  inventory Torrid was receiving in the months leading up to the IPO.  As a result of

10  these constraints, shipments of incoming inventory was not being timely processed

11  created increasingly growing customer order backlogs, to the point that millions of

12  customer orders remained unfulfilled in the months before the IPO.   CW-1

13  confirmed backlogged orders were taking up to 2 to 3 months to fill.

**3.   False and Misleading Statements and Omissions**
**Regarding the Company's Response to and the**
**Impact on the Company of the COVID-19 Pandemic**

16  85.   The Roadshow Presentation, on a slide highlighting the Company's

17  "accelerating margin profile" and "rapid profitability and earnings growth," told

18  investors the Company's success had showed its ***strong resiliency amid the***

19  ***COVID-19 pandemic***."   In a slide dedicated solely to touting the Company's

20  response to the pandemic, Defendants stated that Torrid had implemented "key

21  initiatives" during that time, including developing a "***shortened product***

22  ***development cycle***."   Defendants also told investors that the Company's "***agile***

23  ***response to COVID led to sequential improvement in comp sales growth***."

24  86.   The Registration Statement acknowledged the past impacts the

25  COVID-19 pandemic had on Torrid's sales and supply chain.   However, the

26  Registration Statement portrayed Torrid as being effectively out of the woods as

27  related to any related impacts on its business.   Specifically, the Registration

28  Statement included the claim that "[i]n response to the COVID-19 pandemic, ***Torrid***

- 24 -

1    *proactively implemented various initiatives* with a focus on ensuring the health and
2    safety of employees and customers, *minimizing the financial impact of COVID-19*
3    and continuing to build the foundation for future growth and profitability."

4        87.    The Registration Statement also stated that in response to COVID-19
5    disruptions, Torrid had made changes to its speed model for product development,
6    telling investors that the Company "*[m]ade targeted investments and changes to*
7    *our process to improve the speed and flexibility of our supply chain including*
8    *shortening our development cycle by two weeks*."

9        88.    Similarly, the Registration Statement stated that the Company was
10   taking further steps to reduce promotional activity and drive higher margins, by
11   "*[l]everag[ing] data analytics and insights to tailor marketing and promotional*
12   *strategies in response to consumer behavior changes related to the ongoing*
13   *COVID-19 pandemic*."

14       89.    The Registration Statement further represented that investors could
15   expect declines in earnings as a result of the COVID-19 pandemic to reverse, stating
16   "[i]n 2020, Adjusted EBITDA declined 24% year-over-year to $101 million driven
17   by *temporarily lower gross profit margin* and fixed cost deleverage as a result of
18   the challenges presented by COVID-19."  According to Defendants, Torrid had
19   recovered, and "[b]y May 2020, net sales growth began to rebound," demonstrating
20   "the strong inherent demand for [the Company's] differentiated product and the
21   *resiliency of [its] business model*."

22       90.    The statements detailed in ¶¶85-89 regarding Torrid's supply chain
23   enhancements in responses to COVID-19, were materially false and/or misleading
24   or omitted material information necessary to make them not misleading based on the
25   following facts:

26       (a)    At the time of the IPO Defendants failed to disclose that the
27   Company had already abandoned its data driven, low-risk merchandising strategy.
28   Moreover, because of supply chain inconsistencies and increasing manufacture lead

- 25 -

times Torrid was increasing purchase orders of its product to ensure sufficient stock on-hand, and exceeding planned merchandise levels for certain styles, including Basic and Core styles, creating a glut of inventory.  To rid itself of the excess inventory the Company was forced to use site-wide and broad-based promotions and flash sales, rather than a tailored promotional strategy, which negatively impacted the Company's revenues, and gross margins.

### E.  Omissions Based on Violations of Items 105 and 303 of Regulation S-K

91.   In addition to misstatements and omissions set forth above in ¶¶76-81, 83, 85-89, the Registration Statement was materially false and misleading when issued because it failed to disclose material information that was required to be disclosed pursuant to the regulations governing its preparation.

92.   Specifically, Item 105 required the Registration Statement to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. §229.105(a).  Although the Registration Statement included a discussion of risk factors, that discussion was materially incomplete and therefore misleading.  In addition, Item 303 required the Registration Statement to "[d]escribe any known trends or uncertainties that have had or that [the Company reasonably expects are] likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §229.303(b)(2)(ii).

93.   In negligent violation of Item 105 and Item 303, the Registration Statement failed to disclose the significant problems with Torrid's supply chain and inventory management at the time of the IPO, specifically, that: (a) because of delayed manufacturer shipments, increased manufacturer lead-times and supply chain inconsistencies, Torrid was unable to make data driven merchandise decisions, perform read-and-react testing on its products, or use its speed model to reduce product development time; (b) as a result of the loss of these capabilities, Torrid was

- 26 -

1  purchasing large quantities of product upfront and exceeding planned merchandise

2  levels, which left the Company unable to quickly respond to customer demand; and

3  resulted in the Company not having the right products on hand to meet consumer

4  demand and a build-up of excess, stale and obsolete seasonal inventory; and (c) the

5  delayed shipments were also causing Torrid to miss seasonal launches, such as

6  spring/summer, which also created excess inventory that either didn't move or could

7  not be sold at full price because it was seasonally stale.  When the delayed inventory

8  was eventually processed into the Distribution Center, it did not sell until

9  promotional activities, including "flash sales," which were limited time sales (*e.g.*,

10 24 to 48 hours) at deeply discounted prices, were used to move the inventory.

11     94.    As result of the foregoing, after the IPO, Torrid's inventory levels rose

12 dramatically and gross margins dramatically decreased.  The Company's inventory

13 management and supply chain issues were known to management, presented

14 uncertainty, and made investment in Torrid speculative and risky.   This is

15 particularly so since Torrid is an apparel company, and as such, having both the right

16 amount and type of product to meet customer demand is vital to the Company's

17 success; failure to do so would, and did, compromise Torrid's financial performance.

18     **F.**    **Securities Act Counts**

19 **COUNT I**

20 **Violations of §11 of the Securities Act**<br>**(Against All Defendants)**

21

22     95.    Plaintiffs incorporate ¶¶1-94 as though fully set forth herein.  Plaintiffs

23 also exclude allegations that could be construed as alleging fraud or intentional

24 misconduct, as this Count is based solely on claims of strict liability and/or

25 negligence.

26     96.    By reason of the conduct herein alleged, each defendant named in this

27 Count violated §11 of the 1933 Act.

28

- 27 -

97.   For all the reasons set forth above in ¶¶82, 84, 90, the Registration Statement contained untrue statements of material fact and omitted material facts necessary to make the statements made therein not false or misleading.

98.   On July 1, 2021, Torrid conducted its IPO pursuant to SEC Form S-1 which Torrid filed publicly with the SEC on June 7, 2021 and, after several amendments, was declared effective on or about June 30, 2021.

99.   Plaintiffs purchased Torrid common stock pursuant and/or traceable to the Registration Statement.

100.   Torrid is the registrant for the IPO.  As issuer of the common stock, Torrid is strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

101.   In the exercise of reasonable care, each of the Defendants named herein, should have known of the misstatements and omissions contained in the Registration Statement as set forth above at ¶¶76-81, 83, 85-89.

102.   Each of the Individual Defendants either signed and/or was involved in preparing the Registration Statement.

103.   None of the Individual Defendants conducted a reasonable investigation or possessed reasonable grounds to believe that the Registration Statement did not contain untrue statements of material fact or omit material facts necessary to make the statements made therein not false or misleading.

104.   The Underwriter Defendants served as underwriters of the IPO.  The Underwriter Defendants did not conduct a reasonable investigation or possess reasonable grounds to believe that the Registration Statement did not contain untrue statements of material fact or omit material facts necessary to make the statements made therein not false or misleading.

105.   Plaintiffs and the other members of the Class who purchased Torrid common stock pursuant or traceable to the Registration Statement sustained substantial damages in connection therewith.

- 28 -

106.   Less than one year has elapsed since Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time this action was commenced.

## COUNT II

### Violation of §12(a)(2) of the Securities Act
### (Against All Defendants)

107.   Plaintiffs incorporate ¶¶1-106 as though fully set forth herein. Plaintiffs also exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

108.   This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Torrid common stock in and pursuant to the IPO and who were damaged thereby.

109.   By reason of the conduct alleged herein, the Defendants violated §12(a)(2) of the Securities Act.  The Registration Statement, and the Prospectus incorporated therein, and oral communications made by Defendants in connection with the IPO contained untrue statements of material fact, and omitted material facts necessary to make the statements made therein not misleading as detailed above at ¶¶76-90.

110.   Each of the Defendants offered or sold Torrid common stock by means of the Registration Statement and the Prospectus incorporated therein.

111.   Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Registration Statement and the Prospectus incorporated therein at the time it acquired the Company's shares.

4854-9104-7523.v1

112.   Class members who hold such common stock have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the Defendants named herein.  Class members who have sold their shares of common stock seek damages to the extent permitted by law.

### COUNT III

**Violations of §15 of the 1933 Act**
**(Against the Individual Defendants and Sycamore Defendants)**

113.   Plaintiffs incorporate ¶¶1-112 as though fully set forth herein. Plaintiffs also exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

114.   By reason of the conduct alleged herein, the Individual Defendants and the Sycamore Defendants violated §15 of the Securities Act.  Each of the Individual Defendants and Sycamore was a control person of Torrid by virtue of his or her position as an owner, director and/or senior officer of Torrid.

115.   The Individual Defendants and the Sycamore Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or were major shareholders of Torrid.

116.   As detailed in ¶29, Sycamore is Torrid's largest shareholder and controlled Torrid at the time of the IPO.  Sycamore possessed control over Torrid and the Individual Defendants by and through its holdings in Torrid common stock, which Sycamore held through the Sycamore Entities.  The Sycamore Defendants individually and collectively possessed control over Torrid and the Individual Defendants.

117.   Each of the Individual Defendants and Sycamore Defendants was a participant in the violations of §§11 and 12(a)(2) of the 1933 Act alleged in the Counts above, based on their having signed or authorized the signing of the

4854-9104-7523.v1

Registration Statement and having otherwise participated in the process by which the IPO was completed.

## IV.   EXCHANGE ACT CLAIMS

### A.   The Exchange Act Parties

#### 1.   Exchange Act Plaintiffs

118.   Lead Plaintiff City of Warren Police and Fire Retirement System is a public pension fund in Warren, Michigan, managed by a board of elected and appointed officials, comprising pension and retirement plans for the benefit of the personnel of the Police and Fire Departments of Warren, Michigan, and for the widows and children of such members.   Lead Plaintiff has approximately $275 million in assets under management and hundreds of plan participants.   Lead Plaintiff, as set forth in its certification previously filed with the Court, incorporated by reference herein, purchased or otherwise acquired Torrid common stock during the Class Period, at artificially inflated prices and was damaged thereby.  ECF 15-2.

119.   Plaintiff Erika Schroth, as set forth in the attached certification, incorporated by reference herein, purchased or otherwise acquired Torrid common stock during the Class Period at artificially inflated prices and was damaged thereby.

#### 2.   Exchange Act Defendants

120.   Defendant Torrid is a direct-to-consumer brand of women's plus-size apparel and intimates.  Torrid's common stock trades on the NYSE under the ticker symbol "CURV."  As of March 22, 2023, the Company had more than 103 million shares of common stock issued and outstanding.

121.   Defendant Muñoz was the CEO, President, and a director of Torrid at the time of the IPO and during the Class Period until May 2022, when Torrid announced that Muñoz had resigned as CEO and from the Board.

122.   Defendant Wehlitz was Torrid's CFO at the time of the IPO and during the Class Period until Wehlitz retired, effective May 2022.

- 31 -

4854-9104-7523.v1

123.   Defendant Kaluzny was a director of Torrid at the time of the IPO. Defendant Kaluzny is a co-founder and a Managing Director of defendant Sycamore.

124.   Defendant Kopelioff was a director of Torrid at the time of the IPO. Defendant Kopelioff is a Managing Director of defendant Sycamore.

125.   Defendant Harper was a director of Torrid at the time of the IPO and became Torrid's CEO in May 2022, holding that role during the Class Period, following defendant Muñoz's transition to a different role at the Company.

126.   Defendant Sycamore Partners Management, L.P. is a private equity firm based in New York, specializing in retail, distribution, and consumer investments

127.   The defendants referenced above in ¶¶121-125 are collectively referred to herein as the "Individual Exchange Act Defendants."

128.   Torrid, the Individual Exchange Act Defendants, and Sycamore are referred to herein, collectively, as "Defendants" or the "Exchange Act Defendants."

**B.     Defendants' False and Misleading Statements and
         Omissions During the Class Period**

**1.     Torrid's IPO Registration Statement**

129.   Plaintiffs incorporate by reference all of the allegations contained above in ¶¶1-128, as each of the statements and omissions that rendered the Registration Statement and Torrid's IPO Roadshow Presentation materially false and misleading also give rise to liability under the Exchange Act against the Exchange Act Defendants.  Each of the statements and omissions described were knowingly or recklessly false and misleading when made by the Defendants as set forth in ¶¶82, 84, 90.

130.   As set forth below, following the IPO, Defendants continued to mislead investors about the Company's inventory and supply chain issues.  Plaintiffs assert that all statements set forth below that are bolded and italicized were materially false

- 32 -

and or misleading for the reasons set forth therein.  Non-bolded and non-italicized statements are included for context.

## 2. 2Q 2021 Form 10-Q and Earnings Call

131.   On September 8, 2021, after the market closed, Torrid announced its 2Q 2021 results on SEC Form 10-Q signed by defendants Muñoz and Wehlitz.

132.   In the 2Q 2021 SEC Form 10-Q, Defendants continued to tout the Company's data driven, low-risk merchandise model, stating in relevant portion:

> ***Our strategy is built around a consistent and stable base of core products*** that provide our customer with year round style.  At the same time, we introduce new lines of merchandise approximately 16 times per year, thus ***providing a consistent flow of fresh merchandise*** to keep our customer engaged, encourage repeat business and attract new customers.  ***We employ a data-driven approach to design and product development, proactively and quickly incorporating sales and operational performance information*** alongside customer feedback from thousands of product reviews.

133.   On the same day Defendants hosted an investor conference call to discuss the Company's 2Q 2021 results ("2Q 2021 Earnings Call").

134.   The 2Q 2021 Earnings Call was Torrid's first earnings call as a publicly traded company.  During the 2Q 2021 Earnings Call, Defendants reported strong 2Q 2021 financial results and better than expected sales and adjusted EBITDA guidance for 3Q 2021 and FY 2021, signaling to investors a continuation of the growth momentum Torrid experienced in the first half of 2021 into the second half of 2021, despite supply chain challenges the retail industry was facing.

135.   During the 2Q 2021 Earnings Call Wehlitz reported that Torrid's gross margins for 2Q 2021 had increased from the prior year due to less mark-downs in the quarter, stating:

4854-9104-7523.v1

*Gross profit in the second quarter was $150 million or 45% of net sales compared to $80 million or 32.1% of net sales in the second quarter of 2020 and $103 million or 39.8% of net sales in the second quarter of 2019*.  This nearly 1,300 basis point expansion in our gross profit rate from the prior year was primarily due to an improved product margin resulting from less discounting during the quarter as compared to the prior year.  Our gross profit also benefited from leveraging distribution expenses, store occupancy costs and store depreciation expenses.

136.   With regard to the Company's guidance for 3Q 2021 and FY 2021, Wehlitz also told investors that:

*For the third quarter, we expect net sales to be between $305 million to $350 million and adjusted EBITDA to be between $47 million and $52 million.  Our guidance assumes more modest gross margin expansion than we delivered in the second quarter, reflecting current trends as well as anticipated impact of supply chain challenges. . . .*

*For fiscal 2021, we expect net sales between $1.29 billion to $1.3 billion and adjusted EBITDA between $248 million and $258 million.  This assumes gross margin pressures in the back half of the year from the supply chain challenges, as I previously referred to*.

137.   While Company guidance assumed gross margin pressures in the second half of 2021, analysts following the Company still viewed this guidance as better than expected.  For example, analysts Telsey Advisory Group wrote on September 9, 2021 that Torrid had given investors "Better-Than-Expected FY2021 Guide," and commented that the Company's "[t]hird quarter guidance [was] above expectations."  Analysts from BofA Securities stated: "Select price increases should offset supply chain costs."  Jefferies analysts called the guidance "robust," adding,

- 34 -

"the [Company] was able to guide well-ahead of cons[ervative]/previous plan." Analysts from William Blair echoed this sentiment, writing that Torrid's third quarter guidance was "7% ahead of the consensus estimate."

138.   During the 2Q 2021 Earnings Call Muñoz reiterated that Torrid's data driven, low risk merchandising model was continuing to allow the Company to quickly respond to customer demand and still remained an effective strategy for growing the business and maintaining gross margins, stating:

> *[O]ur data-driven low-risk merchandising model helps us provide a broad assortment of proprietary products with a distinct style*, and we provide them when and where she wants them.  *Our flexible operating model allows us to quickly read and react to our customers' preferences* and to consistently meet her needs for great-fitting quality product at a tremendous value.   Our close relationships with our customers provide us with constant valuable feedback that we deploy to continually provide her with the things she needs and wants.
>
> We further leverage this feedback and our extensive fit capabilities to expand into categories that drive high loyalty, such as blue jeans, bras, swim and shoes.   *The effectiveness of our merchandising strategy is illustrated by our ability to grow our business across all of our categories year after year as well as by our consistently high penetration of regular-priced sell-throughs at over 80% of our total sales and also supported by our wildly low 9% return rate*.

139.   The statements detailed in ¶¶131-136, 138 were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts:

(a)    Defendants failed to disclose that prior to the IPO, Torrid was forced to abandoned its data driven, low risk merchandising model because it was

suffering from supply chain inconsistencies, inventory shipment delays, increasing manufacturer lead times, and that because of these conditions, Torrid was unable to make data driven merchandise decisions, perform read-and-react testing on its products, or use its speed model to reduce product development during the Class Period.

(b)   As a result of the loss of these capabilities, during the Class Period Torrid was purchasing large quantities of product upfront and exceeding planned merchandise levels, which left the Company unable to quickly respond to customer demand; and this resulted in the Company not having the right products on hand to meet consumer demand and a build-up of excess, stale and obsolete seasonal inventory.

(c)   As CW-2 confirms, delayed inventory shipments continued to increase Torrid's inventory levels following the IPO, almost doubling them and that the Distribution Center lacked sufficient capacity and staffing to handle these inventory increases.   CW-2 confirmed that during the Class Period, as the Distribution Center was overflowing with inventory, trailers full of un-received inventory sat in the Distribution Center parking lot.   These trailers would remain un-received for weeks, and in some cases not formally received in the Distribution Center until the following quarter.   As CW-2 reported, inventory was not formally received until it was unloaded, physically brought into the Distribution Center, and scanned into Torrid's systems.   CW-2 confirmed that the Distribution Center's lack of capacity and staffing prevented the Company from getting ready for new product launches being able to receive new seasonal inventory.

(d)   The delayed shipments were also causing Torrid to miss seasonal launches during the Class Period, which created excess inventory that either didn't move or could not be sold at full price because it was seasonally stale.   As CW-1 reported, when the delayed inventory was eventually processed into the Distribution Center, it did not sell until promotional activities, including "flash sales," which

- 36 -

were limited time sales (*e.g.*, 24 to 48 hours) at deeply discounted prices, were used to move the inventory.

**C.    The Truth Is Revealed over Several Partially Corrective Disclosures, While Defendants Continue to Mislead Investors**

**1.    3Q 2021 Form 10-Q and Earnings Call**

140.   On December 8, 2021, after the market closed, Torrid announced its 3Q 2021 results on SEC Form 10-Q signed by defendants Muñoz and Wehlitz.

141.   The SEC Form 10-Q, echoed the Company's prior filing as to Torrid's proprietary inventory management systems, repeating verbatim the 2Q 2021 SEC Form 10-Q:

> ***Our strategy is built around a base of core products*** that provide our customer with year round style.  At the same time, we introduce new lines of merchandise approximately 16 times per year, thus ***providing a consistent flow of fresh merchandise*** to keep our customer engaged, encourage repeat business and attract new customers.  ***We employ a data-driven approach to design and product development, proactively and quickly incorporating sales and operational performance information*** alongside customer feedback from thousands of product reviews.  We engage in ongoing dialogue with customers through social media and customer surveys.  ***Shifts in inventory levels may result in fluctuations in the amount of regular price sales, markdowns, and merchandise mix, as well as gross margin***.

142.   On the same day, Defendants hosted an investor conference call to discuss the Company's 3Q 2021 results ("3Q 2021 Earnings Call").  During the 3Q 2021 Earnings Call Defendants' reported better-than-expected 3Q 2021 EPS, with Wehlitz confirming that 3Q margins were "***primarily driven by reduced promotional activity*** and pricing initiatives."  Wehlitz also disclosed that 3Q sales came in at the low end of guidance due to inventory delays.  Defendants also

- 37 -

4854-9104-7523.v1

disclosed that the Company was narrowing its 4Q 2021 and FY 2021 guidance due to inflation headwinds (including air freight) and continued inventory delays in 4Q.

143.   During the 3Q 2021 Earnings Call Defendants continued to make materially false and misleading statements and omissions that served to buffer the impact of Torrid's mixed 3Q 2021 results and maintained the artificial inflation in the price of Torrid's stock.  Specifically, during the call, Defendants lead investors to believe the Company was: (i) still using its low-risk merchandising model to manage inventory risk; (ii) taking proactive measures to mitigate supply chain pressures that would benefit the Company in the upcoming quarters; (iii) using promotions strategically in 4Q and not as a means to rid the Company of excess or non-moving inventory; and (iv) that Defendants were very comfortable with the Company's inventory levels.

144.   On the 3Q 2021 Earnings Call, Muñoz assured investors that Torrid was successfully navigating the industry supply chain challenges with its "***powerful and nimble operating model***" of which the Company's low-risk merchandising model was a key component.  Muñoz, however, again failed to disclose that Torrid had already abandoned that model, and as a result Torrid had placed orders that exceeded demand, resulting in a glut of inventory that would have to cleared out through deep promotions and discounts.  Muñoz also eased investor concerns by stating:

> ***We have strong long-term vendor relationships and a diversified manufacturing base, and we are working closely with our partners to mitigate the current challenges.  Our priority is getting our products into the U.S. and specifically into our customers' hands in addition to managing the costs associated with these deliveries.  As always, we are focused on delivering for our customer and meeting her needs despite the current operating environment.  While we expect supply chain headwinds to continue at least into the first half of 2022, we are***

- 38 -

1    *successfully navigating the current environment and our underlying*
2    *operating model remains strong*.

3    145.   On the 3Q 2021 Earnings Call Wehlitz also assured investors they were
4    taking aggressive steps to mitigate supply chain pressures, stating:

5          *We are closely monitoring the situation and continuing to take*
6    *proactive measures to mitigate the impact, including selectively air*
7    *freighting goods and placing orders earlier as well as offsetting some*
8    *of the associated cost pressures by consolidating fabric orders and*
9    *selectively increasing prices.  While we are taking proactive measures*
10   *to manage our supply chain, many of these initiatives will not begin*
11   *to benefit until starting early next year*.

12   146.   During the 3Q 2021 Earnings Call, Defendants also eased investor
13   concerns about the reasons for higher promotional activity in 4Q 2021.  In response
14   to analyst questions about what the level and type of promotional activity investors
15   could expect from Torrid in 4Q 2021, both Wehlitz and Muñoz told investors that
16   Torrid's increased 4Q promotional activity was "*very strategic*" due to events such
17   as Black Friday and Cyber Monday and used as a "*customer engagement tool*,"
18   assuring analysts that the promotional activity was not to clear excess or non-moving
19   inventory.  On the call defendants stated:

20          [Wehlitz:] *In Q4 specifically, in general for Q4, the promotional*
21   *activity is higher.  Again, we don't necessarily play the same seasonal*
22   *issues that other retailers have but we do have to play in the arena of*
23   *Black Friday and Cyber Monday events.  That promotional activity is*
24   *typically deeper, and that does bring down the – that increase the*
25   *promotional rate for that quarter compared to other quarters*.  But it's
26   not a new anomaly for us as we're having to play with the bigger and
27   broader macro issues there.  And then from a promotional standpoint,
28   in general, we do use it, as we've said, more of a customer engagement

- 39 -

tool and really trying to keep her engaged along the way in that journey of what we're doing.  So Liz, will you add to that?

\*     \*     \*

[Wehlitz:] *[R]elated to the promotions a bit for Q4.  So yes, we'll selectively look at the promotions related to truly seasonal goods.  But I think we're very happy with our – as we're getting our inventory and how we're positioning ourselves as we go into Q1, and being very strategic about how we're doing promotions to try to make sure that we're mitigating as much as that product as possible that might have a shorter shelf life as far as seasonal goods.*

\*     \*     \*

[Muñoz:] *I think it's just important to get that point across, and George made it that we use promotions in a different way.  We don't necessarily use promotions to drive product that's not working or things like that.  We use them as an engagement tool.*

147.   During the 3Q 2021 Earnings Call, Wehlitz also assured investors that Defendants had adequate inventory levels going into 4Q 2021, stating:

> *Inventory at the end of the quarter was $159 million compared to $124 million last year and $140 million in the third quarter of 2019. Excluding in-transit levels, our inventory was slightly down from prior year.  Although our available inventory is modestly below optimal levels, we took measures to air freight and feel very comfortable with the adequate inventory levels to meet the consumer demand that is reflected in our fourth quarter forecast.*

148.   Defendants' statements detailed in ¶¶141-142, 144-147 were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts:

- 40 -

(a)      Defendants failed to disclose that prior to the IPO, Torrid was forced to abandoned its data driven, low risk merchandising model because it was suffering from supply chain inconsistencies, inventory shipment delays, increasing manufacturer lead times, and that because of these conditions, Torrid was unable to make data driven merchandise decisions, perform read-and-react testing on its products, or use its speed model to reduce product development during the Class Period.

(b)      As a result of the loss of these capabilities, during the Class Period Torrid was purchasing large quantities of product upfront and exceeding planned merchandise levels, which left the Company unable to quickly respond to customer demand; and this resulted in the Company not having the right products on hand to meet consumer demand and a build-up of excess, stale and obsolete seasonal inventory.

(c)      As CW-2 confirms, delayed inventory shipments continued to increase Torrid's inventory levels following the IPO, almost doubling them and that the Distribution Center lacked sufficient capacity and staffing to handle these inventory increases.   CW-2 confirmed that during the Class Period, as the Distribution Center was overflowing with inventory, trailers full of un-received inventory sat in the Distribution Center parking lot.   These trailers would remain un-received for weeks, and in some cases not formally received in the Distribution Center until the following quarter.   As CW-2 reported, inventory was not formally received until it was unloaded, physically brought into the Distribution Center, and scanned into Torrid's systems.   CW-2 confirmed that the Distribution Center's lack of capacity and staffing prevented the Company from getting ready for new product launches being able to receive new seasonal inventory.

(d)      The delayed shipments were also causing Torrid to miss seasonal launches during the Class Period, which created excess inventory that either didn't move or could not be sold at full price because it was seasonally stale.   As CW-1

- 41 -

1  reported, when the delayed inventory was eventually processed into the Distribution

2  Center, it did not sell until promotional activities, including "flash sales," which

3  were limited time sales (*e.g.*, 24 to 48 hours) at deeply discounted prices, were used

4  to move the inventory.

**2.  January 10, 2022 Press Release**

6  149.  On January 10, 2022, Torrid issued a press release lowering 4Q 2021

7  and FY 2021 guidance due to labor challenges at its Distribution Center and retail

8  stores due to Omicron.  The press release was also filed on a SEC Form 8-K on

9  January 12, 2022 and signed by defendant Wehlitz.

10  150.  The reduced guidance given by Defendants in the January 10, 2022

11  press release was materially false and misleading, and had no reasonable basis, given

12  the undisclosed inventory management and supply chain issues described above in

13  ¶¶139-148.

**3.  March 17, 2022 Earnings Call and FY 2021 SEC Form 10-K**

151.  On March 17, 2022, after the market closed, Defendants hosted an

investor conference call to discuss the Company's 4Q 2021 financial results ("4Q

2021 Earnings Call").

152.  On the 4Q 2021 Earnings Call, Defendants reported 4Q results that

were better than the lowered guidance given on January 10, 2021 and better-than-

expected guidance for FY 2022.  Defendants reported that 4Q gross margins

declined in the quarter due to elevated freight and product costs, offset by higher

pricing and lower promotion activity.

153.  Muñoz started the 4Q 2021 Earnings Call by telling investors:

> Starting with our 2021 performance, ***net sales grew 31% versus***
> ***2020 and 23% versus 2019.  Adjusted EBITDA increased by 144%***
> ***over last year and 86% versus 2019, and adjusted EBITDA margin***
> ***reached 19%.  Importantly, we achieved these results in the face of***

*pervasive supply chain challenges and cost pressures, demonstrating the strength of our brand and strong execution against our growth strategies*.

154.   Concerned about macro COVID-related supply chain issues and potential increased promotional activity due to shipping delays, on the 4Q 2021 Earnings Call, analysts continued to ask Defendants about the "promotional environment" Defendants were seeing.   Both Muñoz and Wehlitz again assured investors that promotional activity was being used strategically as a customer engagement tool and that promotional activity in FY 2022 was expected to normalize:

[Muñoz:] *As far as the promotional activity, we see promotional activity to be similar to '21.   And we are focused on the promotional events that we know are part of our DNA, and they form a bond with our customer.   They drive engagement.   And I will tell you that a lot of these promotional events are also really good new customer acquisition tools.   So things like Torrid Cash and the Love Your Bra event will continue.   And then we use incentives to get customers in the categories we really want them to be in because they are very sticky like bras and blue jeans, and we've seen success in that.   So I think it's going to continue as it's been, and we will adjust and address as it comes at us*.

[Wehlitz:] *And then as a follow-up to what Liz said, yes, looking at '22 to be more of a normalized year related to that.   But if you're looking compared to 2021, remember that the first half of the year, we were much more impacted by the stimulus and the pent-up demand.   And there was less promotional activity going on because of what she was spending and she had available to spend.   So it will be*

- 43 -

*more of a normalized [year related to] that as we look more towards pre-COVID levels*.

155.   Defendants also assured investors that the Company was taking steps to mitigate supply challenges by forming a "speed" committee to analyze Torrid's production cycle to reduce lead times and increase efficiency.  On the call, Muñoz stated:

We are also addressing supply chain challenges, which we expect to persist into 2022 by managing areas that are within our control.  *As part of these efforts, we have formed a speed committee, where we are analyzing our full production cycle in order to reduce lead times and increase efficiency*.

156.  On the 4Q 2021 Earnings Call Wehlitz assured the market that Defendants were comfortable with Torrid's inventory levels and the Company was taking aggressive steps to address supply chain issues:

*We feel comfortable with both our current inventory position and the flow of shipments as we continue to take proactive measures to mitigate the impact of shipping delays and higher transportation costs.  We are placing orders earlier, consolidating fabric orders to get low pricing and selectively taking price increases.  We are confident in our ability to continue to navigate the supply chain challenges facing us in our industry*.

157.  In response to follow-up questions from analysts about Torrid's increased inventory levels compared to sales and how the market should view this information, Wehlitz responded:

So from a comparison with – at the end of the year 2021 compared to 2019, our inventory in total was up.  *But if you look at it from – and excluding in-transit, because, again, with this delay related to the supply chain and the transit times, it has increased what we have in-*

*transit in the water, not in our buildings.  You exclude that, we were up 12% compared to '19.  So very in line with what we're looking at from a sales perspective.*

*We feel very good about what we have in inventory.  We feel good about the composition of what we have in the inventory.  And we feel good about what's coming in as well as what we factored in, again, as Liz said, timing-wise, trying to place orders earlier to get the product in.  So I think from an inventory perspective, we have the inventory to be able to support higher sales than we have put into the guidance*.  And I think from an inventory perspective, as we look throughout the year, I think we're going to – we would definitely be higher than we were in '19.  But again, it will be moderated to what we think we can have from an investment standpoint of what's keeping ourselves current and in line with our expectations of where we're going to be to be able to support from a sales perspective.

158.   On March 30, 2022, after the market closed, Torrid filed with the SEC its annual report on Form 10-K for the fiscal year ended January 29, 2022 ("FY 2021 10-K").  Defendants Muñoz and Wehlitz both signed the FY 2021 10-K.

159.   The FY 2021 10-K, highlighted the Company's merchandize and inventory management systems, including its "read-and-react" and "shallow buy" approach:

*Our trend driven items incorporate the latest fashions available* in the broader market to excite and engage our customer but are bought narrowly and reordered as demand dictates to minimize inventory risk.

\*      \*      \*

*Our strategy is built around a consistent and stable base of Core products* that provide our customer with year round style.  At the same time, we introduce new lines of merchandise  approximately 16

times per year, thus ***providing a consistent flow of fresh merchandise*** to keep our customer engaged, encourage repeat business and attract new customers.

> ***We regularly use the depth and breadth of our data to assess sales, market trends and new product development to inform purchasing decisions.  As a result, we have the flexibility to react quickly to product performance, make in-season inventory purchasing adjustments where possible and to respond to the latest sales trends by ordering or re-ordering as appropriate.  Further, we utilize a read-and-react testing approach, with small purchase quantities, to introduce our New product offering, minimizing fashion risk.  This strategy also allows us to mitigate inventory risk, particularly for new products or styles, while simultaneously providing our customers access to current fashion***.

160.   The FY 2021 10-K also promoted the Company's Distribution Center, repeating claims from the Registration Statement about its capacity and ability to facilitate Torrid's existing and future demands:

> Our unified commerce business model is serviced by our distribution facility located in West Jefferson, Ohio.  We acquired the operations of the ***fully-functional, state-of-the-art distribution center*** in West Jefferson, Ohio in 2018.  This 750,000 square foot facility is highly automated and we believe is ***capable of handling our existing and future needs***.  Additionally, the West Jefferson facility is already equipped with omni-channel capabilities that have enabled our buy-online-pickup-in-store ("BOPIS") rollout while continuing to drive efficient online returns and position us to execute on our unified commerce strategy.  During 2020 we also accelerated our omni-channel offerings such as ship from store and curbside pickup, which when

- 46 -

combined with BOPIS will continue to drive both customer acquisition and retention.

Our distribution center manages the transportation, receipt, storage, sorting, packing and distribution of merchandise for our e-Commerce platform and store channels.  Stores are replenished at least once per week from these facilities by third-party delivery services.  This frequency provides our stores *a steady flow of new inventory that helps maintain product freshness and in-stock availability*.

161.   Defendants' statements alleged in ¶¶153-157, 159-160 were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts:

(a)   Defendants failed to disclose that prior to the IPO, Torrid was forced to abandoned its data driven, low risk merchandising model because it was suffering from supply chain inconsistencies, inventory shipment delays, increasing manufacturer lead times, and that because of these conditions, Torrid was unable to make data driven merchandise decisions, perform read-and-react testing on its products, or use its speed model to reduce product development during the Class Period.

(b)   As a result of the loss of these capabilities, during the Class Period Torrid was purchasing large quantities of product upfront and exceeding planned merchandise levels, which left the Company unable to quickly respond to customer demand; and this resulted in the Company not having the right products on hand to meet consumer demand and a build-up of excess, stale and obsolete seasonal inventory.

(c)   As CW-2 confirms, delayed inventory shipments continued to increase Torrid's inventory levels following the IPO, almost doubling them and that the Distribution Center lacked sufficient capacity and staffing to handle these inventory increases.   CW-2 confirmed that during the Class Period, as the

- 47 -

Distribution Center was overflowing with inventory, trailers full of un-received inventory sat in the Distribution Center parking lot.  These trailers would remain un-received for weeks, and in some cases not formally received in the Distribution Center until the following quarter.  As CW-2 reported, inventory was not formally received until it was unloaded, physically brought into the Distribution Center, and scanned into Torrid's systems.  CW-2 confirmed that the Distribution Center's lack of capacity and staffing prevented the Company from getting ready for new product launches being able to receive new seasonal inventory.

(d)     The delayed shipments were also causing Torrid to miss seasonal launches during the Class Period, which created excess inventory that either didn't move or could not be sold at full price because it was seasonally stale.  As CW-1 reported, when the delayed inventory was eventually processed into the Distribution Center, it did not sell until promotional activities, including "flash sales," which were limited time sales (*e.g.*, 24 to 48 hours) at deeply discounted prices, were used to move the inventory.

### 4.     1Q 2022 SEC Form 10-Q and Earnings Call

162.   On June 7, 2022, after the market closed, Torrid announced its 1Q 2022 results on SEC Form 10-Q signed by defendant Harper.

163.   In the SEC Form 10-Q the Company continued to represent that its inventory management systems provided Torrid with a competitive edge:

> ***Our strategy is built around a base of core products*** that provide our customer with year round style.  At the same time, we introduce new lines of merchandise approximately 16 times per year, thus ***providing a consistent flow of fresh merchandise to keep our customer engaged***, encourage repeat business and attract new customers.  ***We employ a data-driven approach to design and product development, proactively and quickly incorporating sales and operational performance information*** alongside customer feedback from thousands of product

1   reviews.  We engage in ongoing dialogue with customers through social

2   media and customer surveys.

3   164.   On the same day Defendants hosted an investor conference call to

4   discuss the Company's 1Q 2022 financial results ("1Q 2022 Earnings Call").  On

5   the 1Q 2022 Earnings Call, the first call hosted by newly appointed defendant

6   Harper, Defendants reported that the Company exceeded 1Q sales and adjusted

7   EBITDA guidance.

8   165.   On the call Defendants gave disappointing 2Q 2022 guidance, stating

9   that 2Q "outlook assumes our gross margin rate will be below Q1 as we clear through

10   inventory heading into the back half of the year."  Defendants, however, continued

11   to make materially false and misleading statements and omissions that served to

12   maintain the artificial inflation in Torrid's stock price, by reiterating the FY 2022

13   guidance given previously on the 4Q 2021 Earnings Call, telling investors gross

14   margins would improve in the second half of 2022 due in part to a more "surgical"

15   approach to promotional activity that would improve gross margins, and that

16   Defendants were comfortable with Torrid's inventory position going into 3Q to 4Q

17   2022.

18   166.   On the 1Q 2022 Earnings Call, interim CFO Tanner MacDiarmid

19   ("MacDiarmid") confirmed FY 2022 guidance stating:

20   ***For the full year, we are maintaining our full year sales guidance of***

21   ***between $1.3 billion and $1.365 billion***.  As Lisa stated, we are focused

22   on creating a better balance of sales and margin in the business that is

23   expected to moderate sales growth in the back half, while driving

24   improvements in margin.

25   167.   On the 1Q 2022 Earnings Call, Harper admitted that the Company had

26   not been using promotions strategically as the Registration Statement had previously

27   represented, stating:

28

- 49 -

4854-9104-7523.v1

*In the past, our promotions have been largely broad-based offers to all customers and across categories, which was anchored heavily on percentage discount.  Going forward, we plan to take a more surgical approach to promotions by closely aligning them with our merchandising and marketing strategies and our inventory investment.  It will take time to refine these strategies, and we will maintain site-wise promotions in the near term while we test and react into more targeted promotions*.

168.   While Defendants reported 1Q 2022 inventory was up 51% compared to 2019 levels, with 30% sales growth, during the 1Q 2022 Earnings Call, Defendants assured investors they were still comfortable with Torrid's inventory levels.  During the call interim CFO MacDiarmid stated in response to analyst questions about inventory:

*So we are comfortable with the position of the inventories within remainder of the year.  We are going to have to be more promotional in Q2 so that we're doing clean-off of our inventory heading to the post summer time frame.  But we feel like we've planned receipts in the back half of the year such that we're going to be comfortable with our inventory position Q3 to Q4 time frame*.

169.   Following the conference call, analysts expressed confidence in this strategy and in Torrid's margins improving in the second half of 2022.  For example, analysts from Cowen Equity Research wrote a June 8, 2022 report highlighting that Torrid's "More Targeted Marketing, Promotions" could assure investors there was "A Better 2H ahead."  Jefferies Equity Research analysts wrote, the same day, that it saw ahead "enhance[d] promotional and marketing strategies to better balance margin and sales growth" as the Company "develop[s] a more efficient and effective organization by re-aligning resources."  Analysts from BofA Securities added that Torrid management "intends to be more surgical."

- 50 -

4854-9104-7523.v1

1    170.   Defendants' statements alleged in ¶¶163, 166-168 were materially false

2    and/or misleading or omitted material information necessary to make them not

3    misleading based on the following facts:

4    (a)    Defendants failed to disclose that prior to the IPO, Torrid was

5    forced to abandoned its data driven, low risk merchandising model because it was

6    suffering from supply chain inconsistencies, inventory shipment delays, increasing

7    manufacturer lead times, and that because of these conditions, Torrid was unable to

8    make data driven merchandise decisions, perform read-and-react testing on its

9    products, or use its speed model to reduce product development during the Class

10   Period.

11   (b)    As a result of the loss of these capabilities, during the Class

12   Period Torrid was purchasing large quantities of product upfront and exceeding

13   planned merchandise levels, which left the Company unable to quickly respond to

14   customer demand; and this resulted in the Company not having the right products on

15   hand to meet consumer demand and a build-up of excess, stale and obsolete seasonal

16   inventory.

17   (c)    CW-2 confirms, delayed inventory shipments continued to

18   increase Torrid's inventory levels following the IPO, almost doubling them and that

19   the Distribution Center lacked sufficient capacity and staffing to handle these

20   inventory increases.   CW-2 confirmed that during the Class Period, as the

21   Distribution Center was overflowing with inventory, trailers full of un-received

22   inventory sat in the Distribution Center parking lot.   These trailers would remain

23   un-received for weeks, and in some cases not formally received in the Distribution

24   Center until the following quarter.   As CW-2 reported, inventory was not formally

25   received until it was unloaded, physically brought into the Distribution Center, and

26   scanned into Torrid's systems.   CW-2 confirmed that the Distribution Center's lack

27   of capacity and staffing prevented the Company from getting ready for new product

28   launches being able to receive new seasonal inventory.

- 51 -

(d)     The delayed shipments were also causing Torrid to miss seasonal launches during the Class Period, which created excess inventory that either didn't move or could not be sold at full price because it was seasonally stale.  As CW-1 reported, when the delayed inventory was eventually processed into the Distribution Center, it did not sell until promotional activities, including "flash sales," which were limited time sales (*e.g.*, 24 to 48 hours) at deeply discounted prices, were used to move the inventory.

**5.     August 3, 2022 Press Release**

171.   On August 3, 2022 Torrid issued a press release announcing the appointment of a new CFO, Tim Martin, and lowering the 2Q 2022 sales and adjusted EBITDA guidance previously given on June 7, 2022.  In the press release Harper stated:

> While we continue to make progress driving strategic initiatives that will support sustainable, profitable growth long term, we are reducing our sales and EBITDA guidance for the second quarter as we continue to navigate through the current macro environment.  Although our web traffic trends have been consistent, store traffic trends slowed in July and shipping disruptions caused by upgrades to our distribution platform during the quarter created unanticipated headwinds.  The increased capacity in our fulfillment center is now operational and customers are receiving their orders as expected.  ***Additionally, we were able to clear our projected levels of excess inventory and expect to have assortments in a balanced position by mid-September.  Heading into the back half of the year, we remain focused on prioritizing margin through compelling new product, disciplined inventory management, and cost control through effective resource allocation.***

4854-9104-7523.v1

172.   Following issuance of the August 3 press release, analysts with Morgan Stanley noted that Torrid's "stock declined 8% after-hours following the guidance cut, though opened up 2% this morning."

173.   Harper's statements in the August 3 press release that the Company expects to be in a balanced inventory position by mid-September (beginning of 3Q) and was making progress with its strategic promotion strategy to drive margin, encouraged investors.  For example, on August 4, 2022 William Blair issued an equity research report stating that "Torrid has gotten its inventory levels under control after a quarter of more aggressive promotions, and view this as a transitionary quarter under a more radical shift in promotional and merchandise strategy under new management."

174.   The reduced guidance given by Defendants in the August 3, 2022 press release was materially false and misleading, and had no reasonable basis, given the undisclosed inventory management and supply chain issues described above in ¶¶161, 170.

**6.    2Q 2022 SEC Form 10-Q and Earnings Call**

175.   On September 7, 2022, after the market closed, Torrid announced its 2Q 2022 results on SEC Form 10-Q signed by Harper.

176.   In its SEC Form 10-Q, Defendants continued to tout Torrid's inventory management systems, stating:

> ***Our strategy is built around a base of core products*** that provide our customer with year round style.  At the same time, we introduce new lines of merchandise approximately 16 times per year, thus ***providing a consistent flow of fresh merchandise to keep our customer engaged***, encourage repeat business and attract new customers.  ***We employ a data-driven approach to design and product development, proactively and quickly incorporating sales and operational performance information*** alongside customer feedback from thousands of product

- 53 -

reviews.  We engage in ongoing dialogue with customers through social media and customer surveys.

177.    On the same day Defendants hosted an investor conference call to discuss the Company's 2Q 2022 results ("2Q 2022 Earnings Call").  On the call Defendants lowered FY 2022 guidance.

178.    On the 2Q 2022 Earnings Call, Defendants reiterated that Torrid would be back in a balanced inventory position by mid-September (3Q) and margins would improve because the Company planned for lower inventory receipts for in the second half of 2022 and Torrid's excess inventory had been dealt with in 2Q 2022.  Harper stated: "We will continue to focus on clearance through the first part of the third quarter and we have bought receipts to be more balanced in the back half of the year."

179.    In responding to analyst questions concerning how many quarters it would take Torrid to get any additional excess inventory, Harper answered:

> I would say right now that we're really comfortable with the mix of inventory between clearance and regular price online.  And we're at 2019 levels and store between a mix of clearance and regular price.
>
> We think that it is getting progressively better.  And as I've mentioned, we're – the inventory purchased in the back half of the year is down 7% year-over-year.  So we feel like that this quarter is the quarter where we're really dealing – the last quarter where we're dealing with this excess inventory issue.  It will improve as we go into the back half of the third quarter as well as in the fourth quarter.

180.    Similarly, on the 2Q 2022 Earnings Call Harper assured investors that one of Torrid's top priorities was to reduce site-wide promotions, which was the cause of Torrid's gross margins downward trajectory over the four prior consecutive quarters.  On the call Harper told investors that Torrid was already implementing inventory and demand focused discounts versus blanket promotions leading

- 54 -

investors to believe that gross margin pressures would begin to ease in the second half of FY 2022.  Harper stated:

> This brings me to the 3 main priorities.  Our first priority is to refine our marketing and our promotional strategy.  We continue to believe that there's an opportunity to reduce site-wide promotions and to realign our marketing and merchandising strategy.  As we move into the back half of the year, we'll be testing into more category-focused promotions based on price elasticity with the goal of reducing discounts on styles with the strongest natural demand.
>
> ***We're implementing these changes on site, and we started providing percentage discounts based on inventory and demand as opposed to blanket promotions.  This is the first step in refining our promotional cadence and driving margin improvements***.

181.  Harper's upbeat statements about Torrid's inventory levels improving in the second half of FY 2022 and strategy for gross margin turnaround was followed by similar statements from MacDiarmid, Torrid's Interim CFO, which were also materially false and misleading.  On the call MacDiarmid confirmed: "***As we moved through [2Q], we remain focused on selling through excess inventory.  And with our current planned sales and receipts, we remain comfortable with [how] our inventory levels are positioned for the remainder of the year***."

182.  Following the 2Q 2022 Earnings Call, analysts at Morgan Stanley noted that Torrid's stock traded down -12% after market close reflecting disappointment in the 2Q 2022 earnings report and updated FY 2022 lowered guidance.

183.  Defendants' statements alleged in ¶¶176, 179-181 were materially false and/or misleading or omitted material information necessary to make them not misleading based on the following facts:

(a)  Defendants failed to disclose that prior to the IPO, Torrid was forced to abandoned its data driven, low risk merchandising model because it was

suffering from supply chain inconsistencies, inventory shipment delays, increasing manufacturer lead times, and that because of these conditions, Torrid was unable to make data driven merchandise decisions, perform read-and-react testing on its products, or use its speed model to reduce product development during the Class Period.

(b)     As a result of the loss of these capabilities, during the Class Period Torrid was purchasing large quantities of product upfront and exceeding planned merchandise levels, which left the Company unable to quickly respond to customer demand; and this resulted in the Company not having the right products on hand to meet consumer demand and a build-up of excess, stale and obsolete seasonal inventory.

(c)     As CW-2 confirms, delayed inventory shipments continued to increase Torrid's inventory levels following the IPO, almost doubling them and that the Distribution Center lacked sufficient capacity and staffing to handle these inventory increases.   CW-2 confirmed that during the Class Period, as the Distribution Center was overflowing with inventory, trailers full of un-received inventory sat in the Distribution Center parking lot.   These trailers would remain un-received for weeks, and in some cases not formally received in the Distribution Center until the following quarter.   As CW-2 reported, inventory was not formally received until it was unloaded, physically brought into the Distribution Center, and scanned into Torrid's systems.   CW-2 confirmed that the Distribution Center's lack of capacity and staffing prevented the Company from getting ready for new product launches being able to receive new seasonal inventory.

(d)     The delayed shipments were also causing Torrid to miss seasonal launches during the Class Period, which created excess inventory that either didn't move or could not be sold at full price because it was seasonally stale.   As CW-1 reported, when the delayed inventory was eventually processed into the Distribution Center, it did not sell until promotional activities, including "flash sales," which

- 56 -

1 were limited time sales (*e.g.*, 24 to 48 hours) at deeply discounted prices, were used
2 to move the inventory.

### 7.    December 8, 2022 Earnings Call

184.   As described in detail at ¶¶227-229, beginning in December 2021, partial disclosures regarding the true state of Torrid's business and financial performance gradually removed the artificial inflation from Torrid common stock.

185.   On December 8, 2022, after the market closed, Torrid announced its 3Q 2022 financial results and on the same day Defendants hosted an investor conference call to discuss the Company's 3Q 2022 results ("3Q 2022 Earnings Call").

186.   Contrary to Defendants' statements during the 2Q 2021 earnings call on September 8, 2022, that Torrid would be back in a balanced inventory position by mid-September (3Q) and margins would improve because the Company planned for lower inventory receipts for the second half of 2022 and Torrid's excess inventory had been dealt with in 2Q 2022, Defendants again lowered net sales and Adjusted EBITDA guidance for FY 2022, as Torrid "continue[d] to focus on reducing [its] inventory levels" because "[u]nfortunately, given [Torrid's] inventory position" it would have to maintain high levels of promotional activities to "continue to clear through product."

187.   On this news, Torrid common stock fell over 21%, to $3.35 per share at the close of trading on December 9, 2022.

188.   Investors reacted negatively to Defendants' December 8, 2022 disclosures that heavier product discounts and promotional activity caused 3Q 2021's disappointing results and were the reason for lower FY 2022 guidance.  For example, on December 9, 2022 Morgan Stanley issued a research report noting that Torrid's "3Q22 miss stands out [versus] peers," and stating that "[t]his weak report represents one in a string of many and stands out to us in a sea of beats across the specialty retail space this earnings season."  Analysts at William Blair also issued a report on December 9, 2022, downgrading Torrid shares to market perform because

of Torrid's disappointing news, noting in the tile of the report that, "Inventory Overhang Bigger Than Thought."

### D.   Additional Scienter Allegations

189.   By virtue of the facts set forth above at ¶¶82, 84, 90, 139, 148, 161, 170, 183 and below at ¶¶190-224, it may be strongly inferred that Defendants knew or recklessly disregarded that their Class Period statements were materially false or misleading to investors and/or omitted facts necessary to make the facts stated not false or materially misleading.

#### 1.   Torrid's Prior Abandonment of an Earlier IPO Due to the Same Inventory Issues that Existed at the Time of the July 2021 IPO Supports Scienter

190.   Torrid had previously filed a Registration Statement with the SEC on July 10, 2017 in anticipation of an IPO, but on April 19, 2019, defendant Muñoz, Torrid's CEO at the time, requested that the SEC withdraw the 2017 Registration Statement "consistent with the public interest and the protection of investors."

191.   Torrid subsequently filed another Registration Statement and on July 1, 2021, the day of Torrid's IPO, defendant Muñoz explained that the 2017 Registration Statement had been withdrawn in 2019 because of Torrid's inventory and inventory management problems, explaining: "[T]he chain had an inventory problem…. 'We didn't have our head around inventory management.  We had no targets or disciplines around how we acquired inventory.'"  Muñoz also stated that "the timing was right this time around for our IPO, both culturally as well as where we are as a company," implying that she had specific knowledge of the Company's current state of inventory management and other operations.

192.   Management's decision to withdraw the 2017 Registration Statement in 2019 because of the Company's inability to manage its inventory, and defendant Muñoz's comments about those issues on the day of the IPO, creates a strong inference that the Individual Defendants either had specific and detailed knowledge

- 58 -

of Torrid's inventories and inventory management systems or were reckless in not having that knowledge.

### 2. Defendants' Admissions that They "Carefully Monitored" and Reviewed Torrid's Inventory Levels and Other Financial Metrics

193.  The Individual Defendants, admittedly, had detailed knowledge of Torrid's operations and performance, including its inventory levels, sales and margins.  According to the Registration Statement, which Defendants signed and/or participated in drafting, they employed a "data-driven approach" to manage sales and inventory, where management closely "review[ed] [Torrid's] inventory levels on an ongoing basis," and "monitor[ed] inventory levels, sales trends and sales forecasts to estimate and record reserves for excess, slow-moving and obsolete inventory."

194.  Following the IPO, and using the information they obtained from closely monitoring Torrid's inventory and financial metrics, Torrid executives, including defendants Muñoz, Wehlitz, and Harper, provided investors with updates as to the Company's financial and operational performance, inventory levels, and gross profit margins on each and every earnings call held throughout the Class Period.  For example, during the 3Q 2021 Earnings Call, Muñoz highlighted Torrid's "powerful and nimble operating model" while giving investors an update as to the Company's gross profit margins.  On the 4Q 2021 Earnings Call, defendants Muñoz and Wehlitz told investors the Company had "ended the quarter in a strong inventory position" despite "inventory constraints and the impact of the Omicron variant," and that executives were "comfortable with both the level and the newness of [Torrid's] inventory."

195.  Wehlitz, as CFO of Torrid, likewise spoke frequently about Torrid's inventory management and gross profit margins on conference calls with investors during his time as the Company's CFO.  For example, during the 2Q 2021 Earnings Call, defendant Wehlitz provided an update on Torrid's inventory levels and

informed investors that the Company would "continue to carefully monitor the supply chain situation" and stated: "[W]e are really monitoring what those arrivals are and shifts are in our inventory."

196.   On the 3Q 2021 Earnings Call, Wehlitz told investors the Company was "below optimal levels" of inventory, but that it had been "particularly pleased with [its] sales performance given the inventory constraints caused by the supply chain challenges we faced during the quarter" and felt "very comfortable with the adequate inventory levels" it would soon have.  On the 4Q 2021 Earnings Call, defendant Wehlitz told investors "[w]e feel very good about what we have in inventory.  We feel good about the compensation of what we have in the inventory.  And we feel good about what's coming in as well as what we factored in."

197.   In light of these statements about Torrid to the market on topics that were material to both investors and the Company, it was incumbent upon the Individual Defendants to ensure they understood the true and full facts concerning the topics on which they spoke.  Either they possessed the knowledge of Torrid's financial and operational results they claimed to have from closely and carefully monitoring them, in which case they knew their statements were materially false or misleading, or they lacked the knowledge they claimed to have, in which case their conduct was severely reckless.

### 3.   Defendants' Class Period Admissions Regarding Torrid's Undisclosed Abandonment of Its Low-Risk Merchandising Model, Steep Inventory Discounts and Incapable Distribution Center

198.   Defendants made several critical admissions during the Class Period about the capacity of Torrid's Distribution Center, its abandonment of the low-risk merchandising model and steep discounts Torrid had been giving in order to sell excess inventory.

199.   First, Defendants admitted that the Company had not been using promotions "strategically," as they previously stated in the Registration Statement.

4854-9104-7523.v1

Rather, Torrid had been giving customers steep discounts in order to move its glut of inventory. During the 1Q 2022 Earnings Call, defendant Harper revealed that "[i]n the past, our promotions have been largely broad-based offers to all customers and across categories, which was ***anchored heavily*** on percentage discount."

200.   Then, during the 2Q 2022 Earnings Call, defendant Harper conceded that, in connection with "managing [Torrid's] inventory," Torrid had been "upgrading the capacity in [its] distribution center." Construction necessary to increase the capacity of a distribution center obviously does not happen overnight and takes at least several months to obtain the appropriate Company approvals, negotiate the work to be done and complete construction (particularly since COVID with prevalent supply-chain issues). Thus, Defendants knew, or recklessly discarded that their statements that Torrid's Distribution Center was "state-of-the-art" and had sufficient capacity, were materially false.

201.   Finally, at the end of the Class Period, Defendants admitted that Torrid had long ago been forced to abandon its purported low-risk merchandising model. During the 3Q 202 Earnings Call, defendant Harper admitted that Torrid had, in fact, not been able to utilize its low-risk merchandising model, further contributing to lower profits and gross margins over the last several quarters.

202.   Defendants' own admissions of the undisclosed facts that Torrid had abandoned its low-risk model and ordered larger quantities sooner than needed, even though the Company's distribution center lacked sufficient capacity to house and process incoming inventory resulting in millions of dollars in excess inventory that Torrid was then forced to heavily discount-supports a strong inference of scienter.

**4.   Defendants' Detailed Responses to Pointed Analysts Questions Supports Their Actual Knowledge of the Facts About Which They Spoke**

203.   Defendants' detailed responses to pointed analyst questions throughout the Class Period further supports scienter.  For example, during the 3Q 2021 Earnings Call, in response to analyst questions about what the level and type of

promotional activity investors could expect from Torrid in 4Q 2021, both Wehlitz and Muñoz told investors that Torrid's increased 4Q promotional activity was "very strategic" due to events such as Black Friday and Cyber Monday and used as a "customer engagement tool," assuring analysts that the promotional activity was not to clear excess or non-moving inventory.  On the 3Q 2021 Earnings Call, defendant Muñoz stated: "We don't necessarily use promotions to drive product that's not working or things like that.  We use them as an engagement tool."

204.   Concerned about macro COVID-related supply chain issues and potential increased promotional activity due to shipping delays, on the 4Q 2021 Earnings Call, analysts continued to ask defendants about the "promotional environment" Defendants were seeing.  Both Muñoz and Wehlitz again assured investors that promotional activity was being used strategically as a customer engagement tool and that promotional activity in FY 2022 was expected to normalize:

> [Muñoz:] As far as the promotional activity, we see promotional activity to be similar to '21.  And we are focused on the promotional events that we know are part of our DNA, and they form a bond with our customer.  They drive engagement.  And I will tell you that a lot of these promotional events are also really good new customer acquisition tools. . . .
>
> [Wehlitz:] . . . [L]ooking at '22 to be more of a normalized year related to that.  But if you're looking compared to 2021, remember that the first half of the year, we were much more impacted by the stimulus and the pent-up demand.  And there was less promotional activity going on because of what she was spending and she had available to spend.  So it will be more of a normalized [year related to] that as we look more towards pre-COVID levels.

- 62 -

4854-9104-7523.v1

205.   On the 4Q 2021 Earnings Call in response to follow-up questions from analysts about Torrid's increased inventory levels compared to sales and how the market should view this information, Wehlitz responded:

So from a comparison with – at the end of the year 2021 compared to 2019, our inventory in total was up.  But if you look at it from – and excluding in-transit, because, again, with this delay related to the supply chain and the transit times, it has increased what we have in-transit in the water, not in our buildings.  You exclude that, we were up 12% compared to '19.  So very in line with what we're looking at from a sales perspective.

We feel very good about what we have in inventory.  We feel good about the composition of what we have in the inventory.  And we feel good about what's coming in as well as what we factored in.

206.   During the 2Q 2022 Earnings Call in response to analyst questions concerning how many quarters it would take Torrid to get any additional excess inventory, defendant Harper answered:

I would say right now that we're really comfortable with the mix of inventory between clearance and regular price online.  And we're at 2019 levels and store between a mix of clearance and regular price.

We think that it is getting progressively better.  And as I've mentioned, we're – the inventory purchased in the back half of the year is down 7% year-over-year.  So we feel like that this quarter is the quarter where we're really dealing – the last quarter where we're dealing with this excess inventory issue.  It will improve as we go into the back half of the third quarter as well as in the fourth quarter.

207.  Defendants' very detailed responses to analysts' questions about inventory levels, Torrid's ability to sell its inventory and whether it would need to use significant discounting to demonstrate they either possessed the knowledge of

- 63 -

4854-9104-7523.v1

these facts and made materially false statements anyway, or they lacked the knowledge they claimed to have, in which case their conduct was severely reckless.

> **5.** **Defendants Were Aware of Increasing Inventory Levels from Access to, or Receipt of, Inventory Count and in-Bound Receiving Log Reports and the KPI Dashboard**

208.   CW-2, responsible for overseeing a team that performed daily counts of inventory in the Distribution Center, submitted periodic reports of these inventory counts to Torrid headquarters.  According to CW-2, the daily counts were designed to ensure, among other things, that certain targets set by the corporate office were achieved.  CW-2 also created and sent to corporate headquarters periodically, "In-Bound Receiving logs," which contained detailed information about the flow of inventory from Torrid's suppliers to the Distribution Center, including the number of trailers received and incoming, whether those trailers had been unloaded into the Distribution Center, and identification numbers for those trailers.

209.   Also, the WMS had a 25-part KPI dashboard that generated inventory related reports, including inventory valuation reports, and order fulfillment reports, to which Torrid's executives had access.

210.   These reports and the KPI Dashboard would have informed Defendants of the Company's inventory delays and then excessive build-up during the Class Period, among other things.

211.   Defendants, as executive officers of Torrid located at the corporate headquarters, would have had access to and/or received the In-Bound Receiving Log and inventory count reports and the KPI Dashboard, particularly given they admittedly closely and carefully monitored Torrid's inventory levels throughout the Class Period.  ¶¶193-197, *supra*.  Thus, they would have been aware that inventory levels noticeably increased shortly after the IPO and that the Distribution Center was inadequate to handle these increased levels.

4854-9104-7523.v1

#### 6.    Torrid's Lack of Internal Controls Supports Scienter

212.    Defendants Muñoz and Wehlitz signed the Company's 2Q 2021 Form 10-Q, 3Q 2021 Form 10-Q, and FY 2021 Form 10-K financial statements. Defendants Muñoz and Wehlitz also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), attesting that that the Company's financial statements "fairly present[ed] in all material respects the financial condition, results of operations and cash flows" of the Company for Torrid's 2Q 2021 Form 10 Q, 3Q 2021 Form 10 Q, and FY 2021 Form 10-K filed with the SEC. Defendant Harper signed the Company's 1Q 2022 Form 10-Q, 2Q 2022 Form 10-Q, and 3Q 2022 Form 10-Q as well as SOX Certifications appended to each.

213.    Torrid, however, lacked sufficient internal controls over its financial reporting throughout the Class Period, resulting in the misstatement of its financial statements from inventory sitting out on trailers not recorded in WMS or the Company's financial statements. As alleged herein, as a result of Torrid's lack of internal controls, its inventory balance was understated, and gross margins and earnings were overstated in the Registration Statement.

214.    Defendants were aware of, or recklessly disregarded these facts through their purportedly close and careful monitoring of inventory and other financial metrics, as well as from reports received from Torrid's distribution center.

#### 7.    Executive Departures Support a Strong Inference of Scienter

215.    Torrid's Registration Statement listed four directors and four members of senior management at the time of its IPO – defendant Muñoz as CEO, defendant Wehlitz as CFO, Michael Salmon as Chief Operating Officer, and Anne Stephenson as Chief Merchandising and Product Officer.  Today, less than two years later, Torrid's entire management and executive team has since resigned or been replaced, further supporting a strong inference of scienter.

216.   The Company announced on December 8, 2021 that its CFO, defendant Wehlitz, had resigned and would soon leave his role as Torrid CFO.   Wehlitz's announced departure was within just six months of the IPO and after he pocketed over $4.4 million in proceeds.

217.   On May 3, 2022, the Company announced that defendant Muñoz was stepping down from her role as CEO and from the Board, effective immediately.

218.   On August 3, 2022, Torrid announced that its CFO MacDiarmid, who had taken the role following defendant Wehlitz's resignation, would also be stepping down as the Company's CFO, effective September 12, 2022.

219.   On October 4, 2022, Torrid announced in a Form 8-K filed with the SEC that its head of human resources, Kelly McGuire Diehl, had been fired, and would be replaced by the Company's Chief Legal Officer.

220.   On January 5, 2023, Torrid notified investors, through a Form 8-K filed with the SEC, that the Company had also entered into a separation agreement with its Chief Strategy Officer, Michael Salmon.   Notably absent from the filing was Torrid's standard language used in Item 5.02 disclosures that the separation was "not related to any issues regarding financial disclosures or account matters."

221.   On March 23, 2023, Torrid filed a Form 8-K with the SEC, informing the public and investors that it had also reached a separation agreement with its Chief Merchandising and Product Officer, Anne Stephenson.   Similar to the Company's announcement of its Chief Strategy Officer's departure just two months earlier, the SEC Form 8-K filed March 23, 2023, did not contain the standard assurance that Torrid's separation with its Chief Merchandising and Product Officer was "not related to any issues regarding financial disclosures or account matters."

### 8.   Defendants' Insider Sales During the Class Period Further Support an Inference of Scienter

222.   Defendants sold over $235 million of Torrid common stock during the Class Period, while possessing material, non-public information about the Company,

- 66 -

4854-9104-7523.v1

avoiding nearly $200 million in losses by not holding those shares through the Class Period.  Defendants' Class Period sales are summarized in the chart below.

| Defendant | Shares Sold | Proceeds | Losses Avoided |
|---|---|---|---|
| Sycamore | 10,701,990 | $210,133,573.65 | $174,281,907.15 |
| Lisa Harper | 730,397 | $14,341,345.10 | $11,894,515.15 |
| Elizabeth Muñoz | 351,200 | $6,295,411.370 | $5,118,891.37 |
| George Wehlitz | 223,609 | $4,436,213.65 | $3,687,123.50 |
| Sum | 12,007,196 | $235,206,543.76 | $194,982,437.16 |

**9.    Defendants' Class Period Compensation Including IPO Incentive Awards Constitutes Additional Evidence of Scienter**

223.   The Individual Defendants were highly motivated to materially misstate the success of Torrid's operations and business throughout the Class Period. Defendants Muñoz and Wehlitz received over $28 million and $22.7 million, respectively, in fully-vested Torrid common stock in connection with the IPO. Defendants Muñoz and Wehlitz's total compensation figures were $39,956,898 and $24,955,094, respectively, for fiscal year 2021 alone.

224.   Defendant Muñoz, pursuant to her employment agreement with the Company, also received $1.5 million of Torrid stock upon Torrid's IPO as an "IPO Award," with 50% of those shares vesting immediately.  The Company held similar agreements with other unnamed executives and members of Torrid management, totaling $4.4 million of share-based compensation immediately upon the consummation of any IPO.

**E.    Loss Causation**

225.   During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme and wrongful course of business that artificially inflated the price of Torrid common stock by making materially false and misleading statements and/or omitting material information concerning Torrid's business practices and financial results.  By artificially inflating and manipulating Torrid's

stock price, the Exchange Act Defendants deceived Plaintiffs and the Class and caused them losses when the truth was revealed.  As the Exchange Act Defendants' prior misrepresentations and fraudulent conduct reached the market through a series of partial disclosures, it caused Torrid's stock price to fall precipitously as the prior artificial inflation was removed.  As a result of their purchases of Torrid common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

226.   The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below.  These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.

227.   On December 8, 2021, after the market closed, Torrid held its 3Q 2021 Earnings Call with investors.  During the call, Defendants disclosed that 3Q sales came in at the low end of guidance due to inventory delays and that the Company was narrowing its 4Q 2021 and FY 2021 guidance due to inflation headwinds (including air freight) and continued inventory delays in 4Q 2021.  As a result of this partial disclosure, the price of Torrid's shares declined over 27% on a volume of more than 6 million shares to close at $11.28 per share on December 9, 2021.  While Torrid's stock price dropped over 27%, the S&P 500 Index and the S&P Retail Select Industry Index (the two comparative index identified in Torrid's FY 2021 Form 10-K), declined only 0.71% and 1.77%, respectively.  However, the corrective impact of this disclosure was tempered by Defendants continued misleading statements and omissions that concealed the full impact of Defendants' fraud from investors.

228.   On January 10, 2022, before the market opened for trading that day, Torrid issued a press release, announcing another lowering of its already disappointing sales and earnings guidance for 4Q 2021.  As a result of this partial disclosure, the price of Torrid's shares declined over 23% to close at $8.20 per share

- 68 -

4854-9104-7523.v1

on January 10, 2022.  While Torrid's stock price dropped over 23%, the S&P 500 Index and the S&P Retail Select Industry Index declined 0.14% and 1.74%, respectively.  However, the corrective impact of this disclosure was tempered by Defendants' continued misleading statements and omissions that concealed the full impact of Defendants' fraud from investors.

229.  On June 7, 2022, after the market closed, Torrid held its 1Q 2022 Earnings Call with investors.  During the call, Defendants disclosed disappointing 2Q 2022 guidance, stating that the 2Q "outlook assumes our gross margin rate will be below Q1 as we clear through inventory heading into the back half of the year." As a result of this partial disclosure, the price of Torrid's shares fell over 6%, to $5.42 per share at the close of trading on June 8, 2022.  While Torrid's stock price fell over 6%, the S&P 500 Index and S&P Retail Select Industry Index, declined 1.08% and 0.07%, respectively.  However, the corrective impact of this disclosure was tempered by Defendants' continued misleading statements and omissions that concealed the full impact of Defendants' fraud from investors.

230.  On December 8, 2022, shortly after the market closed, Torrid held its 3Q 2022 Earnings Call with investors.  During the 3Q 2022 Earnings Call, investors learned that Torrid's gross profit margins continued to decline, now only 31.6% in the third quarter of 2022, compared to 40.9% just the year before.  The Company's new CFO explained this decline was almost entirely attributable to Torrid's inventory levels, stating "[a]pproximately 850 basis points of this decline was due to higher discounts and promotions to clear inventory."  Defendant Harper admitted on the call that the Company had not been able to utilize Torrid's data driven, low-risk merchandising model, further contributing to lower profits and gross margins. During the same call, Defendants admitted some of Torrid's processes for developing product assortment flow "had been lost over the pandemic time period." The Company again lowered net sales and Adjusted EBITDA guidance, as Torrid "continue[d] to focus on reducing [its] inventory levels" because "[u]nfortunately,

- 69 -

given [Torrid's] inventory position" it would have to maintain high levels of promotional activities to "continue to clear through product." As a result of this disclosure, Torrid stock price fell over 21%, to $3.35 per share at the close of trading on December 9, 2022.

231.   The causes of the decline were confirmed by analyst reports published shortly thereafter. On December 9, 2022, BofA Securities cut its price objective by 16.67%, citing "heavy promos to right inventory." Cowen Equity Research lowered its price target by 16% in a report headlined "Inventory Rationalization and Greater Discipline Ahead," that highlighted the Company's need to "work through merchandising, marketing, and promotional strategies … ." Analysts from Jefferies Equity Research similarly lowered their price target of Torrid common stock by 22%, in line with the decline reflected in the market, explaining that the "G[ross] M[argin] miss was due to increased promotional activity to clear through excess inventory" a trend Jefferies "expected to continue." Morgan Stanley Research described the Company's 3Q 2022 reports as "Another Stumble" that "further diminishe[d] investors' confidence in the business & management." Morgan Stanley went on to describe Torrid as "the only specialty retailer in our coverage to miss on revenue & EPS/EBITDA this quarter" as the Company's "weak report represents one in a string of many." The same day, William Blair Equity Research downgraded the Company's stock in a report that noted "weaker-than-expected results" as "inventories were up 43% compared to a 13% increase in sales over the same period" with a headline that read "Downgrading to Market Perform; Inventory Overhang Bigger Than Thought."

### F.   The Presumption of Reliance

232.   A class-wide presumption of reliance is appropriate with respect to the Exchange Act claims in this action under the fraud-on-the-market doctrine. As a result of Defendants' materially false and misleading statements, the Company's

4854-9104-7523.v1

1    publicly traded common stock traded at artificially inflated prices during the Class
2    Period on a market that was open, well-developed, and efficient at all times.
3    Plaintiffs and other members of the Class purchased or otherwise acquired the
4    Company's publicly traded common stock relying upon the integrity of the market
5    price of those securities and the market information relating to Torrid, and have been
6    damaged thereby.

7        233.   A class-wide presumption of reliance is also appropriate with respect
8    to the Exchange Act claims in this action under the United States Supreme Court's
9    holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),
10   because such claims are grounded on Defendants' material omissions.  Because this
11   action involves Defendants' failure to disclose material adverse information
12   regarding the Company's business operations and financial prospects – information
13   that Defendants were obligated to disclose – positive proof of reliance is not a
14   prerequisite to recovery.  All that is necessary is that the facts withheld be material
15   in the sense that a reasonable investor might have considered them important in
16   making investment decisions.  Given the importance of Defendants' material Class
17   Period omissions set forth above, that requirement is satisfied here.

18       234.   At all relevant times, the market for Torrid common stock was an
19   efficient market for the following reasons, among others:

20           (a)    Torrid common stock met the requirements for listing, and was
21   listed, actively traded on the NYSE, a highly efficient market;

22           (b)    As a regulated issuer, Torrid filed periodic public reports with
23   the SEC and the NYSE;

24           (c)    Torrid regularly communicated with public investors via
25   established market communication mechanisms, including the regular dissemination
26   of press releases on the national circuits of major newswire services and other wide-
27   ranging public disclosures, such as communications with the financial press and
28   other similar reporting services;

- 71 -

(d)     Torrid was followed by securities analysts employed by major brokerage firms such as BofA Securities, Jefferies, Cowen Equity Research, William Blair, and Morgan Stanley, among others, who wrote research reports that were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports were publicly available and entered the public marketplace; and

(e)     Torrid stock price reacted in response to new, material information about Torrid's business.

235.   As a result of the foregoing, the market for Torrid common stock promptly digested current information regarding Torrid from all publicly available sources and reflected such information in the price of the stock.   Under these circumstances, all purchasers of Torrid common stock during the Class Period suffered similar injury through their purchase of Torrid common stock at artificially inflated prices and a presumption of reliance applies.

### G.     Exchange Act Counts

### COUNT IV

### Violations of §10(b) of the Exchange Act and SEC Rule 10b-5
### (Against the Exchange Act Defendants)

236.   This count is brought against Torrid and the Individual Defendants.

237.   Plaintiffs incorporate the allegations above in ¶¶129-235.

238.   During the Class Period, each of the Exchange Act Defendants named in this count disseminated or approved the statements as specified above in ¶¶129-188, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

239.   The Exchange Act Defendants named in this count violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

4854-9104-7523.v1

1          (a)     employed devices, schemes, and artifices to defraud;

2          (b)     made untrue statements of material facts or omitted to state

3 material facts necessary in order to make the statements made, in light of the

4 circumstances under which they were made, not misleading; or

5          (c)     engaged in acts, practices and a course of business that operated

6 as a fraud or deceit upon Plaintiffs and others similarly situated in connection with

7 their purchases of Torrid common stock during the Class Period.

8      240.  Exchange Act Defendants, individually and together, directly and

9 indirectly, by the use, means of instrumentalities of interstate commerce and/or the

10 mails, engaged and participated in a continuous course of conduct to conceal the

11 truth and/or adverse material information about Torrid's business, operations and

12 financial condition as specified herein.

13      241.  Exchange Act Defendants had actual knowledge of the

14 misrepresentations and omissions of material fact set forth herein, or recklessly

15 disregarded the true facts that were available to them.

16      242.  As a result of the dissemination of the materially false or misleading

17 information and/or failure to disclose material facts, as set forth above, the market

18 price of Torrid common stock was artificially inflated during the Class Period.  In

19 ignorance of the fact that the market price of the Company's common stock was

20 artificially inflated, and relying directly or indirectly on the false and misleading

21 statements, or upon the integrity of the market in which the Company's common

22 stock traded and/or on the absence of material adverse information that was known

23 to or recklessly disregarded by defendants (but not disclosed in defendants' public

24 statements during the Class Period), Plaintiffs and the other Class members

25 purchased or otherwise acquired Torrid common stock during the Class Period at

26 artificially high prices and were harmed thereby.

27      243.  Plaintiffs and the Class, in reliance on the integrity of the market, paid

28 artificially inflated prices for Torrid common stock, and suffered losses when the

relevant truth was revealed.  Plaintiffs and the Class would not have purchased Torrid common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

244.   As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their Class Period transactions in Torrid common stock.

245.   By reason of the foregoing, the Exchange Act Defendants named in this count have violated §10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT V

### Violations of §20(a) of the Exchange Act
### (Against Sycamore and the Individual Exchange Act Defendants)

246.   Plaintiffs incorporate the allegations in ¶¶129-245, above.

247.   This count is brought against Sycamore and the Individual Exchange Act Defendants.

248.   The Individual Exchange Act Defendants were each control persons of Torrid during the Class Period by virtue of their positions as directors and/or senior officers.

249.   Sycamore was a control person of Torrid during the Class Period by virtue of its controlling share of Torrid that it held throughout the Class Period.

250.   Each of the defendants named in this count acted as controlling persons of Torrid within the meaning of §20(a) of the Exchange Act.  By virtue of their high-level positions as officers and/or directors, their ownership and contractual rights, participation in and awareness of the Company's operations and knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly false and misleading statements.

4854-9104-7523.v1

251.   Each of the Individual Exchange Act Defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count IV, and exercised that power.

252.   As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases and acquisitions of the Company's common stock during the Class Period as the relevant truth was revealed.

253.   By reason of the foregoing, the defendants named in this count violated §20(a) of the Exchange Act.

## COUNT VI

### Violations of §20A of the Exchange Act
### (Against the Sycamore Defendants and Defendants Muñoz, Wehlitz, and Harper)

254.   Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.  Count VI is brought pursuant to §20A of the Exchange Act against the Sycamore Defendants, Muñoz, Wehlitz, and Harper, on behalf of Lead Plaintiff and members of the Class who traded contemporaneously with the Defendants named herein, and were damaged by those defendants' insider trading.

255.   As detailed herein, the Sycamore Defendants, Muñoz, Wehlitz, and Harper were in possession of material non-public information concerning Torrid at the time of the IPO.  The Defendants took advantage of possessing material non-public information regarding Torrid to obtain over $230 million in insider trading profits during the IPO.

256.   Defendants' sales of Torrid common stock were made contemporaneously with Lead Plaintiff's purchases of Torrid common stock as set forth below.

- 75 -

257. Defendant Sycamore made the following sales:

| Defendant | Date of Sale | Shares Sold | Price |
|---|---|---|---|
| Sycamore[4] | 7/6/2021 | 10,701,990 | $19.635 |

258. Defendant Sycamore's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Shares Purchased | Price |
|---|---|---|---|
| City of Warren | 7/1/2021 | 1800 | $21.00 |
| City of Warren | 7/12/2021 | 300 | $23.44 |
| City of Warren | 7/13/2021 | 100 | $23.24 |
| City of Warren | 7/14/2021 | 400 | $23.48 |
| City of Warren | 7/20/2021 | 300 | $22.49 |
| City of Warren | 7/22/2021 | 300 | $22.54 |

259. Defendant Harper made the following sales:

| Defendant | Date of Sale | Shares Sold | Price |
|---|---|---|---|
| Harper | 7/6/2021 | 730,397 | $19.635 |

260. Defendant Harper's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Shares Purchased | Price |
|---|---|---|---|
| City of Warren | 7/1/2021 | 1800 | $21.00 |
| City of Warren | 7/12/2021 | 300 | $23.44 |
| City of Warren | 7/13/2021 | 100 | $23.24 |
| City of Warren | 7/14/2021 | 400 | $23.48 |
| City of Warren | 7/20/2021 | 300 | $22.49 |
| City of Warren | 7/22/2021 | 300 | $22.54 |

261. Defendant Wehlitz made the following sales:

---

4   As noted in §III.A.2.C., *supra*, defendant Sycamore held and traded its shares individually and by and through the Sycamore Entities. The trades depicted in this chart thus reflect shares held and sold by the Sycamore Defendants, collectively.

| Defendant | Date of Sale | Shares Sold | Price |
|---|---|---|---|
| **Wehlitz** | 7/6/2021 | 210,837 | $19.635 |
| **Wehlitz** | 7/30/2021 | 10,625 | $27.00 |

262. Defendant Wehlitz's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Shares Purchased | Price |
|---|---|---|---|
| **City of Warren** | 7/1/2021 | 1800 | $21.00 |
| **City of Warren** | 7/12/2021 | 300 | $23.44 |
| **City of Warren** | 7/13/2021 | 100 | $23.24 |
| **City of Warren** | 7/14/2021 | 400 | $23.48 |
| **City of Warren** | 7/20/2021 | 300 | $22.49 |
| **City of Warren** | 7/22/2021 | 300 | $22.54 |
| **Schroth** | 8/9/2021 | 1 | $26.664 |

263. Defendant Muñoz made the following sales:

| Defendant | Date of Sale | Shares Sold | Price |
|---|---|---|---|
| **Muñoz** | 7/6/2021 | 252,637 | $19.635 |
| **Muñoz** | 7/30/2021 | 17,152 | $27.00 |
| **Muñoz** | 8/30/2021 | 13,258 | $24.45 |
| **Muñoz** | 7/7/2022 | 5,903 | $4.45 |
| **Muñoz** | 8/29/2022 | 13,258 | $6.19 |

264. Defendant Muñoz's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Shares Purchased | Price |
|---|---|---|---|
| **City of Warren** | 7/1/2021 | 1800 | $21.00 |
| **City of Warren** | 7/12/2021 | 300 | $23.44 |
| **City of Warren** | 7/13/2021 | 100 | $23.24 |
| **City of Warren** | 7/14/2021 | 400 | $23.48 |
| **City of Warren** | 7/20/2021 | 300 | $22.49 |
| **City of Warren** | 7/22/2021 | 300 | $22.54 |
| **Schroth** | 8/9/2021 | 1 | $26.664 |

4854-9104-7523.v1

| **Schroth** | 8/31/2022 | 200 | $5.71 |
| **Schroth** | 9/19/2022 | 180 | $5.61 |
| **Schroth** | 9/27/2022 | 2,000 | $4.35 |
| **Schroth** | 9/27/2022 | 1 | $4.34 |
| **Schroth** | 9/27/2022 | 1 | $4.34 |

265.   Lead Plaintiff and members of the Class who purchased shares of Torrid common stock contemporaneously with sales by Defendants suffered damages because (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the materially false and misleading statements and concealments alleged herein.

## V.   SAFE HARBOR PROVISION DOES NOT APPLY

266.   The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to any of the allegedly false statements pleaded in this Consolidated Complaint.   The statements alleged to be false and misleading herein all relate to then existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Furthermore, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized

- 78 -

1   or approved by an executive officer of Torrid who knew that the statement was false
2   when made.

3   **VI.    CLASS ACTION ALLEGATIONS**

4          267.   Plaintiffs bring this action as a class action pursuant to Federal Rule of
5   Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of purchasers of
6   Torrid common stock during the Class Period.   Excluded from the Class are
7   Defendants and their immediate families, the officers and directors of the Company,
8   at all relevant times, members of their immediate families and their legal
9   representatives, heirs, successors or assigns and any entity in which Defendants have
10  or had a controlling interest.

11         268.   The members of the Class are so numerous that joinder of all members
12  is impracticable.   Throughout the Class Period, Torrid shares were actively traded
13  on the NYSE.   While the exact number of Class members is unknown to Plaintiffs
14  at this time, and can only be ascertained through appropriate discovery, Plaintiffs
15  believe that there are hundreds of members in the proposed Class, if not more.
16  Record owners and other members of the Class may be identified from records
17  maintained by Torrid, its transfer agent or securities' brokers, and may be notified
18  of the pendency of this action electronically or by mail, using the form of notice
19  similar to that customarily used in securities class actions.

20         269.   Plaintiffs' claims are typical of the claims of the members of the Class
21  as all members of the Class are similarly affected by Defendants' wrongful conduct
22  in violation of federal law complained of herein.

23         270.   Plaintiffs will fairly and adequately protect the interests of the members
24  of the Class and has retained counsel competent and experienced in class action and
25  securities litigation.

26

27

28

271.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about Torrid's business and operations;

(c)   whether the price of Torrid common stock was artificially inflated during the Class Period; and

(d)   to what extent the members of the Class have sustained damages and the proper measure of damages.

272.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.   Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Lead Plaintiff as Class Representative and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.   Declaring that the Securities Act Defendants are liable pursuant to the Securities Act;

- 80 -

4854-9104-7523.v1

1       C.    Declaring that the Exchange Act Defendants are liable pursuant to the

2   Exchange Act;

3       D.    Awarding compensatory damages in favor of Plaintiffs and the other

4   Class members against all Defendants jointly and generally for all damages

5   sustained as a result of Defendants' wrongdoing in an amount to be proven at trial,

6   together with interest thereon;

7       E.    Awarding Plaintiffs and other members of the Class their costs and

8   expenses of this litigation, including reasonable attorneys' fees, accountants' fees

9   and experts' fees, and other costs and disbursements;

10       F.    Awarding rescission or a rescissory measure of damages; and

11       G.    Awarding Plaintiffs and other members of the Class injunctive and

12   other equitable relief, including rescission, as appropriate, in addition to any other

13   relief that is just and proper under the circumstances.

14   **VIII.  JURY DEMAND**

15       Plaintiffs hereby demand a trial by jury.

16   DATED:  May 12, 2023                ROBBINS GELLER RUDMAN

17                                         & DOWD LLP
LAURIE L. LARGENT

18                                        STEPHEN JOHNSON

19   

20                                       s/ LAURIE L. LARGENT
                                  LAURIE L. LARGENT

21   

22                                     655 West Broadway, Suite 1900
San Diego, CA  92101

23                                     Telephone:  619/231-1058
619/231-7423 (fax)

24                                     llargent@rgrdlaw.com
sjohnson@rgrdlaw.com

25                                     Lead Counsel for Lead Plaintiff

26   

27   

28   

4854-9104-7523.v1

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Lead Plaintiff

LEVI & KORSINSKY LLP
SHANNON L. HOPKINS (to be
admitted *pro hac vice*)
GREGORY M. POTREPKA (to be
admitted *pro hac vice*)
DAVID JAYNES
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: 203/9924523
shopkins@zlk.com
gpotreka@zlk.com
djaynes@zlk.com

Attorneys for Plaintiff Erika Schroth

4854-9104-7523.v1

# Certification of Plaintiff Pursuant to Federal Securities Laws

I, Erika Schroth , duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the amended complaint and authorize its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in Torrid Holdings Inc. which are the subject of this litigation during the class period set forth in the amended complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury that the foregoing is true and correct. Executed this

Date: May 11, 2023

Name: Erika Schroth

Signature:

83

| Case Name | Torrid Holdings Inc. |
|---|---|
| Ticker | CURV |
| Class Period | 06-30-2021 to 11-16-2022 |

| Client Name |
|---|
| Erika Schroth |

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 08-09-2021 | P | 1 | $ 26.6636* |
| 01-03-2022 | P | 2 | $ 09.6661* |
| 07-01-2022 | P | 5 | $ 04.2900* |
| 08-15-2022 | P | 150 | $ 06.9500* |
| 08-15-2022 | P | 35 | $ 07.1900* |
| 08-16-2022 | P | 2 | $ 07.1500* |
| 08-18-2022 | P | 35 | $ 06.7800* |
| 08-23-2022 | P | 100 | $ 06.1000* |
| 08-31-2022 | P | 200 | $ 05.7100 |
| 09-19-2022 | P | 180 | $ 05.6100 |
| 09-27-2022 | P | 2000 | $ 04.3500 |
| 09-27-2022 | P | 1 | $ 04.3400 |
| 09-27-2022 | P | 1 | $ 04.3400 |

*Price per share was converted from CAD to USD using FX Rate provided per transaction

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on May 12, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

 s/ LAURIE L. LARGENT
LAURIE L. LARGENT

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  llargent@rgrdlaw.com

4854-9104-7523.v1

## Mailing Information for a Case 2:22-cv-08375-JLS-AS Sandra Waswick v. Torrid Holdings, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam Marc Apton**
  aapton@zlk.com,ecf@zlk.com

- **Kevin M. Askew**
  kaskew@orrick.com

- **Darrell S. Cafasso**
  dcafasso@orrick.com

- **Mark C. Holscher**
  mark.holscher@kirkland.com,mholscher@kirkland.com,adrienne-levin-5018@ecf.pacerpro.com

- **Stephen Johnson**
  sjohnson@rgrdlaw.com

- **Jennifer M. Keighley**
  jkeighley@orrick.com

- **James N. Kramer**
  jkramer@orrick.com,lpatts@orrick.com,casestream@ecf.courtdrive.com

- **Laurie L Largent**
  llargent@rgrdlaw.com,agonzales@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Brett M. Middleton**
  brettm@johnsonfistel.com,kristeno@johnsonfistel.com,paralegal@johnsonfistel.com

- **Austin C Norris**
  austin.norris@kirkland.com,laura-bay-kirkland-ellis-llp-2744@ecf.pacerpro.com,jelani.solper@kirkland.com,laura.bay@kirkland.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,tprzybylowski@pomlaw.com,jlopiano@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pom

- **Laurence M. Rosen**
  lrosen@rosenlegal.com,lrosen@ecf.courtdrive.com

- **Alexander K. Talarides**
  atalarides@orrick.com,lpatts@orrick.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

86