# EXHIBIT 13

**Table of Contents**

As filed with the Securities and Exchange Commission on July 10, 2017

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM S-1
## REGISTRATION STATEMENT UNDER
## THE SECURITIES ACT OF 1933

# Torrid Inc.
(Exact name of registrant as specified in its charter)

| Delaware | 5600 | 47-3714423 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**18501 E. San Jose Ave.**
**City of Industry, California 91748**
**(626) 667-1002**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Kay Hong**
**Chief Executive Officer**
**Torrid Inc.**
**18501 E. San Jose Ave.**
**City of Industry, California 91748**
**(626) 667-1002**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies of all communications, including communications sent to agent for service, should be sent to:*

| | |
|---|---|
| **Richard Aftanas, P.C.** | **Michael Benjamin** |
| **Brian Hecht** | **Stelios G. Saffos** |
| **Kirkland & Ellis LLP** | **Latham & Watkins LLP** |
| **601 Lexington Avenue** | **885 Third Avenue** |
| **New York, New York 10022** | **New York, New York 10022** |
| **(212) 446-4800** | **(212) 906-1200** |

**Approximate date of commencement of proposed sale to the public: As soon as practicable after this Registration Statement becomes effective.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box: ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                    Accelerated filer ☐
Non-accelerated filer ☒ (Do not check if a smaller reporting company)    Smaller reporting company ☐
Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act ☒

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Proposed Maximum Aggregate Offering Price(1)(2) | Amount of Registration Fee |
|---|---|---|
| Common Stock, $0.01 par value per share | $100,000,000 | $11,590 |

(1) Includes shares of common stock that the underwriters may purchase (including pursuant to the option to purchase additional shares) from the selling stockholders.
(2) Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(o) under the Securities Act of 1933, as amended.

**The registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until this Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

**Table of Contents**

The information in this prospectus is not complete and may be changed. The selling stockholders may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

Subject to Completion
Preliminary Prospectus dated , 2017

PROSPECTUS

# Shares

# TORRID

# Torrid Inc.

## Common Stock

This is the initial public offering of Torrid Inc. ("Torrid"). All of the shares of common stock are being sold by the selling stockholders. Torrid will not receive any of the proceeds from the sale of the shares being sold by the selling stockholders.

Prior to this offering, there has been no public market for the common stock. It is currently estimated that the initial public offering price per share will be between $ and $ . Torrid intends to apply to list the common stock on the New York Stock Exchange ("NYSE") under the symbol "CURV."

After the completion of this offering, affiliates of Sycamore Partners Management, L.P. ("Sycamore") will continue to own a majority of the voting power of shares eligible to vote in the election of our directors. As a result, we will be a "controlled company" within the meaning of the corporate governance standards of the NYSE. See "Management—Corporate Governance."

We are an "emerging growth company" as defined under the federal securities laws and, as such, will be subject to certain reduced public company reporting requirements. See "Prospectus Summary—Implications of Being an Emerging Growth Company."

**Investing in the common stock involves risks that are described in the "Risk Factors" section beginning on page 15 of this prospectus.**

| | Per Share | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discount | $ | $ |
| Proceeds, before expenses, to the selling stockholders | $ | $ |

The underwriters may also exercise their option to purchase up to an additional shares from the selling stockholders, at the public offering price, less the underwriting discount, for 30 days after the date of this prospectus. Neither the Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

The shares will be ready for delivery on or about , 2017.

| | |
|---|---|
| **BofA Merrill Lynch** | **Morgan Stanley** |

| | | |
|---|---|---|
| **Goldman Sachs & Co. LLC** | **J.P. Morgan** | **Jefferies** |

| | | |
|---|---|---|
| **Baird** | **Telsey Advisory Group** | **William Blair** |

The date of this prospectus is , 2017.

Table of Contents



Table of Contents



Table of Contents



Table of Contents



**TABLE OF CONTENTS**

| | |
|---|---|
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 15 |
| FORWARD-LOOKING STATEMENTS | 36 |
| USE OF PROCEEDS | 38 |
| DIVIDEND POLICY | 39 |
| CAPITALIZATION | 40 |
| DILUTION | 41 |
| SELECTED HISTORICAL CONSOLIDATED FINANCIAL AND OPERATING DATA | 42 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 44 |
| BUSINESS | 66 |
| MANAGEMENT | 78 |
| EXECUTIVE COMPENSATION | 84 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS | 91 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 93 |
| DESCRIPTION OF CERTAIN INDEBTEDNESS | 96 |
| DESCRIPTION OF CAPITAL STOCK | 98 |
| SHARES ELIGIBLE FOR FUTURE SALE | 102 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS TO NON-U.S. HOLDERS | 104 |
| UNDERWRITING | 109 |
| LEGAL MATTERS | 117 |
| EXPERTS | 117 |
| CHANGE IN AUDITORS | 117 |
| WHERE YOU CAN FIND MORE INFORMATION | 117 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | F-1 |

We have not and the selling stockholders and the underwriters have not authorized anyone to provide you with any information other than that contained in this prospectus or in any free writing prospectus prepared by or on behalf of us or to which we have referred you. The selling stockholders are offering to sell, and seeking offers to buy, shares of our common stock only in jurisdictions where such offers and sales are permitted. The information in this prospectus or any free writing prospectus is accurate only as of its date, regardless of its time of delivery or the time of any sale of shares of our common stock. Our business, financial condition, results of operations and prospects may have changed since that date.

For investors outside the United States: neither we nor the selling stockholders or the underwriters have done anything that would permit our initial public offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about, and observe any restrictions relating to, the offering of the shares of our common stock and the distribution of this prospectus outside of the United States.

**Table of Contents**

**BASIS OF PRESENTATION**

Our fiscal year ends on the Saturday nearest to January 31 and each fiscal year is generally comprised of four 13-week quarters (although in years with 53 weeks, the fourth quarter is comprised of 14 weeks). Fiscal years are identified in this prospectus according to the calendar year in which they begin. For example, references to "fiscal year 2016" or similar references refer to the fiscal year ended January 28, 2017.

On May 1, 2015, Hot Topic, Inc. ("Hot Topic") entered into a Contribution Agreement pursuant to which Hot Topic contributed all of the existing assets and liabilities related to its former Torrid business to a newly-formed, separate and wholly-owned subsidiary of Hot Topic, Torrid LLC. Immediately thereafter, on May 1, 2015, Hot Topic entered into a Purchase Agreement (the "Purchase Agreement") with Torrid Inc. (formerly known as Torrid Holding Corp.), pursuant to which Hot Topic sold all of its issued and outstanding equity interests in Torrid LLC to Torrid Inc. This transaction is referred to herein as the "Separation."

For the period presented prior to the Separation, fiscal year 2014 and the portion of fiscal year 2015 from February 1, 2015 to May 2, 2015, Torrid was included within Hot Topic's business and did not operate as a standalone company. The results of operations and cash flows for this period included herein were derived from Hot Topic's consolidated financial statements and accounting records as if Hot Topic's Torrid business had been operated as a standalone business prior to the Separation. The financial position, results of operations and cash flows for this period include certain assets and liabilities that are specifically identifiable or attributable to Torrid, and they also include an allocation of expenses related to certain Hot Topic corporate functions, including senior management, distribution, legal, human resources, finance, general and administrative and information technology. These expenses have been allocated to us based on direct usage or benefit where identifiable, with the remainder allocated on a pro rata basis of revenues, headcount, store count, units shipped and received, square footage or other relevant measures. Torrid considers the expense allocation methodology and results to be reasonable; however, the allocations may not be indicative of the actual expenses that would have been incurred had Torrid operated as a separate company for this period. Torrid's results of operations and cash flows for the period following the Separation are as a result of operating Torrid as a separate company.

Our financial statements for fiscal years 2015 and 2016 and the three months ended April 30, 2016 and April 29, 2017 include the results of the Lovesick test concept, which in January 2017 we decided to close and we expect to have completed closing the Lovesick test concept by the end of the second quarter of fiscal year 2017. Unless otherwise noted, the operating information presented in this prospectus, including that denoted as Torrid brand information, represents our results excluding the Lovesick test concept.

As described in this prospectus, comparable company sales growth includes same-store net sales and e-commerce net sales calculated on a year-over-year basis. We apply current year foreign currency exchange rates to both current year and prior year comparable sales to remove the impact of foreign currency fluctuation and achieve a consistent basis for comparison. For purposes of this calculation, we consider a store comparable after it has been open for 15 full fiscal months. If a store is closed during a fiscal year, it is only included in the computation of comparable company sales for the full fiscal months in which it was open. Partial fiscal months are excluded from the computation of comparable company sales. As described in this prospectus, comparable brand sales growth represents comparable company sales growth, excluding the effects of the Lovesick test concept. As described in this prospectus, e-commerce penetration refers to Torrid brand net sales generated in the e-commerce channel divided by total Torrid brand net sales, excluding the effects of the Lovesick test concept.

As used in this prospectus, store-level EBITDA refers to a particular store's net sales, less product costs and direct operating costs, including payroll, occupancy and other operating costs specifically associated with that store. Store-level EBITDA is an assessment of store-level profitability and a supplemental measure of the operating performance of our stores that is neither required by, nor presented in accordance with, accounting principles generally accepted in the United States ("GAAP") and our calculations thereof may not be comparable to those reported by other companies. We present this measure as we believe it is frequently used by securities analysts, investors and other interested parties to evaluate companies in our industry and we use it internally as a benchmark to compare our performance to that of our competitors. This measure has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our results as reported under GAAP.

ii

Table of Contents

References to the membership of our customer loyalty program, Torrid Insider, refer to the total number of customers that have signed up for Torrid Insider, and not unsubscribed, over the life of the program; there is no additional requirement for these customers to have been recently or repetitively active as customers of Torrid.

Certain figures in this prospectus have been subject to rounding adjustments. Therefore, figures shown as totals in certain tables may not sum due to rounding.

## MARKET AND INDUSTRY DATA

We obtained the industry, market and competitive position data throughout this prospectus from our own internal estimates and research as well as from industry and general publications and research, studies and surveys conducted by third parties. Industry publications, studies and surveys generally state that they have been obtained from sources believed to be reliable, although they do not guarantee the accuracy or completeness of such information. While we believe that each of these studies and publications is reliable, we have not independently verified market and industry data from third-party sources. While we believe our internal company research is reliable and the definitions of our market and industry are appropriate, neither such research nor these definitions have been verified by any independent source. Certain industry, market and competitive position data presented in this prospectus was obtained from various public data reports published by The NPD Group, Inc. We refer to this data throughout this prospectus as data from "NPD."

## TRADEMARKS AND TRADE NAMES

This prospectus includes our trademarks such as "Torrid," which are protected under applicable intellectual property laws and are the property of Torrid Inc. or its subsidiaries. This prospectus also contains trademarks, service marks, trade names and copyrights, of other companies, which are the property of their respective owners. Solely for convenience, trademarks and trade names referred to in this prospectus may appear without the ® or ™ symbols, but such references are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights or the right of the applicable licensor to these trademarks and trade names.

## NON-GAAP FINANCIAL MEASURES

Adjusted EBITDA and Adjusted EBITDA margin are supplemental measures of our operating performance that are neither required by, nor presented in accordance with, GAAP and our calculations thereof may not be comparable to similarly titled measures reported by other companies. Adjusted EBITDA represents GAAP net income (loss) plus interest expense and other, net, (benefit) provision for income taxes, depreciation and amortization, non-cash deductions and charges, other expenses, an adjustment for the Transition Services Agreement (as defined herein) and the elimination of Lovesick test concept EBITDA. Adjusted EBITDA margin represents Adjusted EBITDA as a percentage of Torrid brand net sales. We present these measures as we believe they are frequently used by securities analysts, investors and other interested parties to evaluate companies in our industry and we use them internally as benchmarks to compare our performance to that of our competitors. These measures have limitations as analytical tools and you should not consider them in isolation or as substitutes for analysis of our results as reported under GAAP.

Adjusted EBITDA and Adjusted EBITDA margin are not measurements of our financial performance under GAAP and should not be considered as alternatives to net income (loss), income (loss) from operations or any other performance measures determined in accordance with GAAP or as alternatives to cash flows from operating activities as a measure of our liquidity. We believe Adjusted EBITDA and Adjusted EBITDA margin facilitate operating performance comparisons from period to period by isolating the effects of certain items that vary from period to period or are incurred on a limited basis with respect to any particular store, without any correlation to ongoing operating performance. We also use Adjusted EBITDA and Adjusted EBITDA margin as two of the primary methods for planning and forecasting the overall expected performance of our business and for evaluating on a quarterly and annual basis actual results against such expectations. Further, we recognize

**Table of Contents**

Adjusted EBITDA and Adjusted EBITDA margin as commonly used measures in determining business value and, as such, use them internally to report and analyze our results and we additionally use Adjusted EBITDA as a benchmark to determine certain non-equity incentive payments made to executives. Our presentation of Adjusted EBITDA and Adjusted EBITDA margin should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items.

For a reconciliation of net income (loss) to Adjusted EBITDA, see "Prospectus Summary—Summary Consolidated Historical Financial and Other Data."

iv

**Table of Contents**

<div style="border:1px solid #000; padding:10px;">

**PROSPECTUS SUMMARY**

*This summary highlights information contained elsewhere in this prospectus. This summary does not contain all of the information that you should consider in making your investment decision. You should read the following summary together with the entire prospectus, including the more detailed information regarding our Company, the common stock being sold in this offering and our consolidated financial statements and the related notes appearing elsewhere in this prospectus. You should carefully consider, among other things, our consolidated financial statements and the related notes thereto included elsewhere in this prospectus and the matters discussed in the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this prospectus before deciding to invest in our common stock. Some of the statements in this prospectus constitute forward-looking statements. See "Forward-Looking Statements."*

*Except where the context otherwise requires or where otherwise indicated, the terms "Torrid," "we," "us," "our," "our Company" and "our business" refer to Torrid Inc. together with its consolidated subsidiaries as a combined entity.*

*Our financial statements for fiscal years 2015 and 2016 and the three months ended April 30, 2016 and April 29, 2017 include the results of the Lovesick test concept, which in January 2017 we decided to close and we expect to have completed closing the Lovesick test concept by the end of the second quarter of fiscal year 2017. Unless otherwise noted, the operating information presented in this section and elsewhere in this prospectus, including that denoted as Torrid brand, represents our results excluding the Lovesick test concept.*

**Company Overview**

Torrid is the industry-leading and fastest growing branded omni-channel retailer of apparel, intimates and accessories for young, plus-size women in North America. Our mission is to grow our leadership position in this market by providing our customers with a broad assortment of high-quality, carefully-fitted apparel, intimates and accessories that is unapologetically young, sexy and fashionable. Our target customer is a 25 to 40 year old woman who is curvy and wears sizes 10 to 30. We believe our customer values the convenience and appeal of our curated presentation of merchandise that helps her be stylish for any occasion, including casual, work and dressy, at accessible price points. We believe we offer the young, plus-size woman both a product selection and a customer experience that have not previously been available to her. This offering makes us her favorite shopping destination and presents the opportunity to capture a significant portion of an underserved and growing market. Our differentiated approach and distinctive assortment have resulted in a highly loyal customer base and strong growth in our business. We have delivered 21 consecutive quarters of industry-leading comparable brand sales growth (averaging 27% over the three years ended January 28, 2017), a compound annual growth rate ("CAGR") in Torrid brand net sales of 44% for the three years ended January 28, 2017, fiscal year 2016 net loss of $29.1 million and fiscal year 2016 Adjusted EBITDA of $86.0 million. For a reconciliation of our Adjusted EBITDA to our net income (loss), please see "Prospectus Summary—Summary Consolidated Historical Financial and Other Data."

We believe we are the clear market leader for an underserved and growing demographic of young, plus-size women that no other national specialty retailer targets or adequately addresses. According to NPD, the women's plus-size apparel market was approximately $21 billion in 2016, and has grown at more than twice the rate of the overall U.S. women's apparel market. This accelerated market growth is expected to continue. While approximately two-thirds of U.S. women are plus-size (sizes 14 and up), only 17% of women's apparel sales during 2016 in the U.S. were in plus-sizes. We estimate there is only one dedicated plus-size apparel store for every 30 specialty apparel stores. As a result, there are approximately 34,000 plus-size women for each plus-size apparel store, as compared to 600 women for each other specialty apparel store. We also believe other existing national plus-size retailers aim to serve customers over 40 years old, an age demographic that has traditionally been associated with plus-sizes. However, approximately 50% of the plus-size population is under 45 years old and we believe this demographic is particularly underserved.

</div>

1

Table of Contents

We operate a growing omni-channel business model that is highly profitable on an Adjusted EBITDA basis. In fiscal year 2016, we achieved industry-leading e-commerce penetration of 34%, an increase from 20% penetration in fiscal year 2012. As of April 29, 2017, we operated 487 stores in 48 U.S. states, Puerto Rico and Canada, 99% of which generated positive store-level EBITDA in fiscal year 2016. Our stores average approximately 2,850 square feet. Our stores are located primarily in premium malls, strip centers, lifestyle centers or outlet locations. They perform consistently across all formats because, we believe, our stores serve as a shopping destination for our customers. Each new store requires a small investment that typically pays back in approximately 17 months. Our stores not only serve existing customers but also help us acquire new customers who then shop our assortment across channels.

To achieve our mission, we have aligned our strategy and team around three guiding pillars: People, Product and Customer Experience.

**People.** We believe other apparel companies address the plus-size woman only as an afterthought and, as a result, have not attracted the strongest talent to address this customer's specific, fit-driven product needs. We have created a company culture focused on attracting, training and developing talent that does not settle for the low expectations that have previously been the norm for shoppers in the plus-size market. We are passionate about what we do. We seek to hire, develop and promote people that share both our passion and our focus on creating the best products and experience for our customers. We are organized to maximize collaboration among our product, merchandising and other business teams, all of which share our common mission. In conjunction with the Separation in fiscal year 2015, we developed standalone corporate functions to increase the focus of our team. We believe these investments enabled our recent performance trends and position us well for continued growth.

**Product.** We are relentlessly focused on creating great products. We believe our products not only provide an unparalleled technical fit, but also have the style and attitude that enable our customers to shop and dress like her non-plus-size friends. We believe we are a destination for our customers to shop for every occasion, from casual to dressy and everything in between. We design, develop and merchandise almost all of our products in-house under the Torrid brand name. Our products are exclusive to us, with few exceptions, and provide a consistent quality and fit that we believe she cannot find elsewhere. Our merchandise addresses our customers' entire closet, including tops, bottoms, denim, dresses, intimates, swimwear, shoes and accessories. Approximately 80% of Torrid brand net sales in fiscal year 2016 were from core and on-trend basics that she regularly replenishes. Approximately 20% of Torrid brand net sales in fiscal year 2016 were from trend-driven items that incorporate the latest fashions available in the broader market. We introduce new lines of merchandise more than a dozen times per year. This frequency ensures an ongoing flow of new and relevant merchandise that keeps our customer coming back to us. We employ a data-centric approach and have a responsive supply chain, both of which allow us to respond quickly to customer preferences and mitigate inventory risk. Together, these attributes have led to consistent, predictable operating performance over time.

**Customer Experience.** We seek to provide our customers with products and an experience that makes them feel special, rather than different. We believe our brand is democratic and attracts women of all ages, ethnicities and sizes. However, our target customer is an employed young woman between the ages of 25 and 40 years old with above-average annual household income (average of approximately $75,000), who wears sizes 10 to 30 (average of 18). She leads a busy life, is short on time and wants a curated presentation of quality apparel, intimates and accessories that are on trend and fit her well. We believe our target customer has been largely overlooked by other retailers. When our customer discovers Torrid, she actively engages with us and becomes highly loyal. This is evidenced by the strength of our loyalty program, Torrid Insider, which grew from 2.7 million members at the end of fiscal year 2014 to over 4.5 million members at the end of fiscal year 2016. These loyalty program members represented approximately 86% of Torrid brand net sales for fiscal year 2016 and show tremendous enthusiasm for our brand. Our loyalty customers make a purchase from us an average of approximately four times per year and have increased their spending with us over time.

2

**Table of Contents**

We believe our product-focused strategy and passionate team have resulted in a defensible market position and consistent growth in Torrid brand net sales and Adjusted EBITDA. Recent financial highlights include:

- Torrid brand net sales growth to $629.7 million in fiscal year 2016, representing a three-year CAGR in Torrid brand net sales of 44%;

- Positive comparable brand sales growth for 21 consecutive quarters, averaging 27% over the three years ended January 28, 2017;

- Net income of $1.6 million in fiscal year 2014 and net losses of $163.8 million and $29.1 million in fiscal years 2015 and 2016, respectively;

- Adjusted EBITDA growth from negative $2.2 million in fiscal year 2014, to $86.0 million in fiscal year 2016; and

- Adjusted EBITDA margin expansion from negative 0.7% in fiscal year 2014, to 13.7% in fiscal year 2016.



**Competitive Strengths**

We attribute our continued success to the following competitive strengths:

**Differentiated, Leading Brand in a Growing and Underserved Market.** Based on our industry experience and analysis of publicly available information, we believe we are the industry-leading and fastest growing branded omni-channel retailer of apparel, intimates and accessories for young plus-size women in North America. The Torrid brand represents a distinctive combination of assortment, quality, fit and customer experience that, we believe, plus-size women have never had available to them. Our brand satisfaction is among

3

Table of Contents

the highest for specialty retailers, according to third party customer surveys. We believe this significant brand value will facilitate sustainable net sales growth and market share gains over time. We target an underserved and growing demographic of young, plus-size women, whom we believe no other national specialty retailer targets or adequately addresses. We believe retailers not dedicated to plus-size have entered the plus-size category as an afterthought, often relegating the plus-size customer to a less desirable section of the store and failing to design product that addresses her specific fit requirements. We believe we are both gaining share in the market and helping expand the market for plus-size apparel.

**Loyal and Passionate Customer.** Our target customer is an employed young woman between the ages of 25 and 40 years old, who is short on time and wants a curated presentation of quality apparel, intimates and accessories that are on trend and fit her well. We believe many of our customers form a deep emotional connection with our brand, as their discovery of our brand is often the first time in their lives they feel well-served and respected by an apparel company. As a result, our customer is highly loyal, with 86% of Torrid brand net sales in fiscal year 2016 generated by over 4.5 million customers who have chosen to join our loyalty program. Our loyalty program gives us a rich database of information to market to our customers more effectively and has enabled us to consistently retain over 80% of net sales from the prior year's customers. Our loyal customers are growing more productive, with the average spend per loyalty program customer increasing by a 12% CAGR since fiscal year 2012.

**Low-Risk Merchandising Model.** We believe plus-size customers prioritize how a product fits above all other purchasing criteria. Unlike retailers who are not exclusively focused on the plus-size customer, we design and engineer our product specifically to fit our customers' body type. We believe our singular focus on plus-sizes allows us to create product that fits uniquely well, without compromising on style. We ensure that our merchandise has a consistent fit across our entire assortment and size range. This enables our customer to shop seamlessly between our e-commerce platform and stores with confidence that the products she purchases will fit consistently. Our vertical sourcing model gives us control over fit, quality, consistency and cost, while ensuring product exclusivity.

We have a strong core and on-trend basics program, which represented approximately 80% of Torrid brand net sales in fiscal year 2016, complemented by trend-driven merchandise, which represented approximately 20% of Torrid brand net sales in fiscal year 2016. Because our customer prioritizes fit, we do not rely on being fashion leaders. Nonetheless, each year we introduce more than a dozen collections that provide a consistent flow of fresh merchandise. This frequency of deliveries reduces our dependence on any one collection and motivates our customers to visit our e-commerce platform and our stores more frequently.

We believe we have an efficient, diversified and flexible supply chain that allows us to better meet our customers' needs, mitigate inventory risk and limit product markdowns. We assess sales data, market trends and new product development on a weekly basis in order to make in-season inventory purchasing adjustments where possible and to respond to the latest sales trends. We believe our data-centric approach and responsive supply chain allow us to respond quickly to customer preferences and mitigate inventory risk, leading to consistent, predictable operating performance over time.

**Industry-Leading Omni-Channel Business Model.** We have established a powerful, industry-leading omni-channel business model that is rapidly growing and highly profitable on an Adjusted EBITDA basis. Our e-commerce platform and store base complement and drive traffic to one another. We leverage our targeted marketing initiatives, including direct mail and digital marketing, to acquire new customers across all channels. Approximately 75% of new-to-brand customers in fiscal year 2016 first engaged with Torrid through our stores. We have a history of converting customers from single-channel customers to omni-channel customers. On average, our omni-channel customer shops more often and spends approximately five times more per year than our single-channel customer. As a result, the proportion of our net sales derived from our e-commerce channel increased from 20% penetration in fiscal year 2012 to 34% penetration in fiscal year 2016.

4

Table of Contents

Our e-commerce platform is highly flexible and allows us to expand and enhance our customers' experience with our brand. We use our e-commerce platform to expand our selection of styles, colors and merchandise meaningfully beyond what is available in our stores, making the online shopping experience highly engaging and additive to our in-store experience. Often a new customer will discover our brand and identify her correct size by visiting a store then utilize our e-commerce platform to reorder the product in different colors or styles.

We have a robust real estate strategy and a well-established base of 487 stores across 48 U.S. states, Puerto Rico and Canada as of April 29, 2017, 99% of which generated positive store-level EBITDA in fiscal year 2016. Our stores are located primarily in premium malls, strip centers, lifestyle centers and outlet locations. They perform consistently across all formats because, we believe, our stores serve as a shopping destination for our customers and are therefore less dependent on broader traffic trends. Nonetheless, a majority of our store leases, and all of our store leases signed since 2013, include performance-based termination provisions or "kickout" clauses. These clauses provide us the contractual flexibility to exit a store or renegotiate rent in the event a store's performance deteriorates. Given the positive performance trajectory of our stores, we have historically exercised these termination provisions on a limited basis. Our stores are highly productive and have historically produced positive store-level EBITDA in the first year of operations. Our commitments to new stores are binding approximately four months before opening. New stores require a small initial investment that is typically recovered within approximately 17 months and generates an attractive return. We believe our stores also enhance brand awareness, drive traffic to our e-commerce platform and encourage a growing number of customers to shop across multiple channels of our omni-channel business model.

**Highly Experienced Team with Proven Track Record Delivering Industry-Leading Financial Results.** Our Company is led by a team of experienced professionals who have proven track records and are passionate about our mission. Our Chief Executive Officer, Kay Hong, joined the Company in January 2017. She is a retail veteran with extensive direct and retail channel knowledge and has spent over a decade building businesses. Ms. Hong previously served as Chief Operating Officer and Executive Vice President Direct and Chief Marketing Officer at Talbots and as Chief Executive Officer of Harry & David. Our product team is led by Elizabeth Muñoz, our Senior Vice President of Product, who has been with the Company since 2010 and was previously the President of Lucky Brands. Our merchandising and marketing teams are led by Kate Horton, our Senior Vice President of Merchandising and Marketing, who has been with the Company since 2012 and was previously the Vice President of Merchandising at Soma Intimates. Our Chief Financial Officer, George Wehlitz, has been with the Company since 2016 and was previously Chief Financial Officer at Hot Topic, where he helped develop the Torrid concept. Our leadership team is passionate about our customer, has created a highly collaborative culture and has built a deep pool of talent throughout the organization.

### Growth Strategies

**Grow Brand Awareness and Omni-Channel Customer Base.** We believe we are both gaining market share and helping expand the market for plus-size apparel. Most of our success to date has been driven by word of mouth, social media, targeted marketing events, direct mail and digital marketing. Our investments in our direct mail program and digital marketing have increased the engagement of our existing customers. We nearly doubled our active customer base between fiscal year 2014 and fiscal year 2016. We believe we can profitably expand our advertising and marketing programs using data-driven initiatives to further build our brand and customer base. We increased the proportion of our net sales derived from our e-commerce channel from 20% penetration in fiscal year 2012 to 34% penetration in fiscal year 2016. We believe our e-commerce channel can grow to represent 50% of our net sales over time.

**Expand Our Footprint.** We believe the plus-size young woman is dramatically underserved in her choice of apparel retailers and we have a significant and attractive opportunity to grow our footprint. Based on

Table of Contents

our proven, profitable store model, we intend to continue to capture this underpenetrated market with a disciplined roll-out of new stores that drive both in-store and e-commerce sales. Because we are a destination for our customers, we have successfully opened and operated our stores in all retail formats, including premium malls, strip centers, lifestyle centers and outlet locations. Our current total retail square footage is less than approximately one-third of the total square footage of a typical specialty retailer. In addition, each of our stores is approximately 2,850 square feet, which is less than one-half of the size of a typical specialty retail store. We believe there is a significant opportunity for us to profitably open additional stores in the U.S. and Canada and remain underpenetrated in total retail square footage relative to our peers. We intend to opportunistically open approximately 95 new stores in 2017 and approximately 45 new stores in fiscal year 2018, in each case net of any store closures over the period. In fiscal year 2016, 99% of our locations generated positive store-level EBITDA. Our new stores average approximately $950,000 of net sales per store and approximately $200,000 of store-level EBITDA in the first year of operations. New stores cost approximately $290,000 to open, including net capital expenditures and pre-opening expenses, and we target payback periods of approximately 17 months. We remain highly disciplined in our store growth strategy, and our commitments to new stores are binding approximately four months before opening. We have historically been able to obtain attractive leasing rates and flexible lease termination rights. A majority of our store leases, and all new store leases signed since 2013, include performance-based termination provisions or "kick-out" clauses. We leverage our store base to drive increased omni-channel sales and conversion. We provide flexibility for a customer to order from our e-commerce platform or in our stores and to have the product delivered to either her home or a store.

**Augment Data-Driven Customer-Relationship Initiatives to Drive Sales Per Customer.** We intend to continue to leverage the strength of our loyalty program, which has over 4.5 million members and allows us to attribute approximately 86% of Torrid brand net sales to an individual buyer. This robust customer data allows us to better engage with customers, increase retention and continue to convert customers to omni-channel customers. Our omni-channel customers on average spend approximately five times more per year than our single-channel customers. In the second quarter of fiscal year 2017, we expect to launch our mobile app. We expect our mobile app's unique content and simplified purchasing to help drive customer engagement and net sales. We continue to strengthen our omni-channel model and our ability to leverage our substantial customer data and loyalty program. We believe these growing capabilities will provide our customer with an increasingly holistic and personal brand experience and will drive increasing traffic and conversion both in-store and online.

**Broaden Product Assortment and Merchandising Offering.** We believe there is a substantial opportunity to grow our business by selectively expanding our product categories and assortment to leverage our customer relationships and trusted fit. For example, we recently relaunched our swim category, leveraging our experience with the fit and design of our intimates offering to deliver exciting new product. We have identified a number of compelling growth opportunities, including further penetration of intimates, shoes and swim, which we expect to drive increased net sales.

**Enhance Margins With Best Practices.** We believe we can improve margins through ongoing refinement of our merchandising strategy, additional sourcing efficiencies and leveraging our fixed costs. Our efficient vertical sourcing model allows us to quickly react to shifting trends, better meet customer needs, mitigate inventory risk and limit product markdowns. We believe we can leverage enhanced "read-and-react" strategies to improve our speed to market, increase net sales, improve inventory turns, reduce markdowns and improve merchandise margins. We expect to capture efficiencies from increased sourcing volumes as our purchases grow along with net sales. We also expect to leverage our overhead expenses from both store unit and comparable brand sales growth.

Table of Contents

**Risks Relating to Our Business and Our Common Stock**

We are subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition or results of operations. You should carefully consider these risks, including the risks discussed in the section entitled "Risk Factors," before investing in our common stock. Risks relating to our business include, among others:

- our business is sensitive to consumer spending and general economic conditions, and an economic slowdown could adversely affect our financial performance;

- our business is highly dependent upon our ability to identify and respond to new and changing product trends, customer preferences and other related factors;

- our business depends in part on a strong brand image;

- we could face increased competition from other retailers that could adversely affect our ability to generate higher net sales and margins, as well as our ability to obtain favorable store locations;

- our ability to attract customers to our stores that are located in shopping centers depends on the success of these shopping centers;

- our inability to successfully adapt to consumer shopping preferences and develop and maintain a relevant and reliable omni-channel experience for our customers, our financial performance and brand image could be adversely affected;

- risks related to our dependence on third party manufacturing facilities; and

- our status as a "controlled company" and ability to rely on exemptions from certain corporate governance requirements.

**Our Equity Sponsor**

Sycamore Partners Management, L.P., is a private equity firm based in New York specializing in retail and consumer investments. The firm has more than $3.5 billion in capital under management. Sycamore's strategy is to partner with management teams to improve the operating profitability and strategic value of their businesses. Sycamore's investment portfolio currently includes Belk, Coldwater Creek, EMP Merchandising, Hot Topic, The Limited LLC, MGF Sourcing, NBG Home, Nine West, Talbots and Torrid.

Following this offering, Sycamore will control approximately % of the voting power of our outstanding common stock (or % if the underwriters exercise their option to purchase additional shares from the selling stockholders). As a result, Sycamore will control any action requiring the general approval of our stockholders, including the election of our board of directors, the adoption of amendments to our certificate of incorporation and bylaws and the approval of any merger or sale of substantially all of our assets. Because Sycamore will hold more than 50% of the voting power of our outstanding common stock, we will be a "controlled company" under the corporate governance rules for NYSE-listed companies. We will therefore be permitted to, and we intend to, elect not to comply with certain corporate governance requirements. See "Management—Corporate Governance—Board Composition; Director Independence; Controlled Company Exemption."

**Implications of Being an Emerging Growth Company**

We are an "emerging growth company" as defined in the Jumpstart Our Business Startups Act (the "JOBS Act"), enacted in April 2012. As an "emerging growth company," we may take advantage of specified

7

**Table of Contents**

reduced reporting and other requirements that are otherwise applicable to public companies. These provisions include, among other things:

- exemption from the auditor attestation requirement in the assessment of our internal controls over financial reporting;

- exemption from new or revised financial accounting standards applicable to public companies until such standards are also applicable to private companies;

- exemption from compliance with any new requirements adopted by the Public Company Accounting Oversight Board (United States), requiring mandatory audit firm rotation or a supplement to our auditor's report in which the auditor would be required to provide additional information about the audit and our financial statements;

- an exemption from the requirement to seek non-binding advisory votes on executive compensation and golden parachute arrangements; and

- reduced disclosure about executive compensation arrangements.

We may take advantage of these provisions until the end of the fiscal year following the fifth anniversary of our initial public offering or such earlier time that we are no longer an "emerging growth company." We will cease to be an "emerging growth company" if we have $1.07 billion or more in "total annual gross revenues" during our most recently completed fiscal year, if we become a "large accelerated filer" with a market capitalization of $700 million or more, or as of any date on which we have issued more than $1.0 billion in non-convertible debt over the three-year period to such date. We may choose to take advantage of some, but not all, of these reduced burdens. For example, we have taken advantage of the reduced reporting requirement with respect to disclosure regarding our executive compensation arrangements and expect to take advantage of the exemption from auditor attestation on the effectiveness of our internal control over financial reporting. For as long as we take advantage of the reduced reporting obligations, the information that we provide stockholders may be different from information provided by other public companies. We are irrevocably electing to "opt out" of the extended transition period relating to the exemption from new or revised financial accounting standards and as a result, we will comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-"emerging growth companies."

## Stock Split & Distribution

Prior to the completion of this offering, we will effect the following:

- a -for- split of our common stock (the "Stock Split");

- thereafter, our direct parent, Torrid Holding LLC, will create a new subsidiary, New Torrid Holding LLC, and contribute shares of Torrid Inc. stock to New Torrid Holding LLC; and

- thereafter, Torrid Holding LLC will be merged with and into Torrid Inc., with Torrid Inc. surviving the merger, and the shares of our common stock that Torrid Holding LLC holds (after giving effect to the Stock Split), along with the equity interests of New Torrid Holding LLC that Torrid Holding LLC holds, will be distributed to the equityholders of Torrid Holding LLC based on their relative rights under its limited liability company agreement, with no additional issuance of shares by us. Each holder of units of Torrid Holding LLC will receive shares or our common stock and equity interests in New Torrid Holding LLC in such merger, subject to the terms of the limited liability company agreement of Torrid Holding LLC (the "Distribution").

We expect the related party promissory note to be extinguished by operation of law in connection with the Distribution.

Table of Contents

As a result of these transactions, immediately prior to the completion of this offering, all of our outstanding common stock will be held directly by New Torrid Holding LLC and the members of Torrid Holding LLC. New Torrid Holding LLC intends to sell in the offering all of the shares of our common stock it holds at the time of the offering.

### Corporate Information

Torrid Inc., the issuer of the common stock in this offering, is a Delaware corporation. Our corporate headquarters is located at 18501 E. San Jose Ave., City of Industry, California 91748. Our telephone number is (626) 667-1002. Our website address is torrid.com. The information contained in or connected to our website is not deemed to be part of this prospectus.

9

**Table of Contents**

<div style="border:1px solid">

**The Offering**

| | |
|---|---|
| Issuer in this offering | Torrid Inc. |
| Common stock offered by the selling stockholders | shares. |
| | shares if the underwriters exercise their option to purchase additional shares in full. |
| Common stock to be outstanding immediately after this offering | shares. |
| Use of proceeds | The selling stockholders will receive all the proceeds from the sale of shares of our common stock in this offering. We will not receive any proceeds from the sale of shares of our common stock in this offering. |
| Controlled company | Upon completion of this offering, Sycamore will continue to beneficially own more than 50% of our outstanding common stock. As a result, we are eligible to, and we intend to, avail ourselves of the "controlled company" exemptions under the rules of the NYSE, including exemptions from certain of the corporate governance listing requirements. See "Management—Corporate Governance—Board Composition; Director Independence; Controlled Company Exemption." |
| Voting rights | Holders of our common stock are entitled to one vote for each share held of record on all matters submitted to a vote of our stockholders. |
| Dividend policy | We currently expect to retain all available funds and any future earnings to fund the development and growth of our business and to repay indebtedness and therefore we do not anticipate paying any cash dividends in the foreseeable future. Our ability to pay dividends on our common stock is limited by the credit agreement governing the ABL Facility, and may be further restricted by the terms of any of our future indebtedness. See "Dividend Policy." |
| Risk factors | Investing in our common stock involves a high degree of risk. See "Risk Factors" elsewhere in this prospectus for a discussion of factors you should carefully consider before deciding to invest in our common stock. |
| Proposed symbol for listing and trading on NYSE | "CURV." |

</div>

10

**Table of Contents**

Unless otherwise indicated, all information in this prospectus relating to the number of shares of our common stock to be outstanding immediately after this offering:

- excludes shares of common stock reserved for future grants under our equity compensation plan, which we plan to adopt in connection with this offering; and

- assumes (1) no exercise by the underwriters of their option to purchase up to additional shares from the selling stockholders, (2) an initial public offering price of $ per share, the midpoint of the initial public offering price range indicated on the cover of this prospectus, and (3) the completion of the Stock Split and the Distribution.

**Table of Contents**

**Summary Consolidated Historical Financial and Other Data**

The following tables present our summary consolidated financial and other data as of and for the periods indicated. We have derived the summary consolidated statements of operations and cash flows data for the fiscal years ended January 31, 2015, January 30, 2016 and January 28, 2017 from our audited consolidated financial statements for such periods included elsewhere in this prospectus. Our summary consolidated balance sheet data as of January 30, 2016 and January 28, 2017 have been derived from our audited consolidated financial statements for such periods included elsewhere in this prospectus.

We have derived the summary consolidated statements of operations and cash flows data for the three months ended April 30, 2016 and April 29, 2017 from our unaudited consolidated financial statements included elsewhere in this prospectus. Our summary consolidated balance sheet data as of April 29, 2017 has been derived from our unaudited consolidated financial statements for such period included elsewhere in this prospectus.

The summary consolidated historical financial and other data presented below should be read in conjunction with our consolidated financial statements and the related notes thereto, included elsewhere in this prospectus, and "Management's Discussion and Analysis of Financial Condition and Results of Operations." Our summary consolidated historical financial and other data may not be indicative of our future performance.

| | Fiscal Year Ended | | | Three Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | January 31, 2015 | January 30, 2016 | January 28, 2017 | April 30, 2016 | April 29, 2017 |
| | (dollars in thousands, except where noted) | | | (unaudited) | |
| **Statements of Operations Data:** | | | | | |
| Net sales | $ 292,771 | $ 440,722 | $ 640,172 | $ 151,977 | $ 197,523 |
| Cost of goods sold | 187,201 | 267,755 | 388,517 | 85,098 | 119,618 |
| Gross profit | 105,570 | 172,967 | 251,655 | 66,879 | 77,905 |
| Selling, general and administrative expenses | 101,153 | 152,193 | 191,655 | 42,041 | 58,251 |
| Share-based compensation | 750 | 56 | 63,901 | 3,059 | 12,977 |
| Impairment charges | 383 | 198,784 | 3,214 | — | — |
| Income (loss) from operations | 3,284 | (178,066) | (7,115) | 21,779 | 6,677 |
| Interest (expense) income and other, net | — | (460) | (260) | 328 | (353) |
| Income (loss) before provision (benefit) for income taxes | 3,284 | (178,526) | (7,375) | 22,107 | 6,324 |
| Provision (benefit) for income taxes | 1,664 | (14,742) | 21,722 | 9,054 | 2,846 |
| Net income (loss) | $ 1,620 | $ (163,784) | $ (29,097) | $ 13,053 | $ 3,478 |
| Net income (loss) per share (in dollars)(1): | | | | | |
| Basic | | | | | |
| Diluted | | | | | |
| Basic and diluted weighted average shares(1): | | | | | |
| Basic | | | | | |
| Diluted | | | | | |
| **Statements of Cash Flows Data:** | | | | | |
| Net cash provided by (used in): | | | | | |
| Operating activities | $ 26,701 | $ 46,867 | $ 58,955 | $ 20,568 | $ 35,897 |
| Investing activities | (30,974) | (95,551) | (59,688) | (10,673) | (15,033) |
| Financing activities | 4,300 | 81,755 | (22,916) | — | (6,875) |
| **Other Financial and Operating Data:** | | | | | |
| Torrid brand net sales(2) | $ 292,771 | $ 440,722 | $ 629,723 | $ 151,725 | $ 192,140 |
| Adjusted EBITDA(3) | $ (2,158) | $ 35,059 | $ 86,004 | $ 30,521 | $ 31,375 |
| Adjusted EBITDA margin(3) | (0.7)% | 8.0% | 13.7% | 20.1% | 16.3% |
| Comparable brand sales growth(4) | 22% | 33% | 25% | 30% | 12% |
| Store count (#) | 287 | 361 | 455 | 382 | 487 |

**Table of Contents**

| | As of | | |
|---|---|---|---|
| | January 30, 2016 | January 28, 2017 | April 29, 2017 |
| | (dollars in thousands) | | |
| | | | (unaudited) |
| **Balance Sheet Data:** | | | |
| Cash and cash equivalents | $      33,164 | $      9,583 | $      23,487 |
| Total current assets | 118,863 | 123,186 | 133,988 |
| Total current liabilities | 78,916 | 112,798 | 114,561 |
| Total long-term debt | 45,000 | 15,209 | 15,209 |
| Total liabilities and stockholder's equity | 218,004 | 265,786 | 286,992 |

(1)   Gives effect to the -for- stock split that occurred on , 2017.

(2)   Torrid brand net sales represents net sales, less net sales attributable to the Lovesick test concept, which in January 2017 we decided to close.

(3)   Adjusted EBITDA and Adjusted EBITDA margin are supplemental measures of our operating performance that are neither required by, nor presented in accordance with, GAAP and our calculations thereof may not be comparable to similarly titled measures reported by other companies. Adjusted EBITDA represents GAAP net income (loss) plus interest expense and other, net, (benefit) provision for income taxes, depreciation and amortization, non-cash deductions and charges, other expenses, an adjustment for the Transition Services Agreement and the elimination of Lovesick test concept EBITDA. Adjusted EBITDA margin represents Adjusted EBITDA as a percentage of Torrid brand net sales. We present these measures as we believe they are frequently used by securities analysts, investors and other interested parties to evaluate companies in our industry and we use them internally as benchmarks to compare our performance to that of our competitors. These measures have limitations as analytical tools and you should not consider them in isolation or as substitutes for analysis of our results as reported under GAAP.

Adjusted EBITDA and Adjusted EBITDA margin are not measurements of our financial performance under GAAP and should not be considered as alternatives to net income (loss), income (loss) from operations or any other performance measures determined in accordance with GAAP or as alternatives to cash flows from operating activities as a measure of our liquidity. We believe Adjusted EBITDA and Adjusted EBITDA margin facilitate operating performance comparisons from period to period by isolating the effects of certain items that vary from period to period or are incurred on a limited basis with respect to any particular store, without any correlation to ongoing operating performance. We also use Adjusted EBITDA and Adjusted EBITDA margin as two of the primary methods for planning and forecasting the overall expected performance of our business and for evaluating on a quarterly and annual basis actual results against such expectations. Further, we recognize Adjusted EBITDA and Adjusted EBITDA margin as commonly used measures in determining business value and, as such, use them internally to report and analyze our results and we additionally use Adjusted EBITDA as a benchmark to determine certain non-equity incentive payments made to executives. Our presentation of Adjusted EBITDA and Adjusted EBITDA margin should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items.

13

**Table of Contents**

The following table provides a reconciliation of net income (loss) to Adjusted EBITDA for the periods presented:

| | Fiscal Year Ended | | | Three Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | January 31, 2015 | January 30, 2016 | January 28, 2017 | April 30, 2016 | April 29, 2017 |
| | | | (dollars in thousands) (unaudited) | | |
| Net income (loss) | $ 1,620 | $ (163,784) | $ (29,097) | $ 13,053 | $ 3,478 |
| Interest expense (income) and other, net | — | 460 | 260 | (328) | 353 |
| Provision (benefit) for income taxes | 1,664 | (14,742) | 21,722 | 9,054 | 2,846 |
| Depreciation and amortization(A) | 14,446 | 13,691 | 16,801 | 3,588 | 5,359 |
| Non-cash deductions and charges(B) | 2,978 | 201,136 | 70,790 | 3,961 | 14,424 |
| Other expenses(C) | 767 | 1,545 | (95) | (174) | 4,515 |
| Adjustment for Transition Services Agreement(D) | (23,633) | (4,307) | — | — | — |
| Lovesick test concept EBITDA(E) | — | 1,060 | 5,623 | 1,367 | 400 |
| Adjusted EBITDA | $ (2,158) | $ 35,059 | $ 86,004 | $ 30,521 | $ 31,375 |

(A)   Depreciation and amortization excludes $0.1 million of amortization of debt issuance costs in fiscal years 2015 and 2016 that are reflected in interest expense and other, net.

(B)   Non-cash deductions and charges includes (i) share-based compensation expense, including $0.8 million in fiscal year 2014, $0.1 million in fiscal year 2015, $63.9 million in fiscal year 2016, $3.1 million in the three months ended April 30, 2016 and $13.0 million in the three months ended April 29, 2017 related to revaluing the liability-classified equity incentive units, (ii) losses on fixed asset disposals, (iii) non-cash asset impairment charges, including $0.4 million in fiscal year 2014, $198.8 million in fiscal year 2015 related to an assessment we performed for our goodwill and other indefinite-lived intangible assets in connection with the Separation and $3.2 million in fiscal year 2016 and (iv) the net impact of non-cash rent expense.

(C)   Other expenses represent non-routine expenses, including (i) legal settlement expense in fiscal years 2014 and 2015 and related reversal in fiscal year 2016, (ii) transaction-related fees in fiscal years 2015 and 2016 and the three months ended April 30, 2016 and April 29, 2017 and (iii) reimbursement of certain expenses incurred by Sycamore in providing advisory services to us in fiscal year 2015.

(D)   Represents the impact of charges under the Transition Services Agreement that would have been paid to Hot Topic by Torrid had the Transition Services Agreement been in place during the entirety of fiscal years 2014 and 2015.

(E)   Represents the elimination of EBITDA, adjusted for non-cash asset impairment charges and the net impact of non-cash rent expense, attributable to the Lovesick test concept, a young women's plus-size retail concept that in January 2017 we decided to close.

(4)   Comparable brand sales growth includes same-store net sales and e-commerce net sales calculated on a year-over-year basis for the Torrid brand. We apply current year foreign currency exchange rates to both current year and prior year comparable sales to remove the impact of foreign currency fluctuation and achieve a consistent basis for comparison. We consider a store comparable after it has been open for 15 full fiscal months. If a store is closed during a fiscal year, it is only included in the computation of comparable brand sales for full fiscal months in which it was open. Partial fiscal months are excluded from the computation of comparable brand sales.

**Table of Contents**

## RISK FACTORS

*This offering and an investment in our common stock involve a high degree of risk. You should carefully consider the risks described below, together with the financial and other information contained in this prospectus, before you decide to purchase shares of our common stock. If any of the following risks actually occurs, our business, financial condition, results of operations, cash flow and prospects could be materially and adversely affected. As a result, the trading price of our common stock could decline and you could lose all or part of your investment in our common stock.*

### Risks Related to Our Business

***Our business is sensitive to consumer spending and general economic conditions, and an economic slowdown could adversely affect our financial performance.***

Consumer purchases of discretionary retail items, including our products, generally decline during recessionary periods and other periods where disposable income is adversely affected. Our performance is subject to factors that affect domestic and worldwide economic conditions, particularly those that affect our target demographic. These factors may include unemployment rates, levels of consumer and student debt, the availability of consumer credit, healthcare costs, reductions in net worth, residential real estate and mortgage markets, taxation, fuel and energy prices, interest rates, consumer confidence, the value of the United States dollar versus foreign currencies and other macroeconomic factors. Deterioration in economic conditions or increasing unemployment levels may reduce the level of consumer spending and inhibit consumers' use of credit, which may adversely affect our net sales and profits. In recessionary periods, we may have to increase the number of promotional sales or otherwise dispose of inventory for which we have previously paid to manufacture, which could adversely affect our profitability in those periods. Weakened economic conditions and a slowdown in the economy could also adversely affect shopping center traffic and new shopping center development, which could materially adversely affect us, even though we are a destination for our customers.

In addition, a weakened economic environment or recessionary period may exacerbate some of the risks noted below, including consumer demand, strain on available resources, store growth, decreases in mall traffic, brand reputation, our ability to develop and maintain a reliable omni-channel customer experience, our ability to execute our growth initiatives, interruption of the production and flow of merchandise from key vendors, foreign exchange rate fluctuations and leasing substantial amounts of space. The same risks could be exacerbated individually or collectively.

***Our business is highly dependent upon our ability to identify and respond to new and changing product trends, customer preferences and other related factors. Our inability to identify or respond to these new trends may lead to inventory markdowns and write-offs, which could adversely affect our business and our brand image.***

Our target market of 25 to 40 year old plus-size women has stylistic preferences that cannot be predicted with certainty and are subject to change. Our success depends in large part upon our ability to effectively identify and respond to changing product trends and consumer demands among this segment, and to translate market trends into appropriate, salable product offerings. Our failure to identify and react appropriately to new and changing product trends or tastes, to accurately forecast demand for certain product offerings or an overall decrease in the demand for plus-size products could lead to, among other things, excess or insufficient amounts of inventory, markdowns and write-offs, which could materially adversely affect our business and our brand image. Because our success depends significantly on our brand image among our target segment, damage to our brand image as a result of our failure to identify and respond to changing product trends could have a material negative impact on our business. Additionally, as a specialty retailer focusing on young, plus-size women, we may not effectively identify product trends that appeal to our target segment or successfully adapt product trends prevailing in the market more broadly to this target segment. While we believe we have a flexible supply chain,

15

**Table of Contents**

we often enter into agreements for the manufacture and purchase of merchandise well ahead of the season in which that merchandise will be sold. Therefore we are vulnerable to changes in consumer preference and demand between the time we design and order our merchandise and the season in which this merchandise will be sold. There can be no assurance that our new product offerings will have the same level of acceptance as our product offerings in the past or that we will be able to adequately and timely respond to the preferences of our customers. The failure of our product offerings to appeal to our customers could have a material adverse effect on our business, results of operations and financial condition.

***Our business depends in part on a strong brand image, and if we are not able to maintain and enhance our brand, particularly among our target segment and in new markets where we have limited brand recognition, we may be unable to attract sufficient numbers of customers to our stores or sell sufficient quantities of our products.***

Our ability to maintain our reputation is critical to our brand image. Our reputation could be jeopardized if we fail to maintain high standards for merchandise quality and integrity. Any negative publicity about these types of concerns may reduce demand for our merchandise. Failure to maintain high ethical, social and environmental standards for all of our operations and activities, including those of our third-party manufacturers (if they do not, for instance, adhere to our vendor code of conduct), or adverse publicity regarding our responses to these concerns could also jeopardize our reputation. Failure to comply with local laws and regulations, to maintain an effective system of internal controls or to provide accurate and timely financial statement information could also hurt our reputation. Damage to our reputation or loss of consumer confidence for any of these reasons could have a material adverse effect on our business, financial condition and results of operations, as well as require additional resources to rebuild our reputation.

***We could face increased competition from other retailers that could adversely affect our ability to generate higher net sales and margins, as well as our ability to obtain favorable store locations.***

We face substantial competition in the plus-size women's retail apparel industry from both specialty and general retailers, including department stores, mass merchants, regional retail chains, web-based stores and other direct retailers that engage in the retail sale of apparel, accessories, footwear and other similar product categories. We compete with these businesses for customers, vendors, suitable store locations and personnel. We compete on the basis of a combination of factors, including among others, our knowledge of and focus on our target segment, price, breadth, quality, fit and style of merchandise offered, in-store experience, level of customer service, ability to identify and offer new and emerging product trends and brand image.

Many of our competitors have greater financial, marketing and other resources available. In many cases, our competitors sell their products in stores that are located in the same shopping centers as our stores. In addition to competing for sales, we compete for favorable site locations and lease terms in malls, strip centers, lifestyle centers and outlet centers and our competitors may be able to secure more favorable locations than we can as a result of their relationships with, or appeal to, landlords. Our competitors may also sell substantially similar products at reduced prices online or through outlet locations or discount stores, increasing the competitive pricing pressure for those products.

We also compete with other retailers for personnel. The competition for retail talent is increasing, and we may not be able to secure the talent we need to operate our stores without increasing wages. We cannot assure you that we will continue to be able to compete successfully against existing or future competitors. Our expansion into markets served by our competitors and entry of new competitors or expansion of existing competitors into our markets could have a material adverse effect on us.

16

Table of Contents

***Our ability to attract customers to our stores that are located in shopping centers depends on the success of these shopping centers, and any decrease in customer traffic in these shopping centers could cause our net sales and profitability to be less than expected.***

Our stores are primarily located in shopping centers, and some of these shopping centers have been experiencing declines in customer traffic. While we believe we are a destination for our customers, our sales at these stores are impacted by the volume of customer traffic in those shopping centers and the surrounding area. In centers that may experience declining customer traffic, certain of our expenses are contractually fixed and our ability to reduce these expenses if we were to experience sales declines is limited in the near term. To mitigate this potential risk, we have negotiated termination provisions in a majority of our store leases that allow us to terminate the lease if store sales fall below certain thresholds or if certain co-tenancy requirements are not met. However, these provisions may not be adequate to protect our results of operations if our sales were to decline.

Our stores benefit from the ability of a shopping center's other tenants, particularly anchor stores, such as department stores, to generate consumer traffic in the vicinity of our stores and maintain the overall popularity of the shopping center as a shopping destination. Our sales volume and traffic generally may be adversely affected by, among other things, a decrease in popularity of the shopping centers in which our stores are located, the closing of anchor stores important to our business, a decline in the popularity of other stores in the shopping centers in which our stores are located, changing economic conditions and/or demographic patterns (including any increases in purchases of merchandise online as opposed to in-store), or a deterioration in the financial condition of shopping center operators or developers which could, for example, limit their ability to finance tenant improvements for us and other retailers. A reduction in customer traffic as a result of these or any other factors, or our inability to obtain or maintain favorable store locations within shopping centers could have a material adverse effect on us.

***If we are unable to successfully adapt to consumer shopping preferences and develop and maintain a relevant and reliable omni-channel experience for our customers, our financial performance and brand image could be adversely affected.***

We are continuing to grow our omni-channel business model. While we interact with many of our customers largely through our stores, our customers are increasingly using computers, tablets and smartphones to make purchases online and to help them in making purchasing decisions when in our stores. Our customers also engage with us online through our social media channels, including Facebook, Instagram, Pinterest and Twitter, by providing feedback and public commentary about all aspects of our business. Omni-channel retailing is rapidly evolving and our success depends on our ability to anticipate and implement innovations in customer experience and logistics in order to appeal to customers who increasingly rely on multiple channels to meet their shopping needs. If for any reason we are unable to implement our omni-channel initiatives or provide a convenient and consistent experience for our customers across all channels that provides the products they want, when and where they want them, then our financial performance and brand image could be adversely affected.

***We do not own or operate any manufacturing facilities and therefore depend upon third parties for the manufacture of all of our merchandise. The inability of a manufacturer to ship goods on time and to our specifications, or to operate in compliance with our guidelines or any other applicable laws, could negatively impact our business.***

We do not own or operate any manufacturing facilities. As a result, we are dependent upon our timely receipt of quality merchandise from third-party manufacturers. If our manufacturers do not ship orders to us in a timely manner or meet our quality standards, it could cause delays in responding to consumer demands or inventory shortages and negatively affect consumer confidence in the quality and value of our brand or negatively impact our competitive position. Any of these factors could have a material adverse effect on our financial condition or results of operations. Furthermore, we are susceptible to increases in sourcing costs, which we may not be able to pass on to customers, and changes in payment terms from manufacturers, which could adversely affect our financial condition and results of operations.

17

**Table of Contents**

We maintain compliance guidelines for our vendors that dictate various standards, including product quality, manufacturing practices, labor compliance and legal compliance. If any of our manufacturers fail to comply with applicable laws or these guidelines, or engage in any socially unacceptable business practices, such as poor working conditions, child labor, disregard for environmental standards or otherwise, our brand reputation could be negatively impacted and our results of operations could in turn be materially adversely affected.

***The raw materials used to manufacture our products and our transportation and labor costs are subject to availability constraints and price volatility, which could result in increased costs.***

The raw materials used to manufacture our merchandise are subject to availability constraints and price volatility caused by high demand for cotton, high demand for petroleum-based synthetic and other fabrics, weather conditions, supply conditions, government regulations, economic climate and other unpredictable factors. In addition, our transportation and labor costs are subject to price volatility caused by many of these same factors. Increases in the demand for, or the price of, raw materials used to manufacture our merchandise or increases in transportation or labor costs could each have a material adverse effect on our cost of sales or our ability to meet our customers' needs. We may not be able to pass all or a material portion of such increased costs on to our customers, which could negatively impact our profitability. Higher gasoline prices may also affect the willingness of consumers to drive to our stores or the shopping centers where they are located, and thereby adversely affect customer traffic. Continued rises in energy or other commodity costs could adversely affect consumer spending and demand for our products and increase our operating costs, either of which could have a material adverse effect on our financial condition and results of operations.

***The interruption of the flow of merchandise from international manufacturers could disrupt our supply chain.***

We purchase the majority of our merchandise outside of the United States through arrangements with various vendors. In fiscal year 2016, approximately 95% of our product receipts were sourced internationally, primarily from China and Vietnam. Political, social or economic instability in these regions, or in other regions where our products are made, could cause disruptions in trade, including exports to the United States. Other events that could also cause disruptions to our supply chain include:

- the imposition of additional trade law provisions or regulations;

- the imposition of additional duties, tariffs and other charges on imports and exports;

- quotas imposed by bilateral textile agreements;

- foreign currency fluctuations;

- natural disasters;

- theft;

- restrictions on the transfer of funds;

- the financial instability or bankruptcy of manufacturers; and

- significant labor disputes, such as dock strikes.

We cannot predict whether the countries in which our merchandise is manufactured, or may be manufactured in the future, will be subject to new or additional trade restrictions imposed by the United States or other foreign governments, including the likelihood, type or effect of any such restrictions. Trade restrictions, including new or increased tariffs or quotas, border taxes, embargoes, safeguards and customs restrictions against

18

Table of Contents

apparel items, as well as labor strikes and work stoppages or boycotts, could increase the cost or reduce or delay the supply of apparel available to us and adversely affect our business, financial condition or results of operations.

***If the distribution facilities servicing our business were to encounter difficulties or if they were to shut down for any reason, we could face shortages of inventory in our stores, delayed shipments to our e-commerce customers and harm to our reputation. Any of these issues, as well as loss of the use of our corporate offices due to natural disasters or otherwise could have a material adverse effect on our business operations.***

Our omni-channel business model is serviced by two distribution facilities located in City of Industry, California and La Vergne, Tennessee that are operated by Hot Topic. These facilities support our entire business, with all merchandise shipped from our vendors to these facilities, and then packaged and shipped to our stores or our e-commerce customers. The success of our stores and the satisfaction of our e-commerce customers depend on their timely receipt of merchandise. The efficient flow of our merchandise requires that our distribution facilities be operated effectively and have adequate capacity to support our current level of operations and any anticipated increased levels that may follow from the growth of our business.

If we encounter difficulties associated with our distribution facilities or in our relationship with the third party operating our facilities or our facilities were to shut down for any reason, including as a result of fire or other natural disaster or work stoppage, we could face shortages of inventory, resulting in "out of stock" conditions in our stores, incur significantly higher costs and longer lead times associated with distributing our products to both our stores and e-commerce customers and experience dissatisfaction from our customers. Any of these outcomes could have a material adverse effect on our business and harm our reputation.

In addition to our distribution facilities, our corporate offices are also vulnerable to damage from natural disasters, fire and other unexpected events which could cause us to experience significant disruption in our business, resulting in lost sales and productivity, and causing us to incur significant costs to repair, any of which could have a material adverse effect on our business.

***We rely upon independent third-party transportation providers for substantially all of our product shipments and are subject to increased shipping costs as well as the potential inability of our third-party transportation providers to deliver on a timely basis.***

We currently rely upon independent third-party transportation providers for substantially all of our product shipments, including shipments to our distribution centers, to and from all of our stores and to our customers. Our utilization of these delivery services for shipments is subject to risks, including increases in fuel prices, which would increase our shipping costs, and employee strikes and inclement weather which may impact a shipping company's ability to provide delivery services that adequately meet our shipping needs. If we change the shipping companies we use, we could face logistical difficulties that could adversely affect deliveries and we would incur costs and expend resources in connection with such change. Moreover, we may not be able to obtain terms as favorable as those received from our current independent third-party transportation providers which, in turn, would increase our costs.

***Our growth strategy is dependent on a number of factors, any of which could strain our resources or delay or prevent the successful penetration into new markets.***

Our growth strategy is dependent on a number of factors, including growing our e-commerce business, as well as opening new stores and remodeling existing ones. Additional factors required for the successful implementation of our growth strategy include, but are not limited to, continuing to operate an effective e-commerce platform and implementing initiatives to improve our existing operations, obtaining desirable store locations, negotiating acceptable leases, completing projects on budget, supplying proper levels of merchandise and successfully hiring and training store managers and sales associates. In order to optimize profitability for

19

Table of Contents

new stores, we must secure desirable retail lease space when opening stores in new and existing markets. We must choose store sites, execute favorable real estate transactions on terms that are acceptable to us, hire competent personnel and effectively open and operate these new stores. We historically have received landlord allowances for store build outs, which offset certain capital expenditures we must make to open a new store. If landlord allowances cease to be available to us in the future or are decreased, opening new stores would require increased capital outlays, which could adversely affect our ability to continue opening new stores.

While we believe the opportunity exists to open a substantial number of stores without competing with our existing units, to the extent we open new stores in markets where we have existing stores, our existing stores in those markets may experience reduced net sales. Moving or expanding store locations and operating stores in new markets present competitive, merchandising and regulatory challenges we do not have experience in or know how to face. Our planned growth will also require additional infrastructure for the development, maintenance and monitoring of those stores. In addition, if our current management systems and information systems are insufficient to support this expansion, our ability to open new stores and to manage our existing stores would be adversely affected. If we fail to continue to improve our infrastructure, we may be unable to implement our growth strategy or maintain current levels of operating performance in our existing stores.

Our growth plans will place increased demands on our financial, operational, managerial and administrative resources. These increased demands may cause us to operate our business less efficiently, which in turn could cause deterioration in the performance of our existing stores.

Executing our growth plans and achieving our objectives is dependent upon our ability to successfully execute against such plans and objectives. There can be no guarantee that these plans or objectives will result in improved operating results or an increase in the value of the business.

*We have, and will continue to have, significant lease obligations. We are subject to risks associated with leasing substantial amounts of space, including future increases in occupancy costs and the need to generate cash flow to meet our lease obligations.*

We have, and will continue to have, significant lease obligations. We lease all of our store locations and our corporate headquarters. We typically occupy our stores under operating leases with initial terms of ten years. In the future, we may not be able to negotiate favorable lease terms. Our inability to do so may cause our occupancy costs to be higher in future years or may force us to close stores in desirable locations.

A majority of our leases have early termination clauses, which permit the lease to be terminated by us if certain sales levels are not met in specific periods or if the center does not meet specified occupancy standards. In addition to future minimum lease payments, some of our store leases provide for additional rental payments based on a percentage of net sales, or "percentage rent," if sales at the respective stores exceed specified levels, as well as the payment of common area maintenance charges, real property insurance and real estate taxes. Many of our lease agreements have defined escalating rent provisions over the initial term and any extensions. As we expand our footprint, our lease expense and our cash outlays for rent under the lease terms will increase.

We depend on cash flow from operations to pay our lease expenses. If our business does not generate sufficient cash flow from operating activities to fund these expenses, we may not be able to service our lease expenses, which could materially harm our business. Furthermore, the significant cash flow required to satisfy our obligations under the leases increases our vulnerability to adverse changes in general economic, industry, and competitive conditions, and could limit our ability to fund working capital, incur indebtedness, and make capital expenditures or other investments in our business

If an existing or future store is not profitable, and we decide to close it, we may nonetheless be committed to perform our obligations under the applicable lease including, among other things, paying the base rent for the balance of the lease term. Moreover, even if a lease has an early cancellation clause, we may not

20

Table of Contents

satisfy the contractual requirements for early cancellation under that lease. Our inability to enter into new leases or renew existing leases on terms acceptable to us or be released from our obligations under leases for stores that we close could materially adversely affect us.

***Our failure to find store employees that reflect our brand image and embody our culture could adversely affect our business.***

Our success depends in part upon our ability to attract, motivate and retain a sufficient number of store employees, including store managers, who understand and appreciate our corporate culture and customers, and are able to adequately and effectively represent this culture and establish credibility with our customers. The store employee turnover rate in the retail industry is generally high. Excessive store employee turnover will result in higher employee costs associated with finding, hiring and training new store employees. If we are unable to hire and retain store personnel capable of consistently providing a high level of customer service, as demonstrated by their enthusiasm for our culture, understanding of our customers and knowledge of the merchandise we offer, our ability to open new stores may be impaired, the performance of our existing and new stores could be materially adversely affected and our brand image may be negatively impacted. Competition for such qualified individuals could require us to pay higher wages to attract a sufficient number of employees. Additionally, our labor costs are subject to many external factors, including unemployment levels, prevailing wage rates, minimum wage laws, potential collective bargaining arrangements, health insurance costs and other insurance costs and changes in employment and labor legislation or other workplace regulation (including changes in entitlement programs such as health insurance and paid leave programs). Such increase in labor costs may adversely impact our profitability, or if we fail to pay such higher wages we could suffer increased employee turnover.

While we have not historically experienced significant sales seasonality, we may require temporary personnel to adequately staff our stores, with heightened dependence during busy periods such as the holiday season and when multiple new stores are opening. There can be no assurance that we will receive adequate assistance from our temporary personnel, or that there will be sufficient sources of suitable temporary personnel to meet our demand. Any such failure to meet our staffing needs or any material increases in employee turnover rates could have a material adverse effect on our business or results of operations.

***We rely on third parties to provide us with certain key services for our business. If any of these third parties fails to perform their obligations to us or declines to provide services to us in the future, we may suffer a disruption to our business. Furthermore, we may be unable to provide these services or implement substitute arrangements on a timely basis on terms favorable to us.***

We receive certain key services from a range of different third parties, including merchandise vendors, landlords, suppliers and logistics partners. For example, we rely on Hot Topic to provide certain inbound and outbound transportation and delivery services, distribution services, customs and brokerage services. In connection with our sourcing activities, we rely on vendors to help us source products. If any of these third parties fails to perform their obligations to us or declines to provide services to us in the future, we may suffer a disruption to our business or increased costs. Furthermore, we may be unable to provide these services or implement substitute arrangements on a timely and cost-effective basis on terms favorable to us.

***We depend on key members of our executive management team and may not be able to retain or replace these individuals or recruit additional personnel, which could harm our business.***

We depend on the leadership and experience of key members of our executive management team. The loss of the services of any of our executive management could have a material adverse effect on our business and prospects, as we may not be able to find suitable individuals to replace such personnel on a timely basis or without incurring increased costs, or at all. In addition, we believe that our future success will depend greatly on our continued ability to attract and retain highly skilled and qualified personnel. There is a high level of

21

Table of Contents

competition for experienced, successful personnel in the retail industry. Our inability to meet our staffing requirements in the future could impair our growth and harm our business.

***Hot Topic provides us with certain key services for our business. If Hot Topic fails to perform its obligations to us or if we do not find appropriate replacement services, we may be unable to provide these services or implement substitute arrangements on a timely and cost-effective basis on terms favorable to us.***

For the period following the Separation, Hot Topic provided certain services to us under a Transition Services Agreement. On June 2, 2017, we terminated this agreement and entered into a new Services Agreement with Hot Topic, expiring in 2020, unless we elect to terminate the agreement (or certain services under the agreement) prior to that time. The notice requirement for early termination is 18 months or as otherwise agreed by us and Hot Topic. The Services Agreement may also be extended beyond June 2, 2020 upon mutual agreement. Pursuant to the Services Agreement, we will continue to receive certain services, including information technology, distribution and logistics management and real estate management services. Rates and costs related to the services provided under the Services Agreement may change with prior written approval from both parties. If Hot Topic fails to perform its obligations under the Services Agreement or any other agreement, we may be unable to obtain substitute arrangements in a timely and cost-effective manner. In addition, we may be unable to obtain replacement services included in the Services Agreement and any other agreements as they expire, or may be required to incur additional costs and may experience delays or business interruptions as a result of our transition to other service providers, which could have a material adverse effect on our business. For more information on the Services Agreement, see "Certain Relationships and Related Party Transactions—Transition Services Agreement & Services Agreement with Hot Topic."

***Failure to effectively utilize information systems and implement new technologies could disrupt our business or reduce our sales or profitability.***

We rely extensively on various information systems, including data centers, hardware and software and applications to manage many aspects of our business, including to process and record transactions in our stores, to enable effective communication systems, to plan and track inventory flow, to manage logistics and to generate performance and financial reports. These various systems are substantially operated by our services provider and we rely on them for efficient and consistent operations of these systems. We are dependent on the integrity, security and consistent operations of these systems and related back-up systems. Our computer systems and the third-party systems we rely on are also subject to damage or interruption from a number of causes, including power outages; computer and telecommunications failures; computer viruses or malware; security breaches; cyber-attacks; catastrophic events such as fires, floods, earthquakes, tornadoes, hurricanes; acts of war or terrorism and design or usage errors by our associates or contractors. Compromises, interruptions or shutdowns of our systems, including those managed by third parties, whether intentional or inadvertent, could lead to delays in our business operations and, if significant or extreme, affect our results of operations.

From time to time, our systems require modifications and updates, including by adding new hardware, software and applications; maintaining, updating or replacing legacy programs; and integrating new service providers, and adding enhanced or new functionality. Although we believe we are diligent in selecting systems and vendors and implementing procedures to enable us to maintain the integrity of our systems when we modify them, there are inherent risks associated with modifying or replacing systems, and with new or changed relationships, including accurately capturing and maintaining data, realizing the expected benefit of the change and managing the potential disruption of the operation of the systems as the changes are implemented. Potential issues associated with implementation of these technology initiatives could reduce the efficiency of our operations in the short term. In addition, any interruption in the operation of our websites, particularly our e-commerce site, could cause us to suffer reputational harm or to lose sales if customers are unable to access our site or purchase merchandise from us during such interruption. The efficient operation and successful growth of our business depends upon our information systems. The failure of our information systems and the third party systems we rely on to perform as designed, or our failure to implement and operate them effectively, could disrupt our business or subject us to liability and thereby harm our profitability.

22

Table of Contents

***Unauthorized disclosure of sensitive or confidential information, whether through a breach of our computer system or otherwise, could severely hurt our business.***

Some aspects of our business, like that of most retailers, involves the receipt, storage and transmission of customers' personal information, consumer preferences and payment card information, including in relation to our private label credit card, as well as confidential information about our associates, our suppliers and our Company, some of which is entrusted to third-party service providers and vendors. We rely on commercially available systems, software, tools (including encryption technology) and monitoring to provide security and oversight for processing, transmission, storage and the protection of confidential information. Despite the security measures we have in place, our facilities and systems, and those of third parties with which we do business, may be vulnerable to security breaches, acts of vandalism and theft, computer viruses, misplaced or lost data, programming and/or human errors, or other similar events.

Electronic security attacks designed to gain access to sensitive information by breaching mission critical systems of large organizations are constantly evolving, and high profile electronic security breaches leading to unauthorized release of confidential information have occurred recently at a number of major U.S. companies. Computer hackers or other unauthorized third parties may attempt to penetrate or otherwise gain access to our computer systems or the systems of third parties with which we do business through fraud or other means of deceit and, if successful, misappropriate personal information, payment card or check information or confidential business information. Hardware, software or applications we utilize may contain defects in design or manufacture or other problems that could unexpectedly compromise information security. In addition, our associates, contractors or third parties with which we do business or to which we outsource business operations may attempt to circumvent our security measures in order to misappropriate such information, and may purposefully or inadvertently cause a breach involving such information. Despite advances in security hardware, software, and encryption technologies, the methods and tools used to obtain unauthorized access, disable or degrade service, or sabotage systems are constantly changing and evolving, and may be difficult to anticipate or detect for long periods of time. We have implemented and regularly review and update processes and procedures to protect against unauthorized access to or use of secured data and to prevent data loss. However, the ever-evolving threats mean we and our third-party service providers and vendors must continually evaluate and adapt our respective systems, procedures, controls and processes, and there is no guarantee that they will be adequate to safeguard against all data security breaches or misuses of data.

An electronic security breach in our systems (or in the systems of third parties with which we do business) that results in the unauthorized release of individually identifiable customer or other sensitive data could nonetheless occur and have a material adverse effect on our reputation and lead to financial losses from remedial actions, loss of business or potential liability, including possible punitive damages. In addition, as the regulatory environment relating to retailers and other companies' obligation to protect such sensitive data becomes increasingly rigorous, with new and constantly changing requirements applicable to our business, compliance with those requirements could result in additional costs, and a material failure on our part to comply could subject us to fines or other regulatory sanctions and potentially to lawsuits.

***We are subject to payment-related risks that could increase our operating costs, expose us to fraud or theft, subject us to potential liability and potentially disrupt our business.***

We accept payments using a variety of methods, including cash, checks, credit and debit cards, and gift cards, and we may offer new payment options over time. Acceptance of these payment options subjects us to rules, regulations, contractual obligations and compliance requirements, including payment network rules and operating guidelines, data security standards and certification requirements, and rules governing electronic funds transfers. These requirements may change over time or be reinterpreted, making compliance more difficult or costly.

For certain payment methods, including credit and debit cards, we pay interchange and other fees, which may increase over time and raise our operating costs. We rely on third parties to provide payment processing

23

Table of Contents

services, including the processing of credit cards, debit cards, and other forms of electronic payment. If these companies become unable to provide these services to us, or if their systems are compromised, it could potentially disrupt our business. The payment methods that we offer also subject us to potential fraud and theft by criminals, who are becoming increasingly more sophisticated, seeking to obtain unauthorized access to or exploit weaknesses that may exist in the payment systems. If we fail to comply with applicable rules or requirements for the payment methods we accept, or if payment-related data is compromised due to a breach or misuse of data, we may be liable for costs incurred by payment card issuing banks and other third parties or subject to fines and higher transaction fees, or our ability to accept or facilitate certain types of payments may be impaired. In addition, our customers could lose confidence in certain payment types, which may result in a shift to other payment types or potential changes to our payment systems that may result in higher costs. As a result, our business and operating results could be adversely affected.

***There are claims made against us from time to time that can result in litigation or regulatory proceedings which could distract management from our business activities and result in significant liability.***

We face the risk of litigation and other claims against us. Litigation and other claims may arise in the ordinary course of our business and include commercial disputes, employment related claims, including wage and hour claims, intellectual property disputes, such as trademark, copyright and patent infringement disputes, consumer protection and privacy matters, product-related allegations, and premises liability claims. In addition, we could face a wide variety of employee claims against us, including general discrimination, privacy, labor and employment, ERISA and disability claims.

Any claims could result in litigation against us and could also result in regulatory proceedings being brought against us by various federal and state agencies that regulate our business, including the United States Equal Employment Opportunity Commission, the Federal Trade Commission or the Consumer Product Safety Commission. Often these cases raise complex factual and legal issues, which are subject to risks and uncertainties and could require significant management time. Litigation and other claims and regulatory proceedings against us could result in unexpected expenses, legal liability and injunctions against us or restrictions placed upon us, which could disrupt our operations, preclude us from selling products, or otherwise have a material adverse effect on our operations, financial results and our reputation.

In addition, we may be subject to liability if we infringe the trademarks or other intellectual property rights of third parties. If we were to be found liable for any such infringement, we could be required to pay substantial damages and could be subject to injunctions preventing further infringement. Such infringement claims could subject us to boycotts by our customers and harm to our brand image. In addition, any payments we are required to make and any injunctions we are required to comply with as a result of such infringement actions could adversely affect our financial results.

***Changes in laws, including employment laws and laws related to our merchandise, could make conducting our business more expensive or otherwise change the way we do business.***

We are subject to numerous laws and regulations, including labor and employment, product safety, customs, truth-in-advertising, consumer protection, privacy and zoning and occupancy laws and ordinances, intellectual property laws and other laws that regulate retailers generally and/or govern the import and export of goods, advertising and promotions, the sale of merchandise, product content and the operation of stores and warehouse facilities. If these regulations were to change or were violated by our management, employees, vendors, buying agents or trading companies, the costs of certain goods could increase, or we could experience delays in shipments of our goods, be subject to fines or penalties, or suffer reputational harm, which could reduce demand for our merchandise and hurt our business and results of operations.

In addition to increased regulatory compliance requirements, changes in laws could make ordinary conduct of our business more expensive or require us to change the way we do business. For example, changes in

24

**Table of Contents**

federal and state minimum wage laws could raise the wage requirements for certain of our employees, which would likely cause us to reexamine our entire wage structure for stores. Other laws related to employee benefits and treatment of employees, including laws related to limitations on employee hours, work scheduling, supervisory status, leaves of absence, mandated health benefits or overtime pay, could also negatively impact us, such as by increasing compensation and benefits costs for overtime and medical expenses.

Moreover, changes in product safety or other consumer protection laws, environmental laws and other regulations could lead to increased compliance costs to us for certain merchandise, or additional labor costs associated with readying merchandise for sale. It is often difficult for us to plan and prepare for potential changes to applicable laws and future compliance costs related to such changes could be material to us.

***Government or consumer concerns about product safety could result in regulatory actions, recalls or changes to laws, which could harm our reputation, increase costs or reduce sales.***

We are subject to regulation by the Consumer Product Safety Commission and similar state and international regulatory authorities, and our products could be subject to involuntary recalls and other actions by these authorities. We purchase merchandise from suppliers domestically as well as outside the United States. One or more of our suppliers might not adhere to product safety requirements or our quality control standards, and we might not identify the deficiency before such merchandise is received by our customers. Issues of product safety could result in a recall of products we sell. Additionally, regulatory authorities, including the Consumer Product Safety Commission, have undertaken reviews of product safety and are in the process of enacting or are considering various proposals for more stringent laws and regulations. In particular, the Consumer Product Safety Improvement Act of 2008, which imposes significant requirements on the sale of consumer products and enhanced penalties for noncompliance. Such regulations contain provisions which have uncertain applicability to products we sell, and such lack of certainty may inhibit our willingness to carry products or cause us to carry product we otherwise would not. These regulations could result in delays in getting products to our stores, lost sales, the rejection of our products by consumers, damage to our reputation or material increases in our costs, and may have a material adverse effect on our business. Moreover, individuals and organization may assert legal claims for our non-compliance with consumer product rules and regulations, and we may be subject to lawsuits relating to these claims. There is a risk that these claims or liabilities may exceed or fall outside the scope of indemnities provided by third parties or outside the coverages of our insurance policies.

***We may be unable to protect our trademarks or other intellectual property rights, which could harm our business.***

We rely on certain trademark registrations and common law trademark rights to protect the distinctiveness of our brand. However, there can be no assurance that the actions we have taken to establish and protect our trademarks will be adequate to prevent imitation of our trademarks by others or to prevent others from claiming that sales of our products infringe, dilute or otherwise violate third party trademarks or other proprietary rights that could block sales of our products.

The laws of certain foreign countries may not protect the use of unregistered trademarks to the same extent as do the laws of the United States. As a result, international protection of our brand image may be limited and our right to use our trademarks outside the United States could be impaired. Other persons or entities may have rights to trademarks that contain portions of our marks or may have registered similar or competing marks for apparel and/or accessories in foreign countries in which our vendors source our merchandise. There may also be other prior registrations of trademarks identical or similar to our trademarks in other foreign countries of which we are not aware. Accordingly, it may be possible for others to prevent the manufacture of our branded goods in certain foreign countries or the sale or exportation of our branded goods from certain foreign countries to the United States. If we were unable to reach a licensing arrangement with these parties, our vendors may be unable to manufacture our products in those countries. Our inability to register our trademarks or purchase or license the right to use the relevant trademarks or logos in these jurisdictions could limit our ability to obtain supplies from less costly markets or penetrate new markets in jurisdictions outside the United States.

25

Table of Contents

Litigation may be necessary to protect and enforce our trademarks and other intellectual property rights, or to defend against claims by third parties alleging that we infringe, dilute or otherwise violate third party trademarks or other intellectual property rights. Any litigation or claims brought by or against us, whether with or without merit, and whether successful or not, could result in substantial costs and diversion of our resources, which could have a material adverse effect on our business, financial condition, results of operations or cash flows. Any intellectual property litigation or claims against us could result in the loss or compromise of our intellectual property rights, could subject us to significant liabilities, require us to seek licenses on unfavorable terms, if available at all, prevent us from manufacturing or selling certain products, limit our ability to market or sell to our customers using certain methods or technologies and/or require us to redesign or re-label our products or rename our brand, any of which could have a material adverse effect on our business, financial condition, results of operations or cash flows.

***We have a limited operating history as a standalone company, which may make it difficult to compare our current operating results to prior periods.***

Torrid was formed as a standalone company in May 2015, and was previously a business component within Hot Topic. Accordingly, Torrid's financial results include financial results for fiscal year 2014 and for the portion of fiscal year 2015 from February 1, 2015 to May 2, 2015 during which Torrid did not operate as a standalone company. The results of operations and cash flows for this period prior to the Separation were derived from or "carved out" of Hot Topic's consolidated financial statements and accounting records to present Hot Topic's Torrid business as a separate business during the period prior to the Separation. The financial position, results of operations and cash flows for this period include certain assets and liabilities that are specifically identifiable or attributable to Torrid, and they also include an allocation of expenses related to certain Hot Topic corporate functions. Torrid considers the expense allocation methodology and results to be reasonable; however, the allocations may not be indicative of the actual expenses that would have been incurred had Torrid operated as a separate privately held company for this period. Accordingly, the financial results for fiscal years 2014 and 2015 may not provide a comparable presentation of our financial position or results of operations as if we had operated as a standalone entity during the period prior to the Separation.

***Our indebtedness and lease obligations could adversely affect our financial flexibility and our competitive position.***

As of April 29, 2017, we had $15.2 million of outstanding indebtedness, consisting of amounts due under our related party promissory note. Our level of indebtedness increases the risk that we may be unable to generate cash sufficient to pay amounts due in respect of our indebtedness. We also have, and will continue to have, significant lease obligations. As of January 28, 2017, our minimum annual rental obligations under long-term operating leases for fiscal year 2017 was $36.2 million. Our indebtedness and lease obligations could have other important consequences to you and significant effects on our business. For example, it could:

- increase our vulnerability to adverse changes in general economic, industry and competitive conditions;

- require us to dedicate a substantial portion of our cash flow from operations to make payments on our indebtedness and leases, thereby reducing the availability of our cash flow to fund working capital, capital expenditures and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- restrict us from exploiting business opportunities;

- make it more difficult to satisfy our financial obligations, including payments on our indebtedness;

26

Table of Contents

- place us at a disadvantage compared to our competitors that have less debt and lease obligations; and

- limit our ability to borrow additional funds for working capital, capital expenditures, acquisitions, debt service requirements, execution of our business strategy or other general corporate purposes.

In addition, the agreement governing the ABL Facility contains, and the agreements evidencing or governing any other future indebtedness may contain, restrictive covenants that will limit our ability to engage in activities that may be in our long-term best interests. Our failure to comply with those covenants could result in an event of default which, if not cured or waived, could result in the acceleration of all of our indebtedness.

***Our indebtedness may restrict our current and future operations, which could adversely affect our ability to respond to changes in our business and to manage our operations.***

The agreement governing the ABL Facility contains, and the agreements evidencing or governing any other future indebtedness may contain, financial restrictions on us and our restricted subsidiaries, including restrictions on our or our restricted subsidiaries' ability to, among other things:

- place liens on our or our restricted subsidiaries' assets;

- make investments other than permitted investments;

- incur additional indebtedness;

- prepay or redeem certain indebtedness;

- merge, consolidate or dissolve;

- sell assets;

- engage in transactions with affiliates;

- change the nature of our business;

- change our or our subsidiaries' fiscal year or organizational documents; and

- make restricted payments (including certain equity issuances).

In addition, we are required to maintain compliance with various financial ratios in the agreement governing the ABL Facility.

A failure by us or our subsidiaries to comply with the covenants or to maintain the required financial ratios contained in the agreement governing the ABL Facility could result in an event of default under such indebtedness, which could adversely affect our ability to respond to changes in our business and manage our operations. Additionally, a default by us under the agreement governing the ABL Facility or an agreement governing any other future indebtedness may trigger cross-defaults under the agreements governing the ABL Facility or any other future agreements governing our indebtedness. Upon the occurrence of an event of default or cross-default under any of the present or future agreements governing our indebtedness, the lenders could elect to declare all amounts outstanding to be due and payable and exercise other remedies as set forth in the agreements. If any of our indebtedness were to be accelerated, there can be no assurance that our assets would be sufficient to repay this indebtedness in full, which could have a material adverse effect on our ability to continue to operate as a going concern. See "Description of Certain Indebtedness."

27

Table of Contents

***Changes in tax laws or regulations or in our operations may impact our effective tax rate and may adversely affect our business, financial condition and results of operations.***

Changes in tax laws or regulations in any of the jurisdictions in which we operate, or adverse outcomes from tax audits that we may be subject to in any of the jurisdictions in which we operate, could result in an unfavorable change in our effective tax rate, which could adversely affect our business, financial condition and operating results.

Additionally, results of the November 2016 U.S. elections have introduced greater uncertainty with respect to tax and trade policies, tariffs and government regulations affecting trade between the U.S. and other countries. We source the majority of our merchandise from manufacturers located outside of the U.S., including a significant amount from Asia. Major developments in tax policy or trade relations, such as the disallowance of tax deductions for imported merchandise or the imposition of unilateral tariffs on imported products, could have a material adverse effect on our business, results of operations and liquidity.

***We may recognize impairments on long-lived assets.***

Our long-lived assets, primarily stores and intangible assets, are subject to periodic testing for impairment. Store assets are reviewed using factors including, but not limited to, our future operating plans and projected future cash flows. Failure to achieve our future operating plans or generate sufficient levels of cash flow at our stores could result in impairment charges on long-lived assets, which could have a material adverse effect on our financial condition or results of operations.

***War, terrorism and other catastrophes could negatively impact our customers, places where we do business and our expenses.***

The continued threat of terrorism, heightened security and military action in response to this threat, any future acts of terrorism, and significant natural disasters or other catastrophic events may cause disruptions and create uncertainties that affect our business. To the extent that such disruptions or uncertainties negatively impact commercial transportation and shipping, shopping patterns and/or shopping center traffic, or adversely affect consumer confidence or the economy in general, our business, operating results and financial condition could be materially and adversely affected. A significant natural disaster or other catastrophic event affecting our facilities could materially affect our supply chain, our information system and other aspects of our operations.

**Risks Related to this Offering and Ownership of Our Common Stock**

***Following the offering, we will be classified as a "controlled company" and, as a result, we will qualify for, and intend to rely on, exemptions from certain corporate governance requirements. You will not have the same protections afforded to stockholders of companies that are subject to such requirements. In addition, Sycamore's interests may conflict with our interests and the interests of other stockholders.***

After the closing of this offering, Sycamore will continue to control a majority of our common stock. As a result, we will be a "controlled company" within the meaning of the applicable stock exchange corporate governance standards. Under the rules of the NYSE, a company of which more than 50% of the outstanding voting power is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain stock exchange corporate governance requirements, including:

- the requirement that a majority of our board of directors consists of independent directors;

- the requirement that nominating and corporate governance matters be decided solely by independent directors; and

- the requirement that employee and officer compensation matters be decided solely by independent directors.

28

Table of Contents

Following this offering, we intend to utilize these exemptions. As a result, we may not have a majority of independent directors and our nominating and corporate governance and compensation functions may not be decided solely by independent directors. Accordingly, you will not have the same protections afforded to stockholders of companies that are subject to all of the stock exchange corporate governance requirements.

The interests of Sycamore and its affiliates, which include Hot Topic, could conflict with or differ from our interests or the interests of our other stockholders. For example, the concentration of ownership held by Sycamore could delay, defer or prevent a change of control of our Company or impede a merger, takeover or other business combination which may otherwise be favorable for us and our other stockholders. Additionally, Sycamore is in the business of making investments in companies and may, from time to time, acquire and hold interests in businesses that compete, directly or indirectly with us. Sycamore may also pursue acquisition opportunities that may be complementary to our business, and as a result, those acquisition opportunities may not be available to us. So long as Sycamore continues to directly or indirectly own a significant amount of our common stock, even if such amount is less than a majority thereof, Sycamore will continue to be able to substantially influence or effectively control our ability to enter into corporate transactions.

***An active public market for our common stock may not develop following this offering, which could limit your ability to sell your shares of our common stock at an attractive price, or at all.***

Prior to this offering, there has been no public market for our common stock. We cannot predict the extent to which investor interest in our Company will lead to the development of an active trading market in our common stock or how liquid that market might become. An active public market for our common stock may not develop or be sustained after the offering. If an active public market does not develop or is not sustained, it may be difficult for you to sell your shares of common stock at a price that is attractive to you, or at all.

***We are an "emerging growth company" under the JOBS Act, and any decision on our part to comply with certain reduced reporting and disclosure requirements applicable to emerging growth companies could make our common stock less attractive to investors.***

We are an emerging growth company, and, for as long as we continue to be an emerging growth company, we currently intend to take advantage of exemptions from various reporting requirements applicable to other public companies but not to "emerging growth companies," including, but not limited to, not being required to have our independent registered public accounting firm audit our internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), reduced disclosure obligations regarding executive compensation in our registration statements, periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. We will cease to be an emerging growth company upon the earliest of: (i) the end of the fiscal year following the fifth anniversary of this offering; (ii) the last day of the first fiscal year during which our total annual gross revenue is $1.07 billion or more; (iii) the date on which we have, during the previous three-year period, issued more than $1.0 billion in non-convertible debt securities; or (iv) the end of any fiscal year in which the market value of our common stock held by non-affiliates exceeded $700 million as of the end of the second quarter of that fiscal year. We cannot predict if investors will find our common stock less attractive if we choose to rely on exemptions from certain disclosure requirements. If some investors find our common stock less attractive as a result of any choices to reduce future disclosure, there may be a less active trading market for our common stock and the price of our common stock may be more volatile.

In addition, as our business grows, we may cease to satisfy the conditions of an "emerging growth company." Under the JOBS Act, "emerging growth companies" can delay adopting new or revised accounting standards until such time as those standards apply to private companies. We have irrevocably elected not to avail ourselves of this exemption from new or revised accounting standards and, therefore, we will be subject to the same new or revised accounting standards as other public companies that are not "emerging growth companies."

29

**Table of Contents**

We are currently evaluating and monitoring developments with respect to these new rules, and we cannot assure you that we will be able to take advantage of all of the benefits from the JOBS Act.

***Our stock price may be volatile or may decline regardless of our operating performance, and you may not be able to resell your shares at or above the initial public offering price.***

After this offering, the market price for our common stock is likely to be volatile, in part because our shares have not been traded publicly. In addition, the market price of our common stock may fluctuate significantly in response to a number of factors, most of which we cannot control, including:

- quarterly variations in our operating results compared to market expectations;

- changes in preferences of our customers;

- announcements of new products, significant price reductions or other strategic actions by us or our competitors;

- public reactions to our press releases, public announcements and/or filings with the SEC;

- speculation in the press or investment community;

- size of the public float;

- stock price performance and valuations of our competitors;

- fluctuations in stock market prices and volumes;

- default on our indebtedness or foreclosure of our properties;

- actions by competitors or other shopping center tenants;

- changes in senior management or key personnel;

- actions by our stockholders;

- changes in financial estimates by securities analysts or our failure to meet any such estimates;

- negative earnings or other announcements by us or other retail apparel companies;

- downgrades in our credit ratings or the credit ratings of our competitors;

- issuances (or sales by our stockholders) of capital stock;

- general market conditions;

- global economic, legal and regulatory factors unrelated to our performance; and

- the realization of any of the risks described in this section, or other risks that may materialize in the future.

Numerous factors affect our business and cause variations in our operating results and affect our net sales and comparable store sales, including consumer preferences, buying trends and overall economic trends;

30

**Table of Contents**

our ability to identify and respond effectively to product trends and customer preferences; changes in the population of our target segment; actions by competitors and other shopping center tenants; changes in our merchandise mix; pricing; the timing of our releases of new merchandise and promotional events; the level of customer service that we provide in our stores; changes in sales mix among sales channels; our ability to source and distribute products effectively; inventory shrinkage; weather conditions, particularly during the holiday season; and the number of stores we open, close and convert in any period.

The initial public offering price of our common stock will be determined by negotiations between us and the underwriters based upon a number of factors and may not be indicative of prices that will prevail following the consummation of this offering. Volatility in the market price of our common stock may prevent investors from being able to sell their common stock at or above the initial public offering price. As a result, you may suffer a loss on your investment.

In addition, stock markets have experienced extreme price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many retail companies. In the past, stockholders have instituted securities class action litigation following periods of market volatility. If we were involved in securities litigation, we could incur substantial costs and our resources and the attention of management could be diverted from our business.

### *Future sales of our common stock, or the perception in the public markets that these sales may occur, may depress our stock price.*

Sales of substantial amounts of our common stock in the public market after this offering, or the perception that these sales could occur, could adversely affect the price of our common stock and could impair our ability to raise capital through the sale of additional shares. Upon completion of this offering, we will have shares of common stock outstanding. The shares of common stock offered in this offering will be freely tradable without restriction under the Securities Act, except for any shares of our common stock that may be held or acquired by our directors, executive officers and other affiliates, as that term is defined in the Securities Act, which will be restricted securities under the Securities Act. Restricted securities may not be sold in the public market unless the sale is registered under the Securities Act or an exemption from registration is available.

We, each of our officers and directors, Sycamore and certain other security holders have agreed, subject to certain exceptions, with the underwriters not to dispose of or hedge any of the shares of common stock or securities convertible into or exchangeable for, or that represent the right to receive, shares of common stock during the period from the date of this prospectus continuing through the date 180 days after the date of this prospectus, except with the prior written consent of . See "Underwriting." When the lock-up period expires, we and those of our beneficial owners who are subject to a lock-up agreement will be able to sell our shares in the public market. In addition, may, in their sole discretion, release all or some portion of the shares subject to lock-up agreements at any time and for any reason. See "Underwriting" and "Shares Eligible for Future Sale." Sales of a substantial number of such shares upon expiration of the lock-up agreements, the perception that such sales may occur, or early release of these agreements, could cause our market price to fall or make it more difficult for you to sell your shares of common stock at a time and price that you deem appropriate.

All of our shares of common stock outstanding as of the date of this prospectus may be sold in the public market by existing stockholders 180 days after the date of this prospectus, subject to applicable limitations imposed under federal securities laws. See "Shares Eligible for Future Sale" for a more detailed description of the restrictions on selling shares of our common stock after this offering.

In the future, we may also issue our securities if we need to raise capital in connection with a capital raise or acquisitions. The amount of shares of our common stock issued in connection with a capital raise or acquisition could constitute a material portion of our then-outstanding shares of our common stock.

31

Table of Contents

***Anti-takeover provisions in our organizational documents and Delaware law might discourage or delay acquisition attempts for us that you might consider favorable.***

Our amended and restated certificate of incorporation and amended and restated bylaws that will become effective immediately prior to the consummation of this offering will contain provisions that may make the merger or acquisition of our Company more difficult without the approval of our board of directors. Among other things, these provisions:

- would allow us to authorize the issuance of undesignated preferred stock in connection with a stockholder rights plan or otherwise, the terms of which may be established and the shares of which may be issued without stockholder approval, and which may include super voting, special approval, dividend, or other rights or preferences superior to the rights of the holders of common stock;

- prohibit stockholder action by written consent from and after the date on which the parties to our stockholders agreement and their affiliates cease to beneficially own at least 50% of the total voting power of all then outstanding shares of our capital stock unless such action is recommended by all directors then in office;

- provide that our board of directors is expressly authorized to make, alter, or repeal our bylaws and that our stockholders may only amend our bylaws with the approval of 50% or more of all of the outstanding shares of our capital stock entitled to vote, if the parties to our stockholders agreement and their affiliates beneficially own less than 50% in voting power of our stock entitled to vote generally in the election of directors; and

- establish advance notice requirements for nominations for elections to our board or for proposing matters that can be acted upon by stockholders at stockholder meetings.

Further, as a Delaware corporation, we are also subject to provisions of Delaware law, which may impair a takeover attempt that our stockholders may find beneficial. These anti-takeover provisions and other provisions under Delaware law could discourage, delay or prevent a transaction involving a change in control of our Company, including actions that our stockholders may deem advantageous, or negatively affect the trading price of our common stock. These provisions could also discourage proxy contests and make it more difficult for you and other stockholders to elect directors of your choosing and to cause us to take other corporate actions you desire.

***If you purchase shares of common stock sold in this offering, you will incur immediate and substantial dilution.***

Based on our net tangible book value per share as of , 2017 and an assumed initial public offering price of $ per share (the midpoint of the range set forth on the cover of this prospectus), purchasers of our common stock in this offering will experience an immediate and substantial dilution of $ per share, representing the difference between our net tangible book value per share and the assumed initial public offering price. In addition, you may also experience additional dilution upon future equity issuances or the exercise of stock options to purchase common stock granted to our employees, consultants and directors under our stock option and equity incentive plans. See "Dilution."

***If securities or industry analysts do not publish research or publish inaccurate or unfavorable research about our business, our stock price and trading volume could decline.***

The trading market for our common stock will depend in part on the research and reports that securities or industry analysts publish about us or our business. We do not currently have and may never obtain research coverage by securities and industry analysts. If no securities or industry analysts commence coverage of our

32

Table of Contents

Company, the trading price for our stock would be negatively impacted. If we obtain securities or industry analyst coverage and if one or more of the analysts who covers us downgrades our stock or publishes inaccurate or unfavorable research about our business, our stock price would likely decline. If one or more of these analysts ceases coverage of us or fails to publish reports on us regularly, demand for our stock could decrease, which could cause our stock price and trading volume to decline.

### We do not expect to pay any cash dividends for the foreseeable future.

The continued operation and expansion of our business will require substantial funding. Accordingly, we do not anticipate that we will pay any cash dividends on shares of our common stock for the foreseeable future. Any determination to pay dividends in the future will be at the discretion of our board of directors and will depend upon results of operations, financial condition, contractual restrictions, restrictions imposed by applicable law and other factors our board of directors deems relevant. Additionally, our operating subsidiaries are currently restricted from paying cash dividends by the agreements governing their indebtedness, and we expect these restrictions to continue in the future. Accordingly, if you purchase shares in this offering, realization of a gain on your investment will depend on the appreciation of the price of our common stock, which may never occur. Investors seeking cash dividends in the foreseeable future should not purchase our common stock.

### We will incur increased costs as a result of becoming a public company, particularly after we are no longer an "emerging growth company."

As a public company, we will incur significant legal, accounting, insurance and other expenses that we have not incurred as a private company, including costs associated with public company reporting requirements. We also have incurred and will incur costs associated with complying with the requirements of Sarbanes-Oxley and related rules implemented by the SEC and. The expenses incurred by public companies generally for reporting and corporate governance purposes have been increasing. We expect these rules and regulations to increase our legal and financial compliance costs and to make some activities more time-consuming and costly. These laws and regulations could also make it more difficult or costly for us to obtain certain types of insurance, including director and officer liability insurance, and we may be forced to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. These laws and regulations could also make it more difficult for us to attract and retain qualified persons to serve on our board of directors, our board committees or as our executive officers. Furthermore, if we are unable to satisfy our obligations as a public company, we could be subject to delisting of our common stock, fines, sanctions and other regulatory action and potentially civil litigation.

After we are no longer an "emerging growth company," we expect to incur additional management time and cost to comply with the more stringent reporting requirements applicable to companies that are deemed accelerated filers or large accelerated filers, including complying with the auditor attestation requirements of Section 404 of Sarbanes-Oxley. See "—We are an "emerging growth company" under the JOBS Act, and any decision on our part to comply with certain reduced reporting and disclosure requirements applicable to emerging growth companies could make our common stock less attractive to investors."

We are currently unable to estimate the costs we may incur as a result of becoming a public company or the timing of such costs with any degree of certainty.

### If we are unable to design, implement and maintain effective internal controls in accordance with Section 404 of Sarbanes-Oxley, we may not be able to report our financial results in a timely and reliable manner, which could have a material adverse effect on our business and stock price. We have identified material weaknesses in our internal control over financial reporting.

As a public company, we will have significant requirements for enhanced financial reporting and internal controls. The process of designing and implementing effective internal controls is a continuous effort

33

Table of Contents

that requires us to anticipate and react to changes in our business and the economic and regulatory environments and to expend significant resources to maintain a system of internal controls that is adequate to satisfy our reporting obligations as a public company. If we are unable to establish or maintain appropriate internal controls over financial reporting, it could cause us to fail to meet our reporting obligations on a timely basis, result in material misstatements in our consolidated financial statements and harm our operating results. In addition, we will be required upon completion of the offering to comply with the SEC's rules implementing Sections 302 and 404 of Sarbanes-Oxley, which will require management to certify financial and other information in our quarterly and annual reports and provide an annual management report on the effectiveness of our internal control over financial reporting starting with the first fiscal year after the completion of this offering. This assessment will need to include disclosure of any material weaknesses identified by our management in our internal control over financial reporting. Testing and maintaining internal controls may divert our management's attention from other matters that are important to our business. We may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404 of Sarbanes-Oxley.

In connection with the audits of our consolidated financial statements as of and for the years ended January 30, 2016 and January 28, 2017, we identified material weaknesses in our internal control over financial reporting. These material weaknesses resulted in a revision and restatement of previously issued annual and interim consolidated financial statements and could result in misstatements to our consolidated financial statements or disclosures that would result in a material misstatement to our annual or interim consolidated financial statements that would not be prevented or detected on a timely basis. The material weaknesses we identified were as follows: (1) we determined that we did not maintain a sufficient complement of resources with an appropriate level of accounting expertise, knowledge and training commensurate with the complexity of our financial accounting and financial reporting requirements to allow for appropriate monitoring of financial reporting matters and internal control over financial reporting; (2) we did not maintain effective controls over the period-end financial reporting process and preparation of financial statements; and (3) we did not design and maintain controls related to the accuracy and presentation of our share-based compensation expense and the corresponding capital contribution from Torrid Holding LLC. We are in the process of implementing measures designed to improve our internal control over financial reporting and remediate the control deficiencies that led to our material weaknesses, including hiring additional finance personnel and establishing controls over the period-end financial reporting process and preparation of financial statements, and designing and implementing controls over share-based compensation.

We cannot assure you that the measures we have taken to date, together with any measures we may take in the future, will be sufficient to remediate the control deficiencies that led to our material weaknesses or to avoid potential future material weaknesses. If we are unable to conclude that we have effective internal control over financial reporting or if our efforts are not successful to remediate the control deficiencies that led to our material weakness or other material weaknesses or control deficiencies occur in the future, the accuracy and timing of our financial reporting may be adversely affected, we may be unable to maintain compliance with securities law requirements regarding timely filing of periodic reports in addition to applicable stock exchange listing requirements and investors may lose confidence in our financial reporting, which could have a material adverse effect on the trading price of our stock.

***Our amended and restated certificate of incorporation will designate the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with the Company or the Company's directors, officers or other employees.***

Our amended and restated certificate of incorporation will provide that, unless we consent to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall, to the fullest extent permitted by law, be the sole and exclusive forum for any (1) derivative action or proceeding brought on behalf of our Company, (2) action asserting a claim of breach of a fiduciary duty owed by any director or officer of our Company to the Company or the Company's stockholders, (3) action asserting a claim against the Company or

34

Table of Contents

any director or officer of the Company arising pursuant to any provision of the Delaware General Corporation Law (the "DGCL") or our amended and restated certificate of incorporation or our amended and restated bylaws, or (4) action asserting a claim against us or any director or officer of the Company governed by the internal affairs doctrine. Any person or entity purchasing or otherwise acquiring any interest in any shares of our capital stock shall be deemed to have notice of and to have consented to the forum provisions in our amended and restated certificate of incorporation. This choice-of-forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with the Company or the Company's directors, officers or other employees, which may discourage such lawsuits. Alternatively, if a court were to find this provision of our amended and restated certificate of incorporation inapplicable or unenforceable with respect to one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could materially and adversely affect our business, financial condition and results of operations and result in a diversion of the time and resources of our management and board of directors.

Table of Contents

**Table of Contents**

## FORWARD-LOOKING STATEMENTS

This prospectus contains forward-looking statements that are subject to risks and uncertainties. All statements other than statements of historical fact included in this prospectus are forward-looking statements. Forward-looking statements give our current expectations and projections relating to our financial condition, results of operations, plans, objectives, future performance and business. You can identify forward-looking statements by the fact that they do not relate strictly to historical or current facts. These statements may include words such as "anticipate," "estimate," "expect," "project," "plan," "intend," "believe," "may," "will," "should," "can have," "likely" and other words and terms of similar meaning (including their negative counterparts or other various or comparable terminology) in connection with any discussion of the timing or nature of future operating or financial performance or other events. For example, all statements we make relating to our estimated and projected costs, expenditures, cash flows, growth rates and financial results, our plans and objectives for future operations, growth or initiatives, strategies or the expected outcome or impact of pending or threatened litigation are forward-looking statements. All forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those that we expected, including:

- changes in consumer spending and general economic conditions;

- our ability to identify and respond to new and changing product trends, customer preferences and other related factors;

- our dependence on a strong brand image;

- increased competition from other general and specialty retailers;

- the success of the shopping centers in which our stores are located;

- our ability to adapt to consumer shopping preferences and develop and maintain a relevant and reliable omni-channel experience for our customers;

- our dependence upon independent third parties for the manufacture of all of our merchandise;

- availability constraints and price volatility in the raw materials used to manufacture our products;

- interruptions of the flow of our merchandise from international manufacturers causing disruptions in our supply chain;

- shortages of inventory, delayed shipments to our e-commerce customers and harm to our reputation due to difficulties or shut-down of our distribution facilities;

- our reliance upon independent third-party transportation providers for substantially all of our product shipments;

- our growth strategy;

- our leasing substantial amounts of space;

- the failure to find store employees that reflect our brand image and embody our culture;

- our dependence upon key executive management;

- our reliance on Hot Topic for the provision of certain services, including distribution, information technology and real estate management;

36

**Table of Contents**

- our reliance on information systems;

- system security risk issues that could disrupt our internal operations or information technology services;

- claims made against us resulting in litigation;

- changes in laws and regulations applicable to our business;

- our inability to protect our trademarks or other intellectual property rights;

- our limited operating history as a standalone company;

- our substantial indebtedness and lease obligations;

- restrictions imposed by our indebtedness on our current and future operations;

- changes in tax laws or regulations or in our operations that may impact our effective tax rate;

- increased costs as a result of being a public company; and

- our failure to maintain adequate internal controls.

We derive many of our forward-looking statements from our operating budgets and forecasts, which are based upon many detailed assumptions. While we believe that our assumptions are reasonable, we caution that it is very difficult to predict the impact of known factors, and, it is impossible for us to anticipate all factors that could affect our actual results. Important factors that could cause actual results to differ materially from our expectations, or cautionary statements, are disclosed under the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this prospectus. All written and oral forward-looking statements attributable to us, or persons acting on our behalf, are expressly qualified in their entirety by the cautionary statements as well as other cautionary statements that are made from time to time in our other SEC filings and public communications. You should evaluate all forward-looking statements made in this prospectus in the context of these risks and uncertainties.

We caution you that the important factors referenced above may not contain all of the factors that are important to you. In addition, we cannot assure you that we will realize the results or developments we expect or anticipate or, even if substantially realized, that they will result in the consequences or affect us or our operations in the way we expect. The forward-looking statements included in this prospectus are made only as of the date hereof. We undertake no obligation to publicly update or revise any forward-looking statement as a result of new information, future events or otherwise.

**Table of Contents**

**USE OF PROCEEDS**

The selling stockholders are selling all of the shares of our common stock being sold in this offering, including any shares that may be sold in connection with the exercise of the underwriters' option to purchase additional shares. See "Security Ownership of Certain Beneficial Owners." Accordingly, we will not receive any proceeds from the sale of shares of our common stock in this offering. We will bear all costs, fees and expenses in connection with this offering, which are estimated to be $ , except that the selling stockholders will pay any applicable underwriting fees, discounts or commissions and certain transfer taxes.

38

**Table of Contents**

**DIVIDEND POLICY**

We currently intend to retain all available funds and any future earnings to fund the development and growth of our business and to repay indebtedness, and therefore we do not anticipate paying any cash dividends in the foreseeable future. Additionally, because we are a holding company, our ability to pay dividends on our common stock is limited by restrictions on the ability of our subsidiaries to pay dividends or make distributions to us, including restrictions under the terms of the agreements governing our indebtedness. See "Description of Certain Indebtedness." Any future determination to pay dividends will be at the discretion of our board of directors, subject to compliance with covenants in current and future agreements governing our indebtedness, and will depend upon our results of operations, financial condition, capital requirements and other factors that our board of directors deems relevant.

**Table of Contents**

**CAPITALIZATION**

The following table sets forth our cash and cash equivalents and our capitalization as of April 29, 2017 on:

- an actual basis; and

- an as adjusted basis to give effect to the Distribution.

You should read the following table in conjunction with the sections entitled "Use of Proceeds," "Selected Historical Consolidated Financial and Operating Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus.

| | As of April 29, 2017 | |
|---|---|---|
| | **Actual** | **As Adjusted** |
| | (dollars in thousands) (unaudited) | |
| Cash and cash equivalents | $ 23,487 | $ |
| Debt: | | |
| ABL Facility | — | |
| Related party promissory note(1) | 15,209 | |
| Total debt | 15,209 | |
| Stockholder's equity: | | |
| Common shares, par value $0.01 per share, 1,000 shares authorized, 1 share issued and outstanding (actual); shares authorized, shares issued and outstanding (as adjusted) | — | |
| Additional paid-in capital | 338,326 | |
| Accumulated deficit | (224,970) | |
| Accumulated other comprehensive loss | (45) | |
| Total stockholder's equity | 113,311 | |
| Total capitalization | $ 128,520 | $ |

(1)    We expect the related party promissory note to be extinguished by operation of law in connection with the Distribution.

The information set forth above excludes shares of common stock reserved for future grants under our equity compensation plan, which we plan to adopt in connection with this offering.

40

**Table of Contents**

**DILUTION**

The selling stockholders are selling all of the shares of our common stock being sold in this offering. Accordingly, we will not receive any proceeds from the sale of shares of our common stock in this offering. However, purchasers of the common stock in this offering will experience immediate and substantial dilution to the extent of the difference between the initial public offering price per share of our common stock and the net tangible book value per share of our common stock as of April 29, 2017.

As of April 29, 2017, we had net tangible book value of approximately $ million, or $ per share. Our net tangible book value per share represents total tangible assets less total liabilities divided by the number of common shares outstanding. After giving effect to (i) the sale of common stock by the Selling Stockholders in this offering, based upon a public offering price of $ per share, which is the midpoint of the range set forth on the cover page of this prospectus, and after deducting estimated offering expenses payable by us and (ii) the completion of the Stock Split and the Distribution, as if each had occurred on April 29, 2017, our as adjusted net tangible book value as of April 29, 2017 would have been approximately $ million, or $ per share. The following table illustrates this dilution on a per share basis:

| | | |
|---|---|---|
| Assumed initial public offering price per share | | $ |
| Net tangible book value per share as of April 29, 2017 | $ | |
| Dilution per share to new investors | | $ |

The following table summarizes, as of April 29, 2017, the total number of shares of common stock owned by existing stockholders, including the selling stockholders, and to be owned by new investors, the total consideration paid and the average price per share paid to us, by our existing stockholders, and to be paid by new investors, to the selling stockholders, in this offering. The table assumes (1) no exercise by the underwriters of their option to purchase up to additional shares from the selling stockholders, (2) an initial public offering price of $ per share, the midpoint of the range set forth on the cover of this prospectus, after deducting underwriting discounts and commissions and estimated offering expenses payable by us in connection with this offering, and (3) the completion of the Stock Split and the Distribution:

| | Shares Purchased | Total Consideration | Average Price Per Share |
|---|---|---|---|
| Existing stockholders | | $ | $ |
| New investors | | $ | $ |

41

Table of Contents

**SELECTED HISTORICAL CONSOLIDATED FINANCIAL AND OPERATING DATA**

The following tables set forth our selected historical consolidated financial and operating data as of and for the periods indicated. We have derived the consolidated statements of operations and cash flows data for the fiscal years ended January 31, 2015, January 30, 2016 and January 28, 2017 from our audited consolidated financial statements for such periods included elsewhere in this prospectus. Our consolidated balance sheet data as of January 30, 2016 and January 28, 2017 have been derived from our audited consolidated financial statements for such periods included elsewhere in this prospectus.

We have derived the consolidated statements of operations and cash flows data for the three months ended April 30, 2016 and April 29, 2017 from our unaudited consolidated financial statements included elsewhere in this prospectus. Our consolidated balance sheet data as of April 29, 2017 has been derived from our unaudited consolidated financial statements for such period included elsewhere in this prospectus.

The historical consolidated financial data presented below should be read in conjunction with our consolidated financial statements and the related notes thereto included elsewhere in this prospectus, and the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations." Our historical consolidated financial data may not be indicative of our future performance.

| | Fiscal Year Ended | | | Three Months Ended | |
|---|---|---|---|---|---|
| | January 31, 2015 | January 30, 2016 | January 28, 2017 | April 30, 2016 | April 29, 2017 |
| | (dollars in thousands, excluding per share data) | | | | |
| | | | | (unaudited) | |
| **Statements of Operations Data:** | | | | | |
| Net sales | $ 292,771 | $ 440,722 | $ 640,172 | $ 151,977 | $ 197,523 |
| Cost of goods sold | 187,201 | 267,755 | 388,517 | 85,098 | 119,618 |
| Gross profit | 105,570 | 172,967 | 251,655 | 66,879 | 77,905 |
| Selling, general and administrative expenses | 101,153 | 152,193 | 191,655 | 42,041 | 58,251 |
| Share-based compensation | 750 | 56 | 63,901 | 3,059 | 12,977 |
| Impairment charges | 383 | 198,784 | 3,214 | — | — |
| Income (loss) from operations | 3,284 | (178,066) | (7,115) | 21,779 | 6,677 |
| Interest (expense) income and other, net | — | (460) | (260) | 328 | (353) |
| Income (loss) before provision (benefit) for income taxes | 3,284 | (178,526) | (7,375) | 22,107 | 6,324 |
| Provision (benefit) for income taxes | 1,664 | (14,742) | 21,722 | 9,054 | 2,846 |
| Net income (loss) | $ 1,620 | $ (163,784) | $ (29,097) | $ 13,053 | $ 3,478 |
| Net income (loss) per share (in dollars)[1]: | | | | | |
| Basic | | | | | |
| Diluted | | | | | |
| Basic and diluted weighted average shares[1]: | | | | | |
| Basic | | | | | |
| Diluted | | | | | |
| **Statements of Cash Flows Data:** | | | | | |
| Net cash provided by (used in): | | | | | |
| Operating activities | $ 26,701 | $ 46,867 | $ 58,955 | $ 20,568 | $ 35,897 |
| Investing activities | (30,974) | (95,551) | (59,688) | (10,673) | (15,033) |
| Financing activities | 4,300 | 81,755 | (22,916) | — | (6,875) |

(1)    Gives effect to the -for- stock split that occurred on , 2017.

42

**Table of Contents**

| | As of | | |
|---|---|---|---|
| | **January 30, 2016** | **January 28, 2017** | **April 29, 2017** |
| | | (dollars in thousands) | |
| | | | (unaudited) |
| **Balance Sheet Data:** | | | |
| Cash and cash equivalents | $ 33,164 | $ 9,583 | $ 23,487 |
| Total current assets | 118,863 | 123,186 | 133,988 |
| Total current liabilities | 78,916 | 112,798 | 114,561 |
| Total long-term debt | 45,000 | 15,209 | 15,209 |
| Total liabilities and stockholder's equity | 218,004 | 265,786 | 286,992 |

43

Table of Contents

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion summarizes the significant factors affecting the consolidated operating results, financial condition, liquidity and cash flows of our Company as of and for the periods presented below. The following discussion and analysis should be read in conjunction with the consolidated financial statements and the related notes thereto included elsewhere in this prospectus. This discussion contains forward-looking statements that are based on the beliefs of our management, as well as assumptions made by, and information currently available to, our management. Actual results could differ materially from those discussed in or implied by forward-looking statements as a result of various factors, including those discussed below and elsewhere in this prospectus, particularly in the section entitled "Risk Factors."*

**Overview**

Torrid is the industry-leading and fastest growing branded omni-channel retailer of apparel, intimates and accessories for young, plus-size women in North America. Our mission is to grow our leadership position in this market by providing our customers with a broad assortment of high-quality, carefully-fitted apparel, intimates and accessories that is unapologetically young, sexy and fashionable. Our target customer is a 25 to 40 year old woman who is curvy and wears sizes 10 to 30. We believe our customer values the convenience and appeal of our curated presentation of merchandise that helps her be stylish for any occasion, including casual, work and dressy, at accessible price points. We believe we offer the young, plus-size woman both a product selection and a customer experience that have not previously been available to her. This offering makes us her favorite shopping destination and presents the opportunity to capture a significant portion of an underserved and growing market. Our differentiated approach and distinctive assortment have resulted in a highly loyal customer base and strong growth in our business.

**Factors Affecting Our Operating Results**

Various factors affect our operating results during each period, including:

*Overall Economic Trends.* Consumer purchases of clothing generally remain constant or may increase during stable economic periods and decline during recessionary periods and other periods when disposable income is adversely affected. Consequentially, our results of operations during any given period are often impacted by the overall economic conditions in the markets which we operate.

*Demographic Changes.* Our business has experienced growth over recent periods due, in part, to an increase in the plus-size population. Slower or negative growth in this demographic, in particular among women ages 25 to 40, specific to certain geographic markets or overall, could adversely affect our results of operations.

*Consumer Preferences and Product Trends.* While approximately 80% of our Torrid brand net sales in fiscal year 2016 were from core basics or on-trend basics, which are mostly consistent across seasons, our ability to maintain our appeal to our existing customers and to attract new customers depends on our ability to provide desirable products that are attractive to customers within our market segment. Our results are driven by our ability to successfully introduce new products. If we misjudge customer preferences or trends as they relate to our market segment, we may be faced with significant excess inventories for some products and be required to mark down or discard those products, either of which would impact our gross profit.

*Competition.* As a specialty apparel and accessories retailer targeting 25 to 40 year old plus-size women, we face competition from specialty, online and general retailers. Retailers compete based on a variety of factors, including design, quality, price, brand and customer service. Levels of competition and the ability of our competitors to attract customers through better products, competitive pricing, or other factors impact our results of operations.

44

Table of Contents

*Pricing and Changes in Our Merchandise Mix.* Our product offering changes from period to period, as do the prices at which goods are sold and the margins we are able to earn from the sales of those goods. The levels at which we are able to price our merchandise are influenced by a variety of factors, including the quality of our products, the cost of production, the prices at which our competitors are selling similar products and the willingness of our customers to pay for our products.

*Ability to Source and Distribute Products Effectively.* Our costs of sales are impacted by our ability to find third parties who can manufacture our products at favorable costs while maintaining the desired levels of quality. Our costs of distribution are impacted by a number of factors, including the cost of fuel and the amount of product being transported through distribution networks in the markets in which we operate, which affects our ability to obtain more favorable pricing with our providers.

*Changes in Sales Channel Mix.* Our results of operations may vary according to the amount of products we sell in our stores versus the amount of products we sell on our e-commerce platform. Many of our stores' operating costs are largely fixed, with the exceptions of incentive compensation for our employees and discretionary spending, while our e-commerce platform has a larger variable cost component and its costs depend in large part on the amount of goods sold. Changes in the mix of sales between channels could also result in a shift in capital resource allocation.

*The Number of Stores We Open and Close in Any Period.* During any period in which we are opening additional stores, we will incur capital expenditures as a result of that expansion. The number of stores that we operate in any period will impact our results for that period. Store closures may result in the impairment of assets utilized in those stores.

*Real Estate.* We have entered into operating lease agreements for stores under primarily non-cancelable leases with terms ranging from two to ten years. While we believe the terms of these leases generally are favorable, including performance-based termination provisions or "kickout" clauses, changes in lease terms due to market or other factors, including any increase in our rent expense, will impact our results for that period.

*Standalone Company Costs.* During our transition from a business unit within Hot Topic to a standalone company, we incurred costs under a transition services agreement (the "Transition Services Agreement") related to services being provided to us by Hot Topic for distribution, legal, human resources, finance, administrative, information technology, real estate management and other support services. Since the Separation, we have transitioned a number of functions from Hot Topic to be part of our own standalone organization, including legal, human resources, finance and certain administrative functions. On June 2, 2017, we terminated the Transition Services Agreement and entered into a new services agreement with Hot Topic (the "Services Agreement"), pursuant to which we will continue to receive certain services, including distribution, information technology and real estate management services. Following the completion of this initial public offering, we will incur additional legal, accounting and other expenses that we did not incur as a private company, including costs associated with public company reporting and corporate governance requirements. These requirements include compliance with certain aspects of the Sarbanes-Oxley Act as well as other rules implemented by the SEC, and applicable stock exchange rules. We expect these rules and regulations to substantially increase our legal and financial compliance costs and to make certain financial reporting and other activities more time-consuming and costly. We also expect to continue to incur share-based compensation expense in connection with grants under our equity incentive plan.

*Seasonality.* While seasonality frequently impacts businesses in the retail sector, our business is generally not seasonal. Accordingly, our net sales do not fluctuate as significantly as those of other retailers from quarter to quarter and any modest seasonal effect does not significantly change the underlying trends in our business. This lack of seasonality provides structural cost advantages relative to peers, including reduced staffing cyclicality and seasonal distribution capacity needs.

45

Table of Contents

**How We Assess the Performance of Our Business**

In assessing the performance of our business, we consider a variety of financial and operating metrics, including both GAAP and non-GAAP measures. For a further discussion of certain non-GAAP measures see "Non-GAAP Financial Measures" and "Prospectus Summary—Summary Consolidated Historical Financial and Other Data." These metrics include:

*Net Sales.* Net sales reflects our revenues from the sale of our merchandise, shipping and handling revenue received from e-commerce sales and gift card breakage income, less returns, discounts and loyalty program expenses. Revenue from our stores is recognized at the time of sale and revenue from our e-commerce channel is recognized upon receipt of the merchandise by the customer. Net sales are impacted by the size of our active customer base, product assortment and availability, marketing and promotional activities and the spending habits of our customers. Net sales are also impacted by the migration of single-channel customers (i.e., customers shopping only in-store or online) to omni-channel customers (i.e., customers shopping both in-store and online), who on average spend significantly more than single-channel customers in a given year.

*Comparable Company Sales.* We consider a store comparable after it has been open for 15 full fiscal months. If a store is closed during a fiscal year, it is only included in the computation of comparable company sales for the full fiscal months in which it was open. Partial fiscal months are excluded from the computation of comparable company sales. We include our e-commerce sales in the computation of comparable company sales. We apply current year foreign currency exchange rates to both current year and prior year comparable sales to remove the impact of foreign currency fluctuation and achieve a consistent basis for comparison. Comparable brand sales growth represents comparable company sales growth, excluding the effects of the Lovesick test concept.

*Number of Stores.* Store count reflects all stores open at the end of a reporting period. As we continue to increase our number of stores, we expect that non-comparable store sales will continue to contribute to our total net sales. In connection with opening new stores, we incur pre-opening costs, which primarily consist of payroll, travel, training, marketing, initial opening supplies and costs of transporting initial inventory and fixtures to store locations, as well as occupancy costs incurred from the time of possession of a store site to the opening of that store. These pre-opening costs are included in our selling, general and administrative expenses and are expensed as incurred.

*Gross Profit.* Gross profit is equal to our net sales minus cost of goods sold. Our cost of goods sold includes merchandise costs, freight, inventory shrinkage, payroll expenses associated with the merchandising department, distribution center expenses and store occupancy expenses, including rent, common area maintenance charges, real estate taxes and depreciation. Our cost of goods sold increases in higher volume quarters because we sell more merchandise. Merchandising payroll costs and store occupancy costs included within cost of goods sold are largely fixed and do not necessarily increase as volume increases. We review our inventory levels on an ongoing basis in order to identify slow-moving merchandise and generally use markdowns to clear that merchandise. The timing and level of markdowns are driven primarily by customer acceptance of our merchandise. The primary drivers of our merchandise costs include the raw materials, labor in the countries where we source our merchandise, customs duties, and logistics costs.

*Selling, General and Administrative Expenses.* Selling, general and administrative expenses include all operating costs not included in cost of goods sold. Our historical revenue growth has been accompanied by increased selling, general and administrative expenses. For instance, we continue to make marketing and payroll investments to support our growth. While we expect these expenses to increase as we continue to open new stores, increase brand awareness and grow our business, we believe these expenses will decrease as a percentage of net sales over time as net sales increase.

*Adjusted EBITDA and Adjusted EBITDA Margin.* Adjusted EBITDA represents GAAP net income (loss) plus interest expense and other, net, (benefit) provision for income taxes, depreciation and amortization,

46

Table of Contents

non-cash deductions and charges, other expenses, an adjustment for the Transition Services Agreement and the elimination of Lovesick test concept EBITDA. Adjusted EBITDA margin represents Adjusted EBITDA as a percentage of Torrid brand net sales. We present these measures as we believe they are frequently used by securities analysts, investors and other interested parties to evaluate companies in our industry and we use them internally as benchmarks to compare our performance to that of our competitors. We believe Adjusted EBITDA and Adjusted EBITDA margin facilitate operating performance comparisons from period to period by isolating the effects of certain items that vary from period to period without any correlation to ongoing operating performance. We also use Adjusted EBITDA and Adjusted EBITDA margin as two of the primary methods for planning and forecasting the overall expected performance of our business and for evaluating on a quarterly and annual basis actual results against such expectations. Further, we recognize Adjusted EBITDA and Adjusted EBITDA margin as commonly used measures in determining business value and, as such, use them internally to report and analyze our results and we additionally use Adjusted EBITDA as a benchmark to determine certain non-equity incentive payments made to executives.

## Results of Operations

### Three Months Ended April 29, 2017 Compared to the Three Months Ended April 30, 2016

The following table summarizes our consolidated results of operations for the periods indicated (dollars in thousands):

| | Three Months Ended | | | |
|---|---|---|---|---|
| | April 30, 2016 | | April 29, 2017 | |
| | | % of Net Sales | | % of Net Sales |
| | | (unaudited) | | |
| Net sales | $151,977 | 100.0% | $197,523 | 100.0% |
| Cost of goods sold | 85,098 | 56.0 | 119,618 | 60.6 |
| Gross profit | 66,879 | 44.0 | 77,905 | 39.4 |
| Selling, general and administrative expenses | 42,041 | 27.7 | 58,251 | 29.5 |
| Share-based compensation | 3,059 | 2.0 | 12,977 | 6.6 |
| Income from operations | 21,779 | 14.3 | 6,677 | 3.4 |
| Interest expense (income) and other, net | 328 | 0.0 | (353) | (0.2) |
| Income before provision for income taxes | 22,107 | 14.5 | 6,324 | 3.2 |
| Provision for income taxes | 9,054 | 6.0 | 2,846 | 1.4 |
| Net income | $ 13,053 | 8.6% | $ 3,478 | 1.8% |

The following table provides a reconciliation of net loss to Adjusted EBITDA for the periods presented (dollars in thousands):

| | Three Months Ended | |
|---|---|---|
| | April 30, 2016 | April 29, 2017 |
| | (unaudited) | |
| Net income | $ 13,053 | $ 3,478 |
| Interest expense (benefit) and other, net | (328) | 353 |
| Provision for income taxes | 9,054 | 2,846 |
| Depreciation and amortization | 3,588 | 5,359 |
| Non-cash deductions and charges(A) | 3,961 | 14,424 |
| Other expenses (benefit)(B) | (174) | 4,515 |
| Lovesick test concept EBITDA | 1,367 | 400 |
| Adjusted EBITDA | $ 30,521 | $ 31,375 |

47

**Table of Contents**

    

(A)    Non-cash deductions and charges includes $3.1 million in the three months ended April 30, 2016 and $13.0 million in the three months ended April 29, 2017 related to revaluing the liability-classified equity incentive units.

(B)    Other expenses represent non-routine expenses, including transaction-related fees in the three months ended April 30, 2016 and April 29, 2017.

*Net Sales*

Net sales increased $45.5 million, or 30.0%, to $197.5 million for the three months ended April 29, 2017, from $152.0 million for the three months ended April 30, 2016. This increase was primarily due to (i) an increase in comparable company sales of 12% and (ii) an increase in the number of stores we operated. We operated 510 stores at April 29, 2017 and 394 stores at April 30, 2016, representing a 29.4% increase.

Adjusted to exclude net sales from the Lovesick test concept, Torrid brand net sales for the three months ended April 29, 2017 increased $40.4 million, or 26.6%, to $192.1 million, from $151.7 million for the three months ended April 30, 2016. This increase was primarily due to (i) an increase in comparable brand sales of 11.4% and (ii) an increase in the number of Torrid brand stores we operated. We operated 487 Torrid brand stores at the end of the three months ended April 29, 2017 and 382 Torrid brand stores at April 30, 2016, representing a 27.5% increase.

*Gross Profit*

Gross profit for the three months ended April 29, 2017 increased $11.0 million, or 16.5%, to $77.9 million, from $66.9 million for the three months ended April 30, 2016. This increase was primarily due to higher net sales volumes partially offset by higher store occupancy and depreciation costs associated with new store openings, distribution center costs and merchandising payroll costs. Gross profit as a percentage of net sales decreased 4.6% to 39.4% in the three months ended April 29, 2017 from 44.0% in the three months ended April 30, 2016. This decrease was primarily from lower merchandise margin rate due to additional promotional activity, including selling excess product identified from fiscal year 2016 inventory, which was largely completed during the three months ended April 29, 2017, and the wind down of the Lovesick test concept stores, higher net internet freight and distribution network costs partially offset by leverage in merchandise payroll costs.

Adjusted to exclude the gross profit related to the Lovesick test concept, gross profit for the three months ended April 29, 2017 increased $9.5 million, or 14.2%, to $76.7 million, from $67.2 million in the three months ended April 30, 2016. As adjusted, gross profit as a percentage of Torrid brand net sales decreased by 4.4% to 39.9% in the three months ended April 29, 2017 from 44.3% in the three months ended April 30, 2016.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses for the three months ended April 29, 2017 increased $16.2 million, or 38.6%, to $58.3 million, from $42.0 million for the three months ended April 30, 2016. This increase was primarily due to an increase in store payroll and other store operating costs of $8.4 million related to higher store count and wage rate increases, an increase in marketing costs to acquire and retain customers of $3.3 million and an increase of $4.6 million in headquarters general and administrative costs. Selling, general and administrative expenses as a percentage of net sales increased by 1.8% to 29.5% in the three months ended April 29, 2017 from 27.7% in the three months ended April 30, 2016. This increase was driven by higher store payroll, increased marketing costs related to direct mail and online programs and higher professional fees partially offset by lower performance bonus and preopening expenses. Adjusted to exclude losses on fixed asset disposals, non-recurring legal expenses and expenses related to the Lovesick test concept, selling, general and administrative expenses for the three months ended April 29, 2017 increased $11.0 million, or 26.7%, to $52.1 million, from $41.2 million for the three months ended April 30, 2016. As adjusted, selling, general and administrative expenses as a percentage of Torrid brand net sales was 27.1% at April 29, 2017, flat compared to the three months ended April 30, 2016.

48

**Table of Contents**

*Share-Based Compensation*

Share-based compensation for the three months ended April 29, 2017 increased $9.9 million to $13.0 million, from $3.1 million for the three months ended April 30, 2016. The increase in share-based compensation expense was primarily driven by the effects of revaluing the liability-classified equity incentive units, which are required to be adjusted to fair value at the end of each reporting period.

*Interest Expense and Other, Net*

Interest expense and other, net was $(0.4) million for the three months ended April 29, 2017, compared to $0.3 million for the three months ended April 30, 2016. The change was due to the impact of foreign currency exchange rates from non-U.S. operations.

*Provision for Income Taxes*

The provision for income taxes for the three months ended April 29, 2017 increased by $6.2 million to $2.8 million, from a benefit of $9.1 million for the three months ended April 30, 2016. Our effective tax rate was 45.0% for the three months ended April 29, 2017 and 41.0% for the three months ended April 30, 2016. The change in the effective tax rate for the three months ended April 29, 2017, as compared to the three months ended April 30, 2016 is primarily due to the increase in the amount of non-taxable items associated with share-based compensation and decrease in income before provision for income taxes.

### Fiscal Year 2016 Compared to Fiscal Year 2015

The following table summarizes our consolidated results of operations for the periods indicated (dollars in thousands):

| | Fiscal Year Ended | | | |
| --- | --- | --- | --- | --- |
| | January 30, 2016 | | January 28, 2017 | |
| | | % of Net Sales | | % of Net Sales |
| Net sales | $ 440,722 | 100.0% | $640,172 | 100.0% |
| Cost of goods sold | 267,755 | 60.8 | 388,517 | 60.7 |
| Gross profit | 172,967 | 39.2 | 251,655 | 39.3 |
| Selling, general and administrative expenses | 152,193 | 34.5 | 191,655 | 29.9 |
| Share-based compensation | 56 | 0.0 | 63,901 | 10.0 |
| Impairment charges | 198,784 | 45.1 | 3,214 | 0.5 |
| Loss from operations | (178,066) | (40.4) | (7,115) | (1.1) |
| Interest expense and other, net | (460) | (0.1) | (260) | 0.0 |
| Loss before provision (benefit) for income taxes | (178,526) | (40.5) | (7,375) | (1.1) |
| (Benefit) provision for income taxes | (14,742) | (3.3) | 21,722 | 3.4 |
| Net loss | $(163,784) | (37.2)% | $ (29,097) | (4.5)% |

49

Table of Contents

The following table provides a reconciliation of net loss to Adjusted EBITDA for the periods presented (dollars in thousands):

| | Fiscal Year Ended | |
|---|---|---|
| | January 30, 2016 | January 28, 2017 |
| Net loss | $ (163,784) | $ (29,097) |
| Interest expense and other, net | 460 | 260 |
| (Benefit) provision for income taxes | (14,742) | 21,722 |
| Depreciation and amortization(A) | 13,691 | 16,801 |
| Non-cash deductions and charges(B) | 201,136 | 70,790 |
| Other expenses (income)(C) | 1,545 | (95) |
| Adjustment for Transition Services Agreement(D) | (4,307) | — |
| Lovesick test concept EBITDA(E) | 1,060 | 5,623 |
| Adjusted EBITDA | $ 35,059 | $ 86,004 |

(A)  Depreciation and amortization excludes $0.1 million of amortization of debt issuance costs in fiscal years 2015 and 2016 that are reflected in interest expense and other, net.

(B)  Non-cash deductions and charges includes (i) share-based compensation expense, including $0.1 million in fiscal year 2015 and $63.9 million in fiscal year 2016 related to revaluing the liability-classified equity incentive units, (ii) losses on fixed asset disposals, (iii) non-cash asset impairment charges, including $198.8 million in fiscal year 2015 related to an assessment we performed for our goodwill and other indefinite-lived intangible assets in connection with the Separation and $3.2 million in fiscal year 2016 and (iv) the net impact of non-cash rent expense.

(C)  Other expenses represent non-routine expenses, including (i) legal settlement expense in fiscal years 2015 and 2016 and related reversal in fiscal year 2016, (ii) transaction-related fees in fiscal year 2015 and (iii) reimbursement of certain expenses incurred by Sycamore in providing advisory services to us in fiscal year 2015.

(D)  Represents the impact of charges under the Transition Services Agreement that would have been paid to Hot Topic by Torrid had the Transition Services Agreement been in place during the entirety of fiscal year 2015.

(E)  Represents the elimination of EBITDA, adjusted for non-cash asset impairment charges and the net impact of non-cash rent expense, attributable to the Lovesick test concept, a new young women's plus-size retail concept that in January 2017 we decided to close.

*Net Sales*

Net sales for fiscal year 2016 increased $199.5 million, or 45.3%, to $640.2 million, from $440.7 million for fiscal year 2015. This increase was primarily due to (i) an increase in comparable company sales of 25% and (ii) an increase in the number of stores we operated. We operated 478 stores at the end of fiscal year 2016 and 361 stores at the end of fiscal year 2015, representing a 32.4% increase. Net sales from our e-commerce platform represented 33% of our total net sales in fiscal year 2016 compared to 28% of our total net sales in fiscal year 2015. Adjusted to exclude net sales from the Lovesick test concept, Torrid brand net sales for fiscal year 2016 increased $189.0 million, or 42.9%, to $629.7 million, from $440.7 million for fiscal year 2015. This increase was primarily due to (i) an increase in comparable brand sales of 24.6% and (ii) an increase in the number of Torrid brand stores we operated. We operated 455 Torrid brand stores at the end of fiscal year 2016 and 361 Torrid brand stores at the end of fiscal year 2015, representing a 26.0% increase.

*Gross Profit*

Gross profit for fiscal year 2016 increased $78.7 million, or 45.5%, to $251.7 million, from $173.0 million for fiscal year 2015. This increase was primarily due to higher net sales volumes partially offset by higher store occupancy and depreciation costs associated with new store openings, distribution center costs and merchandising payroll costs. Gross profit as a percentage of net sales increased by 0.1% to 39.3% in fiscal

50

Table of Contents

year 2016 from 39.2% in fiscal year 2015. This increase was driven by leverage of our store occupancy costs, store depreciation expense and merchandising payroll costs, as a result of higher net sales volume and our comparable company sales growth, partially offset by increased markdown activity, online shipping costs, and distribution center costs. Adjusted to include charges that would have been paid under the Transition Services Agreement and gross profit related to the Lovesick test concept, gross profit for fiscal year 2016 increased $77.3 million, or 44.7%, to $250.1 million, from $172.8 million in fiscal year 2015. As adjusted, gross profit as a percentage of Torrid brand net sales increased by 0.5% to 39.7% in fiscal year 2016 from 39.2% in fiscal year 2015.

### Selling, General and Administrative Expenses

Selling, general and administrative expenses for fiscal year 2016 increased $39.5 million, or 25.9%, to $191.7 million, from $152.2 million for fiscal year 2015. This increase was primarily due to an increase in store payroll and other store operating costs of $28.6 million and an increase in marketing costs to acquire and retain customers of $7.2 million and a $1.6 million increase in pre-opening costs due to opening additional stores. Selling, general and administrative expenses as a percentage of net sales decreased by 4.6% to 29.9% in fiscal year 2016 from 34.5% in fiscal year 2015. This decrease was driven by leverage of our headquarter expenses, store payroll and other store operating expenses and marketing costs as a result of higher net sales volume and our comparable company sales growth. Adjusted to include charges that would have been paid under the Transition Services Agreement up to the date of the Separation and to exclude losses on fixed asset disposals, non-recurring legal and transaction expenses and expenses related to the Lovesick test concept, selling, general and administrative expenses for fiscal year 2016 increased $30.8 million, or 20.1%, to $184.0 million, from $153.1 million for fiscal year 2015. As adjusted, selling, general and administrative expenses as a percentage of Torrid brand net sales decreased by 5.5% to 29.2% in fiscal year 2016 from 34.7% in fiscal year 2015.

### Share-Based Compensation

Share-based compensation for fiscal year 2016 increased $63.8 million to $63.9 million, from $0.1 million in fiscal year 2015. The increase in share-based compensation expense was driven by the effects of revaluing the liability-classified equity incentive units, which are required to be adjusted to fair value at the end of each reporting period. The increase in fair value of the incentive units was as a result of the improved performance and growth of our business during fiscal year 2016.

### Impairment Charges

Impairment charges for fiscal year 2016 decreased $195.6 million, or 98.4%, to $3.2 million, from $198.8 million for fiscal year 2015. The impairment charges in fiscal year 2015 resulted from an impairment assessment we performed for our goodwill and other indefinite-lived intangible assets in connection with the Separation. In fiscal year 2016, the impairment charge resulted from the closure of the Lovesick test concept.

### Interest Expense and Other, Net

Interest expense and other, net was $0.3 million for fiscal year 2016, compared to $0.5 million for fiscal year 2015. The decrease is due to the favorable impact of foreign currency exchange rates from non-U.S. operations partially offset by the increased use of our ABL Facility for seasonal borrowings.

### (Benefit) Provision for Income Taxes

The provision for income taxes for fiscal year 2016 increased by $36.4 million to $21.7 million, from a benefit of $(14.7) million for fiscal year 2015. Our effective tax rate was 294.5% for fiscal year 2016 and (8.3%) for fiscal year 2015. The effective tax rate for 2016 was significantly impacted by share-based compensation that was not deductible for tax purposes, while a portion of non-deductible goodwill and other indefinite-life intangible asset impairments impacted fiscal year 2015. Excluding these items, our effective tax rate would have been 38.4% for fiscal year 2016 and 37.9% for fiscal year 2015.

51

Table of Contents

*Fiscal Year 2015 Compared to Fiscal Year 2014*

The following table summarizes our consolidated results of operations for the periods indicated (dollars in thousands):

| | Fiscal Year Ended | | | |
| --- | --- | --- | --- | --- |
| | January 31, 2015 | % of Net Sales | January 30, 2016 | % of Net Sales |
| Net sales | $292,771 | 100.0% | $ 440,722 | 100.0% |
| Cost of goods sold | 187,201 | 63.9 | 267,755 | 60.8 |
| Gross profit | 105,570 | 36.1 | 172,967 | 39.2 |
| Selling, general and administrative expenses | 101,153 | 34.6 | 152,193 | 34.5 |
| Share-based compensation | 750 | 0.3 | 56 | 0.0 |
| Impairment charges | 383 | 0.1 | 198,784 | 45.1 |
| Income (loss) from operations | 3,284 | 1.1 | (178,066) | (40.4) |
| Interest expense and other, net | — | — | (460) | (0.1) |
| Income (loss) before provision (benefit) for income taxes | 3,284 | 1.1 | (178,526) | (40.5) |
| Provision (benefit) for income taxes | 1,664 | 0.6 | (14,742) | (3.3) |
| Net income (loss) | $  1,620 | 0.5% | $(163,784) | (37.2)% |

The following table provides a reconciliation of net income (loss) to Adjusted EBITDA for the periods presented (dollars in thousands):

| | Fiscal Year Ended | |
| --- | --- | --- |
| | January 31, 2015 | January 30, 2016 |
| Net income (loss) | $    1,620 | $    (163,784) |
| Interest expense and other, net | — | 460 |
| Provision (benefit) for income taxes | 1,664 | (14,742) |
| Depreciation and amortization(A) | 14,446 | 13,691 |
| Non-cash deductions and charges(B) | 2,978 | 201,136 |
| Other expenses(C) | 767 | 1,545 |
| Adjustment for Transition Services Agreement(D) | (23,633) | (4,307) |
| Lovesick test concept EBITDA(E) | — | 1,060 |
| Adjusted EBITDA | $    2,158 | $    35,059 |

(A)   Depreciation and amortization excludes $0.1 million of amortization of debt issuance costs in fiscal year 2015 that are reflected in interest expense and other, net.

(B)   Non-cash deductions and charges includes (i) share-based compensation expense, including $0.8 million in fiscal year 2014 and $0.1 million in fiscal year 2015 related to revaluing the liability-classified equity incentive units, (ii) losses on fixed asset disposals, (iii) non-cash asset impairment charges, including $0.4 million in fiscal year 2014 and $198.8 million in fiscal year 2015 related to an assessment we performed for our goodwill and other indefinite-lived intangible assets in connection with the Separation and (iv) the net impact of non-cash rent expense.

(C)   Other expenses represent non-routine expenses, including (i) legal settlement expense in fiscal years 2014 and 2015, (ii) transaction-related fees in fiscal year 2015 and (iii) reimbursement of certain expenses incurred by Sycamore in providing advisory services to us in fiscal year 2015.

(D)   Represents the impact of charges under the Transition Services Agreement that would have been paid to Hot Topic by Torrid had the Transition Services Agreement been in place during the entirety of fiscal years 2014 and 2015.

52

Table of Contents

(E)    Represents the elimination of EBITDA, adjusted for non-cash asset impairment charges and the net impact of non-cash rent expense, attributable to the Lovesick test concept, a new young women's plus-size retail concept that in January 2017 we decided to close.

*Net Sales*

Net sales for fiscal year 2015 increased $147.9 million, or 50.5%, to $440.7 million, from $292.8 million for fiscal year 2014. This increase was primarily due to an increase in comparable company sales of 33% and an increase in the number of stores we operated. We operated 361 stores at the end of fiscal year 2015 and 287 stores at the end of fiscal year 2014, representing a 25.8% increase. Net sales from our e-commerce platform represented 28% of our total net sales in fiscal year 2015 compared to 27% of our total net sales in fiscal year 2014.

*Gross Profit*

Gross profit for fiscal year 2015 increased $67.4 million, or 63.8%, to $173.0 million, from $105.6 million for fiscal year 2014. This increase was primarily due to higher net sales volumes partially offset by higher store occupancy and depreciation costs associated with new store openings and distribution center costs. Gross profit as a percentage of net sales increased by 3.2% to 39.2% in fiscal year 2015 from 36.1% in fiscal year 2014. This increase was driven by leverage of our store occupancy costs, store depreciation expense and merchandising payroll costs, as a result of higher net sales volume and our comparable company sales growth, and higher merchandise margin rate, partially offset by distribution center costs. Adjusted to include charges that would have been paid under the Transition Services Agreement and gross profit related to the Lovesick test concept, gross profit for fiscal year 2015 increased $70.9 million, or 69.6%, to $172.8 million, from $101.9 million in fiscal year 2014. As adjusted, gross profit as a percentage of Torrid brand net sales increased by 4.4% to 39.2% in fiscal year 2015 from 34.8% in fiscal year 2014.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses for fiscal year 2015 increased $51.0 million, or 50.5%, to $152.2 million, from $101.2 million for fiscal year 2014. This increase was primarily due to an increase in store payroll and other store operating costs of $23.2 million, payroll related expenses and costs incurred under the Transition Services Agreement of $19.6 million, an increase in marketing costs to acquire and retain customers of $5.9 million, an increase in professional services and legal costs of $1.2 million and a $1.2 million increase in pre-opening costs due to opening additional stores. Selling, general and administrative expenses as a percentage of net sales decreased by 0.1% to 34.5% in fiscal year 2015 from 34.6% in fiscal year 2014. This decrease was driven by leverage of our store payroll, other store operating expenses and marketing costs as a result of higher net sales volume and our comparable company sales growth, partially offset by costs incurred under the Transition Services Agreement. Adjusted to include charges that would have been paid under the Transition Services Agreement up to the date of the Separation and to exclude losses on fixed asset disposals, non-recurring legal and transaction expenses and expenses related to the Lovesick test concept, selling, general and administrative expenses for fiscal year 2015 increased $33.2 million, or 27.7%, to $153.1 million, from $119.9 million for fiscal year 2014. As adjusted, selling, general and administrative expenses as a percentage of Torrid brand net sales decreased by 6.2% to 34.7% in fiscal year 2015 from 40.9% in fiscal year 2014.

*Share-Based Compensation*

Share-based compensation for fiscal year 2015 decreased $0.7 million to $0.1 million, from $0.8 million in fiscal year 2014. The decrease in share-based compensation expense was driven by the effects of revaluing the liability-classified equity incentive units, which are required to be adjusted to fair value at the end of each reporting period.

53

**Table of Contents**

*Impairment Charges*

Impairment charges for fiscal year 2015 increased $198.4 million, to $198.8 million, from $0.4 million for fiscal year 2014. The impairment charges in fiscal year 2015 resulted from an impairment assessment we performed for our goodwill and other indefinite-lived intangible assets in connection with the Separation.

*Interest Expense and Other, Net*

Interest expense and other, net was $0.5 million for fiscal year 2015. The $0.5 million increase in fiscal year 2015 was due to the unfavorable impact of foreign currency exchange rates from non-U.S. operations and the increased use of our ABL Facility for seasonal borrowings.

*Provision (Benefit) for Income Taxes*

The benefit for income taxes for fiscal year 2015 increased by $16.4 million to $14.7 million, from a provision of $1.7 million for fiscal year 2014. Our effective tax rate was (8.3%) for fiscal year 2015 and 50.7% for fiscal year 2014. The effective tax rate for 2015 was significantly impacted by a portion of non-deductible goodwill and other indefinite-life intangible asset impairments. Excluding these items, our effective tax rate would have been 37.9% for fiscal year 2015.

## Quarterly Results of Operations

The following table sets forth certain unaudited financial and operating information for each fiscal quarter during fiscal years 2015, 2016 and the first quarter of fiscal year 2017. The quarterly information includes all adjustments (consisting of normal recurring adjustments) that, in the opinion of management, are necessary for a fair presentation of the information presented. This information should be read in conjunction with the consolidated financial statements and related notes thereto included elsewhere in this prospectus.

| | Fiscal Year 2015(1) | | | | Fiscal Year 2016(1) | | | | Fiscal Year 2017 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | First Quarter(2) | Second Quarter | Third Quarter | Fourth Quarter(2) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter(2) | First Quarter |
| | (dollars in thousands, except where noted) | | | | | | | | |
| Net sales | $ 101,343 | $ 96,579 | $112,097 | $ 130,703 | $151,977 | $150,634 | $160,264 | $ 177,297 | $197,523 |
| Gross profit | 42,365 | 39,254 | 43,050 | 48,298 | 66,879 | 63,322 | 61,537 | 59,917 | 77,905 |
| Income (loss) from operations | (184,370) | 4,037 | 1,835 | 432 | 21,779 | 5,551 | (23,704) | (10,741) | 6,677 |
| Net (loss) income | (167,174) | 2,332 | 1,115 | (57) | 13,053 | 533 | (16,679) | (26,004) | 3,478 |
| **Other Operating Data:** | | | | | | | | | |
| Adjusted EBITDA(3) | $ 13,920 | $ 8,396 | $ 6,604 | $ 6,140 | $ 30,521 | $ 22,471 | $ 20,928 | $ 12,083 | $ 31,375 |
| Comparable brand sales growth(4) | 30% | 26% | 38% | 38% | 30% | 30% | 24% | 17% | 12% |

54

Table of Contents

1.    Fiscal year 2016 results were impacted by $63.9 million in share-based compensation expense related to revaluing our liability-classified equity incentive units. The table below sets forth share-based compensation expense, related to revaluing our liability-classified equity incentive units for the periods presented (dollars in thousands):

| | Fiscal Year 2015 | | | | Fiscal Year 2016 | | | | Fiscal Year 2017 |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter |
|---|---|---|---|---|---|---|---|---|---|
| Share-based compensation expense | $ (806) | $ — | $ — | $ 862 | $ 3,059 | $ 10,952 | $ 38,085 | $ 11,805 | $ 12,977 |

2.    Results impacted by non-cash asset impairment charges, including $198.7 million in the first quarter of fiscal year 2015 related to an assessment we performed for our goodwill and other indefinite-lived intangible assets in connection with the Separation, $0.1 million in the fourth quarter of fiscal year 2015 and $3.2 million in the fourth quarter of fiscal year 2016 from impairment charges to definite lived assets.

3.    The following table provides a reconciliation of net loss to Adjusted EBITDA for the periods presented (dollars in thousands):

| | Fiscal Year 2015 | | | | Fiscal Year 2016 | | | | Fiscal Year 2017 |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter |
|---|---|---|---|---|---|---|---|---|---|
| Net (loss) income | $(167,174) | $ 2,332 | $ 1,115 | $ (57) | $ 13,053 | $ 533 | $(16,679) | $(26,004) | $ 3,478 |
| Interest expense (income) and other, net | — | 113 | 86 | 261 | (328) | 268 | 261 | 59 | 353 |
| (Benefit) provision for income taxes | (17,196) | 1,592 | 634 | 228 | 9,054 | 4,750 | (7,286) | 15,204 | 2,846 |
| Depreciation and amortization(A) | 3,791 | 3,256 | 3,277 | 3,367 | 3,588 | 3,911 | 4,356 | 4,946 | 5,359 |
| Non-cash deductions and charges(B) | 198,449 | 425 | 753 | 1,509 | 3,961 | 11,765 | 39,093 | 15,971 | 14,424 |
| Other expenses(C) | 357 | 677 | 435 | 76 | (174) | 130 | 44 | (95) | 4,515 |
| Adjustments for Transition Services Agreement(D) | (4,307) | — | — | — | — | — | — | — | — |
| Test concept expenses(E) | — | — | 304 | 756 | 1,367 | 1,114 | 1,139 | 2,003 | 400 |
| Adjusted EBITDA | $ 13,920 | $ 8,395 | $ 6,604 | $ 6,140 | $ 30,521 | $ 22,471 | $ 20,928 | $ 12,084 | $ 31,375 |

A.    Depreciation and amortization excludes amortization of debt issuance costs beginning in the second quarter of fiscal year 2015 that are reflected in interest expense and other, net.

55

Table of Contents

B. Non-cash deductions and charges includes:

    i. share-based compensation expense, related to revaluing our liability-classified equity incentive units, as follows (dollars in thousands):

| | Fiscal Year 2015 | | | | Fiscal Year 2016 | | | | Fiscal Year 2017 |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter |
|---|---|---|---|---|---|---|---|---|---|
| Share-based compensation expense | $ (806) | $ — | $ — | $ 862 | $ 3,059 | $ 10,952 | $ 38,085 | $ 11,805 | $ 12,977 |

    ii. losses on fixed asset disposals.

    iii. non-cash asset impairment charges, as follows (dollars in thousands):

| | Fiscal Year 2015 | | | | Fiscal Year 2016 | | | | Fiscal Year 2017 |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter |
|---|---|---|---|---|---|---|---|---|---|
| Non-cash asset impairment charges | $198,699 | $ — | $ — | $ 85 | $ — | $ — | $ — | $ 3,214 | $ — |

    iv. the net impact of non-cash rent expense.

C. Other expenses represent non-routine expenses, including (i) legal settlement expense in fiscal year 2015 and related reversal in fiscal year 2016, (ii) transaction-related fees in fiscal years 2015 and 2016 and (iii) reimbursement of certain expenses incurred by Sycamore in providing advisory services to us in fiscal year 2015.

D. Represents the impact of charges under the Transition Services Agreement that would have been paid to Hot Topic by Torrid had the Transition Services Agreement been in place during the entirety of fiscal year 2015.

E. Represents the elimination of EBITDA, adjusted for non-cash asset impairment charges and the net impact of non-cash rent expense, attributable to the Lovesick test concept, which in January 2017 we decided to close.

4. Comparable brand sales growth includes same-store net sales and e-commerce net sales calculated on a period-over-period basis for the Torrid brand. We apply current year foreign currency exchange rates to both current year and prior year comparable sales to remove the impact of foreign currency fluctuation and achieve a consistent basis for comparison. We consider a store comparable after it has been open for 15 full fiscal months. If a store is closed during a fiscal period, it is only included in the computation of comparable brand sales for full fiscal months in which it was open. Partial fiscal months are excluded from the computation of comparable brand sales.

**Liquidity and Capital Resources**

*General*

    Our business relies on cash flows from operations as our primary source of liquidity. We do, however, have access to additional liquidity, if needed, through borrowings under our ABL Facility. Our primary cash needs are for merchandise inventories, payroll, store and headquarters rent, capital expenditures associated with opening new stores and updating existing stores, logistics, information technology and to pay Hot Topic for certain services under the Services Agreement. Additional future liquidity needs will include funding the costs of operating as a public company. The most significant components of our working capital are cash and cash

Table of Contents

equivalents, merchandise inventories, accounts payable and other current liabilities. Our working capital position benefits from the fact that we generally collect cash from sales to customers the same day or, in the case of credit or debit card transactions, within a few days of the related sale, and typically we have 30 days from the invoice date to pay our merchandise vendors. We believe that cash generated from operations and the availability of borrowings under our ABL Facility or other financing arrangements will be sufficient to meet working capital requirements, and anticipated capital expenditures for at least the next 12 months. There can be no assurance, however, that our business will generate sufficient cash flows from operations or that future borrowings will be available under our ABL Facility or otherwise to enable us to service our indebtedness, or to make capital expenditures in the future. Our future operating performance and our ability to service or extend our indebtedness will be subject to future economic conditions and to financial, business and other factors, many of which are beyond our control.

### Cash Flow Analysis

A summary of operating, investing and financing activities are shown in the following table (dollars in thousands):

| | Year Ended | | | Three Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | January 31, 2015 | January 30, 2016 | January 28, 2017 | April 29, 2016 | April 30, 2017 |
| Net cash provided by operating activities | $    26,701 | $    46,867 | $    58,955 | $    20,568 | $    35,897 |
| Net cash used in investing activities | (30,974) | (95,551) | (59,688) | (10,673) | (15,033) |
| Net cash (used in) provided by financing activities | 4,300 | 81,755 | (22,916) | — | (6,875) |

### Net Cash Provided By Operating Activities

Operating activities consist primarily of net loss adjusted for non-cash items, including depreciation and amortization, the effect of working capital changes, taxes paid and tenant allowances received from landlords.

Net cash provided by operating activities during the three months ended April 29, 2017 was $35.9 million compared to $20.5 million during the three months ended April 30, 2016. Key elements of cash provided by operating activities were (i) a net income of $3.5 million, (ii) adjustments to reconcile net income to net cash provided by operating activities of $18.5 million, primarily driven by share-based compensation and depreciation and amortization and (iii) changes in net operating assets and liabilities and other activities of $13.9 million, primarily due to increases in accounts payable, deferred rent, income taxes payable, due to related parties and a decrease in inventory, partially offset by a decrease in accrued and other current liabilities and an increase in prepaid expenses and other current assets.

Net cash provided by operating activities during fiscal year 2016 was $59.0 million. Key elements of cash provided by operating activities were (i) a net loss of $29.1 million, (ii) adjustments to reconcile net loss to net cash provided by operating activities of $81.1 million, primarily driven by depreciation and amortization and share-based compensation and (iii) changes in net operating assets and liabilities and other activities of $7.0 million, primarily due to increases in accrued and other current liabilities, deferred rent and other noncurrent liabilities, and amounts due to related parties primarily under the Transition Services Agreement, partially offset by an increase in inventory and a decrease in income taxes payable.

Net cash provided by operating activities during fiscal year 2015 was $46.9 million. Key elements of cash provided by operating activities were (i) a net loss of $163.8 million, (ii) adjustments to reconcile net loss to net cash provided by operating activities of $188.6 million, primarily driven by depreciation and amortization and impairment of goodwill and intangible assets and (iii) changes in net operating assets and liabilities and other

57

**Table of Contents**

activities of $22.1 million, primarily due to an increase in accrued and other current liabilities, deferred rent and other noncurrent liabilities, amounts due to related parties primarily under the Transition Services Agreement, and income taxes payable, partially offset by increases in inventory and prepaid expenses and other current assets.

Net cash provided by operating activities during fiscal year 2014 was $26.7 million. Key elements of cash provided by operating activities were (i) a net income of $1.6 million, (ii) adjustments to reconcile net income to net cash provided by operating activities of $14.7 million, primarily driven by depreciation and amortization and (iii) changes in net operating assets and liabilities and other activities of $10.4 million, primarily due to an increase in accrued and other current liabilities, deferred rent and other noncurrent liabilities, accounts payable and income taxes payable, partially offset by increases in inventory and prepaid expenses and other current assets.

### Net Cash Used in Investing Activities

Investing activities consist primarily of capital expenditures for growth (new store openings, relocations and major remodels), store maintenance (minor store remodels and investments in store fixtures), and infrastructure to support the business related primarily to information technology and our headquarters facility.

Net cash flows used in investing activities were $15.0 million, $59.7 million, $95.6 million and $31.0 million during the three months ended April 29, 2017, and fiscal years 2016, 2015 and 2014, respectively. Net cash flows used in investing activities in fiscal year 2015 included $55.0 million in cash used for the acquisition of the Torrid business from Hot Topic. Capital expenditures were $15.0 million in the three months ended April 29, 2017 compared to $10.7 million in the three months ended April 30, 2016, $59.7 million in fiscal year 2016 compared to $40.6 million in fiscal year 2015 and $31.0 million in fiscal year 2014. Capital expenditures are primarily related to the opening of new stores, store relocations and major store remodels. The remaining capital expenditures in each period related primarily to support minor store remodels, fixtures, information technology and other investments in our headquarters facility.

We expect capital expenditures for fiscal year 2017 to be approximately $60 to $70 million, including capital for our new store growth, store relocations, store remodels and infrastructure related to information technology and our headquarters facilities.

### Net Cash Provided By Financing Activities

Financing activities in our historical period, after the Separation, have consisted primarily of borrowings and repayments related to our ABL Facility and fees and expenses paid in connection with entry into our ABL Facility. Prior to the Separation we were part of Hot Topic's consolidated treasury function and our liquidity was provided by Hot Topic.

Net cash used by financing activities was $6.9 million for the three months ended April 29, 2017, consisting of short-term borrowings and repayments of our credit facility and no borrowings or repayments for the three months ended April 30, 2016.

Net cash used by financing activities was $22.9 million in fiscal year 2016. This use of cash included $29.8 million utilized in repayment of our related party promissory note, partially offset by $6.9 million in net proceeds from our credit facility.

Net cash provided by financing activities was $81.8 million in fiscal year 2015. This reflected a $45.0 million cash equity contribution made to us by our parent and proceeds from our related party promissory note of $45.0 million, partially offset by $8.2 million of net cash adjustments to reflect pre-Separation activity with Hot Topic and deferred financing costs.

**Table of Contents**

Net cash provided by financing activities was $4.3 million in fiscal year 2014 which was due to net cash adjustments to reflect pre-Separation activity with Hot Topic.

*ABL Facility*

In May 2015, we entered into our ABL Facility of $50 million (subject to a borrowing base), with Bank of America, N.A.

Certain of our domestic subsidiaries are co-borrowers with us under the ABL Facility and the principal amount outstanding of the loans under the ABL Facility are expected to be due and payable in full on the fifth anniversary of the closing date.

Availability under the ABL Facility is subject to a percentage of our eligible inventory and receivables to collateralize the borrowing and is reduced by the level of outstanding letters of credit.

The borrowing base for the revolving credit facility at any time equals the sum of 90% of eligible credit card receivables, plus 90% of the appraised net orderly liquidation value of eligible inventory and eligible in-transit inventory multiplied by the cost of such eligible inventory and eligible in-transit inventory (to be increased to 92.5% during the period beginning on September 1 of each year and ending on December 31 of each year). The ABL Facility includes borrowing capacity for letters of credit and for borrowings on same-day notice, referred to as Swing Line Loans, and will be available in U.S. dollars.

We have the right to request up to $30 million of additional commitments under the ABL Facility, and the lenders under this facility are not under any obligation to provide any such additional commitments, and any increase in commitments is subject to customary conditions precedent. If we were to request any such additional commitments and the existing lenders or new lenders were to agree to provide such commitments, the ABL Facility size could increase to up to $80 million, but our ability to borrow under this facility would still be limited by the amount of the borrowing base.

Borrowings under the ABL Facility bear interest at an annual rate equal to, at our option, either (a) a base rate determined by reference to the highest of (1) the prime rate of Bank of America, N.A., (2) the federal funds effective rate plus 0.50% and (3) a LIBOR rate for an interest period of one month adjusted for certain costs, plus 1.00% or (b) at a LIBOR rate for the interest period relevant to such borrowing adjusted for certain costs, in each case plus an applicable margin that ranges from 1.75% to 2.0% for LIBOR borrowings and 0.75% to 1.0% for base rate borrowings. At the end of fiscal year 2016, the applicable interest rate for borrowings under the ABL Facility was 4.5%.

If we elect the LIBOR rate, interest is due and payable on the last day of each interest period, unless an interest period exceeds three months, then the respective dates that fall every three months after the beginning of the interest period shall also be interest payment dates. If we opt for the base rate, (including a Swing Line Loan), interest is due and payable on the first business day of each month and on the maturity date.

In addition to paying interest on outstanding principal under the ABL Facility, we are required to pay a commitment fee in respect of unutilized commitments. The commitment fee ranges between 0.25% and 0.375% per annum of unutilized commitments and will be subject to adjustment each fiscal quarter based on the amount of unutilized commitments during the immediately preceding fiscal quarter. We must also pay customary letter of credit fees and agent fees.

If at any time the aggregate amount of outstanding loans, unreimbursed letter of credit drawings and undrawn letters of credit under the ABL Facility exceeds the lesser of (a) the commitment amount and (b) the borrowing base, we will be required to repay outstanding loans and/or cash collateralize letters of credit in an aggregate amount equal to such excess, with no reduction of the commitment amount.

Table of Contents

We may voluntarily reduce the unused portion of the commitment amount and repay outstanding loans at any time. Prepayment of the loans may be made without premium or penalty other than customary "breakage" costs with respect to LIBOR loans.

All obligations under the ABL Facility are unconditionally guaranteed by our parent and substantially all of our existing majority-owned domestic subsidiaries and will be required to be guaranteed by certain of our future domestic majority-owned subsidiaries. All obligations under the ABL Facility, and the guarantees of those obligations, will be secured, subject to certain exceptions, by substantially all of our and parent's assets.

Our ABL Facility contains a number of covenants that, among other things and subject to certain exceptions, will restrict our ability and the ability of our subsidiaries to: incur additional indebtedness; pay dividends on our capital stock or redeem, repurchase or retire our capital stock or our other indebtedness; make investments, loans and acquisitions; engage in transactions with our affiliates; sell assets, including capital stock of our subsidiaries; alter the business we conduct; consolidate or merge; and incur liens. As of the end of fiscal year 2016, we were compliant with our debt covenants under the ABL Facility.

Availability under the ABL Facility at the end of fiscal year 2016 was $42.3 million, which reflects $6.9 million of outstanding borrowings and $0.8 million of standby letters of credit issued and outstanding. During the first quarter of fiscal year 2015, we recorded the entire $0.4 million of financing costs for the ABL Facility which are reflected in deposits and other assets in our consolidated balance sheets. During fiscal year 2016, we amortized $0.1 million of financing costs and paid $0.2 million in interest payments for the ABL Facility. Interest payments and amortized financing costs were recognized in interest expense and other, net.

**Contractual Obligations**

We enter into long term contractual obligations and commitments in the normal course of business, primarily debt obligations and non-cancelable operating leases. As of January 28, 2017, our contractual cash obligations over the next several periods are set forth below (dollars in thousands):

| | Total | <1 Year | 1-3 Years | 3-5 Years | Thereafter |
|---|---|---|---|---|---|
| **Contractual Obligations:** | | | | | |
| ABL Facility(1) | $ 6,875 | $ — | $ — | $ 6,875 | $ — |
| Related Party Promissory Note(2) | 15,292 | — | 15,292 | — | — |
| Purchase Obligations | 153,541 | 153,541 | — | — | — |
| Letters of Credit and Other Obligations | 2,693 | 2,590 | 103 | — | — |
| Operating Lease Obligations(3) | 288,318 | 36,209 | 69,058 | 67,585 | 115,466 |
| Total | $466,719 | $192,340 | $ 84,453 | $ 74,460 | $ 115,466 |

(1)  Amounts assume the outstanding amount on the ABL Facility is paid upon maturity, which may or may not reflect future events. The amount listed above does not include interest expense as the amount of interest expense is subject to change based on the amount drawn on the ABL Facility.

(2)  Amounts assume the outstanding amount on the related party promissory note is paid upon maturity. See "Note 8—Related Party Transactions" contained in the consolidated financial statements and notes included elsewhere in this prospectus for additional disclosure related to the related party promissory note. This amount includes $0.1 million of associated interest which is payable upon maturity.

(3)  Assumes the base lease term included in our operating lease arrangements as of January 28, 2017. Our future operating lease obligations would change if we exercise renewal options or if we renewed existing leases or entered into new operating leases. See "Note 13—Commitments and Contingencies" contained in the consolidated financial statements and notes, included elsewhere in this prospectus for additional disclosure related to operating lease obligations.

60

Table of Contents

**Off-Balance Sheet Arrangements**

We currently do not have any off-balance sheet arrangements or financing activities with special-purpose entities.

**Critical Accounting Policies and Significant Estimates**

Our discussion of results of operations and financial condition is based upon the consolidated financial statements included elsewhere in this prospectus, which have been prepared in accordance with GAAP. The preparation of financial statements in conformity with GAAP requires management to make estimates and certain assumptions about future events that affect the classification and amounts reported in our consolidated financial statements and accompanying notes, including revenue and expenses, assets and liabilities, and the disclosure of contingent assets and liabilities. These estimates and assumptions are based on our historical results as well as management's judgment. Although management believes the judgment applied in preparing estimates is reasonable based on circumstances and information known at the time, actual results could vary materially from estimates based on assumptions used in the preparation of our consolidated financial statements.

The most significant accounting estimates involve a high degree of judgment or complexity. Management believes the estimates and judgments most critical to the preparation of our consolidated financial statements and to the understanding of our reported financial results include those made in connection with revenue recognition, including accounting for gift card breakage, estimated merchandise returns and loyalty program expenses; estimating the value of inventory; impairment assessments for goodwill and other indefinite-lived intangible assets, and long-lived assets; and estimating share-based compensation expense. Management evaluates its policies and assumptions on an ongoing basis. Our significant accounting policies related to these accounts in the preparation of our consolidated financial statements are described below (see Note 2 to our audited consolidated financial statements included elsewhere in this prospectus for additional information regarding our critical accounting policies).

*Revenue Recognition*

Revenue is generally recognized at our store locations at the point at which the customer receives and pays for the merchandise at the register. For online sales, revenue is recognized upon delivery to the customer. Sales are recognized net of merchandise returns, which are reserved for based on historical experience. The criteria for recognition of revenue is met when persuasive evidence that an arrangement exists, delivery of product has occurred, the price is fixed or determinable and collectability is reasonably assured. In circumstances where either title or risk of loss pass upon receipt by the customer, we defer recognition of revenue until such event occurs, based on shipping records.

At the time sales revenue is recognized, we record a reserve for merchandise returns based on prior returns experience and expected future returns in accordance with our return policy and discretionary returns practices. We monitor our returns experience and resulting reserves on an ongoing basis and we believe our estimates are reasonable. We do not believe there is a reasonable likelihood that there will be a material change in the assumptions used to calculate the allowance for sales returns. However, if actual sales returns are significantly different than the estimated allowance, our results of operations could be materially affected.

Gift card breakage is income recognized due to the non-redemption of a portion of gift cards sold by us for which a liability was recorded in prior periods. We recognize estimated gift card breakage as a component of net sales in proportion to actual gift card redemptions over the period that remaining gift card values are redeemed. Based upon historical experience, we estimate the value of outstanding gift cards that will ultimately not be redeemed (breakage) nor escheated under statutory unclaimed property laws. This amount is recognized as revenue over the time pattern established by our historical gift card redemption experience. We monitor our gift card redemption experience and associated accounting on an ongoing basis. Our historical experience has not

61

**Table of Contents**

varied significantly from amounts historically recorded and we believe our assumptions are reasonable. While customer redemption patterns result in estimated gift card breakage, changes in our customers' behavior could impact the amount that ultimately is unused and could affect the amount recognized as a component of net sales.

Under our loyalty program, customers accumulate points based on purchase activity and upon reaching a certain point level, customers can earn awards that may only be redeemed for merchandise. Unredeemed points are subject to expiration after 13 months without additional purchase activity and unredeemed awards expire 45 days after issuance. We use historical redemption rates to estimate the value of future award redemptions and we recognize the estimated value of these future awards as a reduction of revenue in the consolidated statements of operations and comprehensive income (loss) in the period the points are earned by the customer.

*Inventory*

Inventory consists of finished goods merchandise held for sale to our customers. Inventory is valued at the lower of moving average cost or market.

In the normal course of business, we record inventory reserves based on past and projected sales performance, as well as the inventory on hand. We make certain assumptions regarding net realizable value in order to assess whether our inventory is recorded properly at the lower of cost or market. These assumptions are based on both historical average selling price experience and current selling price information. The carrying value of inventory is reduced to estimated net realizable value when factors indicate that merchandise will not be sold on terms sufficient to recover its cost.

We monitor inventory levels, sales trends and sales forecasts to estimate and record reserves for excess, slow-moving and obsolete inventory. We utilize internal channels to liquidate excess inventory. The prices obtained through these offprice selling methods varies based on many factors. Accordingly, estimates of future sales prices requires management judgment based on historical experience, assessment of current conditions and assumptions about future transactions. In addition, we conduct physical inventory counts to determine and record actual shrinkage. Estimates for shrinkage are recorded between physical counts, based on actual shrinkage experience. Actual shrinkage can vary from these estimates. When observed differences are identified, we adjust our inventory balances accordingly. We believe our assumptions are reasonable, and monitor actual results to adjust estimates and inventory balances on an ongoing basis. We have not made significant changes to our assumptions during the periods presented in our consolidated financial statements included elsewhere in this prospectus, and estimates have not varied significantly from historically recorded amounts.

*Asset Impairment Assessments*

*Goodwill and Indefinite-Lived Intangible Assets*

At the end of the fiscal third quarter, we perform an impairment analysis of goodwill and indefinite-lived intangible assets to determine whether the carrying value reflected on the balance sheet is recoverable, and more frequently if events or circumstances indicate that the fair value of a reporting unit is less than its fair value. Examples of impairment indicators that would trigger an impairment assessment of goodwill between annual evaluations include, among others, macro-economic conditions, competitive environment, industry conditions, changes in our profitability and cash flows, and changes in sales trends or customer demand.

We may assess our goodwill for impairment initially using a qualitative approach ("step zero") to determine whether conditions exist to indicate that it is more likely than not that the fair value of a reporting unit is less than its carrying value. If management concludes, based on assessment of relevant events, facts and circumstances, that it is more likely than not that a reporting unit's fair value is greater than its carrying value, no further impairment testing is required.

62

**Table of Contents**

If management's assessment of qualitative factors indicates that it is more likely than not that the fair value of a reporting unit is less than its carrying value, then a two-step quantitative assessment is performed. We also have the option to bypass the qualitative assessment described above and proceed directly to the two-step quantitative assessment. "Step one" requires comparing the fair value of a reporting unit to its carrying value, including goodwill. We estimate the fair value of reporting units using the income approach. The income approach uses a discounted cash flow analysis, which involves significant estimates and assumptions, including preparation of revenue and profitability growth forecasts, selection of the discount rate and the terminal year multiple.

If the fair value of the respective reporting unit exceeds its carrying amount, goodwill is not considered to be impaired and no further testing is required. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test is to measure the amount of impairment loss, if any. "Step two" compares the implied fair value of goodwill to the carrying amount of goodwill. The implied fair value of goodwill is determined by a hypothetical purchase price allocation using the reporting unit's fair value as the purchase price. If the carrying amount of goodwill exceeds the implied fair value, an impairment charge is recorded to write down goodwill to its implied fair value.

We recorded a full goodwill impairment on May 2, 2015 and as a result we did not have any goodwill as of the end of fiscal years 2015 and 2016. We recorded an impairment charge on May 2, 2015 in our consolidated statements of operations and comprehensive income (loss) that reduced the carrying values of the trade name to its estimated fair value. At the end of the third quarter of fiscal year 2016, we performed our annual impairment assessment of our trade name and the assessment indicated there was no impairment.

Refer to Note 7 to our audited consolidated financial statements included elsewhere in this prospectus for additional information regarding goodwill and indefinite-lived intangible assets.

*Long-Lived Assets*

Long-lived assets include definite-lived intangible assets subject to amortization and property and equipment.

We assess the carrying value of long-lived assets for potential impairment whenever events or changes in circumstances indicate that the carrying value may not be recoverable. We group and evaluate long-lived assets for impairment at the individual store level, which is the lowest level at which individual cash flows can be identified. Factors we consider important that could trigger an impairment review of our stores or online operations include significant underperformance relative to expected historical or projected future operating results, a significant change in the manner of the use of the asset or a significant negative industry or economic trend.

When we determine the carrying value of long-lived assets may not be recoverable based upon the existence of one or more of the aforementioned factors, impairment is measured based on a projected discounted cash flow method using a discount rate. These cash flows are calculated by netting future estimated sales of each store against estimated cost of goods sold, store occupancy costs and other store operating expenses such as payroll, supplies, repairs and maintenance and credit/debit card fees.

We assessed the carrying value of long-lived assets as described above. In January 2017, as a result of a change in strategy, we decided to close the Lovesick test concept, including its stores and website. We evaluated the carrying value of each individual Lovesick store for potential impairment, as the individual store level is the lowest level at which individual cash flows can be identified. During fiscal year 2016, we recognized store impairment charges associated with the closure of the Lovesick concept in the consolidated statements of operations and comprehensive income (loss). The costs relate to the impairment of assets associated with stores that are closing.

63

Table of Contents

Determining the fair value of long-lived assets requires management judgment and relies upon the use of significant estimates and assumptions, including future sales, our margins and cash flows, current and future market conditions, discount rates applied, useful lives and other factors. We believe our assumptions are reasonable based on available information. Changes in these assumptions may cause the fair value to be significantly impacted. In the event future performance is lower than forecasted results, future cash flows may be lower than expected, which could result in future impairment charges. While we believe that recently opened stores will provide sufficient cash flow, material changes in financial performance could result in future store impairment charges.

### *Share-Based Compensation*

We recognize share-based compensation expense in the consolidated statements of operations and comprehensive income (loss) associated with incentive units issued by our parent (HT Holdings LLC prior to the Separation and Torrid Holding LLC after the Separation) to employees. The incentive units are remeasured based on the fair value of the awards at the end of each reporting period as the incentive units are accounted for as liability instruments. In fiscal years 2015 and 2016 and the three months ended April 29, 2017, we recorded the fair value of these awards as a capital contribution from our parent as our parent is the legal obligor for the incentive units.

The fair value incorporates various assumptions including the time to liquidity event, equity volatility and risk-free interest rate of return. Equity volatility is based on the historical volatilities of comparable publicly traded companies for the time horizon equal to the time to the anticipated liquidity event; and the risk-free interest rate is for a term corresponding to the time to liquidity event. The most recent remeasurement of the fair value of the incentive units was performed as of April 29, 2017.

The share-based compensation expense and related capital contribution are reflected in our consolidated financial statements as these awards are deemed to be for our benefit. The incentive units contain a repurchase feature, whereby upon termination, our parent has the right to purchase from former employees any or all of the vested incentive units at fair value. Based on the features and characteristics of the incentive units, including repurchase rights and disproportionate voting and distribution rights, we determined that the incentive units were in-substance liabilities.

### Jumpstart Our Business Startups Act of 2012 ("JOBS Act")

In April 2012, the JOBS Act was signed into law. The JOBS Act contains provisions that, among other things, reduce certain reporting requirements for an "emerging growth company." As an "emerging growth company," we are electing not to take advantage of the extended transition period afforded by the JOBS Act for the implementation of new or revised accounting standards, and, as a result, we will comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth public companies. Section 107 of the JOBS Act provides that our decision not to take advantage of the extended transition period is irrevocable.

We have chosen to rely on the other exemptions and reduced reporting requirements provided by the JOBS Act. Subject to certain conditions set forth in the JOBS Act, as an "emerging growth company" we are not required to, among other things, (i) provide an auditor's attestation report on our system of internal controls over financial reporting pursuant to Section 404 of Sarbanes-Oxley, (ii) provide all of the compensation disclosure that may be required of non-emerging growth public companies under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, (iii) comply with any requirement that may be adopted by the Public Company Accounting Oversight Board (United States) regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the consolidated financial statements (auditor discussion and analysis) and (iv) disclose certain executive compensation-related items, such as the correlation between executive compensation and performance and comparisons of the chief executive officer's

64

Table of Contents

compensation to median employee compensation. We may remain an "emerging growth company" until the last day of the fiscal year following the fifth anniversary of the completion of this offering. However, if certain events occur prior to the end of such five-year period, including if we become a "large accelerated filer," our total annual gross revenue equals or exceeds $1.07 billion or we issue more than $1.0 billion of non-convertible debt in any three-year period, we will cease to be an "emerging growth company" prior to the end of such five-year period.

**Recently Issued Accounting Pronouncements**

See Note 3 to our audited consolidated financial statements included elsewhere in this prospectus for information regarding recently issued accounting pronouncements.

**Quantitative and Qualitative Disclosure of Market Risks**

*Interest Rate Risk*

We are subject to interest rate risk in connection with borrowings under our ABL Facility, which bears interest at a variable rate equal to LIBOR plus an applicable margin. See "—Liquidity and Capital Resources—ABL Facility."

*Foreign Exchange Risk*

The reporting currency for our consolidated financial statements is U.S. dollars. To date, net sales generated outside of the United States have not been significant. As a result, we have not been impacted materially by changes in exchange rates and do not expect to be impacted materially for the foreseeable future. However, as our net sales generated outside of the United States increase, our results of operations could be adversely impacted by changes in exchange rates. For example, if we recognize international sales in local foreign currencies (as we currently do in Canada), as the U.S. dollar strengthens it would have a negative impact on our international results upon translation of those results into U.S. dollars during consolidation. We also purchase a significant quantity of merchandise from foreign countries. However, these purchases are made in U.S. dollar-denominated purchase contracts. We do not currently hedge foreign currency fluctuations and do not intend to do so for the foreseeable future.

*Impact of Inflation*

Our results of operations and financial condition are presented based on historical cost. While it is difficult to accurately measure the impact of inflation due to the imprecise nature of the estimates required, we believe the effects of inflation, if any, on our results of operations and financial condition have been immaterial. We cannot assure you our business will not be affected in the future by inflation.

65

**Table of Contents**

## BUSINESS

Torrid is the industry-leading and fastest growing branded omni-channel retailer of apparel, intimates and accessories for young, plus-size women in North America. Our mission is to grow our leadership position in this market by providing our customers with a broad assortment of high-quality, carefully-fitted apparel, intimates and accessories that is unapologetically young, sexy and fashionable. Our target customer is a 25 to 40 year old woman who is curvy and wears sizes 10 to 30. We believe our customer values the convenience and appeal of our curated presentation of merchandise that helps her be stylish for any occasion, including casual, work and dressy, at accessible price points. We believe we offer the young, plus-size woman both a product selection and a customer experience that have not previously been available to her. This offering makes us her favorite shopping destination and presents the opportunity to capture a significant portion of an underserved and growing market.

We believe we are the clear market leader for an underserved and growing demographic of young, plus-size women that no other national specialty retailer targets or adequately addresses. According to NPD, the women's plus-size apparel market was approximately $21 billion in 2016, and has grown at more than twice the rate of the overall U.S. women's apparel market. This accelerated market growth is expected to continue. While approximately two-thirds of U.S. women are plus-size (sizes 14 and up), only 17% of women's apparel sales during 2016 in the U.S. were in plus-sizes. We estimate there is only one dedicated plus-size apparel store for every 30 specialty apparel stores. As a result, there are approximately 34,000 plus-size women for each plus-size apparel store, as compared to 600 women for each other specialty apparel store. We also believe other existing national plus-size retailers aim to serve customers over 40 years old, an age demographic that has traditionally been associated with plus-sizes. However, approximately 50% of the plus-size population is under 45 years old and we believe this demographic is particularly underserved.

We operate a growing omni-channel business model that is highly profitable on an Adjusted EBITDA basis. In fiscal year 2016, we achieved industry-leading e-commerce penetration of 34%, an increase from 20% penetration in fiscal year 2012. As of April 29, 2017, we operated 487 stores in 48 U.S. states, Puerto Rico and Canada, 99% of which generated positive store-level EBITDA in fiscal year 2016. Our stores average approximately 2,850 square feet. Our stores are located primarily in premium malls, strip centers, lifestyle centers or outlet locations. They perform consistently across all formats because, we believe, our stores serve as a shopping destination for our customers. Each new store requires a small investment that typically pays back in approximately 17 months. Our stores not only serve existing customers but also help us acquire new customers who then shop our assortment across channels.

### Competitive Strengths

We attribute our continued success to the following competitive strengths:

**Differentiated, Leading Brand in a Growing and Underserved Market.** Based on our industry experience and analysis of publicly available information, we believe we are the industry-leading and fastest growing branded omni-channel retailer of apparel, intimates and accessories for young plus-size women in North America. The Torrid brand represents a distinctive combination of assortment, quality, fit and customer experience that, we believe, plus-size women have never had available to them. Our brand satisfaction is among the highest for specialty retailers, according to third party customer surveys. We believe this significant brand value will facilitate sustainable net sales growth and market share gains over time. We target an underserved and growing demographic of young, plus-size women, whom we believe no other national specialty retailer targets or adequately addresses. We believe retailers not dedicated to plus-size have entered the plus-size category as an afterthought, often relegating the plus-size customer to a less desirable section of the store and failing to design product that addresses her specific fit requirements. We believe we are both gaining share in the market and helping expand the market for plus-size apparel.

66

Table of Contents

**Loyal and Passionate Customer.** Our target customer is an employed young woman between the ages of 25 and 40 years old, who is short on time and wants a curated presentation of quality apparel, intimates and accessories that are on trend and fit her well. We believe many of our customers form a deep emotional connection with our brand, as their discovery of our brand is often the first time in their lives they feel well-served and respected by an apparel company. As a result, our customer is highly loyal, with 86% of Torrid brand net sales in fiscal year 2016 generated by over 4.5 million customers who have chosen to join our loyalty program. Our loyalty program gives us a rich database of information to market to our customers more effectively and has enabled us to consistently retain over 80% of net sales from the prior year's customers. Our loyal customers are growing more productive, with the average spend per loyalty program customer increasing by a 12% CAGR since fiscal year 2012.

**Low-Risk Merchandising Model.** We believe plus-size customers prioritize how a product fits above all other purchasing criteria. Unlike retailers who are not exclusively focused on the plus-size customer, we design and engineer our product specifically to fit our customers' body type. We believe our singular focus on plus-sizes allows us to create product that fits uniquely well, without compromising on style. We ensure that our merchandise has a consistent fit across our entire assortment and size range. This enables our customer to shop seamlessly between our e-commerce platform and stores with confidence that the products she purchases will fit consistently. Our vertical sourcing model gives us control over fit, quality, consistency and cost, while ensuring product exclusivity.

We have a strong core and on-trend basics program, which represented approximately 80% of Torrid brand net sales in fiscal year 2016, complemented by trend-driven merchandise, which represented approximately 20% of Torrid brand net sales in fiscal year 2016. Because our customer prioritizes fit, we do not rely on being fashion leaders. Nonetheless, each year we introduce more than a dozen collections that provide a consistent flow of fresh merchandise. This frequency of deliveries reduces our dependence on any one collection and motivates our customers to visit our e-commerce platform and stores more frequently.

We believe we have an efficient, diversified and flexible supply chain that allows us to better meet our customers' needs, mitigate inventory risk and limit product markdowns. We assess sales data, market trends and new product development on a weekly basis in order to make in-season inventory purchasing adjustments where possible and to respond to the latest sales trends. We believe our data-centric approach and responsive supply chain allow us to respond quickly to customer preferences and mitigate inventory risk, leading to consistent, predictable operating performance over time.

**Industry-Leading Omni-Channel Business Model.** We have established a powerful, industry-leading omni-channel business model that is rapidly growing and highly profitable on an Adjusted EBITDA basis. Our e-commerce platform and store base complement and drive traffic to one another. We leverage our targeted marketing initiatives, including direct mail and digital marketing, to acquire new customers across all channels. Approximately 75% of new-to-brand customers in fiscal year 2016 first engaged with Torrid through our stores. We have a history of converting customers from single-channel customers to omni-channel customers. On average, our omni-channel customer shops more often and spends approximately five times more per year than our single-channel customer. As a result, the proportion of our net sales derived from our e-commerce channel increased from 20% penetration in fiscal year 2012 to 34% penetration in fiscal year 2016.

Our e-commerce platform is highly flexible and allows us to expand and enhance our customers' experience with our brand. We use our e-commerce platform to expand our selection of styles, colors and merchandise meaningfully beyond what is available in our stores, making the online shopping experience highly engaging and additive to our in-store experience. Often a new customer will discover our brand and identify her correct size by visiting a store then utilize our e-commerce platform to reorder the product in different colors or styles.

We have a robust real estate strategy and a well-established base of 487 stores across 48 U.S. states, Puerto Rico and Canada as of April 29, 2017, 99% of which generated positive store-level EBITDA in fiscal year

67

Table of Contents

2016. Our stores are located primarily in premium malls, strip centers, lifestyle centers and outlet locations. They perform consistently across all formats because, we believe, our stores serve as a shopping destination for our customers and are therefore less dependent on broader traffic trends. Nonetheless, a majority of our store leases, and all of our store leases signed since 2013, include performance-based termination provisions or "kickout" clauses. These clauses provide us the contractual flexibility to exit a store or renegotiate rent in the event a store's performance deteriorates. Given the positive performance trajectory of our stores, we have historically exercised these termination provisions on a limited basis. Our stores are highly productive and have historically produced positive store-level EBITDA in the first year of operations. Our commitments to new stores are binding approximately four months before opening. New stores require a small initial investment that is typically recovered within approximately 17 months and generates an attractive return. We believe our stores also enhance brand awareness, drive traffic to our e-commerce platform and encourage a growing number of customers to shop across multiple channels of our omni-channel business model.

**Highly Experienced Team with Proven Track Record Delivering Industry-Leading Financial Results.** Our Company is led by a team of experienced professionals who have proven track records and are passionate about our mission. Our Chief Executive Officer, Kay Hong, joined the Company in January 2017. She is a retail veteran with extensive direct and retail channel knowledge and has spent over a decade building businesses. Ms. Hong previously served as Chief Operating Officer and Executive Vice President Direct and Chief Marketing Officer at Talbots and as Chief Executive Officer of Harry & David. Our product team is led by Elizabeth Muñoz, our Senior Vice President of Product, has been with the Company since 2010 and who was previously the President of Lucky Brands. Our merchandising and marketing teams are led by Kate Horton, our Senior Vice President of Merchandising and Marketing, who has been with the Company since 2012 and was previously the Vice President of Merchandising at Soma Intimates. Our Chief Financial Officer, George Wehlitz, has been with the Company since 2016 was previously Chief Financial Officer at Hot Topic, where he helped develop the Torrid concept. Our leadership team is passionate about our customer, has created a highly collaborative culture and has built a deep pool of talent throughout the organization.

## Growth Strategies

**Grow Brand Awareness and Omni-Channel Customer Base.** We believe we are both gaining market share and helping expand the market for plus-size apparel. Most of our success to date has been driven by word of mouth, social media, targeted marketing events, direct mail and digital marketing. Our investments in our direct mail program and digital marketing have increased the engagement of our existing customers. We nearly doubled our active customer base between fiscal year 2014 and fiscal year 2016. We believe we can profitably expand our advertising and marketing programs using data-driven initiatives to further build our brand and customer base. We increased the proportion of our net sales derived from our e-commerce channel from 20% penetration in fiscal year 2012 to 34% penetration in fiscal year 2016. We believe our e-commerce channel can grow to represent 50% of our net sales over time.

**Expand Our Footprint.** We believe the plus-size young woman is dramatically underserved in her choice of apparel retailers and we have a significant and attractive opportunity to grow our footprint. Based on our proven, profitable store model, we intend to continue to capture this underpenetrated market with a disciplined roll-out of new stores that drive both in-store and e-commerce sales. Because we are a destination for our customers, we have successfully opened and operated our stores in all retail formats, including premium malls, strip centers, lifestyle centers and outlet locations. Our current total retail square footage is less than approximately one-third of the total square footage of a typical specialty retailer. In addition, each of our stores is approximately 2,850 square feet, which is less than one-half of the size of a typical specialty retail store. We believe there is a significant opportunity for us to profitably open additional stores in the U.S. and Canada and remain underpenetrated in total retail square footage relative to our peers. We intend to opportunistically open approximately 95 new stores in 2017 and approximately 45 new stores in fiscal year 2018, in each case net of any store closures over the period. In fiscal year 2016, 99% of our locations generated positive store-level EBITDA. Our new stores average approximately $950,000 of net sales per store and approximately $200,000 of store-level

68

Table of Contents

EBITDA in the first year of operations. New stores cost approximately $290,000 to open, including net capital expenditures and pre-opening expenses, and we target payback periods of approximately 17 months. We remain highly disciplined in our store growth strategy, and our commitments to new stores are binding approximately four months before opening. We have historically been able to obtain attractive leasing rates and flexible lease termination rights. A majority of our store leases, and all store leases signed since 2013, include performance-based termination provisions or "kick-out" clauses. We leverage our store base to drive increased omni-channel sales and conversion. We provide flexibility for a customer to order from our e-commerce platform or in our stores and to have the product delivered to either her home or a store.

**Augment Data-Driven Customer-Relationship Initiatives to Drive Sales Per Customer.** We intend to continue to leverage the strength of our loyalty program, which has over 4.5 million members and allows us to attribute approximately 86% of Torrid brand net sales to an individual buyer. This robust customer data allows us to better engage with customers, increase retention and continue to convert customers to omni-channel customers. Our omni-channel customers on average spend approximately five times more per year than our single-channel customers. In the second quarter of fiscal year 2017, we expect to launch our mobile app. We expect our mobile app's unique content and simplified purchasing to help drive customer engagement and net sales. We continue to strengthen our omni-channel model and our ability to leverage our substantial customer data and loyalty program. We believe these growing capabilities will provide our customer with an increasingly holistic and personal brand experience and will drive increasing traffic and conversion both in-store and online.

**Broaden Product Assortment and Merchandising Offering.** We believe there is a substantial opportunity to grow our business by selectively expanding our product categories and assortment to leverage our customer relationships and trusted fit. For example, we recently relaunched our swim category, leveraging our experience with the fit and design of our intimates offering to deliver exciting new product. We have identified a number of compelling growth opportunities, including further penetration of intimates, shoes and swim, which we expect to drive increased net sales.

**Enhance Margins With Best Practices.** We believe we can improve margins through ongoing refinement of our merchandising strategy, additional sourcing efficiencies and leveraging our fixed costs. Our efficient vertical sourcing model allows us to quickly react to shifting trends, better meet customer needs, mitigate inventory risk and limit product markdowns. We believe we can leverage enhanced "read-and-react" strategies to improve our speed to market, increase net sales, improve inventory turns, reduce markdowns and improve merchandise margins. We expect to capture efficiencies from increased sourcing volumes as our purchases grow along with net sales. We also expect to leverage our overhead expenses from both store unit and comparable brand sales growth.

**Market**

Torrid operates as a specialty retailer in the large and growing women's plus-size apparel industry. According to NPD, the women's plus-size apparel market was approximately $21 billion in 2016, and has grown at more than twice the rate of the overall U.S. women's apparel market. This accelerated market growth is expected to continue. Growth in the plus-size customer base has taken place across both income levels and ethnicities.

The plus-size female apparel customer has historically been underserved. While approximately two-thirds of U.S. women are plus-size (sizes 14 and up), only 17% of women's apparel sales during 2016 in the U.S. were in plus-sizes. We estimate there is only one dedicated plus-size apparel store for every 30 specialty apparel stores. As a result, there are approximately 34,000 plus-size women for each plus-size apparel store, as compared to 600 women for each other specialty apparel store. We believe this has contributed to significant dissatisfaction for the plus-size customer. According to an NPD survey of plus-size women, 63% of respondents report they feel shopping for their size is stressful and 62% of respondents report that it is difficult to find clothing as stylish and attractive as those available to non-plus-size women. As a result, we believe the plus-size

69

Table of Contents

woman under-spends her non-plus-size peers. According to a recent third-party plus-size customer survey, 81% of plus-size women reported that they would spend more on clothing if they had more options available in their size. We also believe other existing national plus-size retailers aim to serve customers over 40 years old, an age demographic that has traditionally been associated with plus-sizes. However, approximately 50% of the plus-size population is under 45 years old and we believe this demographic is particularly underserved.

**People**

We believe other apparel companies address the plus-size woman only as an afterthought and, as a result, have not attracted the strongest talent to address this customer's specific, fit-driven product needs. We have created a company culture focused on attracting, training and developing talent that does not settle for the low expectations that have previously been the norm for shoppers in the plus-size market. We are passionate about what we do. We seek to hire, develop and promote people that share both our passion and our focus on creating the best products and experience for our customers.

We are organized to maximize collaboration among our product, merchandising and other business teams, all of which share our common mission. In 2014, we moved into a dedicated headquarters building that was designed with this goal in mind. Our office has an open floor plan, with design, product development and merchandising sitting adjacent to each other. We believe this proximity helps facilitate collaboration across the different parts of our organization. For example, our merchandise category teams sit next to and work closely with their counterparts in planning and allocation. This physical proximity allows for near real-time analysis of sales performance, and adds a nimble, data-driven approach to our creative process. In conjunction with the Separation in fiscal year 2015, we developed standalone corporate functions to increase the focus of our team. We believe these investments enabled our recent performance trends and position us well for continued growth.

Our commitment to finding and developing the best people is not limited to our corporate headquarters. We believe that our field associates are critical to our success and often represent the face of our organization to our customers. Our store organization includes regional directors that oversee district managers within a geographic region. These district managers oversee a group of stores within a smaller geography. Each of our stores is led by a store manager and, depending on the volume of that store, one or two assistant managers, as well as several sales associates. Our managers and associates are often also customers of ours and help spread their passion about our brand through their interactions with customers. We empower our managers and associates to deliver a superior shopping experience. We provide thorough product- and fit-oriented training that aims to strengthen our brand experience in the store. We also provide our associates with sales and key performance data that help them optimize their store's performance and foster a culture of accountability. Communications with our store personnel is a critical channel for valuable product and customer feedback. We believe we have established effective two-way lines of communication throughout our organization.

As of April 29, 2017, we employed 1,317 full-time and 5,214 part-time employees. Of these employees, 322 are employed in our headquarters in City of Industry, California and 6,209 are employed in our stores. Our number of employees, particularly part-time employees, fluctuates depending upon seasonal needs. Our employees are not represented by a labor union and are not party to a collective bargaining agreement. We consider our relations with our employees to be good.

**Product and Merchandise Strategy**

We are relentlessly focused on creating great products. We believe our products not only provide an unparalleled technical fit, but also have the style and attitude that enable our customers to shop and dress like her non-plus-size friends. We believe we are a destination for our customers to shop for every occasion, from casual to dressy and everything in between.

We design, develop and merchandise almost all of our products in-house, under the Torrid brand name. Our products are exclusive to us, with few exceptions, and provide a consistent quality and fit that we believe she

70

Table of Contents

cannot find elsewhere. Our merchandise addresses our customers' entire closet, including tops, bottoms, denim, dresses, intimates, swimwear, shoes and accessories. Our offering is built around core basics (approximately 30% of Torrid brand net sales in fiscal year 2016) that have been part of our collections for more than a year and that customers repurchase frequently. We also offer on-trend basics (approximately 50% of Torrid brand net sales in fiscal year 2016) that are on-trend interpretations of our basic merchandise that we update with new fabrics, embellishments or features. Approximately 20% of Torrid brand net sales in fiscal year 2016 were from trend-driven items that incorporate the latest fashions available in the broader market. We introduce new lines of merchandise more than a dozen times per year. This frequency ensures an ongoing flow of new and relevant merchandise that keeps our customer coming back to us. While we aim to bring her the latest in fashion trends, we do not rely on being a fashion leader. We assess sales data, market trends and new product development on a weekly basis in order to make in-season inventory purchasing adjustments where possible and to respond to the latest sales trends. This strategy allows us to respond quickly to customer preferences and mitigate inventory risk, particularly for new products or styles, and to reduce the potential for product markdowns.

Across our entire assortment, our priority is to deliver the appropriate fit that has not previously been available to our customer. In addition, we believe we are delivering the highest quality product available to our customer at the best possible value. We have consistent and demanding standards for high-quality fabrics and durable construction that we believe further differentiate our offering from what our customer otherwise has available to her.

We believe our merchandising strategy and relentless focus on fit, informed by continuous customer feedback and purchasing data, allows us to consistently deliver great products to our customers. As we have executed on these strategies, we have seen not only substantial growth across all major product categories, but also healthy and consistent gross profit margin performance. Our disciplined planning and product lifecycle management strategies enable effective in-season inventory management to maximize inventory turn and productivity. Through these effective inventory management practices, we are able to limit markdowns, allowing us to maximize our gross profit margin.

**Customers**

We seek to provide our customers with products and an experience that makes them feel special, rather than different. We believe that our brand is democratic and attracts women of all ages, ethnicities and sizes. However, our target customer is an employed young woman between the ages of 25 and 40 years old with above-average annual household income (average of approximately $75,000), who wears sizes 10 to 30 (average of 18). She leads a busy life, is short on time and wants a curated presentation of quality apparel, intimates and accessories that are on trend and fit her well.

We believe our target customer has been largely overlooked by other retailers. When our customer discovers Torrid, she actively engages with us and becomes highly loyal. This is evidenced by the strength of our loyalty program, Torrid Insider, which grew from 2.7 million members at the end of fiscal year 2014 to over 4.5 million members at the end of fiscal year 2016. These loyalty members represented approximately 86% of Torrid brand net sales for fiscal year 2016 and show tremendous enthusiasm for the brand. Our loyalty customers purchase from us an average of approximately four times per year and have increased their spending with us over time. We also offer a private label credit card that provides our customer with additional benefits, which ultimately foster stronger customer loyalty. Our Torrid private label credit card holders, who are a subset of our loyalty program members and represented approximately 30% of Torrid brand net sales in fiscal year 2016, are our most loyal and active customers. These customers purchase from us an average of approximately six times per year.

Beyond their enthusiasm for the brand, our customers have exhibited tremendous loyalty to Torrid as we have grown our business. Revenue retention exceeded 80%, as measured by fiscal year 2016 net sales from customers who also shopped in fiscal year 2015 as a percentage of total fiscal year 2015 net sales.

71

**Table of Contents**

**Omni-Channel**

We are an omni-channel retailer, delivering a seamless brand experience to our customer, wherever and whenever she chooses to shop. Our e-commerce and store channels complement and drive traffic to one another. We deliver a consistent brand message by coordinating our strategies across channels, which we believe influences our customers' buying decisions. Approximately 75% of new-to-brand customers in fiscal year 2016 first engaged with Torrid through our stores. We have a history of converting customers from single-channel customers to omni-channel customers. Omni-channel customers represented approximately 40% of Torrid brand net sales in fiscal year 2016. This conversion is a key part of our strategy. On average, our omni-channel customer shops more often and spends approximately five times more per year than our single-channel customer.

**E-Commerce**

Our e-commerce platform, which has grown rapidly and is highly profitable on an Adjusted EBITDA basis, is flexible and allows us to expand and enhance our customers' experience with our brand. We successfully use our e-commerce platform to expand our selection of styles, colors and merchandise meaningfully beyond what is available in our stores, making the online shopping experience highly engaging and additive to our in-store experience. Often a new customer will discover our brand and identify her correct size by visiting a store then utilize our e-commerce platform to reorder the product in different colors or styles.

Our e-commerce platform features updates on new collections, guidance on how to wear and put together outfits and a selection of web-only exclusives, all of which facilitate customer engagement and interaction. These initiatives have helped increase e-commerce sales as a percentage of net sales from 20% penetration in fiscal year 2012 to 34% penetration in fiscal year 2016. We believe our e-commerce channel can grow to represent 50% of our net sales over time.

Our growth has been multi-faceted, as we have seen gains across all of our key e-commerce performance indicators, including traffic, orders, conversion and average order value. Our emphasis on fit leads to an e-commerce return rate that we believe is significantly lower than the e-commerce apparel industry average.

**Stores**

As of April 29, 2017, we operated 487 stores in 48 U.S. states, Puerto Rico and Canada, 99% of which generated positive store-level EBITDA in fiscal year 2016. Our stores average approximately 2,850 square feet. Our stores are located primarily in premium malls, strip centers, lifestyle centers or outlet locations. They perform consistently across all formats because, we believe, our stores serve as a shopping destination for our customers and are therefore less dependent on broader traffic trends. Nonetheless, a majority of our store leases, and all of our store leases signed since 2013, include performance-based termination provisions or "kickout" clauses. These clauses provide us the contractual flexibility to exit a store or renegotiate rent in the event a store's performance deteriorates. Substantially all of our store leases also include early termination provisions based on co-tenancy requirements for the shopping center. Given the positive performance trajectory of our stores, we have historically exercised these termination provisions on a limited basis.

We remain highly disciplined in our store growth strategy. Our stores are highly productive and have historically produced positive store-level EBITDA in the first year of operations. Our new stores average approximately $950,000 of net sales per store, and approximately $200,000 of store-level EBITDA in the first year of operations. New stores cost approximately $290,000 to open, including net capital expenditures and pre-opening expenses, and we target payback periods of approximately 17 months. We believe our stores enhance brand awareness, drive traffic to our e-commerce platform and encourage a growing number of customers to shop across multiple channels of our omni-channel business model. We remain highly disciplined in our store growth strategy. Our stores are highly productive and have historically produced positive store-level

72

Table of Contents

EBITDA in the first year of operations. Our new stores average approximately $950,000 of net sales per store, and approximately $200,000 of store-level EBITDA in the first year of operations. New stores cost approximately $290,000 to open, including net capital expenditures and pre-opening expenses, and we target payback periods of approximately 17 months. We believe our stores enhance brand awareness, drive traffic to our e-commerce platform and encourage a growing number of customers to shop across multiple channels of our omni-channel business model. Because we are a destination for our customers, we have successfully opened and operated our stores in all retail formats, including premium malls, strip centers, lifestyle centers and outlet locations. Our current total retail square footage is less than approximately one-third of the total square footage of a typical specialty retailer. In addition, each of our stores is approximately 2,850 square feet, which is less than one-half of the size of a typical specialty retail store. We believe there is a significant opportunity for us to profitably open additional stores in the U.S. and Canada and remain underpenetrated in total retail square footage relative to our peers. We intend to opportunistically open approximately 95 new stores in 2017 and approximately 45 new stores in fiscal year 2018, in each case net of any store closures for the period.

We believe our real estate selection process allows us the flexibility to grow our footprint while mitigating risk. We conduct a monthly real estate committee meeting, comprised of both operational and financial constituents, where decisions are made on new and open real estate projects, including remodels, relocations and new stores. Our committee routinely evaluates return on proposed investments utilizing detailed pro forma projections on a store-level basis. We typically commit to a lease approximately four months before a store is scheduled to open, which we believe allows us to respond quickly to changing market conditions.

We believe our stores provide our customers with a differentiated in-store experience that has previously not been available to our target demographic. We provide a sophisticated presentation of products that has an emphasis on outfits, which presents creative styling ideas to our customer and encourages incremental spend. Our stores have a consistent set of physical attributes across the fleet as a result of investments we made and completed in fiscal year 2016. Our stores include beautiful, large fitting rooms that are specifically suited for our customers' needs. Additionally, our store associates are passionate about our brand as they are often customers themselves.

**Data Analytics**

We have a significant volume of customer and transaction data, which we use to drive our decision making. We have developed industry-leading data capture capabilities, which allow us to attribute approximately 86% of Torrid brand net sales to an individual customer. This customer data is based on information provided by customers who have opted-in to be part of our loyalty program. Our extensive database contains valuable customer information that helps us better market to our customers. As of January 28, 2017, our database had over 4.5 million customer names.

We have significant visibility into our customers' transaction behavior, including purchases made across our channels. We use our customer database to acquire, develop and retain customers. We can identify customers who purchase products through our e-commerce platform or our stores, as well as omni-channel customers who purchase in more than one channel. We are beginning to leverage this customer database to drive data analysis and insights that we use in managing our business. For example, to grow the penetration of intimates sales, we are able to offer a promotion targeted at customers who have bought our apparel but not our intimates. We believe our robust use of customer data and our data insight capabilities present an opportunity for us to continue to increase spend per customer.

**Marketing & Advertising**

We use a variety of marketing and advertising mediums to increase brand awareness, acquire new customers, drive customer traffic across our channels and strengthen our brand image. These programs include our direct mailers, email communications, social media interactions, digital marketing and public relations

73

Table of Contents

initiatives. We use our customer database to strategically optimize the value of our marketing investments across customer segments and channels. For example, we can analytically select to whom we mail our direct mailers based on the highest modeled return on investment. This enables us to efficiently acquire new customers, effectively market to existing customers and reactivate lapsed customers.

Our investments in direct mail and digital marketing drive customer acquisition and engagement across all of our channels. We coordinate the introduction of our collections across our e-commerce platform and stores, allowing a customer to experience a consistent brand message wherever and whenever she chooses to shop. We have a large and growing following on our social media channels, including Facebook, Instagram, Pinterest and Twitter. We use these channels to communicate with our customers not only to disseminate our outbound marketing messages but also to collect feedback about their lifestyles and product preferences. We believe this direct dialog with our customers allows us to communicate with them in a way that increases their loyalty to our brand. For instance, in 2015, we launched an annual Torrid Model Search program that in fiscal year 2016 received over 10,000 contestant applications and generated over 12 million media impressions across traditional and social media outlets.

We have strategically increased our marketing investment to continue to propel the growth of our business. In fiscal years 2015 and 2016, we increased our marketing investment by 45% and 25%, respectively, resulting in the growth of our active customer base by over 90% during this period. This investment has taken place across various marketing strategies, including digital marketing and direct mail. We believe these efforts will drive increased brand awareness, leading to higher sales across our omni-channel business.

## Sourcing & Supply Strategy

We outsource the manufacturing of our products, which eliminates the need to own or operate manufacturing facilities. However, we internally design and develop the majority of our products, a model we describe as vertical sourcing. Our vertical sourcing model gives us control over fit, quality, consistency and cost, while ensuring product exclusivity. In fiscal year 2016, approximately 84% of our products were vertically sourced, as compared to approximately 30% of our products that were vertically sourced in fiscal year 2012. As a result of this focus on vertical sourcing, we have grown Torrid brand net sales and have materially improved our gross profits. We leave a portion of our purchases "open to buy," whereby we intentionally do not order in advance all the inventory we will ultimately require. This provides the flexibility to react quickly to product performance and order or re-order as appropriate. This strategy allows us to mitigate inventory risk, particularly for new products or styles. As a result, we have been able to significantly limit our product markdowns, with only 16% of Torrid brand net sales occurring at markdown in fiscal year 2016.

We have a diversified vendor base. No single supplier accounted for more than 11% of merchandise purchased in fiscal year 2016. Approximately 95% of our product receipts in fiscal year 2016 were sourced internationally, primarily from China and Vietnam. We maintain compliance guidelines for our vendors that dictate various standards including product quality, manufacturing practices, labor compliance and legal compliance. Through third parties, we periodically monitor our factories and suppliers to ensure compliance with these guidelines.

## Distribution

Our omni-channel business model is serviced by two distribution facilities located in City of Industry, California and La Vergne, Tennessee. These facilities are operated by Hot Topic, which also utilizes these facilities for its own operations. These services are provided to us at arms-length rates under a long-term service agreement, under which we retain termination rights. See "Certain Relationships and Related Party Transactions—Transition Services Agreement & Services Agreement with Hot Topic."

These facilities manage the transportation, receipt, storage, sorting, packing and distribution of merchandise for our e-commerce platform and store channels. Stores are replenished at least once per week from

74

**Table of Contents**

these facilities by third-party delivery services. This frequency provides our stores a steady flow of new inventory that helps maintain product freshness and in-stock availability.

**Information Systems**

We utilize a full range of management information systems to support our store, e-commerce, merchandising, financial and real estate business teams. Information systems services are provided to us by Hot Topic, which also utilizes these systems for its own operations. These services are provided to us at arms-length rates under a long-term service agreement, under which we retain termination rights. See "Certain Relationships and Related Party Transactions—Transition Services Agreement & Services Agreement with Hot Topic."

We utilize these systems to provide us with various functions, including point-of-sales, inventory management, merchandising support systems, financial reporting, e-commerce solutions and other systems consistent with companies in our industry. We believe these management information services provide us the ability to effectively manage and grow our business.

**Seasonality**

While the retail business is generally seasonal in nature, we have not historically experienced significant seasonal fluctuations in our sales. In fiscal year 2016, no single quarter contributed more than 28% of Torrid brand net sales. We believe this is partly attributable to our broad merchandise offering that encourages purchasing across seasons. We believe our reduced seasonality is also attributable to the behavior of our customer, who is generally purchasing products for herself, not as gifts. We believe our limited sales seasonality provides structural cost advantages relative to peers, including reduced staffing cyclicality and seasonal distribution capacity needs. As we grow and our brand awareness continues to increase, we believe gift purchases may represent a driver of sales growth that could potentially lead to increased seasonality.

**Competition**

The plus-size women's apparel industry is highly competitive. As such, we compete with local, national and international retail chains and department stores, discount stores, catalogs and internet businesses that carry products in our size range and offer similar categories of merchandise to our customer segment. We also compete with a handful of other specialty retailers that, like Torrid, focus on plus-size customers.

Within the women's plus-size apparel industry, we compete with both general and specialty retailers, primarily on the basis of fit, design, service, product quality and value. We believe our distinct combination of fit-centric design, service, product quality and value allows us to compete effectively within the plus-size apparel market. We further differentiate ourselves from general and specialty retail competitors based on the strength of our brand, our industry-leading omni-channel business model, our strong data capabilities, our loyal customer base, our customer-focused product assortment and our highly experienced leadership team. Our competitors range from smaller, growing companies to considerably larger players with substantially greater financial, marketing and other resources. Further, we may face new competitors and increased competition from existing competitors as we expand into new markets and increase our presence in existing markets. Nonetheless, we believe competitors may have difficulty in replicating our organizational strengths, our product-oriented processes and the value of our brand.

**Intellectual Property**

Our trademarks are important to our marketing efforts. We own or have the rights to use certain trademarks, service marks and trade names that are registered with the U.S. Patent and Trademark Office or other foreign trademark registration offices or exist under common law in the United States and other jurisdictions. Trademarks that are important in identifying and distinguishing our products and services include, but are not

75

**Table of Contents**

limited to Torrid®. Our rights to some of these trademarks may be limited to select markets. We also own domain names, including our website, www.Torrid.com. The information contained in or connected to our website is not deemed to be part of this prospectus.

**Properties**

We are headquartered in City of Industry, California. Our principal executive offices are leased under a lease agreement expiring in 2024, with options to renew thereafter. We do not own any real property. Our distribution operations are provided under our long-term services agreement with Hot Topic. See "Certain Relationships and Related Party Transactions—Transition Services Agreement & Services Agreement with Hot Topic."

As of April 29, 2017, we operated 487 stores in 48 U.S. states, Puerto Rico and Canada and 23 stores as part of the Lovesick test concept a young women's plus-size retail concept that in January 2017 we decided to close. Our stores are located primarily in premium malls, strip centers, lifestyle centers or outlet locations. They perform consistently across all formats because, we believe, our stores serve as a shopping destination for our customers and are therefore less dependent on broader traffic trends. The average size of our stores is approximately 2,850 square feet. All of our stores are leased from third parties and new stores historically have had initial lease terms of ten years. The average remaining lease term was 7.0 years as of April 29, 2017. A number of our leases have options to renew for periods up to five years. A majority of our store leases, including all new leases signed since 2013, include performance-based early termination provisions or "kickout" clauses. These clauses provide us the contractual flexibility to exit a store or renegotiate rent in the event a store's performance deteriorates. Assuming termination of each lease at the earlier of its first available kickout date or full term, the average remaining lease term was 2.9 years as of April 29, 2017. Substantially all of our store leases also include early termination provisions based on co-tenancy requirements for the shopping center. Given the positive performance trajectory of our stores, we have historically exercised these termination provisions on a limited basis.

Generally, store leases contain standard provisions concerning the payment of rent, events of default and the rights and obligations of each party. Rent due under the leases is generally comprised of annual base rent and sometimes includes a contingent rent payment based on the store's sales in excess of a specified threshold. The leases also generally require us to pay real estate taxes, insurance and certain common area costs. We renegotiate with landlords to obtain more favorable terms as opportunities arise.

At April 29, 2017, the terms of our Torrid brand store leases expire as follows:

| Fiscal Year | Store Count |
|---|---|
| 2017 | 50 |
| 2018 | 14 |
| 2019 | 8 |
| 2020 | 9 |
| 2021 | 14 |
| 2022 | 36 |
| 2023 | 51 |
| 2024 | 78 |
| 2025 | 93 |
| 2026 | 100 |
| 2027 | 34 |
| **Total** | **487** |

76

Table of Contents

The table below sets forth the number of Torrid brand stores by U.S. state or Canadian province that we operated as of April 29, 2017.

| U.S. State | Number of Stores | U.S. State | Number of Stores | U.S. State | Number of Stores |
|---|---|---|---|---|---|
| AK | 2 | MA | 7 | PA | 14 |
| AL | 2 | MD | 10 | PR | 2 |
| AR | 4 | MI | 14 | RI | 2 |
| AZ | 14 | MN | 7 | SC | 3 |
| CA | 57 | MO | 11 | SD | 2 |
| CO | 10 | MS | 5 | TN | 9 |
| CT | 6 | MT | 1 | TX | 44 |
| DE | 2 | NC | 10 | UT | 6 |
| FL | 28 | ND | 2 | VA | 14 |
| GA | 14 | NE | 3 | WA | 15 |
| HI | 3 | NH | 5 | WI | 10 |
| IA | 4 | NJ | 15 | WV | 3 |
| ID | 2 | NM | 3 | WY | 1 |
| IL | 22 | NV | 7 | | |
| IN | 10 | NY | 23 | **Canada** | |
| KS | 2 | OH | 19 | CAN-AB | 4 |
| KY | 6 | OK | 5 | CAN-ON | 10 |
| LA | 6 | OR | 7 | | |

In the three months ended April 29, 2017, fiscal years 2016 and 2015, we opened 32, 94 and 78 new stores, respectively (in each case excluding the Lovesick test concept). We did not close any stores in the three months ended April 29, 2017 or in fiscal year 2016 and closed four stores in fiscal year 2015.

**Legal Proceedings**

From time to time, we are subject to certain legal proceedings and claims in the ordinary course of business. We are not presently party to any legal proceedings the resolution of which we believe would have a material adverse effect on our business, financial condition, operating results or cash flows. We establish reserves for specific legal matters when we determine that the likelihood of an unfavorable outcome is probable and the loss is reasonably estimable.

**Regulation and Legislation**

We are subject to labor and employment, tax, environmental, privacy and anti-bribery laws. We are also subject to regulations, trade laws and customs, truth-in-advertising, consumer protection and zoning and occupancy laws and ordinances that regulate retailers generally and/or govern the importation, promotion and sale of merchandise and the operation of stores and warehouse facilities. We monitor changes in these laws and believe that we are in material compliance with applicable laws.

A substantial portion of our products are manufactured outside the United States. These products are imported and are subject to U.S. customs laws, which impose tariffs as well as import quota restrictions for textiles and apparel. Some of our imported products are eligible for duty-advantaged programs. While importation of goods from foreign countries from which we buy our products may be subject to embargo by U.S. customs authorities if shipments exceed quota limits, we closely monitor import quotas and believe we have the sourcing network to efficiently shift production to factories located in countries with available quotas. The existence of import quotas has, therefore, not had a material adverse effect on our business. For more information, see "Risk Factors—Risks Related to Our Business—Changes in laws, including employment laws and laws related to our merchandise, could make conducting our business more expensive or otherwise change the way we do business."

77

**Table of Contents**

## MANAGEMENT

Below is a list of the names and ages as of April 29, 2017 of our directors and executive officers and a brief account of the business experience of each of them.

| Name | Age | Position |
| --- | --- | --- |
| Kay Hong | 43 | Chief Executive Officer, Director |
| George Wehlitz, Jr. | 56 | Chief Financial Officer |
| Elizabeth Muñoz | 49 | Senior Vice President of Product |
| Kate Horton | 47 | Senior Vice President of Merchandising and Marketing |
| Stefan Kaluzny | 50 | Chairman of the Board of Directors |
| Peter Morrow | 39 | Director |
| Lisa Harper | 57 | Director |

**Executive Officers**

*Kay Hong* has served as our Chief Executive Officer and a member of our board of directors since joining our Company in January 2017. Ms. Hong is a retail veteran with extensive direct and retail channel knowledge and has spent over a decade building businesses. Ms. Hong spent over 12 years at Alvarez & Marsal, where she was a Managing Director, a member of its executive committee, and led many of the firm's retail engagements prior to her retirement in September 2015. While at Alvarez & Marsal, Ms. Hong served as Chief Operating Officer and Executive Vice President Direct and Chief Marketing Officer at Talbots from August 2012 to September 2014, as Chief Executive Officer and Chief Restructuring Officer of Harry & David from February 2011 to January 2012 and as an interim officer, performance improvement consultant or financial advisor on numerous other retail engagements. Ms. Hong holds a B.S. from Stanford University and an M.B.A. from Harvard Business School. Ms. Hong possesses particular knowledge and experience in retail, merchandising, marketing, operations, strategy, planning and leadership of complex organizations that strengthen the board's collective qualifications, skills and experience.

*George Wehlitz, Jr.* has served as our Chief Financial Officer since October 2016. His oversight of the Torrid finance operations extends back to January 2013, when he became Chief Financial Officer of our legacy parent company Hot Topic. Mr. Wehlitz joined Hot Topic in April 2008 as Vice President, Finance. From November 2005 to January 2008, Mr. Wehlitz was Chief Financial Officer at Cycle Gear, Inc., a specialty retailer of motorcycle apparel and accessories. Mr. Wehlitz previously served Hot Topic as Vice President, Controller from February 2002 to August 2003, and then served as Vice President, Finance from August 2003 to November 2005. From August 2000 to February 2002, Mr. Wehlitz was Chief Financial Officer at The Popcorn Factory, a catalog company for gourmet popcorn gifts. From 1987 to 2000, Mr. Wehlitz held various financial-related positions, at the divisional and corporate level, including Corporate Controller, Treasurer and President of Bombay Canada, for The Bombay Company, Inc. Mr. Wehlitz holds a B.A. degree from Texas Christian University and is a Certified Public Accountant (inactive).

*Elizabeth Muñoz* has served as our Senior Vice President of Product since June 2010. Ms. Muñoz served as the President of Lucky Brand from 2007 to January 2010 and Senior Vice President of Design and Merchandising Lucky Brand from 1997 to January 2010. From 1987 to 1997, Ms. Muñoz held various design-related positions with Bongo Jeans, including Head of Design and Merchandising. Ms. Muñoz graduated from the Fashion Institute of Design & Merchandising.

*Kate Horton* has served as our Senior Vice President of Merchandising and Marketing since May 2016. From January 2015 to May 2016 she served as our Senior Vice President of Merchandising. From July 2012 to January 2015, she served as our Vice President of Merchandising. From 2008 to July 2012, Ms. Horton held a number of leadership positions, including Vice President of Merchandising and Sourcing, at Soma Intimates, a division of Chicos FAS. From 1993 to 2008, Ms. Horton spent time across a variety of retail brands, including bebe,

78

**Table of Contents**

The TJX Companies, Felina Lingerie, Fashion Forms and May Company LA. Ms. Horton holds a B.S. degree from the University of California, Berkeley.

**Non-Employee Directors**

*Stefan Kaluzny* has served as a member of our board of directors and its predecessor since 2013. Mr. Kaluzny is co-founder and Managing Director of Sycamore Partners, a New York based private equity firm. Prior to founding Sycamore Partners, Mr. Kaluzny was a Managing Director of Golden Gate Capital. He was with Golden Gate Capital since its inception in 2000 until January 2011. Prior to Golden Gate Capital, Mr. Kaluzny was co-founder and CEO of Delray Farms, a Hispanic specialty food company. Mr. Kaluzny has also held positions at consulting firms Bain & Company and LEK. He has an M.B.A. from Harvard Business School (Baker Scholar), and a B.A. degree from Yale University. Mr. Kaluzny previously served on the Yale University Investment Committee and as a director of Aéropostale, Inc. from May 2014 to June 2015. In addition to his service on our board of directors, Mr. Kaluzny currently serves as a director at each of Belk, Coldwater Creek, EMP Merchandising, Hot Topic, The Limited LLC, MGF Sourcing, NBG Home, Nine West Holdings and Talbots. As a result of these and other professional experiences, Mr. Kaluzny possesses particular knowledge and experience in retail merchandising; accounting, finance, and capital structure; strategic planning and leadership of complex organizations; and board practices of other major corporations that strengthen the board's collective qualifications, skills and experience.

*Peter Morrow* has served as a member of our board of directors and its predecessor since 2013. Mr. Morrow is co-founder and Managing Director of Sycamore Partners, a New York based private equity firm. Prior to Sycamore Partners, Mr. Morrow was a Principal at Golden Gate Capital and had been with the firm since 2002. Prior to Golden Gate Capital, Mr. Morrow was a consultant for Bain & Company. Mr. Morrow has an M.B.A. from Harvard Business School and a B.A. degree from Stanford University. In addition to his service on our board of directors, Mr. Morrow currently serves as a member of the board of directors of each of Belk, Coldwater Creek, Dollar Express, Hot Topic, The Limited LLC, MGF Sourcing, NBG Home, Nine West Holdings and Talbots. As a result of these and other professional experiences, Mr. Morrow possesses particular knowledge and experience in retail merchandising; accounting, finance, and capital structure; strategic planning and leadership of complex organizations; and board practices of other major corporations that strengthen the board's collective qualifications, skills and experience.

*Lisa Harper* has served as a member of our board of directors and its predecessor since 2008. Ms. Harper currently serves as Chief Executive Officer of Belk, a privately-owned department store chain. Ms. Harper previously served as CEO of each of our Company and its predecessor, Hot Topic, from March 2011 until June 2016. From February 2001 until her retirement in July 2006, she served in various capacities with The Gymboree Corporation, a publicly-traded corporation operating a chain of specialty retail stores for children and women. Her roles at Gymboree included Chairman of the board of directors, from June 2002 to July 2006, Chief Creative Officer, from January 2006 to July 2006, Vice Chairman of the board of directors, from February 2001 to June 2002, and Chief Executive Officer, from February 2001 to January 2006. Ms. Harper has also held merchandising and design positions with several other clothing retailers, including Limited Too, Esprit, GapKids, Mervyn's and Levi Strauss. Ms. Harper attended the University of North Carolina at Chapel Hill. In addition to her service on our board of directors, Ms. Harper currently serves as a member of the board of directors of each of Belk and Hot Topic. As a result of these and other professional experiences, Ms. Harper possesses particular knowledge and experience in retail merchandising, strategic planning and leadership of complex organizations, and board practices of other major corporations that strengthen the board's collective qualifications, skills and experience.

There are no family relationships between any of our executive officers or directors.

79

**Table of Contents**

**Corporate Governance**

***Board Composition; Director Independence; Controlled Company Exemption***

Our certificate of incorporation, which will be in effect prior to the completion of this offering, will provide that our board of directors shall consist of such number of directors as determined from time to time by resolution adopted by a majority of the total number of authorized directors whether or not there exist any vacancies in previously authorized directorships. Initially, our board of directors will consist of directors. Any additional directorships resulting from an increase in the number of directors may only be filled by the directors then in office unless otherwise required by law or by a resolution passed by our board of directors. The term of office for each director will be until his or her successor is elected at our annual meeting or his or her death, resignation or removal, whichever is earliest to occur. Stockholders will elect directors each year at our annual meeting.

Our board of directors will be divided into three classes, with each director serving a three-year term, and one class being elected at each year's annual meeting of stockholders. and will serve as Class I directors with an initial term expiring in . and will serve as Class II directors with an initial term expiring in . and will serve as Class III directors with an initial term expiring in . Any additional directorships resulting from an increase in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the total number of directors. Our board of directors has affirmatively determined that and will be "independent directors," as defined under the rules of the NYSE.

Upon completion of this offering, Sycamore will continue to control a majority of the voting power of our outstanding common stock. As a result, we will be a "controlled company" under the NYSE corporate governance standards. As a controlled company, exemptions under the standards will free us from the obligation to comply with certain corporate governance requirements, including the requirements:

- that we have a compensation committee or nominating and corporate governance committee;

- that a majority of our board of directors consists of "independent directors," as defined under the rules of the NYSE;

- that any corporate governance and nominating committee or compensation committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and

- for an annual performance evaluation of the nominating and governance committees and compensation committee.

These exemptions do not modify the independence requirements for our Audit Committee, and we intend to comply with the requirements of Rule 10A-3 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the rules of the NYSE within the applicable time frame.

Pursuant to the Stockholders' Agreement we will enter into with Sycamore in connection with this offering, when Sycamore beneficially owns less than 50% of our common stock but owns at least 10% of our common stock, Sycamore will be entitled to designate for nomination a number of directors in proportion to its ownership of our common stock, rounded up to the nearest whole number. When Sycamore owns less than 10% of our common stock but owns at least 5% of our common stock, Sycamore will be entitled to designate for nomination the greater of (i) a number of directors in proportion to its ownership of our common stock, rounded up to the nearest whole number, and (ii) one director. See "Certain Relationships and Related Party Transactions—Stockholders' Agreement."

Table of Contents

### Board Leadership Structure

Upon completion of this offering, our board will have two standing committees—Audit Committee and Compensation and Governance Committee—each with a director serving as committee chair. Each of these committees reports to our board of directors as they deem appropriate, and as the board may request.

With respect to the roles of Chairman of the Board and Chief Executive Officer, our Corporate Governance Guidelines provide that the roles may be separated or combined, and the board exercises its discretion in combining or separating these positions as it deems appropriate in light of prevailing circumstances. Our board of directors believes that the combination or separation of these positions should continue to be considered as part of the succession planning process. Our Corporate Governance Guidelines provide the flexibility for our board to modify our leadership structure in the future as appropriate. We believe that Torrid, like many U.S. companies, is well-served by this flexible leadership structure.

### Board Committees

Prior to the completion of this offering, our board of directors will establish a new Audit Committee and a new Compensation and Governance Committee. The composition, duties and responsibilities of these committees is as set forth below. In the future, our board may establish other committees, as it deems appropriate, to assist it with its responsibilities.

### Audit Committee

The Audit Committee will be responsible for, among other matters: (1) appointing, compensating, retaining, evaluating, terminating and overseeing our independent registered public accounting firm; (2) discussing with our independent registered public accounting firm their independence from management; (3) reviewing with our independent registered public accounting firm the scope and results of their audit; (4) approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm; (5) overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC; (6) reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements; (7) establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters; and (8) reviewing and approving related person transactions.

Upon completion of this offering, our Audit Committee will consist of , and . Rule 10A-3 of the Exchange Act and the NYSE rules require us to have one independent Audit Committee member upon the listing of our common stock on the NYSE, a majority of independent directors within 90 days of the date of this prospectus and all independent Audit Committee members within one year of the date of this prospectus. Our board of directors has affirmatively determined that meets the definition of "independent director" for purposes of serving on an Audit Committee under Rule 10A-3 and NYSE rules, and we intend to comply with the other independence requirements within the time periods specified. In addition, our board of directors has determined that will qualify as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K. Our board of directors will adopt a new written charter for the Audit Committee, which will be available on our corporate website at torrid.com after the completion of this offering. The information contained in or connected to our website is not deemed to be part of this prospectus.

### Compensation and Governance Committee

The Compensation and Governance Committee will be responsible for, among other matters: (1) reviewing key employee compensation goals, policies, plans and programs; (2) reviewing and approving the compensation of our directors, chief executive officer and other executive officers; (3) reviewing and approving

81

**Table of Contents**

employment agreements and other similar arrangements between us and our executive officers; (4) administration of stock plans and other incentive compensation plans; (5) identifying individuals qualified to become members of our board of directors, consistent with criteria approved by our board of directors; (6) overseeing the organization of our board of directors to discharge the board's duties and responsibilities properly and efficiently; (7) identifying best practices and recommending corporate governance principles; and (8) developing and recommending to our board of directors a set of corporate governance guidelines and principles applicable to us.

Upon completion of this offering, our Compensation and Governance Committee will consist of , and . As a controlled company, we will rely upon the exemption from the requirement that we have a separate compensation committee and nominating and corporate governance committee with each composed entirely of independent directors within one year of the date of this prospectus. Our board of directors will adopt a new written charter for the Compensation and Governance Committee, which will be available on our corporate website at torrid.com after the completion of this offering. The information contained in or connected to our website is not deemed to be part of this prospectus.

### Risk Oversight

Our board of directors is responsible for overseeing our risk management process. The board focuses on our general risk management strategy, the most significant risks facing Torrid, and ensures that appropriate risk mitigation strategies are implemented by management. The board is also apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions.

The board has delegated to the Audit Committee oversight of our risk management process. Our other board committees also consider and address risk as they perform their respective committee responsibilities. All committees report to the full board as appropriate, including when a matter rises to the level of a material or enterprise level risk. Our management is responsible for day-to-day risk management.

Our internal audit function serves as the primary monitoring and testing function for company-wide policies and procedures, and manages the day-to-day oversight of the risk management strategy for the ongoing business of Torrid. This oversight includes identifying, evaluating, and addressing potential risks that may exist at the enterprise, strategic, financial, operational, and compliance and reporting levels.

### Compensation Committee Interlocks and Insider Participation

No interlocking relationships exist between the members of our board of directors or compensation committee and our board of directors or compensation committee of any other company.

### Code of Ethics

We will adopt a code of business conduct and ethics applicable to our principal executive, financial and accounting officers and all persons performing similar functions. A copy of that code will be available on our corporate website at torrid.com after completion of this offering. We expect that any amendments to the code, or any waivers of its requirements, will be disclosed on our website. The information contained in or connected to our website is not deemed to be part of this prospectus.

### Director Compensation

During fiscal year 2016, other than the compensation provided to Lisa Harper, as discussed under "Executive Compensation—Director Compensation," none of our directors has received any cash, equity or other compensation for services rendered to us. All directors receive reimbursement for reasonable out-of-pocket expenses incurred in connection with meetings of the board. Other than with respect to Lisa Harper, only those

82

**Table of Contents**

non-employee directors who are not affiliated with Sycamore are eligible to receive compensation from us for their service on our board of directors. Non-employee directors who are not affiliated with Sycamore will be paid an annual retainer of $ . An additional $ will be paid annually for each committee on which a non-employee director serves and an additional $ will be paid annually for serving as the chairman of a committee other than the Audit Committee. The chairman of the Audit Committee will be paid an additional $ annually for serving in that capacity. Finally, such non-employee directors who are not affiliated with Sycamore will receive options, upon the completion of this offering, to purchase shares of our common stock at the initial public offering price. Lisa Harper is expected to continue to receive a board fee of $100,000 per year for her services in lieu of, and not in addition to, any other cash, equity or other compensation for services rendered to us.

<div align="center">83</div>

**Table of Contents**

**EXECUTIVE COMPENSATION**

**Summary Compensation Table**

The following table sets forth total compensation of our named executive officers ("NEOs") for fiscal year 2016, which concluded on January 28, 2017. Our NEOs for fiscal year 2016 are Lisa Harper, Mark Mizicko, Elizabeth Muñoz and George Wehlitz, Jr.

| Name and Principal Position | Year | Salary($) | Non-Equity Incentive Plan Compensation($)[1] | All Other Compensation($)[2] | Total($) |
|---|---|---|---|---|---|
| Lisa Harper, former Chief Executive Officer[3] | 2016 | 498,076 | 1,458,333 | 34,773 | 1,991,182 |
| Mark Mizicko, former Chief Operating Officer[4] | 2016 | 461,539 | 653,785 | 44,006 | 1,159,330 |
| Elizabeth Muñoz, Senior Vice President of Product | 2016 | 471,153 | 617,500 | 35,636 | 1,124,289 |
| George Wehlitz, Jr., Chief Financial Officer | 2016 | 450,000 | 585,000 | 44,678 | 1,079,678 |

(1)   The amounts reported in the "Non-Equity Incentive Plan Compensation" column represent annual cash bonuses to our NEOs earned during fiscal year 2016, which were paid in March 2017, as further described below under "—Bonus and Non-Equity Incentive Plan Compensation."

(2)   The compensation included in the "All Other Compensation" column consists of (i) automobile allowance in the amount of $7,500 for Ms. Harper, $14,000 for Mr. Mizicko, $12,000 for Ms. Muñoz and $17,445 for Mr. Wehlitz, (ii) company-paid group health related insurance premiums in the amount of $27,273 for Ms. Harper, $18,330 for Mr. Mizicko, $17,021 for Ms. Muñoz and $18,623 for Mr. Wehlitz, (iii) reimbursement of automobile gasoline expenses for Mr. Mizicko and Mr. Wehlitz, (iv) for Mr. Mizicko and Ms. Muñoz, company-paid supplemental disability insurance premiums, (v) for Mr. Mizicko and Mr. Wehlitz, 401(k) matching contributions equal to $8,539 and $6,750, respectively, and (vi) for Ms. Muñoz, matching contributions to our nonqualified deferred compensation plan equal to $5,338.

(3)   Ms. Harper has transitioned from our Chief Executive Officer to a member of our board of directors, for which she is paid a board fee of $100,000 per year for her services. Her base salary as reflected in the Summary Compensation Table includes the pro rata amount of base pay she received for her service on our board of directors during our most recently completed fiscal year.

(4)   Mr. Mizicko voluntarily resigned from his employment with us as of January 3, 2017.

**General**

During fiscal year 2016, several of our employees transitioned their employment from Hot Topic, our prior parent, to us. The compensation reported herein includes compensation paid by both Hot Topic and us during fiscal year 2016 for services provided by the applicable executive to us during fiscal year 2016.

**Base Salary**

During fiscal year 2016, each of our NEOs other than Ms. Muñoz received his or her annual base salary compensation from Hot Topic through the date on which such NEO was officially transferred to our payroll. During this time, we reimbursed Hot Topic through a transition services agreement for these costs. Mr. Mizicko was officially transitioned to Torrid on April 18, 2016; Ms. Harper was officially transferred to Torrid on July 5, 2016; and Mr. Wehlitz was officially transferred to Torrid on October 2, 2016.

84

Table of Contents

**Bonus and Non-Equity Incentive Plan Compensation**

*Non-Equity Incentive Plan*

Our NEOs are eligible to participate in an annual cash incentive bonus plan (the "Annual Bonus Plan") which provides them an opportunity to earn an annual cash bonus ("Annual Bonus") based on the attainment of certain pre-determined Adjusted EBITDA goals, as adjusted for certain non-recurring events and expenses. Payments made to participants in our Annual Bonus Plan, including our NEOs, are made in the first quarter of the fiscal year following the conclusion of the fiscal year performance period. Notwithstanding the foregoing, in connection with Ms. Harper's transition to serve on our board of directors, Ms. Harper remained eligible to receive payment of her fiscal year 2016 non-equity incentive plan award that she would have been eligible to receive at the end of fiscal year 2016 so long as Ms. Harper provided services to our board of directors or another affiliate of Sycamore Partners through January 28, 2017. The Adjusted EBITDA goals are established by our board of directors prior to, or shortly after, the start of the applicable fiscal year in conjunction with approval of our fiscal year budget and range from a minimum (or threshold) level to a maximum level, with a target level in between. Under the Annual Bonus Plan, as of the end of fiscal year 2016 each NEO has a targeted bonus potential expressed as a percentage of base salary as set forth in the following chart, with a threshold bonus potential equal to 40% of such NEO's target bonus and a maximum bonus potential equal to 200% of such NEO's target bonus. If threshold performance goals are not met, a NEO is not entitled to receive any Annual Bonus under the Annual Bonus Plan. For fiscal year 2016, the Adjusted EBITDA goal under our Annual Bonus Plan was based on a combined Adjusted EBITDA target for the operations of both Torrid and Hot Topic calculated solely for purposes of the Annual Bonus Plan. Torrid's Adjusted EBITDA for fiscal year 2016 for purposes of the Annual Bonus Plan was $86.0 million, compared to a goal of $74.4 million. Notwithstanding such targets, our board of directors has discretion to reduce the size of any award if it believes the interests of our stockholders would be better served by doing so.

| Name | Target Bonus |
| --- | --- |
| Lisa Harper | 175% |
| Mark Mizicko | 75% |
| Elizabeth Muñoz | 65% |
| George Wehlitz, Jr. | 65% |

**Nonqualified Deferred Compensation**

In addition to the standard benefits offered all employees, our NEOs and other senior managers are eligible to participate in our non-qualified deferred compensation plan. The plan allows participating executives to defer base salary and bonus income. During our fiscal year 2016, to the extent they were ineligible to receive such contribution from participation in our 401(k) Plan, we contributed 50% of the first 4% of each participant's eligible contributions into their deferred compensation plan account, including the accounts held by our NEOs. The plan also permits us to grant discretionary contributions at our discretion.

Plan participants are always vested in their deferred salary and bonus amounts, and any matching contributions vest after three years of service. Distributions of deferred amounts are made either in installments or in a lump sum according to the election made by a participant at the time of the deferral. Earnings on the account of each participant are credited to such participant based on the performance of investment vehicles chosen by the participant from a selection offered to all plan participants and which are comprised of investment vehicles generally available to the public. Participants may elect to change the investment vehicles applicable to their accounts at any time.

**Perquisites & Benefits**

Each of our NEOs received certain perquisites and benefits during fiscal year 2016, generally at the same level and offering made available to other employees, including our 401(k) Plan, health care plans, life

Table of Contents

insurance plans, and other welfare benefit programs. Each of our NEOs was entitled to an automobile allowance. Mr. Mizicko and Ms. Muñoz also received company-paid supplemental disability insurance coverage.

**Outstanding Equity Awards at Fiscal Year-End**

The following table sets forth certain information regarding outstanding equity awards of our NEOs as of January 28, 2017. The market value of the shares in the following date is the fair market value of such shares as of January 28, 2017.

| Name | Number of Shares that Have Not Vested[1] | | Market Value of Shares of Stock that Have Not Vest |
|---|---|---|---|
| Lisa Harper | | | |
| Class A Units | 600,000 | $ | 4,587,600 |
| Class B Units | 600,000 | $ | 3,903,600 |
| Mark Mizicko | | | |
| Class A Units | 262,500 | $ | 2,007,075 |
| Class B Units | 262,500 | $ | 1,707,825 |
| Elizabeth Muñoz | | | |
| Class A Units | 262,500 | $ | 2,007,075 |
| Class B Units | 262,500 | $ | 1,707,825 |
| George Wehlitz, Jr. | | | |
| Class A Units | 262,500 | $ | 2,007,075 |
| Class B Units | 262,500 | $ | 1,707,825 |

(1)   In connection with this offering, the Class A and Class B units of Torrid Holding LLC will be among the classes of units converted into shares of our common stock. Assuming the sale of shares of common stock in this offering at a price per share to the public of $ , which is the midpoint of the estimated price range set forth on the cover page of this prospectus, and after giving effect to such conversion and exchange, (a) Ms. Harper's 600,000 unvested Class A and Class B Units would result in an aggregate shares of common stock (b) Ms. Muñoz's, Mr. Mizicko's and Mr. Wehlitz's 262,500 unvested Class A and Class B Units would result in an aggregate shares of common stock.

(2)   Because there was no public market for our equity as of January 28, 2017, the market value of our Class A and Class B Units as of that date was determined by an independent valuation of our equity. The market value of our Class A Units was $7.65 and the market value of our Class B Units was $6.51.

**Long-Term Incentive**

Ms. Harper, Mr. Mizicko, Ms. Muñoz, and Mr. Wehlitz received Class A Units and Class B Units (together, the "Incentive Units") in Torrid Holding LLC on November 2, 2015 pursuant to individual Incentive Unit Purchase Agreements, which are governed under the terms and conditions of the Torrid Holding LLC Second Amended and Restated Limited Liability Company Agreement, dated January 19, 2017 (the "Torrid LLC Agreement"). Incentive Units are intended to constitute a "profits interest" in Torrid Holding LLC, and were awarded at no cost. Under the Torrid LLC Agreement, holders of Torrid Holding LLC's units are entitled to distributions at such times and in such amounts as determined by our board of directors, with a first priority return of accumulated and unpaid yield and a fixed dollar return paid to the holders of Class L Units, and thereafter, pro rata sharing among the holders of various classes of Torrid Holding LLC's vested units on a pro rata basis (including the vested Incentive Units), with each additional class of vested units participating upon the achievement of various hurdle rates set forth in the Torrid LLC Agreement.

*Vesting*

The Units granted to our NEOs generally vested based on continued service by our NEOs as follows: 45% on the date of grant, 5% vest on December 12, 2015 and 5% vest every three months thereafter until the

86

Table of Contents

Units are 100% vested. As of January 28, 2017, the conclusion of our most recent fiscal year, 70% of the Incentive Units granted to our NEOs were vested. In connection with Ms. Harper's transition to serve on our board of directors, we and Ms. Harper agreed that previously awarded incentive equity issued to Ms. Harper will continue to vest according to the terms of the Incentive Unit grant agreement so long as Ms. Harper provides services to our board of directors or another affiliate of Sycamore through the applicable vesting date.

If a NEO ceases to be employed by us or one of our subsidiaries or affiliates for any reason on or prior to June 12, 2018, the final vesting date, all unvested Incentive Units will be forfeited, and all vested Incentive Units are subject to repurchase. Upon a termination of a NEO's employment due to Cause (as defined in the Torrid LLC Agreement) or if the NEO provides any services to any of our competitors during the term of their employment or during the 90-day period following their termination of employment or, in the case of Ms. Harper, otherwise violates the terms and conditions of any restrictive covenants to which she is bound, all Incentive Units may be repurchased at no cost. For Ms. Harper only, if her employment is terminated by us without cause or if Ms. Harper terminates her employment for good reason, the number of Incentive Units that would have vested had Ms. Harper remained employed through the one-year anniversary of her termination date will vest as of her date of termination. In addition, upon a Change of Control or Approved Sale, all Incentive Units held by Ms. Harper will accelerate and vest as of the date of the Change of Control or Approved Sale. Upon a termination of a NEO's employment for any other reason (including due to the NEO's death or disability) on or prior to June 12, 2018, during the one-year period following the NEO's termination of employment we may repurchase any outstanding vested Incentive Units at the then-current fair market value. These Incentive Unit repurchase rights will expire on the first to occur of a "Change of Control," an "Approved Sale" (in each case, as defined below) or June 12, 2018.

For purposes of the Incentive Units, "Change of Control" means the first to occur of any (i) sale or transfer to any third party of our units by the holders thereof as a result of which any individual or a corporation, partnership, limited liability company, trust, unincorporated organization, association, Governmental Entity or other entity ("Person") or group other than Sycamore and its affiliates obtains possession of voting power to elect a majority of our board of directors, (ii) sale or transfer by us or our subsidiaries of all or substantially all (as defined under Delaware law) of our or their assets on a consolidated basis to a Person or group other than Sycamore and its affiliates, or (iii) consolidation, merger or reorganization of us with or into any other entity or entities as a result of which any Person or group other than Sycamore and its affiliates obtains possession of voting power to elect a majority of the surviving entity's board of directors or managers (or equivalent governing body).

For purposes of the Incentive Units, an "Approved Sale" means the approval by the holders of at least a majority of our units held by Sycamore and its affiliates of a sale of all or substantially all of our assets, determined on a consolidated basis, or a sale of a majority of our outstanding units to a Person or Persons other than Sycamore and its affiliates (whether by merger, recapitalization, consolidation, reorganization, combination or otherwise).

**Employment Agreements with our Named Executive Officers**

Other than with respect to our current Chief Executive Officer, discussed below, we do not maintain traditional employment agreements with our NEOs. We do, however, have a departure letter agreement with Mark Mizicko, our former Chief Operating Officer, to memorialize the terms of his resignation from his role as one of our executive officers.

*Letter Agreement with Mark Mizicko*

We entered into a letter agreement with Mr. Mizicko dated January 3, 2017 memorializing his voluntary resignation from his employment with Torrid LLC. Per the terms of the letter agreement, among other matters, we and Mr. Mizicko mutually agreed that previously awarded incentive equity issued to Mr. Mizicko will

87

Table of Contents

continue to vest according to the terms of the Incentive Unit grant agreement so long as Mr. Mizicko remains continuously employed by Belk, Inc. through the applicable vesting date. Further, Mr. Mizicko was eligible to receive payment of the fiscal year 2016 non-equity incentive plan award that he would have received for his services as our Chief Operating Officer so long as he remained continuously employed by Belk, Inc. or one of its subsidiaries through and including January 28, 2017. The amount of Mr. Mizicko's fiscal year 2016 non-equity incentive plan award, which was earned in accordance with the preceding sentence, is included within the Summary Compensation Table, above.

**Employment Agreements and Equity Arrangements with our Current Chief Executive Officer**

*Kay Hong Employment Agreement*

Following the departure of Ms. Harper as our Chief Executive Officer, on January 30, 2017 we entered into an employment agreement with Kay Hong governing her service as our new Chief Executive Officer. Ms. Hong's employment agreements provides for a base salary, an annual incentive award, a one-time signing bonus, equal to $100,000 and payable within 10 days of her effective date, participation in the standard benefit plans and other compensation as may be approved by our Board of Directors. Ms. Hong's employment agreement has no fixed term.

Pursuant to the terms of her employment agreement, Ms. Hong's initial annual base salary is $700,000, which amount will be reviewed annually for potential increase by our board of directors. Ms. Hong is also eligible to earn an annual performance bonus of up to 75% of base salary upon the achievement of annual target performance goals and an additional annual performance bonus of up to 75% of base salary upon the achievement of annual over-performance goals. Annual performance goals and over-performance goal targets will be recommended by our management and established annually by our board of directors.

Ms. Hong's employment agreement also provides that upon consummation of an initial public offering and sale of our equity securities pursuant to an effective registration statement under the Securities Act (the "IPO"), she is entitled to a one-time grant of restricted stock units or restricted stock awards in respect of a number of our common shares that is equal to the quotient determined by dividing $1.0 million by the price per share of our common stock first offered to the public in the IPO. Such award will be granted 50% vested, and the remaining 50% will vest as to one-third of the unvested shares on the first anniversary of the IPO and as to the final two-thirds of the unvested shares on each three-month anniversary thereafter until all shares have vested on the third anniversary of the IPO. If Ms. Hong's employment is terminated by us without Cause (as defined below) or by her for Good Reason (as defined below) during the six months preceding an IPO, she is entitled to receive a one-time cash payment equal to $500,000.

If Ms. Hong's employment is terminated by us with Cause we will pay Ms. Hong any accrued and unpaid portion of her base salary and paid time off through the date of her termination of employment and any bonus earned for the prior fiscal year, payable according to normal payroll practices. If Ms. Hong's employment is terminated due to her death or Disability (as defined in Ms. Hong's employment agreement), she is also entitled to a prorated portion of the annual target bonus earned for the fiscal year in which such termination occurs. Upon a termination of employment by us without Cause or by Ms. Hong for Good Reason, she is entitled severance equal to twelve months' of current base salary, payable in installments in accordance with our normal payroll procedures during the twelve-month period following Ms. Hong's termination of employment, and payment of Ms. Hong's then current target annual bonus, which would be paid at such time as bonuses are paid to our executives generally. Receipt of the severance payments is subject to Ms. Hong executing (and not revoking) a general release of claims and any cash severance amounts payable to Ms. Hong are subject to reduction by any amounts received under other employment or service engagements during the 12-month period immediately following a termination of Ms. Hong's employment.

Ms. Hong's agreement provides that that if Ms. Hong is to receive any payments that would be subject to the excise tax imposed under Section 4999 of the Internal Revenue Code of 1986, as amended, the total

Table of Contents

payments shall be reduced if and to the extent that a reduction of the total payments would result in retaining a larger amount on an after-tax basis than if she received the entire amount of such total payments.

For purposes of Ms. Hong's employment agreement, "Good Reason" means the following: (i) any material adverse change in the authority, responsibilities or duties such that Ms. Hong no longer has the title of, or serves or functions as, our Chief Executive Officer (except due to illness (either physical or mental) or other incapacity or excused absence or vacation), (ii) a material breach by us of Ms. Hong's employment agreement (including, without limitation, any reduction in Ms. Hong's base salary or bonus opportunity), (iii) a relocation of Ms. Hong's principal business location to an area outside of the Los Angeles, California metropolitan area or (iv) the failure of any successor (whether direct or indirect and whether by merger, acquisition, consolidation, asset sale or otherwise) to assume in writing our obligations set forth in Ms. Hong's employment agreement.

For purposes of Ms. Hong's employment agreement, "Cause" means (i) the conviction of a felony (or entry of a plea of guilty or "no contest" with respect to a felony), (ii) fraudulent conduct, (iii) willful refusal to materially perform duties (except during periods when Ms. Hong is unable to perform such duties as a result of illness (either physical or mental) or other incapacity or excused absence or vacation) consistent with Ms. Hong's position and title as reasonably directed by our board of directors, (iv) willful misconduct which has a material adverse effect on the business or reputation of us or any of our subsidiaries or (v) a material breach by Ms. Hong of the obligations set forth in Ms. Hong's employment agreement.

Pursuant to the terms of her employment agreement, Ms. Hong is also subject to a covenant not to solicit employees or customers for a period of 12 months following her termination of employment for any reason, and a covenant to not disclose any confidential information (as defined in Ms. Hong's employment agreement) for a period of five years following a termination of Ms. Hong's employment for any reason.

### Kay Hong Incentive Units

Ms. Hong received Class H and Class J units (together, "CEO Incentive Units") on January 30, 2017 pursuant to an individual Incentive Unit Grant Agreement. The CEO Incentive Units are intended to constitute "profits interests" for tax purposes, which function similarly to a grant of restricted stock, and were awarded at no cost to Ms. Hong. Subject to Ms. Hong's continued employment through the applicable vesting date, the CEO Incentive Units time vest as to 20% of the award on the first anniversary of the grant date, and as to 5% of the award every three months thereafter until the Incentive Units are 100% vested on the 5th anniversary of the grant date.

Under the Torrid LLC Agreement, holders of Torrid Holding LLC's units are entitled to distributions as at such times and in such amounts as determined by our board of directors, with a first priority return of accumulated and unpaid yield and a fixed dollar return paid to the holder of Class L Units, and thereafter, pro rata sharing among the holders of various classes of Torrid Holding LLC's vested units on a pro rata basis (including the vested CEO Incentive Units), with each additional class of vested units participating upon the achievement of various hurdle rates set forth in the Torrid LLC Agreement.

Pursuant to the Incentive Grant Agreement, if Ms. Hong's employment with us terminates for Cause prior to the fifth anniversary of the grant date or if Ms. Hong provides any services to any of our competitors during the term of her employment or during the one year period following her termination of employment or otherwise violates any of the terms of any restrictive covenants between Ms. Hong and us, all CEO Incentive Units are forfeited and cancelled for no consideration. Upon Ms. Hong's termination of employment on or prior to the fifth anniversary of the grant date for any reason other than as specified in the immediately preceding sentence, (i) all unvested CEO Incentive Units are immediately forfeited and cancelled for no consideration and (ii) during the one-year period following Ms. Hong's termination of employment, all vested CEO Incentive Units will be subject to repurchase by us at their fair market value.

Table of Contents

The above vesting restrictions and repurchase rights expire on the first to occur of a "Change of Control," an "Approved Sale" (each, as defined above) or January 30, 2022.

**Potential Payments upon Termination or Change of Control**

Other than (i) pursuant to Ms. Hong's employment agreement as described in "—Employment Agreements and Equity Arrangements with our Current Chief Executive Officer" or (ii) pursuant to Ms. Hong's and our NEO's incentive units as described in "—Long-Term Incentives" above, none of our NEOs have a right to receive severance or other benefits upon a change in control or a termination following a change in control.

**Director Compensation**

During fiscal year 2016, other than the compensation provided to Ms. Harper, as discussed below, none of our directors has received any cash, equity or other compensation for services rendered to us. Our directors and any of their respective affiliates are reimbursed for any out-of-pocket expenses incurred in connection with the performance of their duties as our directors. Ms. Harper receives annual compensation of $100,000 in exchange for her services on our board of directors, which is reflected in the Summary Compensation Table above and prorated for the period of time during fiscal year 2016 that Ms. Harper served on our board of directors.

**Table of Contents**

### SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS

The following table sets forth information as of , 2017 regarding the beneficial ownership of our common stock (1) immediately prior to and (2) as adjusted to give effect to this offering, by:

- each person or group who is known by us to own beneficially more than 5% of our outstanding shares of our common stock;

- each of our named executive officers;

- each of our directors and director nominees;

- all of our executive officers and directors as a group; and

- each selling stockholder.

For further information regarding material transactions between us and certain of our stockholders, see "Certain Relationships and Related Party Transactions."

Beneficial ownership for the purposes of the following table is determined in accordance with the rules and regulations of the SEC. These rules generally provide that a person is the beneficial owner of securities if such person has or shares the power to vote or direct the voting thereof, or to dispose or direct the disposition thereof or has the right to acquire such powers within 60 days. Common stock subject to options that are currently exercisable or exercisable within 60 days of , 2017 are deemed to be outstanding and beneficially owned by the person holding the options. These shares, however, are not deemed outstanding for the purposes of computing the percentage ownership of any other person. Percentage of beneficial ownership is based on shares of common stock outstanding and shares of common stock to be outstanding after the completion of this offering, assuming no exercise of the option to purchase additional shares, or shares, assuming full exercise of the underwriters' option to purchase additional shares. Except as disclosed in the footnotes to this table and subject to applicable community property laws, we believe that each stockholder identified in the table possesses sole voting and investment power over all shares of common stock shown as beneficially owned by the stockholder. Unless otherwise indicated in the table or footnotes below, the address for each beneficial owner is c/o Torrid Inc., 18501 E. San Jose Ave., City of Industry, California 91748.

| Name | Shares Beneficially Owned Prior to This Offering | | Shares to Be Sold in This Offering Assuming No Exercise of Overallotment Option | Shares to Be Sold in This Offering Assuming Full Exercise of Overallotment Option | Shares Beneficially Owned After This Offering Assuming No Exercise of Overallotment Option | | Shares Beneficially Owned After This Offering Assuming Full Exercise of Overallotment Option | |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Number | Number | Percent | Number | Percent |
| **5% Stockholders:** | | | | | | | | |
| Funds Managed by Sycamore Partners Management, L.P.(1) | | | | | | | | |
| **Executive Officers and Directors:** | | | | | | | | |
| Kay Hong | | | | | | | | |
| George Wehlitz, Jr. | | | | | | | | |
| Elizabeth Muñoz | | | | | | | | |
| Kate Horton | | | | | | | | |
| Stefan Kaluzny(1) | | | | | | | | |
| Peter Morrow(1) | | | | | | | | |
| Lisa Harper | | | | | | | | |
| **All executive officers and directors as a group (7 persons)** | | | | | | | | |
| **Other Selling Stockholders** | | | | | | | | |

91

**Table of Contents**

---

\*     Represents beneficial ownership of less than one percent (1%) of our outstanding common stock.

(1)    Includes shares of common stock held directly by Sycamore Partners Torrid, L.L.C. and New Torrid Holding LLC and shares of common stock held indirectly (through their respective ownership in Sycamore Partners Torrid, L.L.C. and New Torrid Holding LLC) by (a) Sycamore Partners, L.P, (b) Sycamore Partners Associates-C, L.P., (c) Sycamore Partners Associates, L.P., (d) Sycamore Partners Associates Investments, L.P., (e) Sycamore Partners (Co-Invest), L.L.C. and (f) Sycamore Partners Associates Co-Invest, Inc. (the entities listed in clauses (a) through (f) above, the "Sycamore Entities"), each of which is a fund managed by Sycamore. Sycamore may be deemed to be the beneficial owner of the shares owned by Sycamore Partners Torrid, L.L.C., New Torrid Holding LLC and the Sycamore Entities, but disclaims beneficial ownership pursuant to the rules under the Securities Exchange Act of 1934, as amended. Each of Mr. Kaluzny and Mr. Morrow is a managing director of Sycamore, and each may be deemed to be the beneficial owner of shares owned by Sycamore Partners Torrid, L.L.C., New Torrid Holding LLC and the Sycamore Entities. Each of Mr. Kaluzny and Mr. Morrow disclaims beneficial ownership of any securities owned by Sycamore Partners Torrid, L.L.C., New Torrid Holding LLC and the Sycamore Entities, except, in each case, to the extent of his pecuniary interest therein. The address for Sycamore, Sycamore Partners Torrid, L.L.C., New Torrid Holding LLC, the Sycamore Entities, Mr. Kaluzny and Mr. Morrow is c/o Sycamore Partners Management, L.P., 9 W. 57th Street, 31st Floor, New York, NY 10019.

92

**Table of Contents**

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

In connection with this offering, we will adopt a written policy with respect to related party transactions. Under our related person transaction policy, a "Related Person Transaction" is any transaction, arrangement or relationship between us or any of our subsidiaries and a Related Person not including any transactions involving $120,000 or less when aggregated with all similar transactions. A "Related Person" is any of our executive officers, directors or director nominees, any stockholder beneficially owning in excess of 5% of our stock or securities exchangeable for our stock, any immediate family member of any of the foregoing persons, and any firm, corporation or other entity in which any of the foregoing persons is an executive officer, a partner or principal or in a similar position or in which such person has a 5% or greater beneficial ownership interest in such entity.

Pursuant to our Related Person Transaction policy, any Related Person Transaction must be approved or ratified by a majority of the disinterested directors on our board of directors or a designated committee thereof consisting solely of disinterested directors. In approving any Related Person Transaction, our board of directors or the committee must determine that the transaction is on terms no less favorable in the aggregate than those generally available to an unaffiliated third party under similar circumstances.

### Transition Services Agreement & Services Agreement with Hot Topic

In connection with the Separation, we entered into a transition services agreement with Hot Topic, dated May 1, 2015 (the "Transition Services Agreement"). During fiscal years 2015 and 2016, we incurred $33.0 million and $32.9 million, respectively, in charges from Hot Topic for various services provided under the Transition Services Agreement. As of January 30, 2016 and January 28, 2017, we owed $3.4 million and $3.2 million, respectively, to Hot Topic under the Transition Services Agreement, which amount is included as due to related parties in our consolidated balance sheets.

On June 2, 2017, we terminated the Transition Services Agreement and entered into a new services agreement with Hot Topic (the "Services Agreement"). Pursuant to the Services Agreement, we will continue to receive certain services, including distribution, information technology and real estate management services. The provision of services under the Services Agreement will expire in 2020, unless we elect to terminate the agreement (or certain services under the agreement) prior to that time. The notice requirement for early termination is 18 months or as otherwise agreed by us and Hot Topic. The Services Agreement may be extended beyond June 2, 2020 upon mutual agreement. The amounts we pay for the services provided pursuant to the Services Agreement vary depending upon the service. We are generally invoiced by Hot Topic monthly for these amounts and are generally required to remit payment to Hot Topic within 30 days of receiving an invoice. In addition, we are required to reimburse Hot Topic for certain costs and expenses incurred by Hot Topic on our behalf in the course of providing these services, including capital investments requested or approved by us, rent payments for additional leased space and license fees.

Since the Separation, we have made investments in our business so that we can operate as a standalone business. The services we continue to receive under the Services Agreement are commercially available from other third parties. As a result, we do not expect the expiration of the services under the Services Agreement to have an adverse impact on our business.

### Advisory Services Agreement

In connection with the Separation, we entered into an advisory services agreement with Sycamore, dated May 1, 2015 (the "Advisory Services Agreement"), pursuant to which Sycamore agreed to provide strategic planning and other related services to us. We are obligated to reimburse Sycamore for their expenses incurred in connection with providing such advisory services to us. As of the end of fiscal year 2016, there were no amounts due, and during fiscal year 2016 no amounts were paid, under this agreement. During fiscal year 2015, we

93

Table of Contents

reimbursed a de minimis amount to Sycamore for certain expenses they incurred on our behalf under the Advisory Services Agreement. Sycamore's liability in connection with its performance of the services under the agreement is limited to that arising from its gross negligence or willful misconduct and we, along with our subsidiaries and affiliates, are responsible for indemnifying Sycamore against all claims relating to the agreement except to the extent arising from Sycamore's gross negligence or willful misconduct. The Advisory Services Agreement will expire by its terms on May 1, 2025 and will automatically be renewed on an annual basis thereafter unless we or Sycamore provides 90 days' prior written notice of our intent not to renew prior to the end of the then-current term. On , 2017, we entered into a termination agreement with respect to the Advisory Services Agreement providing that the Advisory Services Agreement will automatically terminate upon the completion of this offering.

**Related Party Merchandising and Stores**

MGF Sourcing US, LLC, an entity indirectly controlled by affiliates of Sycamore, is one of our suppliers. Purchases from this supplier totaled $8.7 million, $12.1 million and $18.4 million during fiscal years 2014, 2015 and 2016, respectively, and $4.1 million and $6.5 million during the first quarter of fiscal years 2016 and 2017, respectively. Prices paid to this supplier are negotiated on an arms-length basis and are substantially similar to the prices that we would pay to other suppliers of similar goods.

HU Merchandising LLC, a subsidiary of Hot Topic and an entity indirectly controlled by affiliates of Sycamore, is one of our suppliers. During the first quarter of fiscal year 2017, purchases from this supplier were $0.2 million and no purchases were made in the first quarter of fiscal 2016. Prices paid to this supplier are negotiated on an arms-length basis and are substantially similar to the prices we would pay to other suppliers of similar goods. For certain of our goods, Hot Topic provides us with licensing services, such as license procurement and design services. We pay Hot Topic $0.1 million each fiscal quarter for these services.

During the first quarter of fiscal year 2017, we entered into an agreement with Hot Topic under which Hot Topic will move into the retail store space of two Torrid stores closing during the second quarter of fiscal year 2017 in connection with the closing of the Lovesick test concept. As a result of this agreement and with landlord consent, we will avoid certain costs associated with terminating our lease agreements and pay Hot Topic $0.2 million in the aggregate. This expense was recorded as a component of cost of goods sold and the liability is included in due to related parties in our consolidated balance sheets.

**Stockholders' Agreement**

In connection with this offering, we will enter into a Stockholders' Agreement with Sycamore (the "Stockholders' Agreement"). The Stockholders' Agreement will provide Sycamore with certain rights with respect to the designation of directors to serve on our board of directors. As set forth in the Stockholders' Agreement, for so long as Sycamore beneficially owns at least 50% of our common stock, it will be entitled to designate for nomination a majority of our board of directors. When Sycamore beneficially owns less than 50% of our common stock but owns at least 10% of our common stock, Sycamore will be entitled to designate for nomination a number of directors in proportion to its ownership of our common stock, rounded up to the nearest whole number. When Sycamore owns less than 10% of our common stock but owns at least 5% of our common stock, Sycamore will be entitled to designate for nomination the greater of (i) a number of directors in proportion to its ownership of our common stock, rounded up to the nearest whole number, and (ii) one director.

**Registration Rights Agreement**

In connection with this offering, we will enter into a registration rights agreement pursuant to which we will grant certain registration rights to certain funds managed by Sycamore and its affiliates and certain of their transferees, including the right, under certain circumstances and subject to certain restrictions, to require us to register under the Securities Act our common stock held by them. In addition, we will commit to file as promptly as possible after receiving a request from Sycamore, a shelf registration statement registering secondary sales of

94

Table of Contents

our common stock held by Sycamore. Sycamore also will have the right to exercise certain piggyback registration rights in respect of common stock held by them in connection with registered offerings requested by other registration rights holders or initiated by us.

**Related Party Promissory Note**

On May 1, 2015, we issued a $45 million promissory note to our parent, Torrid Holding LLC, due on or before May 1, 2018. On June 16, 2016, we made a $29.8 million repayment of the related party promissory note and paid $0.2 million of related interest. We pay interest on the related party promissory note at an annual compounding rate of 0.43% upon maturity of the related party promissory note. As of the end of fiscal year 2016, there was a $15.2 million lump sum principal payment due on the May 1, 2018 maturity date and the total amount of interest owed was $0.1 million. We expect the related party promissory note to be extinguished by operation of law in connection with the Distribution.

**Issuance of Incentive Units by Torrid Holding LLC**

During fiscal year 2016, our parent, Torrid Holding LLC, issued 2.3 million Class E, Class F, Class G and Class H Torrid incentive units in the aggregate, net of forfeitures, to certain members of our management, including certain of our Named Executive Officers. During fiscal year 2016, we incurred $63.9 million of share based compensation expense related to these issuances and issuances made during fiscal year 2015. For more information, see Note 11 to our audited consolidated financial statements included elsewhere in this prospectus.

95

Table of Contents

## DESCRIPTION OF CERTAIN INDEBTEDNESS

**ABL Facility**

On May 1, 2015, Torrid LLC (the "Lead Borrower"), the other borrowers party thereto and the Company (f/k/a Torrid Holding Corp.) entered into a $50.0 million senior secured asset based revolving Credit Agreement with Bank of America, N.A., as administrative agent and collateral agent, and certain other lenders party thereto. The ABL Facility is available to be used for working capital, capital expenditures and other general corporate purposes and has a scheduled maturity date of April 30, 2020. The ABL Facility contains sub-facilities which allow for swing line advances of up to $5.0 million and up to $5.0 million to be available in the form of letters of credit.

Borrowings under the ABL Facility bear interest at a rate equal to either LIBOR or "base rate" plus an applicable margin rate (the "Applicable Margin"). The Applicable Margin is determined based on excess availability, which measures the difference between (A) the lesser of (i) the aggregate commitments under the ABL Facility and (ii) the then-existing borrowing base (the "Loan Cap") and (B) total outstandings under the ABL Facility. The borrowing base components are 90% of eligible credit card receivables, plus 90% of the cost of eligible inventory (to be increased by the seasonal advance rate increase percentage during the seasonal over-advance period) (net of inventory reserves), plus 90% of the liquidation value of eligible in-transit inventory (to be increased by the seasonal advance rate increase percentage during the seasonal over-advance period) (net of inventory reserves), minus the amount of availability reserves. As of January 28, 2017, we had $6.9 million outstanding under the ABL Facility and $42.3 million available under the ABL Facility. The Applicable Margin for LIBOR-based advances is 2.00% per annum or 1.75% if excess availability is greater than 50% of the aggregate commitments, and for base rate-based advances is 1.00% per annum or 0.75% if excess availability is greater than 50% of the aggregate commitments. There is also a fronting fee payable quarterly in arrears of 0.125% per annum based on the daily amount available to be drawn for each such letter of credit outstanding during such quarter.

Fees payable under the ABL Facility are equal to 0.25% per annum, if the average daily total outstandings under the ABL Facility is greater than 50% of the aggregate commitments, or 0.375% per annum, if the average daily total outstandings under the ABL Facility is less than 50% of the aggregate commitments, payable quarterly in arrears on the first business day of each January, April, July and October. Additionally, letter of credit fees for outstanding letter of credit balances are payable quarterly in arrears (i) with respect to commercial letters of credit, at a rate per annum equal to fifty percent (50%) of the Applicable Margin for LIBOR-based advances and (ii) with respect to standby letters of credit, at a rate per annum equal to the Applicable Margin for LIBOR-based advances, in each case based on the daily stated amount for each such letter of credit outstanding during such quarter.

Interest payments under the ABL Facility are due on the first day of each month for base rate-based advances and on the last day of the interest period for LIBOR-based advances for interest periods of one, three and six months (or if available to all lenders, twelve months), and additionally every three months after the first day of the interest period for LIBOR-based advances for interest periods of greater than three months.

Voluntary prepayments are permitted in whole or in part, without premium or penalty, subject to certain minimum prepayment requirements and payment of costs and expenses incurred by the lenders in connection with prepayment of LIBOR-based borrowings prior to the end of the applicable interest period for such borrowings.

Torrid LLC may terminate in whole or reduce in certain multiples the amount of commitments under the ABL Facility upon five business days' notice to the lender, subject to certain minimum reduction requirements.

Borrowings under the ABL Facility are subject to the accuracy of representations and warranties in all material respects and the absence of any defaults.

96

**Table of Contents**

The ABL Facility contains customary covenants and restrictions on the Company, and its restricted subsidiaries' activities, including, but not limited to, limitations on the incurrence of additional indebtedness; liens, investments, loans, asset sales, mergers, acquisitions and prepayment of other debt; distributions, dividends and the repurchase of capital stock; transactions with affiliates; amendments to material documents; the ability to change the nature of our business or our fiscal year; and permitted activities.

The ABL Facility requires that availability be not less than the greater of 10% of the Loan Cap or $5.0 million at any time.

Events of default under the ABL Facility include, but are not limited to, (1) Torrid LLC's failure to pay principal, interest, fees or other amounts under the ABL Facility when due taking into account any applicable grace period; (2) any representation or warranty proving to have been incorrect in any material respect when made; (3) failure to perform or observe certain covenants or other terms of the ABL Facility subject to certain grace periods; (4) a cross default or failure to pay certain other debt; (5) bankruptcy events; (6) unsatisfied final judgments over a threshold; (7) a change of control; (8) certain defaults under the Employee Retirement Income Security Act of 1974; and (9) the invalidity or impairment of any loan document, subordination provision or any security interest.

All obligations under the ABL Facility are guaranteed by the Company and certain of its domestic subsidiaries and secured by a lien on substantially all of the assets of the Company and certain of its domestic subsidiaries, including all fixtures and equipment; all intellectual property; all equity interests in Torrid LLC and other domestic subsidiaries of the Company; general intangibles; all proceeds of insurance; all books and records; and all other proceeds.

97

**Table of Contents**

**DESCRIPTION OF CAPITAL STOCK**

The following is a description of the material terms of our certificate of incorporation and bylaws as they will be in effect upon completion of this offering. The following description may not contain all of the information that is important to you. To understand them fully, you should read our certificate of incorporation and bylaws, copies of which are or will be filed with the SEC as exhibits to the registration statement, of which this prospectus is a part.

**Authorized Capitalization**

Our authorized capital stock consists of shares of common stock, par value $0.01 per share, and shares of preferred stock, par value $0.01 per share. On , 2017, there were shares of our common stock outstanding, held of record by approximately stockholders. Based upon (1) shares of our common stock outstanding as of and (2) the issuance of shares of common stock in this offering, there will be shares of our common stock outstanding upon completion of this offering, and shares of preferred stock will be outstanding.

As of , 2017, there were shares of our common stock subject to outstanding options.

**Common Stock**

*Voting Rights*

Each share of common stock entitles the holder to one vote with respect to each matter presented to our stockholders on which the holders of common stock are entitled to vote. Subject to any rights that may be applicable to any then outstanding preferred stock, our common stock votes as a single class on all matters relating to the election and removal of directors on our board of directors and as provided by law. Holders of our common stock will not have cumulative voting rights. Except in respect of matters relating to the election removal of directors on our board of directors and as otherwise provided in our certificate of incorporation or required by law, all matters to be voted on by our stockholders must be approved by a majority of the shares present in person or by proxy at the meeting and entitled to vote on the subject matter. In the case of election of directors, all matters to be voted on by our stockholders must be approved by a plurality of the votes entitled to be cast by all shares of common stock.

*Dividend Rights*

Subject to preferences that may be applicable to any then outstanding preferred stock, the holders of our outstanding shares of common stock are entitled to receive dividends, if any, as may be declared from time to time by our board of directors out of legally available funds. Because we are a holding company, our ability to pay dividends on our common stock is limited by restrictions on the ability of our subsidiaries to pay dividends or make distributions to us, including restrictions under the terms of the agreements governing our indebtedness. See "Description of Certain Indebtedness." See also "Dividend Policy."

*Liquidation Rights*

In the event of any voluntary or involuntary liquidation, dissolution or winding up of our affairs, holders of our common stock would be entitled to share ratably in our assets that are legally available for distribution to stockholders after payment of our debts and other liabilities. If we have any preferred stock outstanding at such time, holders of the preferred stock may be entitled to distribution and/or liquidation preferences. In either such case, we must pay the applicable distribution to the holders of our preferred stock before we may pay distributions to the holders of our common stock.

**Table of Contents**

*Other Rights*

Our stockholders have no preemptive, conversion or other rights to subscribe for additional shares. All outstanding shares are, and all shares offered by this prospectus will be, when sold, validly issued, fully paid and nonassessable. There will be no redemption or sinking fund provisions applicable to our common stock. The rights, preferences and privileges of the holders of our common stock are subject to, and may be adversely affected by, the rights of the holders of shares of any series of our preferred stock that we may designate and issue in the future.

*Listing*

We will apply for listing of our common stock on the NYSE under the symbol "CURV."

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock will be American Stock Transfer & Trust Company, LLC.

**Preferred Stock**

Our certificate of incorporation will authorize our board of directors to provide for the issuance of shares of preferred stock in one or more series and to fix the preferences, powers and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including the dividend rate, conversion rights, voting rights, redemption rights and liquidation preference and to fix the number of shares to be included in any such series without any further vote or action by our stockholders. Any preferred stock so issued may rank senior to our common stock with respect to the payment of dividends or amounts upon liquidation, dissolution or winding up, or both. The issuance of preferred stock may have the effect of delaying, deferring or preventing a change in control of our Company without further action by the stockholders and may adversely affect the voting and other rights of the holders of common stock. The issuance of preferred stock with voting and conversion rights may adversely affect the voting power of the holders of common stock, including the loss of voting control to others. At present, we have no plans to issue any of the preferred stock.

**Corporate Opportunity**

As permitted under the DGCL, in our certificate of incorporation, we renounce any interest or expectancy in, or any offer of an opportunity to participate in, specified business opportunities that are presented to us or one or more of our officers, directors or stockholders. In recognition that directors, officers and/or employees of Sycamore may serve as directors and/or officers of ours, and Sycamore and its affiliates, not including us (the "Sycamore Entities"), may engage in similar activities or lines of business that we do, our certificate of incorporation provides for the allocation of certain corporate opportunities between us and the Sycamore Entities. Specifically, none of the Sycamore Entities have any duty to refrain from engaging directly or indirectly in the same or similar business activities or lines of business that we do. In the event that a director or officer of Sycamore who is also a director or officer of ours acquires knowledge of a potential transaction or matter which may be a corporate opportunity for any of the Sycamore Entities and us, we will not have any expectancy in such corporate opportunity, and the director or officer will not have any duty to present such corporate opportunity to us and may pursue or acquire such corporate opportunity for itself or direct such opportunity to another person. A corporate opportunity that an officer or director of ours who is also a director or officer of any of the Sycamore Entities acquires knowledge of will not belong to us unless the corporate opportunity at issue is expressly offered in writing to such person solely in his or her capacity as a director or officer of ours. In addition, even if a business opportunity is presented to an officer or director of any of the Sycamore Entities in his or her capacity as an officer or director of ours, the following corporate opportunities will not belong to us: (1) those we are not financially able, contractually permitted or legally able to undertake;

99

Table of Contents

(2) those not in our line of business; (3) those of no practical advantage to us; and (4) those in which we have no interest or reasonable expectancy. Except with respect to our directors and/or officers that are also directors and/or officers of any of the Sycamore Entities, the corporate opportunity doctrine applies as construed pursuant to applicable Delaware laws, without limitation.

**Antitakeover Effects of Delaware Law and Our Certificate of Incorporation and Bylaws**

Our certificate of incorporation and our bylaws will contain provisions that may delay, defer or discourage another party from acquiring control of us. We expect that these provisions, which are summarized below, will discourage coercive takeover practices or inadequate takeover bids. These provisions are also designed to encourage persons seeking to acquire control of us to first negotiate with our board of directors, which we believe may result in an improvement of the terms of any such acquisition in favor of our stockholders. However, they also give our board of directors the power to discourage acquisitions that some stockholders may favor.

*Action By Written Consent, Special Meeting of Stockholders and Advance Notice Requirements for Stockholder Proposals*

Our certificate of incorporation will provide that stockholder action can be taken only at an annual or special meeting of stockholders and cannot be taken by written consent in lieu of a meeting once Sycamore ceases to beneficially own more than 50% of our outstanding shares. Our certificate of incorporation and bylaws will also provide that, except as otherwise required by law, special meetings of the stockholders can be called only pursuant to a resolution adopted by a majority of the total number of directors that we would have if there were no vacancies or, until the date that Sycamore ceases to beneficially own more than 50% of our outstanding shares, at the request of holders of 50% or more of our outstanding shares. Except as described above, stockholders will not be permitted to call a special meeting or to require our board of directors to call a special meeting.

In addition, our bylaws require advance notice procedures for stockholder proposals to be brought before an annual meeting of the stockholders, including the nomination of directors. Stockholders at an annual meeting may only consider the proposals specified in the notice of meeting or brought before the meeting by or at the direction of our board of directors, or by a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has delivered a timely written notice in proper form to our secretary, of the stockholder's intention to bring such business before the meeting.

These provisions could have the effect of delaying until the next stockholder meeting any stockholder actions, even if they are favored by the holders of a majority of our outstanding voting securities.

*Classified Board of Directors*

Our certificate of incorporation will provide that our board of directors will be divided into three classes of directors, with the classes as nearly equal in number as possible. As a result, approximately one-third of our board of directors will be elected each year. The classification of directors will have the effect of making it more difficult for stockholders to change the composition of our board. In addition, because our board will be classified, under the DGCL, directors may only be removed for cause.

*Removal of Directors*

Our certificate of incorporation will provide that directors may be removed with or without cause at any time upon the affirmative vote of holders of at least a majority of the votes to which all the stockholders would be entitled to cast until Sycamore ceases to beneficially own more than 50% of our outstanding shares. After such time directors may only be removed from office for cause and only upon the affirmative vote of at least 75% of the voting power of our outstanding shares of common stock.

100

Table of Contents

***Amendment to Certificate of Incorporation and Bylaws***

The DGCL provides generally that the affirmative vote of a majority of the outstanding stock entitled to vote on amendments to a corporation's certificate of incorporation or bylaws is required to approve such amendment, unless a corporation's certificate of incorporation or bylaws, as the case may be, requires a greater percentage. Our bylaws may be amended, altered, changed or repealed by a majority vote of our board of directors, provided that, in addition to any other vote otherwise required by law, after the date on which Sycamore ceases to beneficially own more than 50% of our outstanding shares, the affirmative vote of at least 75% of the voting power of our outstanding shares of common stock will be required to amend, alter, change or repeal our bylaws. Additionally, after the date on which Sycamore ceases to beneficially own more than 50% of our outstanding shares, the affirmative vote of at least 75% of the voting power of the outstanding shares of capital stock entitled to vote on the adoption, alteration, amendment or repeal of our certificate of incorporation, voting as a single class, will be required to amend or repeal or to adopt any provision inconsistent with specified provisions of our certificate of incorporation. This requirement of a supermajority vote to approve amendments to our certificate of incorporation and bylaws could enable a minority of our stockholders to exercise veto power over any such amendments.

***Delaware Anti-Takeover Statute***

Section 203 of the DGCL provides that if a person acquires 15% or more of the voting stock of a Delaware corporation, such person becomes an "interested stockholder" and may not engage in certain "business combinations" with the corporation for a period of three years from the time such person acquired 15% or more of the corporation's voting stock, unless: (1) our board of directors approves the acquisition of stock or the merger transaction before the time that the person becomes an interested stockholder; (2) the interested stockholder owns at least 85% of the outstanding voting stock of the corporation at the time the merger transaction commences (excluding voting stock owned by directors who are also officers and certain employee stock plans); or (3) the merger transaction is approved by our board of directors and by the affirmative vote at a meeting, not by written consent, of stockholders of 2/3 of the holders of the outstanding voting stock which is not owned by the interested stockholder. A Delaware corporation may elect in its certificate of incorporation or bylaws not to be governed by this particular Delaware law.

While we have elected in our certificate of incorporation to opt out of Section 203 of the DGCL, our certificate of incorporation contains provisions that have the same effect as Section 203 of the DGCL, except that they provide that investment funds affiliated with Sycamore will not be deemed to be an "interested stockholder" and accordingly will not be subject to such restrictions.

101

**Table of Contents**

**SHARES ELIGIBLE FOR FUTURE SALE**

Prior to this offering, there has been no public market for our common stock. Future sales of substantial amounts of our common stock in the public market, or the perception that such sales may occur, could adversely affect the prevailing market price of our common stock. No prediction can be made as to the effect, if any, future sales of shares, or the availability of shares for future sales, will have on the market price of our common stock prevailing from time to time. The sale of substantial amounts of our common stock in the public market, or the perception that such sales could occur, could adversely affect the prevailing market price of our common stock.

**Sale of Restricted Shares**

Upon completion of this offering, we will have shares of common stock outstanding. Of these shares of common stock, the shares of common stock being sold by the selling stockholders in this offering (including any shares sold by the selling stockholders upon exercise of the underwriters' option to purchase additional shares), will be freely tradable without restriction under the Securities Act of 1933, as amended (the "Securities Act"), except for any such shares which may be held or acquired by an "affiliate" of ours, as that term is defined in Rule 144 promulgated under the Securities Act, which shares will be subject to the volume limitations and other restrictions of Rule 144 described below. The remaining shares of common stock held by our existing stockholders upon completion of this offering will be "restricted securities," as that phrase is defined in Rule 144, and may be resold only after registration under the Securities Act or pursuant to an exemption from such registration, including, among others, the exemptions provided by Rule 144 and 701 under the Securities Act, which rules are summarized below. These remaining shares of common stock held by our existing stockholders upon completion of this offering will be available for sale in the public market after the expiration of the lock-up agreements described in "Underwriting," taking into account the provisions of Rules 144 and 701 under the Securities Act.

**Rule 144**

In general, under Rule 144, as currently in effect, a person who is not deemed to be our affiliate for purposes of Rule 144 or to have been one of our affiliates at any time during the three months preceding a sale and who has beneficially owned the shares of common stock proposed to be sold for at least six months, including the holding period of any prior owner other than our affiliates, is entitled to sell those shares of common stock without complying with the manner of sale, volume limitation or notice provisions of Rule 144, subject to compliance with the public information requirements of Rule 144. If such a person has beneficially owned the shares of common stock proposed to be sold for at least one year, including the holding period of any prior owner other than our affiliates, then that person is entitled to sell those shares of common stock without complying with any of the requirements of Rule 144. In general, six months after the effective date of the registration statement of which this prospectus forms a part, under Rule 144, as currently in effect, our affiliates or persons selling shares of common stock on behalf of our affiliates are entitled to sell, within any three-month period, a number of shares of common stock that does not exceed the greater of (1) 1% of the number of shares of common stock then outstanding and (2) the average weekly trading volume of the shares of common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to that sale. Sales under Rule 144 by our affiliates or persons selling shares of common stock on behalf of our affiliates are also subject to certain manner of sale provisions and notice requirements and to the availability of current public information about us.

**Rule 701**

In general, under Rule 701, any of our employees, directors, officers, consultants or advisors who acquired shares from us in connection with a compensatory stock or option plan or other written agreement before the effective date of this offering, are eligible to resell such shares in reliance upon Rule 144 beginning 90 days after the date of this prospectus. If such person is not an affiliate, the sale may be made subject only to the manner-of-sale restrictions of Rule 144. If such a person is an affiliate, the sale may be made under Rule 144 without compliance with its one-year minimum holding period, but subject to the other Rule 144 restrictions.

102

**Table of Contents**

**10b5-1 Plans**

Prior to or after the completion of the offering, certain of our employees, including our executive officers, and/or directors may enter into written trading plans that are intended to comply with Rule 10b5-1 under the Exchange Act. Sales under these trading plans would not be permitted until the expiration of the lock-up agreements relating to the offering described above.

**Lock-Up Agreements**

We, each of our officers and directors and the selling stockholders have agreed, subject to certain exceptions, with the underwriters not to dispose of or hedge any of the shares of common stock or securities convertible into or exchangeable for, or that represent the right to receive, shares of common stock during the period from the date of the underwriting agreement to be executed by us in connection with this offering continuing through the date that is 180 days after the date of this prospectus, except with the prior written consent of . See "Underwriting."

103

**Table of Contents**

**MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS TO NON-U.S. HOLDERS**

The following is a summary of material U.S. federal income tax consequences of the purchase, ownership and disposition of our common stock to a non-U.S. holder that purchases shares of our common stock in this offering. For purposes of this summary, a "non-U.S. holder" means a beneficial owner of our common stock that is, for U.S. federal income tax purposes:

- a nonresident alien individual;

- a foreign corporation (or entity treated as a foreign corporation for U.S. federal income tax purposes); or

- a foreign estate or foreign trust.

In the case of a holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partner and the partnership. If you are a partner in a partnership holding our common stock, then you should consult your own tax advisor.

This summary is based upon the provisions of the U.S. Internal Revenue Code of 1986, as amended, which we refer to as the Code, the Treasury regulations promulgated thereunder and administrative and judicial interpretations thereof, all as of the date hereof. Those authorities may be changed, perhaps retroactively, so as to result in U.S. federal income tax consequences different from those summarized below. We cannot assure you that a change in law, possibly with retroactive application, will not alter significantly the tax considerations that we describe in this summary. We have not sought and do not plan to seek any ruling from the U.S. Internal Revenue Service, which we refer to as the IRS, with respect to statements made and the conclusions reached in the following summary, and there can be no assurance that the IRS or a court will agree with our statements and conclusions.

This summary does not address all aspects of U.S. federal income taxes that may be relevant to non-U.S. holders in light of their personal circumstances, and does not deal with federal taxes other than the U.S. federal income tax or with non-U.S., state or local tax considerations. Special rules, not discussed here, may apply to certain non-U.S. holders, including:

- U.S. expatriates and former citizens or long-term residents of the United States;

- persons subject to the alternative minimum tax;

- persons holding our common stock as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment;

- banks, insurance companies, and other financial institutions;

- real estate investment trusts or regulated investment companies;

- brokers, dealers or traders in securities;

- corporations that accumulate earnings to avoid U.S. federal income tax;

- tax-exempt organizations or governmental organizations;

- persons deemed to sell our common stock under the constructive sale provisions of the Code;

104

Table of Contents

- persons who hold or receive our common stock pursuant to the exercise of any employee stock option or otherwise as compensation;

- "qualified foreign pension funds" (within the meaning of Section 897(1)(2) of the Code and entities, all of the interests of which are held by qualified foreign pension funds);

- tax-qualified retirement plans;

- controlled foreign corporations;

- passive foreign investment companies; and

- investors in pass-through entities that are subject to special treatment under the Code.

Such non-U.S. holders should consult their own tax advisors to determine the U.S. federal, state, local and other tax consequences that may be relevant to them.

This summary applies only to a non-U.S. holder that holds our common stock as a capital asset (within the meaning of Section 1221 of the Code).

If you are considering the purchase of our common stock, you should consult your own tax advisor concerning the particular U.S. federal income tax consequences to you of the purchase, ownership and disposition of our common stock, as well as the consequences to you arising under U.S. tax laws other than the federal income tax law or under the laws of any other taxing jurisdiction.

**Dividends**

As discussed under the section entitled "Dividend Policy" above, we do not currently anticipate paying dividends. In the event that we do make a distribution of cash or property (other than certain stock distributions) with respect to our common stock (or certain redemptions that are treated as distributions with respect to common stock), any such distributions will be treated as a dividend for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits (as determined under U.S. federal income tax principles). Dividends paid to you generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty. However, dividends that are effectively connected with the conduct of a trade or business by you within the United States and, where a tax treaty applies, are generally attributable to a United States permanent establishment or fixed base, are not subject to the withholding tax, but instead are subject to United States federal income tax on a net income basis at applicable graduated individual or corporate rates. Certain certification and disclosure requirements including delivery of a properly executed IRS Form W-8ECI must be satisfied for effectively connected income to be exempt from withholding. Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

If the amount of a distribution paid on our common stock exceeds our current and accumulated earnings and profits, such excess will be allocated ratably among each share of common stock with respect to which the distribution is paid and treated first as a tax-free return of capital to the extent of your adjusted tax basis in each such share, and thereafter as capital gain from a sale or other disposition of such share of common stock that is taxed to you as described below under the heading "Gain on Disposition of Common Stock." Your adjusted tax basis is generally the purchase price of such shares, reduced by the amount of any such tax-free returns of capital.

If you wish to claim the benefit of an applicable treaty rate to avoid or reduce withholding of U.S. federal income tax for dividends, then you must (a) provide the withholding agent with a properly completed IRS

105

Table of Contents

Form W-8BEN or IRS form W-8BEN-E (or other applicable form) and certify under penalties of perjury that you are not a U.S. person and are eligible for treaty benefits, or (b) if our common stock is held through certain foreign intermediaries, satisfy the relevant certification requirements of applicable U.S. Treasury regulations. Special certification and other requirements apply to certain non-U.S. holders that act as intermediaries (including partnerships).

If you are eligible for a reduced rate of U.S. federal income tax pursuant to an income tax treaty, then you may obtain a refund or credit of any excess amounts withheld by timely filing an appropriate claim with the IRS.

**Gain on Disposition of Common Stock**

Subject to the discussion below under "Legislation Affecting Taxation of Common Stock Held By or Through Foreign Entities," you generally will not be subject to U.S. federal income tax with respect to gain realized on the sale or other taxable disposition of our common stock, unless:

- the gain is effectively connected with a trade or business you conduct in the United States, and, in cases in which certain tax treaties apply, is attributable to a United States permanent establishment or fixed base;

- if you are an individual, you are present in the United States for 183 days or more in the taxable year of the sale or other taxable disposition, and you have a "tax home" (as defined in the Code) in the United States; or

- we are or have been during a specified testing period a "U.S. real property holding corporation" ("USRPHC") for U.S. federal income tax purposes, and certain other conditions are met.

We believe that we have not been and are not, and we do not anticipate becoming, a "U.S. real property holding corporation" for U.S. federal income tax purposes. Because the determination of whether we are a USRPHC depends, however, on the fair market value of our US real property interests relative to the fair market value of our non-U.S. real property interests and our other business assets, there can be no assurance we currently are not a USRPHC or will not become one in the future. Even if we are or were to become a USRPHC, gain arising from the sale or other taxable disposition by a non-U.S. holder of our common stock will not be subject to U.S. federal income tax if our common stock is "regularly traded," as defined by applicable Treasury Regulations, on an established securities market, and such non-U.S. holder owned, actually and constructively, 5% or less of our common stock throughout the shorter of the five-year period ending on the date of the sale or other taxable disposition or the non-U.S. holder's holding period. If we were to become a USRPHC and our common stock were not considered to be "regularly traded" on an established securities market during the calendar year in which the relevant disposition by a non-U.S. holder occurs, such non-U.S. holder (regardless of the percentage of stock owned) would be subject to U.S. federal income tax on a sale or other taxable disposition of our common stock and a 15% withholding tax would apply to the gross proceeds from such disposition. If you are an individual described in the first bullet point above, you will be subject to tax on the gain derived from the sale under regular graduated United States federal income tax rates. If you are an individual described in the second bullet point above, you will be subject to a flat 30% tax on the gain derived from the sale, which may be offset by United States source capital losses (even though you are not considered a resident of the United States) but may not be offset by any capital loss carryovers. If you are a foreign corporation described in the first bullet point above, you will be subject to tax on your gain under regular graduated United States federal income tax rates and, in addition, may be subject to the branch profits tax equal to 30% of your effectively connected earnings and profits or at such lower rate as may be specified by an applicable income tax treaty.

106

Table of Contents

**Information Reporting and Backup Withholding Tax**

We must report annually to the IRS and to you the amount of dividends paid to you and the amount of tax, if any, withheld with respect to such dividends. The IRS may make this information available to the tax authorities in the country in which you are resident.

In addition, you may be subject to information reporting requirements and backup withholding tax (currently at a rate of 28%) with respect to dividends paid on, and the proceeds of disposition of, shares of our common stock, unless, generally, you certify under penalties of perjury (usually on IRS Form W-8BEN or IRS Form W-8BEN-E) that you are not a U.S. person or you otherwise establish an exemption. Additional rules relating to information reporting requirements and backup withholding tax with respect to payments of the proceeds from the disposition of shares of our common stock are as follows:

- If the proceeds are paid to or through the U.S. office of a broker, the proceeds generally will be subject to backup withholding tax and information reporting, unless you certify under penalties of perjury (usually on IRS Form W-8BEN or IRS Form W-8BEN-E) that you are not a U.S. person or you otherwise establish an exemption.

- If the proceeds are paid to or through a non-U.S. office of a broker that is not a U.S. person and is not a foreign person with certain specified U.S. connections (a "U.S.-related person"), information reporting and backup withholding tax generally will not apply.

- If the proceeds are paid to or through a non-U.S. office of a broker that is a U.S. person or a U.S.-related person, the proceeds generally will be subject to information reporting (but not to backup withholding tax), unless you certify under penalties of perjury (usually on IRS Form W-8BEN or IRS Form W-8BEN-E) that you are not a U.S. person or you otherwise establish an exemption.

Any amounts withheld under the backup withholding tax rules may be allowed as a refund or a credit against your U.S. federal income tax liability, provided the required information is timely furnished by you to the IRS.

**Legislation Affecting Taxation of Common Stock Held By or Through Foreign Entities**

Withholding taxes may be imposed under Sections 1471 to 1474 of the Code (such Sections commonly referred to as the Foreign Account Tax Compliance Act, or "FATCA") on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities. Specifically, a 30% withholding tax may be imposed on dividends on, or gross proceeds from the sale or other disposition of, our common stock paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Code) (including, in some cases, when such foreign financial institution or non-financial foreign entity is acting as an intermediary), unless (1) the foreign financial institution undertakes certain diligence and reporting obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Code) or furnishes identifying information regarding each direct and indirect substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules.

If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in (1) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States-owned foreign entities" (each as defined in the Code), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

**Table of Contents**

Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA generally applies to payments of dividends on our common stock at any time, and will apply to payments of gross proceeds from the sale or other disposition of such stock on or after January 1, 2019.

THE SUMMARY OF MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES ABOVE IS INCLUDED FOR GENERAL INFORMATION PURPOSES ONLY. POTENTIAL PURCHASERS OF OUR COMMON STOCK ARE URGED TO CONSULT THEIR OWN TAX ADVISORS TO DETERMINE THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSIDERATIONS OF PURCHASING, OWNING AND DISPOSING OF OUR COMMON STOCK.

108

**Table of Contents**

**UNDERWRITING**

Merrill Lynch, Pierce, Fenner & Smith Incorporated and Morgan Stanley & Co. LLC are acting as representatives of each of the underwriters named below. Subject to the terms and conditions set forth in an underwriting agreement among us, the selling stockholders and the underwriters, the selling stockholders have agreed to sell to the underwriters, and each of the underwriters has agreed, severally and not jointly, to purchase from the selling stockholders, the number of shares of common stock set forth opposite its name below.

| Underwriter | Number of Shares |
|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | |
| Morgan Stanley & Co. LLC | |
| Goldman Sachs & Co. LLC | |
| J.P. Morgan Securities LLC | |
| Jefferies LLC | |
| Robert W. Baird & Co. Incorporated | |
| Telsey Advisory Group LLC | |
| William Blair & Company, L.L.C. | |
| Total | |

Subject to the terms and conditions set forth in the underwriting agreement, the underwriters have agreed, severally and not jointly, to purchase all of the shares sold under the underwriting agreement if any of these shares are purchased. If an underwriter defaults, the underwriting agreement provides that the purchase commitments of the non-defaulting underwriters may be increased or the underwriting agreement may be terminated.

We and the selling stockholders have agreed to indemnify the several underwriters against certain liabilities, including liabilities under the Securities Act, or to contribute to payments the underwriters may be required to make in respect of those liabilities.

The underwriters are offering the shares, subject to prior sale, when, as and if issued to and accepted by them, subject to approval of legal matters by their counsel, including the validity of the shares, and other conditions contained in the underwriting agreement, such as the receipt by the underwriters of officer's certificates and legal opinions. The underwriters reserve the right to withdraw, cancel or modify offers to the public and to reject orders in whole or in part.

**Commissions and Discounts**

The representatives have advised us and the selling stockholders that the underwriters propose initially to offer the shares to the public at the public offering price set forth on the cover page of this prospectus and to dealers at that price less a concession not in excess of $ per share. After the initial offering, the public offering price, concession or any other term of the offering may be changed.

The following table shows the public offering price, underwriting discount and proceeds before expenses to the selling stockholders. The information assumes either no exercise or full exercise by the underwriters of their option to purchase additional shares from the selling stockholders.

| | Per Share | Without Option | With Option |
|---|---|---|---|
| Public offering price | $ | $ | $ |
| Underwriting discount | $ | $ | $ |
| Proceeds, before expenses, to the selling stockholders | $ | $ | $ |

109

Table of Contents

The expenses of the offering, not including the underwriting discount, are estimated at $ and are payable by us.

**Option to Purchase Additional Shares**

The selling stockholders have granted an option to the underwriters, exercisable for 30 days after the date of this prospectus, to purchase up to additional shares at the public offering price, less the underwriting discount. If the underwriters exercise this option, each will be obligated, subject to conditions contained in the underwriting agreement, to purchase from the selling stockholders a number of additional shares proportionate to that underwriter's initial amount reflected in the above table.

**Reserved Shares**

At our request, the underwriters have reserved for sale, at the initial public offering price, up to of the shares offered by this prospectus for sale to some of our directors, officers, employees, distributors, dealers, business associates and related persons. If these persons purchase reserved shares, this will reduce the number of shares available for sale to the general public. Any reserved shares that are not so purchased will be offered by the underwriters to the general public on the same terms as the other shares offered by this prospectus.

**No Sales of Similar Securities**

We, the selling stockholders, our executive officers and directors and certain of our other existing security holders have agreed not to sell or transfer any common stock or securities convertible into, exchangeable for, exercisable for, or repayable with common stock, for 180 days after the date of this prospectus without first obtaining the written consent of . Specifically, we and these other persons have agreed, with certain limited exceptions, not to directly or indirectly

- offer, pledge, sell or contract to sell any common stock,

- sell any option or contract to purchase any common stock,

- purchase any option or contract to sell any common stock,

- grant any option, right or warrant for the sale of any common stock,

- lend or otherwise dispose of or transfer any common stock, or

- enter into any swap or other agreement that transfers, in whole or in part, the economic consequence of ownership of any common stock whether any such swap or transaction is to be settled by delivery of shares or other securities, in cash or otherwise.

This lock-up provision applies to common stock and to securities convertible into or exchangeable or exercisable for or repayable with common stock. Subject to certain exceptions, it also applies to common stock owned now or acquired later by the person executing the agreement or for which the person executing the agreement later acquires the power of disposition.

**Listing**

We expect the shares to be approved for listing on the NYSE under the symbol "CURV." In order to meet the requirements for listing on that exchange, the underwriters have undertaken to sell a minimum number of shares to a minimum number of beneficial owners as required by that exchange.

110

**Table of Contents**

Before this offering, there has been no public market for our common stock. The initial public offering price will be determined through negotiations among us, the selling stockholders and the representatives. In addition to prevailing market conditions, the factors to be considered in determining the initial public offering price are

- the valuation multiples of publicly traded companies that the representatives believe to be comparable to us,

- our financial information,

- the history of, and the prospects for, our Company and the industry in which we compete,

- an assessment of our management, its past and present operations, and the prospects for, and timing of, our future net sales,

- the present state of our development,

- the above factors in relation to market values and various valuation measures of other companies engaged in activities similar to ours.

An active trading market for the shares may not develop. It is also possible that after the offering the shares will not trade in the public market at or above the initial public offering price.

The underwriters do not expect to sell more than 5% of the shares in the aggregate to accounts over which they exercise discretionary authority.

**Price Stabilization, Short Positions and Penalty Bids**

Until the distribution of the shares is completed, SEC rules may limit underwriters and selling group members from bidding for and purchasing our common stock. However, the representatives may engage in transactions that stabilize the price of the common stock, such as bids or purchases to peg, fix or maintain that price.

In connection with the offering, the underwriters may purchase and sell our common stock in the open market. These transactions may include short sales, purchases on the open market to cover positions created by short sales and stabilizing transactions. Short sales involve the sale by the underwriters of a greater number of shares than they are required to purchase in the offering. "Covered" short sales are sales made in an amount not greater than the underwriters' option to purchase additional shares described above. The underwriters may close out any covered short position by either exercising their option to purchase additional shares or purchasing shares in the open market. In determining the source of shares to close out the covered short position, the underwriters will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through the option granted to them. "Naked" short sales are sales in excess of such option. The underwriters must close out any naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of our common stock in the open market after pricing that could adversely affect investors who purchase in the offering. Stabilizing transactions consist of various bids for or purchases of shares of common stock made by the underwriters in the open market prior to the completion of the offering.

The underwriters may also impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount received by it because the representatives have repurchased shares sold by or for the account of such underwriter in stabilizing or short covering transactions.

Similar to other purchase transactions, the underwriters' purchases to cover the syndicate short sales may have the effect of raising or maintaining the market price of our common stock or preventing or retarding a

Table of Contents

decline in the market price of our common stock. As a result, the price of our common stock may be higher than the price that might otherwise exist in the open market. The underwriters may conduct these transactions on the , in the over-the-counter market or otherwise.

Neither we, the selling stockholders nor any of the underwriters make any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of our common stock. In addition, neither we nor any of the underwriters make any representation that the representatives will engage in these transactions or that these transactions, once commenced, will not be discontinued without notice.

**Electronic Distribution**

In connection with the offering, certain of the underwriters or securities dealers may distribute prospectuses by electronic means, such as e-mail.

**Other Relationships**

The underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include sales and trading, commercial and investment banking, advisory, investment management, investment research, principal investment, hedging, market making, brokerage and other financial and non-financial activities and services.

Some of the underwriters and their affiliates have engaged in, and may in the future engage in, investment banking and other commercial dealings in the ordinary course of business with us or our affiliates. They have received, or may in the future receive, customary fees and commissions for these transactions. Certain of the underwriters or their affiliates are agents, lenders and arrangers under the ABL Facility.

In addition, in the ordinary course of their business activities, the underwriters and their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers. Such investments and securities activities may involve securities and/or instruments of ours or our affiliates. The underwriters and their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

**Selling Restrictions**

*European Economic Area*

In relation to each member state of the European Economic Area, no offer of shares which are the subject of the offering has been, or will be made to the public in that Member State, other than under the following exemptions under the Prospectus Directive:

(a)     to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(b)     to fewer than 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive), subject to obtaining the prior consent of the Representatives for any such offer; or

(c)     in any other circumstances falling within Article 3(2) of the Prospectus Directive,

*provided* that no such offer of shares referred to in (a) to (c) above shall result in a requirement for the Company or any Representative to publish a prospectus pursuant to Article 3 of the Prospectus Directive, or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

112

Table of Contents

Each person located in a Member State to whom any offer of shares is made or who receives any communication in respect of an offer of shares, or who initially acquires any shares will be deemed to have represented, warranted, acknowledged and agreed to and with each Representative and the Company that (1) it is a "qualified investor" within the meaning of the law in that Member State implementing Article 2(1)(e) of the Prospectus Directive; and (2) in the case of any shares acquired by it as a financial intermediary as that term is used in Article 3(2) of the Prospectus Directive, the shares acquired by it in the offer have not been acquired on behalf of, nor have they been acquired with a view to their offer or resale to, persons in any Member State other than qualified investors, as that term is defined in the Prospectus Directive, or in circumstances in which the prior consent of the Representatives has been given to the offer or resale; or where shares have been acquired by it on behalf of persons in any Member State other than qualified investors, the offer of those shares to it is not treated under the Prospectus Directive as having been made to such persons.

The Company, the Representatives and their respective affiliates will rely upon the truth and accuracy of the foregoing representations, acknowledgments and agreements.

This prospectus has been prepared on the basis that any offer of shares in any Member State will be made pursuant to an exemption under the Prospectus Directive from the requirement to publish a prospectus for offers of shares. Accordingly any person making or intending to make an offer in that Member State of shares which are the subject of the offering contemplated in this prospectus may only do so in circumstances in which no obligation arises for the Company or any of the Representatives to publish a prospectus pursuant to Article 3 of the Prospectus Directive in relation to such offer. Neither the Company nor the Representatives have authorized, nor do they authorize, the making of any offer of shares in circumstances in which an obligation arises for the Company or the Representatives to publish a prospectus for such offer.

For the purposes of this provision, the expression an "offer of shares to the public" in relation to any shares in any Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the shares to be offered so as to enable an investor to decide to purchase or subscribe the shares, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State, the expression "Prospectus Directive" means Directive 2003/71/EC (as amended) and includes any relevant implementing measure in each Member State.

The above selling restriction is in addition to any other selling restrictions set out below.

### Notice to Prospective Investors in the United Kingdom

In addition, in the United Kingdom, this document is being distributed only to, and is directed only at, and any offer subsequently made may only be directed at persons who are "qualified investors" (as defined in the Prospectus Directive) (i) who have professional experience in matters relating to investments falling within Article 19 (5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended (the "Order") and/or (ii) who are high net worth companies (or persons to whom it may otherwise be lawfully communicated) falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons"). This document must not be acted on or relied on in the United Kingdom by persons who are not relevant persons. In the United Kingdom, any investment or investment activity to which this document relates is only available to, and will be engaged in with, relevant persons.

### Notice to Prospective Investors in Switzerland

The shares may not be publicly offered in Switzerland and will not be listed on the SIX Swiss Exchange ("SIX") or on any other stock exchange or regulated trading facility in Switzerland. This document has been prepared without regard to the disclosure standards for issuance prospectuses under art. 652a or art. 1156 of the Swiss Code of Obligations or the disclosure standards for listing prospectuses under art. 27 ff. of the SIX Listing Rules or the listing rules of any other stock exchange or regulated trading facility in Switzerland. Neither this

113

**Table of Contents**

document nor any other offering or marketing material relating to the shares or the offering may be publicly distributed or otherwise made publicly available in Switzerland.

Neither this document nor any other offering or marketing material relating to the offering, the Company, the shares have been or will be filed with or approved by any Swiss regulatory authority. In particular, this document will not be filed with, and the offer of shares will not be supervised by, the Swiss Financial Market Supervisory Authority FINMA (FINMA), and the offer of shares has not been and will not be authorized under the Swiss Federal Act on Collective Investment Schemes ("CISA"). The investor protection afforded to acquirers of interests in collective investment schemes under the CISA does not extend to acquirers of shares.

***Notice to Prospective Investors in the Dubai International Financial Centre***

This prospectus relates to an Exempt Offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority ("DFSA"). This prospectus is intended for distribution only to persons of a type specified in the Offered Securities Rules of the DFSA. It must not be delivered to, or relied on by, any other person. The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The DFSA has not approved this prospectus nor taken steps to verify the information set forth herein and has no responsibility for the prospectus. The shares to which this prospectus relates may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the shares offered should conduct their own due diligence on the shares. If you do not understand the contents of this prospectus you should consult an authorized financial advisor.

***Notice to Prospective Investors in Australia***

No placement document, prospectus, product disclosure statement or other disclosure document has been lodged with the Australian Securities and Investments Commission ("ASIC"), in relation to the offering. This prospectus does not constitute a prospectus, product disclosure statement or other disclosure document under the Corporations Act 2001 (the "Corporations Act"), and does not purport to include the information required for a prospectus, product disclosure statement or other disclosure document under the Corporations Act.

Any offer in Australia of the shares may only be made to persons (the "Exempt Investors") who are "sophisticated investors" (within the meaning of section 708(8) of the Corporations Act), "professional investors" (within the meaning of section 708(11) of the Corporations Act) or otherwise pursuant to one or more exemptions contained in section 708 of the Corporations Act so that it is lawful to offer the shares without disclosure to investors under Chapter 6D of the Corporations Act.

The shares applied for by Exempt Investors in Australia must not be offered for sale in Australia in the period of 12 months after the date of allotment under the offering, except in circumstances where disclosure to investors under Chapter 6D of the Corporations Act would not be required pursuant to an exemption under section 708 of the Corporations Act or otherwise or where the offer is pursuant to a disclosure document which complies with Chapter 6D of the Corporations Act. Any person acquiring shares must observe such Australian on-sale restrictions.

This prospectus contains general information only and does not take account of the investment objectives, financial situation or particular needs of any particular person. It does not contain any securities recommendations or financial product advice. Before making an investment decision, investors need to consider whether the information in this prospectus is appropriate to their needs, objectives and circumstances, and, if necessary, seek expert advice on those matters.

***Notice to Prospective Investors in Hong Kong***

The shares have not been offered or sold and will not be offered or sold in Hong Kong, by means of any document, other than (a) to "professional investors" as defined in the Securities and Futures Ordinance (Cap.

114

**Table of Contents**

571) of Hong Kong and any rules made under that Ordinance; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that Ordinance. No advertisement, invitation or document relating to the shares has been or may be issued or has been or may be in the possession of any person for the purposes of issue, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to shares which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance and any rules made under that Ordinance.

*Notice to Prospective Investors in Japan*

The shares have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (Law No. 25 of 1948, as amended) and, accordingly, will not be offered or sold, directly or indirectly, in Japan, or for the benefit of any Japanese Person or to others for re-offering or resale, directly or indirectly, in Japan or to any Japanese Person, except in compliance with all applicable laws, regulations and ministerial guidelines promulgated by relevant Japanese governmental or regulatory authorities in effect at the relevant time. For the purposes of this paragraph, "Japanese Person" shall mean any person resident in Japan, including any corporation or other entity organized under the laws of Japan.

*Notice to Prospective Investors in Singapore*

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of shares may not be circulated or distributed, nor may the shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275, of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the shares are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(a)    a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)    a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

securities (as defined in Section 239(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the shares pursuant to an offer made under Section 275 of the SFA except:

(a)    to an institutional investor or to a relevant person defined in Section 275(2) of the SFA, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

(b)    where no consideration is or will be given for the transfer;

(c)    where the transfer is by operation of law;

(d)    as specified in Section 276(7) of the SFA; or

115

**Table of Contents**

(e)    as specified in Regulation 32 of the Securities and Futures (Offers of Investments) (Shares and Debentures) Regulations 2005 of Singapore.

***Notice to Prospective Investors in Canada***

The shares may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 *Prospectus Exemptions* or subsection 73.3(1) of the *Securities Act* (Ontario), and are permitted clients, as defined in National Instrument 31-103 *Registration Requirements, Exemptions and Ongoing Registrant Obligations*. Any resale of the shares must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 (or, in the case of securities issued or guaranteed by the government of a non-Canadian jurisdiction, section 3A.4) of National Instrument 33-105 *Underwriting Conflicts* (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

116

**Table of Contents**

## LEGAL MATTERS

The validity of the common stock offered hereby will be passed upon for us by Kirkland & Ellis LLP, New York, New York. Kirkland & Ellis LLP represents entities affiliated with Sycamore in connection with legal matters. Certain legal matters will be passed upon for the underwriters by Latham & Watkins LLP, New York, New York.

## EXPERTS

The consolidated financial statements as of January 30, 2016 and January 28, 2017 and for each of the two years in the period ended January 28, 2017 included in this prospectus have been so included in reliance on the report of PricewaterhouseCoopers LLP, an independent registered public accounting firm, given on the authority of said firm as experts in auditing and accounting.

The consolidated financial statements of Torrid Inc. as of and for the period ended January 31, 2015, included in this prospectus have been audited by Ernst & Young LLP, independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such report given on the authority of such firm as experts in auditing and accounting.

## CHANGE IN AUDITORS

On December 8, 2015, the Company's board of directors engaged PricewaterhouseCoopers LLP ("PwC") as our independent registered public accounting firm for the year ended January 30, 2016. As a result of the engagement of PwC, we dismissed Ernst & Young LLP ("EY") as our independent auditor, which dismissal was approved by our board of directors.

During the audit of the year ended January 31, 2015 and the subsequent interim period up to the date of EY's dismissal, there were no disagreements with EY on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which, if not resolved to EY's satisfaction, would have caused it to make reference to the subject matter of the disagreement in connection with its report for such period and there were no "reportable events" as such term is defined in Item 304(a)(1)(v) of Regulation S-K. The report of EY on the financial statements of the Company as of and for the year ended January 31, 2015 did not contain any adverse opinions or disclaimer of opinion and was not qualified as to uncertainty, audit scope or accounting principles. During the fiscal year ended January 31, 2015, and the subsequent interim period through December 8, 2015, neither the Company, nor any person on its behalf, consulted PwC with respect to either (i) the application of accounting principles to a specified transaction, either completed or proposed; or the type of audit opinion that might be rendered on the Company's financial statements, and no written report or oral advice was provided to the Company by PwC that PwC concluded was an important factor considered by the Company in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a disagreement, as that term is described in Item 304(a)(1)(iv) of Regulation S-K and the related instructions to Item 304 of Regulation S-K, or a reportable event, as that term is described in Item 304(a)(1)(v) of Regulation S-K.

We requested EY to provide us with a letter addressed to the SEC stating whether or not EY agrees with the above disclosure. A copy of EY's letter, dated July 10, 2017, is attached as Exhibit 16.1 to the registration statement of which this prospectus is a part.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act that registers the shares of our common stock to be sold in this offering. The registration statement, including the attached

117

**Table of Contents**

exhibits, contains additional relevant information about us and our common stock. The rules and regulations of the SEC allow us to omit from this document certain information included in the registration statement.

You may read and copy the reports and other information we file with the SEC at the SEC's Public Reference Room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. You may also obtain copies of this information by mail from the public reference section of the SEC, 100 F Street, N.E., Washington, D.C. 20549, at prescribed rates. You may obtain information regarding the operation of the public reference room by calling 1-800-SEC-0330. The SEC also maintains a website that contains reports, proxy statements and other information about issuers, like us, who file electronically with the SEC. The address of that website is http://www.sec.gov. This reference to the SEC's website is an inactive textual reference only and is not a hyperlink.

Upon completion of this offering, we will become subject to the reporting, proxy and information requirements of the Exchange Act, and as a result will be required to file periodic reports, proxy statements and other information with the SEC. These periodic reports, proxy statements and other information will be available for inspection and copying at the SEC's public reference room and the website of the SEC referred to above, as well as on our website, www.torrid.com. This reference to our website is an inactive textual reference only and is not a hyperlink. The contents of our website are not part of this prospectus, and you should not consider the contents of our website in making an investment decision with respect to our common stock.

We intend to furnish our stockholders with annual reports containing audited financial statements and make available to our stockholders quarterly reports for the first three quarters of each fiscal year containing unaudited interim financial information.

118

Table of Contents

**TORRID INC.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page No. |
|---|---|
| Reports of Independent Registered Public Accounting Firms | F-2 |
| **Consolidated Financial Statements** | |
| Consolidated Balance Sheets as of January 30, 2016 and January 28, 2017 | F-4 |
| Consolidated Statements of Operations and Comprehensive Income (Loss) for the fiscal years ended January 31, 2015, January 30, 2016 and January 28, 2017 | F-5 |
| Consolidated Statements of Stockholder's Equity for the fiscal years ended January 31, 2015, January 30, 2016 and January 28, 2017 | F-6 |
| Consolidated Statements of Cash Flows for the fiscal years ended January 31, 2015, January 30, 2016 and January 28, 2017 | F-7 |
| **Notes to Consolidated Financial Statements** | F-8 |
| **Schedule I—Condensed Financial Information of the Registrant** | F-30 |
| **Unaudited Consolidated Financial Statements** | |
| Consolidated Balance Sheets as of January 28, 2017 and April 29, 2017 | F-34 |
| Consolidated Statements of Operations and Comprehensive Income for the three months ended April 30, 2016 and the three months ended April 29, 2017 | F-35 |
| Consolidated Statements of Cash Flows for the three months ended April 30, 2016 and the three months ended April 29, 2017 | F-36 |
| **Notes to Unaudited Consolidated Financial Statements** | F-37 |

F-1

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Stockholder of Torrid Inc.

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations and comprehensive income (loss), of stockholder's equity, and of cash flows present fairly, in all material respects, the financial position of Torrid Inc. and its subsidiaries as of January 30, 2016 and January 28, 2017, and the results of their operations and their cash flows for each of the two years in the period ended January 28, 2017 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 3 to the consolidated financial statements, the Company changed the manner in which it classifies deferred taxes as of January 28, 2017.

**/s/ PricewaterhouseCoopers LLP**
Irvine, California
April 13, 2017

F-2

**Table of Contents**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Stockholder of Torrid Inc.

We have audited the consolidated statements of income and comprehensive income, parent company equity and cash flows of Torrid Inc. (and subsidiaries) for the year ended January 31, 2015. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Torrid Inc. and subsidiaries at January 31, 2015, and the consolidated results of their operations and their cash flows for the year ended January 31, 2015, in conformity with U.S. generally accepted accounting principles.

/s/ Ernst & Young LLP
Los Angeles, California
May 17, 2017

Table of Contents

**TORRID INC.**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share and per share data)**

|  | January 30, 2016 | January 28, 2017 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 33,164 | $ 9,583 |
| Restricted cash | 99 | 102 |
| Inventory | 67,225 | 103,371 |
| Prepaid expenses and other current assets | 11,887 | 10,130 |
| Deferred tax asset | 6,488 | — |
| Total current assets | 118,863 | 123,186 |
| Property and equipment, net | 88,819 | 131,512 |
| Deposits and other noncurrent assets | 413 | 386 |
| Deferred tax asset | — | 1,280 |
| Intangibles, net | 9,909 | 9,422 |
| Total assets | $ 218,004 | $ 265,786 |
| **Liabilities and stockholder's equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 16,545 | $ 19,795 |
| Accrued and other current liabilities | 47,568 | 66,828 |
| Borrowings under credit facility | — | 6,875 |
| Due to related parties | 8,732 | 16,605 |
| Income taxes payable | 6,071 | 2,695 |
| Total current liabilities | 78,916 | 112,798 |
| Deferred rent and other noncurrent liabilities | 20,282 | 35,409 |
| Deferred tax liability | 10,472 | 2,790 |
| Deferred compensation | 1,051 | 2,672 |
| Related party promissory note | 45,000 | 15,209 |
| Total liabilities | 155,721 | 168,878 |
| Commitments and contingencies (see Note 13) | | |
| **Stockholder's equity:** | | |
| Common shares: $0.01 par value; 1,000 shares authorized; 1 share issued and outstanding at January 30, 2016 and January 28, 2017 | — | — |
| Additional paid-in capital | 261,667 | 325,349 |
| Accumulated deficit | (199,351) | (228,448) |
| Accumulated other comprehensive income (loss) | (33) | 7 |
| Total stockholder's equity | 62,283 | 96,908 |
| Total liabilities and stockholder's equity | $ 218,004 | $ 265,786 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-4

**Table of Contents**

**TORRID INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**AND COMPREHENSIVE INCOME (LOSS)**
**(in thousands, except share data)**

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | January 31, 2015 | January 30, 2016 | January 28, 2017 |
| Net sales | $ 292,771 | $ 440,722 | $ 640,172 |
| Cost of goods sold | 187,201 | 267,755 | 388,517 |
| Gross profit | 105,570 | 172,967 | 251,655 |
| Selling, general and administrative expenses | 101,153 | 152,193 | 191,655 |
| Share-based compensation | 750 | 56 | 63,901 |
| Impairment charges (including goodwill impairment of $139,599 in fiscal year 2015) | 383 | 198,784 | 3,214 |
| Income (loss) from operations | 3,284 | (178,066) | (7,115) |
| Interest expense and other, net | — | (460) | (260) |
| Income (loss) before provision (benefit) for income taxes | 3,284 | (178,526) | (7,375) |
| Provision (benefit) for income taxes | 1,664 | (14,742) | 21,722 |
| Net income (loss) | $ 1,620 | $ (163,784) | $ (29,097) |
| Comprehensive income (loss): | | | |
| Net income (loss) | $ 1,620 | $ (163,784) | $ (29,097) |
| Other comprehensive income (loss): | | | |
| Foreign currency translation adjustment | — | (33) | 40 |
| Total other comprehensive income (loss) | — | (33) | 40 |
| Comprehensive income (loss) | $ 1,620 | $ (163,817) | $ (29,057) |
| **Net loss per share:** | | | |
| Basic and diluted | n/a | $ (163,784) | $ (29,097) |
| **Weighted average number of shares:** | | | |
| Basic and diluted | n/a | 1 | 1 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-5

Table of Contents

**TORRID INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDER'S EQUITY**
**(in thousands, except share data)**

| | Common Shares | | Additional Paid-In Capital | Hot Topic, Inc. Investment in Torrid LLC | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Total Stockholder's Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| **Balance at February 1, 2014** | — | $ — | $ — | $ 259,507 | $ — | $ — | $ 259,507 |
| Net income | — | — | — | 1,620 | — | — | 1,620 |
| Net transactions with Hot Topic, Inc. | — | — | — | (21,505) | — | — | (21,505) |
| **Balance at January 31, 2015** | — | — | — | 239,622 | — | — | 239,622 |
| Net income (loss) | — | — | — | 35,567 | (199,351) | — | (163,784) |
| Reclassification of Hot Topic, Inc. investment in Torrid LLC | — | — | 270,805 | (270,805) | — | — | — |
| Elimination of equity in connection with acquisition of Torrid LLC from Hot Topic, Inc. (see Note 1) | — | — | (55,000) | — | — | — | (55,000) |
| Net transactions with Hot Topic, Inc. | — | — | — | (4,384) | — | — | (4,384) |
| Capital contribution from parent | 1 | 0.01 | 45,000 | — | — | — | 45,000 |
| Capital contribution from parent for incentive units | — | — | 862 | — | — | — | 862 |
| Other comprehensive loss | — | — | | — | — | (33) | (33) |
| **Balance at January 30, 2016** | 1 | 0.01 | 261,667 | — | (199,351) | (33) | 62,283 |
| Net loss | — | — | — | — | (29,097) | — | (29,097) |
| Capital contribution from parent for incentive units | — | — | 63,682 | — | — | — | 63,682 |
| Other comprehensive income | — | — | — | — | — | 40 | 40 |
| **Balance at January 28, 2017** | 1 | $ 0.01 | $ 325,349 | $ — | $ (228,448) | $ 7 | $ 96,908 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-6

Table of Contents

**TORRID INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | January 31, 2015 | January 30, 2016 | January 28, 2017 |
|---|---|---|---|
| | | **Fiscal Year Ended** | |
| **OPERATING ACTIVITIES** | | | |
| Net income (loss) | $ 1,620 | $ (163,784) | $ (29,097) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation and amortization | 14,446 | 13,744 | 16,870 |
| Loss on disposal of property and equipment | 254 | 223 | 609 |
| Impairment of goodwill, tangible and intangible assets | 383 | 198,784 | 3,214 |
| Share-based compensation | 750 | 56 | 63,682 |
| Deferred taxes | (925) | (24,064) | (2,474) |
| Gift card breakage | (219) | (406) | (705) |
| Non cash foreign currency transaction (gain) loss | — | 209 | (149) |
| Changes in operating assets and liabilities: | | | |
| Inventory | (9,437) | (26,273) | (36,107) |
| Prepaid expenses and other current assets | (3,103) | (5,747) | 1,757 |
| Deposits and other noncurrent assets | (248) | 316 | (44) |
| Accounts payable | 3,230 | 7,509 | 3,250 |
| Accrued and other current liabilities | 8,903 | 24,338 | 17,257 |
| Deferred rent and other noncurrent liabilities | 7,494 | 9,930 | 15,127 |
| Deferred compensation | — | — | 1,621 |
| Due to related parties | 964 | 6,060 | 7,523 |
| Income taxes payable | 2,589 | 6,071 | (3,376) |
| Other | — | (99) | (3) |
| Net cash provided by operating activities | 26,701 | 46,867 | 58,955 |
| **INVESTING ACTIVITIES** | | | |
| Acquisition of Torrid LLC from Hot Topic, Inc. | — | (55,000) | — |
| Purchases of property and equipment | (30,974) | (40,551) | (59,688) |
| Net cash used in investing activities | (30,974) | (95,551) | (59,688) |
| **FINANCING ACTIVITIES** | | | |
| Capital contribution from parent | — | 45,000 | — |
| Proceeds from related party promissory note | — | 45,000 | — |
| Principal payments on related party promissory note | — | — | (29,791) |
| Proceeds from credit facility | — | — | 60,355 |
| Principal payments on credit facility | — | — | (53,480) |
| Net transactions with Hot Topic Inc., excluding noncash items | 4,300 | (7,895) | — |
| Deferred financing costs | — | (350) | — |
| Net cash provided (used in) by financing activities | 4,300 | 81,755 | (22,916) |
| Increase (decrease) in cash and cash equivalents | 27 | 33,071 | (23,649) |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | — | (62) | 68 |
| Cash and cash equivalents at beginning of period | 128 | 155 | 33,164 |
| Cash and cash equivalents at end of period | $ 155 | $ 33,164 | $ 9,583 |
| **SUPPLEMENTAL INFORMATION** | | | |
| Cash paid during the period for interest related to the promissory note and credit facility | $ — | $ 130 | $ 463 |
| Cash paid during the period for income taxes | $ — | $ 1,278 | $ 27,580 |
| **SUPPLEMENTAL DISCLOSURE OF NONCASH INVESTING ACTIVITIES** | | | |
| Property and equipment purchases included in accounts payable and accrued liabilities | $ 4,271 | $ 5,696 | $ 8,412 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-7

**Table of Contents**

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1. Basis of Presentation and Description of the Business**

Torrid Inc. (formerly known as Torrid Holding Corp.), or Torrid, was incorporated in Delaware on April 8, 2015 and is a wholly owned subsidiary of our parent, Torrid Holding LLC. Torrid Holding LLC is majority-owned by investment funds managed by Sycamore Partners Management, LLC, or Sycamore. Throughout these financial statements, the terms "we," "us," "our," "company" and similar references refer to Torrid and its consolidated subsidiaries which collectively operated as a separate company for the periods after our acquisition of Torrid LLC from Hot Topic, Inc., or Hot Topic, also majority-owned by investment funds managed by Sycamore, on May 1, 2015 and refer to Torrid which operated as part of Hot Topic for the period prior to our acquisition of Torrid LLC.

Our fiscal year ends on the Saturday nearest to January 31 and each fiscal year is generally comprised of four 13-week quarters (although in years with 53 weeks, the fourth quarter is comprised of 14 weeks). Fiscal years are identified in this prospectus according to the calendar year in which they begin. For example, references to "fiscal year 2016" or similar references refer to the fiscal year ended January 28, 2017.

On May 1, 2015, Hot Topic entered into a Contribution Agreement pursuant to which Hot Topic contributed all of the existing assets and liabilities related to its former Torrid business to a newly-formed, separate and wholly-owned subsidiary of Hot Topic Torrid LLC. Immediately thereafter, on May 1, 2015, Hot Topic entered into a purchase agreement with Torrid Inc., pursuant to which Hot Topic sold all of its issued and outstanding equity interests in Torrid LLC to us for cash consideration of $55.0 million. This acquisition was accounted for as a transaction between entities under common control under ASC 805, *Business Combinations*. In connection with the separation and purchase transaction, we entered into a transition services agreement with Hot Topic as further discussed in "Note 8 – Related Party Transactions." This transaction is referred to herein as the "Separation."

For the periods presented prior to the Separation, fiscal year 2014 and the portion of fiscal year 2015 from February 1, 2015 to May 2, 2015, Torrid was included within Hot Topic's business and did not operate as a standalone company. The results of operations and cash flows for this period included herein were derived from Hot Topic's consolidated financial statements and accounting records as if Hot Topic's Torrid business had been operated as a standalone business prior to the Separation. The financial position, results of operations and cash flows for this period include certain assets and liabilities that are specifically identifiable or attributable to Torrid, and also include an allocation of expenses related to certain Hot Topic corporate functions, including senior management, distribution, legal, human resources, finance, general and administrative and information technology. These expenses have been allocated to us based on direct usage or benefit where identifiable, with the remainder allocated on a pro rata basis of revenues, headcount, store count, units shipped and received, square footage or other measures. We consider the expense allocation methodology and results to be reasonable; however, the allocations may not be indicative of the actual expenses that would have been incurred had we operated as a separate company for this period. Torrid's results of operations and cash flows for the period following the Separation are as a result of operating Torrid as a separate company.

We reclassified the pre-separation $270.8 million Hot Topic investment in Torrid LLC to our additional paid-in capital in the consolidated statements of stockholder's equity. This pre-separation balance, which includes Torrid LLC's net transactions with Hot Topic, primarily relates to Torrid LLC's intercompany transactions with Hot Topic when it was included in Hot Topic's Torrid business, which were effectively settled in our consolidated financial statements at the time the transactions were recorded. In addition, accumulated deficit of $199.4 million in the consolidated statements of stockholder's equity as of January 30, 2016 includes $35.6 million of pre-acquisition activity that is part of the Hot Topic investment reclassified to our stockholder's equity.

**Table of Contents**

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*Description of Business* We are a branded omni-channel retailer of apparel, intimates and accessories targeting the 25- to 40-year-old woman who is curvy and wears sizes 10 to 30. We generate revenues primarily through our stores in the United States of America, Puerto Rico and Canada, and through our e-commerce platform www.torrid.com.

**Note 2. Summary of Significant Accounting Policies**

*Principles of Consolidation* The consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America, or GAAP. The consolidated financial statements include our accounts and those of our wholly owned subsidiaries. All significant intercompany transactions and balances have been eliminated in consolidation.

*Segment Reporting* We have determined that we have one reportable segment, which includes the operation of our e-commerce platform and stores. The single segment was identified based on how the Chief Operating Decision Maker, who we have determined to be our Chief Executive Officer, manages and evaluates performance and allocates resources. Revenues and long-lived assets relating to our operations in Canada and Puerto Rico during fiscal years 2014, 2015 and 2016 and as of the end of the same periods were not material, and therefore, are not reported separately from domestic revenues and long-lived assets.

Our e-commerce platform net sales were 27%, 28% and 33% of our net sales, in fiscal years 2014, 2015 and 2016, respectively.

*Use of Estimates* We are required to make certain estimates and assumptions in order to prepare consolidated financial statements in conformity with GAAP. Such estimates and assumptions affect the reported amounts of assets, liabilities, revenues and expenses and disclosure of contingent assets and liabilities in the consolidated financial statements and accompanying notes. Our most significant estimates include, but are not limited to, the valuation of inventory balances, the determination of sales returns, the assessments related to the valuation of long-lived assets for impairment, estimates related to our loyalty program, the recoverability of deferred taxes, the determination of uncertain tax positions, the valuation of incentive units and the determination of gift card breakage. The estimation process required to prepare our consolidated financial statements requires assumptions to be made about future events and conditions, and as such, is inherently subjective and uncertain. Our actual results could differ materially from those estimates.

*Concentration Risks* We consider all highly liquid investments with maturities of less than three months when purchased to be cash equivalents. All credit and debit card receivable balances are also classified as cash and cash equivalents. As of the end of fiscal years 2015 and 2016, the amounts due from third party financial institutions for these transactions classified as cash and cash equivalents totaled $4.4 million and $6.1 million, respectively. Cash and cash equivalents used primarily for working capital purposes is maintained with various major third party financial institutions in amounts which are in excess of the Federal Deposit Insurance Corporation, or FDIC, insurance limits. We are potentially exposed to a concentration of credit risk when cash and cash equivalent deposits in these financial institutions are in excess of FDIC limits. We consider the credit risk associated with these financial instruments to be minimal as cash and cash equivalents are held by financial institutions with high credit ratings and we have not historically sustained any credit losses associated with our cash and cash equivalents balances.

In addition, our largest supplier accounted for approximately 11% of total net purchases in fiscal year 2016 and no one supplier accounted for more than 10% of total net purchases in fiscal years 2015 and 2014.

*Fair Value of Financial Instruments* We carry certain of our assets and liabilities at fair value in accordance with GAAP. Fair value is defined as the exchange price that would be received for an asset or paid to

F-9

Table of Contents

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. We consider carrying amounts of cash and cash equivalents and accounts payable to approximate fair value because of the short maturity of these financial instruments. We consider the carrying amount of the ABL Facility (as defined in "Note 9—Debt Financing Arrangements") to approximate fair value because of the variable interest rates of the facility. See "Note 15 – Fair Value Measurements" for more details about how we determine the fair value our financial instruments.

*Inventory* Inventory is valued at the lower of moving average cost or market. We make certain assumptions regarding net realizable value in order to assess whether our inventory is recorded properly at the lower of cost or market. These assumptions are based on both historical average selling price experience and current selling price information.

Physical inventory counts are conducted during the year to determine actual inventory on hand and shrinkage. We accrue our estimated inventory shrinkage for the period between the last physical count and current balance sheet date.

*Property and Equipment* Property and equipment are recorded at cost less accumulated depreciation. Major renewals and improvements are capitalized, while routine maintenance and repairs are expensed as incurred. The carrying amounts of property and equipment sold or retired and the related accumulated depreciation are eliminated in the year of disposal, and any resulting gains or losses are included in the consolidated statements of operations and comprehensive income (loss). Application and development costs associated with internally developed software such as salaries of employees and payments made to third parties and consultants working on the software development are capitalized. Subsequent additions, modifications or upgrades to internal-use software are capitalized only to the extent that they constitute major enhancements. Capitalized internal-use software costs are amortized using the straight-line method over their estimated useful lives, which are generally three years. During fiscal years 2014, 2015 and 2016, we amortized approximately $0.2 million, $0.1 million and $0.2 million, respectively, of internal-use software costs. Additionally, as of the end of fiscal years 2015 and 2016, the net book value of capitalized internal-use software totaled approximately $0.3 million.

Depreciation expense is calculated using the straight-line method over the following estimated useful lives:

| | |
|---|---|
| Leasehold improvements | shorter of the 3 to 10 year estimated useful life or the respective lease term |
| Furniture, fixtures and equipment | 2 to 10 years |
| Software and licenses | 3 to 7 years |

The carrying value of property and equipment is subject to assessment for potential impairment whenever events or changes in circumstances indicate that an asset's carrying value may not be recoverable, as further described below.

*Definite-Lived Assets* We assess the carrying value of long-lived assets for potential impairment whenever events or changes in circumstances indicate that the carrying value may not be recoverable. We group and evaluate long-lived assets for impairment at the individual store level, which is the lowest level at which individual cash flows can be identified. Factors we consider important that could trigger an impairment review of our stores or online operations include significant underperformance relative to expected historical or projected future operating results, a significant change in the manner of the use of the asset or a significant negative industry or economic trend. When we determine the carrying value of long-lived assets may not be recoverable

F-10

**Table of Contents**

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

based upon the existence of one or more of the aforementioned factors, impairment is measured based on a projected discounted cash flow method using a discount rate. These cash flows are calculated by netting future estimated sales of each store against estimated cost of goods sold, store occupancy costs and other store operating expenses such as payroll, supplies, repairs and maintenance and credit/debit card fees. Changes in these assumptions may cause the fair value to be significantly impacted. In the event future performance is lower than forecasted results, future cash flows may be lower than expected, which could result in future impairment charges. While we believe that recently opened stores will provide sufficient cash flow, material changes in financial performance could result in future store impairment charges.

*Goodwill and Indefinite-Lived Intangible Assets* Goodwill and indefinite-lived intangible assets are not amortized, but are reviewed for impairment at least annually, or more frequently when events or circumstances indicate the carrying value may not be recoverable. Judgments regarding indicators of potential impairment are based on market conditions and operational performance of the business.

At the end of the fiscal third quarter, we perform an impairment analysis of goodwill and indefinite-lived intangible assets. We may assess our goodwill and indefinite-lived intangible assets for impairment initially using a qualitative approach ("step zero") to determine whether conditions exist to indicate that it is more likely than not that the fair value of a reporting unit is less than its carrying value. If we conclude, based on our assessment of relevant events, facts and circumstances that it is more likely than not that a reporting unit's carrying value is greater than its fair value, then a quantitative analysis will be performed to determine if there is any impairment. We may also elect to initially perform a quantitative analysis instead of starting with step zero. The quantitative assessment for goodwill is a two-step assessment. "Step one" requires comparing the carrying value of a reporting unit, including goodwill, to its fair value using the income approach. The income approach uses a discounted cash flow model, which involves significant estimates and assumptions, including preparation of revenue and profitability growth forecasts, selection of a discount rate, and selection of a terminal year multiple. If the fair value of the respective reporting unit exceeds its carrying amount, goodwill is not considered to be impaired and no further testing is required. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test is to measure the amount of impairment loss, if any. "Step two" compares the implied fair value of goodwill to the carrying amount of goodwill. The implied fair value of goodwill is determined by a hypothetical purchase price allocation using the reporting unit's fair value as the purchase price. If the carrying amount of goodwill exceeds the implied fair value, an impairment charge is recorded to write down goodwill to its implied fair value.

*Loyalty Program* On July 24, 2014, we relaunched our loyalty program, Torrid Insider, in all our stores and on torrid.com. Under this program, customers accumulate points based on purchase activity and upon reaching a certain point level, customers can earn awards that may only be redeemed for merchandise. Unredeemed points are subject to expiration after 13 months without additional purchase activity and unredeemed awards expire 45 days after issuance. We use historical redemption rates to estimate the value of future award redemptions and we recognize the estimated value of these future awards as a reduction of revenue in the consolidated statements of operations and comprehensive income (loss) in the period the points are earned by the customer. As of the end of fiscal years 2015 and 2016, we had $5.0 million and $6.5 million, respectively, in deferred revenue related to the loyalty program included in accrued and other current liabilities in the consolidated balance sheets. We recorded $2.1 million, $2.9 million and $1.5 million as a reduction of net sales in fiscal years 2014, 2015 and 2016, respectively. Future revisions to the estimated liability may result in changes to net sales.

*Self-Insurance* We are self-insured for certain losses related to medical and workers' compensation claims although we maintain stop loss coverage with third party insurers to limit our total liability exposure. In general, our self-insurance reserves are recorded on an undiscounted basis. The estimate of our self-insurance

F-11

**Table of Contents**

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

liability involves uncertainty since we must use judgment to estimate the ultimate cost that will be incurred to settle reported claims and unreported claims for incidents incurred but not reported as of the balance sheet date. When estimating our self-insurance liability, we consider a number of factors, which include historical claim experience and valuations provided by independent third party actuaries. While the ultimate amount of claims incurred is dependent on future developments, we believe recorded reserves are adequate to cover the future payment of claims. However, it is possible that recorded reserves may not be adequate to cover the future payment of claims. Adjustments, if any, to estimates recorded resulting from ultimate claim payments will be reflected in our consolidated statements of operations and comprehensive income (loss) in the periods in which such adjustments are known.

*Comprehensive Income (Loss)* Comprehensive income (loss) includes all changes in equity during a period except those that resulted from investments by, or distributions to, stockholders. Other comprehensive income (loss) refers to revenues, expenses, gains and losses that, under GAAP, are included in comprehensive income (loss), but excluded from net income (loss) as these amounts are recorded directly as an adjustment to stockholder's equity. Components of our comprehensive income (loss) include net income (loss) and foreign currency translation adjustments. We did not have any foreign currency translation adjustments in fiscal year 2014 and such adjustments were not material in fiscal years 2015 and 2016.

*Foreign Currency Translation* The functional currency for our wholly owned foreign subsidiaries included in these consolidated financial statements that are domiciled outside of the United States is the applicable local currency. Assets and liabilities of our foreign subsidiaries are translated into United States dollars at the exchange rate in effect on the balance sheet date. Revenues and expenses are translated at the average rate in effect during the period. Unrealized translation gains and losses are recorded as a cumulative translation adjustment, which is included in the consolidated statements of stockholder's equity as a component of accumulated other comprehensive income (loss). Adjustments that arise from exchange rate changes on transactions denominated in a currency other than the local currency are included in selling, general and administrative expenses in the consolidated statements of operations and comprehensive income (loss) as incurred.

*Revenue Recognition* Revenue is generally recognized at our store locations at the point at which the customer receives and pays for the merchandise at the register. For online sales, revenue is recognized upon delivery to the customer. Sales are recognized net of merchandise returns, which are reserved for based on historical experience. As of the end of fiscal years 2014, 2015 and 2016, merchandise returns reserves were $0.6 million, $0.8 million and $1.7 million, respectively. Revenue from gift cards and store merchandise credits is recognized at the time of redemption. Shipping and handling revenues from our websites are included as a component of net sales. Sales taxes collected from customers and remitted directly to governmental authorities are excluded from net sales.

Gift card breakage is income recognized due to the non-redemption of a portion of gift cards sold by us for which a liability was recorded in prior periods. We recognize estimated gift card breakage as a component of net sales in proportion to actual gift card redemptions over the period that remaining gift card values are redeemed. Our estimated gift card breakage rate is approximately 3.7%. While customer redemption patterns result in estimated gift card breakage, changes in our customers' behavior could impact the amount that ultimately is unused and could affect the amount recognized as a component of net sales. During fiscal years 2014, 2015 and 2016, we recognized $0.2 million, $0.2 million and $0.7 million, respectively, of estimated gift card breakage as a component of net sales.

*Cost of Goods Sold* Cost of goods sold includes: merchandise costs; freight; inventory shrinkage; payroll expenses associated with the merchandising and distribution departments; distribution center expenses,

F-12

Table of Contents

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

including rent, common area maintenance charges, real estate taxes, depreciation, utilities, supplies and maintenance; and store occupancy expenses, including rents, common area maintenance charges, real estate taxes and depreciation.

*Vendor Allowances* We receive certain allowances from our vendors primarily related to damaged merchandise, markdowns and pricing. Allowances received from vendors related to damaged merchandise and pricing are reflected as a reduction of inventory in the period they are received and allocated to cost of goods sold during the period in which the items are sold. Markdown allowances received from vendors are reflected as reductions to cost of goods sold in the period they are received if the goods have been sold or marked down, or as a reduction of inventory if the goods have not yet been sold. During fiscal years 2014, 2015 and 2016, we received vendor allowances of $1.6 million, $2.5 million and $2.7 million, respectively, substantially all of which were accounted for as a reduction of cost of goods sold. Most of the vendor allowances that we receive are based on on-going agreements and negotiations with vendors. We receive vendor allowances from a majority of our vendors.

*Selling, General and Administrative Expenses* Selling, general and administrative expenses include: payroll expenses associated with stores; store operating expenses other than store occupancy; store pre-opening costs; credit card processing fees; marketing expenses; and payroll and other expenses associated with headquarters and administrative functions.

*Store Pre-Opening Costs* Costs incurred in connection with the opening of new stores, store remodels or relocations are expensed as incurred. We incurred $1.6 million, $2.8 million and $4.3 million of pre-opening costs in fiscal years 2014, 2015 and 2016, respectively, which are recorded in selling, general and administrative expenses in the consolidated statements of operations and comprehensive income (loss).

*Shipping and Handling Costs* We classify shipping and handling costs in costs of goods sold, including buying, distribution and store occupancy costs, in the consolidated statements of operations and comprehensive income (loss).

*Operating Leases and Deferred Rent* Certain operating leases contain predetermined escalations of the minimum rental payments to be made over the lease term. We recognize the related rent expense on the straight-line basis over the life of the lease, taking into account fixed escalations as well as reasonably assured renewal periods.

Certain store leases include allowances from landlords in the form of cash. These allowances are part of the negotiated terms of the lease. We record the full amount of the allowance when specific performance criteria are met as a deferred rent liability. The deferred rent liability is amortized into income as a reduction of rent expense over the non-cancelable term of the applicable lease, including reasonably assured renewal periods. For purposes of recognizing these allowances and minimum rental expenses on the straight-line basis, we use the date we obtain the legal right to use and control the leased space to begin amortization, which is generally when we take possession of the space and begin to make improvements in preparation for its intended use.

Certain store leases also provide for contingent rent in addition to fixed rent. The contingent rent is determined as a percentage of gross sales in excess of predefined levels. We record a rent liability in accrued liabilities and the corresponding rent expense when it becomes probable that we will achieve a specified gross sales amount. Certain store operating leases contain cancellation clauses allowing the leases to be terminated at our discretion, provided certain minimum sales levels are not achieved within a defined period of time after opening. We have seldom historically exercised these cancellation clauses and have therefore disclosed commitments for the full terms of such leases in the accompanying disclosures. Our leases are discussed in more detail in "Note 13 – Commitments and Contingencies."

F-13

Table of Contents

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*Debt Issuance Costs* We defer costs directly associated with acquiring third-party financing. Debt issuance costs are deferred and amortized using the straight-line method over the term of the ABL Facility (as defined in "Note 9 – Debt Financing Arrangements").

*Advertising Costs* Advertising costs are expensed the first time each advertising event occurs, except for costs associated with e-mail distribution and other e-commerce direct-to-consumer advertising, which are expensed as incurred. During fiscal years 2014, 2015 and 2016, advertising expenses were $12.0 million, $15.7 million and $19.5 million, respectively. We do not generally receive advertising reimbursements from vendors. As of the end of fiscal years 2015 and 2016, the amount of advertising costs reported as prepaid advertising was $0.7 million and $1.3 million, respectively.

*Income Taxes* We account for income taxes using the asset and liability method. Under this method, deferred tax assets and liabilities are determined based on differences between financial reporting bases and tax bases of assets and liabilities and are measured using the enacted tax rates expected to apply to taxable income in the periods in which the deferred tax asset or liability is expected to be realized or settled. Deferred tax assets are reduced by valuation allowances if we believe it is more likely than not that some portion or the entire deferred tax asset will not be realized.

Deferred tax assets and liabilities are measured using the enacted tax rates in effect in the years when those temporary differences are expected to reverse. The effect on deferred taxes from a change in tax rate is recognized through continuing operations in the period that includes the enactment date of the change. Changes in tax laws and rates could affect recorded deferred tax assets and liabilities in the future.

We prescribe a recognition threshold and a measurement attribute for the consolidated financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. The amount recognized is measured as the largest amount of benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. We include interest and penalties related to uncertain tax positions in income tax expense in the consolidated statements of operations and comprehensive income (loss).

We recognize tax liabilities for uncertain tax positions and adjust these liabilities when our judgment changes as a result of the evaluation of new information not previously available. Due to the complexity of some of these uncertainties, the ultimate resolution may result in a payment that is materially different from the current estimate of the tax liabilities. These differences will be reflected as increases or decreases to income tax expense and the effective tax rate in the period in which the new information becomes available.

We may be subject to periodic audits by the Internal Revenue Service, or IRS, and other taxing authorities. These audits may challenge certain of our tax positions, such as the timing and amount of deductions and allocation of taxable income to various jurisdictions.

*Share-Based Compensation* We recognize share-based compensation expense in the consolidated statements of operations and comprehensive income (loss) associated with incentive units issued by our parent (HT Holdings LLC prior to the Separation and Torrid Holding LLC after the Separation) to employees. The incentive units are remeasured based on the fair value of the awards at the end of each reporting period as the incentive units are accounted for as liability instruments. In fiscal years 2015 and 2016, we recorded the fair value of these awards as a capital contribution from our parent as our parent is the legal obligor for the incentive units. The share-based compensation expense and related capital contribution are reflected in our consolidated financial statements as these awards are deemed to be for our benefit. The incentive units contain a repurchase feature, whereby upon termination, our parent has the right to purchase from former employees any or all of the

F-14

Table of Contents

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

vested incentive units at fair value. Based on the features and characteristics of the incentive units, including the repurchase rights and disproportionate voting and distribution rights, we determined that the incentive units were in-substance liabilities.

*Earnings (Loss) Per Share* Basic earnings (loss) per share is computed by dividing net earnings or loss, respectively, by the weighted average number of common shares outstanding for the period. Diluted earnings per share is applicable only in periods of net income and is computed by dividing net income by the weighted average number of common shares outstanding for the period and potentially dilutive common stock equivalents outstanding for the period. Periods of net loss require the diluted computation to be the same as the basic computation. There were no potentially dilutive common share equivalents outstanding during fiscal years 2014, 2015 and 2016.

*Private Label Credit Card* We have an agreement with a third party to provide customers with private label credit cards, or the Credit Card Agreement. Each private label credit card bears the logo of the Torrid brand and can only be used at our store locations and on torrid.com. A third-party financing company is the sole owner of the accounts issued under the private label credit card program and absorbs the losses associated with non-payment by the private label card holders and a portion of any fraudulent usage of the accounts. Pursuant to the Credit Card Agreement, we receive marketing and promotional funds from the third-party financing company for certain expenses we incur based on usage of the private label credit cards. These marketing and promotional funds are recorded as a reduction in selling, general and administrative expenses in the consolidated statements of operations and comprehensive income (loss). During fiscal years 2014, 2015 and 2016, these funds amounted to $0.6 million, $2.9 million and $5.5 million, respectively, related to these private label credit cards.

*Deferred Compensation Plan* On August 1, 2015, we established the Torrid LLC Management Deferred Compensation Plan, or Deferred Compensation Plan, for the purpose of providing highly compensated employees a program to meet their financial planning needs. The Deferred Compensation Plan provides participants with the opportunity to defer up to 80% of their base salary and up to 100% of their annual earned bonus, all of which, together with the associated investment returns, are 100% vested from the outset. The Deferred Compensation Plan is designed to be exempt from most provisions of the Employee Retirement Security Act of 1974. All deferrals and associated earnings are our general unsecured obligations. We may at our discretion contribute certain amounts to eligible employees' accounts. To the extent participants are ineligible to receive contributions from participation in our 401(k) Plan, we contribute 50% of the first 4% of participants' eligible contributions into their Deferred Compensation Plan accounts. As of the end of fiscal years 2015 and 2016, we did not have any assets of the Deferred Compensation Plan and the associated liabilities were $1.1 million and $2.7 million, respectively, included in non-current liabilities in our consolidated balance sheets. Prior to the adoption of the Torrid LLC Management Deferred Compensation Plan on August 1, 2015, our employees participated in the Hot Topic, Inc. Management Deferred Compensation Plan maintained by Hot Topic and portions of their deferrals and associated earnings were allocated to us and included in our fiscal year 2015 consolidated balance sheet. The Hot Topic, Inc. Management Deferred Compensation Plan is substantially similar to the Torrid LLC Management Deferred Compensation Plan described above.

*Employee Benefit Plan* On August 1, 2015, we adopted the Torrid 401(k) Plan, or the 401(k) Plan. All employees who have been employed by us for at least 200 hours and are at least 21 years of age are eligible to participate. Employees may contribute up to 80% of their eligible compensation to the 401(k) Plan, subject to a statutorily prescribed annual limit. We may at our discretion contribute certain amounts to eligible employees' accounts. We contribute 50% of the first 4% of participants' eligible contributions into their 401(k) Plan accounts. During fiscal years 2015 and 2016, we contributed $0.2 million and $0.3 million, respectively, to eligible employees' Torrid 401(k) Plan accounts. Prior to the adoption of the Torrid 401(k) Plan on August 1, 2015, our employees participated in the Hot Topic 401(k) Plan maintained by Hot Topic. The Hot Topic 401(k) Plan is substantially similar to the Torrid 401(k) Plan described above.

**Table of Contents**

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**Note 3. Accounting Standards**

***Recently Adopted Accounting Standards***

In November 2015, the FASB issued ASU 2015-17, *Balance Sheet Classification of Deferred Taxes*, which eliminates the guidance in Topic 740, *Income Taxes*, that required an entity to separate deferred tax liabilities and assets between current and noncurrent amounts in a classified balance sheet. The new guidance requires that deferred taxes be presented as noncurrent under the new standard. The guidance is effective for fiscal years beginning after December 15, 2017, with early adoption permitted for fiscal years beginning after December 15, 2015. Retrospective or prospective adoption may be applied. We early adopted this new guidance on January 28, 2017 on a prospective basis and reclassified our current deferred tax asset balance of $13.8 million to a noncurrent asset in our fiscal year 2016 consolidated balance sheet. Prior periods have not been retrospectively adjusted.

In August 2015, the FASB issued ASU 2015-15, *Presentation and Subsequent Measurement of Debt Issuance Costs Associated with Line-of-Credit Arrangements*, which clarifies that an entity may defer and present debt issuance costs as an asset and subsequently amortize the deferred debt issuance costs ratably over the term of the line-of-credit arrangement, regardless of whether there are any outstanding borrowings on the line-of-credit arrangement. The new guidance became effective for fiscal years beginning after December 15, 2015 and requires retrospective adoption. Our adoption of this new guidance on January 31, 2016 did not have any impact on our consolidated financial position or results of operations as it was consistent with our current presentation.

In April 2015, the FASB, issued ASU 2015-05, *Intangibles – Goodwill and Other – Internal-Use Software* (Subtopic 350-40, *Customer's Accounting for Fees Paid in a Cloud Computing Arrangement*), which provides guidance to help entities determine whether a cloud computing arrangement contains a software license that should be accounted for as internal-use software or as a service contract. This guidance became effective for interim and annual reporting periods beginning after December 15, 2015, with early adoption permitted. Our prospective adoption of this new guidance on January 31, 2016 did not have a material impact on our consolidated financial position or results of operations.

In April 2015, the FASB issued ASU 2015-03, *Interest – Imputation of Interest* (Subtopic 835-30, *Simplify the Presentation of Debt Issuance Cost*), which simplifies the presentation of debt issuance costs by requiring such costs to be presented as a deduction from the corresponding debt liability. The new guidance became effective for fiscal years beginning after December 15, 2015, with early adoption permitted as of the beginning of the fiscal year of early adoption. Our adoption of this new guidance on January 31, 2016 did not have any impact on our consolidated financial position or results of operations.

In August 2014, the FASB issued ASU 2014-15, *Presentation of Financial Assets – Going Concern*, which requires an entity's management to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the entity's ability to continue as a going concern and requires additional disclosures if certain criteria are met. The new guidance is effective for fiscal years ending after December 15, 2016, and interim periods in fiscal years beginning after December 15, 2016, with early adoption permitted. Our adoption of this new guidance on January 31, 2016 did not have a material impact on our consolidated financial position, results of operations or financial statement disclosures.

***Recently Issued Accounting Pronouncements***

In October 2016, the FASB issued ASU 2016-16 (Topic 740, *Income Taxes): Intra-Entity Transfers of Assets Other Than Inventory*. Currently, it is prohibited to recognize current and deferred income taxes for an

**Table of Contents**

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

intra-entity asset transfer until the asset has been sold to an outside party. This prohibition on recognition is an exception to the principle of comprehensive recognition of current and deferred income taxes. The new guidance requires an entity to recognize the income tax consequences of an intra-entity transfer of an asset other than inventory when the transfer occurs and eliminates the exception for an intra-entity transfer of an asset other than inventory. Two common examples of assets included in the scope of the amendments are intellectual property and property, plant and equipment. The guidance will be effective for fiscal years beginning after December 15, 2018, and interim periods within fiscal years beginning after December 15, 2019. Early adoption is permitted. We do not expect that our adoption of this new guidance will have a material impact on our consolidated financial position or results of operations.

In August 2016, the FASB issued ASU 2016-15, *Classification of Certain Cash Receipts and Payments (*Topic 230, *Statement of Cash Flows*), which reduces diversity in practice in how certain transactions are presented. The issues addressed in the new guidance include the classification of debt prepayment or debt extinguishment costs, the classification of proceeds from the settlement of insurance claims and the classification of a transferor's beneficial interests in securitization transactions. The guidance will be effective for fiscal years beginning after December 15, 2018, and interim periods within fiscal years beginning after December 15, 2019. Early adoption is permitted, provided that all of the amendments are adopted in the same period. Retrospective application is required. We do not expect that our adoption of this new guidance will have a material impact on our consolidated financial position or results of operations.

In March 2016, the FASB issued ASU 2016-09, *Improvements to Employee Share-Based Payment Accounting*. The amendments in this update involve several aspects of accounting for equity-based payment transactions, including income tax consequences, classification of awards, and classification on the statement of cash flows. The amendments in this update are effective for annual periods beginning after December 15, 2016, and interim periods within those annual periods. Early adoption is permitted for any entity in any interim or annual period. If an entity early adopts the amendments in an interim period, any adjustments should be reflected as of the beginning of the fiscal year that includes that interim period. An entity that elects early adoption must adopt all of the amendments in the same period. We are currently evaluating the effect that this new accounting guidance will have on our consolidated financial position and results of operations.

In February 2016, the FASB issued ASU 2016-02, *Leases*, which replaces the existing guidance in ASC 840, *Leases*. The new guidance establishes a right-of-use model that requires a lessee to record a right-of-use asset and a corresponding lease liability on the balance sheet for all leases with terms longer than 12 months. Leases will be classified as either finance leases or operating leases, with classification affecting the pattern of expense recognition in the income statement. The guidance will be effective for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. Retrospective application is required. We are currently evaluating the effect that adopting this new accounting guidance will have on our consolidated financial position and results of operations.

In September 2015, the FASB issued ASU 2015-16, *Business Combinations* (Topic 805, *Simplifying the Accounting for Measurement-Period Adjustments*), which changes the requirement to restate prior period financial statements for measurement period adjustments. The new guidance requires that measurement period adjustments be recognized in the reporting period in which the adjustment amount is determined. This includes the cumulative impact of measurement period adjustments on current and prior periods. The cumulative adjustment would be reflected within the respective financial statement line items affected. The guidance will be effective for fiscal years beginning after December 15, 2016. We do not expect that our adoption of this new guidance will have a material impact on our consolidated financial position or results of operations.

In July 2015, the FASB issued ASU 2015-11, *Inventory* (Subtopic 330, *Simplifying the Measurement of Inventory*), which simplifies the subsequent measurement of inventory by replacing the lower of cost or market

F-17

Table of Contents

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

test with a lower of cost and net realizable value test. The new guidance will be effective for fiscal years beginning after December 15, 2016 and interim periods within fiscal years beginning after December 15, 2017, and requires prospective adoption, with early adoption permitted. We do not expect that our adoption of this new guidance will have a material impact on our consolidated financial position or results of operations.

In February 2015, the FASB issued ASU 2015-02, *Consolidation* (Subtopic 810, *Amendments to the Consolidation Analysis*), which modifies existing consolidation guidance for reporting organizations that are required to evaluate whether they should consolidate certain legal entities. This new guidance will be effective for fiscal periods beginning after December 15, 2016 and for interim periods within fiscal years beginning after December 15, 2017 and allows for either full retrospective or modified retrospective adoption, with early adoption permitted. We do not expect that our adoption of this new guidance on January 29, 2017 will have a material impact on our consolidated financial position or results of operations.

In May 2014, the FASB issued ASU 2014-09, *Revenue from Contracts with Customers*, as a new Topic, ASC Topic 606. The new guidance established principles for reporting revenue and cash flows arising from an entity's contracts with customers. This new revenue recognition standard will replace most of the recognition guidance within GAAP. This guidance was deferred by ASU 2015-14, *Revenue from Contracts with Customers* (Topic 606): Deferral of the Effective Date, issued by the FASB in August 2015, which deferred the effective date of ASU 2014-09 from annual and interim periods beginning after December 15, 2016 to annual and interim periods beginning after December 15, 2017. In March 2016, the FASB issued ASU 2016-08, *Revenue from Contracts with Customers: Principal versus Agent Considerations*, which further clarifies the implementation guidance in ASU 2014-09. In April 2016, the FASB issued ASU 2016-10, *Revenue from Contracts with Customers* (Topic 606): *Identifying Performance Obligations and Licensing*, to expand the guidance on identifying performance obligations and licensing within ASU 2014-09. In May 2016, the FASB issued ASU 2016-12, *Revenues from Contracts with Customers: Narrow-Scope Improvements and Practical Expedients*, which amends the guidance in the new revenue standard on collectability, noncash consideration, presentation of sales tax, and transition. The amendments are intended to address implementation issues that were raised by stakeholders and provide additional practical expedients to reduce the cost and complexity of applying the new revenue standard. These standards are effective for fiscal years beginning after December 15, 2017, including interim periods within that reporting period. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. We are evaluating the impact adopting these standards will have on our consolidated financial statements.

**Note 4. Prepaid Expenses and Other Current Assets**

Prepaid expenses and other current assets consist of the following (in thousands):

|  | January 30, 2016 | January 28, 2017 |
|---|---|---|
| Accounts receivable | $    5,850 | $    7,657 |
| Prepaid advertising | 699 | 1,274 |
| Prepaid rent | 3,849 | 72 |
| Other | 1,489 | 1,127 |
| Prepaid expenses and other current assets | $    11,887 | $    10,130 |

F-18

Table of Contents

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**Note 5. Property and Equipment**

Property and equipment are summarized as follows (in thousands):

|  | January 30, 2016 | January 28, 2017 |
|---|---|---|
| Leasehold improvements | $ 70,544 | $ 112,230 |
| Furniture, fixtures and equipment | 41,482 | 59,612 |
| Software and licenses | 1,398 | 870 |
| Construction-in-progress | 290 | 527 |
|  | 113,714 | 173,239 |
| Less: Accumulated depreciation and amortization | (24,895) | (41,727) |
| Property and equipment, net | $ 88,819 | $ 131,512 |

We recorded depreciation expense related to our property and equipment in the amounts of $12.9 million, $12.8 million and $16.3 million during fiscal years 2014, 2015 and 2016, respectively.

During fiscal years 2014 and 2015, we recognized impairment charges of $0.4 million and $0.1 million, respectively. In January 2017, as a result of a change in strategy, we decided to close the Lovesick test concept, including its stores and website. We evaluated the carrying value of each Lovesick store for potential impairment, as the individual store level is the lowest level at which individual cash flows can be identified. During fiscal year 2016, we recognized $3.2 million of impairment charges, using level 3 inputs, associated with the closure of the Lovesick test concept in the consolidated statements of operations and comprehensive income (loss).

**Note 6. Accrued and Other Current Liabilities**

Accrued and other current liabilities consist of the following (in thousands):

|  | January 30, 2016 | January 28, 2017 |
|---|---|---|
| Accrued payroll and related expenses | $ 8,123 | $ 14,704 |
| Accrued inventory-in-transit | 8,875 | 12,116 |
| Accrued cost of property and equipment | 3,560 | 2,991 |
| Accrued loyalty program | 5,012 | 6,476 |
| Deferred revenue | 2,884 | 4,164 |
| Gift cards, gift certificates and store merchandise credits | 2,811 | 4,387 |
| Accrued marketing | 1,221 | 3,309 |
| Accrued sales and use tax | 2,666 | 2,619 |
| Accrued self-insurance liabilities | 1,041 | 1,705 |
| Current portion of deferred rent | 909 | 2,085 |
| Other | 10,466 | 12,272 |
| Accrued and other current liabilities | $ 47,568 | $ 66,828 |

**Note 7. Goodwill and Intangible Assets**

Prior to the Separation and in connection with the preparation of these consolidated financial statements, portions of such definite-lived intangible assets, goodwill and indefinite-lived intangible assets other than goodwill were allocated to us.

F-19

**Table of Contents**

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

These allocated definite-lived intangible assets, goodwill and indefinite-lived intangible assets other than goodwill are summarized as follows (in thousands):

| | Weighted Average Useful Life (Years) | January 30, 2016 | | | | January 28, 2017 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Gross | Impairment | Accumulated Amortization | Net Book Value | Gross | Accumulated Amortization | Net Book Value |
| Goodwill | n/a | $139,599 | $ (139,599) | $ — | $ — | $ — | $ — | $ — |
| Indefinite-lived intangible assets other than goodwill: | | | | | | | | |
| Trade name | n/a | 67,500 | (59,100) | — | 8,400 | 8,400 | — | 8,400 |
| Definite-lived intangible assets: | | | | | | | | |
| Leasehold interests | 3.2 | 4,535 | — | (3,026) | 1,509 | 4,535 | (3,513) | 1,022 |
| Customer lists | 2 | 440 | — | (440) | — | 440 | (440) | — |
| Total | | $212,074 | $ (198,699) | $ (3,466) | $ 9,909 | $13,375 | $ (3,953) | $ 9,422 |

**Goodwill** In connection with our acquisition of Torrid LLC from Hot Topic and as a result of impairment indicators related to the revised projected cash flows of our business, we performed an interim impairment assessment of goodwill as of May 2, 2015. The projected cash flows were revised in order to reflect the future cash commitments required of us under the transition services agreement.

The fair value was derived by considering the results of two approaches: income approach (specifically the discounted cash flow method), which involves significant estimates and assumptions, including preparation of revenue and profitability growth forecasts, selection of a discount rate (estimated to be approximately 15%) and selection of a terminal year multiple; and market approach (specifically the market comparable method), which involves deriving fair value by comparing us to publicly traded companies in similar lines of business. As the carrying value exceeded the fair value, an indication of impairment existed and step two of the impairment test was carried out.

The impairment assessment resulted in a non-cash full impairment charge of $139.6 million in our consolidated statements of operations and comprehensive income (loss) in fiscal year 2015. Consequently, we did not have any goodwill as of the end of fiscal year 2015.

**Indefinite-Lived Intangible Assets Other Than Goodwill** In connection with our acquisition of Torrid LLC from Hot Topic and as a result of impairment indicators related to the revised projected cash flows of our business, we performed an impairment assessment of our trade name as of May 2, 2015. The fair value of the trade name was derived by estimating the royalties saved through ownership of the asset. Estimated revenue attributable to the trade names was multiplied by an appropriate arm's-length royalty rate to arrive at royalty savings; cash taxes are deducted from the royalty savings to arrive at the estimated after-tax cash flows derived through ownership of the trade name; then cash flows are discounted using a discount rate estimated to be approximately 15%. The sum of these discounted cash flows, including a hypothetical tax amortization benefit, represented the fair value of the trade name.

This assessment resulted in a non-cash impairment charge of $59.1 million in our consolidated statements of operations and comprehensive income (loss) in fiscal year 2015 that reduced the carrying values of the trade name to its estimated fair value. At the end of the fiscal third quarter, we performed our annual impairment assessment of our trade name and the assessment indicated there was no impairment.

**Table of Contents**

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

***Definite-Lived Intangible Assets*** In connection with our acquisition of Torrid LLC from Hot Topic and as a result of impairment indicators related to the revised projected cash flows of our business on a stand-alone basis, we performed an interim impairment assessment of our leasehold interests as of May 2, 2015. The undiscounted cash flows from step one of the impairment test were in excess of the carrying value of our definite-lived intangible assets and as such, no impairment was indicated. In fiscal year 2016, we do not believe that there have been events or changes in circumstances to indicate that the carrying value of definite-lived intangible leasehold interests may not be recoverable.

During fiscal years 2014, 2015 and 2016, we amortized $1.4 million, $0.8 million and $0.5 million, respectively, of net favorable leasehold interests in occupancy costs within cost of goods sold in our consolidated statements of operations and comprehensive income (loss). As of the end of fiscal year 2016, we had $1.0 million of unamortized leasehold interests in our consolidated balance sheet which are expected to be recognized over a weighted average remaining period of 2.6 years.

During fiscal years 2014 and 2015, we amortized $0.2 million and $0.1 million, respectively, of customer lists in selling, general and administration expenses in our consolidated statements of operations and comprehensive income (loss). As of the end of fiscal year 2015, customer lists had been fully amortized.

The estimated amortization expense for our definite-lived intangible assets for each of the next five years and thereafter is as follows (in thousands):

| Fiscal Year | |
|---|---:|
| 2017 | $ 391 |
| 2018 | 131 |
| 2019 | 171 |
| 2020 | 168 |
| 2021 | 153 |
| Thereafter | 8 |
| Total amortization expense | $1,022 |

**Note 8. Related Party Transactions**

***Transition Services Agreement*** On May 1, 2015, we entered into a transition services agreement with Hot Topic under which Hot Topic provided us with certain services to help ensure an orderly transition for us following the Separation. Under the transition services agreement, Hot Topic provided us (or caused applicable third parties to provide) certain back office and general and administrative services, including information technology, logistics management and other specified services to ensure our stand-alone functionality. Each month, we were committed to pay Hot Topic for these services. We recorded payments made to Hot Topic under the transition services agreement in the applicable expense category in either cost of goods sold, or selling, general and administrative expenses. During fiscal years 2015 and 2016, Hot Topic charged us $33.0 million and $32.9 million, respectively, for various services, of which $5.6 million and $9.6 million, respectively, were recorded as components of cost of goods sold, and the remaining $27.4 million and $23.3 million, respectively, were charged to selling, general and administrative expense. As of the end of fiscal year 2015 and 2016, we owed $3.4 million and $3.2 million, respectively, to Hot Topic under the transition services agreement which are included in due to related parties in our consolidated balance sheets.

Hot Topic incurs certain direct expenses on our behalf, such as payments to our non-merchandise vendors and each month, we pay Hot Topic for these pass-through expenses. As of the end of fiscal year 2015 and 2016, the net amounts we owed Hot Topic for these expenses were $3.2 million and $10.6 million, respectively, which are included in due to related parties in our consolidated balance sheets.

As of the end of fiscal years 2015 and 2016, our total aggregate due to related parties in our consolidated balance sheets related to Hot Topic were $6.6 million and $13.8 million, respectively.

F-21

Table of Contents

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*Capital Contributions from Parent* On April 8, 2015, we received a $45.0 million cash contribution from our parent, Torrid Holding LLC. See "Note 14 – Stockholder's Equity" for further discussion regarding the cash contribution.

*Promissory Note to Parent* On May 1, 2015, we issued a $45.0 million promissory note to our parent, Torrid Holding LLC, due on or before May 1, 2018, or the Related Party Promissory Note. On June 16, 2016, we made a $29.8 million repayment of the Related Party Promissory Note and paid $0.2 million of related interest.

We shall pay interest at an annual compounding rate of 0.43% upon maturity of the Related Party Promissory Note. The Related Party Promissory Note interest rate is equal to the federal rate for May 2015 for a short-term instrument with an annual compounding interest rate.

As of the end of fiscal year 2016, there was a $15.2 million lump sum principal payment due upon the May 1, 2018 maturity date and the total amount of interest owed was $0.1 million.

*Sponsor Advisory Services Agreement* In connection with the Separation, we entered into an advisory services agreement with Sycamore dated May 1, 2015, pursuant to which Sycamore agreed to provide strategic planning and other related services to us. We are obligated to reimburse Sycamore for their expenses incurred in connection with providing such advisory services to us. As of the end of fiscal years 2015 and 2016, there were no amounts due, and during fiscal years 2015 and 2016, no amounts were paid under this agreement.

From time to time, we reimburse Sycamore for certain management expenses they pay on our behalf. During fiscal year 2015, the reimbursement we made to Sycamore for such expenses was $0.2 million and not material during fiscal year 2016.

*Other Related Party Transactions* MGF Sourcing US, LLC, an entity indirectly controlled by affiliates of Sycamore, is one of our suppliers. During fiscal years 2014, 2015 and 2016, purchases from this supplier were $8.7 million, $12.1 million and $18.4 million, respectively, which accounted for less than 10% of total purchases in fiscal years 2014, 2015 and 2016. As of the end of fiscal 2015 and 2016, the net amounts we owed MGF Sourcing US, LLC for these purchases were $2.1 million and $2.8 million, respectively. This liability is included in due to related parties in our consolidated balance sheets.

**Note 9. Debt Financing Arrangements**

*Senior Secured Asset-Based Revolving Credit Facility* In May 2015, we entered into a credit agreement for a senior secured asset-based revolving credit facility, or ABL Facility, of $50 million (subject to a borrowing base), with Bank of America, N.A.

Certain of our domestic subsidiaries are co-borrowers with us under the ABL Facility and the principal amount outstanding of the loans under the ABL Facility are expected to be due and payable in full in May 2020.

Availability under the ABL Facility is subject to a percentage of our eligible inventory and receivables to collateralize the borrowing and is reduced by the level of outstanding letters of credit.

The borrowing base for the revolving credit facility at any time equals the sum of 90% of eligible credit card receivables, plus 90% of the appraised net orderly liquidation value of eligible inventory and eligible in-transit inventory multiplied by the cost of such eligible inventory and eligible in-transit inventory (to be increased to 92.5% during the period beginning on September 1 of each year and ending on December 31 of each year). The ABL Facility includes borrowing capacity for letters of credit and for borrowings on same-day notice, referred to as Swing Line Loans, and will be available in U.S. dollars.

F-22

Table of Contents

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

We have the right to request up to $30 million of additional commitments under the ABL Facility, and the lenders under this facility are not under any obligation to provide any such additional commitments, and any increase in commitments is subject to customary conditions precedent. If we were to request any such additional commitments and the existing lenders or new lenders were to agree to provide such commitments, the ABL Facility size could increase to up to $80 million, but our ability to borrow under this facility would still be limited by the amount of the borrowing base.

Borrowings under the ABL Facility bear interest at an annual rate equal to, at our option, either (a) a base rate determined by reference to the highest of (1) the prime rate of Bank of America, N.A., (2) the federal funds effective rate plus 0.50% and (3) a LIBOR rate for an interest period of one month adjusted for certain costs, plus 1.00% or (b) at a LIBOR rate for the interest period relevant to such borrowing adjusted for certain costs ("Adjusted LIBOR"), in each case plus an applicable margin that ranges from 1.75% to 2.0% for LIBOR borrowings and 0.75% to 1.0% for base rate borrowings.

If we elect the LIBOR rate, interest is due and payable on the last day of each interest period, unless an interest period exceeds three months, then the respective dates that fall every three months after the beginning of the interest period shall also be interest payment dates. If we opt for the base rate, (including a Swing Line Loan), interest is due and payable on the first business day of each month and on the maturity date. The elected interest rate as of the end of fiscal year 2016 was 4.5%.

In addition to paying interest on outstanding principal under the ABL Facility, we are required to pay a commitment fee in respect of unutilized commitments. The commitment fee ranges between 0.25% and 0.375% per annum of unutilized commitments and will be subject to adjustment each fiscal quarter based on the amount of unutilized commitments during the immediately preceding fiscal quarter. We must also pay customary letter of credit fees and agent fees.

If at any time the aggregate amount of outstanding loans, unreimbursed letter of credit drawings and undrawn letters of credit under the ABL Facility exceeds the lesser of (a) the commitment amount and (b) the borrowing base, we will be required to repay outstanding loans and/or cash collateralize letters of credit in an aggregate amount equal to such excess, with no reduction of the commitment amount.

We may voluntarily reduce the unused portion of the commitment amount and repay outstanding loans at any time. Prepayment of the loans may be made without premium or penalty other than customary "breakage" costs with respect to LIBOR loans.

All obligations under the ABL Facility are unconditionally guaranteed by substantially all of our existing majority-owned domestic subsidiaries and will be required to be guaranteed by certain of our future domestic majority-owned subsidiaries. All obligations under the ABL Facility, and the guarantees of those obligations, will be secured, subject to certain exceptions, by substantially all of our assets.

Our ABL Facility contains a number of covenants that, among other things and subject to certain exceptions, will restrict our ability and the ability of our subsidiaries to: incur additional indebtedness; pay dividends on our capital stock or redeem, repurchase or retire our capital stock or our other indebtedness; make investments, loans and acquisitions; engage in transactions with our affiliates; sell assets, including capital stock of our subsidiaries; alter the business we conduct; consolidate or merge; and incur liens. As of the end of fiscal 2016, we were compliant with our debt covenants under the ABL Facility.

The ABL Facility specifically restricts dividends and distributions, aside from amounts to cover ordinary operating expenses and taxes, from our subsidiaries to us and to our Parent. However, dividends and distributions are permitted at any time that either (1) availability under the ABL facility is greater than 15% of

F-23

**Table of Contents**

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

the maximum borrowing amount and we are pro forma compliant with a 1.1 to 1.0 fixed charge coverage ratio or (2) availability under the ABL facility is equal to or greater than 35% of the maximum borrowing amount. At January 28, 2017, the maximum restricted payment that our subsidiaries could make from its net assets was $36.0 million, or 32% of their total net assets.

Availability under the ABL Facility at the end of fiscal year 2015 was $49.7 million, which reflects no amounts outstanding. Availability under the ABL Facility at the end of fiscal year 2016 was $42.3 million, which reflects a $6.9 million utilization of the facility. We consider the carrying amount of the ABL Facility to approximate fair value because of the variable interest rate of this facility. Standby letters of credit issued and outstanding under the ABL Facility were $0.3 million and $0.8 million as of the end of fiscal years 2015 and 2016, respectively. During the first quarter of fiscal year 2015, we recorded the entire $0.4 million of financing costs for the ABL Facility which is reflected in deposits and other assets in our consolidated balance sheets. During fiscal years 2015 and 2016, we amortized $0.1 million of financing costs and paid $0.1 million and $0.2 million, respectively, in interest payments for the ABL Facility. Interest payments and amortized financing costs were recognized in interest expense and other, net.

**Note 10. Income Taxes**

During fiscal years 2014 and 2015, income tax expense was calculated on a separate tax return basis, even though our operations were included in Hot Topic's tax returns prior to the Separation. Consequently, after our acquisition of Torrid LLC from Hot Topic, our tax provision and deferred tax balances have been computed on a separate tax return basis.

***Income (Loss) Before Provision (Benefit) for Income Taxes*** The domestic and foreign income (loss) before provision (benefit) for income taxes during fiscal years 2014, 2015 and 2016 is as follows (in thousands):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | January 31, 2015 | January 30, 2016 | January 28, 2017 |
| Domestic | $ 3,284 | $ (177,894) | $ (7,190) |
| Foreign | — | (632) | (185) |
| Income (loss) before provision (benefit) | $ 3,284 | $ (178,526) | $ (7,375) |

***Provision (Benefit) for Income Taxes*** The composition of the provision (benefit) for income taxes during fiscal years 2014, 2015 and 2016 is as follows (in thousands):

| | Fiscal Year Ended | | |
|---|---|---|---|
| | January 31, 2015 | January 30, 2016 | January 28, 2017 |
| Current: | | | |
| Federal | $ 1,819 | $ 10,101 | $ 19,308 |
| State | 770 | 2,443 | 4,674 |
| Foreign | — | — | 214 |
| | 2,589 | 12,544 | 24,196 |
| Deferred: | | | |
| Federal | (453) | (22,835) | (1,154) |
| State | (472) | (4,451) | (1,262) |
| Foreign | — | — | (58) |
| | (925) | (27,286) | (2,474) |
| Total income tax provision (benefit) | $ 1,664 | $ (14,742) | $ 21,722 |

F-24

Table of Contents

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Significant components of our deferred tax assets and liabilities are as follows (in thousands):

| | January 30, 2016 | January 28, 2017 |
|---|---|---|
| Current deferred tax assets (liabilities)(1): | | |
| Inventory | $  1,313 | $  — |
| Loyalty reserve | 1,937 | — |
| Accrued bonus | 1,592 | — |
| Other | 1,646 | — |
| Net current deferred tax assets | 6,488 | — |
| Long-term deferred tax assets (liabilities): | | |
| Inventory | — | 4,320 |
| Loyalty reserve | — | 2,647 |
| Accrued bonus | — | 3,806 |
| Deferred rent | 569 | 1,939 |
| Deferred compensation | — | 1,373 |
| Valuation of intangible assets | (3,825) | (3,851) |
| Depreciation | (7,216) | (13,371) |
| Other | | 1,627 |
| Total non-current net deferred tax liabilities | (10,472) | (1,510) |
| Net deferred tax liabilities | $  (3,984) | $  (1,510) |

1    On January 28, 2017, we early adopted ASU 2015-17, *Balance Sheet Classification of Deferred Taxes*, which requires that our current deferred tax assets (liabilities) of $13.8 million be presented as noncurrent. As we adopted this new guidance prospectively, prior periods have not been retrospectively adjusted. Please refer to "Note 3 – Accounting Standards" for more details about this new guidance.

A reconciliation of the provision (benefit) for income taxes to the statutory tax rate is as follows:

| | | Fiscal Year Ended | |
|---|---|---|---|
| | January 31, 2015 | January 30, 2016 | January 28, 2017 |
| Statutory federal rate | 34.0% | (35.0)% | (35.0)% |
| State and local taxes, net of federal benefit and other | 6.0 | (0.7) | 30.1 |
| Goodwill and other intangible assets impairment | — | 27.4 | — |
| Share-based compensation | 7.8 | — | 303.3 |
| Other permanent differences, net | 2.9 | — | (3.9) |
| Effective income tax rate | 50.7% | (8.3)% | 294.5% |

The effective tax rate in fiscal year 2016 reflects non-taxable share-based compensation expense for which there is no associated income tax benefit.

***Uncertain Tax Positions*** As of the end of fiscal years 2015 and 2016, we did not record a liability for uncertain tax positions as we believed all of the tax positions we took (or expected to take) in a tax return were more likely than not to be sustained upon examination by taxing authorities.

F-25

**Table of Contents**

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

We operate stores throughout the United States, Puerto Rico and Canada, and as a result, we file income tax returns in the United States federal jurisdiction and various state, local and foreign jurisdictions. In the normal course of business, we are subject to examination by taxing authorities. Our fiscal year 2015 federal income tax return is currently under Internal Revenue Service audit. Although we cannot predict the outcome of future examinations, amounts that could be owed in excess of amounts accrued would impact future tax expense but would not be expected to have a material impact on our consolidated financial condition. The federal statute of limitations period is three years and most states follow this limitations period with few exceptions.

**Note 11. Share-Based Compensation**

Prior to the Separation, Hot Topic's indirect parent, HT Holdings LLC, issued incentive units to certain members of our management when they were part of Hot Topic. At the Separation date, these incentive units had a fair value of zero.

After the Separation, during fiscal years 2015 and 2016, our parent, Torrid Holding LLC, issued 15.0 million Class A, Class B, Class C, Class D, Class E, Class F, Class G and Class H Torrid incentive units in the aggregate, net of forfeitures, to certain members of our management.

The following assumptions were used in the contingent claims analysis methodology using a Black-Scholes option valuation model to value the Torrid incentive units as of the end of each fiscal year:

| | Fiscal Year Ended | |
| --- | --- | --- |
| | January 30, 2016 | January 28, 2017 |
| Time to liquidity event | 4 years | 0.5 years |
| Equity volatility | 40% | 50% |
| Risk-free interest rate of return | 1.29% | 0.63% |

The fair value incorporates various assumptions including the time to liquidity event, equity volatility and risk-free interest rate of return. Equity volatility is based on the historical volatilities of comparable publicly traded companies for the time horizon equal to the time to the anticipated liquidity event; and the risk-free interest rate is for a term corresponding to the time to liquidity event. The most recent remeasurement of the fair value of the incentive units was performed as of the end of fiscal year 2016 and the fair value of these awards was determined to be $90.9 million in aggregate, net of forfeitures. Based on the fair value of the incentive units as of the end of fiscal year 2016, we had $26.3 million of unrecognized share-based compensation expense related to the unvested and unearned portion of the incentive units.

The incentive units vest over periods ranging from 2.7 to 5.0 years from the date of grant. The share-based compensation expense and associated capital contribution for these awards is recognized over the vesting period as the awards are earned. During fiscal years 2014, 2015 and 2016, we recognized share-based compensation expense of $0.8 million, $0.1 million and $63.9 million, respectively.

As of the end of fiscal years 2015 and 2016, Torrid Holding LLC had 13.5 million and 15.0 million, of outstanding incentive units, respectively, and 7.1 million and 6.1 million of unvested incentive units, respectively, issued to our employees.

**Table of Contents**

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**Note 12. Deferred Rent and Other Noncurrent Liabilities**

Deferred rent and other noncurrent liabilities consist of the following (in thousands):

| | January 30, 2016 | January 28, 2017 |
|---|---|---|
| Noncurrent portion of deferred rent | $ 20,137 | $ 35,358 |
| Related party promissory note interest payable | 145 | 51 |
| Deferred rent and other noncurrent liabilities | $ 20,282 | $ 35,409 |

**Note 13. Commitments and Contingencies**

*Operating Leases Agreements* We have entered into operating lease agreements for retail space and vehicles under primarily non-cancelable leases with terms ranging from approximately two to ten years. The retail space leases provide for rents based upon the greater of the minimum annual rental amounts or a percentage of annual store sales volume. Certain leases provide for increasing minimum annual rental amounts. Rent expense is recorded on the straight-line basis over the term of the lease upon taking possession of premises. Accordingly, deferred rent, as reflected in the accompanying consolidated balance sheets, represents the difference between rent expense accrued and amounts paid under the terms of the lease agreements. Total rent expense during fiscal years 2014, 2015 and 2016 was $20.8 million, $25.8 million and $33.4 million, respectively, which excludes contingent rent expense of $0.7 million, $1.4 million and $2.0 million, respectively, but includes $1.6 million, $2.1 million and $3.1 million of non-cash deferred rent in fiscal years 2014, 2015 and 2016, respectively.

The estimated annual future minimum lease payments under operating leases for each of the next five years and thereafter are as follows (in thousands):

| Fiscal Year | |
|---|---|
| 2017 | $ 36,209 |
| 2018 | 34,937 |
| 2019 | 34,121 |
| 2020 | 33,984 |
| 2021 | 33,601 |
| Thereafter | 115,466 |
| Total minimum operating lease payments | $ 288,318 |

*Litigation* From time to time, we are involved in matters of litigation that arise in the ordinary course of business. Though significant litigation or awards against us could seriously harm our business and financial results, we do not at this time expect any current litigation to have a material adverse effect on our overall financial condition. We recorded net litigation expense of $0.1 million and $0.4 million in fiscal years 2014 and 2015, respectively, and a net litigation recovery of $0.2 million in fiscal year 2016 related to settlements, which is included in selling, general and administrative expenses in the consolidated statements of operations and comprehensive income (loss).

*Indemnities, Commitments and Guarantees* During the ordinary course of business, we have made certain indemnities, commitments and guarantees under which we may be required to make payments in relation to certain transactions. Commitments include those given to various merchandise vendors and suppliers. The durations of these indemnities, commitments and guarantees vary. Some of these indemnities, commitments and guarantees do not provide for any limitation of the maximum potential future payments we could be obligated to

F-27

**Table of Contents**

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

make. We have not recorded any liability for these indemnities, commitments and guarantees in the accompanying consolidated financial statements as no demands have been made upon us to provide indemnification under such agreements and there are no claims that we are aware of that could have a material effect on our consolidated financial statements.

**Note 14. Stockholder's Equity**

We are authorized to issue 1,000 shares of common stock at $0.01 par value. In accordance with a stock subscription agreement dated April 8, 2015 and the contribution agreement dated May 1, 2015, our parent, Torrid Holding LLC, purchased one share of our common stock with a par value of $0.01 for $45.0 million in exchange for ownership of 100% equity interest in us. We had one share issued and outstanding as of the end of fiscal years 2015 and 2016.

**Note 15. Fair Value Measurements**

We carry certain of our assets and liabilities at fair value in accordance with GAAP. Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date.

Valuation techniques used to measure fair value requires us to maximize the use of observable inputs and minimize the use of unobservable inputs. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to unobservable inputs (Level 3 measurements). Financial assets and liabilities carried at fair value are to be classified and disclosed in one of the following three levels of the fair value hierarchy, of which the first two are considered observable and the last is considered unobservable:

Level 1: Quoted prices in active markets for identical assets or liabilities.

Level 2: Observable inputs, other than Level 1 prices, such as quoted prices for similar assets or liabilities in active markets; quoted prices for similar assets or liabilities in markets that are not active; or other inputs other than quoted prices that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities, including interest rates and yield curves, and market corroborated inputs.

Level 3: Unobservable inputs for the asset or liability that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities. These are valued based on our estimates and assumptions that market participants would use in pricing the asset or liability.

F-28

Table of Contents

**TORRID INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Financial assets and liabilities measured at fair value on a recurring basis as of the end of fiscal year 2015 consisted of the following (in thousands):

| | January 30, 2016 | Quoted Prices in Active Markets for Identical Items (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Assets: | | | | |
| Money market funds (cash equivalent) | $ 25,693 | $ 25,693 | $ — | $ — |
| Total assets | $ 25,693 | $ 25,693 | $ — | $ — |
| Liabilities: | | | | |
| Deferred compensation plan liability (noncurrent) | $ 1,051 | $ — | $ 1,051 | $ — |
| Total liabilities | $ 1,051 | $ — | $ 1,051 | $ — |

Financial assets and liabilities measured at fair value on a recurring basis as of the end of fiscal year 2016 consisted of the following (in thousands):

| | January 28, 2017 | Quoted Prices in Active Markets for Identical Items (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Assets: | | | | |
| Money market funds (cash equivalent) | $ 5 | $ 5 | $ — | $ — |
| Total assets | $ 5 | $ 5 | $ — | $ — |
| Liabilities: | | | | |
| Deferred compensation plan liability (noncurrent) | $ 2,672 | $ — | $ 2,672 | $ — |
| Total liabilities | $ 2,672 | $ — | $ 2,672 | $ — |

The fair value of our money market funds is based on quoted prices in active markets. The deferred compensation plan liability represents the amount that would be earned by participants if the funds were invested in securities traded in active markets. The fair value of the deferred compensation plan liability is determined based on quoted prices of similar assets that are traded in observable markets, or represents the cash withheld by participants prior to any investment activity.

**Note 16. Subsequent Events**

Subsequent events were evaluated through April 13, 2017, which is the date these consolidated financial statements were available to be issued.

**Table of Contents**

**SCHEDULE I – CONDENSED FINANCIAL INFORMATION OF THE REGISTRANT**
**Parent-Company-Only**
**CONDENSED BALANCE SHEETS**
**(in thousands)**

|  | January 30, 2016 | | January 28, 2017 | |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Income tax receivable | $ | 56 | $ | 45 |
| Total current assets | | 56 | | 45 |
| Investment in subsidiaries | | 107,372 | | 112,123 |
| Total assets | $ | 107,428 | $ | 112,168 |
| **Liabilities and stockholder's equity** | | | | |
| Current liabilities: | | | | |
| Total current liabilities | $ | — | $ | — |
| Related party promissory note interest payable | | 145 | | 51 |
| Related party promissory note | | 45,000 | | 15,209 |
| Total liabilities | | 45,145 | | 15,260 |
| **Stockholder's equity:** | | | | |
| Additional paid-in capital | | 261,667 | | 325,349 |
| Accumulated deficit | | (199,351) | | (228,448) |
| Accumulated other comprehensive income (loss) | | (33) | | 7 |
| Total stockholder's equity | | 62,283 | | 96,908 |
| Total liabilities and stockholder's equity | $ | 107,428 | $ | 112,168 |

*The accompanying notes are an integral part of these condensed financial statements.*

F-30

Table of Contents

**SCHEDULE I – CONDENSED FINANCIAL INFORMATION OF THE REGISTRANT**
**Parent-Company-Only**
**CONDENSED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**(in thousands)**

| | Fiscal Year Ended | |
| --- | --- | --- |
| | January 30, 2016 | January 28, 2017 |
| Net sales | $  — | $  — |
| Cost of goods sold | — | — |
| Gross profit | — | — |
| Selling, general and administrative expenses | — | — |
| Loss from operations | — | — |
| Related party interest expense | (145) | (115) |
| Loss before benefit for income taxes | (145) | (115) |
| Benefit for income taxes | (56) | (45) |
| Equity loss in subsidiary | (163,695) | (29,027) |
| Net loss | $ (163,784) | $ (29,097) |
| Comprehensive loss: | | |
| Net loss | $ (163,784) | $ (29,097) |
| Other comprehensive income (loss): | | |
| Foreign currency translation adjustment | (33) | 40 |
| Total other comprehensive income (loss) | (33) | 40 |
| Comprehensive loss | $ (163,817) | $ (29,057) |

*The accompanying notes are an integral part of these condensed financial statements.*

F-31

**Table of Contents**

**SCHEDULE I – CONDENSED FINANCIAL INFORMATION OF THE REGISTRANT**
**Parent-Company-Only**
**CONDENSED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Fiscal Year Ended | |
|---|---|---|
| | January 30, 2016 | January 28, 2017 |
| **OPERATING ACTIVITIES** | | |
| Net loss | $ (163,784) | $ (29,097) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
|     Equity loss in subsidiary | 163,695 | 29,027 |
|     Changes in operating assets and liabilities: | | |
|         Income taxes receivable | (56) | 11 |
|         Related party promissory note interest payable | 145 | (94) |
| Net cash provided by operating activities | — | (153) |
| **INVESTING ACTIVITIES** | | |
| Acquisition of Torrid LLC from Hot Topic, Inc. | (55,000) | — |
| Net cash used in investing activities | (55,000) | — |
| **FINANCING ACTIVITIES** | | |
| Capital contribution from Torrid Holding LLC | 45,000 | — |
| Proceeds from related party promissory note | 45,000 | — |
| Repayment of related party promissory note | — | (29,791) |
| Contribution to subsidiary | (35,000) | — |
| Dividend from subsidiary | — | 29,944 |
| Net cash provided by financing activities | 55,000 | 153 |
| (Decrease) increase in cash | — | — |
| Effect of foreign currency exchange rate changes on cash | — | — |
| Cash and cash equivalents at beginning of period | — | — |
| Cash and cash equivalents at end of period | $ — | $ — |

*The accompanying notes are an integral part of these condensed financial statements.*

F-32

Table of Contents

**SCHEDULE I – CONDENSED FINANCIAL INFORMATION OF THE REGISTRANT**
**Parent-Company-Only**
**NOTES TO CONDENSED FINANCIAL STATEMENTS**

**Note 1. Basis of Presentation**

Torrid Inc. (formerly known as Torrid Holding Corp.) or Torrid, was incorporated in Delaware on April 8, 2015 and is a wholly owned subsidiary of Torrid Holding LLC. Torrid Holding LLC is majority-owned by investment funds managed by Sycamore Partners Management, LLC, or Sycamore. The parent-company-only financial statements should be read in conjunction with the audited consolidated financial statements of Torrid Inc. which are included elsewhere in this prospectus. The parent-company-only financial statements are for Torrid Inc. and exclude the operations of its directly owned subsidiary, Torrid LLC. For purposes of this condensed financial information, Torrid's wholly-owned and majority-owned subsidiaries are recorded based upon their proportionate share of the subsidiaries' net assets (similar to presenting them using the equity method). Torrid Inc.'s investment in subsidiaries is stated at cost plus contributions from parent and earnings or losses from subsidiaries.

On May 1, 2015, Hot Topic entered into a contribution agreement pursuant to which Hot Topic contributed all of the existing assets and liabilities related to its former Torrid business to a newly-formed separate wholly-owned subsidiary of Hot Topic, Torrid LLC. Immediately thereafter, on May 1, 2015, Hot Topic entered into a purchase agreement with Torrid Inc., pursuant to which Hot Topic sold all of its issued and outstanding equity interests in Torrid LLC to us for cash consideration of $55 million. This acquisition was accounted for as a common control transaction under ASC 805, Business Combinations.

Income taxes and share-based compensation expense have been allocated to Torrid's subsidiaries for the fiscal years ended January 30, 2016 and January 28, 2017.

**Note 2. Guarantees and Restrictions**

In May 2015, Torrid LLC entered into a credit agreement for a senior secured asset-based revolving credit facility, or ABL Facility, of $50 million (subject to a borrowing base), with Bank of America, N.A. Certain of Torrid LLC's domestic subsidiaries are co-borrowers with Torrid LLC under the ABL Facility and the principal amount outstanding of the loans under the ABL Facility are expected to be due and payable in full May 2020.

All obligations under the ABL Facility are unconditionally guaranteed by substantially all of Torrid LLC's existing majority-owned domestic subsidiaries and will be required to be guaranteed by certain of Torrid LLC's future domestic majority-owned subsidiaries. All obligations under the ABL Facility, and the guarantees of those obligations, will be secured, subject to certain exceptions, by substantially all of Torrid LLC's assets. The ABL Facility contains a number of covenants that, among other things and subject to certain exceptions, will restrict Torrid LLC's ability and its subsidiaries to: incur additional indebtedness; pay dividends on Torrid LLC's capital stock or redeem, repurchase or retire Torrid LLC's capital stock or Torrid LLC's other indebtedness; make investments, loans and acquisitions; sell assets, including capital stock of Torrid LLC's subsidiaries; alter the business Torrid LLC conducts; consolidate or merge; and incur liens. As of the end of fiscal 2016, Torrid LLC was compliant with its debt covenants under the ABL Facility.

**Note 3. Subsequent Events**

Subsequent events were evaluated through April 13, 2017, which is the date that the condensed financial statements were available to be issued.

F-33

Table of Contents

**TORRID INC.**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share and per share data)**

|  | January 28, 2017 | April 29, 2017 (unaudited) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 9,583 | $ 23,487 |
| Restricted Cash | 102 | 102 |
| Inventory | 103,371 | 98,814 |
| Prepaid expenses and other current assets | 10,130 | 11,585 |
| Total current assets | 123,186 | 133,988 |
| Property and equipment, net | 131,512 | 142,021 |
| Deposits and other noncurrent assets | 386 | 385 |
| Deferred tax asset | 1,280 | 1,280 |
| Intangible assets, net | 9,422 | 9,318 |
| Total assets | $ 265,786 | $ 286,992 |
| **Liabilities and stockholder's equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 19,795 | $ 26,919 |
| Accrued and other current liabilities | 66,828 | 64,466 |
| Borrowings under credit facility | 6,875 | — |
| Due to related parties | 16,605 | 18,553 |
| Income taxes payable | 2,695 | 4,623 |
| Total current liabilities | 112,798 | 114,561 |
| Deferred rent and other noncurrent liabilities | 35,409 | 38,053 |
| Deferred tax liability | 2,790 | 2,790 |
| Deferred compensation | 2,672 | 3,068 |
| Related party promissory note | 15,209 | 15,209 |
| Total liabilities | 168,878 | 173,681 |
| Commitments and contingencies (Note 13) | | |
| Stockholder's equity: | | |
| Common shares: $0.01 par value; 1,000 shares authorized; 1 share issued and outstanding at January 28, 2017 and April 29, 2017 | — | — |
| Additional paid-in capital | 325,349 | 338,326 |
| Accumulated deficit | (228,448) | (224,970) |
| Accumulated other comprehensive income (loss) | 7 | (45) |
| Total stockholder's equity | 96,908 | 113,311 |
| Total liabilities and stockholder's equity | $ 265,786 | $ 286,992 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-34

Table of Contents

**TORRID INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**AND COMPREHENSIVE INCOME**
**(UNAUDITED)**
**(in thousands, except share data)**

| | Three Months Ended April 30, 2016 | Three Months Ended April 29, 2017 |
|---|---|---|
| Net sales | $ 151,977 | $ 197,523 |
| Cost of goods sold | 85,098 | 119,618 |
| Gross profit | 66,879 | 77,905 |
| Selling, general and administrative expenses | 42,041 | 58,251 |
| Share-based compensation | 3,059 | 12,977 |
| Income from operations | 21,779 | 6,677 |
| Interest income (expense) and other, net | 328 | (353) |
| Income before provision for income taxes | 22,107 | 6,324 |
| Provision for income taxes | 9,054 | 2,846 |
| Net income | $ 13,053 | $ 3,478 |
| Comprehensive income | | |
| Net income | $ 13,053 | $ 3,478 |
| Other comprehensive income (loss): | | |
| Foreign currency translation adjustment | 75 | (52) |
| Total other comprehensive income (loss) | 75 | (52) |
| Comprehensive income | $ 13,128 | $ 3,426 |
| **Net income per share:** | | |
| Basic and diluted | $ 13,053 | $ 3,478 |
| **Weighted average number of shares:** | | |
| Basic and diluted | 1 | 1 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-35

Table of Contents

**TORRID INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**
**(In thousands)**

| | Three Months Ended April 30, 2016 | | Three Months Ended April 29, 2017 | |
|---|---|---|---|---|
| OPERATING ACTIVITIES | | | | |
| Net income | $ | 13,053 | $ | 3,478 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Depreciation and amortization | | 3,606 | | 5,377 |
| Loss on disposal of property and equipment | | 29 | | 37 |
| Share-based compensation | | 3,059 | | 12,977 |
| Gift card breakage | | (128) | | (137) |
| Non cash foreign currency transaction (gain) loss | | (402) | | 236 |
| Changes in operating assets and liabilities: | | | | |
| Inventory | | 382 | | 4,535 |
| Prepaid expenses and other current assets | | (1,364) | | (1,455) |
| Deposits and other noncurrent assets | | (15) | | (16) |
| Accounts payable | | 3,095 | | 7,935 |
| Accrued and other current liabilities | | (7,295) | | (3,986) |
| Deferred rent and other noncurrent liabilities | | 3,987 | | 2,644 |
| Deferred compensation | | 303 | | 396 |
| Due to related parties | | (2,059) | | 1,948 |
| Income taxes payable | | 4,317 | | 1,928 |
| Net cash provided by operating activities | | 20,568 | | 35,897 |
| INVESTING ACTIVITIES | | | | |
| Purchases of property and equipment | | (10,673) | | (15,033) |
| Net cash used in investing activities | | (10,673) | | (15,033) |
| FINANCING ACTIVITIES | | | | |
| Proceeds from credit facility | | — | | 69,530 |
| Principal payments on credit facility | | — | | (76,405) |
| Net cash used in financing activities | | — | | (6,875) |
| Increase in cash and cash equivalents | | 9,895 | | 13,989 |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | | 205 | | (85) |
| Cash and cash equivalents at beginning of period | | 33,164 | | 9,583 |
| Cash and cash equivalents at end of period | $ | 43,264 | $ | 23,487 |
| SUPPLEMENTAL INFORMATION | | | | |
| Cash paid during the period for interest related to the promissory note and credit facility | $ | 49 | $ | 4 |
| Cash paid during the period for income taxes | $ | 4,743 | $ | 920 |
| SUPPLEMENTAL DISCLOSURE OF NONCASH INVESTING ACTIVITIES | | | | |
| Property and equipment purchases included in accounts payable and accrued liabilities | $ | 14,663 | $ | 9,351 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-36

Table of Contents

**TORRID INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1. Basis of Presentation and Description of the Business**

Torrid Inc. (formerly known as Torrid Holding Corp.), or Torrid, was incorporated in Delaware on April 8, 2015 and is a wholly owned subsidiary of our parent, Torrid Holding LLC. Torrid Holding LLC is majority-owned by investment funds managed by Sycamore Partners Management, LLC, or Sycamore. Throughout these financial statements, the terms "we," "us," "our," the "Company" and similar references refer to Torrid and its consolidated subsidiaries.

Our fiscal year ends on the Saturday nearest to January 31 and each fiscal year is generally comprised of four 13-week quarters (although in years with 53 weeks, the fourth quarter is comprised of 14 weeks). Fiscal years are identified in this prospectus according to the calendar year in which they begin. For example, references to "fiscal year 2017" or similar references refer to the fiscal year ending February 3, 2018. References to the first quarter of fiscal years 2016 and 2017 and to the three-month periods ended April 30, 2016 and April 29, 2017, respectively, refer to the 13-week periods then ended.

The accompanying unaudited interim consolidated financial statements have been prepared in accordance with United States Generally Accepted Accounting Principles, or GAAP, for interim financial information and Article 10 of Regulation S-X. Accordingly, the interim financial statements do not include all of the information and footnotes required by GAAP for complete financial statements. In the opinion of management, all adjustments (consisting of normal recurring adjustments) considered necessary for a fair statement of the results for the interim periods presented have been included. Operating results for the three-month periods ended April 30. 2016 and April 29, 2017 are not necessarily indicative of the results that may be expected for any future interim periods, the fiscal year ending 2017, or for any future year.

The consolidated balance sheet information at January 28, 2017 has been derived from the audited consolidated financial statements at that date, but does not include all of the disclosures required by GAAP. The accompanying unaudited interim consolidated financial statements and related footnotes should be read in conjunction with the Company's audited consolidated financial statements and notes thereto for the year ended January 28, 2017 included elsewhere in this prospectus/ registration statement. The unaudited interim consolidated financial statements include Torrid and those of our wholly owned subsidiaries. All significant intercompany transactions and balances have been eliminated in consolidation.

***Description of Business*** We are a branded omni-channel retailer of apparel, intimates and accessories targeting the 25- to 40-year-old woman who is curvy and wears sizes 10 to 30. We generate revenues primarily through our stores in the United States of America, Puerto Rico and Canada, and through our e-commerce platform www.torrid.com.

***Segment Reporting*** We have determined that we have one reportable segment, which includes the operation of our e-commerce platform and retail stores. The single segment was identified based on how the Chief Operating Decision Maker, who we have determined to be our Chief Executive Officer, manages and evaluates performance and allocates resources. Revenues and long-lived assets relating to our operations in Canada and Puerto Rico during the first quarter of fiscal years 2016 and 2017 and as of the end of the same periods were not material, and therefore, are not reported separately from domestic net sales and long-lived assets.

***Store Pre-Opening Costs*** Cost incurred in connection with the opening of new stores, store remodels or relocations are expensed as incurred. We incurred $1.3 million and $1.2 million of pre-opening costs in the first quarter of fiscal years 2016 and 2017, respectively.

F-37

Table of Contents

**TORRID INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**Note 2. Accounting Standards**

*Recently Adopted Accounting Standards*

In March 2016, the FASB issued ASU 2016-09, *Improvements to Employee Share-Based Payment Accounting*. The amendments in this update involve several aspects of accounting for equity-based payment transactions, including income tax consequences, classification of awards, and classification on the statement of cash flows. The amendments in this update were effective for fiscal years beginning after December 15, 2016, including interim reporting periods within those annual reporting periods. Early adoption is permitted for any entity in any interim or annual period. If an entity early adopts the amendments in an interim period, any adjustments should be reflected as of the beginning of the fiscal year that includes that interim period. An entity that elects early adoption must adopt all of the amendments in the same period. Our adoption of this new guidance did not have any impact on our consolidated financial position or results of operations.

In September 2015, the FASB issued ASU 2015-16, *Business Combinations* (Topic 805, *Simplifying the Accounting for Measurement-Period Adjustments*), which changes the requirement to restate prior period financial statements for measurement period adjustments. The new guidance requires that measurement period adjustments be recognized in the reporting period in which the adjustment amount is determined. This includes the cumulative impact of measurement period adjustments on current and prior periods. The cumulative adjustment would be reflected within the respective financial statement line items affected. The guidance was effective for fiscal years beginning after December 15, 2015, including interim reporting periods within those annual reporting periods. Our adoption of this new guidance did not have a material impact on our consolidated financial position or results of operations.

In July 2015, the FASB issued ASU 2015-11, *Inventory* (Subtopic 330, *Simplifying the Measurement of Inventory*), which simplifies the subsequent measurement of inventory by replacing the lower of cost or market test with a lower of cost and net realizable value test. The new guidance was effective for fiscal years beginning after December 15, 2016, including interim reporting periods within those annual reporting periods and requires prospective adoption, with early adoption permitted. Our adoption of this new guidance did not have a material impact on our consolidated financial position or results of operations.

In February 2015, the FASB issued ASU 2015-02, *Consolidation* (Subtopic 810, *Amendments to the Consolidation Analysis*), which modifies existing consolidation guidance for reporting organizations that are required to evaluate whether they should consolidate certain legal entities. This new guidance was effective for fiscal periods beginning after December 15, 2015, including interim reporting periods within those annual reporting periods and allows for either full retrospective or modified retrospective adoption, with early adoption permitted. Our adoption of this new guidance did not have a material impact on our consolidated financial position or results of operations.

*Recently Issued Accounting Pronouncements*

In November 2016, the FASB issued ASU 2016-18, *Restricted Cash*, which requires an entity to reconcile and explain the period-over-period change in total cash, cash equivalents and restricted cash within its statements of cash flows. The guidance is effective for fiscal years beginning after December 15, 2017, including interim reporting periods within those annual reporting periods. Early adoption is permitted. A reporting entity must apply the amendments in this guidance using a full retrospective approach. We do not expect that our adoption of this new guidance will have a material impact on our consolidated financial position or results of operations.

F-38

**Table of Contents**

**TORRID INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS (continued)**

In October 2016, the FASB issued ASU 2016-16 (Topic 740, *Income Taxes): Intra-Entity Transfers of Assets Other Than Inventory*. Currently, it is prohibited to recognize current and deferred income taxes for an intra-entity asset transfer until the asset has been sold to an outside party. This prohibition on recognition is an exception to the principle of comprehensive recognition of current and deferred income taxes. The new guidance requires an entity to recognize the income tax consequences of an intra-entity transfer of an asset other than inventory when the transfer occurs and eliminates the exception for an intra-entity transfer of an asset other than inventory. Two common examples of assets included in the scope of the amendments are intellectual property and property, plant and equipment. The guidance will be effective for fiscal years beginning after December 15, 2017, including interim reporting periods within those annual reporting periods. Early adoption is permitted. We do not expect that our adoption of this new guidance will have a material impact on our consolidated financial position or results of operations.

In August 2016, the FASB issued ASU 2016-15, *Classification of Certain Cash Receipts and Payments (*Topic 230, *Statement of Cash Flows*), which reduces diversity in practice in how certain transactions are presented. The issues addressed in the new guidance include the classification of debt prepayment or debt extinguishment costs, the classification of proceeds from the settlement of insurance claims and the classification of a transferor's beneficial interests in securitization transactions. The guidance will be effective for fiscal years beginning after December 15, 2017, including interim reporting periods within those annual reporting periods. Early adoption is permitted, provided that all of the amendments are adopted in the same period. Retrospective application is required. We do not expect that our adoption of this new guidance will have a material impact on our consolidated financial position or results of operations.

In February 2016, the FASB issued ASU 2016-02, *Leases*, which replaces the existing guidance in ASC 840, *Leases*. The new guidance establishes a right-of-use model that requires a lessee to record a right-of-use asset and a corresponding lease liability on the balance sheet for all leases with terms longer than 12 months. Leases will be classified as either finance leases or operating leases, with classification affecting the pattern of expense recognition in the income statement. The guidance will be effective for fiscal years beginning after December 15, 2018, including interim reporting periods within those annual reporting periods. Retrospective application is required. We expect that our assets and liabilities in our consolidated balance sheets will significantly increase. We are currently evaluating other effects that adopting this new accounting guidance will have on our consolidated financial position and results of operations.

In May 2014, the FASB issued ASU 2014-09, *Revenue from Contracts with Customers*, as a new Topic, ASC Topic 606. The new guidance established principles for reporting revenue and cash flows arising from an entity's contracts with customers. This new revenue recognition standard will replace most of the recognition guidance within GAAP. This guidance was deferred by ASU 2015-14, *Revenue from Contracts with Customers* (Topic 606): Deferral of the Effective Date, issued by the FASB in August 2015, which deferred the effective date of ASU 2014-09 from annual and interim periods beginning after December 15, 2016 to annual and interim periods beginning after December 15, 2017. In March 2016, the FASB issued ASU 2016-08, *Revenue from Contracts with Customers: Principal versus Agent Considerations*, which further clarifies the implementation guidance in ASU 2014-09. In April 2016, the FASB issued ASU 2016-10, *Revenue from Contracts with Customers* (Topic 606): *Identifying Performance Obligations and Licensing*, to expand the guidance on identifying performance obligations and licensing within ASU 2014-09. In May 2016, the FASB issued ASU 2016-12, *Revenues from Contracts with Customers: Narrow-Scope Improvements and Practical Expedients*, which amends the guidance in the new revenue standard on collectability, noncash consideration, presentation of sales tax, and transition. The amendments are intended to address implementation issues that were raised by stakeholders and provide additional practical expedients to reduce the cost and complexity of applying the new revenue standard. In December 2016, the FASB issued ASU 2016-20, *Technical Corrections and Improvements to Topic 606, Revenue from Contracts with Customers*, which amends narrow aspects of the guidance in ASU

F-39

**Table of Contents**

**TORRID INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS (continued)**

2014-09, *Revenue from Contracts with Customers*. These standards are effective for fiscal years beginning after December 15, 2017, including interim reporting periods within those annual reporting periods. We are evaluating the impact adopting these standards will have on our consolidated financial statements.

**Note 3. Inventory**

Inventory is valued at the lower of moving average cost or net realizable value. We make certain assumptions regarding net realizable value in order to assess whether our inventory is recorded properly at the lower of cost or net realizable value. These assumptions are based on both historical average selling price experience and current selling price information.

Physical inventory counts are conducted at least once during the year to determine actual inventory on hand and shrinkage. We accrue our estimated inventory shrinkage for the period between the last physical count and current balance sheet date.

**Note 4. Prepaid Expenses and Other Current Assets**

Prepaid expenses and other current assets consist of the following (in thousands):

|  | January 28, 2017 | April 29, 2017 |
|---|---|---|
| Accounts receivable | $ 7,657 | $ 6,514 |
| Prepaid advertising | 1,274 | 1,643 |
| Prepaid rent | 72 | 2,155 |
| Other | 1,127 | 1,273 |
| Prepaid expenses and other current assets | $ 10,130 | $ 11,585 |

**Note 5. Property and Equipment**

Property and equipment are summarized as follows (in thousands):

|  | January 28, 2017 | April 29, 2017 |
|---|---|---|
| Leasehold improvements | $ 112,230 | $ 117,078 |
| Furniture, fixtures and equipment | 59,612 | 70,018 |
| Software and licenses | 870 | 749 |
| Construction-in-progress | 527 | 791 |
|  | 173,239 | 188,636 |
| Less: Accumulated depreciation and amortization | (41,727) | (46,615) |
| Property and equipment, net | $ 131,512 | $ 142,021 |

We recorded depreciation expense related to our property and equipment in the amounts of $3.5 million and $5.3 million during the first quarter of fiscal years 2016 and 2017, respectively.

**Note 6. Intangible Assets**

During the first quarter of fiscal years 2016 and 2017, we amortized $0.1 million and $0.1 million, respectively, of net favorable leasehold interests in occupancy costs within cost of goods sold in our consolidated

F-40

Table of Contents

**TORRID INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS (continued)**

statements of operations and comprehensive income. As of the end of the first quarter of fiscal year 2017, we had $0.9 million of unamortized leasehold interests in our consolidated balance sheet which are expected to be recognized over a weighted average remaining period of 1.7 years.

**Note 7. Accrued and Other Current Liabilities**

Accrued and other current liabilities consist of the following (in thousands):

|  | January 28, 2017 | April 29, 2017 |
|---|---|---|
| Accrued payroll and related expenses | $ 14,704 | $ 9,255 |
| Accrued loyalty program | 6,476 | 7,019 |
| Accrued inventory-in-transit | 12,116 | 6,127 |
| Accrued cost of property and equipment | 2,991 | 4,741 |
| Deferred revenue | 4,165 | 5,118 |
| Accrued professional fees | 481 | 3,932 |
| Current portion of deferred rent | 2,085 | 3,810 |
| Accrued sales and use tax | 2,619 | 3,472 |
| Gift cards, gift certificates and store merchandise credits | 4,387 | 3,119 |
| Accrued marketing | 3,309 | 2,666 |
| Accrued self-insurance liabilities | 1,705 | 1,845 |
| Other | 11,790 | 13,362 |
| Accrued and other current liabilities | $ 66,828 | $ 64,466 |

**Note 8. Loyalty Program**

On July 24, 2014, we relaunched our loyalty program, Torrid Insider, in all our stores and on torrid.com. Under this program, customers accumulate points based on purchase activity and upon reaching a certain point level, customers can earn awards that may only be redeemed for merchandise. Unredeemed points are subject to expiration after 13 months without additional purchase activity and unredeemed awards expire 45 days after issuance. We use historical redemption rates to estimate the value of future award redemptions and we recognize the estimated value of these future awards as a reduction of revenue in the consolidated statements of operations and comprehensive income in the period the points are earned by the customer. As of the end of fiscal year 2016 and as of the end of the first quarter of fiscal year 2017, we had $6.5 million and $7.0 million, respectively, in deferred revenue related to the loyalty program included in accrued and other current liabilities in the consolidated balance sheets. We recorded $0.9 million and $0.5 million as a reduction of net sales in the first quarter of fiscal years 2016 and 2017, respectively. Future revisions to the estimated liability may result in changes to net sales.

**Note 9. Related Party Transactions**

*Transition Services Agreement* On May 1, 2015, we entered into a transition services agreement with Hot Topic Inc., or Hot Topic, under which Hot Topic provided us with certain services to help ensure an orderly transition for us following the Separation. Under the transition services agreement, Hot Topic provided us (or caused applicable third parties to provide) certain back office and general and administrative services, including information technology, logistics management and other specified services to ensure our stand-alone functionality. Each month, we were committed to pay Hot Topic for these services. We recorded payments made to Hot Topic under the transition services agreement in the applicable expense category in either cost of goods

F-41

**Table of Contents**

**TORRID INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS (continued)**

sold, or selling, general and administrative expenses. During the first quarter of fiscal years 2016 and 2017, Hot Topic charged us $10.2 million and $9.7 million, respectively, for various services, of which $1.8 million and $2.9 million, respectively, were recorded as components of cost of goods sold, and the remaining $8.4 million and $6.8 million, respectively, were charged to selling, general and administrative expense. As of the end of fiscal year 2016 and as of the end of the first quarter of fiscal year 2017, we owed $3.2 million and $9.0 million, respectively, to Hot Topic under the transition services agreement which are included in due to related parties in our consolidated balance sheets.

Hot Topic incurs certain direct expenses on our behalf, such as payments to our non-merchandise vendors and each month, we pay Hot Topic for these pass-through expenses. As of the end of fiscal year 2016 and as of the end of the first quarter of fiscal year 2017, the net amounts we owed Hot Topic for these expenses were $10.6 million and $7.1 million, respectively, which are included in due to related parties in our consolidated balance sheets.

***Promissory Note to Parent*** On May 1, 2015, we issued a $45.0 million promissory note to our parent, Torrid Holding LLC, due on or before May 1, 2018, or the Related Party Promissory Note. On June 16, 2016, we made a $29.8 million repayment of the Related Party Promissory Note and paid $0.2 million of related interest. We shall pay interest at an annual compounding rate of 0.43% upon maturity of the Related Party Promissory Note. The Related Party Promissory Note interest rate is equal to the federal rate for May 2015 for a short-term instrument with an annual compounding interest rate. As of the end of fiscal year 2016 and as of the end of the first quarter of fiscal year 2017, there was a $15.2 million lump sum principal payment due upon the May 1, 2018 maturity date and the total amount of interest owed was $0.1 million.

***Sponsor Advisory Services Agreement*** On May 1, 2015, we entered into an advisory services agreement with Sycamore, pursuant to which Sycamore agreed to provide strategic planning and other related services to us. We are obligated to reimburse Sycamore for its expenses incurred in connection with providing such advisory services to us. As of the end of fiscal year 2016 and as of the end of the first quarter of fiscal year 2017, there were no amounts due, and during the first quarter of fiscal years 2016 and 2017, no amounts were paid under this agreement.

From time to time, we reimburse Sycamore for certain management expenses it pays on our behalf. During the first quarter of fiscal years 2016 and 2017, the reimbursement we made to Sycamore for such expenses was not material.

***Other Related Party Transactions***

MGF Sourcing US, LLC, an entity indirectly controlled by affiliates of Sycamore, is one of our suppliers. During the first quarter of fiscal years 2016 and 2017, purchases from this supplier were $4.1 million and $6.5 million, respectively. As of the end of fiscal year 2016 and as of the end of the first quarter of fiscal year 2017, the net amounts we owed MGF Sourcing US, LLC for these purchases were $2.8 million and $2.1 million, respectively. This liability is included in due to related parties in our consolidated balance sheets.

HU Merchandising, LLC, a subsidiary of Hot Topic, is one of our suppliers. During the first quarter of fiscal year 2017, purchases from this supplier were $0.2 million. As of the end of the first quarter of fiscal year 2017, the net amount we owed HU Merchandising, LLC for these purchases was $0.2 million. This liability is included in due to related parties in our consolidated balance sheets. As of the end of fiscal year 2016, there were no amounts due and during the first quarter of fiscal year 2016, no amounts were paid to this supplier.

F-42

**Table of Contents**

**TORRID INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS (continued)**

During the first quarter of fiscal year 2017, we entered into an agreement with Hot Topic under which Hot Topic will move into the retail store space of two Torrid stores closing during the second quarter of fiscal year 2017. As a result of this agreement and with landlord consent, we shall avoid certain costs associated with terminating our lease agreements and pay Hot Topic $0.2 million in the aggregate. The expense was recorded as a component of cost of goods sold and the liability is included in due to related parties in our consolidated balance sheets.

**Note 10. Debt Financing Arrangements**

*Senior Secured Asset-Based Revolving Credit Facility* In May 2015, we entered into a credit agreement for a senior secured asset-based revolving credit facility, or ABL Facility, of $50 million (subject to a borrowing base), with Bank of America, N.A.

Certain of our domestic subsidiaries are co-borrowers with us under the ABL Facility and the principal amount outstanding of the loans under the ABL Facility is expected to be due and payable in full in May 2020.

Availability under the ABL Facility is subject to a percentage of our eligible inventory and receivables to collateralize the borrowing and is reduced by the level of outstanding letters of credit.

The borrowing base for the revolving credit facility at any time equals the sum of 90% of eligible credit card receivables, plus 90% of the appraised net orderly liquidation value of eligible inventory and eligible in-transit inventory multiplied by the cost of such eligible inventory and eligible in-transit inventory (to be increased to 92.5% during the period beginning on September 1 of each year and ending on December 31 of each year). The ABL Facility includes borrowing capacity for letters of credit and for borrowings on same-day notice, referred to as Swing Line Loans, and will be available in U.S. dollars.

We have the right to request up to $30 million of additional commitments under the ABL Facility, and the lenders under this facility are not under any obligation to provide any such additional commitments, and any increase in commitments is subject to customary conditions precedent. If we were to request any such additional commitments and the existing lenders or new lenders were to agree to provide such commitments, the ABL Facility size could increase to up to $80 million, but our ability to borrow under this facility would still be limited by the amount of the borrowing base.

Borrowings under the ABL Facility bear interest at an annual rate equal to, at our option, either (a) a base rate determined by reference to the highest of (1) the prime rate of Bank of America, N.A., (2) the federal funds effective rate plus 0.50% and (3) a LIBOR rate for an interest period of one month adjusted for certain costs, plus 1.00% or (b) at a LIBOR rate for the interest period relevant to such borrowing adjusted for certain costs ("Adjusted LIBOR"), in each case plus an applicable margin that ranges from 1.75% to 2.0% for LIBOR borrowings and 0.75% to 1.0% for base rate borrowings.

If we elect the LIBOR rate, interest is due and payable on the last day of each interest period, unless an interest period exceeds three months, then the respective dates that fall every three months after the beginning of the interest period shall also be interest payment dates. If we opt for the base rate, (including a Swing Line Loan), interest is due and payable on the first business day of each month and on the maturity date. The elected interest rate as of the end of the first quarter of fiscal year 2017 was 4.75%.

In addition to paying interest on outstanding principal under the ABL Facility, we are required to pay a commitment fee in respect of unutilized commitments. The commitment fee ranges between 0.25% and 0.375% per annum of unutilized commitments and will be subject to adjustment each fiscal quarter based on the amount

F-43

Table of Contents

**TORRID INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS (continued)**

of unutilized commitments during the immediately preceding fiscal quarter. We must also pay customary letter of credit fees and agent fees.

If at any time the aggregate amount of outstanding loans, unreimbursed letter of credit drawings and undrawn letters of credit under the ABL Facility exceeds the lesser of (a) the commitment amount and (b) the borrowing base, we will be required to repay outstanding loans and/or cash collateralize letters of credit in an aggregate amount equal to such excess, with no reduction of the commitment amount.

We may voluntarily reduce the unused portion of the commitment amount and repay outstanding loans at any time. Prepayment of the loans may be made without premium or penalty other than customary "breakage" costs with respect to LIBOR loans.

All obligations under the ABL Facility are unconditionally guaranteed by substantially all of our existing majority-owned domestic subsidiaries and will be required to be guaranteed by certain of our future domestic majority-owned subsidiaries. All obligations under the ABL Facility, and the guarantees of those obligations, will be secured, subject to certain exceptions, by substantially all of our assets.

Our ABL Facility contains a number of covenants that, among other things and subject to certain exceptions, will restrict our ability and the ability of our subsidiaries to: incur additional indebtedness; pay dividends on our capital stock or redeem, repurchase or retire our capital stock or our other indebtedness; make investments, loans and acquisitions; engage in transactions with our affiliates; sell assets, including capital stock of our subsidiaries; alter the business we conduct; consolidate or merge; and incur liens. As of the end of the first quarter of fiscal 2017, we were compliant with our debt covenants under the ABL Facility.

The ABL Facility specifically restricts dividends and distributions, aside from amounts to cover ordinary operating expenses and taxes, from our subsidiaries to us and to our parent. However, dividends and distributions are permitted at any time that either (1) availability under the ABL facility is greater than 15% of the maximum borrowing amount and we are pro forma compliant with a 1.1 to 1.0 fixed charge coverage ratio or (2) availability under the ABL facility is equal to or greater than 35% of the maximum borrowing amount. At April 29, 2017, the maximum restricted payment that our subsidiaries could make from its net assets was $43.0 million, or 33% of their total net assets.

Availability under the ABL Facility at the end of fiscal year 2016 was $42.3 million, which reflects a $6.9 million utilization of the facility. Availability under the ABL Facility at the end of the first quarter of fiscal year 2017 was $49.2 million, which reflects no amounts outstanding. We consider the carrying amount of the ABL Facility to approximate fair value because of the variable interest rate of this facility. Standby letters of credit issued and outstanding under the ABL Facility were $0.8 million both as of the end of fiscal year 2016 and as of the end of the first quarter of fiscal year 2017. During the first quarter of fiscal years 2016 and 2017, amortization of financing costs and interest payments for the ABL Facility were immaterial and were recognized in interest expense and other, net.

**Note 11. Income Taxes**

*Effective Tax Rate* During the first quarter of fiscal years 2016 and 2017, the provision for income taxes was $9.1 million and $2.8 million, respectively. The effective tax rates for the three-month periods ended April 30, 2016 and April 29, 2017 were 41.0% and 45.0%, respectively. The change in the effective tax rate for the three-month period ended April 30, 2016, as compared to the same period in 2017 is primarily due to the increase in the amount of non-taxable items associated with share-based compensation and decrease in income before provision for income taxes for the three-month period ended April 29, 2017.

F-44

**Table of Contents**

**TORRID INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS (continued)**

*Uncertain Tax Positions* As of the end of fiscal year 2016 and as of the end of the first quarter of fiscal year 2017, we did not record a liability for uncertain tax positions as we believed all of the tax positions we took (or expected to take) in a tax return were more likely than not to be sustained upon examination by taxing authorities.

**Note 12. Share-Based Compensation**

During fiscal years 2015, 2016 and the first quarter of fiscal year 2017, our parent, Torrid Holding LLC, issued 16.0 million Class A, Class B, Class C, Class D, Class E, Class F, Class G, Class H and Class J Torrid incentive units in the aggregate, net of forfeitures, to certain members of our management.

The fair value incorporates various assumptions including the time to liquidity event, equity volatility and risk-free interest rate of return. Equity volatility is based on the historical volatilities of comparable publicly traded companies for the time horizon equal to the time to the anticipated liquidity event; and the risk-free interest rate is for a term corresponding to the time to liquidity event. The most recent remeasurement of the fair value of the incentive units was performed as of the end of the first quarter of fiscal year 2017 and the fair value of these awards was determined to be $102.1 million in aggregate, net of forfeitures. Based on the fair value of the incentive units as of the end of the first quarter of fiscal year 2017, we had $24.5 million of unrecognized share-based compensation expense related to the unvested and unearned portion of the incentive units.

The incentive units vest over periods ranging from 2.7 to 5.0 years from the date of grant. The share-based compensation expense and associated capital contribution for these awards is recognized over the vesting period as the awards are earned. During the first quarter of fiscal years 2016 and 2017, we recognized share-based compensation expense of $3.1 million and $13.0 million, respectively.

As of the end of the first quarter of fiscal years 2016 and 2017, Torrid Holding LLC had 13.5 million and 16.0 million of outstanding incentive units, respectively, and 6.3 million and 6.0 million of unvested incentive units, respectively, issued to our employees. These incentive units have been excluded from the calculation of earnings per share as they were not issued by us and are therefore not part of our capital structure.

**Note 13. Commitments and Contingencies**

*Litigation* From time to time, we are involved in matters of litigation that arise in the ordinary course of business. Though significant litigation or awards against us could seriously harm our business and financial results, we do not at this time expect any current litigation to have a material adverse effect on our overall financial condition. We recorded net litigation expense of $0.1 million in the first quarter of fiscal year 2016 which is included in selling, general and administrative expenses in the consolidated statements of operations and comprehensive income. We did not recognize any litigation expense in the first quarter of fiscal year 2017.

*Indemnities, Commitments and Guarantees* During the ordinary course of business, we have made certain indemnities, commitments and guarantees under which we may be required to make payments in relation to certain transactions. These indemnities include those given to various lessors in connection with facility leases for certain claims arising from such facility or lease and indemnities to our board of directors and officers to the maximum extent permitted. Commitments include those given to various merchandise vendors and suppliers. From time to time, we have issued guarantees in the form of standby letters of credit as security for workers' compensation claims. (Our letters of credit are discussed in more detail in "NOTE 10 – Debt Financing Arrangements".) The durations of these indemnities, commitments and guarantees vary. Some of these indemnities, commitments and guarantees do not provide for any limitation of the maximum potential future payments we could be obligated to make. We have not recorded any liability for these indemnities, commitments

F-45

**Table of Contents**

**TORRID INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS (continued)**

and guarantees in the accompanying consolidated financial statements as no demands have been made upon us to provide indemnification under such agreements and there are no claims that we are aware of that could have a material effect on our consolidated financial statements.

**Note 14. Stockholder's Equity**

We are authorized to issue 1,000 shares of common stock at $0.01 par value. In accordance with a stock subscription agreement dated April 8, 2015 and the contribution agreement dated May 1, 2015, our parent, Torrid Holding LLC, purchased one share of our common stock with a par value of $0.01 for $45.0 million in exchange for ownership of 100% equity interest in us. We had one share issued and outstanding as of the end of fiscal year 2016 and as of the end of the first quarter of fiscal year 2017.

**Note 15. Fair Value Measurements**

We carry certain of our assets and liabilities at fair value in accordance with GAAP. Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date.

Valuation techniques used to measure fair value requires us to maximize the use of observable inputs and minimize the use of unobservable inputs. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to unobservable inputs (Level 3 measurements). Financial assets and liabilities carried at fair value are to be classified and disclosed in one of the following three levels of the fair value hierarchy, of which the first two are considered observable and the last is considered unobservable:

Level 1: Quoted prices in active markets for identical assets or liabilities.

Level 2: Observable inputs, other than Level 1 prices, such as quoted prices for similar assets or liabilities in active markets; quoted prices for similar assets or liabilities in markets that are not active; or other inputs other than quoted prices that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities, including interest rates and yield curves, and market corroborated inputs.

Level 3: Unobservable inputs for the asset or liability that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities. These are valued based on our estimates and assumptions that market participants would use in pricing the asset or liability.

F-46

Table of Contents

**TORRID INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Financial assets and liabilities measured at fair value on a recurring basis as of the end of fiscal year 2016 consisted of the following (in thousands):

|  | January 28, 2017 | Quoted Prices in Active Markets for Identical Items (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Assets: | | | | |
| Money market funds (cash equivalent) | $ 5 | $ 5 | $ — | $ — |
| Total assets | $ 5 | $ 5 | $ — | $ — |
| Liabilities | | | | |
| Deferred compensation plan liability (noncurrent) | $ 2,672 | $ — | $ 2,672 | $ — |
| Total liabilities | $ 2,672 | $ — | $ 2,672 | $ — |

Financial assets and liabilities measured at fair value on a recurring basis as of the end of the first quarter of fiscal year 2017 consisted of the following (in thousands):

|  | April 29, 2017 | Quoted Prices in Active Markets for Identical Items (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Assets: | | | | |
| Money market funds (cash equivalent) | $ 10,084 | $ 10,084 | $ — | $ — |
| Total assets | $ 10,084 | $ 10,084 | $ — | $ — |
| Liabilities | | | | |
| Deferred compensation plan liability (noncurrent) | $ 3,068 | $ — | $ 3,068 | $ — |
| Total liabilities | $ 3,068 | $ — | $ 3,068 | $ — |

The fair value of our money market funds is based on quoted prices in active markets. The deferred compensation plan liability represents the amount that would be earned by participants if the funds were invested in securities traded in active markets. The fair value of the deferred compensation plan liability is determined based on quoted prices of similar assets that are traded in observable markets, or represents the cash withheld by participants prior to any investment activity.

**Note 16. Private Label Credit Card**

We have an agreement with a third party to provide customers with private label credit cards, or the Credit Card Agreement. Each private label credit card bears the logo of the Torrid brand and can only be used at our store locations and on torrid.com. A third-party financing company is the sole owner of the accounts issued under the private label credit card program and absorbs the losses associated with non-payment by the private label card holders and a portion of any fraudulent usage of the accounts. Pursuant to the Credit Card Agreement, we receive marketing and promotional funds from the third-party financing company for certain expenses we incur based on usage of the private label credit cards. These marketing and promotional funds are recorded as a reduction in selling, general and administrative expenses in the consolidated statements of operations and comprehensive income. During the first quarter of fiscal years 2016 and 2017, these funds amounted to $1.6 million and $1.4 million, respectively, related to these private label credit cards.

F-47

**Table of Contents**

**TORRID INC.**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**Note 17. Deferred Compensation Plan**

On August 1, 2015, we established the Torrid LLC Management Deferred Compensation Plan, or Deferred Compensation Plan, for the purpose of providing highly compensated employees a program to meet their financial planning needs. The Deferred Compensation Plan provides participants with the opportunity to defer up to 80% of their base salary and up to 100% of their annual earned bonus, all of which, together with the associated investment returns, are 100% vested from the outset. The Deferred Compensation Plan is designed to be exempt from most provisions of the Employee Retirement Security Act of 1974, as amended. All deferrals and associated earnings are our general unsecured obligations. We may at our discretion contribute certain amounts to eligible employees' accounts. To the extent participants are ineligible to receive contributions from participation in our 401(k) Plan, we contribute 50% of the first 4% of participants' eligible contributions into their Deferred Compensation Plan accounts. As of the end of fiscal year 2016 and as of the end of the first quarter of fiscal year 2017, we did not have any assets of the Deferred Compensation Plan and the associated liabilities were $2.7 million and $3.1 million, respectively, included in our consolidated balance sheets.

**Note 18. Employee Benefit Plan**

On August 1, 2015, we adopted the Torrid 401(k) Plan, or the 401(k) Plan. All employees who have been employed by us for at least 200 hours and are at least 21 years of age are eligible to participate. Employees may contribute up to 80% of their eligible compensation to the 401(k) Plan, subject to a statutorily prescribed annual limit. We may at our discretion contribute certain amounts to eligible employees' accounts. We contribute 50% of the first 4% of participants' eligible contributions into their 401(k) Plan accounts. During the first quarter of fiscal years 2016 and 2017, we contributed $0.1 million and $0.1 million, respectively, to eligible employees' Torrid 401(k) Plan accounts.

**Note 19. Subsequent Events**

On June 2, 2017, we terminated the transition services agreement and entered into a third party services agreement with Hot Topic, pursuant to which Hot Topic provides us (or causes applicable third parties to provide) certain services, including information technology, distribution and logistics management, real estate leasing and construction management and other services as may be specified. The term of the third party services agreement is three years, unless we or Hot Topic terminate the agreement (or certain services under the agreement) upon 18 months' written notice or as otherwise agreed by us or Hot Topic. Rates and costs related to the services provided under the third party services agreement may change with prior written approval from both parties.

Subsequent events were evaluated through June 6, 2017, which is the date these consolidated financial statements were available to be issued.

F-48

**Table of Contents**



**Table of Contents**

Through and including , 2017, (the 25th day after the date of this prospectus), all dealers effecting transactions in the Common Stock, whether or not participating in this offering, may be required to deliver a prospectus. This delivery requirement is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription.

**Shares**

# TORRID

# Torrid Inc.

### Common Stock

---

**PROSECTUS**

**BofA Merrill Lynch**
**Morgan Stanley**
**Goldman Sachs & Co. LLC**
**J.P. Morgan**
**Jefferies**
**Baird**
**Telsey Advisory Group**
**William Blair**

**Table of Contents**

**PART II**

**INFORMATION NOT REQUIRED IN PROSPECTUS**

**Item 13. Other Expenses of Issuance and Distribution.**

The following table sets forth all costs and expenses, other than the underwriting discounts and commissions payable by us, in connection with the offer and sale of the securities being registered. All amounts shown are estimates except for the SEC registration fee and the Financial Industry Regulatory Authority, Inc., or FINRA, filing fee.

| | | |
|---|---|---|
| SEC registration fee | $ | * |
| FINRA filing fee | $ | * |
| NYSE listing fee | $ | * |
| Printing expenses | $ | * |
| Legal fees and expenses | $ | * |
| Accounting fees and expenses | $ | * |
| Miscellaneous expenses | $ | * |
| Total expenses | $ | * |

---

\*      To be provided by amendment.

**Item 14. Indemnification of Directors and Officers.**

Section 102(b)(7) of the DGCL allows a corporation to provide in its certificate of incorporation that a director of the corporation will not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except where the director breached the duty of loyalty, failed to act in good faith, engaged in intentional misconduct or knowingly violated a law, authorized the payment of a dividend or approved a stock repurchase in violation of Delaware corporate law or obtained an improper personal benefit. Our certificate of incorporation will provide for this limitation of liability.

Section 145 of the DGCL ("Section 145") provides that a Delaware corporation may indemnify any person who was, is or is threatened to be made, party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of such corporation), by reason of the fact that such person is or was an officer, director, employee or agent of such corporation or is or was serving at the request of such corporation as a director, officer, employee or agent of another corporation or enterprise. The indemnity may include expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding, provided such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the corporation's best interests and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was illegal. A Delaware corporation may indemnify any persons who are, were or are a party to any threatened, pending or completed action or suit by or in the right of the corporation by reason of the fact that such person is or was a director, officer, employee or agent of another corporation or enterprise. The indemnity may include expenses (including attorneys' fees) actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit, provided such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the corporation's best interests, provided that no indemnification is permitted without judicial approval if the officer, director, employee or agent is adjudged to be liable to the corporation. Where an officer or director is successful on the merits or otherwise in the defense of any action referred to above, the corporation must indemnify him against the expenses which such officer or director has actually and reasonably incurred. Section 145 further authorizes a corporation to purchase and maintain insurance on behalf of any person who is or was a director,

II-1

Table of Contents

officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation or enterprise, against any liability asserted against him and incurred by him in any such capacity, or arising out of his or her status as such, whether or not the corporation would otherwise have the power to indemnify him under Section 145.

Our certificate of incorporation will provide that we must indemnify our directors and officers to the fullest extent authorized by the DGCL and must also pay expenses incurred in defending any such proceeding in advance of its final disposition upon delivery of an undertaking, by or on behalf of an indemnified person, to repay all amounts so advanced if it should be determined ultimately that such person is not entitled to be indemnified under this section or otherwise.

We intend to enter into indemnification agreements with each of our current directors and executive officers. These agreements will require us to indemnify these individuals to the fullest extent permitted under Delaware law against liabilities that may arise by reason of their service to us, and to advance expenses incurred as a result of any proceeding against them as to which they could be indemnified.

The indemnification rights set forth above shall not be exclusive of any other right which an indemnified person may have or hereafter acquire under any statute, provision of our certificate of incorporation, our bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

We expect to maintain standard policies of insurance that provide coverage (1) to our directors and officers against loss rising from claims made by reason of breach of duty or other wrongful act and (2) to us with respect to indemnification payments that we may make to such directors and officers.

The proposed form of Underwriting Agreement to be filed as Exhibit 1.1 to this Registration Statement provides for indemnification to our directors and officers by the underwriters against certain liabilities.

**Item 15. Recent Sales of Unregistered Securities.**

On May 1, 2015 Torrid Inc. issued one share of common stock, par value $0.01 per share, to its parent company Torrid Holding LLC for $45.0 million in exchange for ownership of 100% of the equity interests in Torrid Inc. The issuance of such common stock was exempt from registration under the Securities Act by virtue of the exemption contained in Section 4(a)(2) of the Securities Act on the basis that the transaction did not involve a public offering. No underwriters were involved in the issuance.

In addition, prior to the completion of this offering, we will effect the following:

- a -for- split of our common stock (the "Stock Split");

- thereafter, our direct parent, Torrid Holding LLC, will create a new subsidiary, New Torrid Holding LLC, and contribute shares of Torrid Inc. stock to New Torrid Holding LLC; and

- thereafter, Torrid Holding LLC will be merged with and into Torrid Inc., with Torrid Inc. surviving the merger, and the shares of our common stock that Torrid Holding LLC holds (after giving effect to the Stock Split), along with the equity interests of New Torrid Holding LLC that Torrid Holding LLC holds, will be distributed to the equity holders of Torrid Holding LLC based on their relative rights under its limited liability company agreement, with no additional issuance of shares by us. Each holder of units of Torrid Holding LLC will receive shares or our common stock and equity interests in New Torrid Holding LLC in such merger, subject to the terms of the limited liability company agreement of Torrid Holding LLC.

None of the foregoing transactions will involve an offer or sale of securities by Torrid Inc.

II-2

**Table of Contents**

**Item 16. Exhibits and Financial Statement Schedules.**

(a)     Exhibits

The exhibit index attached hereto is incorporated herein by reference.

(b)     Financial Statement Schedules

Schedule I—Condensed Financial Information of Registrant

**Item 17. Undertakings.**

The undersigned registrant hereby undertakes to provide to the underwriters at the closing specified in the purchase agreement, certificates in such denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the registrant pursuant to the provisions referenced in Item 14 of this registration statement or otherwise, the registrant has been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered hereunder, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes that:

(1)     For purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in the form of prospectus filed by the registrant pursuant to Rule 424(b) (1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective; and

(2)     For the purpose of determining any liability under the Securities Act of 1933, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at the time shall be deemed to be the initial bona fide offering thereof.

II-3

**Table of Contents**

**SIGNATURES**

Pursuant to the requirements of the Securities Act, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in City of Industry, California on July 10, 2017.

Torrid Inc.

By:  /s/ Kay Hong
Name: Kay Hong
Title: Chief Executive Officer

**POWER OF ATTORNEY**

Each officer and director of Torrid Inc. whose signature appears below constitutes and appoints Kay Hong and George Wehlitz, Jr., and each of them, his or her true and lawful attorney-in-fact and agent, with full power of substitution and revocation, for him or her and in his or her name, place and stead, in any and all capacities, to execute any or all amendments including any post-effective amendments and supplements to this Registration Statement, and any additional Registration Statement filed pursuant to Rule 462, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney-in-fact and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent, or his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

\* \* \* \*

Pursuant to the requirements of the Securities Act, this registration statement has been signed by the following persons in the capacities indicated on the date indicated below:

| <u>Name</u> | <u>Title</u> | <u>Date</u> |
|---|---|---|
| /s/ Kay Hong <br> Kay Hong | Chief Executive Officer and Director <br> (principal executive officer) | July 10, 2017 |
| /s/ George Wehlitz, Jr. <br> George Wehlitz, Jr. | Chief Financial Officer <br> (principal financial officer and principal accounting officer) | July 10, 2017 |
| /s/ Stefan Kaluzny <br> Stefan Kaluzny | Director | July 10, 2017 |
| /s/ Peter Morrow <br> Peter Morrow | Director | July 10, 2017 |
| /s/ Lisa Harper <br> Lisa Harper | Director | July 10, 2017 |

II-4

**Table of Contents**

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| 1.1* | Form of Underwriting Agreement. |
| 3.1* | Form of Certificate of Incorporation of Torrid Inc., to be effective upon the completion of this offering. |
| 3.2* | Form of Bylaws of Torrid Inc., to be effective upon the completion of this offering. |
| 5.1 | Form of Opinion of Kirkland & Ellis LLP. |
| 10.1 | Credit Agreement, dated May 1, 2015, among Torrid LLC, Bank of America, N.A., as administrative agent and collateral agent, and the other lenders party thereto. |
| 10.2* | Services Agreement, dated June 2, 2017, among Torrid LLC and Hot Topic, Inc. |
| 10.3* | Form of Stockholders' Agreement. |
| 10.4* | Form of Registration Rights Agreement. |
| 10.5*+ | Employment Agreement, dated January 30, 2017, by and between Torrid LLC and Kay Hong. |
| 10.6*+ | Torrid Inc. Omnibus Equity Incentive Plan. |
| 16.1 | Letter from Ernst & Young LLP, independent registered public accounting firm. |
| 21.1 | List of subsidiaries of Torrid Inc. |
| 23.1 | Consent of PricewaterhouseCoopers LLP, independent registered public accounting firm. |
| 23.2 | Consent of Ernst & Young LLP, independent registered public accounting firm. |
| 23.3 | Consent of Kirkland & Ellis LLP (included in Exhibit 5.1). |
| 24.1 | Powers of Attorney (included on signature page). |

\*    To be filed by amendment.
\+    Indicates a management contract or compensatory plan or arrangement.

**Exhibit 5.1**

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

601 Lexington Avenue
New York, New York 10022

(212) 446-4800                  Facsimile:
www.kirkland.com                (212) 446-4900

, 2017

Torrid Inc.
18501 E. San Jose Ave.
City of Industry, California 91748

Ladies and Gentlemen:

We are acting as special counsel to Torrid Inc., a Delaware corporation (the "*Company*"), in connection with the preparation and filing of a Registration Statement on Form S-1, originally filed with the Securities and Exchange Commission (the "*Commission*") on July 10, 2017 (File No. 333- ), under the Securities Act of 1933, as amended (the "*Act*") (such Registration Statement, as amended or supplemented, is hereinafter referred to as the "*Registration Statement*"), relating to the proposed registration by the Company of up to shares of the Company's common stock, par value $0.01 per share ("*Common Stock*"), including shares of Common Stock sold pursuant to the underwriters' option to purchase additional shares, if any. The shares of Common Stock to be sold by the selling stockholders identified in the Registration Statement are referred to herein as the "*Shares*" and the offering of the Shares is referred to herein as the "*Offering*."

In that connection, we have examined originals, or copies certified or otherwise identified to our satisfaction, of such documents, corporate records and other instruments as we have deemed necessary for the purposes of this opinion, including (i) the Second Amended and Restated Certificate of Incorporation (the "*Charter*") of the Company in the form filed on , 2017 as Exhibit 3.1 to the Registration Statement and to be filed with the Secretary of State of the State of Delaware prior to the sale of the Shares; (ii) the Second Amended and Restated Bylaws (the "*Bylaws*") of the Company in the form filed on , 2017 as Exhibit 3.2 to the Registration Statement; (iii) the form of Underwriting Agreement filed on , 2017 as Exhibit 1.1 to the Registration Statement (the "*Underwriting Agreement*"); (iv) draft resolutions of the board of directors and stockholders of the Company with respect to the Offering (the "*Resolutions*"); and (v) the Registration Statement.

For purposes of this opinion, we have assumed the authenticity of all documents submitted to us as originals, the conformity to the originals of all documents submitted to us as copies and the authenticity of the originals of all documents submitted to us as copies. We have also assumed the legal capacity of all natural persons, the genuineness of the signatures of persons signing all documents in connection with which this opinion is rendered, the authority of such persons signing on behalf of the parties thereto and the due authorization, execution and delivery of all documents by the parties thereto other than the Company. We have not independently established or verified any facts relevant to the opinion expressed herein, but have relied upon statements and representations of officers and other representatives of the Company and others as to factual matters.

Beijing Chicago Hong Kong Houston London Los Angeles Munich Palo Alto San Francisco Shanghai Washington, D.C.

Based upon and subject to the foregoing qualifications, assumptions and limitations and the further limitations set forth below, we are of the opinion that, when the final Underwriting Agreement is duly executed and delivered by the parties thereto, the Charter is filed with the Secretary of State of the State of Delaware and the Registration Statement becomes effective under the Act, the Shares will be duly authorized and validly issued, fully paid and nonassessable.

Our opinions expressed above are subject to the qualifications that we express no opinion as to the applicability of, compliance with, or effect of any laws except the General Corporation Law of the State of Delaware.

We hereby consent to the filing of this opinion with the Commission as Exhibit 5.1 to the Registration Statement. We also consent to the reference to our firm under the heading "Legal Matters" in the Registration Statement. In giving this consent, we do not thereby admit that we are in the category of persons whose consent is required under Section 7 of the Act or the rules and regulations of the Commission.

We do not find it necessary for the purposes of this opinion, and accordingly we do not purport to cover herein, the application of the securities or "Blue Sky" laws of the various states to the Offering.

This opinion is limited to the specific issues addressed herein, and no opinion may be inferred or implied beyond that expressly stated herein. We assume no obligation to revise or supplement this opinion should the General Corporation Law of the State of Delaware be changed by legislative action, judicial decision or otherwise.

This opinion is furnished to you in connection with the filing of the Registration Statement.

Sincerely,

/s/ KIRKLAND & ELLIS LLP

Beijing Chicago Hong Kong Houston London Los Angeles Munich Palo Alto San Francisco Shanghai Washington, D.C.

**Exhibit 10.1**

EXECUTION COPY

**CREDIT AGREEMENT**

Dated as of May 1, 2015

among

TORRID LLC,
as the Lead Borrower,

For

The Borrowers Named Herein,

The Guarantors Named Herein,

BANK OF AMERICA, N.A.,
as Administrative Agent and Collateral Agent,

The Other Lenders Party Hereto

and

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,
WELLS FARGO BANK, NATIONAL ASSOCIATION
as Joint Lead Arrangers and Joint Bookrunning Managers

**TABLE OF CONTENTS**

| Section | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS AND ACCOUNTING TERMS | | 1 |
| 1.01 | Defined Terms | 1 |
| 1.02 | Other Interpretive Provisions | 51 |
| 1.03 | Accounting Terms | 52 |
| 1.04 | Rounding | 53 |
| 1.05 | Times of Day | 53 |
| 1.06 | Letter of Credit Amounts | 53 |
| 1.07 | Certifications | 53 |
| ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS | | 53 |
| 2.01 | Revolving Loans | 53 |
| 2.02 | Borrowings, Conversions and Continuations of Revolving Loans | 54 |
| 2.03 | Letters of Credit | 56 |
| 2.04 | Swing Line Loans | 64 |
| 2.05 | Prepayments | 67 |
| 2.06 | Termination or Reduction of Commitments | 68 |
| 2.07 | Repayment of Obligations | 69 |
| 2.08 | Interest | 69 |
| 2.09 | Fees | 69 |
| 2.10 | Computation of Interest and Fees | 70 |
| 2.11 | Evidence of Debt | 70 |
| 2.12 | Payments Generally; Agent's Clawback | 71 |
| 2.13 | Sharing of Payments by Credit Parties | 72 |
| 2.14 | Settlement Amongst Lenders | 73 |
| 2.15 | Increase in Commitments | 73 |
| 2.16 | Defaulting Lenders | 75 |
| 2.17 | Extension of Maturity Date | 77 |
| ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT OF LEAD BORROWER | | 80 |
| 3.01 | Taxes | 80 |
| 3.02 | Illegality | 84 |
| 3.03 | Inability to Determine Rates | 84 |
| 3.04 | Increased Costs; Reserves on LIBOR Rate Loans | 84 |
| 3.05 | Compensation for Losses | 86 |
| 3.06 | Mitigation Obligations; Replacement of Lenders | 86 |
| 3.07 | Survival | 87 |
| 3.08 | Designation of Lead Borrower as Borrowers' Agent | 87 |
| ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS | | 87 |
| 4.01 | Conditions of Initial Credit Extension | 87 |
| 4.02 | Conditions to all Credit Extensions | 90 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES | | 91 |
| 5.01 | Existence, Qualification and Power | 91 |
| 5.02 | Authorization; No Contravention | 91 |

(i)

| 5.03 | Governmental Authorization; Other Consents | 92 |
|------|---------------------------------------------|----|
| 5.04 | Binding Effect | 92 |
| 5.05 | Financial Statements; No Material Adverse Effect | 92 |
| 5.06 | Litigation | 93 |
| 5.07 | No Default | 93 |
| 5.08 | Ownership of Property; Liens; Licensed Departments | 93 |
| 5.09 | Environmental Compliance | 93 |
| 5.10 | Insurance | 94 |
| 5.11 | Taxes | 94 |
| 5.12 | ERISA Compliance | 95 |
| 5.13 | Subsidiaries; Equity Interests | 95 |
| 5.14 | Margin Regulations; Investment Company Act | 96 |
| 5.15 | Disclosure | 96 |
| 5.16 | Compliance with Laws | 97 |
| 5.17 | Intellectual Property; Licenses, Etc | 97 |
| 5.18 | Labor Matters | 97 |
| 5.19 | Security Documents | 98 |
| 5.20 | Solvency | 98 |
| 5.21 | Deposit Accounts; Credit Card Arrangements | 99 |
| 5.22 | Brokers | 99 |
| 5.23 | Customer and Trade Relations | 99 |
| 5.24 | Casualty | 99 |
| 5.25 | Closing Date Acquisition | 99 |

**ARTICLE VI AFFIRMATIVE COVENANTS** — 99

| 6.01 | Financial Statements | 100 |
|------|----------------------|-----|
| 6.02 | Certificates; Other Information | 101 |
| 6.03 | Notices | 103 |
| 6.04 | Payment of Obligations | 104 |
| 6.05 | Preservation of Existence, Etc | 104 |
| 6.06 | Maintenance of Properties | 104 |
| 6.07 | Maintenance of Insurance | 104 |
| 6.08 | Compliance with Laws | 106 |
| 6.09 | Books and Records; Accountants | 106 |
| 6.10 | Inspection Rights | 106 |
| 6.11 | Additional Loan Parties | 107 |
| 6.12 | Cash Management | 108 |
| 6.13 | Information Regarding the Collateral | 109 |
| 6.14 | Physical Inventories | 110 |
| 6.15 | Environmental Laws | 110 |
| 6.16 | Further Assurances | 110 |
| 6.17 | Compliance with Terms of Leaseholds | 111 |
| 6.18 | Material Contracts | 111 |
| 6.19 | Designation of Subsidiaries | 112 |

**ARTICLE VII NEGATIVE COVENANTS** — 112

| 7.01 | Liens | 112 |
|------|-------|-----|
| 7.02 | Investments | 113 |
| 7.03 | Indebtedness; Disqualified Stock; Equity Issuances | 113 |
| 7.04 | Fundamental Changes | 113 |
| 7.05 | Dispositions | 113 |

(ii)

| | | |
|---|---|---|
| 7.06 | Restricted Payments | 113 |
| 7.07 | Prepayments of Indebtedness | 114 |
| 7.08 | Change in Nature of Business | 114 |
| 7.09 | Transactions with Affiliates | 115 |
| 7.10 | Burdensome Agreements | 115 |
| 7.11 | Use of Proceeds | 115 |
| 7.12 | Amendment of Material Documents | 116 |
| 7.13 | Fiscal Year; Accounting Changes | 116 |
| 7.14 | Deposit Accounts; Credit Card Processors | 116 |
| 7.15 | Minimum Availability | 116 |
| 7.16 | Stay, Extension and Usury Laws | 116 |

**ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES** — 117

| | | |
|---|---|---|
| 8.01 | Events of Default | 117 |
| 8.02 | Remedies Upon Event of Default | 119 |
| 8.03 | Application of Funds | 120 |

**ARTICLE IX THE AGENT** — 121

| | | |
|---|---|---|
| 9.01 | Appointment and Authority. | 121 |
| 9.02 | Rights as a Lender | 122 |
| 9.03 | Exculpatory Provisions | 122 |
| 9.04 | Reliance by Agent | 123 |
| 9.05 | Delegation of Duties | 123 |
| 9.06 | Resignation of Agent | 123 |
| 9.07 | Non-Reliance on Agent and Other Lenders | 124 |
| 9.08 | No Other Duties, Etc | 124 |
| 9.09 | Agent May File Proofs of Claim | 124 |
| 9.10 | Collateral and Guaranty Matters | 125 |
| 9.11 | Notice of Transfer. | 126 |
| 9.12 | Reports and Financial Statements. | 126 |
| 9.13 | Agency for Perfection. | 127 |
| 9.14 | Indemnification of Agent | 127 |
| 9.15 | Relation among Lenders | 127 |

**ARTICLE X MISCELLANEOUS** — 127

| | | |
|---|---|---|
| 10.01 | Amendments, Etc | 127 |
| 10.02 | Notices; Effectiveness; Electronic Communications | 129 |
| 10.03 | No Waiver; Cumulative Remedies | 131 |
| 10.04 | Expenses; Indemnity; Damage Waiver | 132 |
| 10.05 | Payments Set Aside | 133 |
| 10.06 | Successors and Assigns. | 133 |
| 10.07 | Treatment of Certain Information; Confidentiality | 138 |
| 10.08 | Right of Setoff | 138 |
| 10.09 | Interest Rate Limitation | 139 |
| 10.10 | Counterparts; Integration; Effectiveness | 139 |
| 10.11 | Survival | 139 |
| 10.12 | Severability | 140 |
| 10.13 | Replacement of Lenders | 140 |
| 10.14 | Governing Law; Jurisdiction; Etc. | 141 |
| 10.15 | Waiver of Jury Trial | 142 |
| 10.16 | No Advisory or Fiduciary Responsibility | 142 |

(iii)

| 10.17 | Patriot Act Notice | 143 |
| 10.18 | Foreign Asset Control Regulations | 143 |
| 10.19 | Time of the Essence | 143 |
| 10.20 | Press Releases | 143 |
| 10.21 | Additional Waivers | 144 |
| 10.22 | No Strict Construction | 145 |
| 10.23 | Attachments | 145 |
| 10.24 | Electronic Execution of Assignments and Certain Other Documents | 145 |
| 10.25 | Keepwell | 146 |
| SIGNATURES | | S-1 |

(iv)

**SCHEDULES**

| | |
|---|---|
| 1.01 | Borrowers |
| 1.02 | Disqualified Lenders |
| 2.01 | Commitments and Applicable Percentages |
| 5.01 | Loan Parties Organizational Information |
| 5.06 | Litigation |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.10 | Insurance |
| 5.12 | Certain ERISA Events |
| 5.13 | Subsidiaries; Other Equity Investments |
| 5.18 | Collective Bargaining Agreements |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 6.02 | Financial and Collateral Reporting |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 7.09 | Affiliate Transactions |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Revolving Loan Notice |
| B | Swing Line Loan Notice |
| C-1 | Revolving Note |
| C-2 | Swing Line Note |
| D | Compliance Certificate |
| E | Assignment and Assumption |
| F | Borrowing Base Certificate |
| G-1 - G-4 | U.S. Tax Compliance Certificates |
| H | Transaction Certificate |

(v)

CREDIT AGREEMENT

This CREDIT AGREEMENT ("Agreement") is entered into as of May 1, 2015, among

TORRID LLC, a California limited liability company (the "Lead Borrower"), the Persons named on Schedule 1.01 hereto (together with the Lead Borrower, each a "Borrower" and collectively, the "Borrowers"), TORRID HOLDING CORP., a Delaware corporation ("Holdings"), and each other Guarantor (as hereinafter defined) from time to time party hereto, each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and BANK OF AMERICA, N.A., as Administrative Agent and Collateral Agent.

Holdings has advised the Agent that it has contemporaneously herewith acquired all of the issued and outstanding Equity Interests of the Lead Borrower for a purchase price of $55,000,000. Immediately prior to such acquisition, Hot Topic, Inc., contributed certain of its assets relating to the "Torrid" retail and e-commerce business to the Lead Borrower.

The Borrowers have requested that the Lenders provide a revolving credit facility in an initial aggregate maximum principal amount not to exceed $50,000,000, and the Lenders have indicated their willingness to lend and the L/C Issuer has indicated its willingness to issue Letters of Credit, in each case on the terms and conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01 Defined Terms**. As used in this Agreement, the following terms shall have the meanings set forth below:

"Accelerated Borrowing Base Delivery Event" means each of the following: (i) the occurrence of any Event of Default, or (ii) the failure of the Borrowers to maintain Availability at least equal to the greater of (a) twelve and one-half percent (12.5%) of the Loan Cap, and (b) $6,250,000. For purposes of this Agreement, the occurrence of an Accelerated Borrowing Base Delivery Event shall be deemed continuing (i) so long as such Event of Default has not been waived, and/or (ii) if the Accelerated Borrowing Base Delivery Event arises as a result of the Borrowers' failure to achieve Availability as required hereunder, until Availability has exceeded the greater of (a) twelve and one-half percent (12.5%) of the Loan Cap, and (b) $6,250,000 for thirty (30) consecutive calendar days (or such shorter period as the Agent may agree in its sole discretion), in which case an Accelerated Borrowing Base Delivery Event shall no longer be deemed to be continuing for purposes of this Agreement. The termination of an Accelerated Borrowing Base Delivery Event as provided herein shall in no way limit, waive or delay the occurrence of a subsequent Accelerated Borrowing Base Delivery Event in the event that the conditions set forth in this definition again arise.

"Acceptable Document of Title" means, with respect to any Inventory of the Loan Parties which is in transit from a location outside of the United States to a location of the Loan Parties in the United States that is owned, leased or rented by a Loan Party, a non-negotiable seaway bill, airway bill or other bill of lading that (a) is issued by a common carrier which is not an Affiliate of the any Loan Party which is in actual possession of such Inventory, (b) is issued to the order of a Loan Party or, if so requested by the Agent after the occurrence and during the continuance of an Event of Default, to the order of the Agent, and (c) is not subject to any Lien (other than in favor of the Agent and Liens described in clauses (a), (b), (e) and (o) of the definition of Permitted Encumbrances), and (d) is on terms otherwise reasonably acceptable to the Agent.

-1-

"Accommodation Payment" has the meaning provided therefor in Section 10.21(c).

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, or (c) arising out of the use of a credit or charge card or information contained on or for use with the card.

"ACH" means automated clearing house transfers.

"Acquisition" means, with respect to any Person (a) an investment or a purchase of a Controlling interest in the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or a Controlling interest in the Equity Interests, of any Person, or (d) any acquisition of any Store locations of any Person, in each case (a) through (d) for which the aggregate consideration payable exceeds $3,000,000 in any Fiscal Year (unless a Specified Event of Default then exists or would arise therefrom, in which case all such acquisitions regardless of amount shall be deemed an "Acquisition"), in each case in any transaction or group of transactions which are part of a common plan.

"Additional Commitment Lender" means each Person not then a Lender furnishing a Commitment and each existing Lender increasing its Commitment as provided in Section 2.15 or providing a Commitment having an Extended Maturity Date as provided in Section 2.17.

"Additional Commitment" has the meaning provided therefor in Section 2.17(c).

"Adjusted LIBOR Rate" means, with respect to any LIBOR Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of one percent (1%)) equal to the LIBOR Rate for such Interest Period multiplied by the Statutory Reserve Rate. The Adjusted LIBOR Rate will be adjusted automatically as to all LIBOR Borrowings then outstanding as of the effective date of any change in the Statutory Reserve Rate.

"Adjustment Date" means the first day of each Fiscal Quarter, commencing August 2, 2015.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Affiliate" means, with respect to any Person, (a) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (b) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (c) any other Person directly or indirectly holding 10% or more of any class of the Equity Interests of that Person, and (d) any other Person 10% or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agent" means Bank of America in its capacity as administrative agent and collateral agent under any of the Loan Documents, or any successor thereto.

"Agent Parties" has the meaning provided therefor in Section 10.02(c).

-2-

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Lead Borrower and the Lenders.

"Aggregate Commitments" means the sum of the Commitments. As of the Closing Date, the Aggregate Commitments are $50,000,000.

"Agreement" means this Credit Agreement.

"Allocable Amount" has the meaning provided therefor in Section 10.21(d).

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Margin" means:

(a) from and after the Closing Date until the first Adjustment Date, the percentages set forth in Level II of the pricing grid below; and

(b) from and after the first Adjustment Date and on each Adjustment Date thereafter, the Applicable Margin shall be determined from the following pricing grid based upon the Average Daily Availability as of the Fiscal Quarter ended immediately preceding such Adjustment Date; provided that if any financial statements or any Borrowing Base Certificates are at any time restated or otherwise revised (including as a result of an audit) or if the information set forth in such financial statements or any Borrowing Base Certificates otherwise proves to be false or incorrect such that the Applicable Margin would have been higher than was otherwise in effect during any period, without constituting a waiver of any Default or Event of Default arising as a result thereof, interest due under this Agreement shall be immediately and retroactively recalculated at such higher rate for any applicable periods and shall be due and payable on demand (after netting out, during the same relevant period solely to the extent that such period is not more than two Fiscal Quarters prior to the relevant date of adjustment, any payments of interest and fees paid during such period which have been determined to have been in excess of what was owed by the Borrowers as a result of a proper calculation of the Average Daily Availability that would have resulted in lower pricing for such period).

| Level | Average Daily Availability | LIBOR Margin for Revolving Loans | Base Rate Margin for Revolving Loans |
|---|---|---|---|
| I | Greater than 50% of the Aggregate Commitments | 1.75% | 0.75% |
| "rp II | Less than or equal to 50% of the Aggregate Commitments | 2.00% | 1.00% |

-3-

"Applicable Percentage" means, with respect to all of the Obligations (excluding Other Liabilities) due to any Lender at any time, the percentage (carried out to the ninth decimal place) resulting from dividing (x) such Lender's Commitment at such time (or if the commitments of each Lender to make Revolving Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 2.06 or Section 8.02 or if the Aggregate Commitments have expired, then the sum of the outstanding principal balance of the Revolving Loans owing to such Lender plus the outstanding L/C Obligations owing to such Lender at such time), by (y) the Aggregate Commitments (or if the commitments of each Lender to make Revolving Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 2.06 or Section 8.02 or if the Aggregate Commitments have expired, then the Total Outstandings as of such time). The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Rate" means, at any time of calculation, (a) with respect to Commercial Letters of Credit, a per annum rate equal to fifty percent (50%) of the Applicable Margin for LIBOR Rate Loans, and (b) with respect to Standby Letters of Credit, a per annum rate equal to the Applicable Margin for LIBOR Rate Loans.

"Appraised Value" means, with respect to Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of Inventory as set forth in the inventory stock ledger of the Borrowers, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Agent.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender, or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Arranger" means MLPFS and Wells Fargo, in their capacities as joint lead arrangers.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of Exhibit E or any other form approved by the Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation of any Person, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Auto-Extension Letter of Credit" has the meaning provided therefor in Section 2.03(b)(iii).

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of:

-4-

(a) Loan Cap

minus

(b) The Total Outstandings.

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Commitments pursuant to Section 2.06, and (c) the date of termination of the Commitment of each Lender to make Loans and of the obligation of the L/C Issuer to make L/C Credit Extensions pursuant to Section 8.02.

"Availability Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, and without duplication of any of the factors taken into account in determining the Appraised Value, such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Agent's ability to realize upon the Collateral or the amount that the Agent would likely receive upon the Liquidation of the Collateral, (b) to reflect claims and liabilities that the Agent determines in its Permitted Discretion will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, (d) to reflect any other circumstances which would likely adversely affect the value of the Collateral, or (e) to reflect any circumstances which adversely affect the enforceability or priority of the Agent's Liens on the Collateral. Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's Permitted Discretion, (but are not limited to) reserves based on: (i) rent; (ii) with respect to Eligible In-Transit Inventory, customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (iv) salaries, wages and benefits due to employees of any Loan Party; provided that no Availability Reserves on account of such salaries, wages and benefits shall be imposed unless a Cash Dominion Event has occurred and is continuing, (v) Customer Credit Liabilities, (vi) customer deposits, (viii) reserves for reasonably anticipated changes in the Appraised Value between appraisals, (viii) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Agent in the Collateral, (ix) Cash Management Reserves, (x) Bank Products Reserves, and (xi) the Debt Maturity Reserve; provided that no Bank Products Reserves on account of liabilities and obligations of the Loan Parties in respect of Swap Contracts owing to a Credit Party shall be imposed unless Availability is less than twenty-five percent (25%) of the Borrowing Base. Upon the determination by the Agent, in its Permitted Discretion, that an Availability Reserve should be established or modified, the Agent shall notify the Lead Borrower, to the extent required hereunder. The amount of any Availability Reserve established by the Agent shall have a reasonable relationship to the event, condition or other matter which is the basis for such reserve as determined by the Agent in its Permitted Discretion.

"Average Daily Availability" shall mean the average daily Availability for the immediately preceding Fiscal Quarter.

"Bank of America" means Bank of America, N.A. and its successors.

"Bank Products" means any services or facilities provided to any Loan Party or any Restricted Subsidiary thereof by the Agent, any Lender, or any of their respective Affiliates, including, without limitation, on account of (a) Swap Contracts, (b) leasing, and (c) supply chain finance services (including, without limitation, trade payable services and supplier accounts receivable purchases), but excluding Cash Management Services.

-5-

"Bank Product Reserves" means such reserves as the Agent from time to time determine in its Permitted Discretion as being appropriate to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate"; (b) the Federal Funds Rate for such day, plus 0.50%; and (c) the LIBOR Rate for a one month interest period as determined on such day, plus 1.00%. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in Bank of America's prime rate, the Federal Funds Rate or the LIBOR Rate, respectively, shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Blocked Account" has the meaning provided therefor in Section 6.12(a)(ii).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Agent, establishing control (as defined in the UCC) of such account by the Agent and whereby the Blocked Account Bank agrees, upon the occurrence and during the continuance of a Cash Dominion Event, to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank or other financial institution with whom deposit accounts, securities accounts or commodities accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated or proceeds of Collateral are maintained and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof or the Security Agreement.

"Bookrunning Manager" means MLPFS and Wells Fargo, in their capacities as joint bookrunning manger.

"Borrower Materials" has the meaning provided therefor in Section 6.02.

"Borrowers" has the meaning specified in the introductory paragraph hereto.

"Borrowing" means a Revolving Borrowing or a Swing Line Borrowing, as the context may require.

"Borrowing Base" means, at any time of calculation, an amount equal to:

(a) the face amount of Eligible Credit Card Receivables multiplied by 90%;

plus

(b) the Cost of Eligible Inventory, net of Inventory Reserves, *multiplied by* 90% (provided that, during the Seasonal Overadvance Period, such advance rate shall be increased by the Seasonal Advance Rate Increase Percentage), *multiplied by* the Appraised Value of such Eligible Inventory;

-6-

plus

(c) subject to the last proviso of this definition below, the Cost of Eligible In-Transit Inventory, net of Inventory Reserves, *multiplied by* 90% (provided that, during the Seasonal Overadvance Period, such advance rate shall be increased by the Seasonal Advance Rate Increase Percentage), *multiplied by* the Appraised Value of such Eligible In-Transit Inventory;

minus

(d) the amount of all Availability Reserves at such time;

provided that in no event shall the amounts available to be borrowed against Eligible In-Transit Inventory hereunder exceed the In-Transit Cap.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit F hereto (with such changes therein as may be required by the Agent to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete in all material respects by a Responsible Officer of the Lead Borrower which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Agent.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located and, if such day relates to any LIBOR Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

"Capital Expenditures" means, with respect to any Person for any period, all expenditures made (whether made in the form of cash or other property) or costs incurred for the acquisition or improvement of fixed or capital assets of such Person (excluding normal replacements and maintenance which are properly charged to current operations), in each case that are (or should be) set forth as capital expenditures in a Consolidated statement of cash flows of such Person for such period, in each case prepared in accordance with GAAP, provided that "Capital Expenditures" shall not include (a) any additions, replacements, restorations or substitutions to property, plant and equipment and other capital expenditures made with (i) the proceeds from any Permitted Disposition, to the extent that the proceeds therefrom are utilized (or are contractually committed to be utilized) for capital expenditures within one hundred and eighty (180) days of the receipt of such proceeds, (ii) with insurance proceeds or awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, to the extent that the proceeds therefrom are utilized (or are contractually committed to be utilized) for capital expenditures within one hundred and eighty (180) days of the receipt of such proceeds, or (iii) the proceeds of any Equity Interests issued or capital contributions received by any Loan Party or any Restricted Subsidiary in connection with such capital expenditures, or (b) any expenditures to the extent that they are contractually required to be, and are, reimbursed to the Loan Parties in cash by a third party (including landlords) during such period of calculation.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

-7-

"Cash Collateral Account" means a non-interest bearing account established by one or more of the Loan Parties with Bank of America, and in the name of, the Agent (or as the Agent shall otherwise direct) and under the sole and exclusive dominion and control of the Agent, in which deposits are required to be made in accordance with Section 2.03(g) or 8.02(c).

"Cash Collateralize" means to deposit in the Cash Collateral Account or to pledge and deposit with or deliver to the Agent, for the benefit of one or more of the Agent, the L/C Issuer or the Lenders, as collateral for L/C Obligations or obligations of the Lenders to fund participations in respect thereof (as the context may require), cash or deposit account balances or, if the Agent and the L/C Issuer shall agree in their sole discretion, other credit support, in each case pursuant to documentation in form and substance reasonably satisfactory to the Agent and the L/C Issuer. "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"Cash Dominion Event" means either (a) the occurrence and continuance of any Event of Default, or (b) the failure of the Borrowers to maintain Availability of at least the greater of (i) twelve and one-half percent (12.5%) of the Loan Cap, and (ii) $6,250,000. For purposes of this Agreement, the occurrence of a Cash Dominion Event shall be deemed continuing at the Agent's option (a) so long as such Event of Default has not been waived, and/or (b) if the Cash Dominion Event arises as a result of the Borrowers' failure to achieve Availability as required hereunder, until Availability has exceeded the greater of (i) twelve and one-half percent (12.5%) of the Loan Cap, and (ii) $6,250,000 for forty-five (45) consecutive calendar days, in which case a Cash Dominion Event shall no longer be deemed to be continuing for purposes of this Agreement; *provided* that if two (2) Cash Dominion Events shall have occurred and been discontinued in any twelve (12) consecutive month period (the latter of such Cash Dominion Events being the "Tolling CDE"), then any subsequent Cash Dominion Event occurring within twelve (12) months after the Tolling CDE (the "Post-Tolling CDE") shall be deemed continuing (even if an Event of Default is no longer continuing and/or Availability exceeds the required amount for forty-five (45) consecutive calendar days) at all times for the twelve (12) consecutive month period immediately following the Post-Tolling CDE. The termination of a Cash Dominion Event as provided herein shall in no way limit, waive or delay the occurrence of a subsequent Cash Dominion Event in the event that the conditions set forth in this definition again arise.

"Cash Equivalents" means any of the following:

(a) readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b) commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c) time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii)

-8-

issues (or the parent of which issues) commercial paper rated as described in clause (b) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d) Fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into; and

(e) Investments, classified in accordance with GAAP as current assets of the Loan Parties, in any money market fund, mutual fund, or other investment companies that are registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and which invest solely in one or more of the types of securities described in clauses (a) through (d) above.

"Cash Management Reserves " means such reserves as the Agent, from time to time, determines in its Permitted Discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Cash Management Services then provided or outstanding.

"Cash Management Services" means any cash management services or facilities provided to any Loan Party or any Restricted Subsidiary thereof by the Agent or any Lender or any of their respective Affiliates, including, without limitation, (a) ACH transactions, (b) controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) credit card processing services, (d) foreign exchange facilities, (e) purchase cards and (f) credit or debit card services.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"CFC" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority requiring compliance by any of the Agent, any Lender, any L/C Issuer or the Swing Line Lender (or any lending office of such Person or by such Person's holding company, if any); provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events after the Closing Date Acquisition by which:

(a) at any time prior to the creation of a Public Market, the Permitted Holders shall cease to own and control legally and beneficially, either directly or indirectly, equity securities in Holdings representing more than 50% of the combined voting power of all of Equity Interests entitled to vote for members of the board of directors or equivalent governing body of Holdings on a fully-diluted basis unless the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise, to elect or designate for election at least a majority of the board of directors of the Holdings;

(b) at any time after the creation of a Public Market, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of (x) 35% or more of the Equity Interests of Holdings entitled to vote for members of the board of directors or equivalent governing body of Holdings on a fully-diluted basis (and taking into account all such Equity Interests that such "person" or "group" has the right to acquire pursuant to any option right), or (y) a percentage that is greater than the percentage of the Equity Interests of Holdings entitled to vote for members of the board of directors or equivalent governing body of Holdings that is then beneficially owned by the Permitted Holders; unless, in the case of either clause (x) or (y) above, the Permitted Holders have, at such time and at all times thereafter, the right or the ability by voting power, contract or otherwise, to elect or designate for election at least a majority of the board of directors of Holdings;

(c) during any period of twelve (12) consecutive months, a majority of the members of the board of directors or other equivalent governing body of Holdings cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors);

(d) any "change in control" or similar event as defined in any document governing Material Indebtedness of any Loan Party; or

(e) Holdings fails at any time to own, directly or indirectly, 100% of the Equity Interests of each other Loan Party free and clear of all Liens (other than the Liens in favor of the Agent), except where such failure is as a result of a transaction permitted by the Loan Documents.

-10-

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Closing Date Acquisition" means (i) the contribution by Hot Topic, Inc. and its Subsidiaries of certain of its assets relating to the "Torrid" retail and e-commerce business to the Lead Borrower, (ii) the acquisition by Holdings of all of the issued and outstanding Equity Interests of the Lead Borrower, (iii) the contribution by Holdings of all of the issued and outstanding Equity Interests of each of Torrid Administration, Inc., and Torrid Merchandising, Inc., and (iv) the contribution by the Lead Borrower of certain assets to each of Torrid Administration, Inc., and Torrid Merchandising, Inc., in each case of the foregoing clauses (i), (ii), (iii) and (iv) pursuant to the Closing Date Acquisition Documents.

"Closing Date Acquisition Documents" means (i) that certain Contribution Agreement, dated as of May 1, 2015, between the Lead Borrower and Hot Topic, Inc., (ii) that certain Contribution Agreement dated as of May 1, 2015, between Holdings and the Lead Borrower, with respect to the Equity Interests in certain Subsidiaries as set forth therein, (iii) that certain Contribution Agreement dated as of May 1, 2015, between Holdings and the Lead Borrower, with respect to certain equity contributions as set forth therein, (iv) that certain Trademark Assignment dated as of May 1, 2015, by and among Hot Topic, Inc., Hot Topic Merchandising, Inc. and Torrid Merchandising, Inc., (v) that certain Domain Name Assignment dated as of May 1, 2015, by and among Hot Topic, Inc. and Torrid Merchandising, Inc., (vi) that certain Contribution Agreement dated as of May 1, 2015, between the Lead Borrower and Torrid Administration, Inc., (vii) that certain Contribution Agreement dated as of May 1, 2015, between the Lead Borrower and Torrid Merchandising, Inc., (viii) that certain Purchase Agreement, dated as of May 1, 2015, between Holdings and Hot Topic, Inc., (ix) that certain Contribution Agreement dated as of May 1, 2015, between Torrid Holding LLC and Holdings, (x) that certain Transfer Agreement dated as of May 1, 2015 between Hot Topic Administration, Inc. and Hot Topic, Inc., (xi) that certain Transfer Agreement dated as of May 1, 2015 between Hot Topic Merchandising, Inc. and Hot Topic, Inc., and (xii) the other agreements, instruments, documents and certificates executed and delivered in connection with the foregoing.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" or "Mortgaged Property" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral, or (b) any landlord of Real Estate leased by any Loan Party, pursuant to which each such Person described in clauses (a) or (b), as applicable, (i) acknowledges the Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) provides the Agent with reasonable access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (iv) as to any landlord, provides the Agent with a reasonable time to sell and dispose of the Collateral from such Real Estate, and (v) makes such other agreements with the Agent as the Agent may reasonably require.

"Collection Account" has the meaning provided therefor in Section 6.12(c).

"Commercial Letter of Credit" means any letter of credit or similar instrument issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Loan Party in the ordinary course of business of such Loan Party.

-11-

"Commitment" means, as to each Lender, its obligation to (a) make Revolving Loans to the Borrowers pursuant to Section 2.01, (b) purchase participations in L/C Obligations, and (c) purchase participations in Swing Line Loans, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Commitment Fee" has the meaning provided therefor in Section 2.09.

"Commitment Fee Percentage" means, with respect to each Fiscal Quarter, (a) if the average daily Total Outstandings for the immediately preceding Fiscal Quarter are greater than 50% of the Aggregate Commitments, 0.25% per annum, or (b) if the average daily Total Outstandings for the immediately preceding Fiscal Quarter are less than or equal to 50% of the Aggregate Commitments, 0.375% per annum.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.)

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Connection Income Taxes" means Other Connection Taxes that are imposed or measured by income (however denominated) or that are franchise Taxes or branch profits Taxes,

"Consent" means actual consent given by a Lender from whom such consent is sought; provided that after the passage of ten (10) Business Days from receipt of written notice to a Lender from the Agent of a proposed course of action to be followed by the Agent without such Lender giving the Agent written notice of that Lender's consent or objection to such course of action, such Lender shall be deemed to have withheld consent to such action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Consolidated EBITDA" means, at any date of determination, an amount equal to Consolidated Net Income of the Lead Borrower and its Restricted Subsidiaries on a Consolidated basis for the most recently completed Measurement Period, plus, without duplication, (a) the following to the extent deducted in calculating such Consolidated Net Income: (i) Consolidated Interest Charges, (ii) the provision for Federal, state, local and foreign income Taxes, (iii) depreciation and amortization expense, (iv) non-cash charges and non-cash items for stock-based compensation or other non-cash equity based awards paid to officers, directors or employees, (v) management and transaction fees and expenses paid to Sponsor or its Affiliates to the extent permitted under Section 7.09(e), (vi) non-recurring expenses reducing such Consolidated Net Income in connection with (A) pension liabilities, and (B) tax payments payable in accordance with Accounting Standards Codification 740-10, (vii) non-recurring restructuring expenses reducing such Consolidated Net Income in an aggregate amount not to exceed $3,000,000 for such Measurement Period, (viii) any reasonable fees, expenses or charges related to any issuance of Equity Interests (including pursuant to a Public Offering) or the incurrence or repayment of Indebtedness permitted to be incurred hereunder, including a Permitted Refinancing thereof, (xi) reasonable cash expenses or cash charges arising from or relating to Permitted Store Closings in an aggregate amount not to exceed $2,500,000 for such Measurement Period, (xii) other expenses reducing such Consolidated Net Income which do not represent a cash item in such period or any future period, (xiii) reasonable fees, costs and expenses incurred in connection with the Transactions, (xiv) the amount of any proceeds from

-12-

business interruption insurance received during such period, to the extent the associated losses arise out of the event that resulted in the payment of such business interruption insurance proceeds were included in computing such Consolidated Net Income and (xv) reasonable fees, costs and expenses in connection with any amendments, consents or waivers under the Loan Documents or with respect to any Permitted Acquisition (whether or not consummated), (in each case for the items described in this clause (a), of or by Lead Borrower and its Restricted Subsidiaries for such Measurement Period), minus (b) the following to the extent included in calculating such Consolidated Net Income: (i) Federal, state, local and foreign income tax credits and (ii) all non-cash items increasing Consolidated Net Income which do not represent a cash item in such period or any future period (in each case for the items described in this clause (b), of or by the Lead Borrower and its Subsidiaries for such Measurement Period), all as determined on a Consolidated basis in accordance with GAAP. For clarity, to the extent Restricted Payments made to Holdings pursuant to Sections 7.06(c) and 7.06(d) hereof are not deducted by the Lead Borrower in the determination of Consolidated Net Income, such amounts may not be utilized to increase Consolidated Net Income for the purposes of calculating Consolidated EBITDA (notwithstanding that the payments made under Sections 7.06(c) and 7.06(d) are of the type described in clause (a) of this definition).

"Consolidated Fixed Charge Coverage Ratio" means, at any date of determination, the ratio of (a) (i) Consolidated EBITDA for the most recently completed Measurement Period minus (ii) Capital Expenditures made during such period (other than Financed Capital Expenditures), minus (iii) the aggregate amount of Federal, state, local and foreign income taxes paid in cash during such period (but not less than zero) to (b) Debt Service Charges, of or by the Lead Borrower and its Restricted Subsidiaries for the most recently completed Measurement Period, all as determined on a Consolidated basis in accordance with GAAP.

"Consolidated Interest Charges" means, for any Measurement Period, the sum, without duplication, of (a) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, including, without limitation, all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Swap Contracts, but excluding any non-cash or deferred interest financing costs and net of interest income, and (b) the portion of rent expense with respect to such period under Capital Lease Obligations that is treated as interest in accordance with GAAP, in each case of or by the Lead Borrower and its Restricted Subsidiaries for the most recently completed Measurement Period, all as determined on a Consolidated basis in accordance with GAAP; provided that Consolidated Interest Charges for the first eleven (11) full Fiscal Months following the Closing Date shall be calculated on an annualized basis.

"Consolidated Net Income" means, as of any date of determination, the net income of the Lead Borrower and its Restricted Subsidiaries for the most recently completed Measurement Period, all as determined on a Consolidated basis in accordance with GAAP, provided, however, that there shall be excluded, without duplication, (a) extraordinary gains and extraordinary losses for such Measurement Period, (b) the income (or loss) of any Restricted Subsidiary during such Measurement Period in which any other Person has a joint interest, except to the extent of the amount of cash dividends or other distributions actually paid in cash to the Lead Borrower or another Loan Party during such period, (c) the income (or loss) of such Restricted Subsidiary during such Measurement Period and accrued prior to the date it becomes a Restricted Subsidiary of the Lead Borrower or any of its Restricted Subsidiaries or is merged into or consolidated with the Lead Borrower or any of its Restricted Subsidiaries or that Person's assets are acquired by the Lead Borrower or any of its Restricted Subsidiaries, (d) the income of any direct or indirect Restricted Subsidiary of the Lead Borrower to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that income is not at the time permitted by operation of the terms of its Organization Documents or any agreement, instrument,

-13-

judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary, except that the Lead Borrower's equity in any net loss of any such Restricted Subsidiary for such Measurement Period shall be included in determining Consolidated Net Income, and (e) the cumulative effect of any change in accounting principles, including any increase in amortization or depreciation, any adjustments to inventory basis or rent expenses or any one-time charges resulting from purchase accounting in connection with the Closing Date Acquisition or any other Permitted Acquisition.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Convert", "Conversion" and "Converted" each refers to a conversion of Revolving Loans of one Type into Revolving Loans of the other Type.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrowers' accounting practices, known to the Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrowers, the Borrowers' purchase journals or the Borrowers' stock ledger. "Cost" does not include inventory capitalization costs used in the Borrowers' calculation of cost of goods sold.

"Credit Card Issuer" shall mean any person (other than a Borrower, another Loan Party or Restricted Subsidiary thereof) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, JCB, and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., Alliance Data Systems Corporation and other issuers approved by the Agent.

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary (including, without limitation, Alliance Data Systems Corporation) who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning provided therefor in Section 6.12(a)(i).

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) together with all income, royalties, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such Credit Card Issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party or otherwise relating to credit or debit cards or related services, in each case in the ordinary course of its business.

"Credit Extensions" mean each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

-14-

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) each L/C Issuer, (iv) the Arranger and the Bookrunning Manager, (v) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (vi) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (vii) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means (a) all reasonable and documented out-of-pocket expenses incurred by the Agent, MLPFS and their respective Affiliates, in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent and MLPFS, (B) outside consultants for the Agent, (C) appraisers, (D) commercial finance examiners, and (E) all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, and (F) environmental site assessments, (ii) in connection with (A) the syndication of the credit facilities provided for herein, (B) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the enforcement or protection of the Credit Parties' rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral or in connection with any proceeding under any Debtor Relief Laws, or (D) any workout, restructuring or negotiations in respect of any Obligations, and (iii) all customary fees and charges (as adjusted from time to time) of the Agent with respect to the disbursement of funds (or the receipt of funds) to or for the account of Borrowers (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, and (b) with respect to the L/C Issuer, and its Affiliates, all reasonable and documented out-of-pocket expenses incurred by the L/C Issuer and its Affiliates in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder; and (c) all reasonable and documented out-of-pocket expenses incurred by the Credit Parties who are not the Agent, MLPFS, the L/C Issuer or any Affiliate of any of them, including in the course of any work-out or restructuring of the Loans or other Obligations during the pendency, after the occurrence and during the continuance of any Event of Default, provided that, such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"Customer Credit Liabilities" means at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrowers entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, and (b) outstanding merchandise credits of the Borrowers.

"Customs Broker/Carrier Agreement" means an agreement in form and substance reasonably satisfactory to the Agent among a Loan Party, a customs broker, freight forwarder, consolidator, or other carrier, and the Agent, in which the customs broker, freight forwarder, consolidator, or other carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory and other property solely as directed by the Agent; it being agreed that the Agent shall only give such notice after the occurrence and during the continuance of an Event of Default.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

-15-

"Debt Maturity Reserve" means an Availability Reserve in an amount not to exceed the outstanding balance of any Intercompany Subordinated Indebtedness (or any Indebtedness amending, replacing, refinancing or extending such Intercompany Subordinated Indebtedness) maturing within ninety (90) days of any date of determination of the Debt Maturity Reserve; provided that such Debt Maturity Reserve shall be eliminated when such Intercompany Subordinated Indebtedness is repaid, refinanced or its maturity extended.

"Debt Service Charges" means for any Measurement Period, the sum of (a) Consolidated Interest Charges paid in cash or required to be paid in cash for such Measurement Period (excluding all upfront and closing fees paid on the Closing Date under, or in connection with, this Agreement), plus (b) scheduled principal payments paid in cash or required to be paid in cash on account of Indebtedness (excluding the Obligations and any Synthetic Lease Obligations but including, without limitation, Capital Lease Obligations) for such Measurement Period, in each case determined on a Consolidated basis in accordance with GAAP.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means (a) when used with respect to Loans, an interest rate equal to the interest rate (including the then Applicable Margin) otherwise applicable to such Loan plus two percent (2%) per annum, (b) when used with respect to Letter of Credit Fees, a rate equal to the Applicable Rate for Standby Letters of Credit or Commercial Letters of Credit, as applicable, plus two percent (2%) per annum, and (c) with respect to all other Obligations (excluding Other Liabilities), an interest rate equal to the Base Rate, plus the then Applicable Margin for Base Rate Loans, plus two percent (2%) per annum.

"Defaulting Lender" means, subject to Section 2.16(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder, or (ii) pay to the Agent, the L/C Issuer, the Swing Line Lender or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit or Swing Line Loans) within two (2) Business Days of the date when due, (b) has notified the Lead Borrower, the Agent, the L/C Issuer or the Swing Line Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three (3) Business Days after written request by the Agent or the Lead Borrower, to confirm in writing to the Agent and the Lead Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Agent and the Lead Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination

-16-

by the Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.16(b)) as of the date established therefor by the Agent in a written notice of such determination, which shall be delivered by the Agent to the Lead Borrower, the L/C Issuer, the Swing Line Lender and each other Lender promptly following such determination.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of transactions, of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Lender" means each such Person identified as such on Schedule 1.02 annexed hereto.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the Maturity Date; provided, however, that (a) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock, (b) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of Holdings or its Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by Holdings or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability, and (c) if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder solely by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that Holdings and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States, any State thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico or any other territory).

"Eligible Assignee" means (a) a Lender or any of its Affiliates; (b) a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; (d) any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities; and (e) any other Person (other than a natural Person) satisfying the requirements of Section 10.06(b) hereof; provided that notwithstanding the foregoing, "Eligible Assignee" shall not include a Disqualified Lender, a Permitted Holder, a Loan Party or any of their respective Affiliates or Subsidiaries.

-17-

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to a Borrower from a Credit Card Issuer or Credit Card Processor, and in each case is originated in the ordinary course of business of such Borrower, and (ii) in each case is acceptable to the Agent in its Permitted Discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (i) below. Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than a Borrower as payee or remittance party. In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Loan Parties to reduce the amount of such Credit Card Receivable. Except as otherwise agreed by the Agent in its Permitted Discretion, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

(a) Credit Card Receivables which do not constitute a "payment intangible" (as defined in the UCC);

(b) Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale;

(c) Credit Card Receivables (i) that are not subject to a perfected first-priority security interest in favor of the Agent, or (ii) with respect to which a Borrower does not have good and valid title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents);

(d) Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(e) Credit Card Receivables as to which a Credit Card Issuer or a Credit Card Processor has the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(f) Credit Card Receivables due from a Credit Card Issuer or a Credit Card Processor of the applicable credit card which is the subject of any bankruptcy or insolvency proceedings;

(g) Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or a Credit Card Processor with respect thereto;

(h) Credit Card Receivables which do not conform to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables; or

-18-

(i) Credit Card Receivables which the Agent determines in its Permitted Discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Agent may determine in its Permitted Discretion.

"Eligible In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, In-Transit Inventory:

(a) which has been received in a foreign location by a freight forwarder as consolidator acting on behalf of, and as agent for, a Borrower and which has been shipped from a foreign location for receipt by a Borrower, but which has not yet been delivered to such Borrower, which In-Transit Inventory is scheduled for delivery within fifty (50) days or less from the date of determination;

(b) for which the purchase order is in the name of a Borrower and title and risk of loss has passed to such Borrower;

(c) for which an Acceptable Document of Title has been issued, and in each case as to which the Agent has control (as defined in the UCC) over the documents of title which evidence ownership of the subject Inventory (including, to the extent required by Section 6.16(c) or as otherwise requested by the Agent, by the delivery of a Customs Broker/Carrier Agreement);

(d) which is insured to the reasonable satisfaction of the Agent (including, without limitation, marine cargo insurance and/or stock throughput insurance);

(e) for which either payment of the purchase price has been made by a Borrower, the purchase price is supported by a Commercial Letter of Credit or the purchase price is on terms consistent with past practices of such Borrower and not overdue; and

(f) which otherwise would constitute Eligible Inventory;

provided that the Agent may, in its Permitted Discretion, either establish an Inventory Reserve or exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event the Agent reasonably determines that such Inventory is subject to any Person's right of reclamation, repudiation, stoppage in transit or any event has occurred or is reasonably anticipated by the Agent to arise which may otherwise materially adversely impact the value of such Inventory or the ability of the Agent to realize upon such Inventory.

"Eligible Inventory" means, as of the date of determination thereof, without duplication, items of Inventory of a Borrower that are finished goods, merchantable and readily saleable to the public in the ordinary course of the Borrowers' business deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, (i) comply in all material respects with each of the representations and warranties respecting Inventory made by the Borrowers in the Loan Documents, and (ii) are not excluded as ineligible by virtue of one or more of the criteria set forth below. Except as otherwise agreed by the Agent in its Permitted Discretion, the following items of Inventory shall not be included in Eligible Inventory:

(a) Inventory that is not solely owned by a Borrower or a Borrower does not have good and valid title thereto free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents or any other Permitted Encumbrance described in clauses (a), (b), (e), and (o) of such definition);

-19-

(b) Inventory that is leased by or is on consignment to a Borrower or which is consigned by a Borrower to a Person which is not a Loan Party;

(c) Inventory (other than Eligible In-Transit Inventory) that is not located in the United States (excluding territories or possessions of the United States) or Puerto Rico;

(d) Inventory that is not located at a location that is owned or leased by a Borrower, except (i) Inventory in transit between such owned or leased locations, or (ii) to the extent that the Borrowers have furnished the Agent with (A) any UCC financing statements or other documents that the Agent may determine to be necessary to perfect its security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location;

(e) Inventory that is located in a distribution center, warehouse or other bailee location leased by a Borrower unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or the Agent has waived such requirement in writing in its Permitted Discretion;

(f) without duplication of any of the factors taken into account in determining Appraised Value, Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or work-in-process, raw materials, or that constitute samples, spare parts, promotional, marketing, labels, bags and other packaging and shipping materials or supplies used or consumed in a Borrower's business, (iv) not in compliance in all material respects with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (v) are bill and hold goods;

(g) Inventory that is not subject to a perfected first-priority security interest in favor of the Agent (other than Permitted Encumbrances described in clauses (a), (b), (e) or (o) of such definition);

(h) Inventory that is not insured in compliance with the provisions of Section 5.10

hereof;

(i) Inventory that has been sold but not yet delivered or as to which a Borrower has accepted a deposit;

(j) Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party as to which any Borrower or any of its Subsidiaries has received notice from such third party of a dispute in respect of any such agreement or a breach of any such agreement; or

(k) Inventory acquired in a Permitted Acquisition or which is not of the type usually sold in the ordinary course of the Borrowers' business, unless and until the Agent has completed or received (A) an appraisal of such Inventory from appraisers reasonably satisfactory to the Agent and establishes Inventory Reserves (if applicable) therefor, and otherwise agrees that such Inventory shall be deemed Eligible Inventory, and (B) such other due diligence as the Agent may reasonably require, all of the results of the foregoing to be reasonably satisfactory to the Agent.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises,

-20-

licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any Hazardous Materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC and shall also mean all furniture, store fixtures, motor vehicles, rolling stock, machinery, office equipment, plant equipment, tools, dies, molds, and other goods, property, and assets which are used and/or were purchased for use in the operation or furtherance of a Loan Party's business, and any and all accessions or additions thereto, and substitutions therefor.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan, other than those disclosed on Schedule 5.12 as of the Closing Date; (b) the withdrawal of any Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate a Pension Plan or Multiemployer Plan, or the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan or Multiemployer Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a Multiemployer Plan is in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA (other than with respect to contributions not yet due), other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any ERISA Affiliate.

-21-

"Event of Default" has the meaning provided therefor in Section 8.01. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Excluded Accounts" means any payroll, employee benefits, workers compensation, trust and tax withholding accounts funded by the Loan Parties in the ordinary course of business.

"Excluded Subsidiary" means any Foreign Subsidiary, any Foreign Subsidiary Holding Company, any Immaterial Subsidiary and any Unrestricted Subsidiary.

"Excluded Swap Obligation" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Loan Party of, or the grant under a Loan Document by such Loan Party of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act (or the application or official interpretation thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 10.25 and any and all guarantees of such Loan Party's Swap Obligations by other Loan Parties) at the time the Guarantee of such Loan Party, or grant by such Loan Party of a security interest, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Contracts for which such Guaranty or security interest becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Recipient with respect to an applicable interest in a Loan or Commitment (or other interest) pursuant to a law in effect on the date on which (i) such Recipient acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Lead Borrower under Section 10.13) or (ii) such Recipient changes its Lending Office, except in each case to the extent that, pursuant to Section 3.01(a)(ii) or (c), amounts with respect to such Taxes were payable either to such Recipient's assignor immediately before such Recipient became a party hereto or to such Recipient immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(e), (d) any U.S. federal withholding Taxes imposed pursuant to FATCA, and (e) any back-up withholding Taxes.

"Executive Order" has the meaning provided therefor in Section 10.18.

"Extended Maturity Date" means the date that each of the Agent, the Lead Borrower and each Extending Lender agree in accordance with Section 2.17.

"Extended Commitments" has the meaning provided therefor in Section 2.17(a).

"Extending Lender" has the meaning provided therefor in Section 2.17(b).

-22-

"Extension Amendment" has the meaning provided therefor in Section 2.17(d).

"Extension Election" has the meaning provided therefor in Section 2.17(b).

"Extension Request" has the meaning provided therefor in Section 2.17(a).

"Extension Series" has the meaning provided therefor in Section 2.17(a).

"Facility Guaranty" means the Guaranty made by the Guarantors in favor of the Agent and the other Credit Parties, in form reasonably satisfactory to the Agent.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Agent.

"Fee Letter" means the Fee Letter, dated May 1, 2015, among the Borrowers, the Agent and MLPFS.

"Financed Capital Expenditures" shall mean Capital Expenditures made through purchase money financing (other than from Credit Extensions hereunder) or capital lease transactions permitted hereunder.

"Fiscal Month" means each monthly accounting period of the Lead Borrower calculated in accordance with the National Retail Federation calendar.

"Fiscal Quarter" means each quarterly accounting period of the Lead Borrower consisting of successive 13-week periods (each such 13 week period to begin on a Sunday and end on a Saturday) of the Lead Borrower of any Fiscal Year; provided that for any 53-week Fiscal Year, the last Fiscal Quarter of such Fiscal Year shall consist of the successive 14-week period from and including the first day after the third Fiscal Quarter of such Fiscal Year through and including the last day of such Fiscal Year.

"Fiscal Year" means the annual accounting period of Borrowers ending on the Saturday nearest to January 31st in each calendar year.

"Foreign Asset Control Regulations" has the meaning provided therefor in Section 10.18.

"Foreign Lender" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Foreign Subsidiary" means any Subsidiary that is (i) a CFC, or (ii) a direct or indirect Subsidiary of a CFC.

-23-

"Foreign Subsidiary Holding Company" means any Subsidiary, substantially all of the assets of which are Equity interests of one or more Foreign Subsidiaries.

"Foreign Vendor" means a Person that sells In-Transit Inventory to a Borrower.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Exposure" means, at any time there is a Defaulting Lender, (a) with respect to the L/C Issuer, such Defaulting Lender's Applicable Percentage of the outstanding L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof, and (b) with respect to the Swing Line Lender, such Defaulting Lender's Applicable Percentage of Swing Line Loans other than Swing Line Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders in accordance with the terms hereof.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien), provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the

-24-

guaranteeing Person in good faith. Notwithstanding the foregoing, "Guarantee" shall not include liabilities for indemnities under laws, contracts, arrangements and agreements incurred in the ordinary course of business (including liabilities for director, officer, employee and agent indemnification obligations). The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means, collectively, (a) Holdings and each Subsidiary of Holdings (other than any Excluded Subsidiary) existing on the Closing Date and each other Subsidiary of Holdings that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.11, and (b) with respect to Other Liabilities owing by any Loan Party or any of its Restricted Subsidiaries and any Swap Obligation of a Specified Loan Party (determined before giving effect to Section 1 of the Facility Guaranty and Section 10.25 hereof) under the Facility Guaranty, each Borrower.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Holdings" means Torrid Holding Corp., a Delaware corporation, and the owner of 100% of the issued and outstanding Equity Interests in the Lead Borrower.

"Honor Date" has the meaning provided therefor in Section 2.03(c)(i).

"Hot Topic Tri-Party Agreement" means that certain Agreement dated as of the Closing Date by and among the Loan Parties, Hot Topic, Inc. and certain of its Affiliates, and the Agent.

"Increase Effective Date" has the meaning provided therefor in Section 2.15(d).

"Immaterial Subsidiary" means, on any date, any Subsidiary of Holdings with assets having a book value of less than $250,000 in the aggregate.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b) the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c) net obligations of such Person under any Swap Contract;

(d) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business not past due for more than ninety (90) days after the date on which such trade account payables were created);

(e) indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; provided that, other than for purposes of calculating the Consolidated Fixed Charge Coverage Ratio, if such Person has not assumed or otherwise become liable for such indebtedness, such indebtedness shall be measured at the fair market value of such property securing such indebtedness at the time of determination;

-25-

(f) all Attributable Indebtedness of such Person;

(g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person prior to the date that is 91 days after the scheduled Maturity Date (including, without limitation, Disqualified Stock but excluding any tax distributions required to be made with respect to entities that are treated as partnerships or disregarded entities for federal income tax purposes), or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h) all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning provided therefor in Section 10.04(b).

"Information" has the meaning provided therefor in Section 10.07.

"Initial Maturity Date" has the meaning provided therefor in the definition of Maturity Date.

"Intellectual Property" means all present and future: trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intercompany Subordinated Indebtedness" means the Subordinated Indebtedness described in Section 4.01(g) hereof, which Indebtedness is subordinated to the Obligations pursuant to the Intercompany Subordination Agreement.

-26-

"Intercompany Subordination Agreement" means that certain Subordination Agreement dated as of the Closing Date, by and among the Loan Parties and Torrid Holding LLC, a Delaware limited liability company, and acknowledged by the Agent.

"Interest Payment Date" means, (a) as to any LIBOR Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; provided, however, that if any Interest Period for a LIBOR Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan (including a Swing Line Loan), the first Business Day of each month and the Maturity Date.

"Interest Period" means, as to each LIBOR Rate Loan, the period commencing on the date such LIBOR Rate Loan is disbursed or Converted to or continued as a LIBOR Rate Loan and ending on the date one, three or six (or, to the extent available to all Lenders, twelve) months thereafter, as selected by the Lead Borrower in its Revolving Loan Notice; provided that:

(i) any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(ii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period;

(iii) no Interest Period shall extend beyond the Maturity Date; and

(iv) notwithstanding the provisions of clause (iii), no Interest Period shall have a duration of less than one (1) month, and if any Interest Period applicable to a LIBOR Borrowing would be for a shorter period, such Interest Period shall not be available hereunder.

For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent Conversion or continuation of such Borrowing.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Lead Borrower's and/or its Subsidiaries' internal controls over financial reporting.

"In-Transit Cap" means twenty percent (20%) of the Borrowing Base (calculated without inclusion of amounts described in clause (d) of the definition thereof).

"In-Transit Inventory" means Inventory of a Borrower which is in the possession of a common carrier and is in transit from a Foreign Vendor of a Borrower from a location outside of the continental United States to a location of a Borrower that is within the continental United States.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

-27-

"Inventory Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, and without duplication of any of the factors taken into account in determining "Appraised Value", such reserves as may be established from time to time by the Agent in its Permitted Discretion with respect to the determination of the saleability, at retail, of the Eligible Inventory, which reflect such other factors as affect the market value of the Eligible Inventory or which reflect claims and liabilities that the Agent determines in its Permitted Discretion will need to be satisfied in connection with the realization upon the Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Agent's Permitted Discretion, include (but are not limited to) reserves based on:

(a) obsolescence;

(b) seasonality;

(c) Shrink;

(d) imbalance;

(e) change in Inventory character;

(f) change in Inventory composition;

(g) change in Inventory mix;

(h) mark-downs (both permanent and point of sale); and

(i) retail mark-ons and mark-ups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events.

Upon the determination by any Agent, in its Permitted Discretion, that an Inventory Reserve should be established or modified, such Agent shall notify the Lead Borrower to the extent required hereunder.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" means with respect to any Letter of Credit, the Letter Credit Application, and any other document, agreement and instrument entered into by the L/C Issuer and any Borrower (or any other Loan Party) or in favor the L/C Issuer and relating to any such Letter of Credit.

-28-

"Joinder Agreement" means an agreement, in form reasonably satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Agent may reasonably determine.

"Landlord Lien State" means such states in which a landlord's claim for rent may have priority over the Lien of the Agent in any of the Collateral.

"Latest Maturity Date" means, at any date of determination, the latest Maturity Date applicable to any Loan or Commitment hereunder at such time, including the latest termination date of any Extended Commitment or Additional Commitment, as applicable, as extended in accordance with this Agreement from time to time.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"L/C Advance" means, with respect to each Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Applicable Percentage.

"L/C Borrowing" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on or prior to the date when required to be reimbursed by the Borrowers or refinanced as a Revolving Borrowing.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Issuer" means (a) Bank of America in its capacity as issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder (which successor may only be a Lender selected by the Agent in its reasonable discretion), and (b) any other Lender approved by the Agent and the Lead Borrower in their reasonable discretion. The L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the L/C Issuer, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"L/C Obligations" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts, including all L/C Borrowings. For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Lead Borrower" has the meaning specified in the introductory paragraph hereto.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any real property for any period of time.

-29-

"Lender" has the meaning specified in the introductory paragraph hereto and, as the context requires, includes the Swing Line Lender.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Lead Borrower and the Agent.

"Letter of Credit" means each Standby Letter of Credit and each Commercial Letter of Credit issued hereunder.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"Letter of Credit Expiration Date" means the day that is five (5) Business Days prior to the Maturity Date then in effect.

"Letter of Credit Fee" has the meaning provided therefor in Section 2.03(i).

"Letter of Credit Sublimit" means an amount equal to $5,000,000. The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Commitments. A permanent reduction of the Aggregate Commitments shall not require a corresponding pro rata reduction in the Letter of Credit Sublimit; provided, however, that if the Aggregate Commitments are reduced to an amount less than the Letter of Credit Sublimit, then the Letter of Credit Sublimit shall be reduced to an amount equal to (or, at Lead Borrower's option, less than) the Aggregate Commitments.

"LIBOR Borrowing" means a Borrowing comprised of LIBOR Rate Loans.

"LIBOR Rate" means:

(a) for any Interest Period with respect to a LIBOR Rate Loan, the rate per annum equal to the London interbank offered rate administered by ICE Benchmark Administration Limited ("ICE LIBOR"), as published by Reuters (or other commercially available source providing quotations of ICE LIBOR as designated by the Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If such rate is not available at such time for any reason, then the "LIBOR Rate" for such Interest Period shall be the rate per annum determined by the Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBOR Rate Loan being made, continued or converted by Bank of America and with a term equivalent to such Interest Period would be offered by Bank of America's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; and

(b) for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to (i) ICE LIBOR, at approximately 11:00 a.m., London time determined two London Banking Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the Agent to be the rate at which deposits in Dollars for delivery on the date of determination in same day funds in the approximate amount of the Base Rate Loan being made or maintained and with a term equal to one month would be offered by Bank of America's London Branch to major banks in the London interbank Eurodollar market at their request at the date and time of determination.

-30-

"LIBOR Rate Loan" means a Revolving Loan that bears interest at a rate based on the Adjusted LIBOR Rate.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidation" means the exercise by the Agent of those rights and remedies accorded to the Agent under the Loan Documents and applicable Laws as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent, of any public, private or "going-out-of-business", "store closing" or other similar sale or any other Disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan" means an extension of credit by a Lender to the Borrowers under Article II in the form of a Revolving Loan or a Swing Line Loan.

"Loan Account" has the meaning provided therefor in Section 2.11(a).

"Loan Cap" means, at any time of determination, the lesser of (a) the Aggregate Commitments or (b) the Borrowing Base.

"Loan Documents" means this Agreement, each Note, each Issuer Document, the Fee Letter, all Borrowing Base Certificates, the Blocked Account Agreements, the Credit Card Notifications, the Security Documents, the Facility Guaranty, the Intercompany Subordination Agreement, the Hot Topic Tri-Party Agreement, and any other instrument or agreement now or hereafter executed and delivered in connection herewith.

"Loan Parties" means, collectively, the Borrowers and the Guarantors.

"Management Fees" means management fees payable by the Loan Parties pursuant to the Sponsor Management Agreement.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, assets, properties, liabilities (actual or contingent), or financial condition of Holdings and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its material obligations under any Loan Document to which it is a party; or (c) a material impairment of the rights and remedies of the Agent or the Lenders under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.

-31-

"Material Contract" means, with respect to any Person, each contract to which such Person is a party the breach or termination of which could reasonably be expected to result in a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Obligations but including Other Liabilities which constitute Indebtedness) of the Loan Parties in an aggregate principal amount exceeding $5,000,000. For purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof, (b) undrawn committed or available amounts shall be included, and (c) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included. For the avoidance of doubt, the Intercompany Subordinated Indebtedness shall constitute Material Indebtedness at all times hereunder.

"Maturity Date" means the later of (a) April 30, 2020 (the "Initial Maturity Date") and (b) with respect to any Lender which participates in any Extension Series pursuant to Section 2.17, such extended maturity date relating to such Extension Series as determined pursuant to such Section 2.17.

"Maximum Rate" has the meaning provided therefor in Section 10.09.

"Measurement Period" means, at any date of determination, the most recently completed twelve Fiscal Months of Holdings and its Subsidiaries.

"MLPFS" means Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgages" means each and every fee mortgage or deed of trust, security agreement and assignment by the Loan Party owning or holding the leasehold interest in the Real Estate encumbered thereby in favor of the Agent.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Lead Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including the Lead Borrower or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Proceeds" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) minus (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), and (B) the reasonable and customary out-of-pocket fees, commissions and expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, on account of appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates)) and (C) income taxes reasonably estimated to be actually payable within two years of the date of the relevant transaction (or such longer period as may apply in the event of an installment sale or similar transaction) as a result of any gain recognized in connection therewith; provided that, during a Cash Dominion Event, the amounts described in this clause (C) shall be remitted to the Agent for application to the Obligations as set forth herein.

-32-

"Non-Consenting Lender" has the meaning provided therefor in Section 10.01.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Extension Notice Date" has the meaning provided therefor in Section 2.03(b)(iii).

"Note" means a Revolving Note and the Swing Line Note, as each may be amended, supplemented or modified from time to time.

"Notice Date" has the meaning provided therefor in Section 2.17.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Subsidiary thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees costs, expenses and indemnities are allowed claims in such proceeding, and (b) any Other Liabilities; provided that Obligations of a Loan Party shall exclude any Excluded Swap Obligations with respect to such Loan Party.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Liabilities" means all obligations on account of (i) any Cash Management Services furnished to any of the Loan Parties or any of their Restricted Subsidiaries, and/or (ii) any Bank Product furnished to any of the Loan Parties and/or any of their Restricted Subsidiaries; provided that Other Liabilities of a Loan Party shall exclude any Excluded Swap Obligations with respect to such Loan Party.

-33-

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.06).

"Outstanding Amount" means (a) with respect to Revolving Loans and Swing Line Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date; and (b) with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by the Borrowers of Unreimbursed Amounts or the refinancing of such unreimbursed amounts as Borrowings hereunder.

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Participant" has the meaning provided therefor in Section 10.06(d).

"Participant Register" has the meaning provided therefor in Section 10.06(d).

"Patriot Act" has the meaning provided therefor in Section 10.17.

"Payment Conditions" means, at the time of determination with respect to any specified transaction or payment, that (a) no Default or Event of Default then exists or would arise as a result of entering into such transaction or the making of such payment, (b) immediately after giving pro forma effect to such transaction or the making of such payment, the Pro Forma Availability Condition has been satisfied, (c) the Consolidated Fixed Charge Coverage Ratio for the Measurement Period preceding such transaction or the making of such payment shall be greater than or equal to 1.0 to 1.0, provided that the provisions of this clause (c) shall not be applicable if Availability, calculated in accordance with clause (b) hereof, immediately after giving pro forma effect to such transaction or payment and projected for the immediately succeeding six (6) months following such transaction or payment is greater than or equal to twenty-five percent (25%) of the Loan Cap; and (d) the Lead Borrower shall have delivered a Transaction Certificate to the Agent duly executed by a Responsible Officer of the Lead Borrower and attaching evidence (reasonably detailed and reasonably satisfactory to the Agent) of satisfaction of the conditions contained in clauses (b) and (c) above, as applicable.

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and Multiemployer Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

-34-

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan but excluding a Multiemployer Plan) that is maintained or is contributed to by the Lead Borrower and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Permitted Acquisition" means an Acquisition in which all of the following conditions are satisfied:

(a) such Acquisition shall have been approved by the Board of Directors of the Person (or similar governing body if such Person is not a corporation) which is the subject of such Acquisition and such Person shall not have announced that it will oppose such Acquisition or shall not have commenced any action which alleges that such Acquisition shall violate applicable Law; provided that the foregoing condition shall only be required to be satisfied for any Acquisition (i) involving a merger, consolidation or acquisition of Equity Interests of a Person, (ii) of all or substantially all of the assets of a Person, or (iii) to the extent applicable Law, the Organization Documents of the Person which is the subject of such Acquisition, or the applicable purchase agreement, merger agreement or similar definitive documentation otherwise require such board approval;

(b) the Lead Borrower shall have furnished the Agent with (i) thirty (30) days' (or such lesser number of days as to which the Agent may agree in writing) prior written notice of such intended Acquisition, and (ii) with respect to any such intended Acquisition, or any series of related Permitted Acquisitions, involving consideration in the aggregate in excess of $5,000,000, a current draft of the Acquisition Documents (and final copies thereof as and when executed), a summary of any due diligence undertaken by the Loan Parties in connection with such Acquisition, appropriate financial statements of the Person which is the subject of such Acquisition, pro forma projected financial statements for the twelve (12) month period following such Acquisition after giving effect to such Acquisition (including balance sheets, cash flows and income statements by month for the acquired Person, individually, and on a Consolidated basis with all Loan Parties), and such other information as the Agent may reasonably require, all of which shall be in form reasonably satisfactory to the Agent;

(c) if proceeds of Credit Extensions are utilized to pay any portion of the consideration for such Acquisition, the legal structure of the Acquisition shall be reasonably acceptable to the Agent in its discretion;

(d) after giving effect to the Acquisition, if the Acquisition is an Acquisition of Equity Interests, a Loan Party shall acquire and own, directly or indirectly, a majority of the Equity Interests in the Person being acquired and shall Control a majority of any voting interests or shall otherwise Control the governance of the Person being acquired;

(e) any assets acquired shall be utilized in, and if the Acquisition involves a merger, consolidation or acquisition of Equity Interests, the Person which is the subject of such Acquisition shall be engaged in, a business otherwise permitted to be engaged in by a Borrower under this Agreement or substantially the same lines of business (or reasonably related thereto) as one or more of the principal businesses of a Borrower;

(f) if the Person which is the subject of such Acquisition will be maintained as a Subsidiary of a Loan Party, or if the assets acquired in an Acquisition will be transferred to a Subsidiary which is not then a Loan Party, such Subsidiary shall have been joined as a Borrower hereunder or as a Guarantor to the extent required pursuant to Section 6.12, and the Agent shall have received a first priority security and/or mortgage interest in such Subsidiary's Equity Interests and property of such Subsidiary of the same nature as constitutes Collateral under the Security Documents (subject, in each case, to Permitted Encumbrances having priority by operation of applicable law); and

-35-

(g) the Loan Parties shall have satisfied the Payment Conditions.

"Permitted Discretion" means the Agent's good-faith and reasonable (from the perspective of a secured asset-based lender in credit facilities of the type contemplated hereby) business judgment and consistent with the Agent's customary practices in asset-based credit facilities of the type contemplated hereby. Notwithstanding the foregoing, it shall not be within Permitted Discretion for the Agent to establish Reserves which are duplicative of each other whether or not such Reserves fall under more than one Reserve category.

"Permitted Disposition" means any of the following:

(a) dispositions of Inventory in the ordinary course of business;

(b) bulk sales or other dispositions at arm's length of the Inventory of a Loan Party not in the ordinary course of business in connection with Permitted Store Closings;

(c) non-exclusive licenses of Intellectual Property of a Loan Party or any of its Subsidiaries in the ordinary course of business;

(d) licenses for the conduct of licensed departments within the Loan Parties' Stores in the ordinary course of business; provided that, if requested by the Agent, the Agent shall have entered into an intercreditor agreement with the Person operating such licensed department on terms and conditions reasonably satisfactory to the Agent;

(e) dispositions of Equipment in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary;

(f) sales, transfers and dispositions among the Loan Parties or by any Subsidiary to a Loan Party;

(g) sales, transfers and dispositions by any Subsidiary which is not a Loan Party to another Subsidiary that is not a Loan Party;

(h) as long as no Default or Event of Default then exists or would arise therefrom, sales of Real Estate of any Loan Party (or sales of any Person or Persons created to hold such Real Estate or the Equity Interests in such Person or Persons), including sale-leaseback transactions involving any such Real Estate pursuant to leases on market terms, as long as, (A) such sale is made for fair market value, and (B) in the case of any sale-leaseback transaction permitted hereunder, the Loan Parties shall have used commercially reasonable efforts to deliver to the Agent a Collateral Access Agreement duly executed by each such purchaser or transferee and on terms and conditions reasonably satisfactory to the Agent;

(i) to the extent constituting a Disposition, the making of Permitted Investments;

(j) leases, subleases, licenses and sublicenses of real or personal property (other than Intellectual Property) entered into by Loan Parties and their Subsidiaries in the ordinary course of business at arm's length and on market terms;

-36-

(k) Dispositions of Equipment to the extent that (i) such Equipment is exchanged for credit against the purchase price of similar replacement property, (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property, or (iii) such Disposition is pursuant to a sale-leaseback transaction permitted hereunder;

(l) as long as no Event of Default would arise therefrom, the sale or issuance of any Equity Interests (other than Disqualified Stock) by Holdings or any Subsidiary thereof;

(m) the Disposition of any asset which is subject to or has sustained any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding, so long as the Net Proceeds thereof are applied to the Obligations as set forth herein;

(n) as long as no Default or Event of Default then exists or would arise therefrom, Dispositions of Intellectual Property that, in the judgment of a Loan Party, is no longer useful or necessary in its business or that of any Subsidiary;

(o) (i) so long as no Cash Dominion Event has then occurred and is continuing, Dispositions of cash and Cash Equivalents to the extent otherwise permitted hereby, and (ii) after the occurrence of a Cash Dominion Event, Dispositions of cash in the Excluded Accounts and proceeds of Loans made hereunder to pay expenses or engage in transactions otherwise permitted hereby;

(p) Dispositions of delinquent Accounts for collection purposes for fair value; and

(q) other Dispositions not expressly permitted pursuant to the foregoing clauses (a) through (p), provided that (i) the aggregate fair market value of all assets Disposed of in reliance upon this clause (q) shall not exceed $3,000,000 in any calendar year, and (ii) no Event of Default then exists or would arise therefrom.

"Permitted Encumbrances" means:

(a) Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Laws, arising in the ordinary course of business and securing obligations that are not overdue by more than sixty (60) days or are being contested in compliance with Section 6.04;

(c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d) deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e) Liens in respect of judgments that would not constitute an Event of Default hereunder;

-37-

(f) easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(g) Liens existing on the Closing Date listed on Schedule 7.01 and Liens to secure any Permitted Refinancings of the Indebtedness with respect thereto;

(h) Liens on fixed or capital assets of any Loan Party which secure Indebtedness permitted under clause (c) of the definition of Permitted Indebtedness so long as (i) such Liens and the Indebtedness secured thereby are incurred prior to or within ninety (90) days after such acquisition, (ii) the Indebtedness secured thereby does not exceed the cost of acquisition of the applicable assets, and (iii) such Liens shall attach only to the assets acquired, improved or refinanced with such Indebtedness and shall not extend to any other property or assets of the Loan Parties;

(i) Liens in favor of the Agent;

(j) landlords' and lessors' statutory Liens in respect of rent not in default;

(k) possessory Liens in favor of brokers and dealers arising in connection with the acquisition of or disposition of Permitted Investments, provided that such liens (i) attach only to such Investments and (ii) secure only obligations incurred in the ordinary course of business and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(l) Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, Liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m) Liens arising from precautionary UCC filings (or similar filings under other applicable Law) regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party;

(n) voluntary Liens on property (other than property of the type included in the Borrowing Base) in existence at the time such property is acquired pursuant to a Permitted Acquisition or on such property of a Subsidiary of a Loan Party in existence at the time such Subsidiary is acquired pursuant to a Permitted Acquisition; provided, that such Liens are not incurred in connection with or in anticipation of such Permitted Acquisition and do not attach to any other assets of any Loan Party or any Subsidiary;

(o) Liens in favor of customs and revenues authorities imposed by applicable Laws arising in the ordinary course of business in connection with the importation of goods and securing obligations (i) that are not overdue by more than thirty (30) days, or (ii)(A) that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation;

(p) Liens in favor of any holder of Indebtedness permitted pursuant to clause (j) of the definition of "Permitted Indebtedness"; provided that such Liens shall be junior and subordinate to the Liens securing the Obligations and the holder of such Indebtedness shall have entered into an intercreditor and subordination agreement with the Agent on terms reasonably acceptable to the Agent;

(q) leases, licenses, subleases or sublicenses granted to other Persons in the ordinary course of business which do not (i) interfere in any material respect with the business of the Loan Parties or (ii) secure any Indebtedness for borrowed money;

(r) any interest or title of (i) a lessor or sublessor under any lease or sublease or (ii) a licensor or sublicensor under any license or sublicense, in each case entered into in the ordinary course of business, so long as such interest or title relates solely to the assets subject thereto;

(s) Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(t) any interest or title of a lessor under any operating lease and all Liens on the underlying assets subject to such lease that affect such lessor's interest or title in such asset;

(u) Liens deemed to exist in connection with Investments in financial repurchase agreements that qualify as Cash Equivalents provided that such Liens do not extend to any assets other than the assets that are the subject of such repurchase agreement;

(v) Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection;

(w) Liens in favor of the L/C Issuer on cash collateral securing the obligations of a Defaulting Lender to fund risk participations hereunder;

(x) Liens in respect of the licensing of Intellectual Property in the ordinary course of business, to the extent such licensing is otherwise permitted hereunder;

(y) Liens upon In-Transit Inventory arising in the ordinary course of business in favor of Persons from time to time approved in writing by the Agent, subject to such conditions or documentation as the Agent, in its Permitted Discretion may set forth or require in such writing, and securing only obligations in favor of such Persons resulting from the transport of such In-Transit Inventory (and not associated with Indebtedness (whether for borrowed money or otherwise) or other unrelated obligations), which obligations are not overdue by more than sixty (60) days or are being contested in compliance with Section 6.04; provided that this clause (y) shall not be deemed to limit or impair any right of the Agent, in its Permitted Discretion, to establish, maintain or modify Reserves relative to Inventory subject to such Liens; and

(z) other Liens securing obligations in an aggregate amount not to exceed $1,000,000.

"Permitted Holders" means the Sponsor.

"Permitted Indebtedness" means each of the following:

(a) Indebtedness outstanding on the Closing Date listed on Schedule 7.03 and any Permitted Refinancing thereof;

(b) Indebtedness of any Loan Party to any other Loan Party;

(c) purchase money Indebtedness of any Loan Party to finance the acquisition of any personal property consisting solely of fixed or capital assets, including Capital Lease Obligations, and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and Permitted Refinancings thereof, provided, however, that the aggregate principal amount of Indebtedness permitted by this clause (c) shall not exceed $2,500,000 at any time outstanding and further provided that, if requested by the Agent, the Loan Parties shall use commercially reasonable efforts to cause the holders of such Indebtedness to enter into a Collateral Access Agreement on terms reasonably satisfactory to the Agent;

(d) Indebtedness incurred for the construction or acquisition or improvement of, or to finance or to refinance, any Real Estate owned by any Loan Party (including therein any Indebtedness incurred in connection with sale-leaseback transactions permitted hereunder and any Synthetic Lease Obligations), provided that, if requested by the Agent, the Loan Parties shall use commercially reasonable efforts to cause the holders of such Indebtedness and the lessors under any sale-leaseback transaction to enter into a Collateral Access Agreement on terms reasonably satisfactory to the Agent;

(e) contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business;

(f) obligations (contingent or otherwise) of any Loan Party or any Restricted Subsidiary thereof existing or arising under any Swap Contract, provided that (i) such obligations are (or were) entered into by such Person in the ordinary course of business for the purpose of directly mitigating risks associated with fluctuations in interest rates or foreign exchange rates, and not for purposes of speculation or taking a "market view" and (ii) such Swap Contract does not contain any provision exonerating the non-defaulting party from its obligation to make payments on outstanding transactions to the defaulting party;

(g) Indebtedness with respect to the deferred purchase price for any Permitted Acquisition, provided that such Indebtedness does not require the payment in cash of principal (other than in respect of working capital adjustments) prior to the Maturity Date, has a final maturity which extends beyond the Maturity Date, and is subordinated to the Obligations on terms reasonably acceptable to the Agent;

(h) Indebtedness of any Person that becomes a Subsidiary of a Loan Party in a Permitted Acquisition, which Indebtedness is existing at the time such Person becomes a Subsidiary of a Loan Party (other than Indebtedness incurred solely in contemplation of such Person's becoming a Subsidiary of a Loan Party);

(i) the Obligations;

-40-

(j) other secured Indebtedness not otherwise specifically described herein in an aggregate principal amount not to exceed $5,000,000 at any time outstanding; provided that the documentation governing such Indebtedness shall be in form and substance reasonably satisfactory to the Agent;

(k) Subordinated Indebtedness;

(l) Guarantees (i) by any Loan Party and its Restricted Subsidiaries of any Indebtedness of any other Loan Party permitted hereunder and (ii) as long as no Default or Event of Default has occurred and is continuing or would arise therefrom, by any Loan Party and its Restricted Subsidiaries of any Indebtedness otherwise permitted hereunder of any Subsidiary that is not a Loan Party to the extent such Guarantees comply with the provisions of clause (c)(iv) of the definition of "Permitted Investments";

(m) contingent liabilities arising with respect to customary indemnification obligations in favor of sellers in connection with Permitted Acquisitions;

(n) Indebtedness incurred by any Loan Party or any Restricted Subsidiary thereof in the ordinary course of business in connection with the financing of insurance premiums;

(o) to the extent constituting Indebtedness, Indebtedness due to the Sponsor on account of the accrual of Management Fees and transaction fees; and

(p) unsecured Indebtedness not otherwise specifically described herein and in an aggregate principal amount not to exceed $15,000,000 at any time outstanding.

"Permitted Investments" means each of the following:

(a) Cash Equivalents;

(b) Investments existing on the Closing Date set forth on Schedule 7.02 and any extension or renewal thereof, but not any increase in the amount thereof;

(c) (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding as of the Closing Date, (ii) additional Investments (including capital contributions) by any Loan Party and its Subsidiaries in Loan Parties, (iii) additional Investments by Subsidiaries of the Loan Parties that are not Loan Parties in other Subsidiaries that are not Loan Parties, and (iv) so long as no Default or Event of Default has occurred and is continuing or would result from such Investment, additional Investments by the Loan Parties in Wholly-Owned Subsidiaries that are not Loan Parties in an aggregate outstanding amount invested after the Closing Date not to exceed $5,000,000 at any time;

(d) Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(e) Guarantees constituting Permitted Indebtedness;

(f) Investments by any Loan Party in Swap Contracts permitted hereunder;

-41-

(g) Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(h) Investments received as the non-cash portion of consideration received in connection with Permitted Dispositions;

(i) advances to officers, directors and employees of the Loan Parties and Restricted Subsidiaries in the ordinary course of business outstanding for ordinary business purposes or notes from officers, directors and employees in exchange for Equity Interests of the Lead Borrower purchased by such officers, directors or employees, in an amount not to exceed, as to all Investments described in this clause (i), $3,000,000 at any time;

(j) Investments constituting Permitted Acquisitions and earnest money deposits made in connection with any letter of intent or purchase agreement entered into in connection with any Permitted Acquisition;

(k) to the extent constituting an Investment, acquisitions of Inventory in the ordinary course of business;

(l) bank deposits in the ordinary course of business, subject to the provisions of Section 6.12;

(m) Investments consisting of extensions of credit by any Subsidiary of a Borrower that is not a Loan Party to any Loan Party; provided that (i) each Loan Party and its Subsidiaries shall accurately record all intercompany transactions on its books and records, and (ii) such intercompany loans shall be subordinated to the Obligations as evidenced by a subordination agreement in form and substance reasonably satisfactory to the Agent and shall otherwise be on terms reasonably satisfactory to the Agent; and

(n) so long as the Payment Conditions are satisfied and without increasing the amounts permitted under any other clause of this definition, additional Investments not otherwise specifically described herein.

provided, however, that notwithstanding the foregoing, (i) after the occurrence and during the continuance of a Cash Dominion Event, no such Investments specified in clauses (a) and (n) shall be permitted to be made unless either (A) no Loans or, if then required to be Cash Collateralized, Letters of Credit are then outstanding, or (B) the Investment is a temporary Investment pending expiration of an Interest Period for a LIBOR Rate Loan, the proceeds of which Investment will be applied to the Obligations after the expiration of such Interest Period, and (ii) such Investments shall be pledged to the Agent as additional collateral for the Obligations pursuant to such agreements as may be reasonably required by the Agent.

"Permitted Overadvance" means an Overadvance made by the Agent, in its discretion, which:

(a) is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties; or

(b) is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation;

-42-

(c) is made to pay any other amount chargeable to any Loan Party hereunder or under any other Loan Document; and

(d) together with all other Permitted Overadvances then outstanding, shall not (i) exceed five percent (5%) of the Borrowing Base at any time, or (ii) unless a Liquidation is occurring, remain outstanding for more than forty-five (45) consecutive Business Days, unless in each case, the Required Lenders otherwise agree.

provided however, that the foregoing shall not (i) modify or abrogate any of the provisions of Section 2.03 regarding the Lenders' obligations with respect to Letters of Credit or Section 2.04 regarding the Lenders' obligations with respect to Swing Line Loans, or (ii) result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances, and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder, and further provided that in no event shall the Agent make an Overadvance, if after giving effect thereto, (i) the Total Outstandings would exceed the Aggregate Commitments (as in effect prior to any termination of the Aggregate Commitments pursuant to Section 2.06 or 8.02 hereof) , or (ii) at any time that there are only two (2) Lenders and a Specified Event of Default exists, any Lender (so long as such Lender is a Lender as of the Effective Date and maintains a Commitment not less than the Commitment of such Lender as of the Effective Date) requests the Agent in writing to cease making such Overadvances.

"Permitted Refinancing" means, with respect to any Person, any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced; provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premiums thereon and underwriting discounts, defeasance costs, fees, commissions, expenses and other transaction costs and by an amount equal to any existing commitments unutilized thereunder), (b) the weighted average life to maturity of such Permitted Refinancing is greater than or equal to the weighted average life to maturity of the Indebtedness being Refinanced (c) such Permitted Refinancing shall not require any scheduled principal payments due prior to the Maturity Date in excess of, or prior to, the scheduled principal payments due prior to such Maturity Date for the Indebtedness being Refinanced, (d) if the Indebtedness being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Credit Parties as those contained in the documentation governing the Indebtedness being Refinanced, (e) no Permitted Refinancing shall have direct or indirect obligors who were not also obligors of the Indebtedness being Refinanced, or greater guarantees or security, than the Indebtedness being Refinanced (and if secured, shall be subject to a lien subordination or other intercreditor agreement on terms not less favorable to the Agent than the terms of the lien subordination or other intercreditor agreement, if any, applicable to the Indebtedness being Refinanced), (f) such Permitted Refinancing shall be otherwise on terms not materially less favorable to the Credit Parties than those contained in the documentation governing the Indebtedness being Refinanced, including, without limitation, with respect to financial and other covenants and events of default, (g) the interest rate applicable to any such Permitted Refinancing shall not exceed the then applicable market interest rate, and (h) at the time thereof, no Default or Event of Default shall have occurred and be continuing.

"Permitted Store Closings" means (a) Store closures and related Inventory dispositions which do not exceed (i) in any Fiscal Year of the Lead Borrower and its Subsidiaries, ten percent (10%) of the number of the Borrowers' Stores as of the beginning of such Fiscal Year (net of new Store openings) and (ii) in the aggregate from and after the Closing Date, twenty percent (20%) of the number of the Borrowers' Stores in existence as of the Closing Date (net of new Store openings), and (b) the related

-43-

Inventory is either moved to a distribution center or another retail location of the Borrowers for future sale in the ordinary course of business or is disposed of at such Stores in accordance with liquidation agreements and with professional liquidators reasonably acceptable to the Agent.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Plan" means (i) any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan but excluding a Multiemployer Plan), maintained for employees of the Lead Borrower or any ERISA Affiliate or (ii) any such Plan to which the Lead Borrower or, solely with respect to a Pension Plan or Multiemployer Plan, any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Platform" has the meaning provided therefor in Section 6.02.

"Prepayment Event" means:

(a) Any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party constituting Collateral outside of the ordinary course of business, provided that any such Disposition in an amount not in excess of $2,000,000 prior to the occurrence of a Cash Dominion Event shall not be deemed a Prepayment Event; or

(b) Any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of a Loan Party in an amount in excess of $2,000,000 constituting Collateral, except to the extent (i) any portion of the proceeds therefrom is required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent (in which event, solely such portion shall be excluded pursuant to this clause (i)), or (ii) prior to the occurrence of a Cash Dominion Event, the proceeds therefrom are deposited into a segregated account and committed (pursuant to a legal and binding agreement) to be utilized for purposes of replacing or repairing the assets in respect of which such proceeds, awards or payments were received within 180 days of the occurrence of the damage to or loss of the assets being repaired or replaced and actually utilized within 270 days of the occurrence of the damage to or loss of such assets; provided that any such casualty or other insured damage to, or any such taking (and such payments), described in this clause (b) in an amount not in excess of $2,000,000 prior to the occurrence of a Cash Dominion Event shall not be deemed a Prepayment Event.

"Pro Forma Availability Condition" shall mean, as of any date of calculation, Pro Forma Excess Availability will be equal to or greater than twelve and one-half percent (12.5%) of the Loan Cap.

"Pro Forma Excess Availability" shall mean, as of any date of calculation, after giving pro forma effect to the transaction then to be consummated or payment to be made, projected Availability as of the date of such transaction or payment and as of the end of each Fiscal Month during the subsequent projected six (6) Fiscal Months.

"Pro Forma RP Availability Condition" shall mean, as of any date of calculation, Pro Forma Excess Availability will be equal to or greater than fifteen percent (15%) of the Loan Cap.

"Public Lender" has the meaning provided therefor in Section 6.02.

-44-

"Public Market" shall exist if (a) a Public Offering has been consummated and (b) any Equity Interests of the Lead Borrower have been distributed by means of an effective registration statement under the Securities Act of 1933.

"Public Offering" means a public offering of the Equity Interests of the Lead Borrower pursuant to an effective registration statement under the Securities Act of 1933.

"Qualified ECP Guarantor" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Real Estate" means all real property subject to a Lease and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Recipient" means the Agent, any Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any Obligation (excluding those on account of Other Liabilities) of any Loan Party hereunder.

"Register" has the meaning provided therefor in Section 10.06(c).

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Lead Borrower and its Subsidiaries as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reports" has the meaning provided therefor in Section 9.12(b).

"Request for Credit Extension" means (a) with respect to a Borrowing, Conversion or continuation of Revolving Loans, a Revolving Loan Notice, (b) with respect to an L/C Credit Extension, a Letter of Credit Application, and (c) with respect to a Swing Line Loan, a Swing Line Loan Notice.

"Required Lenders" means, as of any date of determination, at least two Lenders holding more than 50% of the Aggregate Commitments or, if the Aggregate Commitments have been terminated, at least two Lenders holding in the aggregate more than 50% of the Total Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Lender for purposes of this definition); provided that the Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserves" means all Inventory Reserves and Availability Reserves. The Agent shall have the right, at any time and from time to time after the Closing Date in its Permitted Discretion to establish new, or modify or eliminate any existing, Reserves upon three (3) Business Days prior notice to the Lead Borrower (during which period the Agent shall be available to discuss any such proposed Reserve with

-45-

the Lead Borrower); provided that no such prior notice shall be required (i) after the occurrence and during the continuance of an Event of Default or (ii) for changes to any Reserves resulting solely by virtue of mathematical calculations of the amount of the Reserve in accordance with the methodology of calculation previously disclosed and utilized.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"Restricted Subsidiary" means any Subsidiary of any Loan Party which is not an Unrestricted Subsidiary.

"Revolving Borrowing" means a borrowing consisting of simultaneous Revolving Loans of the same Type and, in the case of LIBOR Rate Loans, having the same Interest Period made by each of the Lenders pursuant to Section 2.01.

"Revolving Loan" means an extension of credit by a Lender to a Borrower pursuant to Section 2.01.

"Revolving Loan Notice" means a notice of (a) a Revolving Borrowing, (b) a Conversion of Revolving Loans from one Type to the other, or (c) a continuation of LIBOR Rate Loans, pursuant to Section 2.02(b), which, if in writing, shall be substantially in the form of Exhibit A.

"Revolving Note" means a promissory note made by the Borrowers in favor of a Lender evidencing Revolving Loans made by such Lender, substantially in the form of Exhibit C-1.

"RP Conditions" means, at the time of determination with respect to the making of any Restricted Payment, that (a) no Default or Event of Default then exists or would arise as a result of the making of such Restricted Payment, (b) immediately after giving pro forma effect to such Restricted Payment, the Pro Forma RP Availability Condition has been satisfied, (c) the Consolidated Fixed Charge Coverage Ratio for the Measurement Period preceding such Restricted Payment shall be greater than or equal to 1.1 to 1.0, provided that the provisions of this clause (c) shall not be applicable if Availability, calculated in accordance with clause (b) hereof, immediately after giving pro forma effect to such Restricted Payment and projected for the immediately succeeding six (6) months following such Restricted Payment is greater than or equal to thirty-five (35%) of the Loan Cap; (d) with respect to Restricted Payments to be made on or prior to November 1, 2016, immediately prior to and after giving pro forma effect to such Restricted Payment, no Loans are then outstanding; and (e) the Lead Borrower shall have delivered a Transaction Certificate to the Agent duly executed by a Responsible Officer of the Lead Borrower and attaching evidence (reasonably detailed and reasonably satisfactory to the Agent) of satisfaction of the conditions contained in clauses (b), (c) and (d) above, as applicable.

-46-

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"Seasonal Advance Rate Increase Percentage" two and one-half percent (2.5%).

"Seasonal Overadvance Period" shall mean the period in each year commencing September 1 and ending on December 31.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Loan Parties and the Agent.

"Security Documents" means the Security Agreement, the Blocked Account Agreements, the Mortgages, the Credit Card Notifications, any Collateral Access Agreement, any Custom Broker/Carrier Agreement, and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Settlement Date" has the meaning provided therefor in Section 2.14(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Lead Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Solvent" and "Solvency" means, with respect to any Person and its Restricted Subsidiaries on a Consolidated basis on a particular date, that on such date (a) at fair valuation, all of the properties and assets of such Person are greater than the sum of the debts, including contingent liabilities, of such Person, (b) the present fair saleable value of the properties and assets of such Person is not less than the amount that would be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person is able to realize upon its properties and assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts beyond such Person's ability to pay as such debts mature, (e) such Person is not engaged in a business or a transaction, and is not about to engage in a business or transaction, for which such Person's properties and assets would constitute unreasonably small capital after giving due consideration to the prevailing practices in the industry in which such Person is engaged, and (f) such Person is not "insolvent" within the meaning of Section 101 (32) of the Bankruptcy Code. The amount of all guarantees and other contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, can reasonably be expected to become an actual or matured liability.

"Specified Event of Default" means the occurrence of any Event of Default described in any of <u>Sections 8.01(a)</u>, <u>8.01(b)</u>, <u>8.01(c)(i)</u>, <u>8.01(d)</u>, <u>8.01(f)</u>, <u>8.01(j)</u>, <u>8.01(k)</u>, or <u>8.01(l)</u>.

"Specified Loan Party" means any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to <u>Section 10.25</u>).

"Sponsor" means, collectively, Sycamore Partners Management L.L.C. and any of its respective Affiliates and funds or partnerships managed or advised by it (including Sycamore Partners, L.P. and Sycamore Partners A, L.P.), but not including, however, any portfolio company of any of the foregoing.

"Sponsor Management Agreement" means that certain Advisory Agreement, dated as of May 1, 2015 by and between Sycamore Partners Management, L.L.C., Torrid Holding LLC, and the Loan Parties, as amended, modified, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof.

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit and that (a) is used in lieu or in support of performance guaranties or performance, surety or similar bonds (excluding appeal bonds) arising in the ordinary course of business, (b) is used in lieu or in support of stay or appeal bonds, (c) supports the payment of insurance premiums for reasonably necessary casualty insurance carried by any of the Loan Parties, or (d) supports payment or performance for identified purchases or exchanges of products or services in the ordinary course of business.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB to which the Agent is subject with respect to the Adjusted LIBOR Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. LIBOR Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Store" means any retail store (which may include any Real Estate, fixtures, Equipment, Inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms reasonably approved in writing by the Agent, including, without limitation, the Intercompany Subordinated Indebtedness.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the

-48-

management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligations" means, with respect to any Loan Party, any obligation of such Loan Party to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) reasonably determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Swing Line Borrowing" means a borrowing of a Swing Line Loan pursuant to Section 2.04.

"Swing Line Lender" means Bank of America, in its capacity as provider of Swing Line Loans, or any successor swing line lender hereunder.

"Swing Line Loan" has the meaning provided therefor in Section 2.04(a).

"Swing Line Loan Notice" means a notice of a Swing Line Borrowing pursuant to Section 2.04(b), which, if in writing, shall be substantially in the form of Exhibit B.

"Swing Line Note" means the promissory note of the Borrowers substantially in the form of Exhibit C-2, payable to the Swing Line Lender, evidencing the Swing Line Loans made by the Swing Line Lender.

"Swing Line Sublimit" means an amount equal to the lesser of (a) $5,000,000 and (b) the Aggregate Commitments. The Swing Line Sublimit is part of, and not in addition to, the Aggregate Commitments. A permanent reduction of the Aggregate Commitments shall not require a corresponding pro rata reduction in the Swing Line Sublimit; provided, however, that if the Aggregate Commitments are reduced to an amount less than the Swing Line Sublimit, then the Swing Line Sublimit shall be reduced to an amount equal to (or, at Lead Borrower's option, less than) the Aggregate Commitments.

-49-

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (a) the Maturity Date, (b) the date on which the maturity of the Obligations (excluding Other Liabilities) is accelerated (or deemed accelerated) and the Aggregate Commitments are irrevocably terminated (or deemed terminated) in accordance with Article VIII, or (c) the termination of the Aggregate Commitments in accordance with the provisions of Section 2.06 hereof.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans and all L/C Obligations.

"Trademark" has the meaning set forth in the Security Agreement.

"Trading with the Enemy Act" has the meaning provided therefor in Section 10.18.

"Transaction Certificate" means a certificate substantially in the form of Exhibit H.

"Transactions" shall mean the Closing Date Acquisition and the transactions contemplated by the Loan Documents to occur on the Closing Date.

"Transition Services Agreement" means that certain Transition Services Agreement, dated as of May 1, 2015, by and between the Lead Borrower and Hot Topic, Inc., as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof.

"Type" means, with respect to a Revolving Loan, its character as a Base Rate Loan or a LIBOR Rate Loan.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, or priority of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection, or priority, or availability of such remedy, as the case may be.

"UCP 600" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce ("ICC") Publication No. 600 (or such later version thereof as may be in effect at the time of issuance).

"UFCA" has the meaning provided therefor in Section 10.21(d).

"UFTA" has the meaning provided therefor in Section 10.21(d).

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base or misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

"Unreimbursed Amount" has the meaning provided therefor in Section 2.03(c)(i).

"Unrestricted Subsidiary" means a Subsidiary of a Loan Party designated by Holdings' board of directors as such in accordance with Section 6.19.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning provided therefor in Section 3.01(e)(ii)(B)(III).

"Wells Fargo" means Wells Fargo Bank, National Association.

"Wholly-Owned Subsidiary" means, with respect to any Person, any corporation, partnership or other entity of which all of the Equity Interests (other than, in the case of a corporation, directors' qualifying shares) are directly or indirectly owned or controlled by such Person or one or more Wholly- Owned Subsidiaries of such Person or by such Person and one or more Wholly-Owned Subsidiaries of such Person.

**1.02 Other Interpretive Provisions**. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, amendment and restatements, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory rules, regulations, orders, and provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or

-51-

regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c) Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d) Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (i) the repayment in Dollars in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit and Bank Products (other than Swap Contracts), providing Cash Collateralization) of all of the Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Swap Contracts) other than (x) unasserted contingent indemnification Obligations, (y) any Obligations relating to Bank Products (including Swap Contracts) that, at such time, are allowed by the applicable Bank Product provider to remain outstanding without being required to be repaid or Cash Collateralized, and (y) any Obligations relating to Cash Management Services that, at such time, are allowed by the applicable provider of such Cash Management Services to remain outstanding without being required to be repaid, and (ii) the termination of the Aggregate Commitments and the obligation of the L/C Issuer to issue Letters of Credit hereunder.

**1.03 Accounting Terms.**

(a) <u>Generally</u>. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the financial statements and related materials described in <u>Sections 6.01(a)</u>, except as otherwise specifically prescribed herein.

(b) <u>Changes in GAAP</u>. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> <u>that</u>, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Without limiting the foregoing and notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, in a manner such that any obligations relating to a lease that, in accordance with GAAP as in effect on the Closing Date, would be accounted for by the Borrowers as an operating lease shall be accounted for as obligations relating to an operating lease and not as Capitalized Lease Obligations (and shall not constitute Indebtedness hereunder).

**1.04 Rounding.** Any financial ratios required to be maintained by the Loan Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05 Times of Day.** Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06 Letter of Credit Amounts.** Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

**1.07 Certifications**. All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such Person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

**2.01 Revolving Loans**. Subject to the terms and conditions set forth herein, each Lender severally agrees to make loans (each such loan, a "Revolving Loan") to the Borrowers from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Lender's Commitment, or (y) such Lender's Applicable Percentage of the Borrowing Base;

provided that:

(a) after giving effect to any Revolving Borrowing, (x) the Total Outstandings shall not exceed the Loan Cap, and (y) the aggregate Outstanding Amount of the Revolving Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans shall not exceed such Lender's Commitment; and

(b) the Outstanding Amount of all L/C Obligations shall not at any time exceed the Letter of Credit Sublimit.

Within the limits of each Lender's Commitments, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.01, prepay under Section 2.05, and reborrow under this Section 2.01.

**2.02 Borrowings, Conversions and Continuations of Revolving Loans**.

(a) Revolving Loans (other than Swing Line Loans) shall be either Base Rate Loans or LIBOR Rate Loans as the Lead Borrower may request subject to and in accordance with this Section 2.02. All Swing Line Loans shall be only Base Rate Loans. Subject to the other provisions of this Section 2.02, Revolving Borrowings of more than one Type may be incurred at the same time.

(b) Each Revolving Borrowing, each Conversion of Revolving Loans from one Type to the other, and each continuation of LIBOR Rate Loans shall be made upon the Lead Borrower's irrevocable notice to the Agent, which may be given by telephone. Each such notice must be received by the Agent not later than 1:00 p.m. (i) three (3) Business Days prior to the requested date of any Borrowing of, Conversion to or continuation of LIBOR Rate Loans or of any Conversion of LIBOR Rate Loans to Base Rate Loans, and (ii) on the requested date of any Borrowing of Base Rate Loans. Each telephonic notice by the Lead Borrower pursuant to this Section 2.02(b) must be confirmed promptly by delivery to the Agent of a written Revolving Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower. Each Borrowing of, Conversion to or continuation of LIBOR Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof. Except as provided in Sections 2.03(c) and 2.04(c), each Borrowing of or Conversion to Base Rate Loans shall be in such minimum amounts as the Agent may require. Each Revolving Loan Notice (whether telephonic or written) shall specify (i) whether the Lead Borrower is requesting a Revolving Borrowing, a Conversion of Revolving Loans from one Type to the other, or a continuation of LIBOR Rate Loans, (ii) the requested date of the Borrowing, Conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Revolving Loans to be borrowed, Converted or continued, (iv) the Type of Revolving Loans to be borrowed or to which existing Revolving Loans are to be Converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If the Lead Borrower fails to specify a Type of Revolving Loan in a Revolving Loan Notice or if the Lead Borrower fails to give a timely notice requesting a Conversion or continuation of a LIBOR Rate Loan, then the applicable Revolving Loans shall be made as, or Converted to, Base Rate Loans. Any such automatic Conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable LIBOR Rate Loans. If the Lead Borrower requests a Borrowing of, Conversion to, or continuation of LIBOR Rate Loans in any such Revolving Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month. Notwithstanding anything to the contrary herein, a Swing Line Loan may not be Converted to a LIBOR Rate Loan.

(c) Following receipt of a Revolving Loan Notice, the Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Revolving Loans, and if no timely notice of a Conversion or continuation is provided by the Lead Borrower, the Agent shall notify each Lender of the details of any automatic Conversion of LIBOR Rate Loans to Base Rate Loans described in Section 2.02(b). In the case of a Revolving Borrowing, each Lender shall make the amount of its Revolving Loan available to the Agent in immediately available funds at the Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Revolving Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Agent shall use reasonable efforts to make all funds so received available to the Borrowers in like funds by no later than 4:00 p.m. on the day of receipt by the Agent either by (i) crediting the account of the Lead Borrower on the books of Bank of America with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Lead Borrower; provided, however, that if, on the date the Revolving Loan Notice with respect to such Borrowing is given by the Lead Borrower, there are L/C Borrowings outstanding, then the proceeds of such Borrowing, first, shall be applied to the payment in full of any such L/C Borrowings, and second, shall be made available to the Borrowers as provided above.

-54-

(d) The Agent, without the request of the Lead Borrower, may advance any interest, fee, service charge (including direct wire fees), expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby. The Agent shall advise the Lead Borrower of any such advance or charge promptly after the making thereof. Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrowers' obligations under Section 2.05(c). Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(d) shall bear interest at the interest rate then and thereafter applicable to Revolving Loans which are Base Rate Loans.

(e) Except as otherwise provided herein, a LIBOR Rate Loan may be continued or Converted only on the last day of an Interest Period for such LIBOR Rate Loan. During the existence of a Default or an Event of Default, no Loans may be requested as, Converted to or continued as LIBOR Rate Loans without the Consent of the Required Lenders.

(f) The Agent shall promptly notify the Lead Borrower and the Lenders of the interest rate applicable to any Interest Period for LIBOR Rate Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Agent shall notify the Lead Borrower and the Lenders of any change in Bank of America's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(g) After giving effect to all Revolving Borrowings, all Conversions of Revolving Loans from one Type to the other, and all continuations of Revolving Loans as the same Type, there shall not be more than five (5) Interest Periods in effect with respect to LIBOR Rate Loans.

(h) The Agent, the Lenders, the Swing Line Lender and the L/C Issuer shall have no obligation to make any Loan or to provide any Letter of Credit if an Overadvance would result. The Agent may, in its Permitted Discretion, make Permitted Overadvances without the consent of the Borrowers, the Lenders, the Swing Line Lender and the L/C Issuer and the Borrowers, the Swing Line Lender, and each Lender and L/C Issuer shall be bound thereby. Any Permitted Overadvance may constitute a Swing Line Loan. A Permitted Overadvance is for the account of the Borrowers and shall constitute a Revolving Loan bearing interest at the Base Rate and an Obligation and shall be repaid by the Borrowers in accordance with the provisions of Section 2.05(c). The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The making by the Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of Section 2.03 regarding the Lenders' obligations to purchase participations with respect to Letters of Credit or of Section 2.04 regarding the Lenders' obligations to purchase participations with respect to Swing Line Loans. The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvances.

-55-

**2.03 Letters of Credit**.

(a) <u>The Letter of Credit Commitment</u>.

(i) Subject to the terms and conditions set forth herein, (A) the L/C Issuer agrees, in reliance upon the agreements of the Lenders set forth in this <u>Section 2.03</u>, (1) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit for the account of the Loan Parties (including on behalf of any Restricted Subsidiary thereof), and to amend or extend Letters of Credit previously issued by it, in accordance with <u>Section 2.03(b)</u> below, and (2) to honor drawings under the Letters of Credit; and (B) the Lenders severally agree to participate in Letters of Credit issued for the account of the Loan Parties (including on behalf of any Restricted Subsidiary thereof) and any drawings thereunder; <u>provided</u> that after giving effect to any L/C Credit Extension with respect to any Letter of Credit, (x) the Total Outstandings shall not exceed the Loan Cap, (y) the aggregate Outstanding Amount of the Revolving Loans of any Lender, <u>plus</u> such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations, <u>plus</u> such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans shall not exceed such Lender's Commitment, and (z) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit. Each request by the Lead Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrowers that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof, the Borrowers' ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrowers may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii) The L/C Issuer shall not issue any Letter of Credit, if:

(A) subject to <u>Section 2.03(b)(iii)</u>, the expiry date of such requested Standby Letter of Credit would occur more than twelve (12) months after the date of issuance or last extension, unless the Agent has approved such expiry date; or

(B) subject to <u>Section 2.03(b)(iii)</u>, the expiry date of such requested Commercial Letter of Credit would occur more than 180 days after the date of issuance, unless the Agent has approved such expiry date; or

(C) the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless either such Letter of Credit is Cash Collateralized on or prior to the date of issuance of such Letter of Credit (or such later date as to which the Agent may agree) or the Agent has approved such expiry date; or

(D) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the L/C Issuer from issuing such Letter of Credit, or any Law applicable to the L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit, or request that the L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the L/C Issuer in good faith deems material to it; or

(E) the issuance of such Letter of Credit would violate one or more policies of the L/C Issuer applicable to letters of credit generally; or

(F) except as otherwise agreed by the Agent, such Letter of Credit is to be denominated in a currency other than Dollars; <u>provided</u> that if the L/C Issuer, with the consent of the Agent, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the Borrowers of the honoring of any drawing under such Letter of Credit shall be paid in the currency in which such Letter of Credit was denominated; or

-56-

(G) such Letter of Credit contains any provisions for automatic reinstatement of the Stated Amount after any drawing thereunder; or

(H) any Lender is at that time a Defaulting Lender, unless the L/C Issuer has entered into arrangements, including the delivery of Cash Collateral, satisfactory to the L/C Issuer (in its sole discretion) with the Borrowers or such Lender to eliminate the L/C Issuer's actual or potential Fronting Exposure (after giving effect to Section 2.16(a)(iv)) with respect to the Defaulting Lender arising from either (i) the Letter of Credit then proposed to be issued, or (ii) such Letter of Credit and all other L/C Obligations as to which the L/C Issuer has actual or potential Fronting Exposure, as it may elect in its sole discretion.

(iii) The L/C Issuer shall not amend any Letter of Credit if the L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof or if the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(iv) The L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the L/C Issuer shall have all of the benefits and immunities (A) provided to the Agent in Article IX with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Agent" as used in Article IX included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

(b) Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit.

(i) Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Lead Borrower delivered to the L/C Issuer (with a copy to the Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Lead Borrower. Such Letter of Credit Application may be sent by facsimile, by United States mail, by overnight courier, by electronic transmission using the system provided by the L/C Issuer, by personal delivery or by any other means acceptable to the L/C Issuer. Such Letter of Credit Application must be received by the L/C Issuer and the Agent not later than 11:00 a.m. at least two (2) Business Days (or such other date and time as the Agent and the L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as the L/C Issuer may reasonably require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the L/C Issuer (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the L/C Issuer may reasonably require. Additionally, the Lead Borrower shall furnish to the L/C Issuer and the Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the L/C Issuer or the Agent may reasonably require.

-57-

(ii) Subject to the provisions of Section 2.02(b)(v) hereof, promptly after receipt of any Letter of Credit Application, the L/C Issuer will confirm with the Agent (by telephone or in writing) that the Agent has received a copy of such Letter of Credit Application from the Lead Borrower and, if not, the L/C Issuer will provide the Agent with a copy thereof. Unless the L/C Issuer has received written notice from any Lender, the Agent or any Loan Party, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article IV shall not then be satisfied or unless the L/C Issuer would not be permitted, or would have no obligation, at such time to issue such Letter of Credit under the terms hereof (by reason of the provisions of Section 2.03(a)(ii) or otherwise), then, subject to the terms and conditions hereof, the L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the applicable Loan Party or enter into the applicable amendment, as the case may be, in each case in accordance with the L/C Issuer's usual and customary business practices. Immediately upon the issuance or amendment of each Letter of Credit, each Lender shall be deemed to (without any further action), and hereby irrevocably and unconditionally severally agrees to, purchase from the L/C Issuer, without recourse or warranty, a risk participation in such Letter of Credit in an amount equal to the product of such Lender's Applicable Percentage times the Stated Amount of such Letter of Credit. Upon any change in the Commitments under this Agreement, it is hereby agreed that with respect to all L/C Obligations, there shall be an automatic adjustment to the participations hereby created to reflect the new Applicable Percentages of the assigning and assignee Lenders.

(iii) If the Lead Borrower so requests in any applicable Letter of Credit Application, the L/C Issuer may, in its sole and absolute discretion, agree to issue a Standby Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that any such Auto-Extension Letter of Credit must permit the L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Standby Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such twelve-month period to be agreed upon at the time such Standby Letter of Credit is issued. Unless otherwise directed by the L/C Issuer, the Lead Borrower shall not be required to make a specific request to the L/C Issuer for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the L/C Issuer to permit the extension of such Standby Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; provided, however, that the L/C Issuer shall not permit any such extension if (A) the L/C Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Standby Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of Section 2.03(a)(ii) or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is five (5) Business Days before the Non-Extension Notice Date (1) from the Agent that the Required Lenders have elected not to permit such extension or (2) from the Agent, any Lender or the Lead Borrower that one or more of the applicable conditions specified in Section 4.02 is not then satisfied, and in each such case directing the L/C Issuer not to permit such extension.

(iv) Any L/C Issuer (other than Bank of America or any of its Affiliates) shall notify the Agent in writing on each Business Day of all Letters of Credit issued on the prior Business Day by such L/C Issuer, provided that (A) until the Agent advises any such Issuing Bank that the provisions of Section 4.02 are not satisfied, or (B) the aggregate amount of the Letters of Credit issued in any such week exceeds such amount as shall be agreed by the Agent and the L/C Issuer, such L/C Issuer shall be required to so notify the Agent in writing only once each week of the Letters of Credit issued by such L/C Issuer during the immediately preceding week as well as the daily amounts

-58-

outstanding for the prior week, such notice to be furnished on such day of the week as the Agent and such L/C Issuer may agree. The L/C Issuer will also deliver (contemporaneously with the notification set forth in the first sentence hereof) to the Lead Borrower and the Agent a true and complete copy of each such Letter of Credit or amendment.

(v) Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the L/C Issuer will also deliver to the Lead Borrower and the Agent a true and complete copy of such Letter of Credit or amendment.

(c) <u>Drawings and Reimbursements; Funding of Participations</u>.

(i) Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the L/C Issuer shall notify the Lead Borrower and the Agent thereof. Not later than 11:00 a.m. on the first Business Day immediately following the date that the Lead Borrower receives notice from the L/C Issuer of a drawing under a Letter of Credit (each such date, an "<u>Honor Date</u>"), the applicable Borrower shall be deemed to have requested a Borrowing of Revolving Loans that are Base Rate Loans to be disbursed on the such Business Day in an amount equal to the amount of such payment by the L/C Issuer under the Letter of Credit without regard to the minimum and multiples specified in Section 2.02(b) for the principal amount of Base Rate Loans, but subject to the amount of the unutilized portion of the Loan Cap and the conditions set forth in Section 4.02 (other than the delivery of a Revolving Loan Notice). In the event that such a Borrowing cannot be made pursuant to the terms hereof, then not later than 11:00 a.m. on the first Business Day after the Honor Date, the applicable Borrower shall reimburse the L/C Issuer through the Agent in an amount equal to the amount of such drawing. If the Borrowers fail to so reimburse the L/C Issuer by such time, the Agent shall promptly notify each Lender of the Honor Date, the amount of the unreimbursed drawing (the "<u>Unreimbursed Amount</u>"), and the amount of such Lender's Applicable Percentage thereof. Any notice given by the L/C Issuer or the Agent pursuant to this Section 2.03(c)(i) may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii) Each Lender shall upon any notice from the Agent pursuant to Section 2.03(c)(i) make funds available to the Agent (and the Agent may apply Cash Collateral provided for this purpose) for the account of the L/C Issuer at the Agent's Office in an amount equal to its Applicable Percentage of the Unreimbursed Amount not later than 1:00 p.m. on the Business Day specified in such notice by the Agent, whereupon, subject to the provisions of Section 2.03(c)(iii), each Lender that so makes funds available shall be deemed to have made a Loan that is a Base Rate Loan to the Borrowers in such amount. The Agent shall remit the funds so received to the L/C Issuer.

(iii) With respect to any Unreimbursed Amount that is not fully refinanced by a Revolving Borrowing of Base Rate Loans because the conditions set forth in Section 4.02 cannot be satisfied or for any other reason and the Borrowers have failed to reimburse the L/C Issuer pursuant to clause (c)(i) above, the Borrowers shall be deemed to have incurred from the L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced or reimbursed, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate for Revolving Loans which are Base Rate Loans. In such event, each Lender's payment to the Agent for the account of the L/C Issuer pursuant to Section 2.03(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this Section 2.03.

-59-

(iv) Until each Lender funds its Revolving Loan or L/C Advance pursuant to this Section 2.03(c) to reimburse the L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Lender's Applicable Percentage of such amount shall be solely for the account of the L/C Issuer.

(v) Each Lender's obligation to make Revolving Loans or L/C Advances to reimburse the L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the L/C Issuer, any Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default or Event of Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that each Lender's obligation to make Revolving Loans pursuant to this Section 2.03(c) is subject to the conditions set forth in Section 4.02 (other than delivery by the Lead Borrower of a Revolving Loan Notice). No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Borrowers to reimburse the L/C Issuer for the amount of any payment made by the L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi) If any Lender fails to make available to the Agent for the account of the L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.03(c) by the time specified in Section 2.03(c)(ii), then, without limiting the other provisions of this Agreement, the L/C Issuer shall be entitled to recover from such Lender (acting through the Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the L/C Issuer at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the L/C Issuer in accordance with banking industry rules on interbank compensation plus any administrative, processing or similar fees customarily charged by the L/C Issuer in connection with the foregoing. If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Revolving Loan included in the relevant Revolving Borrowing or L/C Advance in respect of the relevant L/C Borrowing, as the case may be. A certificate of the L/C Issuer submitted to any Lender (through the Agent) with respect to any amounts owing under this clause (vi) shall be conclusive absent manifest error.

(d) Repayment of Participations.

(i) At any time after the L/C Issuer has made a payment under any Letter of Credit and has received from any Lender its L/C Advance in respect of such payment in accordance with Section 2.03(c), if the L/C Issuer, or the Agent for the account of the L/C Issuer, receives any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrowers or otherwise, including proceeds of Cash Collateral applied thereto by the Agent pursuant to Section 2.03(g)), the L/C Issuer shall distribute any payment it receives to the Agent and the Agent will distribute to such Lender its Applicable Percentage thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's L/C Advance was outstanding) in the same funds as those received by the Agent.

(ii) If any payment received by the L/C Issuer or by Agent for the account of the L/C Issuer pursuant to Section 2.03(c)(i) is required to be returned under any of the circumstances described in Section 10.05 (including pursuant to any settlement entered into by the L/C Issuer in its discretion), each Lender shall pay to the Agent for the account of the L/C Issuer its Applicable Percentage thereof on demand of the Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the L/C Issuer in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the L/C Issuer in connection with the foregoing. The obligations of the Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

-60-

(e) <u>Obligations Absolute</u>. The obligation of the Borrowers to reimburse the L/C Issuer for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i) any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii) the existence of any claim, counterclaim, setoff, defense or other right that the Borrowers or any Restricted Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii) any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv) any waiver by the L/C Issuer of any requirement that exists for the L/C Issuer's protection and not the protection of the Borrowers or any waiver by the L/C Issuer which does not in fact materially prejudice the Borrowers;

(v) any honor of a demand for payment presented electronically even if such Letter of Credit requires that demand be in the form of a draft;

(vi) any payment made by the L/C Issuer in respect of an otherwise complying item presented after the date specified as the expiration date of, or the date by which documents must be received under such Letter of Credit if presentation after such date is authorized by the UCC, the ISP or the UCP, as applicable;

(vii) any payment by the L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(viii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrowers or any of their Restricted Subsidiaries; or

(ix) the fact that any Default or Event of Default shall have occurred and be continuing.

-61-

The Lead Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of non-compliance with the Lead Borrower's instructions or other irregularity, the Lead Borrower will immediately notify the L/C Issuer. The Borrowers shall be conclusively deemed to have waived any such claim against the L/C Issuer and its correspondents unless such notice is given as aforesaid. Notwithstanding the foregoing, the Borrowers shall not be precluded from asserting any claim for damages suffered by the Borrowers to the extent caused by the gross negligence, bad faith or willful misconduct of the L/C Issuer, as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(f) Role of L/C Issuer. Each Lender and the Borrowers agree that, in paying any drawing under a Letter of Credit, the L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the L/C Issuer, the Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable to any Loan Party or to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Required Lenders; (ii) any action taken or omitted in the absence of gross negligence, bad faith, or willful misconduct; (iii) any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit or any error in interpretation of technical terms; (iv) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document; or (v) for any action, neglect or omission under or in connection with any Letter of Credit or Issuer Document, including, without limitation, the issuance or amendment of any Letter of Credit, the failure to issue or amend any Letter of Credit, or the honoring or dishonoring of any demand under any Letter of Credit, and such action or neglect or omission will be binding upon the Loan Parties and the Lenders; provided that the Borrowers may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to punitive, consequential or exemplary, damages suffered by the Borrowers which the Borrowers prove were caused by the L/C Issuer's willful misconduct, bad faith, or gross negligence, as determined by a final and non-appealable judgment of a court of competent jurisdiction. The Borrowers hereby assume all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrowers' pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the L/C Issuer, the Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (ix) of Section 2.03(e); provided, however, that anything in such clauses to the contrary notwithstanding, the Borrowers may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrowers which the Borrowers prove were caused by the L/C Issuer's willful misconduct, bad faith, or gross negligence or the L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit, in each case as determined by a final and non-appealable judgment of a court of competent jurisdiction. In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary (or the L/C Issuer may refuse to accept and may refuse to make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit and may disregard any requirement in a Letter of Credit that notice of dishonor be given in a particular manner and any requirement that presentation be made at a particular place or by a particular time of day), and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason. The L/C Issuer shall not be responsible for the wording of any Letter of Credit (including, without limitation, any drawing conditions or any

-62-

terms or conditions that are ineffective, ambiguous, inconsistent, unduly complicated or reasonably impossible to satisfy), notwithstanding any assistance the L/C Issuer may provide to the Borrowers with drafting or recommending text for any Letter of Credit Application or with the structuring of any transaction related to any Letter of Credit, and each Borrower hereby acknowledges and agrees that any such assistance will not constitute legal or other advice by the L/C Issuer or any representation or warranty by the L/C Issuer that any such wording or such Letter of Credit will be effective. Without limiting the foregoing, the L/C Issuer may, as it deems reasonably appropriate, modify or alter and use in any Letter of Credit the terminology contained on the Letter of Credit Application for such Letter of Credit. The L/C Issuer may send a Letter of Credit or conduct any communication to or from the beneficiary via the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") message or overnight courier, or any other commercially reasonable means of communicating with a beneficiary.

(g) Cash Collateral. Upon the request of the Agent, if, as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, the Borrowers shall, in each case, promptly Cash Collateralize the then Outstanding Amount of all L/C Obligations in an amount equal to 103% of the Outstanding Amount of all L/C Obligations, pursuant to documentation in form and substance reasonably satisfactory to the Agent and the L/C Issuer (which documents are hereby Consented to by the Lenders). Sections 2.05, 2.06(b) and 8.02(c) set forth certain additional requirements to deliver Cash Collateral hereunder. The Borrowers hereby grant to the Agent a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing to secure all Obligations. Such cash collateral shall be maintained in blocked, non-interest bearing deposit accounts at Bank of America. If at any time the Agent determines that any funds held as cash collateral are subject to any right or claim of any Person other than the Agent or that the total amount of such funds is less than 103% of the aggregate Outstanding Amount of all L/C Obligations, the Borrowers will, forthwith upon demand by the Agent, pay to the Agent, as additional funds to be deposited as cash collateral, an amount equal to the excess of (x) 103% of the aggregate Outstanding Amount of L/C Obligations over (y) the total amount of funds, if any, then held as cash collateral that the Agent determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as cash collateral, such funds shall be applied, to the extent permitted under applicable Laws, to reimburse the L/C Issuer and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations in the manner specified in Section 8.03.

(h) Applicability of ISP and UCP; Limitation of Liability. Unless otherwise expressly agreed by the L/C Issuer and the Lead Borrower when a Letter of Credit is issued (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP shall apply to each Commercial Letter of Credit. Notwithstanding the foregoing, the L/C Issuer shall not be responsible to the Borrowers for, and the L/C Issuer's rights and remedies against the Borrowers shall not be impaired by, any action or inaction of the L/C Issuer required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the Law or any order of a jurisdiction where the L/C Issuer or the beneficiary is located, the practice stated in the ISP or UCP, as applicable, or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade - International Financial Services Association (BAFT-IFSA), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

(i) Letter of Credit Fees. The Borrowers shall pay to the Agent for the account of each Lender in accordance with its Applicable Percentage a Letter of Credit fee (the "Letter of Credit Fee") for each Letter of Credit equal to the Applicable Rate multiplied by the daily Stated Amount under each such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit). For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06. Letter of Credit

-63-

Fees shall be due and payable quarterly in arrears on the first Business Day of each January, April, July and October, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. Notwithstanding anything to the contrary contained herein, while any Event of Default exists, at the request of the Agent or the Required Lenders, all Letter of Credit Fees shall accrue at the Default Rate as provided in Section 2.08(b) hereof.

(j) Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer. The Borrowers shall pay directly to the L/C Issuer for its own account a fronting fee with respect to each Letter of Credit, at a rate equal to 0.125% per annum, computed on the daily amount available to be drawn under such Letter of Credit and on a quarterly basis in arrears. Such fronting fees shall be due and payable on the first Business Day of each January, April, July and October, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06. In addition, the Borrowers shall pay directly to the L/C Issuer for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the L/C Issuer relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(k) Conflict with Issuer Documents. In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

(l) Letters of Credit Issued for Restricted Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Loan Party (or on behalf of a Restricted Subsidiary), the Borrowers shall be obligated to reimburse the L/C Issuer hereunder for any and all drawings under such Letter of Credit. Each Borrower hereby acknowledges that the issuance of Letters of Credit for the account of the Loan Parties (or on behalf of Restricted Subsidiaries) inures to the benefit of such Borrower, and that such Borrower's business derives substantial benefits from the businesses of such Restricted Subsidiaries.

**2.04 Swing Line Loans**.

(a) The Swing Line. Subject to the terms and conditions set forth herein, the Swing Line Lender shall, in reliance upon the agreements of the other Lenders set forth in this Section 2.04, make loans (each such loan, a "Swing Line Loan") to the Borrowers from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, notwithstanding the fact that such Swing Line Loans, when aggregated with the Applicable Percentage of the Outstanding Amount of Revolving Loans and L/C Obligations of the Lender acting as Swing Line Lender, may exceed the amount of such Lender's Commitment; provided, however, that after giving effect to any Swing Line Loan, (i) the Total Outstandings shall not exceed the Loan Cap, and (ii) the aggregate Outstanding Amount of the Revolving Loans of any Lender at such time, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations at such time, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans at such time shall not exceed such Lender's Commitment and provided, further, that the Borrowers shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan, and provided further that the Swing Line Lender shall not be obligated to make any Swing Line Loan if it shall determine (which determination shall be conclusive and binding absent manifest error) that it has, or by such Credit Extension may have, Fronting Exposure. Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04. Each Swing Line Loan shall bear interest only at the Base Rate plus the Applicable Margin for Base Rate Loans. Immediately upon the

-64-

making of a Swing Line Loan, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Lender's Applicable Percentage *multiplied by* the amount of such Swing Line Loan. The Swing Line Lender shall have all of the benefits and immunities (A) provided to the Agent in Article IX with respect to any acts taken or omissions suffered by the Swing Line Lender in connection with Swing Line Loans made by it or proposed to be made by it as if the term "Agent" as used in Article IX included the Swing Line Lender with respect to such acts or omissions, and (B) as additionally provided herein with respect to the Swing Line Lender.

(b) Borrowing Procedures. Each Swing Line Borrowing shall be made upon the Lead Borrower's irrevocable notice to the Swing Line Lender and the Agent, which may be given by telephone. Each such notice must be received by the Swing Line Lender and the Agent not later than 1:00 p.m. on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be a minimum of $100,000, and (ii) the requested borrowing date, which shall be a Business Day. Each such telephonic notice must be confirmed promptly by delivery to the Swing Line Lender and the Agent of a written Swing Line Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower. Promptly after receipt by the Swing Line Lender of any telephonic Swing Line Loan Notice, the Swing Line Lender will confirm with the Agent (by telephone or in writing) that the Agent has also received such Swing Line Loan Notice and, if not, the Swing Line Lender will notify the Agent (by telephone or in writing) of the contents thereof. Unless the Swing Line Lender has received notice (by telephone or in writing) from the Agent at the request of the Required Lenders prior to 2:00 p.m. on the date of the proposed Swing Line Borrowing (A) directing the Swing Line Lender not to make such Swing Line Loan as a result of the limitations set forth in the provisos to the first sentence of Section 2.04(a), or (B) that one or more of the applicable conditions specified in Article IV is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender will use its commercially reasonable efforts to make the amount of its Swing Line Loan available to the Borrowers by not later than 4:00 p.m. on the borrowing date specified in such Swing Line Loan Notice either by (i) crediting the account of the Lead Borrower on the books of Bank of America with the amount of such funds or (ii) wire transferring such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Swing Line Lender by the Lead Borrower; provided, however, that if, on the date of the proposed Swing Line Loan, there are L/C Borrowings outstanding, then the proceeds of such Borrowing, first, shall be applied to the payment in full of any such L/C Borrowings, and second, shall be made available to the Borrowers as provided above.

(c) Refinancing of Swing Line Loans.

(i) In addition to settlements required under Section 2.14 hereof, the Swing Line Lender at any time in its sole and absolute discretion may request, on behalf of the Borrowers (which hereby irrevocably authorize the Swing Line Lender to so request on their behalf), that each Lender make a Revolving Loan which is a Base Rate Loan in an amount equal to such Lender's Applicable Percentage of the amount of Swing Line Loans then outstanding. Such request shall be made in writing (which written request shall be deemed to be a Revolving Loan Notice for purposes hereof) and in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but subject to the unutilized portion of the Loan Cap and the conditions set forth in Section 4.02. The Swing Line Lender shall furnish the Lead Borrower with a copy of the applicable Revolving Loan Notice promptly after delivering such notice to the Agent. Each Lender shall make an amount equal to its Applicable Percentage of the amount specified in such Revolving Loan Notice available to the Agent in immediately available funds for the account of the Swing Line Lender at the Agent's Office not later than 1:00 p.m. on the day specified in such Revolving Loan Notice, whereupon, subject to Section 2.04(c)(ii), each Lender that so makes funds available shall be deemed to have made a Revolving Loan which is a Base Rate Loan to the Borrowers in such amount. The Agent shall remit the funds so received to the Swing Line Lender.

-65-

(ii) If for any reason any Swing Line Loan cannot be refinanced by such a Revolving Borrowing in accordance with Section 2.04(c)(i), the request for Revolving Loans which are Base Rate Loans submitted by the Swing Line Lender as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Lenders fund its risk participation in the relevant Swing Line Loan and each Lender's payment to the Agent for the account of the Swing Line Lender pursuant to Section 2.04(c)(i) shall be deemed payment in respect of such participation.

(iii) If any Lender fails to make available to the Agent for the account of the Swing Line Lender any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.04(c) by the time specified in Section 2.04(c)(i), the Swing Line Lender shall be entitled to recover from such Lender (acting through the Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the Swing Line Lender in accordance with banking industry rules on interbank compensation plus any administrative, processing or similar fees customarily charged by the Swing Line Lender in connection with the foregoing. If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Revolving Loan included in the relevant Revolving Borrowing or funded participation in the relevant Swing Line Loan, as the case may be. A certificate of the Swing Line Lender submitted to any Lender (through the Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

(iv) Each Lender's obligation to make Revolving Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this Section 2.04(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the Swing Line Lender, the Borrowers or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default or an Event of Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that each Lender's obligation to make Revolving Loans pursuant to this Section 2.04(c) is subject to the conditions set forth in Section 4.02. No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrowers to repay Swing Line Loans, together with interest as provided herein.

(d) Repayment of Participations.

(i) At any time after any Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender, or the Agent on behalf of the Swing Line Lender, receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute such payment to the Agent and the Agent shall distribute to each such Lender its Applicable Percentage of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's risk participation was funded) in the same funds as those received by the Swing Line Lender.

(ii) If any payment received by the Swing Line Lender, or the Agent on behalf of the Swing Line Lender, in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in Section 10.05 (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Lender shall pay to the Swing Line Lender its Applicable Percentage thereof on demand of the Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per

-66-

annum equal to the greater of the Federal Funds Rate and a rate determined by the Swing Line Lender in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Swing Line Lender in connection with the foregoing. The Agent will make such demand upon the request of the Swing Line Lender. The obligations of the Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e) Interest for Account of Swing Line Lender. The Swing Line Lender shall be responsible for invoicing the Borrowers for interest on the Swing Line Loans. Until a Lender funds its Revolving Loan or risk participation pursuant to this Section 2.04 to refinance such Lender's Applicable Percentage of any Swing Line Loan, interest in respect of such Applicable Percentage shall be solely for the account of the Swing Line Lender.

(f) Payments Directly to Swing Line Lender. The Borrowers shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.

**2.05 Prepayments**.

(a) The Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent, at any time or from time to time voluntarily prepay Revolving Loans, in whole or in part without premium or penalty; provided that (i) such notice must be received by the Agent not later than 1:00 p.m. (A) three Business Days prior to any date of prepayment of LIBOR Rate Loans and (B) on the date of prepayment of Base Rate Loans; (ii) any prepayment of LIBOR Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof; and (iii) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if LIBOR Rate Loans, the Interest Period(s) of such Loans. The Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a LIBOR Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Subject to Section 2.16, each such prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.

(b) The Borrowers may, upon irrevocable notice from the Lead Borrower to the Swing Line Lender (with a copy to the Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; provided that (i) such notice must be received by the Swing Line Lender and the Agent not later than 1:00 p.m. on the date of the prepayment, and (ii) any such prepayment shall be in a minimum principal amount of $100,000. Each such notice shall specify the date and amount of such prepayment. If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(c) If for any reason the Total Outstandings at any time exceed the Loan Cap, as then in effect, the Borrowers shall immediately prepay the Loans and L/C Borrowings and Cash Collateralize the L/C Obligations (other than L/C Borrowings) in an aggregate amount equal to such excess; provided, however, that the Borrowers shall not be required to Cash Collateralize the L/C Obligations (other than L/C Borrowings) pursuant to this Section 2.05(c) unless after the prepayment in full of the Loans the Total Outstandings exceed the Loan Cap, as then in effect.

-67-

(d) (i) Upon the occurrence of a Cash Dominion Event, the Borrowers shall prepay the Loans as and to the extent required by the provisions of Section 6.12 hereof, and (ii) after the occurrence and during the continuance of an Event of Default or as and to the extent required by the provisions of Section 2.06(b), the Borrowers shall Cash Collateralize the L/C Obligations.

(e) The Borrowers shall prepay the Loans (including L/C Borrowings) and, after the occurrence and during the continuance of an Event of Default or to the extent required by the provisions of Section 2.06(b), Cash Collateralize the other L/C Obligations in an amount equal to the Net Cash Proceeds received by a Loan Party on account of a Prepayment Event, irrespective of whether a Cash Dominion Event then exists and is continuing.

(f) Prepayments made pursuant to Section 2.05(c), (d), and (e) above and funds on deposit in the Collection Account required to be applied to the Obligations pursuant to Section 6.12(d)(iii), first, shall be applied ratably to the L/C Borrowings and the Swing Line Loans, second, shall be applied ratably to the outstanding Revolving Loans, third, after the occurrence and during the continuance of an Event of Default, shall be used to Cash Collateralize the remaining L/C Obligations; fourth, shall be applied ratably to Other Liabilities then due and payable; and fifth, the amount remaining, if any, after the prepayment in full of all L/C Borrowings and Loans outstanding at such time and the Cash Collateralization of the remaining L/C Obligations (to the extent required hereunder) in full shall be deposited by the Agent in a deposit account of the Lead Borrower and may be utilized by the Borrowers in the ordinary course of its business to the extent otherwise permitted hereunder. Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrowers or any other Loan Party) to reimburse the L/C Issuer or the Lenders, as applicable, and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations.

(g) Each prepayment of the Revolving Loans shall not reduce or terminate the Aggregate Commitments.

**2.06 Termination or Reduction of Commitments.**

(a) The Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent, terminate the Aggregate Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit or from time to time permanently reduce the Aggregate Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit; provided that (i) any such notice shall be received by the Agent not later than 11:00 a.m. five Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $5,000,000 or any whole multiple of $1,000,000 in excess thereof, (iii) the Borrowers shall not terminate or reduce the Aggregate Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Outstandings would exceed the Aggregate Commitments. If, after giving effect to any reduction of the Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit exceeds the amount of the Aggregate Commitments, such Letter of Credit Sublimit or Swing Line Sublimit shall be automatically reduced by the amount of such excess.

(b) The Agent will promptly notify the Lenders of any termination or reduction of the Letter of Credit Sublimit, Swing Line Sublimit, or the Aggregate Commitments under this Section 2.06. Upon any reduction of the Aggregate Commitments, the Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. If, as a result of such termination or reduction, (i) the Outstanding Amount of L/C Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit, the Borrowers shall contemporaneously with such reduction or termination, Cash Collateralize such excess amount, (ii) the Swing Line Loans hereunder would exceed the Swing Line Sublimit, the Borrowers shall contemporaneously with such reduction or

-68-

termination, pay the Agent an amount equal to such excess, and (iii) the Revolving Loans or the Swing Line Loans hereunder would exceed the Aggregate Commitments or the Swing Line Sublimit, as applicable, the Borrowers shall contemporaneously with such reduction or termination, pay the Agent an amount equal to such excess.

**2.07 Repayment of Obligations**.

Except as provided in Section 10.11 with respect to the collateralization of the Other Liabilities, the Borrowers shall repay to the Lenders on the Termination Date all Obligations outstanding on such date (other than contingent indemnification claims for which a claim has not been asserted) and shall cause each Letter of Credit to be returned to the L/C Issuer undrawn or shall Cash Collateralize all L/C Obligations (to the extent not previously Cash Collateralized as required herein).

**2.08 Interest**.

(a) Subject to the provisions of Section 2.08(b) below, (i) each LIBOR Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Adjusted LIBOR Rate for such Interest Period plus the Applicable Margin for LIBOR Rate Loans; (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin for Base Rate Loans; and (iii) each Swing Line Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin for Base Rate Loans.

(b) (i) If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Law.

(ii) If any other Event of Default has occurred and is continuing, then the Agent, (i) at any time that there are only two (2) Lenders and a Specified Event of Default exists, at the request of any Lender (so long as such Lender is a Lender as of the Effective Date and maintains a Commitment not less than the Commitment of such Lender as of the Effective Date), or (ii) in all other circumstances, at the request of the Required Lenders, shall notify the Lead Borrower that all outstanding Obligations (excluding Other Liabilities) shall bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Law.

(iii) Accrued and unpaid interest on past due amounts (including interest on past due interest to the fullest extent permitted by Law) shall be due and payable upon demand.

(c) Except as provided in Section 2.08(b)(iii), interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.09 Fees.** In addition to certain fees described in subsections (i) and (j) of Section 2.03:

(i) Commitment Fee. The Borrowers shall pay to the Agent for the account of each Lender in accordance with its Applicable Percentage, a commitment fee equal to the Commitment Fee Percentage *multiplied by* the actual daily amount by which the Commitments

exceed the sum of the Outstanding Amount of Revolving Loans and L/C Obligations (subject to adjustment as provided in Section 2.16) during the immediately preceding quarter. The commitment fee described in the immediately preceding sentence (the "Commitment Fee") shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on the first Business Day of each January, April, July and October, commencing with the first such date to occur after the Closing Date, and on the last day of the Availability Period. It is hereby understood and agreed that Swing Line Loans shall not be considered utilization of the Commitment for purposes of the calculation of the commitment fees payable hereunder.

(ii) Other Fees. The Borrowers shall pay the fees specified in the Fee Letter to the Persons, in the amounts, and at the times specified in the Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.10 Computation of Interest and Fees**.

All computations of interest for Base Rate Loans when the Base Rate is determined by Bank of America's "prime rate" shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11 Evidence of Debt**.

(a) The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business. In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender. The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Agent, the Borrowers shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Revolving Loans or Swing Line Loans (in the case of the Swing Line Lender), as applicable, in addition to such accounts or records. Each Lender may, but shall not be obligated to, attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto. Upon receipt of an affidavit and indemnity of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b) In addition to the accounts and records referred to in Section 2.11(a), each Lender and the Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swing Line Loans. In the event of any conflict between the accounts and records maintained by the Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.

-70-

**2.12 Payments Generally; Agent's Clawback**.

(a) <u>General</u>. All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. Except for principal payments to be made on the Settlement Date (as provided in Section 2.14), the Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Agent after 2:00 p.m. shall, at the option of the Agent, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day (other than with respect to payment of a LIBOR Loan), and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b) (i) <u>Funding by Lenders; Presumption by Agent</u>. Unless the Agent shall have received notice from a Lender prior to (A) the proposed date of any Borrowing of LIBOR Rate Loans (or in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing), or (B) the date that such Lender's participation in a Letter of Credit or Swing Line Loan is required to be funded, that such Lender will not make available to the Agent such Lender's share of such Borrowing or participation, the Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 (or in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02), Section 2.03 or Section 2.04, as applicable, and may, in reliance upon such assumption, make available to the Borrowers, the L/C Issuer or the Swing Line Lender, as applicable, a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Revolving Borrowing or participation available to the Agent, then the applicable Lender and the Borrowers severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Base Rate Loans. If the Borrowers and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays its share of the applicable Revolving Borrowing or participation to the Agent, then the amount so paid shall constitute such Lender's Revolving Loan included in such Revolving Borrowing or participation in such Letter of Credit or Swing Line Loan. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Agent.

(ii) <u>Payments by Borrowers; Presumptions by Agent</u>. Unless the Agent shall have received notice from the Lead Borrower prior to the time at which any payment is due to the Agent for the account of any of the Lenders or the L/C Issuer hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the L/C Issuer, as the

-71-

case may be, the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the L/C Issuer, as the case may be, severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender or the L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

A notice of the Agent to any Lender or the Lead Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c) <u>Failure to Satisfy Conditions Precedent</u>. If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to the Borrowers by the Agent because the conditions to the applicable Credit Extension set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of <u>Section 4.02</u> hereof), the Agent shall promptly return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d) <u>Obligations of Lenders Several</u>. The obligations of the Lenders hereunder to make Revolving Loans, to fund participations in Letters of Credit and Swing Line Loans and to make payments hereunder are several and not joint. The failure of any Lender to make any Revolving Loan, to fund any such participation or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Revolving Loan, to purchase its participation or to make its payment hereunder.

(e) <u>Funding Source</u>. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13 Sharing of Payments by Credit Parties** If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in such Credit Party's receiving payment of a proportion of the aggregate amount of such Obligations greater than its <u>pro rata</u> share thereof as provided herein (including as in contravention of the priorities of payment set forth in <u>Section 8.03</u>), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Credit Parties, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in <u>Section 8.03</u>, <u>provided</u> that:

(i) if any such participations or sub-participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or sub-participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii) the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or any payment on account of the Other Liabilities prior to the occurrence of an Event of Default, or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Revolving Loans or sub-participations in L/C Obligations or Swing Line Loans to any Eligible Assignee or Participant, other than to the Loan Parties or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.14 Settlement Amongst Lenders**

(a) The amount of each Lender's Applicable Percentage of outstanding Loans (including, for clarity, outstanding Swing Line Loans), shall be computed weekly (or more frequently in the Agent's discretion) and shall be adjusted upward or downward based on all Loans and repayments of Loans received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

(b) The Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Loans (including, for clarity, outstanding Swing Line Loans) for the period and the amount of repayments received for the period. As reflected on the summary statement, each Lender (other than the Swing Line Lender) shall transfer to the Agent (as provided below) or the Agent shall transfer to each Lender (including, for clarity, the Swing Line Lender), such amounts as are necessary to insure that, after giving effect to all such transfers, the Outstanding Amount of Swing Line Loans is zero and the amount of Revolving Loans made by each Lender shall be equal to such Lender's Applicable Percentage of all Revolving Loans outstanding as of such Settlement Date. If the summary statement requires transfers to be made to the Agent by the Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent. If and to the extent any Lender shall not have so made its transfer to the Agent, such Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

**2.15 Increase in Commitments**.

(a) Request for Increase. Provided no Default or Event of Default then exists or would arise therefrom, upon notice to the Agent (which shall promptly notify the Lenders), the Lead Borrower may from time to time, request an increase in the Aggregate Commitments by an amount (for all such requests) not exceeding $30,000,000; provided that (i) any such request for an increase shall be in a minimum amount of $10,000,000 (or such lesser amount as to which the Agent may agree in writing), and (ii) the Lead Borrower may make a maximum of three (3) such requests. At the time of sending such notice, the Lead Borrower (in consultation with the Agent) shall specify the Persons to whom such requested increase is to be made (and if to any then existing Lender, such request shall be made pro rata to all existing Lenders) and the time period within which each such Person is requested to respond (which shall in no event be less than ten Business Days from the date of delivery of such notice to such Persons). Any Person so designated by the Lead Borrower which is not then a Lender shall be subject to the approval of the Agent, the L/C Issuer and the Swing Line Lender (which approvals shall not be unreasonably withheld, delayed or conditioned).

-73-

(b) <u>Elections to Increase</u>. Each Person to whom a request for an increase is made pursuant to clause (a), above, shall notify the Agent within such time period whether or not it agrees to furnish, or as to then existing Lenders increase, its Commitment and, if so, the amount of its Commitment it is willing to furnish or increase. Any Person not responding within such time period shall be deemed to have declined to furnish, or as to then existing Lenders, increase, its Commitment.

(c) <u>Notification by Agent; Additional Commitment Lenders</u>. The Agent shall notify the Lead Borrower of each Person's responses to each request made hereunder. To achieve the full amount of a requested increase and subject to the approval of the Agent, the L/C Issuer and the Swing Line Lender (which approvals shall not be unreasonably withheld, delayed or conditioned), to the extent that the Persons so designated by the Lead Borrower pursuant to clause (a) hereof decline to establish, or with respect to then existing Lenders to increase their Commitments, or decline to increase their Commitments to the amount requested by the Lead Borrower, MLPFS will use its reasonable efforts to arrange for other Eligible Assignees to become a Lender hereunder and to issue commitments in an amount equal to the amount of the increase in the Aggregate Commitments requested by the Lead Borrower and not accepted by the Persons so designated (and the Lead Borrower may also invite additional Eligible Assignees to become Lenders), *provided, however,* that without the consent of the Agent, at no time shall the Commitment of any Additional Commitment Lender be less than $5,000,000.

(d) <u>Effective Date and Allocations</u>. If the Aggregate Commitments are increased in accordance with this Section, the Agent, in consultation with the Lead Borrower, shall determine the effective date (the "<u>Increase Effective Date</u>") and the final allocation of such increase. The Agent shall promptly notify the Lead Borrower and the new (if any) and existing Lenders of the final allocation of such increase and the Increase Effective Date and on the Increase Effective Date (i) the Aggregate Commitments under, and for all purposes of, this Agreement shall be increased by the aggregate amount of such Commitment increases, and (ii) <u>Schedule 2.01</u> shall be deemed modified, without further action, to reflect the revised Commitments and Applicable Percentages of the new and existing Lenders.

(e) <u>Conditions to Effectiveness of Increase</u>. As a condition precedent to such increase, (i) the Lead Borrower shall deliver to the Agent a certificate of each Loan Party dated as of the Increase Effective Date signed by a Responsible Officer of such Loan Party (A) certifying and attaching the resolutions adopted by such Loan Party approving or consenting to such increase, and (B) in the case of the Borrowers, certifying that, before and after giving effect to such increase, (1) the representations and warranties contained in <u>Article V</u> and the other Loan Documents are true and correct in all material respects on and as of the Increase Effective Date, except to the extent that such representations and warranties (x) specifically refer to an earlier date, in which case they are true and correct in all material respects as of such earlier date or (y) are qualified by materiality in the text thereof, in which case they are true and correct in all respects, and except that for purposes of this <u>Section 2.15</u>, the representations and warranties contained in subsections (a) and (b) of <u>Section 5.05</u> shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of <u>Section 6.01</u>, and (2) no Default or Event of Default exists or would arise therefrom, (ii) the Borrowers, the Agent, and any Additional Commitment Lender shall have executed and delivered a joinder to the Loan Documents in such form as the Agent shall reasonably require; (iii) the Borrowers shall have paid such fees and other compensation to the Additional Commitment Lenders as the Lead Borrower and such Additional Commitment Lenders shall reasonably agree; (iv) the Borrowers shall have paid such arrangement fees to MLPFS as the Lead Borrower and the Agent may reasonably agree; (v) if reasonably requested by the Agent, the Borrowers shall deliver an opinion or opinions, in form and substance reasonably satisfactory to the Agent, from counsel to the Borrowers reasonably satisfactory to the Agent and dated such date; (vi) the Borrowers and the Additional Commitment Lender shall have delivered such other instruments, documents and agreements as the Agent may reasonably have requested; and (vii) no Default or Event of Default exists. The Borrowers shall prepay any Revolving Loans outstanding on the Increase Effective Date (and pay any additional amounts required pursuant to <u>Section 3.05</u>) to the extent necessary to keep the outstanding Revolving Loans ratable with any revised Applicable Percentages arising from any non-ratable increase in the Commitments under this Section.

<div align="center">-74-</div>

(f) Conflicting Provisions. This Section shall supersede any provisions in Sections 2.13 or 10.01 to the contrary.

**2.16 Defaulting Lenders.**

(a) Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i) Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definitions of "Required Lenders" and Section 10.01.

(ii) Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Agent from a Defaulting Lender pursuant to Section 10.08 shall be applied at such time or times as may be determined by the Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the L/C Issuer or Swing Line Lender hereunder; third, to Cash Collateralize the L/C Issuer's Fronting Exposure with respect to such Defaulting Lender; fourth, as the Lead Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; fifth, if so determined by the Agent and the Lead Borrower, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement (including, without limitation, future Fronting Exposure with respect to such Defaulting Lender with respect to Swing Line Loans) and (y) Cash Collateralize the L/C Issuer's future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement; sixth, to the payment of any amounts owing to the Lenders, the L/C Issuer or Swing Line Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the L/C Issuer or the Swing Line Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Obligations owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Obligations owed to, such Defaulting Lender until such time as all Loans and funded and

-75-

unfunded participations in L/C Obligations and Swing Line Loans are held by the Lenders pro rata in accordance with the Commitments hereunder without giving effect to Section 2.16(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.16(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii) Certain Fees.

(A) No Defaulting Lender shall be entitled to receive any fee payable under Section 2.09(i) for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B) Each Defaulting Lender shall be entitled to receive Letter of Credit Fees owing to such Defaulting Lender for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Applicable Percentage of the stated amount of Letters of Credit for which it has provided Cash Collateral pursuant to Section 2.03(g).

(C) With respect to any fee payable under Section 2.09(i) or any Letter of Credit Fee not required to be paid to any Defaulting Lender pursuant to clause (A) or (B) above, the Borrowers shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in L/C Obligations or Swing Line Loans that has been reallocated to such Non- Defaulting Lender pursuant to clause (iv) below, (y) pay to the L/C Issuer and Swing Line Lender, as applicable, the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such L/C Issuer's or Swing Line Lender's Fronting Exposure to such Defaulting Lender, and (z) not be required to pay the remaining amount of any such fee.

(iv) Reallocation of Applicable Percentages to Reduce Fronting Exposure. All or any part of such Defaulting Lender's participation in L/C Obligations and Swing Line Loans shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that (x) the conditions set forth in Section 4.02 are satisfied at the time of such reallocation (and, unless the Borrowers shall have otherwise notified the Agent at such time, the Borrowers shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (y) such reallocation does not cause the aggregate Outstanding Amount of Obligations (excluding Other Liabilities) of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Commitment. No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v) Cash Collateral, Repayment of Swing Line Loans. If the reallocation described in clause (a)(iv) above cannot, or can only partially, be effected, the Borrowers shall, without prejudice to any right or remedy available to them hereunder or under applicable Law, (x) first, prepay Swing Line Loans in an amount equal to the Swing Line Lenders' Fronting Exposure and (y) second, Cash Collateralize the L/C Issuer's Fronting Exposure in accordance with the procedures set forth in Section 2.03(g).

-76-

(b) <u>Defaulting Lender Cure</u>. If the Lead Borrower and the Agent (and, if the applicable Lender is a Lender, the Swing Line Lender and the L/C Issuer) agree in writing that a Lender is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Agent may determine to be necessary to cause the Revolving Loans and funded and unfunded participations in Letters of Credit and Swing Line Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to <u>Section 2.16(a)(iv)</u>), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**2.17 Extension of Maturity Date.**

(a) <u>Extension of Commitments</u>. The Borrowers may at any time and from time to time request that all or a portion of the Commitments (each, an "<u>Existing Revolver Tranche</u>") be amended to extend the Maturity Date with respect to all or a portion of any principal amount of such Commitments (any such Commitments which have been so amended, "<u>Extended Commitments</u>") and to provide for other terms consistent with this <u>Section 2.17</u>; <u>provided</u> that there shall be no more than three (3) tranches of Loans and Commitments outstanding at any time. In order to establish any Extended Commitments, the Lead Borrower shall provide a notice to the Agent (who shall provide a copy of such notice to each of the Lenders under the applicable Existing Revolver Tranche) (each, an "<u>Extension Request</u>") setting forth the proposed terms (which shall be determined in consultation with the Agent) of the Extended Commitments to be established, which shall (x) be identical as offered to each Lender under such Existing Revolver Tranche (including as to the proposed interest rates and fees payable) and offered pro rata to each Lender under such Existing Revolver Tranche and (y) be identical to the Commitments under the Existing Revolver Tranche from which such Extended Commitments are to be amended, except that: (i) the Maturity Date of the Extended Commitments shall be later than the Maturity Date of the Commitments of such Existing Revolver Tranche, (ii) the Extension Amendment may provide for other covenants and terms that apply solely to any period after the Latest Maturity Date that is in effect on the effective date of the Extension Amendment (immediately prior to the establishment of such Extended Commitments); and (iii) all borrowings under the Commitments and repayments thereunder shall be made on a pro rata basis (except for (I) payments of interest and fees at different rates on Extended Commitments (and related outstandings) and (II) repayments required upon the termination date of the non-extending Commitments); <u>provided further</u>, that (A) the conditions precedent to a Borrowing set forth in <u>Section 4.02</u> shall be satisfied as of the date of such Extension Amendment and at the time when any Loans are made in respect of any Extended Commitment, (B) in no event shall the final maturity date of any Extended Commitments of a given Extension Series at the time of establishment thereof be earlier than the then Latest Maturity Date of any other Commitments hereunder, and (C) all documentation in respect of the such Extension Amendment shall be consistent with the foregoing. Any Extended Commitments amended pursuant to any Extension Request shall be designated a series (each, an "<u>Extension Series</u>") of Extended Commitments for all purposes of this Agreement; provided that any Extended Commitments amended from an Existing Revolver Tranche may, to the extent provided in the applicable Extension Amendment, be designated as an increase in any previously established Extension Series with respect to such Existing Revolver Tranche. Each Extension Series of Extended Commitments incurred under this <u>Section 2.17</u> shall be in an aggregate principal amount reasonably acceptable to the Agent.

-77-

(b) <u>Extension Request</u>. The Lead Borrower shall provide the applicable Extension Request at least sixty (60) Business Days (or such shorter period as may be agreed by the Agent) prior to the date on which Lenders under the Existing Revolver Tranche are requested to respond, and shall agree to such procedures, if any, as may be established by, or acceptable to, the Agent, in each case acting reasonably, to accomplish the purposes of this <u>Section 2.17</u>. No Lender shall have any obligation to agree to provide any Extended Commitment pursuant to any Extension Request. Any Lender (each, an "<u>Extending Lender</u>") wishing to have all or a portion of its Commitments under the Existing Revolver Tranche subject to such Extension Request amended into Extended Commitments shall notify the Agent (each, an "<u>Extension Election</u>") on or prior to the date specified in such Extension Request of the amount of its Commitments under the Existing Revolver Tranche which it has elected to request be amended into Extended Commitments (subject to any minimum denomination requirements imposed by the Agent). In the event that the aggregate principal amount of Commitments under the Existing Revolver Tranche in respect of which applicable Lenders shall have accepted the relevant Extension Request exceeds the amount of Extended Commitments requested to be extended pursuant to the Extension Request, Commitments subject to Extension Elections shall be amended to reflect allocations of the Extended Commitments, which Extended Commitments shall be allocated as agreed by the Agent and the Lead Borrower.

(c) <u>New Revolving Commitment Lenders</u>. Following any Extension Request made by the Borrowers in accordance with <u>Sections 2.17(a)</u> and <u>2.17(b)</u>, if the Lenders shall have declined to agree during the period specified in <u>Section 2.17(b)</u> above to provide Extended Commitments in an aggregate principal amount equal to the amount requested by the Borrowers in such Extension Request, the Borrowers may request that Additional Commitment Lenders provide an Extended Commitment hereunder (an "<u>Additional Commitment</u>"); <u>provided</u> that such Extended Commitments of such Additional Commitment Lenders (i) shall be in an aggregate principal amount for all such Additional Commitment Lenders not to exceed the aggregate principal amount of Extended Commitments so declined to be provided by the existing Lenders and (ii) shall be on identical terms to the terms applicable to the terms specified in the applicable Extension Request (and any Extended Commitments provided by existing Lenders in respect thereof); <u>provided further</u> that, as a condition to the effectiveness of any Extended Commitment of any Additional Commitment Lender, the Agent, the L/C Issuer and the Swing Line Lender shall have consented (such consent not to be unreasonably withheld) to each Additional Commitment Lender if such consent would be required under <u>Section 10.06(b)</u> for an assignment of Commitments to such Person. Notwithstanding anything herein to the contrary, any Extended Commitment provided by Additional Commitment Lenders shall be pro rata to each Additional Commitment Lender. Upon effectiveness of the Extension Amendment to which each such Additional Commitment Lender is a party, (a) the Commitments of all existing Lenders of each Type specified in the Extension Amendment in accordance with this <u>Section 2.17</u> will be permanently reduced pro rata by an aggregate amount equal to the aggregate principal amount of the Extended Commitments of such Additional Commitment Lenders and (b) the Commitment of each such Additional Commitment Lender will become effective. The Extended Commitments of Additional Commitment Lenders will be incorporated as Commitments hereunder in the same manner in which Extended Commitments of existing Lenders are incorporated hereunder pursuant to this <u>Section 2.17</u>, and for the avoidance of doubt, all Borrowings and repayments of Loans from and after the effectiveness of such Extension Amendment shall be made pro rata across all Types of Commitments including such Additional Commitment Lenders (based on the outstanding principal amounts of the respective Types of Commitments) except for (x) payments of interest and fees at different rates for each Type of Commitments and (y) repayments required on the Maturity Date for any particular Type of Commitments. Upon the effectiveness of each Additional Commitment pursuant to this <u>Section 2.17(c)</u>, (a) each Lender of all applicable existing Types of Commitments immediately prior to such effectiveness will automatically and without further act be deemed to have assigned to each Additional Commitment Lender, and each such Additional Commitment Lender will automatically and without further act be deemed to have assumed, a portion of such Lender's

-78-

participations hereunder in outstanding Letters of Credit and Swingline Loans such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the outstanding (i) participations hereunder in Letters of Credit and (ii) participations hereunder in Swingline Loans held by each Lender of each Type of Commitments (including each such Additional Commitment Lender) will equal the percentage of the aggregate Commitments of all Types of Lenders represented by such Lender's Commitment and (b) if, on the date of such effectiveness, there are any Loans outstanding, such Loans shall on or prior to the effectiveness of such Additional Commitment be prepaid from the proceeds of Loans outstanding after giving effect to such Additional Commitments, which prepayment shall be accompanied by accrued interest on the Loans being prepaid and any costs incurred by any Lender in accordance with Section 3.04. The Agent and the Lenders hereby agree that the minimum borrowing, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

(d) Extension Amendment. Extended Commitments and Additional Commitments shall be established pursuant to an amendment (each, an "Extension Amendment") to this Agreement among the Borrowers, the Agent and each Extending Lender and each Additional Commitment Lender, if any, providing an Extended Commitment or an Additional Commitment, as applicable, thereunder, which shall be consistent with the provisions set forth in Sections 2.17(a), (b) and (c) above (but which shall not require the consent of any other Lender). The effectiveness of any Extension Amendment shall be subject to the satisfaction on the date thereof of each of the conditions set forth in Section 4.02 and, to the extent reasonably requested by the Agent, receipt by the Agent of (i) legal opinions, board resolutions and officers' certificates consistent with those delivered on the Closing Date other than changes to such legal opinion resulting from a Change in Law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Agent and (ii) reaffirmation agreements and/or such amendments to the Security Documents as may be reasonably requested by the Agent in order to ensure that the Extended Commitments or the Additional Commitments, as the case may be, are provided with the benefit of the applicable Loan Documents. The Agent shall promptly notify each Lender as to the effectiveness of each Extension Amendment. Each of the parties hereto hereby agrees that this Agreement and the other Loan Documents may be amended pursuant to an Extension Amendment, without the consent of any other Lenders, to the extent (but only to the extent) necessary to (i) reflect the existence and terms of the Extended Commitments or the Additional Commitments, as the case may be, incurred pursuant thereto, (ii) make such other changes to this Agreement and the other Loan Documents (without the consent of the Required Lenders) and (iii) effect such other amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Agent and the applicable Borrower, to effect the provisions of this Section, and the Required Lenders hereby expressly authorize the Agent to enter into any such Extension Amendment.

(e) Treatment as Payment of Loans. No conversion of Loans pursuant to any Extension in accordance with this Section 2.17 shall constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement.

(f) Conflicting Provisions. This Section shall supersede any provisions in Sections 2.13 or 10.01 to the contrary.

-79-

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY;**
**APPOINTMENT OF LEAD BORROWER**

**3.01 Taxes.**

(a) <u>Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes</u>.

(i) Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws. If any applicable Laws (as determined in the good faith discretion of the Agent) require the deduction or withholding of any Tax from any such payment by the Agent or a Loan Party, then the Agent or such Loan Party shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to <u>subsection (e)</u> below.

(ii) If any Loan Party or the Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment, then (A) such Loan Party or the Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to <u>subsection (e)</u> below, (B) such Loan Party or the Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this <u>Section 3.01</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction on account of Indemnified Taxes been made.

(b) <u>Payment of Other Taxes by the Borrowers</u>. Without limiting the provisions of subsection (a) above, the Borrowers shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Agent timely reimburse it for the payment of, any Other Taxes.

(c) <u>Tax Indemnifications</u>.

(i) The Loan Parties shall, and each Loan Party does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 3.01</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Lead Borrower by a Lender or the L/C Issuer (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender or the L/C Issuer, shall be conclusive absent manifest error.

-80-

(ii) Each Lender and the L/C Issuer shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, (x) the Agent against any Indemnified Taxes attributable to such Lender or the L/C Issuer (but only to the extent that any Loan Party has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (y) the Agent and the Loan Parties, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.06(d) relating to the maintenance of a Participant Register and (z) the Agent and the Loan Parties, as applicable, against any Excluded Taxes attributable to such Lender or the L/C Issuer, in each case, that are payable or paid by the Agent or a Loan Party in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error. Each Lender and the L/C Issuer hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender or the L/C Issuer, as the case may be, under this Agreement or any other Loan Document against any amount due to the Agent under this clause (ii).

(d) Evidence of Payments. Upon request by the Lead Borrower or the Agent, as the case may be, after any payment of Taxes by the Lead Borrower or by the Agent to a Governmental Authority as provided in this Section 3.01, the Lead Borrower shall deliver to the Agent or the Agent shall deliver to the Lead Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Lead Borrower or the Agent, as the case may be.

(e) Status of Lenders; Tax Documentation.

(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Lead Borrower and the Agent, at the time or times reasonably requested by the Lead Borrower or the Agent, such properly completed and executed documentation reasonably requested by the Lead Borrower or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Lead Borrower or the Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Lead Borrower or the Agent as will enable the Lead Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing, in the event that the Lead Borrower is a U.S. Person,

-81-

(A) any Lender that is a U.S. Person shall deliver to the Lead Borrower and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Lead Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Agent), whichever of the following is applicable:

(I) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II) executed originals of IRS Form W-8ECI;

(III) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN; or

(IV) to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Lead Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Agent), executed originals of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Lead Borrower or the Agent to determine the withholding or deduction required to be made; and

-82-

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Lead Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Lead Borrower or the Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Agent as may be necessary for the Lead Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii) Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 3.01 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Lead Borrower and the Agent in writing of its legal inability to do so.

(f) Treatment of Certain Refunds. Unless required by applicable Laws, at no time shall the Agent have any obligation to file for or otherwise pursue on behalf of a Lender or the L/C Issuer, or have any obligation to pay to any Lender or the L/C Issuer, any refund of Taxes withheld or deducted from funds paid for the account of such Lender or the L/C Issuer, as the case may be. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this Section 3.01, it shall pay to the Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by a Loan Party under this Section 3.01 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Party, upon the request of the Recipient, agrees to repay the amount paid over to the Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to the Loan Party pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Loan Party or any other Person.

(g) Survival. Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender or the L/C Issuer, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

-83-

**3.02 Illegality**. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBOR Rate Loans, or to determine or charge interest rates based upon the LIBOR Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Lead Borrower through the Agent, (i) any obligation of such Lender to make or continue LIBOR Rate Loans or to Convert Base Rate Loans to LIBOR Rate Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the LIBOR Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Agent without reference to the LIBOR Rate component of the Base Rate, in each case, until such Lender notifies the Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (x) the Borrowers shall, upon demand from such Lender (with a copy to the Agent), prepay or, if applicable, Convert all LIBOR Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Agent without reference to the LIBOR Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the LIBOR Rate, the Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the LIBOR Rate component thereof until the Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the LIBOR Rate. Upon any such prepayment or Conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or Converted.

**3.03 Inability to Determine Rates**. If the Required Lenders determine that for any reason in connection with any request for a LIBOR Rate Loan or a Conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank market for the applicable amount and Interest Period of such LIBOR Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan, or (c) the LIBOR Rate for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify the Lead Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain LIBOR Rate Loans shall be suspended, and (y) in the event of a determination described in the preceding sentence with respect to the LIBOR Rate component of the Base Rate, the utilization of the LIBOR Rate component in determining the Base Rate shall be suspended, in each case until the until the Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Lead Borrower may revoke any pending request for a Borrowing of, Conversion to or continuation of LIBOR Rate Loans or, failing that, will be deemed to have Converted such request into a request for a Revolving Borrowing of Base Rate Loans in the amount specified therein.

**3.04 Increased Costs; Reserves on LIBOR Rate Loans**.

(a) Increased Costs Generally. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the LIBOR Rate) or the L/C Issuer;

-84-

(ii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii) impose on any Lender or the L/C Issuer or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or LIBOR Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any LIBOR Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the L/C Issuer hereunder , other than an increase related to Taxes, which are governed exclusively by Section 3.01 hereof (whether of principal, interest or any other amount) then, upon request of such Lender or the L/C Issuer and delivery of the certificate contemplated by Section 3.04(c), the Loan Parties will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b) Capital Requirements. If any Lender or the L/C Issuer determines that any Change in Law affecting such Lender or the L/C Issuer or any Lending Office of such Lender or such Lender's or the L/C Issuer's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the L/C Issuer's capital or on the capital or liquidity of such Lender's or the L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit or Swing Line Loans held by, such Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the L/C Issuer's policies and the policies of such Lender's or the L/C Issuer's holding company with respect to capital adequacy), then upon delivery of the certificate contemplated by Section 3.04(c), from time to time the Loan Parties will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company for any such reduction suffered.

(c) Certificates for Reimbursement. A certificate of a Lender or the L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or the L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section certifying that such Lender is seeking corresponding compensation from other similarly situated borrowers and delivered to the Lead Borrower shall be conclusive absent manifest error. The Loan Parties shall pay such Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d) Delay in Requests. Failure or delay on the part of any Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or the L/C Issuer's right to demand such compensation, provided that the Loan Parties shall not be required to compensate a Lender or the L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender or the L/C Issuer, as the case may be, notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

-85-

**3.05 Compensation for Losses.** Upon demand of any Lender (with a copy to the Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a) any continuation, Conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b) any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or Convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Lead Borrower; or

(c) any assignment of a LIBOR Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Lead Borrower pursuant to Section 10.13;

including any actual loss (as opposed to incidental, consequential, indirect or similar losses) of anticipated profits and any loss or reasonable expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. The Borrowers shall also pay any customary and reasonable administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each LIBOR Rate Loan made by it at the LIBOR Rate for such Loan by a matching deposit or other borrowing in the London interbank market for a comparable amount and for a comparable period, whether or not such LIBOR Rate Loan was in fact so funded. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section and setting forth in reasonable detail the manner in which such amount or amounts was determined shall be delivered to the Lead Borrower.

**3.06 Mitigation Obligations; Replacement of Lenders**.

(a) Designation of a Different Lending Office. If any Lender or the L/C Issuer requests compensation under Section 3.04, or the Borrowers are required to pay any Indemnified Taxes or any additional amount to any Lender, the L/C Issuer, any Participant or any Governmental Authority for the account of any Lender the L/C Issuer or any such Participant pursuant to Section 3.01, or if any Lender, the L/C Issuer or any such Participant gives a notice pursuant to Section 3.02, then such Lender, the L/C Issuer or any such Participant shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the good faith judgment of such Lender, the L/C Issuer or Participant such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender, L/C Issuer or Participant to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, L/C Issuer or Participant. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender, L/C Issuer or Participant in connection with any such designation or assignment.

-86-

(b) <u>Replacement of Lenders</u>. If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrowers are required to pay any Indemnified Taxes or any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u> and, in each case, such Lender has declined or is unable to designate a different Lending Office in accordance with <u>Section 3.06(a)</u>, the Borrowers may replace such Lender in accordance with <u>Section 10.13</u>.

**3.07 Survival.** All of the Borrowers' obligations under this <u>Article III</u> shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Agent.

**3.08 Designation of Lead Borrower as Borrowers' Agent.**

(a) Each Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement. As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Lead Borrower and of any other Borrower. In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Lead Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b) Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers. Consequently, each Borrower hereby assumes, guarantees and agrees to discharge all Obligations of each of the other Borrowers.

(c) The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested a Credit Extension. Neither the Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**4.01 Conditions of Initial Credit Extension**. The obligation of the L/C Issuer and each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a) The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance reasonably satisfactory to the Agent:

(i) counterparts of this Agreement each properly executed by a Responsible Officer of the signing Loan Party and the Lenders sufficient in number for distribution to the Agent, each Lender and the Lead Borrower;

(ii) a Note executed by the Borrowers in favor of each Lender requesting a Note (to the extent any such Note or Notes were requested on or before the Closing Date);

-87-

(iii) such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may reasonably require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv) copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing, and qualified to engage in business in the jurisdiction of its formation, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v) a favorable opinion of Simpson Thacher & Bartlett LLP, counsel to the Loan Parties, addressed to the Agent and each Lender, as to such matters concerning the Loan Parties and the Loan Documents as the Agent may reasonably request (which shall include, among other things, authority, legality, validity, binding effect and enforceability of the Loan Documents, non-contravention and creation and perfection of the Liens on the Collateral in favor of the Agent);

(vi) a certificate of a Responsible Officer of the Lead Borrower certifying (A) that the conditions specified in Sections 4.01 and 4.02 have been satisfied, (B) that since February 1, 2014, there has not occurred a Material Adverse Effect, and (C) as to the Solvency of the Loan Parties;

(vii) a letter from the agent and the lenders under the Hot Topic, Inc. loan arrangements reasonably satisfactory in form and substance to the Agent evidencing that the Loan Parties have been or concurrently with the Closing Date will be released from all obligations under such loan arrangements, all Liens securing obligations thereunder have been or concurrently with the Closing Date are being released, and consenting to the transfer of all of the issued and outstanding Equity Interests of the Lead Borrower to Holdings;

(viii) (A) the Security Documents, each duly executed by the applicable Loan Parties, and (B) evidence that certificates evidencing any stock or instruments being pledged under the Security Documents, together with undated stock powers or other documents of transfer executed in blank, have been delivered to the Agent;

(ix) a disbursement letter, in form and substance reasonably satisfactory to the Agent and the Lenders;

(x) at least ten (10) Business Days prior to the Closing Date, (A) appraisals (based on net liquidation value) by a third party appraiser acceptable to the Agent of all Inventory of the Borrowers to be included in the Borrowing Base, which appraisals are in form and substance reasonably satisfactory to the Agent, and (B) a written report regarding the results of a commercial finance examination of the Loan Parties, which shall be in form and substance reasonably satisfactory to the Agent;

-88-

(xi) all other Loan Documents, each duly executed by the applicable Loan Parties;

(xii) results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any Mortgages, and releases or subordination agreements reasonably satisfactory to the Agent are being tendered concurrently with such extension of credit or other arrangements reasonably satisfactory to the Agent for the delivery of such termination statements, releases, satisfactions and discharges have been made; and

(xiii) all Uniform Commercial Code financing statements and short-form grants of security interest in Intellectual Property, required by Law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the Liens intended to be created under the Loan Documents having the priority intended thereby and all such documents and instruments shall have been so filed, registered or recorded (or arrangements for the same made) to the reasonable satisfaction of the Agent.

(b) After giving effect to any charges to the Loan Account made in connection with the establishment of the credit facility contemplated hereby, Availability shall be not less than seventy-five percent (75%) of the Borrowing Base.

(c) The Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the month ended on April 4, 2015, and executed by a Responsible Officer of the Lead Borrower.

(d) Since February 1, 2014, there shall not have occurred a "Material Adverse Effect".

(e) After giving effect to the Transactions, the Loan Parties or their Subsidiaries shall have outstanding no Indebtedness for borrowed money, credit facilities, or preferred Equity Interests other than the Obligations and the Intercompany Subordinated Indebtedness, except as reasonably agreed by the Agent.

(f) The Closing Date Acquisition shall have been, or shall be concurrently with the effectiveness of this Agreement, consummated in accordance with the terms of the Closing Date Acquisition Documents and in compliance with applicable Law. The Agent shall have received the Closing Date Acquisition Documents, certified as being true, correct and complete by a Responsible Officer of the Lead Borrower, each of which shall be reasonably satisfactory to the Agent.

(g) The Agent shall have received evidence, in form and substance reasonably satisfactory to the Agent, that the Sponsor, members of management of the Lead Borrower and/or other co-investors reasonably acceptable to the Agent have (i) made an equity contribution in cash to Holdings in the amount of $45,000,000, (ii) made a subordinated loan to the Lead Borrower, in the aggregate amount of $45,000,000 (with no less than 50.1% of the foregoing equity contribution and subordinated loan being made by the Sponsor), and (iii) the proceeds of the foregoing equity contribution and subordinated loan shall have been used to pay the $55,000,000 purchase price for the Closing Date Acquisition pursuant to the Closing Date Acquisition Documents and the remaining $35,000,000 of proceeds shall have been contributed

-89-

by Holdings to the Lead Borrower. The Borrowers shall have delivered to the Agent true and complete copies of the documents and agreements evidencing the foregoing equity contribution and Subordinated Indebtedness, in each case, certified as being true, correct and complete by a Responsible Officer of the Lead Borrower, and which shall be on terms reasonably satisfactory to the Agent.

(h) All fees required to be paid to the Agent or MLPFS on or before the Closing Date shall have been paid in full, and all fees required to be paid to the Lenders on or before the Closing Date shall have been paid in full.

(i) The Borrowers shall have paid all reasonable, documented and accrued fees, charges and disbursements of counsel to the Agent to the extent owing and invoiced at least one Business Day prior to the Closing Date.

(j) The Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" rules and regulations, including without limitation the Patriot Act, in each case, to the extent requested at least three (3) Business Days prior to the Closing Date (or such shorter period as the Agent may agree in writing).

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02 Conditions to all Credit Extensions**. The obligation of each Lender to honor any Request for Credit Extension (other than a Revolving Loan Notice requesting only a Conversion of Revolving Loans to the other Type, or a continuation of LIBOR Rate Loans) and of each L/C Issuer to issue each Letter of Credit is subject to the following conditions precedent:

(a) The representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, (ii) in the case of any representation and warranty qualified by materiality, in which case they shall be true and correct in all respects, and (iii) for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01.

(b) No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c) The Agent and, if applicable, the L/C Issuer or the Swing Line Lender shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d) After giving effect to the Credit Extension requested to be made on any such date and the use of proceeds thereof, Availability shall be greater than zero.

-90-

Each Request for Credit Extension (other than a Revolving Loan Notice requesting only a Conversion of Revolving Loans to the other Type or a continuation of LIBOR Rate Loans) submitted by the Lead Borrower shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in this Section 4.02 have been satisfied on and as of the date of the applicable Credit Extension. The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until (i) at any time that there are only two (2) Lenders and a Specified Event of Default exists, any Lender (so long as such Lender is a Lender as of the Effective Date and maintains a Commitment not less than the Commitment of such Lender as of the Effective Date), or (ii) in all other circumstances, the Required Lenders, otherwise direct the Agent to cease making Loans and issuing Letters of Credit, the Lenders will fund their Applicable Percentage of all Loans and L/C Advances and participate in all Swing Line Loans and Letters of Credit whenever made or issued, which are requested by the Lead Borrower and which are agreed to by the Agent, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, provided, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans and to issue Letters of Credit hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01 Existence, Qualification and Power**. Each Loan Party and each Restricted Subsidiary thereof (a) is duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization or formation, (b) has (i) all requisite corporate or organizational power and authority and (ii) all requisite governmental licenses, permits, authorizations, consents and approvals to (in the case of clauses (i) and (ii)) (A) own or lease its assets and carry on its business and (B) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clauses (b)(ii) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number, if any.

**5.02 Authorization; No Contravention**. The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Restricted Subsidiaries, or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, except, in each case referred to in this clause (b), to the extent that any such conflict, breach, termination, contravention, default or payment could not reasonably be expected to have a Material Adverse Effect; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law, except to the extent that any such violation could not reasonably be expected to have a Material Adverse Effect.

**5.03 Governmental Authorization; Other Consents**. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document to which such Loan Party is a party, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the priority of such Liens contemplated thereby), (b) such as have been obtained or made and are in full force and effect or (c) those the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

**5.04 Binding Effect**. This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05 Financial Statements; No Material Adverse Effect**.

(a) The financial statements described in Section 6.01(a) and delivered, and for periods, after the Closing Date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (ii) fairly present in all material respects the financial condition of the Lead Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

(b) The financial statements described in Section 6.01(b) and delivered, and for periods, after the Closing Date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of the Lead Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments and purchase accounting adjustments.

(c) Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(d) The Consolidated forecasted balance sheet and statements of income and cash flows of the Lead Borrower and its Subsidiaries heretofore or hereafter delivered pursuant to Section 6.01(d) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Loan Parties' best estimate of its future financial performance, provided, that such statements would be subject to normal quarterly and year-end adjustments, purchase accounting adjustments in connection with the Closing Date Acquisition and the absence of footnotes (it being understood that such forecasted financial information is subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties, that no assurance is given that any particular forecasts will be realized, that actual results may differ and that such differences may be material).

-92-

**5.06 Litigation**. Except as specifically disclosed in Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Restricted Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to the Closing Date Acquisition, this Agreement or any other Loan Document, or any of the transactions contemplated hereby or thereby, or (b) either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.07 No Default**. No Default or Event of Default has occurred and is continuing or would result from the consummation of the Transactions.

**5.08 Ownership of Property; Liens; Licensed Departments.**

(a) Each of the Loan Parties and each Restricted Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in, all Real Estate necessary or used in the ordinary conduct of its business except for (i) such defects in title or failure to have such title or other interest as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (ii) as permitted by Section 7.01. Each of the Loan Parties and each Restricted Subsidiary has good and marketable title to, valid leasehold interests in, or valid licenses or other rights to use all personal property and assets material to the ordinary conduct of its business, except for (i) such defects in title or failure to have such title or other interest as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (ii) as permitted by Section 7.01.

(b) Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate (excluding Leases) that is owned by the Loan Parties and each of their Restricted Subsidiaries as of the Closing Date, together with a list of the holders of any mortgage or other Lien thereon as of the Closing Date. Each Loan Party and each of its Restricted Subsidiaries has good, marketable and insurable fee simple title to the Real Estate owned by such Loan Party or such Restricted Subsidiary, free and clear of all Liens, other than Permitted Encumbrances. Schedule 5.08(b)(2) sets forth the address (including street address and state) of all Leases of the Loan Parties, together with the name and address of each lessor with respect to each such Lease as of the Closing Date. Each of such Leases is in full force and effect and the Loan Parties are not in default in any material respect of the terms thereof.

(c) The property of each Loan Party and each of its Restricted Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(d) There is no Indebtedness of any Loan Party or any of its Restricted Subsidiaries outstanding other than Permitted Indebtedness.

(e) As of the Closing Date, no Loan Party or any of its Restricted Subsidiaries is party to any license for the conduct of licensed departments within the Loan Parties' Stores.

**5.09 Environmental Compliance.**

(a) No Loan Party or any Restricted Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any reasonable basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

-93-

(b) Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, to the knowledge of the Loan Parties: (i) none of the properties currently or formerly owned or operated by any Loan Party or any Restricted Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; (ii) there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed by any Loan Party or any Restricted Subsidiary thereof on any property currently owned or operated by any Loan Party or any Restricted Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Restricted Subsidiary thereof; (iii) there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Restricted Subsidiary thereof; and (iv) Hazardous Materials have not been released, discharged or disposed of by any Loan Party or any Restricted Subsidiary thereof on any property currently or formerly owned or operated by any Loan Party or any Restricted Subsidiary thereof.

(c) Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Loan Party or any Restricted Subsidiary thereof is undertaking, and no Loan Party or any Restricted Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported by any Loan Party or any of its Restricted Subsidiaries to or from, any property currently or formerly owned or operated by any Loan Party or any Restricted Subsidiary thereof have been disposed of in a manner not reasonably expected to result in a Material Adverse Effect.

**5.10 Insurance**. The properties of the Loan Parties and their Restricted Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance and directors and officers liability insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Restricted Subsidiary operates. Schedule 5.10 sets forth a summary of all insurance maintained by or on behalf of the Loan Parties and their Restricted Subsidiaries as of the Closing Date. As of the Closing Date, each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable as of the Closing Date have been paid.

**5.11 Taxes**. The Loan Parties and their Restricted Subsidiaries have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all material Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien has been filed and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation. There is no proposed tax assessment against any Loan Party or any Restricted Subsidiary that could reasonably be expected to have a Material Adverse Effect. As of the Closing Date, no Loan Party or any Restricted Subsidiary thereof is a party to any tax sharing agreement.

-94-

**5.12 ERISA Compliance**.

(a) Except as could not reasonably be expected to result in a Material Adverse Effect, each Plan and Multiemployer Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state laws, and each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination, opinion or advisory letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service. To the knowledge of the Lead Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b) There are no pending or, to the best knowledge of the Lead Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan or Multiemployer Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan or, to the best knowledge of the Lead Borrower, Multiemployer Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c) Except as could not reasonably be expected to result in a Material Adverse Effect, (i) no ERISA Event has occurred, and neither the Lead Borrower nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan; (ii) the Lead Borrower and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) except as otherwise disclosed in Part (c) of Schedule 5.12, as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 80% or higher and neither the Lead Borrower nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 80% as of the most recent valuation date; (iv) neither the Lead Borrower nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) neither the Lead Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; and (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

**5.13 Subsidiaries; Equity Interests**.

(a) As of the Closing Date, the Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth, in each case, as of the Closing Date, the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests owned by a Loan Party in such Subsidiaries have been validly issued, are fully paid and non-assessable and, as of the Closing Date, are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents. Except as set forth in Schedule 5.13, as of the Closing Date, there are no outstanding rights to purchase any Equity Interests in any Subsidiary. As of the Closing Date, the Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of Schedule 5.13. As of the Closing Date, all of the outstanding

-95-

Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents. As of the Closing Date, the copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect. Part (d) of Schedule 5.13 identifies, as of the Closing Date, the designation of each Subsidiary as a Restricted Subsidiary, an Unrestricted Subsidiary and/or an Immaterial Subsidiary.

(b) Upon consummation of the Transactions, except as set forth on Schedule 5.13, there shall be no Equity Interests of any Loan Party that will be convertible into or exchangeable for shares of any Equity Interests of any Loan Party or any of its Subsidiaries, and no options, warrants, calls, subscriptions, convertible securities, or other rights, agreements or commitments which will obligate any Loan Party to issue, transfer or sell any Equity Interests of, or other interests in, any Loan Party or any of its Subsidiaries. Except as set forth on Schedule 5.13, upon consummation of the Transactions, there shall be no outstanding obligations of any Loan Party to repurchase, redeem or otherwise acquire any Equity Interests of any Loan Party or any of its Subsidiaries and no Loan Party shall have any awards or options outstanding under any stock option plans or agreements or any other outstanding stock-related awards. As of the Closing Date and immediately thereafter, except as set forth on Schedule 5.13, no Loan Party shall have any obligation to issue, transfer or sell any Equity Interests of such Loan Party or its Subsidiaries. As of the Closing Date, there are no voting trusts or other agreements to which any Loan Party is a party with respect to the holding, voting or disposing of Equity Interests of such Loan Party. As of the Closing Date, no Loan Party has any outstanding bonds, debentures, notes or other obligations or other securities that entitle the holders thereof to vote with the shareholders of any Loan Party on any matter or which are convertible into or exercisable for securities having such a right to vote. All of the Equity Interests issued by the Loan Parties were issued in compliance with all applicable Laws concerning the issuance of securities except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.14 Margin Regulations; Investment Company Act.**

(a) No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Credit Extensions to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b) None of the Loan Parties or any Restricted Subsidiary thereof is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15 Disclosure**. Each Loan Party has disclosed to the Agent and the Lenders all written agreements, instruments and corporate or other restrictions to which it or any of its Restricted Subsidiaries is subject, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished (in writing) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains

-96-

any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading as of the date such information was provided to the Agent and the Lenders; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being understood that such projected financial information is subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrowers, that no assurance is given that any particular projections will be realized, that actual results may differ and that such differences may be material).

**5.16 Compliance with Laws**. Each of the Loan Parties and each Restricted Subsidiary is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.17 Intellectual Property; Licenses, Etc.** The Loan Parties and their Restricted Subsidiaries own, or possess the right to use through one or more licenses, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses as currently conducted, and, to the best knowledge of the Loan Parties, without conflict with the rights of any other Person other than conflicts, which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. To the best knowledge of the Lead Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Restricted Subsidiary infringes upon any rights held by any other Person which, either individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No claim or litigation against any Loan Party alleging any such infringement regarding any of the foregoing is pending or, to the best knowledge of the Lead Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.18 Labor Matters**.

There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Restricted Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened in writing that could reasonably be expected to have a Material Adverse Effect. The hours worked by and payments made to employees of the Loan Parties comply in all material respects with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters, except to the extent that any such violation could not reasonably be expected to have a Material Adverse Effect. No Loan Party or any of its Restricted Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Act or similar state Law that could reasonably be expected to have a Material Adverse Effect. All payments due from any Loan Party and its Restricted Subsidiaries, or for which any valid claim may be made against any Loan Party or any of its Restricted Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.18, as of the Closing Date, no Loan Party or any Restricted Subsidiary is a party to or bound by any collective bargaining agreement, management agreement, employment agreement (solely with respect to employees holding a senior executive level position or above), bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. As of the Closing Date, there are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board or any other Governmental Authority, and no labor organization or group of employees of any Loan Party or any Restricted Subsidiary has made a

-97-

pending demand for recognition. As of the Closing Date, there are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Restricted Subsidiary pending or, to the knowledge of any Loan Party, threatened in writing to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Restricted Subsidiaries except, for such complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints as could not reasonably be expected to have a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Restricted Subsidiaries is bound.

**5.19 Security Documents**.

(a) The Security Agreement creates in favor of the Agent, for the benefit of the Credit Parties, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. The financing statements, releases and other filings are in appropriate form for filing in the offices specified in Schedule II of the Security Agreement. Upon such filing and/or the obtaining of "control" (as defined in the UCC), the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected under the UCC (in effect on the date this representation is made) by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, in each case prior and superior in right to any other Person (except for Permitted Encumbrances having priority over the Lien of the Agent by operation of applicable Law).

(b) When the Security Agreement (or a short form thereof) is filed in the United States Copyright Office and when financing statements, releases and other filings in appropriate form are filed in the offices specified on Schedule II of the Security Agreement, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in copyrights and related assets constituting Intellectual Property Collateral (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Copyright Office may be necessary to perfect a Lien on copyrights acquired by the Loan Parties after the Closing Date).

**5.20 Solvency.**

After giving effect to the transactions contemplated by this Agreement, and before and after giving effect to each Credit Extension, the Loan Parties, on a Consolidated basis, are and will be Solvent. No transfer of property has been or will be made by any Loan Party and no obligation has been or will be incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of any Loan Party.

-98-

**5.21 Deposit Accounts; Credit Card Arrangements**.

(a) Annexed hereto as Schedule 5.21(a) is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository, and (iv) the identification of each Blocked Account Bank.

(b) Annexed hereto as Schedule 5.21(b) is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22 Brokers**. No broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.23 Customer and Trade Relations**. There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations, except to the extent that any of the foregoing could not reasonably be expected to have a Material Adverse Effect.

**5.24 Casualty**. Neither the businesses nor the properties of any Loan Party or any of its Restricted Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.25 Closing Date Acquisition** The Loan Parties have delivered to the Agent a complete and correct copy of each material Closing Date Acquisition Document, including all schedules and exhibits thereto. Such Closing Date Acquisition Documents set forth the entire agreement and understanding of the parties thereto relating to the subject matter thereof, and there are no other agreements, arrangements or understandings, written or oral, relating to the matters covered thereby. The execution, delivery and performance of each such Closing Date Acquisition Document by each of the Loan Parties party thereto has been duly authorized by all necessary action (including, without limitation, as required by applicable Law or by any applicable corporate or other organizational documents) on the part of each such Person.

(b) The Closing Date Acquisition is being consummated on the Closing Date in accordance with the terms of the Closing Date Acquisition Documents and in compliance with applicable Law.

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than the Other Liabilities and contingent indemnification claims for which a claim has not been asserted), or any Letter of Credit shall remain outstanding (except to the extent fully Cash Collateralized or supported by another letter of credit in a manner reasonably satisfactory to the L/C Issuer and the Agent), the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Restricted Subsidiary to:

-99-

**6.01 Financial Statements**. Deliver to the Agent, in form and detail reasonably satisfactory to the Agent:

(a) as soon as available, but in any event within one hundred twenty (120) days after the end of each Fiscal Year of the Lead Borrower (commencing with the fiscal year ended January 30, 2016), a Consolidated balance sheet of the Lead Borrower and its Restricted Subsidiaries as at the end of such Fiscal Year, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year, setting forth in each case, beginning with the Fiscal Year ending January 28, 2017, in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and unqualified opinion of a Registered Public Accounting Firm of nationally recognized standing reasonably acceptable to the Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit;

(b) as soon as available, but in any event within forty-five (45) days (or, with respect to the Fiscal Quarter ending August 1, 2015, sixty (60) days) after the end of each of the Fiscal Quarters of each Fiscal Year of the Lead Borrower (commencing with the Fiscal Quarter ended August 1, 2015), a Consolidated balance sheet of Lead Borrower and its Restricted Subsidiaries as at the end of such Fiscal Quarter, and the related Consolidated statements of income or operations, and cash flows for such Fiscal Quarter and for the portion of the Lead Borrower's Fiscal Year then ended, setting forth in each case in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(d) hereof, (B) beginning with the Fiscal Quarter ending April 30, 2016, the corresponding Fiscal Quarter of the previous Fiscal Year and (C) beginning with the Fiscal Quarter ending April 30, 2016, the corresponding portion of the previous Fiscal Year, all in reasonable detail, certified by a Responsible Officer of the Lead Borrower as fairly presenting the financial condition, results of operations, and cash flows of the Lead Borrower and its Restricted Subsidiaries as of the end of such Fiscal Quarter in accordance with GAAP, subject only to normal year-end audit adjustments, purchase accounting adjustments and the absence of footnotes;

(c) as soon as available, but in any event within thirty (30) days (or, with respect to the Fiscal Months ending May 30, 2015 and July 4, 2015, sixty (60) days) after the end of each of the first two (2) Fiscal Months of each Fiscal Quarter of the Lead Borrower (commencing with the Fiscal Month ending May 30, 2015), a Consolidated balance sheet of the Lead Borrower and its Restricted Subsidiaries as at the end of such Fiscal Month, and the related Consolidated statements of income or operations, and cash flows for such Fiscal Month, and for the portion of the Lead Borrower's Fiscal Year then ended, setting in each case in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(d) hereof, (B) beginning with the Fiscal Month ending May 27, 2016, the corresponding Fiscal Month of the previous Fiscal Year and (C) beginning with the Fiscal Month ending May 27, 2016, the corresponding portion of the previous fiscal year, all in reasonable detail, certified by a Responsible Officer of the Lead Borrower as fairly presenting the financial condition, results of operations, and cash flows of Lead Borrower and its Restricted Subsidiaries as of the end of such Fiscal Month in accordance with GAAP, subject only to normal year-end audit adjustments, purchase accounting adjustments and the absence of footnotes;

(d) as soon as available, but in any event no more than sixty (60) days after the end of each Fiscal Year of Holdings, forecasts prepared by management of the Lead Borrower, in form reasonably satisfactory to the Agent, of (i) Availability, and (ii) of the Consolidated balance

-100-

sheets and statements of income or operations and cash flows of Holdings and its Restricted Subsidiaries, each of the foregoing on a monthly basis for the immediately following Fiscal Year (including the Fiscal Year in which the Maturity Date occurs), and as soon as available, any significant revisions to such forecast with respect to such Fiscal Year.

**6.02 Certificates; Other Information**. Deliver to the Agent, in form and detail satisfactory to the Agent:

(a) concurrently with the delivery of the financial statements referred to in Section 6.01(a), a certificate of its Registered Public Accounting Firm certifying such financial statements;

(b) concurrently with the delivery of the financial statements referred to in Sections 6.01(a) and (b) (commencing with the delivery of the financial statements for the Fiscal Quarter ending August 1, 2015 and the Fiscal Year ending January 30, 2016), (i) a duly completed Compliance Certificate signed by a Responsible Officer of the Lead Borrower, (ii) in the event of any change in GAAP used in the preparation of such financial statements, the Lead Borrower shall also provide a statement of reconciliation conforming such financial statements to GAAP, and (iii) a copy of management's discussion and analysis with respect to such financial statements;

(c) on the fifteenth (15th) day of each Fiscal Month (or, if such day is not a Business Day, on the next succeeding Business Day), a Borrowing Base Certificate showing the Borrowing Base and Availability as of the close of business as of the last day of the immediately preceding Fiscal Month, each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Lead Borrower; provided that, without limiting the Agent's rights set forth in the last proviso of this clause (c), at any time that an Accelerated Borrowing Base Delivery Event has occurred and is continuing, such Borrowing Base Certificate shall be delivered on Wednesday of each week (or, if Wednesday is not a Business Day, on the next succeeding Business Day), as of the close of business on the immediately preceding Saturday; and provided further that at any time that an Event of Default or a Cash Dominion Event has occurred and is continuing, such Borrowing Base Certificate shall be delivered on a more frequent basis as the Agent may direct in its Permitted Discretion;

(d) contemporaneously with any Permitted Disposition under clauses (b), (m) or (q) of the definition thereof, or any casualty or condemnation, in each case (i) to the extent a Cash Dominion Event has occurred and is continuing or would result therefrom, or (ii) involving any property of the type included in the Borrowing Base and the consideration for such Permitted Disposition, or the value of the property that is the subject to such casualty or condemnation, as applicable, is equal to or greater than $2,500,000, an updated Borrowing Base Certificate showing the Borrowing Base, after giving effect to such Permitted Disposition, casualty or condemnation,

(e) promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the annual audit of the accounts or books of the Loan Parties or any Restricted Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

(f) The financial and collateral reports described on Schedule 6.02 hereto, at the times set forth in such Schedule;

-101-

(g) as soon as available, but in any event within thirty (30) days after the end of each Fiscal Year of the Loan Parties, only if there have been any changes during the prior Fiscal Year in the insurance coverage in effect for each Loan Party and its Restricted Subsidiaries, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Restricted Subsidiaries and containing such additional information as the Agent, or any Lender through the Agent, may reasonably specify;

(h) promptly after the Agent's request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness;

(i) promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Restricted Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Restricted Subsidiary thereof or any other matter which, if adversely determined, could reasonably expected to have a Material Adverse Effect; and

(j) promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01(a), (b), or (c) or Section 6.02(d) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents, or provides a link thereto on the Lead Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Lead Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); provided that the Lead Borrower shall notify the Agent (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (i.e., soft copies) of such documents. The Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Loan Parties hereby acknowledge that (a) the Agent and/or MLPFS will make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on Debt Domain, IntraLinks, Syndtrak or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender"). The Loan Parties hereby agree that they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Agent, MLPFS, the L/C Issuer and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Borrower Materials marked

-102-

"PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Agent and MLPFS shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

**6.03 Notices**. Promptly notify the Agent:

(a) of the occurrence of any Default or Event of Default (including, without limitation, any breach or non-performance of, or any default under, or with respect to Material Indebtedness of any Loan Party or any Restricted Subsidiary thereof);

(b) of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect,

(c) of any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Restricted Subsidiary thereof and any Governmental Authority; or the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Restricted Subsidiary thereof, including pursuant to any applicable Environmental Laws, in each case that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(d) of the occurrence of any ERISA Event that could reasonably be expected to result in (i) a Material Adverse Effect, or (ii) liability to any Loan Party in excess of $5,000,000;

(e) of any material change in accounting policies or financial reporting practices by any Loan Party or any Restricted Subsidiary thereof;

(f) of any change in any Loan Party's chief executive officer or chief financial officer;

(g) of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

(h) of any collective bargaining agreement or other material labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

(i) of the filing of any Lien for unpaid Taxes against any Loan Party in excess of $500,000;

(j) of any casualty or other insured damage to any of the Collateral or the commencement of any action or proceeding for the taking of any interest in any of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed, in each case, which could reasonably be expected to result in a Material Adverse Effect;

(k) of the occurrence of any Prepayment Event;

(l) of the occurrence of any event described in clause (d) of the definition of "Permitted Disposition"; and

-103-

Case 2:22-cv-08375-JLS-AS   Document 72-13   Filed 06/23/23   Page 296 of 345
Page ID #:1605

(m) of any failure by any Loan Party to pay rent as and when required by the applicable Lease (giving effect to any grace periods included therein) at (i) any of the Loan Parties' distribution centers or warehouses; (ii) fifteen percent (15%) or more of such Loan Party's Store locations or (iii) any of such Loan Party's locations if such failure continues for more than ten (10) days following the day on which such rent first came due (giving effect to any grace periods included therein) and in any case described in this clause (iii), such failure could reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Lead Borrower setting forth details of the occurrence referred to therein and stating what action the Lead Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with reasonable particularity the provisions of this Agreement and any other Loan Document that have been breached.

**6.04 Payment of Obligations**. Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, and (b) except to the extent constituting a Permitted Encumbrance, all lawful claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators, and carriers; except, in each case, where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (d) no Lien has been filed or has arisen with respect thereto, other than Liens of the type described in clauses (a), (b), (e), (j) or (o) of the definition of "Permitted Encumbrances", and (e) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement.

**6.05 Preservation of Existence, Etc.** (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation (i) except in a transaction permitted by Section 7.04 or 7.05, or (ii) except, in the case of any Restricted Subsidiary that is not a Loan Party, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except in a transaction permitted by Section 7.04 or 7.05 and except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except, to the extent no Default or Event of Default then exists or would arise therefrom: (i) such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties, (ii) pursuant to a transaction permitted by Section 7.04 or 7.05, or (iii) that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.06 Maintenance of Properties**. (a) Maintain, preserve and protect all of its properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof, in either case except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07 Maintenance of Insurance**

(a) Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent (who are not Affiliates of the Loan Parties), insurance with respect to its

-104-

properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agent.

(b) Maintain for themselves and their Restricted Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Agent furnish the Agent certificates evidencing renewal of each such policy.

(c) Maintain for themselves and their Restricted Subsidiaries fire and extended coverage policies with respect to any Collateral and cause fire and extended coverage policies maintained with respect to any Collateral to name the Agent as an additional loss payee and to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies jointly to the Agent and the applicable Loan Party (it being understood that the Loan Parties shall promptly cause such proceeds to be remitted to the Agent to the extent required pursuant to the terms of this Agreement), (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(d) Maintain commercial general liability policies and cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(e) Maintain business interruption policies and cause such business interruption policies to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies jointly to the Agent and the applicable Loan Party (it being understood that the Loan Parties shall promptly cause such proceeds to be remitted to the Agent to the extent required pursuant to the terms of this Agreement), (ii) a provision to the effect that none of the Loan Parties, the Credit Parties or any other party shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(f) Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of non-payment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(g) Deliver to the Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent, including an insurance binder) together with evidence reasonably satisfactory to the Agent of payment of the premium therefor.

(h) Permit any representatives that are designated by the Agent, upon reasonable notice and during normal business hours, to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby, to the extent permitted by applicable Law, waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08 Compliance with Laws**. Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP, (b) such contest effectively suspends enforcement of the contested Laws, and (c) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agent with respect to establishing or modifying Reserves in a manner permitted by this Agreement.

**6.09 Books and Records; Accountants.**

(a) (i) Maintain proper books of record and account, in which true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Restricted Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Restricted Subsidiary, as the case may be.

(b) at all times retain a Registered Public Accounting Firm which is reasonably satisfactory to the Agent and instruct such Registered Public Accounting Firm to cooperate with, and be available upon reasonable notice and during normal business hours to, the Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the reasonable scope of the retention of such Registered Public Accounting Firm, as may be raised by the Agent (provided that the Lead Borrower shall be given the opportunity to participate in any such discussions).

**6.10 Inspection Rights.**

(a) Upon the request of the Agent after reasonable prior notice and at reasonable times, permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm (provided that the Lead Borrower shall be given the opportunity to participate in any such discussions), all at the expense of the Loan Parties and at such reasonable times during normal business hours, but no more than one (1) time per twelve (12) month period, upon reasonable advance

-106-

notice to the Lead Borrower, provided, however, that upon the occurrence and during the continuance of an Event of Default, the Agent (or any of its representatives or independent contractors) may do any of the foregoing after reasonable prior notice and at reasonable times as often as may be reasonably desired at the expense of the Loan Parties at any time during normal business hours.

(b) Upon the request of the Agent after reasonable prior notice and at reasonable times, permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct commercial finance examinations and other evaluations of the Loan Parties, including, without limitation, of (i) the Lead Borrower's practices in the computation of the Borrowing Base, (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (iii) the Loan Parties' business plan, forecasts and cash flows. The parties hereto agree that the Agent may, in its discretion, after reasonable prior notice and at reasonable times, undertake (and, subject to the immediately succeeding sentence, shall be limited to) (A) up to one (1) commercial finance examination in each twelve month period at the Loan Parties' expense; provided that if Availability is less than the greater of (x) thirty-five percent (35%) of the Loan Cap, and (y) $15,000,000 at any time, the Agent may, in its discretion, undertake up to two (2) commercial finance examinations in the immediately succeeding twelve month period at the Loan Parties' expense, and (B) up to one (1) additional commercial finance examination in each twelve month period at the Lenders' expense. Notwithstanding the foregoing, if required by Law or if a Default or Event of Default shall have occurred and be continuing, after reasonable prior notice and at reasonable times, the Agent may cause additional commercial finance examinations to be undertaken at the expense of the Loan Parties.

(c) Upon the request of the Agent after reasonable prior notice and at reasonable times, permit the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Collateral, including, without limitation, the assets included in the Borrowing Base. The parties hereto agree that the Agent may, in its discretion, after reasonable prior notice and at reasonable times, undertake (and, subject to the immediately succeeding sentence, shall be limited to) (A) up to one (1) inventory appraisal in each twelve month period at the Loan Parties' expense; provided, that if Availability is less than the greater of (x) thirty-five percent (35%) of the Loan Cap, and (y) $15,000,000 at any time, the Agent may, in its discretion, undertake up to two (2) inventory appraisals in the immediately succeeding twelve month period at the Loan Parties' expense, and (B) up to one (1) additional inventory appraisal in each twelve month period at the Lenders' expense. Notwithstanding the foregoing, (i) if required by Law or if a Default or Event of Default shall have occurred and be continuing, after reasonable prior notice and at reasonable times, the Agent may cause additional appraisals to be undertaken at the expense of the Loan Parties, and (ii) the Agent may cause an additional desktop inventory appraisal to be undertaken within 180 days following the Loan Parties' implementation of the cost method of valuation of Inventory at the expense of the Loan Parties in accordance with Section 7.13.

**6.11 Additional Loan Parties.**

(a) Notify the Agent at the time that any Person becomes a Wholly-Owned Subsidiary of any Loan Party, and promptly thereafter (and in any event within thirty (30) days or such longer period as the Agent may agree), cause any such Person which is a Domestic Subsidiary (other than any Excluded Subsidiary) to (x) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Agent shall deem reasonably appropriate for such purpose, (y) grant a Lien to the Agent on such Person's assets of the same type that constitute Collateral to secure the Obligations to the extent required by the Security Documents, and (z) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and customary

-107-

opinions of counsel to such Person (which shall cover, among other things, authority, legality, validity, binding effect and enforceability of the Loan Documents described in this clause (a), non-contravention and creation and perfection of the Liens on the assets described in this clause (a) in favor of the Agent), and (ii) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness (except that, notwithstanding the foregoing, if any Subsidiary is a Foreign Subsidiary or a Foreign Subsidiary Holding Company, the Equity Interests of such Subsidiary to be pledged shall be limited to 65% of the outstanding voting Equity Interests of such Subsidiary and 100% of the non-voting Equity Interests of such Subsidiary), in each case in form, content and scope reasonably satisfactory to the Agent. For the avoidance of doubt and notwithstanding anything herein or in any Security Document to the contrary, none of the assets of any Foreign or any Foreign Subsidiary Holding Company (including any Equity Interests held by a Foreign Subsidiary) shall be required to be pledged hereunder or under any Security Document.

(b) In no event shall compliance with this Section 6.11 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.11 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrower or Guarantor or permit the inclusion of any acquired assets or assets of such Subsidiary in the computation of the Borrowing Base.

(c) Notwithstanding anything to the contrary contained herein, if the Agent reasonably determines that the cost of obtaining any pledge or security interest otherwise required pursuant to this Section 6.11 is excessive in relation to the benefit thereof, then no such pledge or security interest shall be required hereunder.

**6.12 Cash Management**.

(a) (i) On or prior to the Closing Date, deliver to the Agent copies of notifications (each, a "Credit Card Notification") reasonably satisfactory in form and substance to the Agent which have been executed on behalf of such Loan Party and delivered to such Loan Party's credit card clearinghouses and processors listed on Schedule 5.21(b); and (ii) within ninety (90) days following the Closing Date (or such later date to which the Agent may agree in writing in its Permitted Discretion), enter into a Blocked Account Agreement reasonably satisfactory in form and substance to the Agent with each Blocked Account Bank (collectively, the "Blocked Accounts").

(b) ACH or wire transfer no less frequently than once each Business Day (or with such other frequency as the Agent may otherwise agree in its sole discretion), whether or not there are then any outstanding Obligations to a Blocked Account (i) all available amounts on deposit in each DDA that is not a Blocked Account (other than any Excluded Account) (except for normal course allowances for deposit errors, returned checks and other similar items maintained in such DDAs consistent with past practices), and (ii) all payments received from all Credit Card Issuers and Credit Card Processors.

(c) After the occurrence and during the continuance of a Cash Dominion Event, cause the ACH or wire transfer to the collection account maintained by the Agent at Bank of America (the "Collection Account"), no less frequently than once each Business Day (or with such other frequency as the Agent may otherwise agree in its sole discretion), whether or not there are then any outstanding Obligations, all cash receipts and collections received by each Loan Party from all sources, including, without limitation, the following:

-108-

(i) all available cash receipts from the sale of Inventory (including without limitation, proceeds of credit card charges) and other assets (whether or not constituting Collateral);

(ii) all proceeds of collections of Accounts;

(iii) all Net Proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any Disposition or other transaction or event, including, without limitation, any Prepayment Event;

(iv) the then available cash balance of each Blocked Account (except for normal course allowances for deposit errors, returned checks and other similar items maintained in such Blocked Accounts consistent with past practices); and

(v) the then available cash balance of each DDA (other than any Excluded Account and any disbursement accounts designated by the Lead Borrower and used solely for such purpose) not described in clause (iv) (except for normal course allowances for deposit errors, returned checks and other similar items maintained in such DDAs consistent with past practices).

(d) The Collection Account shall at all times during the continuance of a Cash Dominion Event be under the sole dominion and control of the Agent. The Loan Parties hereby acknowledge and agree that (i) during the continuance of a Cash Dominion Event, the Loan Parties have no right of withdrawal from the Collection Account, (ii) the funds on deposit in the Collection Account shall at all times be collateral security for all of the Obligations, and (iii) during the continuance of a Cash Dominion Event, the funds on deposit in the Collection Account shall be applied to the Obligations as provided in Section 2.05(f) or Section 8.03, as applicable. In the event that, notwithstanding the provisions of this Section 6.12, any Loan Party receives or otherwise has dominion and control of any such cash receipts or collections (other than any amounts in any Excluded Accounts), such receipts and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Collection Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

(e) Upon the reasonable request of the Agent, cause bank statements and/or other reports that are received by the Loan Parties with respect to each Blocked Account to be delivered to the Agent not less often than monthly.

**6.13 Information Regarding the Collateral**. Furnish to the Agent at least fifteen (15) days prior written notice of any change in: (i) any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's chief executive office or its principal place of business; (iii) any Loan Party's organizational type or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization. The Loan Parties shall not effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties (which first priority shall be subject only to Permitted Encumbrances having priority by operation of applicable law).

**6.14 Physical Inventories**.

(a) Cause not less than one (1) physical inventory to be undertaken with respect to the Loan Parties' distribution centers and Store locations, at the expense of the Loan Parties, in each Fiscal Year (provided that at the Loan Parties' option, periodic cycle counts may be performed in lieu of such annual physical inventory at its distribution centers or any Store locations), in each case consistent with past practices, conducted by such inventory takers as are satisfactory to the Agent and following such methodology as is consistent, as applicable, with the methodology used in the immediately preceding inventory or as otherwise may be satisfactory to the Agent. The Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party. The Lead Borrower, within forty-five (45) days following the completion of such inventory, shall provide the Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) to the extent that the results thereof reflect a material discrepancy from the Loan Parties' stock ledger or general ledger and shall, in any event, post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(b) Permit the Agent, in its discretion, if any Default or Event of Default exists, to cause additional such inventories to be taken as the Agent determines in its Permitted Discretion (each, at the expense of the Loan Parties).

**6.15 Environmental Laws**.

(a) Conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws; (b) obtain and renew all environmental permits reasonably necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are reasonably required to comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, except, in case of each of the foregoing causes, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP. Nothing contained herein shall be deemed to limit the rights of the Agent with respect to establishing or modifying Reserves in the manner permitted by this Agreement.

**6.16 Further Assurances.**

(a) Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, amendments to financing statements and other documents), that may be required under any Law, or which the Agent may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect (to the extent required by, and subject to the limitations set forth in, the Security Documents and this Agreement) the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

-110-

(b) If any material assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority (subject only to Permitted Encumbrances having priority by operation of applicable law) Lien under the Security Documents upon acquisition thereof and other than Equity Interests in a Foreign Subsidiary or a Foreign Subsidiary Holding Company not required to be pledged pursuant to Section 6.11 hereof), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a perfected Lien securing the Obligations and will take such actions as shall be reasonably necessary or shall be reasonably requested by any Agent to grant and perfect (to the extent required by, and subject to the limitations set forth in, the Security Documents and this Agreement) such Liens, including actions described in paragraph (a) of this Section 6.16, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.16(b) waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.16(b) if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute Consent to the inclusion of any acquired assets in the computation of the Borrowing Base. Notwithstanding the foregoing, the Loan Parties shall not be required to grant a mortgage in favor of the Agent on any owned Real Estate acquired by any Loan Party after the Closing Date.

(c) Upon the reasonable request of the Agent, cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Agent covering such matters and in such form as the Agent may reasonably require; provided that the Loan Parties shall not be required to furnish such agreements prior to the date is forty-five (45) days after the Closing Date (or such later date to which the Agent may agree in writing in its Permitted Discretion), it being understood and agreed that any In-Transit Inventory in possession of or under control of (including as a result of possession of applicable documents of title) such customs brokers, freight forwarders, consolidators and/or carriers may be included in the Borrowing Base during such forty-five (45) day period as long as no Default or Event of Default occurs and is continuing and such In-Transit Inventory otherwise constitutes Eligible In-Transit Inventory hereunder; however, any In-Transit Inventory in possession of or under control of (including as a result of possession of applicable documents of title) such customs brokers, freight forwarders, consolidators and/or carriers shall not be included in the Borrowing Base after such forty-five (45) day period unless and until such agreements have been obtained and such In-Transit Inventory otherwise constitutes Eligible In-Transit Inventory hereunder.

**6.17 Compliance with Terms of Leaseholds.**

Except as otherwise expressly permitted hereunder, (a) make all payments and otherwise perform all obligations in respect of all Leases to which any Loan Party or any of its Restricted Subsidiaries is a party, keep such Leases in full force and effect, (b) not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled except to the extent such Lease is no longer used or useful in the conduct of the business of the Loan Parties in the ordinary course of business, consistent with past practices, (c) notify the Agent of any default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, and (d) cause each of its Restricted Subsidiaries to do the foregoing, except, in any case, where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**6.18 Material Contracts**. (a) Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect in accordance with its terms, and except to the extent such Material Contract is no longer used or useful in the conduct of the business of the Loan Parties in the ordinary course of business, consistent with past practices, (c) enforce each such Material Contract in accordance with its terms, (d) upon reasonable request of the Agent, make to each other party to each such Material Contract such

-111-

demands and requests for information and reports or for action as any Loan Party or any of its Restricted Subsidiaries is entitled to make under such Material Contract, and (e) cause each of its Restricted Subsidiaries to do the foregoing, except, in the case of (a) through (e) above, where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**6.19 Designation of Subsidiaries.**

The board of directors of Holdings may at any time designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; provided that (i) immediately before and after such designation, no Default or Event of Default shall have occurred and be continuing, (ii) after giving effect to such designation, the Payment Conditions shall have been satisfied, (iii) none of the Borrowers may be designated as an Unrestricted Subsidiary, (iv) no Restricted Subsidiary may be designated as an Unrestricted Subsidiary if it was previously designated an Unrestricted Subsidiary, (vi) no Unrestricted Subsidiary shall own any Equity Interests in the Lead Borrower its Restricted Subsidiaries, (vii) no Unrestricted Subsidiary shall hold any Indebtedness of, or any Lien on any property of, the Lead Borrower and its Restricted Subsidiaries, (viii) the holder of any Indebtedness of any Unrestricted Subsidiary shall not have any recourse to the Lead Borrower and its Restricted Subsidiaries with respect to such Indebtedness, (ix) no Unrestricted Subsidiary shall be a party to any transaction or arrangement with the Lead Borrower and its Restricted Subsidiaries that would not be permitted by Section 7.09, (x) none of Holdings or any of its Restricted Subsidiaries shall have any obligation to subscribe for additional Equity Interests of any Unrestricted Subsidiary or to preserve or maintain the financial condition of any Unrestricted Subsidiary, and (xi) no Subsidiary may be designated as an Unrestricted Subsidiary unless (A) it is a CFC, or (B) none of its assets included in the calculation of Borrowing Base immediately prior to such Subsidiary's being designated as an Unrestricted Subsidiary. The designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by Holdings and its Restricted Subsidiaries therein at the date of designation in an amount equal to the net book value of Holdings' or Restricted Subsidiary's (as applicable) Investment therein. The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the incurrence at the time of designation of any Indebtedness or Liens of such Subsidiary existing at such time.

<div align="center">

**ARTICLE VII**
**NEGATIVE COVENANTS**

</div>

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than the Other Liabilities and contingent indemnification claims for which a claim has not been asserted), or any Letter of Credit shall remain outstanding (except to the extent fully Cash Collateralized or supported by another letter of credit in a manner reasonably satisfactory to the L/C Issuer and the Agent), no Loan Party shall, nor shall it permit any Restricted Subsidiary to, directly or indirectly:

**7.01 Liens**. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or authorize under the UCC or any applicable Law or statute of any jurisdiction a financing statement that names any Loan Party or any Restricted Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Restricted Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income or grant any Liens on its assets, other than, as to all of the above, Permitted Encumbrances.

<div align="center">-112-</div>

**7.02 Investments. Make any Investments, except Permitted Investments.**

**7.03 Indebtedness; Disqualified Stock; Equity Issuances.**

(a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; (b) issue Disqualified Stock; or (c) issue and sell any other Equity Interests unless (i) such Equity Interests shall be issued solely by the Lead Borrower and not by a Subsidiary of a Loan Party, (ii) such Equity Interests shall not be subject to redemption other than redemption at the option of the Lead Borrower and in accordance with the limitations contained in this Agreement, and (iii) no Change of Control shall result therefrom.

**7.04 Fundamental Changes**. Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing), except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

(a) any Subsidiary which is not a Loan Party may merge or consolidate with or into (i) a Loan Party, provided that the Loan Party shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries which are not Loan Parties, provided that when any Wholly-Owned Subsidiary is merging or consolidating with another Subsidiary, the Wholly-Owned Subsidiary shall be the continuing or surviving Person;

(b) any Subsidiary which is a Loan Party may merge with or consolidate into any other Subsidiary which is a Loan Party or into a Borrower, provided that in any merger involving a Borrower, a Borrower shall be the continuing or surviving Person;

(c) in connection with a Permitted Acquisition, any Subsidiary of a Loan Party may merge with or into or consolidate with any other Person or permit any other Person to merge with or into or consolidate with it; provided that (i) the Person surviving such merger shall be a Wholly-Owned Subsidiary of a Loan Party and such Person shall become a Loan Party in accordance with the provisions of Section 6.11 hereof, and (ii) in the case of any such merger to which any Loan Party is a party, such Loan Party is the surviving Person; and

(d) any Subsidiary which is not a Borrower may liquidate or dissolve if the Lead Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Lead Borrower and is not materially disadvantageous to the Credit Parties.

**7.05 Dispositions**. Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**7.06 Restricted Payments**. Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that each of the following shall be permitted:

(a) each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party (other than Holdings);

(b) the Loan Parties and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person (in each case other than Disqualified Stock);

-113-

(c) the Loan Parties may declare and pay cash dividends to Holdings in an amount not to exceed such amount as is necessary to permit Holdings to pay its proportionate share of (i) reasonable and customary corporate and operating expenses (including reasonable out-of-pocket expenses for legal, administrative and accounting services provided by third parties, and compensation, benefits and other amounts payable to officers and employees in connection with their employment in the ordinary course of business), (ii) tax liabilities attributable to the taxable income of the Lead Borrower and its Subsidiaries for any taxable period in which the Lead Borrower and its Subsidiaries is a member of any affiliated, consolidated, combined or unitary group the common parent of which is Holdings, and (iii) franchise fees or similar taxes and fees required to maintain its corporate existence;

(d) any Loan Party may declare and pay cash dividends to Holdings not to exceed an amount necessary to permit Holdings to pay customary indemnities and reasonable ordinary course expenses attributable to Holdings, the Lead Borrower or its respective Subsidiaries to the Sponsor pursuant to the Sponsor Management Agreement;

(e) so long as no Default or Event of Default then exists or would result therefrom, the Loan Parties and their Subsidiaries may make Restricted Payments in an amount not to exceed $1,000,000 in the aggregate per Fiscal Year to Holdings to permit Holdings or its parent to repurchase, redeem or otherwise acquire Equity Interests issued by it (and, so long as no Default or Event of Default then exists or would result therefrom, Holdings may use the proceeds of such Restricted Payments for such purpose); and

(f) if the RP Conditions are satisfied, the Lead Borrower may declare or pay cash dividends to Holdings (and, so long as the RP Conditions are satisfied, Holdings may use the proceeds of such Restricted Payments to make Restricted Payments to the holders of Holdings' Equity Interests).

**7.07 Prepayments of Indebtedness**. Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness, except (a) regularly scheduled or mandatory repayments, repurchases, redemptions or defeasances of (i) Permitted Indebtedness (other than Subordinated Indebtedness), (ii) Subordinated Indebtedness in accordance with the subordination terms thereof; provided that if any Specified Event of Default (or event, with the passage of time, the giving of notice or both would constitute a Specified Event of Default) then exists or would arise therefrom, the Loan Parties and their Subsidiaries may not utilize proceeds of Credit Extensions or Proceeds of Collateral to make any such repayments, repurchases, redemptions or defeasances described in this clause (a), (b) voluntary prepayments, repurchases, redemptions or defeasances of (i) Permitted Indebtedness (but excluding on account of any Subordinated Indebtedness) as long as the Payment Conditions are satisfied, (ii) Subordinated Indebtedness (other than the Intercompany Subordinated Indebtedness) in accordance with the subordination terms thereof and as long as the Payment Conditions are satisfied, and (iii) the Intercompany Subordinated Indebtedness as long as the RP Conditions are satisfied; and (c) Permitted Refinancings of any such Indebtedness.

**7.08 Change in Nature of Business.**

(a) In the case of Holdings, engage in any line of business substantially different from the business conducted by Holdings on the Closing Date.

(b) In the case of any Loan Party other than Holdings, engage in any line of business substantially different from the business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

-114-

(c) Without the written consent of the Required Lenders, create, acquire or maintain any Domestic Subsidiary other than a Wholly-Owned Subsidiary.

**7.09 Transactions with Affiliates**. Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Restricted Subsidiary as would be obtainable by the Loan Parties or such Restricted Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties, (b) transactions described on Schedule 7.09 hereto, (c) advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees, (d) the payment of reasonable fees and out-of-pocket costs to directors and officers, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Lead Borrower or any of its Restricted Subsidiaries, (e) transactions among the Loan Parties and the Sponsor to the extent permitted pursuant to Section 7.06, and (f) as long as no Change of Control results therefrom, any issuances of securities of Holdings (other than Disqualified Stock and other Equity Interests not permitted hereunder) or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans (in each case in respect of Equity Interests in Holdings) of Holdings or any of its Subsidiaries.

**7.10 Burdensome Agreements**. Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party or any Subsidiary, except for (x) at the time any Subsidiary becomes a Subsidiary of any Borrower, so long as such agreement was not entered into primarily in contemplation of such Person becoming a Subsidiary of such Borrower, (y) customary restrictions and conditions contained in agreements relating to the sale of all or a substantial part of the assets of any Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary to be sold and such sale is permitted hereunder or (z) customary provisions in leases and other contracts and agreements restricting the assignment thereof, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) or (d) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; (b) customary anti-assignment provisions in contracts restricting the assignment thereof or in contracts for the Disposition of any assets or any Subsidiary provided that the restrictions in any such contract shall apply only to the assets or Subsidiary that is to be Disposed of; or (c) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person unless such Lien is a Permitted Encumbrance.

**7.11 Use of Proceeds**. Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose, or (b) for any purposes other than (i) the acquisition of working capital assets in the ordinary course of business, (ii) to finance Capital Expenditures of the Loan Parties, (iii) to finance transaction costs in connection with the Closing Date Acquisition (but, for the avoidance of doubt, not including the purchase price therefor), and (iv) for general corporate purposes, in each case to the extent expressly permitted under Law and the Loan Documents.

-115-

**7.12 Amendment of Material Documents**.

Amend, modify or waive any of a Loan Party's (or any Restricted Subsidiary's) rights or obligations under (a) its Organization Documents in a manner materially adverse to the Credit Parties, (b) any Material Contract or Material Indebtedness (other than (i) the Intercompany Subordinated Indebtedness, or (ii) on account of any Permitted Refinancing of any Material Indebtedness (other than the Intercompany Subordinated Indebtedness), in each case, to the extent that such amendment, modification or waiver (i) would result in a Default or Event of Default under any of the Loan Documents, or (ii) could be reasonably likely to have a Material Adverse Effect, or (c) the Intercompany Subordinated Indebtedness or the Hot Topic Tri-Party Agreement, to the extent that such amendment, modification or waiver (i) would result in a Default or Event of Default under any of the Loan Documents, or (ii) is materially adverse to the Credit Parties.

**7.13 Fiscal Year; Accounting Changes**.

Change the Fiscal Year of any Loan Party without the prior written consent of the Agent, or change in any material respect the accounting policies or reporting practices of the Loan Parties (it being agreed that any change that materially affects the calculation of the Cost of Eligible Inventory included in the Borrowing Base or the calculation of the Consolidated Fixed Charge Coverage Ratio is such a change), except as required by GAAP and except that the Loan Parties may change their inventory valuation methods from the retail valuation method to the cost method of valuation of Inventory, provided that (i) the Loan Parties shall have provided the Agent with at least ten (10) days' prior written notice of such change in method, and (ii) the Agent may, in its Permitted Discretion and at the Loan Parties' expense, undertake an appraisal of the Loan Parties' inventory after giving effect to the implementation of the cost method of valuation, as provided in the last sentence of Section 6.10(c).

**7.14 Deposit Accounts; Credit Card Processors**.

Open new DDAs with a Blocked Account Bank (other than any Excluded Accounts and any disbursement accounts designated by the Lead Borrower and used solely for such purpose) or enter into any agreements with Credit Card Issuers or Credit Card Processors unless the Loan Parties shall have delivered to the Agent appropriate Blocked Account Agreements or Credit Card Notifications, as applicable, consistent with the provisions of Section 6.12 and otherwise satisfactory to the Agent. Without the consent of the Agent (not to be unreasonably withheld or delayed), no Loan Party shall maintain any bank accounts with any Blocked Account Bank (other than any Excluded Accounts and any disbursement accounts designated by the Lead Borrower and used solely for such purpose) or enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein or in Section 6.12 hereof.

**7.15 Minimum Availability**.

Permit Availability at any time to be less than the greater of (a) ten percent (10%) of the Loan Cap, or (b) $5,000,000.

**7.16 Stay, Extension and Usury Laws**. At any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of its obligations under this Agreement; and the Loan Parties (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such Law, and covenant that they shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Credit Parties, but shall suffer and permit the execution of every such power as though no such law has been enacted.

-116-

**ARTICLE VIII**
**EVENTS OF DEFAULT AND REMEDIES**

**8.01 Events of Default**. Any of the following shall constitute an "Event of Default":

(a) <u>Non-Payment</u>. The Borrowers or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal on any Loan or any L/C Obligation, or deposit any funds as Cash Collateral in respect of L/C Obligations, (ii) any interest on any Loan or on any L/C Obligation, or any fee due hereunder within three (3) Business Days after the same becomes due, or (iii) any other amount (excluding Other Liabilities) payable hereunder or under any other Loan Document within five (5) Business Days after the due date thereof; or

(b) <u>Specific Covenants</u>. (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of <u>Sections 6.01</u>, <u>6.02(b)</u> and <u>(c)</u>, <u>6.03(a)</u>, <u>6.05(a)</u>, <u>6.10</u>, <u>6.11</u>, <u>6.12</u> or <u>Article VII</u>; or

(c) <u>Other Defaults</u>. Any Loan Party fails to perform or observe any (i) term, covenant or agreement contained in subclauses <u>(b)</u>, <u>(c)</u>, <u>(d)</u>, <u>(e)</u>, <u>(i)</u> or <u>(k)</u> of <u>Section 6.03</u>, <u>Section 6.05(b)</u>, <u>Sections 6.07</u> or <u>6.13</u> and such failure continues for five (5) Business Days or (ii) other covenant or agreement (not specified in subsection <u>(a)</u>, <u>(b)</u> or <u>(c)(i)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days, in each case, following receipt by the Lead Borrower of written notice from the Agent or the Required Lenders of any such failure; or

(d) <u>Representations and Warranties</u>. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made (or, if qualified by materiality in the text thereof, in any respect when made or deemed made); or

(e) <u>Cross-Default</u>. Any Loan Party or any Restricted Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness, or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or

(f) <u>Insolvency Proceedings, Etc</u>. Any Loan Party or any of its Restricted Subsidiaries institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or a proceeding shall be commenced or

-117-

a petition filed, without the application or consent of such Person, seeking or requesting the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed and the appointment continues undischarged, undismissed or unstayed for sixty (60) calendar days or an order or decree approving or ordering any of the foregoing shall be entered; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g) <u>Inability to Pay Debts; Attachment</u>. (i) Any Loan Party or any Restricted Subsidiary thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due in the ordinary course of business, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within forty-five (45) days after its issuance or levy; or

(h) <u>Judgments</u>. There is entered against any Loan Party or any Restricted Subsidiary thereof (i) one or more final judgments or orders for the payment of money in an aggregate amount (as to all such final judgments and orders) exceeding $5,000,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) such judgment is not, within thirty (30) days after the entry thereof, satisfied, vacated, discharged or execution thereof stayed or bonded pending appeal; or

(i) <u>ERISA</u>. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which results or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC and which could reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $5,000,000 or which could reasonably likely result in a Material Adverse Effect; or

(j) <u>Invalidity of Loan Documents</u>. (i) Any provision of any Loan Document, at any time after its execution and delivery and for any reason (other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations), ceases to be in full force and effect; or any Loan Party or any Restricted Subsidiary thereof contests in writing in any manner the validity or enforceability of any material provision of any Loan Document; or any Loan Party or any Restricted Subsidiary thereof denies in writing that it has any or further liability or obligation under any material provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted in writing by any Loan Party or any Restricted Subsidiary thereof not to be, a valid and perfected Lien on any material portion of the Collateral (to the extent required by the Security Documents and this Agreement) perfected Lien on any Collateral (other than an immaterial portion of the Collateral), with the priority required by the applicable Security Document (subject to Permitted Encumbrances); or

-118-

(k) <u>Change of Control</u>. There occurs any Change of Control; or

(l) <u>Cessation of Business</u>. Except as otherwise expressly permitted hereunder, the Loan Parties, taken as a whole, shall take any action to suspend the operation of their business in the ordinary course, liquidate all or a material portion of their assets or Store locations, or employ an agent or other third party to conduct a program of closings, liquidations or "Going-Out-Of- Business" sales of any material portion of their business; or

(m) <u>Loss of Collateral</u>. There occurs any uninsured loss to any of the Collateral, which loss could reasonably be expected to have a Material Adverse Effect; or

(n) <u>Indictment</u>. The indictment or institution of any legal process or proceeding against Holdings, any other Loan Party or any Restricted Subsidiary thereof, under any federal, state, provincial, territorial, municipal, foreign or other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony and such indictment remains unquashed or undismissed for a period of ninety (90) days or more, unless the Agent, in its Permitted Discretion, determines that the indictment is not material;

(o) <u>Guaranty</u>. The termination, revocation or attempted termination or revocation in writing by any Loan Party of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document; or

(p) <u>Subordination</u>. (i) The subordination or intercreditor provisions of the documents evidencing or governing any Subordinated Indebtedness (the "<u>Subordination Provisions</u>") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) any Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in writing in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions.

**8.02 Remedies Upon Event of Default**. If any Event of Default occurs and is continuing, the Agent may, or, (i) at any time that there are only two (2) Lenders and a Specified Event of Default exists, at the request of any Lender (so long as such Lender is a Lender as of the Effective Date and maintains a Commitment not less than the Commitment of such Lender as of the Effective Date), or (ii) in all other circumstances, at the request of the Required Lenders, shall, take any or all of the following actions:

(a) declare the Commitments of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such Commitments and obligations shall be terminated;

(b) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations (excluding Other Liabilities not then due and payable) to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties (to the extent permitted by applicable Law);

(c) if so requested by the Required Lenders, require that the Loan Parties Cash Collateralize the L/C Obligations; and

-119-

(d) whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties;

provided, however, that upon the occurrence of any Default or Event of Default with respect to any Loan Party or any Restricted Subsidiary thereof under Section 8.01(f), the obligation of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans, all interest accrued thereon and all other Obligations shall automatically become due and payable, and the obligation of the Loan Parties to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Agent or any Lender.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03 Application of Funds**. After the exercise of remedies provided for in Section 8.02 (or after the Obligations have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), any amounts received from any Loan Party, from the liquidation of any Collateral, or on account of the Obligations shall, subject to the provisions of Section 2.16, be applied by the Agent in the following order:

First, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting fees, indemnities (including indemnities due under Section 10.03 hereof), Credit Party Expenses and other amounts (including reasonable and documented fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent;

Second, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting indemnities (including indemnities due under Section 10.03 hereof), Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders and the L/C Issuer (including Credit Party Expenses to the respective Lenders and the L/C Issuer and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to the extent not previously reimbursed by the Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances;

Fourth, to the extent that Swing Line Loans have not been refinanced by a Revolving Loan, payment to the Swing Line Lender of that portion of the Obligations constituting principal and accrued and unpaid interest on the Swing Line Loans;

Fifth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Revolving Loans and L/C Borrowings, and fees (including Letter of Credit Fees and Commitment Fees), ratably among the Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Fifth payable to them;

-120-

Sixth, to payment of that portion of the Obligations constituting unpaid principal of the Revolving Loans and L/C Borrowings, ratably among the Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Sixth held by them;

Seventh, to the Agent for the account of the L/C Issuer, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit;

Eighth, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations as provided in Section 10.11, but excluding any Other Liabilities), ratably among the Credit Parties in proportion to the respective amounts described in this clause Eighth held by them;

Ninth, to payment of that portion of the Obligations arising from Cash Management Services, ratably among the Credit Parties in proportion to the respective amounts described in this clause Ninth held by them;

Tenth, to payment of all other Obligations arising from Bank Products, ratably among the Credit Parties in proportion to the respective amounts described in this clause Tenth held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Seventh above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

Excluded Swap Obligations with respect to any Loan Party shall not be paid with amounts received from such Loan Party, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Obligations otherwise set forth above in this Section 8.03.

## ARTICLE IX
## THE AGENT

**9.01 Appointment and Authority**.

Each of the Lenders (in its capacity as a Lender), the Swing Line Lender and the L/C Issuer hereby irrevocably appoints Bank of America to act on its behalf as the administrative agent and collateral agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Agent and the other Credit Parties, and no Loan Party or any Restricted Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the

-121-

Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**9.02 Rights as a Lender**. The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Restricted Subsidiary or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders.

**9.03 Exculpatory Provisions**. The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agent:

(a) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

The Agent shall not be liable to any Credit Party for any action taken or not taken by it (i) with the Consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence, bad faith or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties, a Lender or the L/C Issuer. In the event that the Agent obtains such actual knowledge or receives such a notice, the Agent shall give prompt notice thereof to each of the other Credit Parties. Upon the occurrence of a Default or an Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders. Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties. In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

-122-

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

**9.04 Reliance by Agent**.

The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or increase of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the L/C Issuer, the Agent may presume that such condition is satisfactory to such Lender or the L/C Issuer unless the Agent shall have received written notice to the contrary from such Lender or the L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit. The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05 Delegation of Duties**. The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent. The Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**9.06 Resignation of Agent**. The Agent may at any time give written notice of its resignation to the Lenders, the L/C Issuer and the Lead Borrower. Upon receipt of any such notice of resignation, the Required Lenders (excluding, for purposes of this Section 9.06 only, any Lender who is also the Agent) shall have the right, in consultation with the Lead Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States and which shall, unless an Event of Default has occurred and is continuing at the time of such appointment, be reasonably acceptable to the Lead Borrower (whose consent shall not be unreasonably withheld or delayed). If no such successor shall have been so appointed by the Required Lenders (and accepted by

-123-

the Lead Borrower in accordance with the terms above) and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the L/C Issuer, appoint a successor Agent meeting the qualifications set forth above; underlined provided that if the Agent shall notify the Lead Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender and the L/C Issuer directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder.

**9.07 Non-Reliance on Agent and Other Lenders**. Each Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and the L/C Issuer also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in Section 9.12, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

**9.08 No Other Duties, Etc.** Anything herein to the contrary notwithstanding, none of the Bookrunning Manager or Arranger listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity as the Agent, a Lender or the L/C Issuer hereunder.

**9.09 Agent May File Proofs of Claim**. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuer, the Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuer, the Agent, such Credit Parties and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuer the Agent and such Credit Parties under Sections 2.03(i), 2.03(j), 2.09 and 10.04) allowed in such judicial proceeding; and

-124-

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the L/C Issuer to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuer, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Credit Party any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Credit Party or to authorize the Agent to vote in respect of the claim of any Credit Party in any such proceeding.

**9.10 Collateral and Guaranty Matters**. The Credit Parties irrevocably authorize the Agent, at its option and in its discretion,

(a) to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted and for Obligations collateralized pursuant to Section 10.11) and the expiration, termination or Cash Collateralization of all Letters of Credit (except to the extent fully Cash Collateralized or supported by another letter of credit in a manner reasonably satisfactory to the L/C Issuer and the Agent), (ii) that is Disposed of or to be Disposed of as part of or in connection with any Disposition permitted hereunder, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01;

(b) to release any Lien on any Equity Interests of any Subsidiary of the Lead Borrower granted to or held by the Agent under the Security Agreement in the event that Rule 3- 16 of Regulation S-X under applicable Securities Laws is amended, modified or interpreted by the SEC to require (or is replaced with another rule or regulation or any other law, rule or regulation is adopted, which would require) the filing with the SEC (or any other Governmental Agency) of separate financial statements of such Subsidiary due to the fact that such Subsidiary's Equity Interests secure the Obligations, but only for so long as, and only to the extent, necessary to not be subject to such requirement;

(c) to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances; and

(d) to release any Guarantor from its obligations under any Facility Guaranty and each other applicable Loan Document if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty and each other applicable Loan Document

-125-

pursuant to this Section 9.10. In each case as specified in this Section 9.10, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and Lien granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

**9.11 Notice of Transfer**.

The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Acceptance shall have become effective as set forth in Section 10.06.

**9.12 Reports and Financial Statements**.

By signing this Agreement, each Lender:

(a) agrees to furnish the Agent, at such frequency as the Agent may reasonably request, with a summary of all Other Liabilities due or to become due to such Lender. In connection with any distributions to be made hereunder, the Agent shall be entitled to assume that no amounts are due to any Lender on account of Other Liabilities unless the Agent has received written notice thereof from such Lender and if such notice is received, the Agent shall be entitled to assume that the only amounts due to such Lender on account of Other Liabilities is the amount set forth in such notice;

(b) is deemed to have requested that the Agent furnish, and the Agent agrees to furnish, such Lender, promptly after they become available, copies of all Borrowing Base Certificates and financial statements required to be delivered by the Lead Borrower hereunder

(c) is deemed to have requested that the Agent furnish, and the Agent agrees to furnish, such Lender, promptly after they become available, copies of all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

(d) expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Borrowing Base Certificates, financial statements or Reports, and shall not be liable for any information contained in any Borrowing Base Certificate, financial statement or Report;

(e) expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(f) agrees to keep all Borrowing Base Certificates, financial statements and Reports confidential in accordance with the provisions of Section 10.07 hereof; and

(g) without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's

-126-

participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.13 Agency for Perfection**.

Each Credit Party hereby appoints each other Credit Party as agent for the purpose of perfecting Liens for the benefit of the Credit Parties, in assets which, in accordance with Article 9 of the UCC or any other Law of the United States can be perfected only by possession or control. Should any Credit Party (other than the Agent) obtain possession or control of any such Collateral, such Credit Party shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.14 Indemnification of Agent**. Without limiting the obligations of Loan Parties hereunder, the Lenders shall indemnify the Agent, any sub-agent thereof, the Swing Line Lender, the L/C Issuer and any Related Party, as the case may be ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent, any sub-agent thereof, the Swing Line Lender, the L/C Issuer and their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent, any sub-agent thereof, the Swing Line Lender, the L/C Issuer and their Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's, any sub-agent's, the Swing Line Lender's, the L/C Issuer's and their Related Parties' bad faith, gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

**9.15 Relation among Lenders**. The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

<div align="center">

**ARTICLE X**
**MISCELLANEOUS**

</div>

**10.01 Amendments, Etc.**

(a) No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the Consent of the Required Lenders, and the Lead Borrower or the applicable Loan Party, as the case may be, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(i) increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written Consent of such Lender;

<div align="center">-127-</div>

(ii) postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of each Lender directly and adversely affected thereby, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Commitments hereunder or under any other Loan Document, without the written Consent of each Lender directly and adversely affected thereby;

(iii) reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing, or (subject to clause (iv) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of any Lender, without the written Consent of each Lender directly and adversely affected thereby; provided, however, that only the Consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest or Letter of Credit Fees at the Default Rate;

(iv) change Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of each Lender;

(v) change any provision of this Section or the definition of "Required Lenders" or any other provision hereof or of any Loan Document specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or under any other Loan Document or make any determination or grant any consent hereunder or thereunder, without the written Consent of each Lender;

(vi) except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written Consent of each Lender;

(vii) except for Permitted Dispositions or as provided in Section 9.10, release all or substantially all of the Collateral from the Liens of the Security Documents without the written Consent of each Lender;

(viii) change the definition of the term "Borrowing Base" (or any component definition thereof, including, without limitation, advance rates, eligible asset classes and eligibility criteria), "Reserves," "Availability Reserves," or "Inventory Reserves" if, in any case, as a result thereof, the amounts available to be borrowed by the Borrowers would be increased without the written Consent of each Lender, *provided that* the foregoing shall not limit the Permitted Discretion of the Agent to change, establish or eliminate any Reserves or eligibility criteria as provided herein;

(ix) modify the definition of the term "Permitted Overadvance" so as to increase the amount thereof or, except as otherwise provided in such definition, the time period for which a Permitted Overadvance may remain outstanding without the written Consent of each Lender; and

(x) except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or under the other Loan Documents to any other Indebtedness without the written Consent of each Lender;

and, provided further, that (i) no amendment, waiver or Consent shall, unless in writing and signed by the L/C Issuer in addition to the Lenders required above, affect the rights or duties of the L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no

-128-

amendment, waiver or Consent shall, unless in writing and signed by the Swing Line Lender in addition to the Lenders required above, affect the rights or duties of the Swing Line Lender under this Agreement; (iii) no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of any Agent under this Agreement or any other Loan Document; and (iv) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) any Commitment of any Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

(b) Notwithstanding anything to the contrary in this Agreement or any other Loan Document, (x) no provider or holder of any Bank Products or Cash Management Services shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or any Loan Party, and (y) any Loan Document may be amended and waived with the consent of the Agent at the request of the Lead Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause any Loan Document to be consistent with this Agreement and the other Loan Documents.

(c) If any Lender (other than the Agent) does not Consent (a "Non-Consenting Lender") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the Consent of each Lender or each affected Lender and that has been approved by the Required Lenders, the Lead Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Lead Borrower to be made pursuant to this paragraph).

**10.02 Notices; Effectiveness; Electronic Communications**.

(a) Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and, with respect to electronic communications, except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i) if to the Loan Parties, the Agent, the L/C Issuer or the Swing Line Lender, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii) if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

-129-

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b) Electronic Communications. Notices and other communications to the Lenders and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender or the L/C Issuer pursuant to Article II if such Lender or the L/C Issuer, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication. The Agent or the Lead Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii), if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c) The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Loan Party, any Lender, the L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Agent's transmission of Borrower Materials through the Internet , except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Loan Party, any Lender, the L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

-130-

(d) <u>Change of Address, Etc</u>. Each of the Loan Parties, the Agent, the L/C Issuer and the Swing Line Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Lead Borrower, the Agent, the L/C Issuer and the Swing Line Lender. In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrowers or their securities for purposes of United States Federal or state securities laws.

(e) <u>Reliance by Agent, L/C Issuer and Lenders</u>. The Agent, the L/C Issuer and the Lenders shall be entitled to rely and act upon any notices (including telephonic Revolving Loan Notices and Swing Line Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify the Agent, the L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties, except to the extent such losses, costs, expenses or liabilities are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Person. All telephonic notices to and other telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**10.03 No Waiver; Cumulative Remedies**. No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at Law in connection with such enforcement shall be instituted and maintained exclusively by, the Agent in accordance with <u>Section 8.02</u> for the benefit of all the Lenders and the L/C Issuer; <u>provided</u>, <u>however</u>, that the foregoing shall not prohibit (a) the Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (b) the L/C Issuer or the Swing Line Lender from exercising the rights and remedies that inure to its benefit (solely in its capacity as L/C Issuer or Swing Line Lender, as the case may be) hereunder and under the other Loan Documents, or (c) any Lender from exercising setoff rights in accordance with <u>Section 10.08</u> (subject to the terms of <u>Section 2.13</u>); and <u>provided</u>, <u>further</u>, that if at any time there is no Person acting as Agent

-131-

hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**10.04 Expenses; Indemnity; Damage Waiver**.

(a) Costs and Expenses. The Borrowers shall pay all Credit Party Expenses.

(b) Indemnification by the Loan Parties. The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the reasonable fees, charges and documented out-of-pocket disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, any bank advising or confirming a Letter of Credit and any other Person seeking to enforce the rights of a Borrower, beneficiary, transferee, or assignee or Letter of Credit proceeds or the holder of an instrument or document related to any Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Restricted Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Restricted Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Lead Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Lead Borrower or such Loan Party has obtained a final and non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction. Without limiting the provisions of Section 3.01(c), this Section 10.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c) Waiver of Consequential Damages, Etc. To the fullest extent permitted by Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.

-132-

(d) <u>Payments</u>. All amounts due under this Section shall be payable on demand therefor.

(e) <u>Limitation of Liability</u>. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(f) <u>Survival</u>. The agreements in this Section shall survive the resignation of any Agent, the L/C Issuer or the Swing Line Lender, the assignment of any Commitment or Loan by any Lender, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations and the termination of this Agreement.

**10.05 Payments Set Aside**. This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Loan Party for liquidation or reorganization or otherwise under any Debtor Relief Law, should any Loan Party become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver, interim receiver, trustee, monitor, custodian, conservator, liquidator, rehabilitator or similar officer be appointed for all or any significant part of any Loan Party's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable Law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made. To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and the L/C Issuer severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing. The obligations of the Lenders and the L/C Issuer under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06 Successors and Assigns**.

(a) <u>Successors and Assigns Generally</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder

-133-

except (i) to an Eligible Assignee in accordance with the provisions of <u>Section 10.06(b)</u>, (ii) by way of participation in accordance with the provisions of subsection <u>Section 10.06(d)</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 10.06(f)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) <u>Assignments by Lenders</u>. Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans (including for purposes of this <u>Section 10.06(b)</u>, participations in L/C Obligations and in Swing Line Loans) at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i) <u>Minimum Amounts</u>.

(A) (1) in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and Revolving Loans owing to it or (2) in the case of any assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B) in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment or, if the Commitment is not then in effect, the principal outstanding balance of the Revolving Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 unless each of the Agent and, so long as no Default or Event of Default has occurred and is continuing, the Lead Borrower otherwise consents (each such consent not to be unreasonably withheld, conditioned or delayed); <u>provided</u>, <u>however</u>, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii) <u>Proportionate Amounts</u>. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitments assigned, except that this clause (ii) shall not apply to the Swing Line Lender's rights and obligations in respect of Swing Line Loans.

(iii) <u>Required Consents</u>. No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A) the consent of the Lead Borrower shall be required (such consent not to be unreasonably withheld, conditioned or delayed; <u>provided</u> that after the passage of ten (10) Business Days from receipt of written notice to the Lead Borrower from the Agent of a proposed assignment without the Lead Borrower giving the Agent written notice of the Lead Borrower's objection to such assignment, the Lead Borrower shall be deemed to have consented to such assignment) unless (1) a Default or Event of Default under <u>Section 8.01(a)</u> or <u>8.01(f)</u> has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund with respect to such Lender; and

-134-

(B) the consent of the Agent, the L/C Issuer and the Swing Line Lender (such consent not to be unreasonably withheld, conditioned or delayed) shall be required for assignments in respect of any Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv) <u>Assignment and Assumption</u>. The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, <u>provided</u>, <u>however</u>, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

(v) <u>No Assignment to Certain Persons</u>. No such assignment shall be made (1) (A) to any Person which is not an Eligible Assignee, (B) to any Defaulting Lender or any of its Subsidiaries or Affiliates, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B), or (C) to a natural Person, or (2) if at the time of such assignment the Borrowers would be obligated to pay any greater amount under Article III to the assignee than the Borrowers is then obligated to pay to the assigning Lender under such Article (and if any assignment is made in violation of the foregoing, the Borrowers will not be required to pay such greater amounts).

(vi) <u>Certain Additional Payments</u>. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Lead Borrower and the Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent, the L/C Issuer or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swing Line Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u>, and <u>10.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment; <u>provided</u>, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Upon request of the assignee Lender, the Borrowers (at their expense) shall execute and deliver one or more Notes to the assignee Lender. Any

-135-

assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c) Register. The Agent, acting solely for this purpose as an agent of the Borrowers (and such agency being solely for tax purposes), shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Lead Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice This Section 10.06(c) shall be construed so that the Obligations (excluding Other Liabilities) are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any regulations promulgated thereunder (and any other relevant or successor provisions of the Code or such regulations).

(d) Participations. (i) Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment, and/or the Revolving Loans (including such Lender's participations in L/C Obligations and/or Swing Line Loans) owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, the Lenders and the L/C Issuer shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder.

(ii) Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (i) through (iv) and clauses (vi) and (vii) of the first proviso to Section 10.01 that affects such Participant. Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.02 as though it were a Lender.

(iii) Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form

-136-

under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(e) Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent. A Participant shall not be entitled to the benefits of Section 3.01 unless the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Section 3.01(e) as though it were a Lender.

(f) Certain Pledges. Any Lender may, at any time and without consent of any Loan Party or the Agent, pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g) Assignment to SPV. Notwithstanding any provision to the contrary, any Lender may assign to one or more special purpose funding vehicles (each, an "SPV") all or any portion of its funded Loans (without the corresponding Commitment), without the consent of any Person or the payment of a fee, by execution of a written assignment agreement in a form agreed to by such Lender and such SPV, and may grant any such SPV the option, in such SPV's sole discretion, to provide the Borrowers all or any part of any Loans that such Lender would otherwise be obligated to make pursuant to this Agreement. Such SPVs shall have all the rights which a Lender making or holding such Loans would have under this Agreement, but no obligations. The Lender making such assignment shall remain liable for all its original obligations under this Agreement, including its Commitment (although the unused portion thereof shall be reduced by the principal amount of any Loans held by an SPV). Notwithstanding such assignment, the Agent and Lead Borrower may deliver notices to the Lender making such assignment (as agent for the SPV) and not separately to the SPV unless the Agent and Lead Borrower are requested in writing by the SPV (or its agent) to deliver such notices separately to it. The Borrowers shall, at the reasonable request of any such Lender, execute and deliver to such Person as such Lender may designate, one or more Notes in the amount of such Lender's original Notes to evidence the Loans of such Lender and related SPV.

(h) Resignation as L/C Issuer or Swing Line Lender after Assignment or Resignation. Notwithstanding anything to the contrary contained herein, if at any time Bank of America assigns all of its Commitment and Loans pursuant to subsection (b) above, or resigns as Agent in accordance with the provisions of Section 9.06, Bank of America may, (i) upon thirty (30) days' notice to the Lead Borrower and the Lenders, resign as L/C Issuer and/or (ii) with duplication of any notice required under Section 9.06, upon thirty (30) days' notice to the Lead Borrower, resign as Swing Line Lender. In the event of any such resignation as L/C Issuer or Swing Line Lender, the Lead Borrower shall be entitled to appoint from among the Lenders a successor L/C Issuer or Swing Line Lender hereunder; provided, however, that no failure by the Lead Borrower to appoint any such successor shall affect the resignation of Bank of America as L/C Issuer or Swing Line Lender, as the case may be. If Bank of America resigns as L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as L/C Issuer and all L/C Obligations with respect thereto (including the right to require the

-137-

Lenders to make Revolving Loans that are Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.03(c)). If Bank of America resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Revolving Loans that are Base Rate Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.04(c). Upon the appointment of a successor L/C Issuer and/or Swing Line Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer or Swing Line Lender, as the case may be, (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Bank of America to effectively assume the obligations of Bank of America with respect to such Letters of Credit, and (c) the successor Swing Line Lender shall repay all outstanding Obligations with respect to Swing Line Loans due to the resigning Swing Line Lender.

**10.07 Treatment of Certain Information; Confidentiality**. Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, Approved Funds, and to its and its Affiliates' and Approved Funds' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority), (c) to the extent required by Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement (including any electronic agreement contained in any Platform) containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any Swap Contract relating to any Loan Party and its obligations, (g) with the prior written consent of the Lead Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information, provided it exercises not less than reasonable care.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with Law, including Federal and state securities Laws.

**10.08 Right of Setoff**. If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender, each Participant, the L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the

-138-

Required Lenders, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) or other property at any time held and other obligations (in whatever currency) at any time owing by such Lender, such Participant, the L/C Issuer or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender or the L/C Issuer, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender or the L/C Issuer shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender, such Participant, or the L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Agent for further application in accordance with the provisions of Section 2.16 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agent, the L/C Issuer and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender, each Participant, the L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the L/C Issuer or their respective Affiliates may have. Each Lender and the L/C Issuer agrees to notify the Lead Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09 Interest Rate Limitation**. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Law (the "Maximum Rate"). If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans and other Obligations (other than Other Liabilities not then due and owing) or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10 Counterparts; Integration; Effectiveness**. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous letters of intent, commitment letters, agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11 Survival**. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any

-139-

Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation (other than the Other Liabilities and contingent indemnity obligations for which claims have not been asserted) hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding. Further, the provisions of Sections 3.01, 3.04, 3.05 and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations (other than contingent indemnity obligations for which claims have not been asserted), the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent, in its Permitted Discretion, may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, (y) any obligations that may thereafter arise with respect to the Other Liabilities, and (z) any Obligations that may thereafter arise under Section 10.04 hereof.

**10.12 Severability**. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Agent, the L/C Issuer or the Swing Line Lender, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

**10.13 Replacement of Lenders**. If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any Indemnified Taxes or any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights (other than its existing rights to payments pursuant to Section 3.01 and 3.04) and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a) the Borrowers shall have paid to the Agent the assignment fee specified in Section 10.06(b);

(b) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and L/C Advances, accrued interest thereon, accrued fees (except that accrued fees shall not be payable to a Defaulting Lender) and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d) such assignment does not conflict with Laws; and

-140-

(e) in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**10.14 Governing Law; Jurisdiction; Etc**.

(a) <u>GOVERNING LAW</u>. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF.

(b) <u>SUBMISSION TO JURISDICTION</u>. SUBJECT TO THE LAST SENTENCE OF THIS CLAUSE (B), EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST ANY OTHER PARTY HERETO (OR, IN THE CASE OF THE LOAN PARTIES, AGAINST ANY RELATED PARTY OF THE AGENT, ANY LENDER OR THE L/C ISSUER), IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING TO ENFORCE ANY AWARD OR JUDGMENT RIGHT UNDER THE LOAN DOCUMENTS OR TO BRING ANY ACTION OR PROCEEDING TO ENFORCE ITS RIGHTS UNDER THE LOAN DOCUMENTS WITH RESPECT TO ANY COLLATERAL OR ANY OTHER PROPERTY OF ANY LOAN PARTY IN ANY OTHER FORUM IN WHICH JURISDICTION CAN BE ESTABLISHED.

(c) <u>WAIVER OF VENUE</u>. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d) <u>SERVICE OF PROCESS</u>. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 10.02</u>. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**10.15 Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16 No Advisory or Fiduciary Responsibility**. In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**10.17 Patriot Act Notice**. Each Lender that is subject to the Patriot Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with Patriot the Act. Each Loan Party is in compliance, in all material respects, with the Patriot Act. No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended. The Loan Parties shall, promptly following a request by the Agent or any Lender, provide all documentation and other information that the Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

**10.18 Foreign Asset Control Regulations**. None of the advance of the Loans, the issuance of any Letters of Credit or the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Patriot Act. Furthermore, none of the Borrowers or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.19 Time of the Essence**. Time is of the essence of the Loan Documents.

**10.20 Press Releases**.

(a) Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and without the prior written consent of the Agent unless (and only to the extent that) such Credit Party or Affiliate is required to do so under applicable Law and then, in any event solely to the extent permitted by applicable Law, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

(b) The Agent and each Lender agree that such Person shall not in the future issue any press releases or other public disclosure using the name of the Lead Borrower or its Subsidiaries without at least two (2) Business Days' prior notice to the Agent and the Lead Borrower and without the prior written consent of the Agent and the Lead Borrower unless such Credit Party or Affiliate is required to do so under applicable Law or an Event of Default has occurred and is then continuing. Subject to the foregoing, each Loan Party consents to the publication by the Agent or any Lender of advertising material relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo or trademark with the Lead Borrower's consent (to the extent required pursuant to the immediately preceding sentence), which consent (if so required) shall not be unreasonably

-143-

withheld, conditioned or delayed; <u>provided</u> that after the passage of five (5) Business Days from receipt of written notice to the Lead Borrower from the Agent or any Lender of a proposed press release or other public disclosure without the Lead Borrower giving the Agent written notice of the Lead Borrower's objection to such press release or other public disclosure, the Lead Borrower shall be deemed to have consented thereto); <u>provided</u> <u>further</u> that the Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for review and comment prior to the publication thereof. The Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

**10.21 Additional Waivers**.

(a) The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party, or (iv) any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the payment in full in cash of all the Obligations after the termination of the Commitments). The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the payment in full in cash of the Obligations after the termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise.

(b) To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the payment in full in cash of all the Obligations and the termination of the Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all of the Obligations have been indefeasibly paid in full in cash and the Commitments have been terminated. To the extent permitted by applicable Law, each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(c) Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior payment in full in cash of all of the Obligations and the termination of the Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness. If any amount shall erroneously

-144-

be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents. Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Borrowers. As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (32) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

(d) Without limiting the generality of the foregoing, or of any other waiver or other provision set forth in this Agreement, each Loan Party hereby absolutely, knowingly, unconditionally, and expressly waives any and all claim, defense or benefit arising directly or indirectly under any one or more of Sections 2787 to 2855 inclusive of the California Civil Code or any similar law of California.

### 10.22 No Strict Construction.

The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

### 10.23 Attachments.

The exhibits and schedules attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and schedules and the provisions of this Agreement, the provisions of this Agreement shall prevail.

### 10.24 Electronic Execution of Assignments and Certain Other Documents.

The words "execute," "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.25 Keepwell.**

Each Loan Party that is a Qualified ECP Guarantor at the time the guaranty set forth in the Facility Guaranty or the grant of a security interest under the Loan Documents, in each case, by any Specified Loan Party becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under the Facility Guaranty voidable under applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations and undertakings of each Qualified ECP Guarantor under this Section 10.25 shall remain in full force and effect until the Obligations have been indefeasibly paid in full. Each Loan Party intends this Section to constitute, and this Section 10.25 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

[remainder of page intentionally left blank; signature pages follow]

-146-

*IN WITNESS WHEREOF*, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**TORRID LLC,** as Lead Borrower and as a Borrower

By:    /s/ George Wehlitz
Name:  George Wehlitz
Title:   Vice President and Chief Financial Officer

**TORRID ADMINISTRATION, INC.,** as a Borrower

By:    /s/ George Wehlitz
Name:  George Wehlitz
Title:   Vice President and Chief Financial Officer

**TORRID MERCHANDISING, INC.,** as a Borrower

By:    /s/ George Wehlitz
Name:  George Wehlitz
Title:   Vice President and Chief Financial Officer

**TORRID HOLDING CORP.,** as Holdings and as a Guarantor

By:    /s/ George Wehlitz
Name:  George Wehlitz
Title:   Vice President and Chief Financial Officer

Signature Page to Credit Agreement

**BANK OF AMERICA, N.A.,** as Administrative Agent and Collateral Agent

By:   /s/ Matthew Potter
Name:  Matthew Potter
Title:   Vice President

**BANK OF AMERICA, N.A.,** as a Lender, as L/C Issuer and as Swing Line Lender

By:   /s/ Matthew Potter
Name:  Matthew Potter
Title:   Vice President

Signature Page to Credit Agreement

**WELLS FARGO BANK, NATIONAL ASSOCIATION,** as a Lender

By:   /s/ Matthew N. Williams
Name:  Matthew N. Williams
Title:  Managing Director

Signature Page to Credit Agreement

Exhibit 16.1

July 10, 2017

Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

Ladies and Gentlemen:

We have read the Change in Auditor disclosures in the Form S-1 in the section entitled "Change in Auditors" dated July 10, 2017, of Torrid Inc. and are in agreement with the statements contained in the first two paragraphs of the section titled "Change in Auditors" on page 117 therein. We have no basis to agree or disagree with other statements of the registrant contained therein.

/s/ Ernst & Young LLP

**Exhibit 21.1**

**SUBSIDIARIES OF TORRID INC.**

| Entity | Jurisdiction |
| --- | --- |
| Torrid LLC | California |
| Torrid Administration, Inc. | California |
| Torrid Merchandising Inc. | California |
| Torrid Canada Inc. | Canada |

Exhibit 23.1

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We hereby consent to the use in this Registration Statement on Form S-1 of Torrid Inc. of our report dated April 13, 2017 relating to the consolidated financial statements and financial statement schedule, which appears in such Registration Statement. We also consent to the reference to us under the heading "Experts" in such Registration Statement.

/s/ PricewaterhouseCoopers LLP
Irvine, California
July 10, 2017

Exhibit 23.2

**Consent of Independent Registered Public Accounting Firm**

We consent to the reference to our firm under the caption "Experts" and to the use of our report dated May 17, 2017, in the Registration Statement (Form S-1) and related Prospectus of Torrid Inc. for the registration of shares of its common stock.

/s/ Ernst & Young LLP

Los Angeles, California
July 10, 2017