ROBBINS GELLER RUDMAN
   & DOWD LLP
LAURIE L. LARGENT (153493)
STEPHEN JOHNSON (347822)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
llargent@rgrdlaw.com
sjohnson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA WASWICK, on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TORRID HOLDINGS INC., et al.,<br><br>Defendants. | Case No. 2:22-cv-08375-JLS(ASx)<br><br>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS TORRID HOLDINGS INC., ELIZABETH MUÑOZ, GEORGE WEHLITZ, STEFAN L. KALUZNY, DARY KOPELIOFF, LISA HARPER, THEO KILLION, SYCAMORE PARTNERS MANAGEMENT, L.P., SYCAMORE PARTNERS TORRID, LLC, SYCAMORE PARTNERS, L.P., SYCAMORE PARTNERS ASSOCIATES-C, L.P., SYCAMORE PARTNERS ASSOCIATES INVESTMENTS, L.P., SYCAMORE PARTNERS (CO-INVEST), LLC, AND SYCAMORE PARTNERS ASSOCIATES-C CO-INVEST, L.P.'S MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT<br><br>DATE:     September 22, 2023<br>TIME:     10:30 a.m.<br>COURTROOM:   8A<br>JUDGE:  Hon. Josephine L. Staton |

4883-3924-8499.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................. 3

III.    LEGAL STANDARD ................................................................................... 5

IV.     ARGUMENT ................................................................................................ 6

    A.    The Complaint Adequately Pleads §10(b) Claims .............................. 6

        1.    Defendants' Statement Were Materially False and Misleading ................................................................................ 6

        2.    Torrid's Purported Risk Disclosures Do Not Absolve Them of Liability ................................................................. 12

        3.    Plaintiffs Have Adequately Pled Scienter ............................... 14

        4.    The Complaint Alleges Loss Causation .................................. 19

        5.    The Complaint Pleads Control Person Liability ...................... 20

        6.    The Complaint Adequately Pleads Exchange Act §20A Claims ................................................................................... 21

    B.    The Complaint Alleges Securities Act Violations ............................. 22

V.      CONCLUSION ........................................................................................... 22

- i -

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) ......................................................19

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ..............................................................................12, 13

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharm., Inc.*,
2022 WL 4491093 (S.D. Cal. Sep. 27, 2022) ....................................................18, 19

*Douglas v. Norwegian Cruise Lines*,
2021 WL 1378296 (S.D. Fla. Apr. 12, 2021)......................................................13

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................................19

*Elsayed v. Maserati N. Am. Inc.*,
215 F. Supp. 3d 949 (C.D. Cal. 2016)................................................................9

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ............................................................................22

*Glazer Cap. Mgmt., L.P. v. Forescout Techs. Inc.*,
63 F.4th 747 (9th Cir. 2023)...............................................................................14, 15

*Herman & Maclean v. Huddleston*,
459 U.S. 375 (1983) ............................................................................................22

*Hollinger v. Titan Cap. Corp.*,
914 F.2d 1564 (9th Cir. 1990).............................................................................20

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ............................................................................6

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021), *cert. denied sub nom.*
*Alphabet Inc. v. R.I.*, __U.S. __, 142 S. Ct. 1227 (2022)........................5, 12, 13

4883-3924-8499.v1

**Page**

*In re Am. Apparel, Inc. S'holder Litig.*,
2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ......................................................21

*In re BioMarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ..........................................................18

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020), *cert. denied*,
___ U.S. ___, 142 S. Ct. 71 (2021) ......................................................................19

*In re Fibrogen, Inc.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022)......................................................16

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008).............................................................................19

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008).................................................................7

*In re Mattel, Inc. Sec. Litig.*,
2021 WL 1259405 (C.D. Cal. Jan. 26. 2021).......................................................14

*In re Musicmaker.com Sec. Litig.*,
2001 WL 34062431 (C.D. Cal. June 4, 2001)......................................................20

*In re Plantronics, Inc. Sec. Litig.*,
2022 WL 3653333 (N.D. Cal. Aug. 17, 2022).............................................. 11, 18

*In re Progenity, Inc. Sec. Litig.*,
2023 WL 219345 (S.D. Cal. Jan. 13, 2023) .........................................................13

*In re Qualcomm Inc. Sec. Litig.*,
2019 WL 1239301 (S.D. Cal. Mar. 18, 2019)......................................................16

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017).............................................................................10

*In re QuantumScape Secs. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022)...................................................................9

- iii -

**Page**

*In re Questcor Sec. Litig.*,
    2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ................................................. 18, 19

*In re VeriFone Holdings, Inc., Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ........................................................... 14, 17

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs.*
 *& Prod. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ............................................. 17

*Karinski v. Stamps.com, Inc.*,
    2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ......................................... 12

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ................................................ 12, 13, 20

*Lamartina v. VMware, Inc.*,
    2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) .................................... 21, 22

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
    2008 WL 7084629 (C.D. Ca. July 10, 2008) ....................................... 21

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) .............................................. 14

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ....................................................... 19, 20

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ..................................................... 15, 18

*Oh v. Hanmi Fin. Corp.*,
    621 F. Supp. 3d 1075 (C.D. Cal. 2022) ............................................... 5

*Omnicare, Inc. v. Laborers Dist. Council Const.*
*Indus. Pension Fund*,
    575 U.S. 175 (2015) ..................................................................... 9

*Pebble Beach Inv. Grp., LLC v. Square One Starts, LLC*,
    2021 WL 2531150 (N.D. Cal. June 21, 2021) ....................................... 9

- iv -

4883-3924-8499.v1

**Page**

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
   2023 WL 3569068 (S.D.N.Y. May 19, 2023)......................................................13

*Purple Mountain Tr. v. Wells Fargo & Co.*,
   432 F. Supp. 3d 1095 (N.D. Cal. 2020) ..............................................................14

*Ret. Sys. v. EnergySolutions, Inc.*,
   814 F. Supp. 2d 395 (S.D.N.Y. 2011).................................................................18

*Robeco Cap. Growth Funds SICAV - Robeco Glob.
Consumer Trends v. Peloton Interactive, Inc.*,
   2023 WL 2711342 (S.D.N.Y. Mar. 30, 2023) ....................................................13

*S. Ferry LP No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008).......................................................................15, 17

*Sanders v. RealReal, Inc.*,
   2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) ......................................................8

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
   2019 WL 4859099 (N.D. Cal. Oct. 2, 2019)........................................................17

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..........................................................8, 15

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) ...........................12, 13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ...........................................................................................14

*The Winer Family Tr. v. Queen*,
   2004 WL 2203709 (E.D. Pa. Sept. 27, 2004),
   *aff'd*, 503 F.3d 319 (3d Cir. 2007) ......................................................................9

*Turocy v. El Pollo Loco Holdings, Inc.*,
   2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)................................................15, 18

*Turocy v. El Pollo Loco Holdings, Inc.*,
   2018 WL 3343493 (C.D. Cal. July 3, 2018) .......................................................21

- v -

|  | **Page** |
|---|---|

*Weston v. DocuSign, Inc.*,
    2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) ...................................................... 13

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011), *overruled in part
    on other grounds by Lorenzo v. SEC*,
    __U.S. __, 139 S. Ct. 1094 (2019) ...................................................................... 16

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005).................................................................. 16

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................................... 17

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §77k ..................................................................................................................... 22
    §77l ...................................................................................................................... 22
    §77z-1 ......................................................................................................... 6, 13, 15
    §78j(b) .................................................................................................................... 6
    §78o .................................................................................................................... 20
    §78t(a)................................................................................................................... 20
    §78t-1.............................................................................................................. 21, 22
    §78u-4(b)(1)(B) ................................................................................................... 6, 7

Federal Rules of Civil Procedure
    Rule 12(b)(6) ..................................................................................................... 5, 19

- vi -

## TABLE OF ABBREVIATIONS

| ABBREVIATION | DEFINITION |
|---|---|
| ¶___ and ¶¶___ | Citations to paragraphs in the Complaint |
| Complaint | Plaintiffs' Consolidated Class Action Complaint for the Violation of Federal Securities Laws (ECF 59) |
| CW | Confidential Witnesses |
| DC or Distribution Center | Distribution Center in West Jefferson, Ohio as described in ¶¶44-45 |
| Defendants | Torrid Holdings, Inc., Lisa Harper ("Harper"), Stefan L. Kaluzny ("Kaluzny"), Theo Killion ("Killion"), Dary Kopelioff ("Kopelioff"), Elizabeth Muñoz ("Muñoz"), George Wehlitz ("Wehlitz"), Sycamore Defendants |
| Ex. __ | Refers to the attachments to the Declaration of Austin Norris in Support of Defendants' Motion to Dismiss Amended Class Action Complaint with Prejudice (ECF 72) |
| HR | Human Resources |
| IPO | Torrid's initial public offering conducted on July 1, 2021 |
| Plaintiffs | Lead Plaintiff City of Warren Police and Fire Retirement System and additional plaintiff Erika Schroth |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| Sycamore | Sycamore Partners Management, L.P. |
| Sycamore Defendants | Sycamore Partners Management, L.P., Sycamore Partners Torrid, LLC, Sycamore Partners, L.P., Sycamore Partners Associates-C, L.P., Sycamore Partners Associates, L.P., Sycamore Partners Associates Investments, L.P., Sycamore Partners (Co-Invest), LLC, and Sycamore Partners Associates Co-Invest, L.P. |
| TB | Defendant Torrid Holdings Inc. et al. Notice of Motion and Motion to Dismiss Amended Class Action Complaint with Prejudice (ECF 71) |
| Torrid or the Company | Torrid Holdings, Inc. |

- vii -

4883-3924-8499.v1

| ABBREVIATION | DEFINITION |
|---|---|
| UB or UW Defendants' MTD | Underwriter Defendants' Notice of Motion and Motion to Dismiss and Joinder; Memorandum of Points of Authorities in Support Thereof (ECF 74) |
| Underwriter or UW Defendants | Morgan Stanley & Co. LLC, BofA Securities, Inc., Goldman Sachs & Co. LLC, Jefferies LLC, Robert W. Baird & Co. Incorporated, Cowen and Company, LLC, William Blair & Company, L.L.C., and Telsey Advisory Group LLC |

- viii -

4883-3924-8499.v1

## I.   INTRODUCTION

This class action arises out of Defendants' desire to unload over 12 million shares of their personal holdings of Torrid common stock for over $265 million in proceeds through Torrid's July 21, 2021 IPO.  However, unlike most IPOs, the Company received no proceeds.  Only Torrid's insiders benefitted – using the IPO to pocket millions by making public misstatements and omissions about Torrid's business model while unwitting investors were damaged.

Here, Torrid went public in the middle of a pandemic on Defendants' false assurances that it had in place a "data-driven approach to design, merchandising and inventory planning" with a flexible operating model that allowed Torrid "to respond quickly to the latest sales trends" (¶77), "make adjustments to . . . current offering[s] based on customer feedback" (*id.*) and "read and react with shallow initial buys" to evaluate customers' preferences while "minimizing fashion and inventory risk" (¶78). The Registration Statement also falsely represented that Torrid's only distribution facility was "highly automated," "state-of-the-art," and "capable of handling . . . existing and future needs." ¶83.  Defendants falsely assured investors that these data-driven merchandising strategies would improve Torrid's margins by lowering inventory risk and limiting markdowns. ¶¶77-78.  This was significant to investors because margins are a key indicator of Torrid's (and the retail industry's) profitability. The day of the IPO, defendant Muñoz gave an interview confirming that Torrid had previously filed for an IPO, but withdrew the filing just two years earlier (in 2019) due to Torrid's inventory management challenges, including lack of targeted and disciplined controls around inventory planning and demand.  Muñoz's interview confirmed, and left investors believing, that the July 2021 IPO's timing was now right, and the inventory management issues Torrid suffered in the past were resolved.

But contrary to Defendants' statements, prior to the IPO, Torrid had abandoned its data-driven merchandising strategies because of persistent and lengthy shipment

- 1 -

4883-3924-8499.v1

delays and increased lead times during the pandemic and, instead, had been purchasing large quantities of inventory in excess of demand. When this over-ordered inventory arrived at the DC, it sat in a pile-up of trailers that went unprocessed for weeks because of severe DC staffing shortages, which created huge customer order backlogs and caused a build-up of inventory that was becoming increasingly obsolete and out-of-season.

These problems only worsened following the IPO. Delayed shipments prior to and after the IPO, and Torrid's continued departure from data-driven disciplined ordering, caused Torrid's inventory levels to nearly double, adding to the accumulation of obsolete and seasonally-stale inventory that could only be sold through markdowns and promotions. The DC's insufficient capacity and staffing meant dozens of trailers full of thousands of units of inventory continued to sit unprocessed for weeks in the DC parking lot, and in some cases were not processed until the following quarter.

The truth came out in a series of partially corrective disclosures revealing the negative financial impact of Defendants' decision to abandon Torrid's data-driven merchandising model, the resulting build-up of excess inventory and the DC's lack of resources were having on Torrid's sales, earnings and guidance. By the end of the Class Period, Torrid's shares traded at just $3.35 per share – ***an 84% decline*** from its $21.00 IPO share price. ¶8.

Defendants move to dismiss claiming Plaintiffs are merely seeking to hold them liable for pandemic challenges faced by retailers nationwide and that Torrid's as-yet-unrealized risk disclosures absolve them of liability. This grossly mischaracterizes Plaintiffs' allegations and the law. Defendants made false statements and misled investors about the processes Torrid purportedly had in place to manage its inventory, and the significant markdowns and promotional activities Torrid implemented to unload its build–up of stale fashion inventory. This case is, therefore, not about the pandemic's "potential" to cause disruptions to Torrid's operations as Defendants

- 2 -

4883-3924-8499.v1

vaguely warned. Rather it concerns Defendants misrepresenting what was then-occurring due to their own undisclosed decisions.

Because Defendants and the Underwriter Defendants have joined in, and incorporated, each other's arguments (*see* TB at 1-2; UB at i), Plaintiffs incorporate by reference the arguments set forth in the concurrently filed opposition to the Underwriter Defendants' motion to dismiss.

## II.     STATEMENT OF FACTS

Torrid is a clothing retailer with approximately 600 stores in North America. ¶42. Torrid also operates an e-Commerce sales channel, selling items online and shipping them directly to consumers. ¶45. Nearly all Torrid merchandise is sourced from manufacturers in Asia. ¶49. Torrid receives the Company's inventories at its only distribution facility in West Jefferson, Ohio, where the merchandise is stored, sorted, packed, and shipped directly to customers or retail stores. ¶44.

When COVID-19 began spreading throughout Asia in late 2019, many companies that relied upon suppliers in Asia, like Torrid, experienced delays. ¶¶49, 55, 67. CW-1, who worked at Torrid's DC from December 2019 until March 2022 as an Inventory Control and Audit Specialist, reported that before the IPO, inventory flow into the DC was a constant problem with Torrid receiving merchandise orders from its suppliers up to three months late, causing a growing backlog of unshipped customer orders. ¶¶34-36, 67.

Unbeknownst to investors, Torrid had responded to these pandemic pressures by abandoning its data-driven merchandising strategies. ¶69. In fact, defendant Harper admitted in a December 8, 2022 Earnings Call that Torrid's "data-driven" merchandising strategies "had been lost over the pandemic time period," identifying "[read] and react," "chase mode," "chase capabilities," and "core disciplines" as the key components that had been abandoned before the IPO. ¶230; Ex. 10 at 7. Instead, Defendants had replaced those data-driven processes with large inventory orders that

- 3 -

4883-3924-8499.v1

were well in excess of demand. ¶69. Without data-driven strategies such as "[read] and react," Torrid's product development and inventory decisions were a proverbial "shot in the dark" and resulted in the Company over-ordering massive quantities of inventory, which lacked demand. ¶¶69-70.

According to CW-1, Torrid's DC was also chronically understaffed prior to and throughout the Class Period, resulting in inventory not being received or recorded in the inventory management system for months. ¶¶35-36. CW-1 reported as many as 50 or 60 trailers full of inventory were parked in the DC parking lot, un-received and unprocessed for weeks. *Id*. CW-2, who worked at Torrid's DC from April 2019 to November 2022, recalled as many as 40 unprocessed trailers in the lot. ¶39. CW-1 stated the understaffing problem grew worse after the IPO, with employee turnover nearly doubling, forcing the Company to hire "literally everyone" who applied, regardless of experience or skillset. ¶36.

Torrid's abandonment of its data-driven merchandising strategies, the ordering of large inventory quantities irrespective of demand, and persistent staffing issues, resulted in a significant accumulation of inventory at the DC, with dozens of trailers of inventory sitting unprocessed in the parking lot before and after the IPO. ¶¶39, 69-71. Torrid's excessive ordering caused ballooning inventory levels that the DC lacked the capacity to hold. ¶¶39, 70-71. According to CW-1, by the time the trailer inventory was eventually processed, it was out-of-season and required deeply discounted prices to move. ¶35.

Rather than disclose these conditions to investors, the Registration Statement touted Torrid's data-driven merchandising strategies, claiming that, among other things, the Company used "a read-and-react testing approach with shallow initial buys to iterate [Torrid's] New product offering, thus minimizing fashion and inventory risk." ¶78. The Registration Statement also misrepresented Torrid's Distribution Center as "highly automated," "state-of-the-art," and "capable of handling … existing and future needs" (¶83), despite the ongoing problems with inventory receiving and

- 4 -

4883-3924-8499.v1

processing (¶35) and its lack of storage capacity (¶39), and misrepresented that Torrid had demonstrated "strong resiliency amid the COVID-19 pandemic" and that the Company's "agile response to COVID led to sequential improvement in comp sales growth" (¶85).

Following the IPO, Defendants continued misrepresenting that Torrid used a "data-driven approach to design and product development" (¶132) and purported "flexible operating model allows [the Company] to quickly read and react to our customers' preferences" (¶138) and the capabilities of its DC (¶160), which continued to be untrue.

Beginning in December 2021, investors learned through a series of partially corrective disclosures the truth about Torrid's previously undisclosed issues stemming from inventory delays, abandonment of its data-driven merchandising model and lack of capacity at Torrid's DC.  ¶¶225-31.  By the end of the Class Period, Torrid's stock price was $3.35 per share, *an 84% fall* from the $21 IPO price.  ¶8.

## III.   LEGAL STANDARD

To withstand a Rule 12(b)(6) motion, the Complaint must be "plausible on its face." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 698 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. R.I.*, __U.S. __, 142 S. Ct. 1227 (2022).[1]  "A complaint is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.*  The Court "'must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff.'"  *Oh v. Hanmi Fin. Corp.*, 621 F. Supp. 3d 1075, 1082 (C.D. Cal. 2022).

---

[1]   All emphasis is added and internal citations omitted unless otherwise noted.

- 5 -

4883-3924-8499.v1

## IV.    ARGUMENT

### A.    The Complaint Adequately Pleads §10(b) Claims

Defendants' motion challenges falsity, scienter, and loss causation.    As discussed below, these challenges fail.

#### 1.    Defendants' Statement Were Materially False and Misleading[2]

The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1)(B).  Plaintiffs' alleged statements meet these requirements.[3]

**Defendants' Data-Driven Merchandising Model Misstatements**.  In the Registration Statement and throughout the Class Period, Defendants made materially false statements and omitted material facts relating to Torrid's product development and demand validation, and inventory planning strategies, and the impact of those strategies on Torrid's revenues and margins, falsely claiming that Torrid:

- employs a "data-driven approach to design, merchandising and inventory planning" (¶¶56, 77, 138, 141, 159, 163, 175);

- uses a "read and react testing approach" with "shallow initial buys" to iterate new product offerings, "minimizing inventory" and "fashion risk" (¶¶57, 76, 78, 138, 159);

- has "rigorous discipline around inventory," "clear guidelines," "item-level assortment planning and formal product hindsight reviews" to

[2]    Contrary to Defendants' claims (TB at 19), the Complaint alleges Kaluzny and Kopelioff made misstatements by signing the false IPO Registration Statement in violation of the Exchange Act. *See* ¶¶102, 129; *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061-66 (9th Cir. 2000) (When a corporate official "signs a SEC filing containing misrepresentations," he "'make[s]' a statement so as to be liable as a primary violator under §10(b).").

[3]    Appendix A attached hereto is a summary chart identifying the Complaint's misstatements, the reasons why they are false and misleading, and the allegations supporting scienter. *See* Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Request for Judicial Notice at 5.

- 6 -

create "substantial growth across all major product categories" and "healthy gross profit margin performance" (¶¶59, 79-80);

- uses "disciplined planning and product lifecycle management strategies" to "enable effective in-season inventory management," "limit markdowns," and "maximize inventory turns and productivity" (*id.*); and

- employs a "speed model" to enhance supply chain flexibility, "accelerate product replenishment cycles, improve inventory turnover and drive higher margin sales" (¶¶59-61, 80, 87).

These statements were false and misleading because before the IPO Defendants abandoned these strategies and were instead purchasing large inventory quantities in excess of demand, creating a significant inventory build-up that was becoming increasingly obsolete and out-of-season, and was increasing inventory risk, rather than reducing it. ¶84. Defendants claim Plaintiffs made this abandonment allegation up (TB at 7), but that is belied by their own Ex. 10. Consistent with Plaintiffs' allegations, Ex. 10 confirms that at the end of the Class Period, defendant Harper admitted that essential components of Torrid's data-driven merchandising process, "***had been lost over the pandemic time period***." ¶230. Harper conceded that Torrid's "[read] and react" testing and "core disciplines" around product planning and demand were not in place during the Class Period, and that Torrid was only then-working on reinstating them. *See* Ex. 10 at 7. While Defendants complain that a typo prevented them from identifying this allegation, they nonetheless submitted the entire transcript containing Harper's admission. *See id.*

Defendants also challenge the data-driven merchandising model statements as non-actionable puffery. But a statement is puffery only if it is not "capable of objective verification" and "'so "exaggerated" or "vague" that no reasonable investor would rely on it when considering the total mix of available information.'" *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008). Here, Defendants rely on selective quotes that, when read in context, misled investors by "'creat[ing] an impression of a state of affairs that differs in a material way from

- 7 -

the one that actually exists.'" *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1135 (N.D. Cal. 2017). For instance, Defendants' claim that "read-and-react testing" is puffery ignores the full context of the statement where Defendants falsely stated that the strategy used "shallow initial buys" to "minimiz[e] fashion and inventory risk." ¶78. Similarly, Defendants pluck "rigorous discipline" out of a statement that, when read with context, explains its specific and verifiable meaning. *See* ¶79 ("rigorous discipline around inventory performance by establishing clear guidelines on in-season product [which] maximize[s] inventory turn and productivity" and "limit[s] markdowns"); *Sanders v. RealReal, Inc.*, 2021 WL 1222625, at *10 (N.D. Cal. Mar. 31, 2021). These statements – taken as a whole – are plainly capable of objective verification and are precisely what reasonable investors rely on when making investment decisions.

**Defendants' Distribution Center Misstatements**. In the Registration Statement, and throughout the Class Period, Defendants made false statements and omissions relating to Torrid's DC, falsely claiming:

- "We acquired the operations of the fully-functional, state-of-the-art distribution center in West Jefferson, Ohio in 2018. This 750,000 square foot facility is highly automated and we believe is capable of handling our existing and future needs" (¶¶83, 160); and

- "If the distribution facilities servicing our business were to encounter difficulties . . . we could face shortages of inventory in our stores, delayed shipments to our e-Commerce customers and harm to our reputation" (¶81).

These statements were materially false and misleading because according to the CW accounts: (i) at the IPO, "inventory flow into the Distribution Center was a constant problem" because Torrid had been receiving merchandise orders up to three months late – causing Torrid to abandon its purported data-driven merchandising model and pre-purchase large inventory quantities in excess of demand; (ii) Torrid had insufficient staffing to timely process these large inventory quantities, causing an

- 8 -

increase in inventory on hand, while millions of customer orders went unfulfilled for months; (iii) due to insufficient staffing, as many as 50 to 60 trailers full of unprocessed inventory were parked in the DC parking lot during CW-1's tenure; and (iv) Torrid had to offer merchandise at "deeply discounted prices" to move the inventory that had become obsolete and/or seasonally-stale.  ¶¶6-7, 34-41, 67-68, 74.

Defendants also erroneously contend the Registration Statement's Distribution Center statements are non-actionable opinions (*e.g.*, "we believe [the center] is capable of handling our existing and future needs" ¶160) (TB at 8-9; UB at 13).  But, inserting the word "believe" does not immune Defendants from liability.  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 193 (2015) ("'we believe' . . . can preface nearly any conclusion, and the resulting statements . . . remain perfectly capable of misleading investors.").  Moreover, when read in context, Defendants represented the DC was "capable of handling our existing and future needs" including by "continuing to . . . position us to execute on our unified commerce strategy," which misleadingly obscured that the DC's inventory processing constraints resulted in unfulfilled customer orders and missed launches.  *See* ¶¶35-36, 83, 160; *see In re QuantumScape Secs. Class Action Litig.*, 580 F. Supp. 3d 714, 738-740 (N.D. Cal. 2022) (statements prefaced with opinion language actionable where underlying facts are "capable of being proven true or false").  Even Defendants' cited authority acknowledges that "state-of-the-art" may be actionable when read in context.  *See Pebble Beach Inv. Grp., LLC v. Square One Starts, LLC*, 2021 WL 2531150, at *1 (N.D. Cal. June 21, 2021) (context may have made "state-of-the-art" actionable); *cf. The Winer Family Tr. v. Queen*, 2004 WL 2203709, at *17 (E.D. Pa. Sept. 27, 2004), *aff'd*, 503 F.3d 319 (3d Cir. 2007) ("state-of-the-art" actionable).[4]

---

[4]   *Elsayed v. Maserati N. Am. Inc.*, 215 F. Supp. 3d 949, 960-61 (C.D. Cal. 2016) is inapt given it concerns express warranties rather than fraudulent statements under the Exchange Act.

- 9 -

4883-3924-8499.v1

**Defendants' COVID-19 Misstatements**.  In the Registration Statement, and throughout the Class Period, Defendants made materially false statements and omissions relating to Torrid's response to, and the impact of, COVID-19, falsely claiming that Torrid:

- has demonstrated "strong resiliency amid the COVID-19 pandemic" and an "agile response to COVID" which "led to sequential improvement in comp sales growth," an "accelerating margin profile" and "rapid profitability and earnings growth" (¶85);

- "proactively implemented various initiatives … minimizing the financial impact of COVID-19 and continuing to build the foundation for future growth and profitability" (¶86);

- "[m]ade targeted investments and changes to [its] process to improve the speed and flexibility of our supply chain including shortening our development cycle by two weeks" (¶87);

- the Company's "lower gross profit margin" in 2020 was only a "temporar[y]" impact of COVID-19 and that Torrid demonstrated "the resiliency of [its] business model" in the face of the COVID-19 pandemic when net sales growth began to rebound in May 2020 (¶89); and

- was successfully navigating supply chain with its "powerful and nimble operating model," "delivering for [Torrid's] customer and meeting her needs despite the current operating environment" (¶144).

These misstatements were materially false and misleading because, in the months leading up to IPO, as a result of COVID-19-related delays, manufacturing lead-time increased dramatically, severely limiting Torrid's ability to respond to consumer demand.  ¶¶69, 201-02, 230.  As a result, Torrid over-ordered inventory. ¶70. Moreover, persistent, worsening staffing issues throughout the pandemic caused a logjam of trailers full of unprocessed inventory in the DC parking lot which, once finally processed, resulted in sky-rocketing inventories.  ¶¶35-36, 71.  Thus, Defendants' statements were materially false and misleading when made. Defendants' claim that these statements are puffery is unavailing. *In re Quality Sys.,*

- 10 -

*Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) ("even 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly"); *see also In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *16 (N.D. Cal. Aug. 17, 2022) (statements not puffery where they gave an "inaccurate impression" about the Company's health.).

**Defendants' Inventory and Promotional Activity Misstatements.** Defendants also falsely represented throughout the Class Period that Torrid did not need to offer large discounts to sell inventory and:

- "see[s] promotional activity [in 2022] to be similar to '21," expects "[2022] to be more of a normalized year related to [promotions and discounts]," and "feel[s] comfortable with both [the] current inventory position and the flow of shipments" (¶¶154, 156);

- "[g]oing forward . . . plan[s] to take a more surgical approach to promotions" (¶167); and

- "[was] able to clear [its] projected levels of excess inventory and expect[s] to have assortments in a balanced position by mid-September [2022]" (¶171).

These misstatements, among others (*e.g.*, ¶146) were materially false and misleading because: (i) Defendants admitted Torrid abandoned its data-driven merchandising strategies prior to the IPO (¶¶201, 230), resulting in excess inventory (¶¶35, 39, 186); (ii) according to CW-1, Torrid could not timely process the massive inventories, causing Torrid to miss seasonal launches, and requiring Torrid to offer deeply-discounted "flash sales" to move the excess inventory (¶¶35, 68); and (iii) contrary to Defendants' claim that Torrid could clear its projected excess inventory during the first half of 2022 (¶171), Torrid's inventories were still growing in the second half of 2022 (¶71) and would require additional promotions to sell (¶186).

Defendants reduce the inventory and promotion statements to soundbites that Torrid felt very "good" or "'comfortable' with inventory levels" to claim they are

- 11 -

non-actionable.  TB at 11.  But that mischaracterizes these allegations.  Here, Defendants concealed their abandonment of Torrid's data-driven merchandising model, inventory delays and over-purchases, which were causing ballooning inventories and significant inventory risk.  ¶¶69-71.  Defendants' statements are actionable because they gave investors a misleading impression that Torrid had a handle on inventory when in reality, obsolete and out-of-season inventory was rapidly growing, and trailers of unprocessed inventory were amassing in the DC parking lot. ¶¶35, 39-40; *see Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *11 (C.D. Cal. Jan. 17, 2020) ("'very happy'" actionable where "statements 'affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]'").

### 2. Torrid's Purported Risk Disclosures Do Not Absolve Them of Liability

Defendants' claim Torrid's disclosures about the pandemic's risks immune them from liability.  Not so.  The Ninth Circuit consistently finds where, as here, "[r]isk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." *Alphabet*, 1 F.4th at 703; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1016 (9th Cir. 2018) (statements warning new data "*may* be inconsistent" with prior results misleading when defendants knew "that the 'new data' revealed exactly that") (emphasis in original); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985-87 (9th Cir. 2008) ("[L]earning that stop-work orders *might* be issued is quite different from knowing they were *in fact* issued.")  (Emphasis in original); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (same), *aff'd*, 563 U.S. 27 (2011).

Defendants' arguments that "Torrid's Registration Statement contained extensive warnings related to the pandemic and its *potential impact*" exemplify the problem in each of these purported risk disclosures – they spoke in terms of potential,

- 12 -

yet-to-be events, when the law requires disclosure of present-conditions. TB. at 2-3 (citing seven risk statements, each couched as contingencies – warning of "potential" problems that "could" or "may" occur). Plaintiffs' allegations here, that the Registration Statements' risk warnings described already materialized problems (*e.g.*, the build-up of excess inventory), are thus akin to those found actionable in *Alphabet*, *Khoja*, *Berson*, and *Matrixx*. ¶¶35-36, 38-40. For example, the Registration Statement's purported risk disclosures stated "'[t]he COVID-19 outbreak **has the potential to cause** a disruption in our supply chain.'" TB at 2. But Plaintiffs allege this risk had already materialized at the time of the IPO because pre-IPO, Torrid had abandoned its data-driven merchandising strategies due to ongoing shipment delays, and was instead purchasing large inventory quantities in excess of demand and creating a build-up of excess obsolete and seasonally-stale inventory. *See Weston v. DocuSign, Inc.*, 2023 WL 3000583, at \*17 (N.D. Cal. Apr. 18, 2023) ("disclosures about the pandemic's impact did not alert investors that some of those risks may have already come to fruition").

Torrid's "warnings" — that "[i]nventory levels . . . **may** exceed planned levels, leading to higher markdowns" (TB at 3) and "[o]ur failure to identify and react appropriately to new and changing product trends" and "to accurately forecast demand . . . **could lead to** . . . excess or insufficient amounts of inventory, markdowns and write offs, which could materially adversely affect our business" — are likewise insufficient because those risks had already materialized. See Ex. 3 at 22.[5]

---

[5] Defendants' cases are inapposite. *See Douglas v. Norwegian Cruise Lines*, 2021 WL 1378296, at \*6 (S.D. Fla. Apr. 12, 2021) (finding the alleged misstatements inactionable as immaterial puffery, not that defendants' risk warnings were sufficient): *In re Progenity, Inc. Sec. Litig.*, 2023 WL 219345, at \*9 (S.D. Cal. Jan. 13, 2023) (dismissing plaintiff's claims where, unlike here, defendants disclosed "that they **had begun** to observe 'significant declines'"); *Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 2023 WL 2711342, at \*12 (S.D.N.Y. Mar. 30, 2023) (finding risk warnings sufficient to bring other alleged misstatements statements within the PSLRA); *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at \*20 (S.D.N.Y. May 19, 2023) (dismissing claims that defendants "failed to accurately predict the future," as opposed to a failure to accurately describe present conditions as alleged here).

- 13 -

4883-3924-8499.v1

### 3.    Plaintiffs Have Adequately Pled Scienter

To plead scienter, Plaintiffs must allege actual knowledge or "[r]ecklessly turning a 'blind eye' to impropriety." *In re VeriFone Holdings, Inc., Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012).  Defendants are deliberately reckless when they "'had reasonable grounds to believe material facts existed that were misstated or omitted'" but "'failed to obtain and disclose such facts although [they] could have done so without extraordinary effort.'" *In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *7 (C.D. Cal. Jan. 26. 2021).  Evaluating scienter requires Plaintiffs' allegations to be "taken collectively" and "holistically." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007).  An inference is "'strong'" if it is "at least as likely" as opposing ones.  *Id*. at 324, 328-29.  The following allegations when viewed holistically raise a strong inference of scienter.[6]

**Defendants' Latter Admissions Support Scienter**.  Where defendants "later admitted they knew about problems . . . when they made their . . . misstatements or omissions," scienter is sufficiently pled.  *Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1106 (N.D. Cal. 2020); *see also Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("later statement" may evidence scienter "if the later statement directly contradicts or is inconsistent with the earlier statement'").  Here, at the end of the Class Period, Harper admitted that essential components of Torrid's data-driven merchandising process "***had been lost over the pandemic time period***."  ¶230.  Harper conceded that Torrid was only now working to reinstate "chase mode," "[read]-and-react," and "core disciplines" around product planning though Defendants touted using these processes throughout the Class

---

[6]  Defendants' challenges to the CW allegations fail for the same reasons as discussed in the opposition to the UW Defendants' MTD, and Plaintiffs incorporate them herein.  *See* §III.D.1; *see also Glazer Cap. Mgmt., L.P. v. Forescout Techs. Inc.*, 63 F.4th 747, 771 (9th Cir. 2023) (the adequacy of the complaint "does not depend on each CW possessing inside knowledge about corporate-level trends; Plaintiffs need only provide a basis for each CW's knowledge about the specific statements he made").

- 14 -

4883-3924-8499.v1

Period.  *See* Ex. 10 at 7.  Similarly, just six months after representing the DC was capable of handling Torrid's existing and future needs (¶160), Harper publicly admitted that Torrid had to upgrade the DC because it lacked sufficient capacity.  ¶83; *see Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232-33 (9th Cir. 2004) (defendants' admissions that software needed certain fixes contributed to inference of scienter).  These admissions strongly support scienter.

Defendants try to rebut Harper's admission that Torrid abandoned its data-driven merchandising processes using extraneous evidence.  *See* TB at 6-7; Ex. 42.  But Defendants' improper evidence does not negate the admission; it simply creates an issue of fact inappropriate to resolve at this stage.

**Defendants' Access to Internal Inventory Information**.  Allegations "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information."  *S. Ferry LP No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008); *see Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *16-*17 (C.D. Cal. Aug. 4, 2017) (scienter pled where defendants had access to dashboards and real-time data regarding the relevant operations and one executive monitored that data); *Twitter*, 282 F. Supp. 3d at 1134 (defendant's statements "strongly imply that he had access to the disputed information" where he "'bridged the scienter gap … by referencing data directly.'").

Here, according to CWs, Defendants had access to periodic inventory accounting reports and logs containing detailed information about the DC's inventory flow, including status of incoming inventory, number of trailers incoming and received, and whether trailers had been processed.  ¶¶34, 38.  Torrid's executives (including Defendants) had access to Torrid's WMS system and its 25-part KPI dashboard which generated, *inter alia*, inventory valuation and order fulfillment reports.  ¶48.  Despite Defendants' assertions (TB at 15), the CWs are described in sufficient detail to establish reliability (*e.g.*, position, tenure, and job duties) to support these allegations.  ¶¶34-41; *Forescout*, 63 F.4th at 771 (CWs do not need knowledge

- 15 -

4883-3924-8499.v1

of corporate-level activities for their statements to "combine to tell a plausible story.").

**Defendants' Responses to Analyst Questions**.  Statements "in response to questions from analysts and investors" can contribute to a strong inference of scienter. *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at \*11 (S.D. Cal. Mar. 18, 2019); *In re Fibrogen, Inc.*, 2022 WL 2793032, at \*24 (N.D. Cal. July 15, 2022) (same).

Here, Defendants provided detailed and specific information in response to questions from securities analysts regarding Torrid's inventory.  ¶203 (Muñoz: "We don't necessarily use promotions to drive product . . . ."); ¶205 (Wehlitz: Delay "has increased what we have in-transit in the water, not in our buildings."); ¶206 (Harper: "[W]e're really comfortable with the mix of inventory between clearance and regular price.").  These detailed responses strongly support scienter.

**Defendants' 2019 Abandonment of Torrid's Prior IPO**.  Muñoz, who became Torrid's CEO in 2018, confirmed Torrid withdrew its IPO in 2019 because Torrid lacked inventory discipline:

> We didn't have our head around inventory management.  We had no targets or disciplines around how we acquired inventory.  And . . . there was a constant proliferation of SKUs.  So with not having our inventory problem sorted out, and not having all the right leadership in place, we pulled the filing.  It just didn't feel like the right time.

¶52.  Muñoz emphasized that "the timing was right this time around for our [2021] IPO, both culturally as well as where we are as a company." ¶54.  Muñoz's comments about Torrid's lack of inventory discipline in 2019 and subsequent comments about "where we are as a company" and that "the timing was right this time around" in 2021 strongly suggests Muñoz was fully aware of ongoing inventory issues at the IPO, or deliberately reckless in discussing it without first informing herself about the Company's condition.  *Id*.; *see Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, \*970-\*72 (N.D. Cal. 2005) (facts "before the proposed class period" support scienter); *see also WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039,

- 16 -

1052-53 (9th Cir. 2011), *overruled in part on other grounds by Lorenzo v. SEC*, __U.S. __, 139 S. Ct. 1094 (2019) (same).

**Core Operations**. Factual allegations support scienter under the core operations doctrine when "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry*, 542 F.3d at 785-786. Like other fashion retailers, inventory was so critical to Torrid's financial performance that it would be absurd to suggest Defendants were unaware of Torrid's pre-IPO abandonment of its data-driven merchandising model, excessive inventory ordering, and the trailers in the DC lot that remained unprocessed because of DC constraints, resulting in unfulfilled customer orders and missed seasonal launches. It would be particularly absurd for Muñoz – a self-claimed "product person" who admittedly had hands-on involvement in Torrid's inventory management – to not know of the very issues negatively impacting Torrid's business. ¶¶52-54; *see VeriFone*, 704 F.3d at 710 (defendant's hands-on management style weighs in favor of scienter).

**Executive Departures**. Executive departures support scienter where allegations provide "sufficient information to differentiate between a suspicious change in personnel and a benign one." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009); *SEB Inv. Mgmt. AB v. Symantec Corp.*, 2019 WL 4859099, at *5 (N.D. Cal. Oct. 2, 2019) (multiple executive departures with suspicious timing "is uncharacteristic and thus contributes to scienter").

Here, within two years of Torrid's IPO, all four of the directors and members of senior management listed in the Registration Statement—Wehlitz, Muñoz, Chief Strategy Officer Michael Salmon, and Chief Merchandising and Product Officer Anne Stephenson—plus the Company's new CFO Tanner MacDiarmid (who only held the position for approximately 4 months) and head of HR Kelly McGuire Diehl had either resigned, been fired, or replaced. ¶215; *see In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2017 WL 66281, at *14 (N.D. Cal. Jan. 4, 2017)

- 17 -

4883-3924-8499.v1

("[R]eplac[ing] virtually all of [defendant's] prior management' . . . is also compelling evidence of scienter."). Accordingly, these allegations support an inference of scienter.

**Defendants' Stock Sales and Compensation Packages**. Defendants' more than $235 million in proceeds, support a strong inference of scienter. ¶222. "'Motive can be a relevant consideration'" to scienter "'and personal financial gain may weigh heavily in favor of a scienter inference.'" *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022); *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *18 (C.D. Cal. Oct. 1, 2013) (sales of $101 million support scienter). Indeed, IPO sales provide a "concrete and massive economic benefit" which "'could clearly be characterized as "unusual insider trading activity[.]"'" *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 421 (S.D.N.Y. 2011).

Because Torrid's IPO was undertaken solely for insiders' benefit, Defendants were highly motivated to issue misstatements to maximize their gains. ¶4; *see Turocy*, 2017 WL 3328543, at *18 (scienter alleged where "[d]efendants sold at the earliest possible moment, while aware of negative information kept from investors"). Muñoz and Wehlitz also received over $28 million and $22.7 million, respectively, in fully-vested Torrid common stock in connection with the IPO. ¶223. Muñoz then received another $1.5 million of Torrid stock as an "IPO Award," with 50% of those shares vesting immediately. ¶¶223-224; *see Plantronics*, 2022 WL 3653333, at *19 (allegation individual defendant "stood to benefit, and did benefit, from higher executive compensation" due to the fraud supported scienter).

Defendants' attempt to discount Defendants' stock sales must be rejected. TB at 16. First, "where, as here, stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings." *Oracle*, 380 F.3d at 123; *City of Birmingham Relief & Ret. Sys. v. Acadia Pharm., Inc.*, 2022 WL 4491093, at *13 (S.D. Cal. Sep. 27, 2022) (defendants' substantial class period stock sales and lack of sales supported scienter

- 18 -

notwithstanding percentages). Second, Defendants' lack of trading history does not negate scienter given Torrid's shares debuted in the IPO. TB at 15. Third, Kaluzny's and Kopelioff's lack of stock sales does not undermine scienter because Sycamore's Managing Directors directly benefited from Sycamore selling over 10 million shares – worth more than $210 million – in the IPO. *Id.*; ¶¶19-20. Fourth, Killion's lack of sales neither supports nor negates scienter where, as here, there were considerable gains in suspiciously timed stock sales. *See Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *14 (C.D. Cal. July 1, 2008) (sales by two of five individual defendants support scienter).

Finally, an IPO is not akin to a trading plan and even if Defendants' sales occurred pursuant to a trading plan, which they did not (*see* Exs. 23-41), a "trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales." *See Questcor*, 2013 WL 5486762, at *16.

### 4.     The Complaint Alleges Loss Causation

Pleading loss causation is "not meant to impose a great burden" as it requires "no more than the familiar test for proximate cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Loss causation simply requires a linkage between defendants' alleged fraud and plaintiffs' loss. The corrective disclosures "'need not precisely mirror'" the misrepresentations. *Id.*; *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020), *cert. denied*, ___ U.S. ___, 142 S. Ct. 71 (2021). Thus, loss causation is ordinarily "'not to be decided on a Rule 12(b)(6) motion to dismiss.'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Here, Plaintiffs allege a causal link between the misstatements and omissions, and corrective disclosures of Torrid's disappointing financial performance. Through the alleged series of partially corrective disclosures that caused Torrid's stock price to drop, investors learned the truth: inventory delays were negatively impacting Torrid's

- 19 -

sales and guidance (¶¶142, 227); the DC's lack of resources and capacity negatively impacted sales and earnings (¶¶149, 228); gross margins were declining because of higher discounts and promotions to clear out the glut of stale inventory (¶¶229, 230); and Torrid had abandoned its data-driven merchandising model during the pandemic and throughout the Class Period (¶230). These disclosures revealed what Defendants' misstatements concealed: that inventory delays, inventory over-ordering, Torrid's abandonment of its data-driven merchandising strategies, and trailers of unprocessed inventory were creating a massive build-up of fashion-stale inventory that would, and did, negatively impact Torrid's financial performance. *See First Solar*, 881 F.3d at 753 (loss causation shown where stock price fell upon revelation of negative financial performance).

Defendants' wrongly claim that "changing market conditions" caused Torrid's stock declines. TB at 19. First, this is an issue of fact not proper for a motion to dismiss. *See Khoja*, 899 F.3d at 1003 (recognizing "the prohibition against resolving factual disputes at the pleading stage"). Second, it ignores the Complaint's allegations concerning the market performance of Torrid's peers on the disclosure dates (¶¶227-229) and analyst reactions to Torrid's disclosures (¶¶230-231).

### 5.    The Complaint Pleads Control Person Liability

Because the Complaint adequately alleges primary violations of the Exchange and Securities Acts (*see* §IV.A, *supra*; §IV.B, *infra*), Plaintiffs' control claims against Torrid, the Sycamore Defendants, and the Individual Defendants must be sustained.[7] Defendants' control challenges for Sycamore, Kaluzny, and Kopelioff are meritless. Sycamore was Torrid's controlling, majority shareholder before, during, and after the IPO, and could nominate a majority of Torrid's Board. ¶29; *see In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431, at *17 (C.D. Cal. June 4, 2001)

---

[7]  *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1568 n.4 (9th Cir. 1990) (control person analysis for §15 is the same as §20(a)).

- 20 -

(control alleged where defendants held a majority interest in company prior to IPO, maintained controlling interest post-IPO, and placed three members on the board via a shareholder's agreement).  Kaluzny co-founded Sycamore and continued to control it along with Kopelioff through their respective positions as Managing Directors.  ¶¶18-19, 123-124.  These defendants were also Torrid directors at the time of the IPO who signed the Registration Statement.  ¶¶18-19, 102; *see In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *36 (C.D. Cal. Aug. 8, 2013) ("[T]he presence of Lion Capital designees on the American Apparel board, coupled with those directors' signatures on the 2009 annual report, is sufficient at the pleading stage to state a claim under §20.").

### 6.    The Complaint Adequately Pleads Exchange Act §20A Claims

Section 20A requires "a predicate violation of the securities laws" and "'facts showing that the trading activity of plaintiffs and defendants occur contemporaneously.'"  *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *18 (N.D. Cal. Mar. 31, 2023).  As discussed above, Plaintiffs have alleged predicate violations of the Exchange Act.

Plaintiffs' purchases were also contemporaneous to §20A Defendants' sales. *Compare* ¶¶257, 259, 261, 263 (Sycamore's, Harper's, Wehlitz's, Muñoz's July 6, 2021 sales) *with* ¶¶258, 260, 262, 264 (City of Warren's July 12, 2021 purchase, which occurred within four trading days of sales); *compare* ¶263 (Muñoz's August 29, 2022 sale) *with* ¶264 (Schroth's August 31, 2022 purchase, which occurred within two trading days of Muñoz's sales).  *See Middlesex Ret. Sys. v. Quest Software, Inc.*, 2008 WL 7084629, at *15 (C.D. Ca. July 10, 2008) ("a one-week (five trading day) difference" found contemporaneous); *VMware*, 2023 WL 2763541, at *19 ("four-day trading gap may be considered contemporaneous").

Defendants argue contemporaneity requires that the purchase price equal the sale price.  TB at 21.  Not so.  *See Turocy v. El Pollo Loco Holdings, Inc.*, 2018 WL

- 21 -

4883-3924-8499.v1

3343493, at \*14, \*17 (C.D. Cal. July 3, 2018) (purchasing a security at the same price as defendant sold is not a contemporaneity requirement); *see also VMware*, 2023 WL 2763541, at \*18-\*19 (sustaining §20A claim though plaintiff purchased at a lower price than defendant sold). Plaintiffs have adequately alleged their §20A claims.

## B. The Complaint Alleges Securities Act Violations

Under §§11 and 12, a purchaser "need only show a material misstatement or omission to establish his prima facie case." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983). As explained in §IV.A.1, *supra*, Plaintiffs have adequately alleged that Defendants made material misstatements in the Registration Statement. *See* ¶¶76-112. Plaintiffs incorporate by reference herein their §§11 and 12, arguments against the Underwriter Defendants, which are equally applicable against Defendants here.

## V. CONCLUSION

Wherefore, Defendants' motion should be denied. Should the Court grant the motions to dismiss, in whole or in part, Plaintiffs request leave to amend. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052-53 (9th Cir. 2003).

DATED: August 4, 2023

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
LAURIE L. LARGENT
STEPHEN JOHNSON

s/ LAURIE L. LARGENT
LAURIE L. LARGENT

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
llargent@rgrdlaw.com
sjohnson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 22 -

4883-3924-8499.v1

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Lead Plaintiff

LEVI & KORSINSKY LLP
SHANNON L. HOPKINS (*pro hac vice*)
GREGORY M. POTREPKA (*pro hac vice*)
DAVID JAYNES (SBN 338917)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: 203/9924523
shopkins@zlk.com
gpotreka@zlk.com
diavnes@zlk.com

Additional Counsel for Plaintiff Erika Schroth

- 23 -

4883-3924-8499.v1

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Lead Plaintiff City of Warren Police and Fire Retirement System and additional plaintiff Erika Schroth, certifies that this brief contains 6,841 words, which [choose one]:

_X_ complies with the word limit of L.R. 11-6.1

__complies with the word limit set by court order dated ____.

 s/ LAURIE L. LARGENT
LAURIE L. LARGENT

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  llargent@rgrdlaw.com

4883-3924-8499.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on August 4, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ LAURIE L. LARGENT
LAURIE L. LARGENT

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Email: llargent@rgrdlaw.com

4883-3924-8499.v1

**Mailing Information for a Case 2:22-cv-08375-JLS-AS Sandra Waswick v. Torrid Holdings, Inc. et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam Marc Apton**
  aapton@zlk.com,ecf@zlk.com

- **Kevin M. Askew**
  kaskew@orrick.com

- **Darrell S. Cafasso**
  dcafasso@orrick.com

- **Mark C. Holscher**
  mark.holscher@kirkland.com,mholscher@kirkland.com,adrienne-levin-5018@ecf.pacerpro.com

- **Shannon L. Hopkins**
  shopkins@zlk.com,shalliday@zlk.com,ecf@zlk.com

- **David C Jaynes**
  djaynes@zlk.com,gpotrepka@zlk.com,shalliday@zlk.com,ecf@zlk.com,shopkins@zlk.com

- **Stephen Johnson**
  sjohnson@rgrdlaw.com

- **Jennifer M. Keighley**
  jkeighley@orrick.com

- **James N. Kramer**
  jkramer@orrick.com,lpatts@orrick.com,casestream@ecf.courtdrive.com

- **Laurie L Largent**
  llargent@rgrdlaw.com,agonzales@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Brett M. Middleton**
  brettm@johnsonfistel.com,kristeno@johnsonfistel.com,paralegal@johnsonfistel.com

- **Austin C Norris**
  austin.norris@kirkland.com,laura-bay-kirkland-ellis-llp-2744@ecf.pacerpro.com,jelani.solper@kirkland.com,laura.bay@kirkland.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,tprzybylowski@pomlaw.com,jlopiano@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,jalieberman@pomlaw.c

- **Gregory M. Potrepka**
  gpotrepka@zlk.com,ecf@zlk.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com,lrosen@ecf.courtdrive.com

- **Matthew O. Solum**
  msolum@kirkland.com

- **Alexander K. Talarides**
  atalarides@orrick.com,lpatts@orrick.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)