JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
ALEXANDER K. TALARIDES (SBN 268068)
atalarides@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105
Telephone:   (415) 773-5700
Facsimile:    (415) 773-5759

DARRELL S. CAFASSO (Admitted *Pro Hac Vice*)
dcafasso@orrick.com
JENNIFER KEIGHLEY (Admitted *Pro Hac Vice*)
jkeighley@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
Telephone:   (212) 506-5000
Facsimile:    (212) 506-5151

Attorneys for Underwriter Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA WASWICK, on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> TORRID HOLDINGS INC., et al., <br><br> Defendants. | Case No. 2:22-cv-08375-JLS-AS <br><br> **THE UNDERWRITER DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS** <br><br> <u>Hearing</u> <br> Date:    September 22, 2023 <br> Time:    10:30 a.m. <br> Judge:    Hon. Josephine L. Staton <br> Ctrm:    8A |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ...................................................................................................... 2

    A.   The Rule 9(b) Pleading Standard Applies Here ...................................... 2

    B.   Plaintiffs' Oppositions Confirm Their Section 11 Claim Should Be Dismissed .......................................................................................... 4

        1.   The Challenged Statements Regarding Torrid's Purported "Abandonment" Of Its Data-Driven Merchandise Model Are Not Actionably False Or Milseading ................................... 4

            a.   The Challenged Statements Are Legally Inactionable For Multiple Independent Reasons ............. 4

            b.   Plaintiffs Have Failed To Plausibly Allege That Any Of These Statements Were Materially False Or Misleading At The Time Of the IPO .............................. 11

        2.   The Challenged Statement Regarding Torrid's Distribution Center Fails Because It Is Inactionable And Neither False Nor Misleading Given That It Accurately Describes The Facility's Physical Capacity ............................ 12

        3.   The Challenged Statements Regarding Torrid's Response To The COVID-19 Pandemic Fail Because They Are Inactionable Puffery, Accurately Report Historical Facts, And Are Neither False Nor Misleading ................................. 13

        4.   Defendants Did Not Violate Regulation S-K .......................... 14

    C.   Plaintiffs' Oppositions Confirm That Plaintiffs' Section 12(a)(2) Claim Should Be Dismissed ................................................................. 16

III.  CONCLUSION ................................................................................................ 17

- i -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Coty, Inc. Sec. Litig.*,
   2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016).................................................15

*In re CPI Card Grp. Inc. Sec. Litig.*,
   2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ......................................................15

*In re Eargo, Inc. Sec. Litig.*,
   2023 WL 1997918 (N.D. Cal. Feb. 14, 2023).......................................................3

*Hill St. Health Servs. LLC v. Cnty. of L.A.*,
   2016 WL 9453998 (C.D. Cal. Nov. 16, 2016) .......................................................4

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018).............................................................................9

*Oh v. Hanmi Fin. Corp.*,
   621 F. Supp. 3d 1075 (C.D. Cal. 2022) ...........................................................16

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
   2023 WL 3569068 (S.D.N.Y. May 19, 2023)..............................................10, 11

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017)...........................................................................14

*In re Restoration Robotics, Inc. Sec. Litig.*,
   417 F. Supp. 3d 1242 (N.D. Cal. 2019).............................................................15

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) .......................................................................3, 11

*Sanders v. Realreal, Inc.*,
   2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) ...................................................5

*Scheller v. Nutanix, Inc.*,
   450 F. Supp. 3d 1024 (N.D. Cal. 2020)............................................................12

*Schueneman v. Arena Pharms.*,
   840 F.3d 698 (9th Cir. 2016).............................................................................9

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017)..............................................................5

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010)................................................................6

**Rules**

Fed. R. Civ. P. 8(a) ....................................................................................................3

UNDERWRITER DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

Fed. R. Civ. P. 9(b) ...................................................................................................... 2, 3

Local Rule 11-7 ................................................................................................................ 4

- iii -

## I.   **INTRODUCTION**[1]

Plaintiffs' oppositions confirm that Plaintiffs' Securities Act claims should be dismissed.  As the Underwriters' Motion to Dismiss demonstrates, none of the statements in the Offering Materials that Plaintiffs challenge are actionably false or misleading, and so Plaintiffs' Sections 11 and 12(a)(2) claims fail as a matter of law.

Putting aside the fact that most of the alleged misstatements are legally inactionable "puffery" statements, opinion statements, accurate statements of historical fact, or forward-looking statements protected by the "bespeaks caution" doctrine, Plaintiffs' oppositions do not point to any specific factual allegation in the Complaint that shows plausibly that Torrid had "abandoned" its data-driven merchandising strategies, drastically over-ordered inventory, or jettisoned truckloads of inventory to sit unprocessed in the Distribution Center's parking lot—let alone that Torrid did so *before the IPO*, which is the only period relevant to Plaintiffs' Securities Act claims.  Indeed, Plaintiffs' oppositions make clear that their "abandonment" theory derives from a vague *post*-IPO statement made by Torrid's former CEO indicating that "*some*" of Torrid's "discipline" around "product assortment flow" was "lost *over the pandemic time period*."  *See* Torrid Opp. at 7; Ex. 10.  That statement nowhere indicates that Torrid had "abandoned" anything, and it certainly does not indicate that Torrid had done so *before the IPO*, as is required to state a Securities Act claim.  Because Plaintiffs have built their entire case on this implausible theory, the Complaint should be dismissed as to the Underwriters in its entirety.

Plaintiffs also resort to mischaracterizing the Complaint's allegations to suggest that it includes particularized factual allegations demonstrating that certain

---

[1] Except as otherwise noted, all defined terms herein have the same definition as in the Underwriters' Motion to Dismiss the Complaint (the "Underwriters' Motion to Dismiss" or "UWs MTD"), and all emphases are added.  Plaintiffs' opposition to the Underwriters' Motion to Dismiss will be cited as "UWs Opp." and Plaintiffs' opposition to the Torrid Defendants' Motion to Dismiss will be cited as "Torrid Opp."  All Exhibits referenced herein are attached to the Declaration of Austin Norris in Support of Defendants' Motion to Dismiss.  Dkt. 72.

UNDERWRITER DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

things happened before the IPO. *See* Torrid Opp. at 1-2; UWs Opp. at 7-9. But the paragraphs that Plaintiffs cite include no specific facts to show, for example, that prior to the IPO, inventory was sitting unprocessed in the parking lot or Torrid was saddled with seasonally stale inventory. Thus, Plaintiffs' assertion that Torrid's risk disclosures about inventory management challenges were misleading and independently actionable because the risks had purportedly already "materialized" at the time of the IPO misses the mark, and also ignores the robust disclosures actually set forth in the Registration Statement. The Complaint does not adequately allege that any of these supposed risks had materialized before the IPO, and Plaintiffs plainly cannot amend their Complaint through their opposition briefs.

Further, Plaintiffs cannot avoid that most of the challenged statements constitute legally inactionable puffery or opinion statements, undisputedly accurate statements about historical facts, or forward-looking statements protected by the bespeaks caution doctrine. Plaintiffs' own cited cases underscore why these challenged statements are inactionable. Plaintiffs also make no effort to explain how Torrid's statements about its Distribution Center's physical capacity or the actions that Torrid took in response to COVID-19 are inconsistent with the allegedly true facts. And Plaintiffs' oppositions underscore that their claims under Regulation S-K must be dismissed because the Registration Statement explicitly disclosed the specific items that Plaintiffs claim were withheld.

For these and the reasons further detailed below and in the Underwriters' Motion to Dismiss, as well as Torrid's briefing, Plaintiffs' Securities Act claims should be dismissed, with prejudice.[2]

## II.    **ARGUMENT**

### A.    **The Rule 9(b) Pleading Standard Applies Here.**

The particularity requirements of Rule 9(b) apply to Securities Act claims

---

[2] The Underwriters also join and incorporate the arguments in the Torrid Defendants' Motion to Dismiss the Complaint and their Reply Brief in Support of Their Motion to Dismiss.

- 2 -

grounded in fraud, particularly when, as here, there is "a unified course of conduct" with parallel Exchange Act claims. *See* UWs MTD at 2-3. Citing boilerplate allegations of "negligence" included in paragraphs 103-104 of the Complaint, Plaintiffs argue that Rule 9(b) does not apply to their Securities Act claims. *See* UWs Opp. at 4-6. But Plaintiffs ignore that they rely on the *exact same* factual allegations in their attempt to plead claims under both the Securities Act and the Exchange Act. *Compare, e.g.*, Compl. ¶ 82 (describing alleged "facts" that render challenged statements false for Securities Act claims), *with id.* ¶ 139 (describing the same alleged "facts" for Exchange Act claims). Unlike in the cases that Plaintiffs cite in their opposition (*see* UWs Opp. at 4-5), the same "facts" that form the basis of Plaintiffs' Exchange Act claims *also* form the basis of Plaintiffs' Securities Act claims—and thus the Complaint necessarily "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of [the Securities Act] claim[s]." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotations omitted).

Because the Complaint "employs the exact same factual allegations to allege violations of section 11 [of the Securities Act] as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act," the Court "can assume that it sounds in fraud," and Rule 9(b) therefore applies to Plaintiffs' Securities Act claims. *Id.*; *see, e.g.*, *In re Eargo, Inc. Sec. Litig.*, 2023 WL 1997918, at *6 (N.D. Cal. Feb. 14, 2023) (applying Rule 9(b) to Securities Act claims asserted against underwriters where plaintiffs "Securities Act allegations generally mirror their fraud-based allegations under the Exchange Act"). But regardless, Plaintiffs' claims fail even under Rule 8(a)'s plausibility standard.

**B.** **Plaintiffs' Oppositions Confirm Their Section 11 Claim Should Be Dismissed.**

**1.** **The Challenged Statements Regarding Torrid's Purported "Abandonment" Of Its Data-Driven Merchandise Model Are Not Actionably False Or Milseading.**

As demonstrated below, Plaintiffs' oppositions fail to rebut the Underwriters' showing that the challenged statements related to Torrid's merchandise model—including Torrid's "data-driven approach to design, merchandising and inventory planning and allocation" (Statement 1), "read-and-react testing approach with shallow initial buys . . . thus minimizing fashion and inventory risk" (Statement 2), "rigorous discipline around inventory performance" (Statement 3), "speed model . . . to accelerate product replenishment cycles" (Statement 4), and the risk warning that "inventory levels for certain merchandise styles may exceed planned levels" (Statement 5)—are not actionably false or misleading.[3]

**a.** **The Challenged Statements Are Legally Inactionable For Multiple Independent Reasons.**

As the Underwriters' Motion to Dismiss explains, Statements 1-4 are legally inactionable because they are statements of corporate optimism (puffery), opinions, protected forward-looking statements, accurate statements of historical fact or combinations thereof. *See* UWs MTD at 4-8.

***Puffery.*** Plaintiffs advance no argument in response to the Underwriters' argument that Statements 1 and 4—regarding Torrid's "data-driven" approach and "speed model"—constitute inactionable puffery, as they are the exact type of vague statements of corporate optimism that courts routinely dismiss. *See id.* at 5 & n.1 (collecting cases); Torrid Opp. at 7-8. These statements should be dismissed on that

---

[3]As explained by the Torrid Defendants, Plaintiffs' Appendix A is a wholly improper effort by Plaintiffs to extend their word limit and should be disregarded by this Court, including because its inclusion of legal arguments violates Local Rule 11-7. But even if considered, Appendix A does not change the analysis as it merely restates Plaintiffs' deficient arguments in more detail, and continues Plaintiffs' pattern of mischaracterizing the actual allegations in the Complaint.

UNDERWRITER DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

ground alone. *See, e.g.*, *Hill St. Health Servs. LLC v. Cnty. of L.A.*, 2016 WL 9453998, at *5 (C.D. Cal. Nov. 16, 2016) ("Failure to respond to the merits of one party's argument constitutes a concession of that argument.").

With respect to Statements 2 and 3—regarding Torrid's "read-and-react" testing approach and "rigorous discipline around inventory performance"—Plaintiffs argue that these statements are not puffery because, when read in context, they are purportedly "capable of objective verification." *See* Torrid Opp. at 7-8. But Plaintiffs do not explain how the surrounding context makes these generalized statements objectively verifiable. For instance, Plaintiffs claim that tying Torrid's "read-and-react" testing approach to "shallow initial buys" that "minimize fashion and inventory risk" means that this statement is verifiable, but Plaintiffs do not explain how "shallow" is a definable term, nor how to verify whether risks have been sufficiently "minimized." Likewise, Plaintiffs do not explain how tying Torrid's "rigorous discipline" to its "inventory performance" and "maximiz[ed] inventory turn" makes any of these vague statements objectively verifiable.

Moreover, Plaintiffs ignore and do not attempt to distinguish the cases cited by the Underwriters demonstrating that these types of vague descriptions of Torrid's business model are inactionable. *See* UWs MTD at 5. And Plaintiffs' own cited cases actually support dismissal. For instance, in *Shenwick v. Twitter, Inc.*, while the court found a statement characterizing particular financial metrics as being "similar" to prior results to be verifiable enough to be actionable, it found other generalized statements touting "exciting results" and "continuous improvement" to be inactionable puffery. *See* 282 F. Supp. 3d 1115, 1141 (N.D. Cal. 2017). Statements 2 and 3, which gives a rosy characterization of Torrid's inventory management system rather than representing that particular financial metrics are at a certain level, resemble the latter group of non-actionable statements. As for *Sanders v. Realreal, Inc.*, the court there held that statements referring to a company's "rigorous" authentication process could be actionable, where "authentication is a cognizable process" delivering a verifiable

outcome "that something is or is not authentic," and where the plaintiff had alleged that there was *no* official authentication process. *See* 2021 WL 1222625, at *10 (N.D. Cal. Mar. 31, 2021) ("whether items on the Company's online marketplace underwent *any* authentication is testable and, ultimately, verifiable"). Here, however, "rigorous" is used to characterize an equally vague term ("discipline"), and Plaintiffs have not alleged that Torrid had *no* "discipline" regarding inventory performance. Merely using the descriptor "rigorous" when discussing a company's "discipline" is not actionable.

*Opinions.* Plaintiffs argue that the Underwriters take statements out of context by portraying them entirely as opinion statements. *See* UWs Opp. at 8. But the Underwriters argue only that the portion of Statement 2 referring to Torrid's "belief" that its data-driven approach would drive growth is an inactionable opinion. *See* UWs MTD at 6. Because Plaintiffs do not argue that Torrid did not honestly hold this belief, this portion of the challenged statement is inactionable.[4] *See id.*

*Bespeaks Caution.* The Underwriters' Motion to Dismiss explains that the entirety of Statement 4—describing Torrid's plan to "enhance supply chain flexibility" by using a "speed model" to "improve inventory turnover"—as well as the portion of Statement 2 referring to Torrid's "data-driven approach" "continuing to drive market growth," are inactionable forward-looking statements protected by the bespeaks caution doctrine. *See* UWs MTD at 6-7. Plaintiffs claim that these statements are actionable because the bespeaks caution doctrine does not apply to statements of current or historical fact. *See* UWs Opp. at 12. To support this proposition, Plaintiffs cite inapposite cases addressing misstatements relating to then-current financial figures, which are beside the point here. *See, e.g.*, *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010). Plaintiffs do not explain how the challenged statements, which refer only to Torrid's future plans for inventory management, are relevant to

---

[4] The Underwriters withdraw their challenge to Statement 1 as an opinion statement and a protected forward-looking statement, as Statement 1 does not refer to Torrid's beliefs about its data-driven approach's ability to drive market growth in the future. Statement 1, however, still fails on multiple other grounds.

UNDERWRITER DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

Torrid's "then-present" state, much less address then-current financial metrics.

Plaintiffs also argue that the Registration Statement's risk disclosures are insufficient to invoke the bespeaks caution doctrine because they warn only of contingent risks that purportedly had already materialized before the IPO. *See* UWs Opp. at 12. This argument is unavailing for two independent reasons. *First*, Plaintiffs ignore that the Registration Statement explicitly warned investors that COVID-19 had *already* "substantially affected" business operations in the preceding year. *See* Ex. 3 at F-58; UWs MTD at 10. Torrid also warned investors that the "COVID-19 pandemic has caused general business disruptions worldwide," including by altering "the operations of our suppliers and manufacturers." Ex. 3 at 62; UWs MTD at 10. Thus, Plaintiffs' assertion that the Registration Statement's risk disclosures did not alert investors that COVID-19 had already impacted Torrid's operations is false.

*Second*, Plaintiffs do not plausibly allege that any of the contingent risks warned of in the Registration Statement had already come to fruition at the time of the IPO. For instance, as the Underwriters explained, Plaintiffs cannot point to any particularized factual allegations demonstrating that there was a buildup of obsolete and seasonally stale inventory that could only be sold via markdowns *before* the IPO. *See* UWs MTD at 11-12. Indeed, neither confidential witness provides any facts surrounding the inventory levels prior to the IPO.[5] *Id.* While Plaintiffs repeatedly assert that the Complaint alleges that trailers of unprocessed inventory were parked outside the Distribution Center before the IPO, *see, e.g.*, UWs Opp. at 2, 7-10; Torrid Opp. at 4, the cited paragraphs do not support that assertion. The Complaint only alleges that these trailers were present "at certain points during CW-1's tenure," and that—according to CW-2—there were "40 trailers parked outside" in a paragraph that begins *"[f]ollowing* the IPO." Compl. ¶¶ 35, 39. Similarly, Plaintiffs' assertion that excess inventory in trailers had to be disposed of through "flash sales" follows

---

[5] Plaintiffs concede that CW-2's allegations are completely irrelevant to the pre-IPO time period. *See* UWs Opp. at 7 (claiming only that CW-1 reported certain problems "started before the IPO").

UNDERWRITER DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

the sentence saying that the trailers were parked outside "at certain points." *Id.* at 35. Many of the other paragraphs that Plaintiffs rely on (at UWs Opp. at 9) likewise do not suggest that the alleged issues occurred *before* the IPO. *See, e.g.*, Compl. ¶¶ 68, 82(b), 82(d). In short, neither alleged confidential witness asserts that the logistical challenges warned of in the risk disclosures happened *before* the IPO. And the Complaint's remaining allegations related to unspecified "delayed shipments," unexplained "constant problems…with inventory flow," and "customer order backlogs" for an unknown duration, *see* Compl. ¶ 35, are vague and conclusory, and do not indicate that any of the warned-of risks had come to fruition pre-IPO. *See* UWs MTD at 9.

Plaintiffs' reliance on Torrid's use of different language in its March 2022 10-Q than was used in its Registration Statement (stating COVID-19 "has caused a disruption," rather than "has the potential to cause a disruption," *see* UWs Opp. at 13) is a classic example of impermissible hindsight pleading. That Torrid stated something was true months later says nothing about what was true at the time of the IPO. Regardless, the language in the March 2022 10-Q is consistent with the cautionary language in the Registration Statement itself, including the statements that COVID-19 had "substantially affected" business operations in the preceding year. *See* Ex. 3 at 58. And the new language regarding "excessive employee turnover" in the March 2022 10-Q that Plaintiff highlights is completely irrelevant. *See* UWs Opp. at 13-14. Indeed, Plaintiffs have nowhere alleged that there were any employee *turnover* problems at the Distribution Center at the time of the IPO. *See* Compl. ¶ 35 (alleging only "not enough human resources" at the Distribution Center before the IPO).

***Accurate Statements of Historical Fact.*** Although Plaintiffs do not dispute that Statements 2 and 3 accurately report Torrid's historical performance (i.e., that at the time of the IPO, Torrid had "generate[d] approximately 80% of [its] net sales from products sold at regular price" and had a "healthy gross profit margin performance"), they nevertheless argue that those statements are actionable because literal truth is not

the standard, and Torrid failed to disclose that it purportedly was experiencing a build-up of stale inventory at the time of the IPO that would not be able to be sold at full price. *See* UWs Opp. at 10.  Plaintiffs also argue that Torrid's disclosure of "literally true" inventory figures at the time of the IPO is insufficient to render these statements non-misleading because inventory was purportedly "accumulating unprocessed in the parking lot" at the time of the IPO.  *Id.* at 11.

Both of these arguments fail.  As just discussed, Plaintiffs do not plausibly allege that any excess inventory was sitting unprocessed outside of the Distribution Center, including prior to the IPO.  *See also* UWs MTD at 11-12.  Thus, Plaintiffs' arguments predicated on this build-up occurring prior to the IPO are unavailing.  And the caselaw Plaintiffs rely on in arguing that statements of historical fact can be actionable is distinguishable.  *See* UWs Opp. at 10.  In both *Schueneman v. Arena Pharms.*, Inc., 840 F.3d 698, 707-08 (9th Cir. 2016), and *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1010 (9th Cir. 2018), pharmaceutical companies had released positive results but failed to disclose the results of bad clinical trials (*Schueneman*) or inform investors that the good trial results were not sufficiently reliable (*Khoja*).  Those cases have no bearing on the outcome here because they concern situations where the *past results themselves* were not actually as positive as portrayed.  Here, however, Plaintiffs argue only that Torrid's accurate disclosure of prior results was misleading because, *in the future*, Torrid might have to sell discounted merchandise.  *See* UWs Opp. at 11. As shown in the Underwriters' Motion to Dismiss, such accurate statements of historical fact are inactionable *as a matter of law*, even if future results may not be as positive, *see* UWs MTD at 7-8, and Plaintiffs cite no on-point authority to the contrary.

***Risk Factors.***  Plaintiffs argue that Statement 5, which is a risk warning that "inventory levels for certain merchandise styles may exceed planned levels," and/or that Torrid "may experience inventory shortages," itself is actionable because these risks had allegedly already materialized at the time of the IPO.  *See* UWs Opp. at 9.  Plaintiffs' argument fails, even assuming that risk disclosures can be actionable in the first place.

- 9 -

*See* UWs MTD at 8.

*First,* as discussed above, Plaintiffs do not point to any well-pled allegations showing purported inventory issues that existed before the IPO. *Second*, this argument ignores both that Torrid *did* warn investors that COVID had already impacted its operations, and that any reasonable would have been aware of COVID's impact in any event. Indeed, while Plaintiffs do not dispute the existence of widespread COVID-related supply chain disruptions, they argue that Torrid still had an obligation to disclose specifically that it had purportedly "deviated from its data-driven merchandising strategies," lacked capacity to process its over-ordered inventory and "was both missing seasonal launches and saddled with a glut of seasonally stale inventory." *See* UWs Opp. at 10. Plaintiffs claim this omitted information was specific to Torrid and went beyond COVID's "general trends." *Id.* But the Complaint nowhere alleges that any of these purportedly omitted facts happened *before the IPO.* The only factual allegations that relate to the pre-IPO time-period concern unspecified shipping delays and staffing issues, *i.e.*, the precise COVID-related "general trends" impacting *any* company at the time of the IPO and of which any reasonable investor would have been aware. Plaintiffs themselves admit in the Complaint that the unspecified pre-IPO shipping delays were caused by what was widespread public knowledge at the time: "port congestion in Long Beach and Los Angles [sic], and factory closures of … Asia-Pacific manufacturers." Compl. ¶ 67.

And as discussed above, Torrid even specifically warned investors that COVID-19 had *already* "substantially affected" business operations in the preceding year and that COVID-19 "has the potential to cause a disruption in [Torrid's] supply chain." Ex. 3 at F-21, 58. The Registration Statement further cautioned that the "ongoing COVID-19 outbreak originating in China, may adversely impact [Torrid's] ability to source products from China . . . or to source them in a timely manner," and that Torrid's business could be "materially and adversely affected" as a result. *Id.* at 30-31. It elsewhere warned that COVID-19 had altered "[t]he operations of our suppliers and

manufacturers." *Id.* at 62.  Any reasonable investor would have known that Torrid was confronting shipping delays and staffing challenges based on these disclosures and other information in the market.  *See Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *19 (S.D.N.Y. May 19, 2023) (considering company's COVID-related disclosures alongside publicly available information about the pandemic's impact on steel costs in concluding that the company's risk disclosure was sufficient).  As in *Plymouth*, Torrid's COVID-related disclosures "not only advised investors that 'there might be a ditch ahead' to be wary of falling into, but also that [Torrid] was aware of the ditch's location and was actively trying to manage it." *Id.* at *13.  No reasonable investor could have been misled by Statement 5 (or any of the other challenged statements) in these circumstances.

*Third*, Plaintiffs never address the Underwriters' argument that Statement 5 is inactionable because Plaintiffs do not plausibly allege that Statement 5's warned-of potential harm to Torrid—*i.e.*, "higher markdowns," and "lower than planned margins," *see* Compl. ¶ 81—had materialized prior to the IPO.  *See* UWs MTD at 8.  By failing to respond to this argument, Plaintiffs have conceded it.  *See supra* at 4.

          **b.**    **Plaintiffs Have Failed To Plausibly Allege That Any Of These Statements Were Materially False Or Misleading At The Time Of the IPO.**

Plaintiffs have also failed to allege plausibly that Statements 1-5 were materially false or misleading.  *See* UWs MTD at 9-12.  As discussed, the supposed contradictory "facts" that Plaintiffs rely upon either are derived from vague and conclusory allegations about Torrid's purported "abandonment" of its data-driven model, or concern events that allegedly materialized *post*-IPO.  Moreover, as discussed, any reasonable investor would have been well-aware of the risks COVID-19 posed to Torrid, rendering the challenged statements non-misleading.

Plaintiffs respond by attempting to recharacterize the allegations of the Complaint, insisting that they have included particularized factual allegations that

UNDERWRITER DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

Torrid had excess and stale inventory prior to the IPO. *See* UWs Opp. 7-11. But the allegations that Plaintiffs point to do not support their latest narrative, *see supra* at 7-8, and Plaintiffs cannot amend the complaint through their oppositions. Likewise, Plaintiffs' effort to minimize the widespread public knowledge regarding COVID's impact on the supply chain at the time of the IPO cannot escape the black-letter law that there can be no Section 11 liability when the allegedly undisclosed information was prominently in the public domain well before the IPO. *See Rubke*, 551 F.3d at 1163; *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1034 (N.D. Cal. 2020); *see also* UWs MTD at 10-11.

Moreover, Plaintiffs' oppositions make clear that their entire "abandonment" theory is predicated on a vague post-IPO statement by former Torrid CEO Lisa Harper that provides no support for Plaintiffs' implausible theory that Torrid had abandoned its "data-driven" model pre-IPO. *See* Torrid Opp. at 7. While Plaintiffs contend that Harper "admitted" that "key components" of Torrid's "data-driven model" "had been abandoned before the IPO," Torrid Opp. at 3, that is not supported by the transcript. Instead, that transcript reflects that Harper explained that "*some* of that *discipline* had been lost *over the pandemic time period*," referring to Torrid's "process for developing our product assortment flow." Ex. 10 at 7. Whatever that vague statement means, it does not indicate that Torrid had at any point abandoned its data-driven approach, and it says nothing whatsoever about Torrid's behavior *before* the IPO.

**2. The Challenged Statement Regarding Torrid's Distribution Center Fails Because It Is Inactionable And Neither False Nor Misleading Given That It Accurately Describes The Facility's Physical Capacity.**

Plaintiffs challenge Torrid's statement that it acquired a "fully-functional, state-of-the-art distribution center in West Jefferson, Ohio in 2018," which Torrid "believe[s] is capable of handling our existing and future needs." Compl. ¶ 83. But contrary to Plaintiffs' arguments, the challenged statement contains inactionable

opinions and puffery, and, in any event, is not false and misleading. *See* UWs MTD at 12-14.

Plaintiffs argue that the terms "state-of-the-art" and "believe" do not absolve Torrid of liability, but they fail to explain why the surrounding context renders this statement actionable. *See* Torrid Opp. at 9. Plaintiffs do not even attempt to explain why "state-of-the-art" is actionable here, and the cases they cite make clear that this term is ordinarily puffery. Nor have Plaintiffs explained what "underlying facts" are capable of being proven true or false in Torrid's statement that it "believe[s] [the facility] is capable of handling our existing and future needs," other than Torrid's stated belief. Yet, Plaintiffs *do not* allege that Torrid did not hold this belief at the time of the IPO, rendering this statement inactionable. *See* UWs MTD at 13.

Plaintiffs also do not address the Underwriters' argument that the Complaint does not adequately allege that the challenged statement regarding the Distribution Center was false or misleading. *See* UWs MTD at 13-14. The quoted passage accurately reports the facility's square footage and states that Torrid believes that the facility is capable of handling Torrid's needs. Plaintiffs have not made any well-pled factual allegations that the facility itself lacked sufficient physical space to accommodate inventory prior to the IPO. *See id.* at 13-14. The only relevant confidential witness allegations regarding the pre-IPO period concern the Distribution Center's purported lack of "human resources," Compl. ¶ 35, but the challenged statement made no representation about the Distribution Center's staffing levels. By failing to respond to this argument, Plaintiffs have conceded it.

**3.    The Challenged Statements Regarding Torrid's Response To The COVID-19 Pandemic Fail Because They Are Inactionable Puffery, Accurately Report Historical Facts, And Are Neither False Nor Misleading.**

Plaintiffs barely respond to Defendants' arguments that Torrid's statements regarding its response to the COVID-19 pandemic—i.e., that Torrid "proactively implemented various initiatives," Compl. ¶ 86; "made targeted investments" *id.* ¶ 87;

- 13 -

"[l]everag[ed] data analytics and insights," *id.* ¶ 88; and had "temporarily lower gross profit margin … as a result of the challenges presented by COVID-19," and then a "rebound" that demonstrated the "resiliency of [its] business model," *id.* ¶ 89—are not actionably false or misleading because these statements constitute corporate puffery, reflect accurate historical facts, and are not inconsistent with the purported contradictory facts alleged by Plaintiffs. *See* UWs MTD at 14-16.

Plaintiffs only bother to respond to the first argument, claiming that Defendants' puffery arguments are "unavailing," and then citing two cases in support of that conclusory statement. *See* Torrid Opp. at 10-11. But these cases do not explain why descriptions of "proactively implementing various initiatives," and having a "resilien[t] … business model" constitute anything other than non-verifiable puffery. Instead, these cases note that only statements that "provide[] a concrete description of the past and present state" of a company are actionable, whereas others that use merely "subjective or emotive terms" are not. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017). The challenged statements clearly fall in the latter camp.

Moreover, by failing to respond to the Underwriters' other argument that Plaintiffs nowhere challenge the accuracy of the description of COVID's impact on Torrid's financial metrics in 2020, *see* UWs MTD at 15-16, Plaintiffs have conceded that these statements are non-actionable descriptions of accurate historical facts. And Plaintiffs have likewise conceded—again by virtue of their failure to respond to the Underwriters' argument, *see id.* at 15-16—that they nowhere explain how any of these statements are inconsistent with the allegedly true facts. For instance, Plaintiffs nowhere allege that Torrid did not "proactively implement various initiatives" or make "targeted investments" in response to COVID-19. As such, Plaintiffs have conceded that these statements are not actionably false or misleading for this additional reason.

### 4. Defendants Did Not Violate Regulation S-K.

Plaintiffs argue that Torrid's extensive risk disclosures in the Registration Statement were insufficient under Item 105 of Regulation S-K because they did not warn

- 14 -

that Torrid had "already deviated" from its data-driven strategies and "was suffering from mounting, unprocessed inventories, missed seasonal launches, and delayed customer order fulfilment." *See* UWs Opp. at 16-17. This argument fails for the same reasons discussed above, most notably Plaintiffs' failure to allege plausibly that Torrid had "abandoned" anything at any point, and/or that any of these issues had occurred *before* the IPO. *See also* UWs MTD at 11-12. In addition, as discussed above, Plaintiffs ignore that the Registration Statement warned that COVID-19 had already had an adverse impact on Torrid's operations. *See id.* at 10. Nothing more was required under Item 105.

Plaintiffs similarly argue they have alleged an omitted pre-IPO "trend" that was required to be disclosed under Item 303 of Regulation S-K: the "abandonment" of Torrid's data-driven merchandising model and the ordering of large quantities of inventory in excess of demand. *See* UWs Opp. at 14-15. But again, as discussed, Plaintiffs fail to allege any specific facts to support Torrid's purported "abandonment" of its data-driven approach or over-ordering of inventory before the IPO. *See also* UWs MTD at 11-12, 18. Unlike the case upon which Plaintiffs rely, this complaint is not "full of specific facts that support the existence of the trend" of alleged pre-IPO overstocking. *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017). And contrary to Plaintiffs' argument (UWs Opp. at 15), the mere fact that inventory increased significantly *post*-IPO does not mean that Torrid was placing excessive orders *pre*-IPO. Unlike in *CPI Card*, Plaintiffs here nowhere allege that Torrid deliberately overstocked its inventory prior to the IPO to boost sales. The far more plausible explanation is that shipments that were previously delayed finally arrived post-IPO. Indeed, that is precisely what Plaintiffs have alleged elsewhere. *See* Compl. ¶ 39 ("Following the IPO, Torrid's inventory levels at the Distribution Center had almost doubled and *included late deliveries of inventory*.") *see also id.* ¶¶ 67–69, 82, 139, 148, 161, 170, 183.

Plaintiffs also largely ignore the Underwriters' argument that the Complaint fails

to allege any *persistent* trend that occurred over any sustained time-period prior to the IPO. *See In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019) ("A trend under Item 303 requires an 'observed pattern that accurately reflects persistent conditions of the particular registrant's business environment.'" (internal citations omitted)); *In re Coty, Inc. Sec. Litig.*, 2016 WL 1271065, at *7 (S.D.N.Y. Mar. 29, 2016) (collecting cases in which plaintiffs failed to allege trends because they concerned events that were "almost contemporaneous with the IPO" or that lasted only two months); *see* UWs MTD at 17-18.  Even assuming Plaintiffs had adequately alleged that Torrid had abandoned its data-driven model or begun ordering larger quantities of inventory before the IPO (they have not), Plaintiffs have not alleged with particularity *when* Torrid took these actions, or that these actions continued for any sustained period prior to the IPO.  Contrary to Plaintiffs' arguments, alleging that Torrid abandoned its processes "during the 'pandemic'" and that inventory flow was a "constant problem pre-IPO" (UWs Opp. at 15 n.4) does not support Plaintiffs' theory of a persistent trend of over-ordering inventory and abandoning data-driven strategies. And these vague allegations also do not plausibly allege that any purported trend was "known" at the time of the IPO, *see* Torrid MTD at 13, a point that Plaintiffs also concede by failing to respond to it, *see* UWs Opp. at 14-17.

### C.   Plaintiffs' Oppositions Confirm That Plaintiffs' Section 12(a)(2) Claim Should Be Dismissed.

Plaintiffs do not dispute that, to the extent their Section 11 claims based on a misstatement are dismissed, the Section 12(a)(2) claim based on the same misstatement fails.  *See* UWs Opp. at 18; UWs MTD at 18-19.  As for the additional statements at issue from the Roadshow Presentation—including statements regarding "key initiatives" implemented during the pandemic, Torrid's "shortened product development cycle" and Torrid's "sequential improvement in comp sales growth"— Plaintiffs fail to explain how these statements are actionably false or misleading. *See* UWs Opp. at 18-19.

UNDERWRITER DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

Many of the statements constitute corporate puffery, including the statements regarding Torrid's "accelerating margin profile," and "rapid profitability" that qualify as inactionable "growth statements." *See Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *5 (N.D. Cal. Aug. 31, 2018) ("growth statements" such as "business is going gangbusters" and "[t]his progress is remarkable" "constitute puffery"); UWs MTD at 19. Plaintiffs' reliance on *Oh v. Hanmi Fin. Corp.*, 621 F. Supp. 3d 1075, 1087 (C.D. Cal. 2022), is misplaced because that case alleged that the metrics that were described as "strong" had been miscalculated and misstated. Here, Plaintiffs do not allege that any of Torrid's financial metrics were inaccurate. And in any event, Plaintiffs fail to allege any specific contemporaneous facts to show that these statements were false or misleading at the time of the IPO. *See* UWs MTD at 19-20.

## III. CONCLUSION

The Securities Act claims asserted in the Complaint against the Underwriters should be dismissed in their entirety, with prejudice.

Dated: August 25, 2023

Respectfully submitted,
ORRICK, HERRINGTON & SUTCLIFFE LLP

By:    */s/ Alexander K. Talarides*
JAMES N. KRAMER
DARRELL S. CAFASSO
ALEXANDER K. TALARIDES
JENNIFER KEIGHLEY

Attorneys for the Underwriter Defendants

- 17 -

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for the Underwriter Defendants, certifies that this brief contains 5,506 words, which [choose one]:

_X_ complies with the word limit of L.R. 11-6.1

___ complies with the word limit set by court order dated _____


Dated:  August 25, 2023                    ____/s/ Alexander K. Talarides_____
                                                      ALEXANDER K. TALARIDES

- 18 -