1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   LAURIE L. LARGENT (153493)
    STEPHEN JOHNSON (347822)
3   655 West Broadway, Suite 1900
    San Diego, CA 92101
4   Telephone: 619/231-1058
    619/231-7423 (fax)
5   llargent@rgrdlaw.com
    sjohnson@rgrdlaw.com
6
    Lead Counsel for Lead Plaintiff
7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10  SANDRA WASWICK, on Behalf of All )  Case No. 2:22-cv-08375-JLS(ASx)
    Others Similarly Situated,        )
11                                    )  FIRST AMENDED CONSOLIDATED
                         Plaintiff,   )  CLASS ACTION COMPLAINT FOR
12                                    )  THE VIOLATION OF FEDERAL
           vs.                        )  SECURITIES LAWS
13                                    )
    TORRID HOLDINGS INC.,             )  DEMAND FOR JURY TRIAL
14  ELIZABETH MUNOZ, GEORGE           )
    WEHLITZ, STEFAN L. KALUZNY,       )
15  DARY KOPELIOFF, LISA HARPER,      )
    THEO KILLION, MORGAN              )
16  STANLEY & CO. LLC, BOFA           )
    SECURITIES, INC., GOLDMAN         )
17  SACHS & CO. LLC, JEFFERIES LLC,   )
    ROBERT W. BAIRD & CO.             )
18  INCORPORATED, COWEN AND           )
    COMPANY, LLC, WILLIAM BLAIR       )
19  & COMPANY, L.L.C., TELSEY         )
    ADVISORY GROUP LLC,               )
20  SYCAMORE PARTNERS                 )
    MANAGEMENT, L.P., SYCAMORE        )
21  PARTNERS TORRID, L.L.C.,          )
    SYCAMORE PARTNERS, L.P.,          )
22  SYCAMORE PARTNERS                 )
    ASSOCIATES-C, L.P., SYCAMORE      )
23  PARTNERS ASSOCIATES, L.P.,        )
    SYCAMORE PARTNERS                 )
24  ASSOCIATES INVESTMENTS, L.P.,     )
    SYCAMORE PARTNERS (CO-            )
25  INVEST), L.L.C., and SYCAMORE     )
    PARTNERS ASSOCIATES CO-           )
26  INVEST, L.P.,                     )
                                      )
27                       Defendants.  )
    _____   )
28

4878-3939-4968.v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY OF THE CASE ................................. 1

II.    JURISDICTION AND VENUE ........................................................ 2

III.   PARTIES ............................................................................ 3

      A.    Plaintiffs ................................................................... 3

      B.    Defendants ................................................................ 4

            1.    Torrid and the Individual Defendants .............................. 4

            2.    The Underwriter Defendants ........................................ 5

            3.    The Sycamore Defendants ........................................... 6

IV.    SUBSTANTIVE ALLEGATIONS ..................................................... 7

      A.    Company Background and Information ..................................... 7

      B.    Torrid's IPO ................................................................ 7

      C.    Before the IPO, Torrid Was Experiencing Undisclosed Inventory Constraints that Were Negatively Impacting the Company ................................................................... 8

      D.    Torrid Knew About the Shipment Delays Before the IPO ....... 11

      E.    Prior to the IPO, Torrid Was Also Operating with a Broken and Inefficient Inventory Management System .......... 12

      F.    The Registration Statement Contained Untrue Statements of Material Fact and Omitted Material Facts Necessary to Make the Statements Therein Not Misleading ........................ 15

      G.    The Registration Statement Failed to Disclose Information Required to Be Disclosed Under SEC Regulation S-K ............................................................ 19

      H.    The Company's Misstatements and Omissions of Fact Were Material ............................................................. 22

      I.    Post IPO Events ........................................................ 23

V.     CLASS ALLEGATIONS ............................................................. 25

VI.    COUNTS ............................................................................ 26

      COUNT I      ....................................................... 26

Page

Violations of §11 of the Securities Act (Against All Defendants) ................................................................ 26

COUNT II ........................................................................ 27

Violation of §12(a)(2) of the Securities Act (Against All Defendants) ................................................ 27

COUNT III ....................................................................... 28

Violations of §15 of the Securities Act (Against the Individual Defendants and Sycamore Defendants) .................................................................... 28

VII.    PRAYER FOR RELIEF ............................................................. 29

VIII.   JURY DEMAND ....................................................................... 30

4878-3939-4968.v1

## I.    INTRODUCTION AND SUMMARY OF THE CASE

1.    Court-appointed Lead Plaintiff City of Warren Police and Fire Retirement System ("Lead Plaintiff") and additional plaintiff Erika Schroth (collectively, "Plaintiffs"), bring this action against Defendants (defined below) based upon the investigation of counsel, which included, without limitation, the review and analysis of: (a) public filings made with the United States Securities and Exchange Commission ("SEC"); (b) news releases and other publications disseminated by Defendants; (c) securities analyst reports, news articles, media reports, websites, and other information concerning Defendants and other related non-parties; and (d) an investigation conducted by Plaintiffs' attorneys, including interviews with former Torrid Holdings Inc. ("Torrid" or the "Company") employees.  Plaintiffs believe that substantial additional evidentiary support likely exists for the allegations set forth herein.

2.    This securities class action alleges claims under §§11, 12(a)(2), and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act"), on behalf of all persons or entities that purchased Torrid's common stock pursuant or traceable to the public offering conducted on or about July 1, 2021 ("IPO").

3.    Torrid is a women's apparel retailer headquartered in City of Industry, California specializing in fashionable and stylish plus-size apparel.  Torrid is controlled by a private equity firm, its majority shareholder, defendant Sycamore Partners Management, L.P. ("Sycamore").

4.    On July 1, 2021, Torrid was led to market by defendant Sycamore, the Company's top executive officers and director Lisa Harper.  During the IPO, 12,650,000 shares of Torrid common stock were sold to the public at $21 per share, totaling more than $265 million in proceeds from investors.

5.    Unbeknownst to investors, at the time of the IPO Torrid experienced severe inventory shipment delays from its manufacturers and was dealing with debilitating inventory constraints that were negatively impacting the Company's

- 1 -

business operations and financial performance.  Because of the delays, Torrid could not quickly replenish inventory to meet customer demand, and was losing sales at the time of the IPO.  Also Torrid's expenses increased as the Company was forced to use expensive, expedited transportation alternatives to get inventory when it could.  Compounding the shipment delays, was the fact that Torrid had a broken and inefficient inventory management system that also was impairing the Company's business operations and financial performance.

6.      Rather than disclose these adverse facts, the Registration Statement made the false and misleading claim that Torrid's inventory systems and supply chain operations were operating with maximum speed, flexibility, and efficiency – precisely the opposite of the true state of Torrid's business operations leading up to and during the IPO.

7.      For example, the Registration Statement repeatedly stated that the Company had the "flexibility to respond quickly to the latest sales trends" and "product performance," and "make adjustments to . . . current offering[s] based on customer feedback."  The Registration Statement also stated Torrid had processes in place to "improve the speed and flexibility of our supply chain including shortening our development cycle by two weeks," and "accelerate product replenishment cycles."

8.      The undisclosed pre-IPO problems had a critical impact on Torrid's business.  Investors who bought into Torrid's IPO experienced a rapid devaluation of their investment and by early December 2022, Torrid's stock was trading at $3.35 per share, an 84% fall from the $21 IPO price.  As of December 22, 2023, Torrid's stock continues to trade well below its $21 IPO price, at $5.38 per share.

## II.    JURISDICTION AND VENUE

9.      The claims asserted herein arise under §§11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2), 77o).

4878-3939-4968.v1

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act (15 U.S.C. §77v).

11.     Venue is properly laid in this District pursuant to §22 of the Securities Act, and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange (the "NYSE").

## III.    PARTIES

### A.    Plaintiffs

13.     Lead Plaintiff City of Warren Police and Fire Retirement System is a public pension fund in Warren, Michigan, managed by a board of elected and appointed officials, comprising pension and retirement plans for the benefit of the personnel of the Police and Fire Departments of Warren, Michigan, and for the widows and children of such members.  Lead Plaintiff has approximately $275 million in assets under management and hundreds of plan participants.  Lead Plaintiff, as set forth in its certification previously filed with the Court, incorporated by reference herein, purchased or otherwise acquired Torrid common stock during the Class Period at artificially inflated prices pursuant and/or traceable to the IPO, and was damaged thereby.  ECF 15-2.[1]

14.     Plaintiff Erika Schroth, as set forth in its certification previously filed with the Court, incorporated by reference herein, purchased or otherwise acquired Torrid common stock at artificially inflated prices pursuant and/or traceable to the IPO, and was damaged thereby.  ECF 59 at 83-84.

---

[1]     Since the filing of its certification, Lead Plaintiff moved for appointment as lead plaintiff in *Schaeffer v. Signature Bank, et al.*, No. 1:23-cv-01921 (E.D.N.Y.), and was not appointed.

4878-3939-4968.v1

**B.     Defendants**

**1.     Torrid and the Individual Defendants**

15.     Defendant Torrid, a wholly owned subsidiary of Torrid Holdings LLC, is a Delaware corporation headquartered in City of Industry, California.  Torrid is a direct-to-consumer brand of women's plus-size apparel and intimates.  Torrid common stock trades on the NYSE under the ticker symbol "CURV."

16.     Defendant Elizabeth Muñoz was the Chief Executive Officer ("CEO"), President, and a director of Torrid at the time of the IPO.  Following the IPO, in May 2022, Torrid announced that defendant Muñoz had resigned as CEO and from the Torrid Board of Directors (the "Board") and was assuming a new role as the Company's Chief Creative Officer.  Defendant Muñoz sold approximately $5 million worth of her personal Torrid shares in the IPO.  Defendant Muñoz signed, and was involved in preparing, the Registration Statement.

17.     Defendant George Wehlitz was the Chief Financial Officer ("CFO") of Torrid at the time of the IPO.  Shortly after the IPO, in December 2021, Torrid announced defendant Wehlitz was retiring, effective May 2022.  Defendant Wehlitz sold over $4 million worth of his personal Torrid shares in the IPO.  Defendant Wehlitz signed, and was involved in preparing, the Registration Statement.

18.     Defendant Stefan L. Kaluzny was a director of Torrid at the time of the IPO.  Defendant Kaluzny is a co-founder and Managing Director of defendant Sycamore.  Defendant Kaluzny signed, and was involved in preparing, the Registration Statement.  As described below, defendant Sycamore sold over $210 million worth of Torrid shares in the IPO through its subsidiaries and was the Company's controlling shareholder before, during, and after the IPO.

19.     Defendant Dary Kopelioff was a director of Torrid at the time of the IPO.  Defendant Kopelioff is a Managing Director of defendant Sycamore. Defendant Kopelioff signed, and was involved in preparing, the Registration Statement.  As described below, defendant Sycamore sold over $210 million worth

- 4 -

1  of Torrid shares in the IPO through its subsidiaries and was the Company's
2  controlling shareholder before, during, and after the IPO.

3       20.    Defendant Lisa Harper was a director of Torrid at the time of the IPO
4  and had served as a member of the Company's Board and its predecessor since 2008.
5  Defendant Harper became Torrid's CEO in May 2022, following defendant Muñoz's
6  transition to a different role at the Company.   Defendant Harper sold over $14
7  million worth of her personal Torrid shares in the IPO.  Defendant Harper signed,
8  and was involved in preparing, the Registration Statement.

9       21.    Defendant Theo Killion ("Killion") was a director of Torrid at the time
10  of the IPO.   Defendant Killion signed, and was involved in preparing, the
11  Registration Statement.

12      22.    The defendants referenced above in ¶¶16-21 are collectively referred to
13  herein as the "Individual Defendants."

14              **2.     The Underwriter Defendants**

15      23.    Defendants Morgan Stanley & Co. LLC, BofA Securities, Inc.,
16  Goldman Sachs & Co. LLC, Jefferies LLC, Robert W. Baird & Co. Incorporated,
17  Cowen and Company, LLC, William Blair & Company, L.L.C., and Telsey
18  Advisory Group LLC acted as underwriters of the IPO.

19      24.    The Defendants referenced in ¶23 are referred to herein as the
20  "Underwriter Defendants."

21      25.    The Underwriter Defendants acted together as an underwriting
22  syndicate and participated in drafting and disseminating the Registration Statement
23  in connection with the IPO.

24      26.    The Underwriter Defendants were responsible for ensuring the
25  completeness and accuracy of the various statements contained in, or incorporated
26  by reference into, the Registration Statement used in connection with the IPO.

27      27.    The Underwriter Defendants participated in the sale of more than $265
28  million of Torrid common stock to the Class.

- 5 -

4878-3939-4968.v1

28.     The Underwriter Defendants collectively received more than $17 million for their participation in the IPO.

### 3.     The Sycamore Defendants

29.     Defendant Sycamore is a private equity firm based in New York, specializing in retail, distribution, and consumer investments, with brands like Belk, Express, Ann Taylor, Lane Bryant, The Limited, and Staples, Inc. among its investment portfolio at the time of the IPO.  Sycamore acquired Torrid in 2013 and was the majority shareholder of Torrid at the time of the IPO, controlling its operations and any actions requiring approval of Torrid shareholders.  Sycamore sold over $210 million of its Torrid common stock shares in the IPO.  In connection with IPO, Torrid entered a "Stockholders' Agreement" with Sycamore, entitling Sycamore to nominate a majority of Torrid's Board so long as it maintains its majority share of Torrid common stock.  Sycamore continues to be Torrid's controlling, majority shareholder.

30.     Defendants Sycamore Partners Torrid, L.L.C., Sycamore Partners, L.P., Sycamore Partners Associates-C, L.P., Sycamore Partners Associates, L.P., Sycamore Partners Associates Investments, L.P., Sycamore Partners (Co-Invest), L.L.C., and Sycamore Partners Associates Co-Invest, L.P. are referred to herein as the "Sycamore Entities."  Defendant Sycamore held its investment in Torrid through the Sycamore Entities and sold shares in the IPO through the Sycamore Entities.

31.     Each of the Sycamore Entities were controlled, at all times relevant, directly or indirectly by defendant Kaluzny.

32.     Defendant Sycamore and the Sycamore Entities are referred to collectively herein as the "Sycamore Defendants."

33.     Torrid, Individual Defendants, Underwriter Defendants, and Sycamore Defendants are referred to herein, collectively, as "Defendants."

4878-3939-4968.v1

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background and Information

34.    Torrid designs for a 25-40-year-old curvy woman and offers its customers products across a broad assortment of products that includes tops, denims, dresses, intimates, activewear, footwear, and accessories.   Torrid sells direct to consumers through its e-Commerce platform and hundreds of physical stores located throughout the United States, Puerto Rico, and Canada.

35.    Torrid internally designs and develops a vast majority of its product and at the time of the IPO, approximately 96% of Torrid's merchandise was produced outside of the United States, primarily from manufacturers in the Asia-Pacific region.

### B.    Torrid's IPO

36.    On June 7, 2021, Torrid publicly filed a registration statement on Form S-1 with the SEC in connection with the planned sale of Torrid common stock.

37.    On June 23, 2021, Torrid announced the launch of the Company's roadshow.  To raise interest in Torrid stock in the week leading up to the IPO, Torrid and the Underwriter Defendants made presentations to investors (the "Roadshow"), using a prepared slide deck (the "Roadshow Presentation") that pitched the Company, including its past and projected financial performance.  Following two amendments, the registration statement was deemed effective on June 30, 2021 (collectively referred to as the "Registration Statement"), and was then used to sell more than $265 million of Torrid common stock in Torrid's July 1, 2021 IPO.

38.    Torrid's IPO did not serve the usual purpose of an initial public offering – raising money for the issuing business to fund continued operations, potential growth, or strategic transactions.  Rather, the proceeds raised by Torrid's IPO went to insiders, including defendants Sycamore, Elizabeth Muñoz, CEO, George Wehlitz, CFO, and Lisa Harper, director and CEO as of May 2022.   These

- 7 -

defendants sold approximately 10.8 million shares of their Torrid common stock in the IPO and netted approximately $230 million in proceeds.

39.    The Registration Statement disclosed that after the IPO Sycamore would still "continue to own a majority of the voting power of shares eligible to vote in the election of [Torrid's] directors[,]" and as a result, Torrid would still "be a 'controlled company' within the meaning of the corporate governance standards of the NYSE."

**C.    Before the IPO, Torrid Was Experiencing Undisclosed Inventory Constraints that Were Negatively Impacting the Company**

40.    Unbeknownst to investors in late 2020, Torrid began experiencing shipment delays from its manufactures in Asia, and in May 2021, two months before the IPO the delays significantly worsened due to the emergence of the Delta variant of COVID-19.

41.    Specifically, in May 2021, Torrid's manufacturers started extending shipping delays to up to three months, which more than doubled the normal production time.  These longer delays exacerbated the severe inventory constrains Torrid was already experiencing from the delays that started in late 2020.  The longer delays put severe constrains on Torrid's ability to replenish its inventory and meet customer demand.  The delays caused the Company to be behind by millions of units of product needed to fulfill customer orders at the time of the IPO.  The lengthening delays also caused millions of backlogged orders (orders received but no inventory for), in some weeks upwards of 3.1 million backlogged orders, before the IPO.

42.    Torrid's planned new merchandise introductions for 2021 included the release of 16 new lines of merchandise for the year ("fashion cycles"), meaning the Company was set to introduce new product lines every few weeks.  At the time of the IPO, however, the delays significantly impaired the Company's ability to introduce its 2021 fashion cycles as scheduled, which left Torrid struggling to have fresh inventory on-hand in its stores and on its e Commerce platform, which was

- 8 -

1    critical to the Company's ability to stay in sync with current styles and seasonal

2    trends.  Because of the delays, at least half of Torrid's 2021 scheduled fashion cycles

3    were missed and the Company suffered lost sales before the IPO.

4        43.    The longer delays also significantly disrupted Torrid's planned product

5    restocks, causing stockouts (sold-out products with no definite re-supply date) of

6    popular, high-demand core and basic items, which was resulting in lost sales and

7    customer dissatisfaction before the IPO.  Before the IPO, Torrid customers took to

8    social media and repeatedly complained about the stockouts and order backlogs, and

9    expressed dissatisfaction with the Company.

10       44.    In addition to lost sales, the shipment delays also impaired Torrid's

11   ability to accurately forecast sales.  Prior to the IPO, the Company was struggling to

12   predict demand and adjust inventory levels because of the shipment delays, which

13   caused over-ordering issues and excessive SKUs.

14       45.    Torrid's inability to quickly replenish inventory before the IPO was

15   worsened by a surge in demand the Company experienced in the quarter prior to the

16   IPO that was fueled by promotional activity, COVID-19 stimulus checks, and

17   demand that had been pent up over the pandemic.  This left the Company with lower

18   than expected inventory going into the quarter of the IPO.

19       46.    Also, Torrid was unable to change or adjust the quantities of the delayed

20   shipments because of the contract terms with its manufacturers.  The consequence

21   of this was that the Company did not have the ability to respond quickly to sales

22   trends and product performance and was unable to make inventory purchasing

23   adjustments to respond to customer demand at the time of the IPO.  For instance, for

24   products that were selling well, Torrid was not able to quickly re-order the product

25   to meet customer demand because of the shipment delays, which was resulting in

26   lost sales.  Conversely, for underperforming products that were not resonating with

27   Torrid customers, Torrid was not able to make quick purchase adjustments for those

28   products  because  of  the  delays,  which  was  leading  to  overstocking  of

- 9 -

underperforming products that could not be sold at full price.  Thus, at the time of
the IPO Torrid had more underperforming products on-hand than high demand
products because of the longer delays.  The underperforming products were being
sold through "flash sales," which were limited time sales (*e.g.*, 24 to 48 hours) at
deeply discounted prices because the underperforming product could not be sold at
full price.

47.    Also, before and leading up to the IPO, and in response to the longer
shipment delays that began in May 2021, Torrid was extending "booking times" (the
notice time Torrid's manufacturers' required to secure production slots for
merchandise orders), with its manufacturers, in some cases doubling them, which
further delayed product delivery and hindered Torrid's ability to quickly respond to
customer demand and trends.

48.    These conditions coupled with the Company's broken and inefficient
inventory management system alleged below (§IV.E.), caused Torrid to suffer a
complete meltdown in its supply chain operations and inventory management
systems.  The Company was not experiencing normal perturbations inherent in all
retail operations, but rather a discrete, incredibly rare (indeed, once-in-a-generation)
confluence of adverse events that had materially impaired the most critical aspects
of the Company's operations.  Prior to the IPO, Torrid found itself in a hole that it
could not dig itself out of.  On hand inventory at the Company was set to explode
60% year-over-year in FY 2021, much of it arriving late and requiring the Company
to dispose of merchandise at heavily discounted prices.

49.    Together, the confluence of these events created significant undisclosed
internal chaos at Torrid at the time of the IPO, including stockouts, inventory
shortages, and an inability to quickly replenish inventory or make purchasing
adjustments in response to sales trends and customer demand.  Moreover, as the
length of the delays worsened in the two months before the IPO, Torrid was facing

- 10 -

1   the near-term receipt of millions of units of delayed inventory after the IPO that

2   would be behind current trends and seasonal demand when it arrived.

3       **D.    Torrid Knew About the Shipment Delays Before the IPO**

4       50.    On September 7, 2022 Torrid filed a SEC Form 10-Q for the quarter

5   ending July 31, 2021 (2Q 2021) – the quarter in which the IPO took place.  In the

6   Company's SEC Form 10-Q Torrid reported that in-transit inventory (inventory on

7   its way to Torrid from suppliers), in 2Q 2021 represented 16% of total inventory –

8   both on-hand and in-transit – which was a significant increase from the in-transit

9   inventory reported in the Registration Statement.  This increase confirmed that the

10  shipment delays the Company was experiencing before the IPO, were increasing.

11  Investors were not privy to this information at the time of the IPO because the

12  Registration Statement only reported inventory for fiscal year ("FY") 2020 and 1Q

13  2021.

14      51.    In fact, the Registration Statement reported that Torrid's in-transit

15  inventory represented 17.05% and 13.88% of total inventory – both on-hand and

16  in-transit – at the end of FY 2020 and 1Q 2021, respectively, which led investors to

17  believe that Torrid's operations were growing leaner and its supply chains were

18  improving in speed, even in the face of the pandemic, when that was not the case.

19      52.    The next day on September 8, 2021, Torrid held the 2Q 2021

20  conference with investors, its first earnings call as a public company, to discuss the

21  Company's 2Q 2021 financial results.  During the conference call, defendant

22  Wehlitz, the Company's CFO, confirmed  that "delays associated with global supply

23  chain challenges, resulted in lower inventory levels at the end of the quarter."

24  Discussing Torrid's outlook, Wehlitz also stated that "we expect continued shipping

25  delays or congestion or manufacturing disruption."

26      53.    Wehlitz's remarks at the 2Q 2021 earnings call confirmed what Torrid

27  knew at the time of the IPO, but investors did not: Torrid's previously improving

28  supply chain was getting worse, the Company was experiencing heightened delays

1    in shipments, and these problems were wreaking havoc on Torrid's financial

2    performance.

3    54.    Following the IPO, the undisclosed negative trend affecting Torrid's

4    supply chains, causing increased inventory in-transit, only got worse:



**Percentage of Inventory In-Transit**

5    55.    Torrid knew before the IPO that the shipment delays had increased in

6    severity and was a material factor that made investment in Torrid's IPO risky and

7    that it was reasonably likely that the delays would have a material adverse effect on

8    Torrid's financial performance.

### E.    Prior to the IPO, Torrid Was Also Operating with a Broken and Inefficient Inventory Management System

19    56.    Unbeknownst to investors, prior to the IPO, the Company had been

20    experiencing supply chain and inventory problems for years.  In fact, in July 2017,

21    Defendants attempted to take Torrid public and filed a registration statement with

22    the SEC ("2017 Registration Statement"), but because of inventory management

23    problems, Defendants withdrew the 2017 Registration Statement in April 2019,

24    stating: "The Company believes that the withdrawal of the Registration Statement

25    would be consistent with the public interest and the protection of investors."

26    57.    In a news article published on the day of Torrid's IPO, the author

27    summarized Muñoz's explanation for Torrid's withdrawal of the 2017 Registration

28    Statement: "Torrid had experienced skyrocketing growth year over year but, as

- 12 -

1    sometimes happens, it had skipped some critical steps that would become important

2    at some point," and "[a]mong other things, the chain had an inventory problem.  And

3    its IT functions were still being handled by Hot Topic."[2]

4      58. In the article, Muñoz also stated that Defendants withdrew the 2017

5    Registration Statement because of the inventory management issues, including lack

6    of discipline and an unmanageable depth/breadth of product offerings (identified by

7    SKUs).  In the article, Muñoz was quoted, stating:

8       We didn't have our head around inventory management.  We had

9       no targets or disciplines around how we acquired inventory.  And as a

10      product person, I felt there was a constant proliferation of SKUs.  So

11      with not having our inventory problem sorted out, and not having all

12      the right leadership in place, we pulled the filing.  It just didn't feel like

13      the right time.

14     59. Quoting Muñoz, the article also stated that the Company had

15   purportedly implemented the changes needed to correct the inventory management

16   issues and make Torrid the "fully-functioning independent company that it is today,"

17   including putting in a new leadership team "who [purportedly] deployed core

18   disciplines and targets, and reduced SKUs by 20%[,]" which improved margins.

19     60. During the interview, Muñoz also assured investors that "the timing

20   was right this time around for our IPO, both culturally as well as where we are as a

21   company," thereby assuring investors that the Company's inventory management

22   was no longer presenting problems.

23     61. However, Torrid was never able to remedy its inventory management

24   problems before the onset of the pandemic in early 2020.  In fact, prior to the IPO

25   Torrid continued to struggle with an unmanageable SKU depth/breadth of product

26   _____

27   [2] *See* Marianne Wilson, *Exclusive: Torrid CEO sees plenty of room for growth*,
     Chain Store Age (July 1, 2021), https://chainstoreage.com/exclusive-torrid-ceo-

28   sees-plenty-room-growth.

- 13 -

offerings and was over-positioning itself in certain styles, including Basics and Core styles and Curve inventory. These problems were making it difficult for the Company to track sales trends and consumer preferences, and to make informed decisions about planned and future assortments, restocking and promotions. By the time of the IPO, Torrid had completely lost its ability to accurately monitor demand and adjust inventory levels in real-time and, by virtue, its ability to ensure it had the right products on hand to meet customer demand.

62. Defendant Harper later revealed, during Torrid's December 8, 2022 earnings call, that, prior to the IPO and "over the pandemic time[,]" the Company had ceased using the core disciplines that Torrid had previously implemented in response to inventory management problems, stating in relevant part:

> So I've been here a few months. And one of the things that we've really focused on aside from building the right team and building the right operational foundation for the business is the process for developing our product assortment flow and those assortments by channel.
>
> ***And some of that discipline had been lost over the pandemic time period. And we've reinstated processes*** that are very straightforward, that are very typical and well known in this environment ***and moving more of our analysis and development earlier in the process, meaning a template for the development and then being able to really test and react more appropriately*** as we move down the path.
>
> So we've changed the process for development. We're – and ***we're also have reinstated our chase mode***. Our chase capabilities in the business and we're being able to chase as we go into the first quarter. ***And just basically put some core disciplines into place, particularly in assortments by category and by channel***, the new stores versus online assortments.

So I feel very comfortable with the disciplines that we've put in place that will help deliver some consistency as we move into spring and throughout the balance of next year. Putting chase back in place, leading liquidity and our inventory will allow us to react to the customer more appropriately and help build some of that consistency.

### F.    The Registration Statement Contained Untrue Statements of Material Fact and Omitted Material Facts Necessary to Make the Statements Therein Not Misleading[3]

63.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact and omitted material facts that were required to be disclosed pursuant to the regulations governing its preparation.

64.    Specifically, the Registration Statement did not provide information to investors regarding the negative impact the lengthening merchandise shipment delays from Torrid's manufacturers were having on the Company's ability to replenish inventory and meet customer demand, both of which were causing millions of dollars in backorders and would negatively impact Torrid's sales and expenses in the second half of FY 2021. Quite the opposite, in several instances the Registration Statement stated that Torrid business model had the "flexibility to respond quickly" to the "latest sales" trends:

We leverage our robust customer data to inform purchasing decisions and ***have the flexibility to respond quickly to the latest sales trends*** and incorporate customer feedback to deliver the products our customer wants.

*       *       *

---

[3]    Plaintiffs assert that all of the statements set forth below that are bolded and italicized were materially false and or misleading for the reason set forth therein. Non-bolded and non-italicized statements are included for context.

4878-3939-4968.v1

Through our vertical sourcing model, ***we have the flexibility to respond
quickly to the latest sales trends and make adjustments to our current
offering*** based on customer feedback to deliver product our customer
wants.

*      *      *

***[W]e have the flexibility to react quickly to product performance,
make-in-season inventory purchasing adjustments where possible
and to respond to the latest sales trends by ordering or re-ordering as
appropriate.***

65.     The Registration Statement also told investors that prior to the IPO,
Torrid made "targeted investments and changes to our process ***to improve the speed
and flexibility of our supply chain including shortening our development cycle by
two weeks***."

66.     The Registration Statement also stated that the Company had
"Enhanc[ed] Supply Chain Flexibility" as a result of using a "speed model" for
inventory acquisition, which purportedly allowed the Company to "***accelerate
product replenishment cycles, improve inventory turnover and drive higher
margins sales***."

67.     The Registration Statement added that "[u]nlike brands that do not
focus exclusively on plus-size, we have the requisite scale to order sufficient
quantities and effectively manage a continuously refreshed plus-size inventory."

68.     The statements in ¶¶64-67 were materially false and/or misleading or
omitted material information necessary to make them not misleading because they
failed to disclose the following adverse facts that existed at the time of the IPO:

(a)     Beginning in late 2020 Torrid experienced inventory shipment
delays due to port congestion in Long Beach and Los Angeles, and factory closures
of its Asia-Pacific manufacturers, and in May 2021 the delays significantly

- 16 -

worsened.  In May 2021, two months before the IPO, merchandise shipments were taking up to three months, more than double normal production time.  The delayed shipments were causing severe inventory shortages that were, in turn, causing increasingly growing order backlogs, to the point that over 3 million customer orders remained unfulfilled in the months before the IPO.  At the time of the IPO, order backlogs were taking up to 2 to 3 months to fill.

(b)     Because of the shipment delays, product replenishment cycles were not being accelerated, but, rather, had also been delayed, causing order backlogs, stockouts, and lost sales.

(c)     Torrid did not have the flexibility or ability to adjust ordered product quantities once the shipments were delayed because of the contract terms with its manufacturers.  The consequence of this was that the Company did not have the ability to respond quickly to sales trends and product performance and was unable to make inventory purchasing adjustments to respond to customer demand at the time of the IPO.

(d)     The delayed shipments had materially impaired Torrid's ability to restock popular and high demand items and caused the Company to miss the release schedules for its planned 2021 fashion cycles, with at least half the cycles missed or delayed.  As a result, Torrid lost sales at the time of the IPO.

(e)     The delayed shipments caused stockouts for Torrid's most popular items that sold quickly, while less sought after and late-arriving products accumulated and required promotions to sell.  As a result, the composition of Torrid's inventory significantly changed where Torrid had more underperforming products on hand at the time of the IPO than high demand products and the underperforming products could not be sold at full price.

(f)     The shipment delays caused an increase in operating expenses for expedited shipping methods such as airfreight, which negatively impacted Torrid's financial performance.

4878-3939-4968.v1

(g)    The shipment delays created uncertainty in the Company's demand forecast as it was unable to accurately forecast customer demand, which lead to an overestimation of inventory needed.

(h)    The failure of Torrid's critical inventory management system caused the Company to be unable to monitor and adjust stock levels in real-time, thus creating an excess inventory problem.

69.    The risk factors included in the Registration Statement were also materially false and misleading and omitted material information necessary to make them not misleading.  For example, the risk factors failed to disclose the most significant risks impacting Torrid at the time of the IPO, including lengthening merchandise shipment delays, the Company's then-existing inability to replenish merchandise to meet customer demand that would continue after the IPO, and a broken and inefficient inventory management system that was impairing Torrid's ability to accurately monitor demand and adjust inventory levels in real-time, to ensure it had the right products on hand to meet customer demand.

70.    For example, although the Registration Statement purported to warned that Torrid **may** be negatively impacted by "**inventory shortages**" "**if our manufacturers fail to supply quality products in a timely manner**," the converse was already true and would continue to be true in the second half of FY 2021.

71.    Similarly, the following purported risk warning was materially misleading for the same reason:

> **If our manufacturers do not ship orders to us in a timely manner or meet our quality standards, it could cause delays in responding to consumer demands or inventory shortages and negatively affect consumer confidence in the quality and value of our brand or negatively impact our competitive position.**

72.    The Registration Statement's risk factors also stated that the "COVID-19 outbreak **has the potential** to cause a disruption in our supply chain and **may**

- 18 -

4878-3939-4968.v1

adversely impact economic conditions in North America, Europe, China and elsewhere," but failed to disclose that supply chain disruptions in the form of lengthening shipment delays were already impacting the Company's business, financial results, and sales prospects.

73.    The Registration Statement's failure to disclose adverse facts rendered the discussion of future, potential risks contained therein themselves materially misleading.

**G.    The Registration Statement Failed to Disclose Information Required to Be Disclosed Under SEC Regulation S-K**

74.    In addition to the materially false and misleading statements identified above, Defendants also violated their affirmative obligations to provide certain material information in SEC filings as required by applicable SEC rules and regulations.

75.    Specifically, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105(a), required the Registration Statement to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."  Although the Registration Statement included a discussion of risk factors, that discussion was materially incomplete and therefore misleading.  The disclosures in the Registration Statement failed to adequately alert investors to the actual risks associated with an investment in Torrid.

76.    As set forth herein, the Registration Statement omitted material information required to be stated therein, including that in May 2021 Torrid experienced longer shipment delays, and because those delays experienced lost sales due to order backlog, stockouts, and missed fashion cycles, and was facing the future receipt of millions of units of delayed inventory, which could not be adjusted, and would be behind current trends and seasonal demand once it was received.

77.    As a result, Defendants had a duty to disclose the following adverse factors that made Torrid's IPO risky: (i)  Torrid experienced lengthening shipment

- 19 -

delays beginning in May 2021 that constrained Torrid's ability to obtain and replenish inventory; (ii) these lengthening delays caused lost sales because the Company missed planned 2021 fashion cycles; (iii) these lengthening delays also caused lost sales because Torrid could not quickly restock popular and high demand items; (iv) these lengthening delays caused the composition of Torrid's inventory to dramatically change to where the Company had more underperforming products on-hand that high-demand products; (v) the delays caused an increase in operating expenses for expedited shipping; and (vi) Torrid was faced the future receipt of millions of units of delayed inventory, which could not be adjusted, and would be behind current trends and seasonal demand once it was received.  Because the Registration Statement did not make the requisite disclosures, Defendants violated Item 105.

78.    Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii), required the Registration Statement to "[d]escribe any known trends or uncertainties that have had or that [the Company reasonably expects are] likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Such disclosures are required to be made by an issuing company in registration statements filed in connection with public offerings.

79.    In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating:

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

80.    Further, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

- 20 -

(1)   Is the trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2)   If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

81.   On April 7, 2003, the SEC issued a final rule addressing registrants' disclosure obligations under Item 303 ("2003 Rule"), and modified it on May 7, 2003.   It emphasizes that management discussion and analysis ("MD&A") disclosures are "of paramount importance in increasing the transparency of a company's financial performance and providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions."  The 2003 Rule further states that the MD&A provides "a unique opportunity for management to provide investors with an understanding of its view of the financial performance and condition of the company, an appreciation of what the financial statements show and do not show, as well as important trends and risks that have shaped the past or are reasonably likely to shape the future."

82.   The Registration Statement failed to disclose the following known trends, events or uncertainties, which existed at the time of the IPO, in violation of Item 303, including that: (i) Torrid experienced lengthening shipment delays beginning in May 2021 that constrained Torrid's ability to obtain and replenish inventory; (ii) these lengthening delays caused lost sales because the Company missed planned 2021 fashion cycles; (iii) these lengthening delays also caused lost sales because Torrid could not quickly restock popular and high demand items; (iv) these lengthening delays caused the composition of Torrid's inventory to

- 21 -

dramatically change to where the Company had more underperforming products on-hand that high-demand products; (v) the delays caused an increase in operating expenses for expedited shipping;  and (vi) Torrid was faced the future receipt of millions of units of delayed inventory, which could not be adjusted, and would be behind current trends and seasonal demand once it was received.

**H.    The Company's Misstatements and Omissions of Fact Were Material**

83.    As detailed above, the Registration omitted to state material information about the lengthening shipment delays, and their impact to Torrid's business operations and financial performance and that Torrid was operating with a broken and inefficient inventory management system, that was necessary to make the statements contain therein not misleading to investors and failed to disclose information that was required to be stated therein pursuant to the rules governing preparation.

84.    Torrid operates a merchandise-light model.  This allows the Company to save on costs, as the Company carries less inventory on hand.  As a result, the Company's inventory management systems are critically important to the Company's business, financial results, and operations.  Indeed, in 2017 the Company withdrew a planned IPO because of problems with its inventory management system.  It was absolutely critical to investors that the Company's inventory issues had been fixed, and indeed the resolution of these problems became a key selling point to investors in the IPO.

85.    Likewise, in the fast-paced women's fashion industry, Torrid's ability to replenish and restock its inventory quickly, and align the timing of its product launches with current styles and seasonal trends, was critical to the Company's financial success in growing sales and maintaining customer interest and loyalty. Torrid's ability to receive inventory in time for its scheduled restocks and fashion cycles was key to the Company being able to meet customer demand, manage

4878-3939-4968.v1

stockouts, and avoid lost sales due to merchandise unavailability. Indeed, as Torrid itself explained to investors in the Registration Statement, any delay in merchandise shipments from manufacturers was material to Torrid's business as it could result in inventory shortages, which may negatively impact customer relationships, diminish brand loyalty and result in lost sales.

86. Also, in the lead up to the IPO, Muñoz and other executives claimed that Torrid had fixed its inventory problems that had led to the withdrawal of the Company's earlier IPO attempt. In the Registration Statement Torrid claimed to have implemented a new "speed" inventory system that allowed the Company to quickly replenish merchandise. This is the context in which investors received and read the representations made about Torrid in the Registration Statement.

87. Moreover, Torrid's IPO took place during the COVID-19 pandemic. The Registration Statement and IPO roadshow gave investors comfort that Torrid's business model had demonstrated resiliency to COVID-19-related supply chain disruptions. For example, Torrid's IPO Roadshow Presentation told investors that while the Company saw negative comparable sales in the first six months of the pandemic (February through July 2020), the Company had implemented operational changes to improve the flexibility of its supply chain that accelerated comparable sales growth in the three quarters leading up to the IPO (August 2020 to May 2021). Indeed, in the quarter prior to the IPO, the Registration Statement highlighted a 108% year-over-year increase in comparable sales, and a 108% year-over-year increase to $326 million in net sales.

## I.    Post IPO Events

88. As discussed above in ¶52, following the IPO, on September 8, 2021, Torrid reported financial results for its fiscal quarter ended July 31, 2021, the quarter at the end of which the IPO was conducted. On the conference call with investors the same day, defendant Wehlitz acknowledged that the Company had experienced inventory "delays" during the quarter that resulted "in lower inventory levels at the

- 23 -

end of the quarter."  Also, in Torrid's SEC Form 10-Q filed the day before, Torrid's in-transit inventory increased significantly in 2Q 2021, from the prior quarter.

89.     On December 8, 2021, Torrid reported its 3Q 2021 financial results (the three months ended October 20, 2021).  The Company reported lower than expected sales because "supply chain disruptions limited product availability throughout the third quarter," and revised guidance downward because of the continuing shipment delays, increasing expenses to accelerate inventory delivery, and its inability to replenish inventory to meet customer demand.  On Torrid's earnings conference held with investors the same day, in response to an analyst's about whether "out-of-stocks" were the reason for weaker sales, Wehlitz confirmed in the affirmative, stating: "[W]e do believe that had we had the ample amount of inventory that we were wanting and when we wanted it that our sales would have incremented much higher than we currently had reported at this point.  So mostly related to the delays . . . ."  On December 8, 2021 also filed its SEC Form 10-Q, that reported Torrid's in-transit inventory at the end of 3Q 2021 increased to 19.58%, which was over 40% more than the portion of inventory that was 1Q 2021 in-transit reported in the Registration Statement.

90.     On June 7, 2022 Torrid announced its 1Q 2022 financial results.  On the earnings conference call held the same day, the Company gave disappointing 2Q 2022 guidance, stating that 2Q "outlook assumes our gross margin rate will be below Q1 as we clear through inventory heading into the back half of the year."  Defendants also reported on the call that 1Q 2022 inventory was up 51% compared to 2019 levels, with only 30% sales growth.

91.     On December 8, 2022 Torrid announced its 3Q 2022 financial results.  On the earnings call held the same day investors learned that Torrid's gross profit margins continued to decline, now only 31.6% in the third quarter of 2022, compared to 40.9% just the year before.  Defendants lowered guidance for FY 2022, as Torrid "continue[d] to focus on reducing [its] inventory levels" because "[u]nfortunately,

- 24 -

1    given [Torrid's] inventory position" it would have to maintain high levels of

2    promotional activities to "continue to clear through product."

3    **V.    CLASS ALLEGATIONS**

4        92.    Plaintiffs bring this action as a class action on behalf of a class

5    consisting of all persons who purchased Torrid common stock in or traceable to the

6    IPO (the "Class").  Excluded from the Class are Defendants and their families, the

7    officers, directors, and affiliates of Defendants, at all relevant times, and members

8    of their immediate families, and their legal representatives, heirs, successors, or

9    assigns, and any entity in which Defendants have or had a controlling interest.

10        93.    The members of the Class are so numerous that joinder of all members

11    is impracticable.  Torrid common stock is actively traded on the NYSE and millions

12    of shares were sold in the IPO.  While the exact number of Class members is

13    unknown to Plaintiffs at this time and can only be ascertained through appropriate

14    discovery, Plaintiffs believe that there are hundreds of members in the proposed

15    Class.  Record owners and other members of the Class may be identified from

16    records maintained by Torrid or its transfer agent and may be notified of the

17    pendency of this action by mail, using the form of notice similar to that customarily

18    used in securities class actions, including being given an opportunity to exclude

19    themselves from the Class.

20        94.    Plaintiffs' claims are typical of the claims of the members of the Class,

21    as all members of the Class are similarly affected by Defendants' wrongful conduct

22    in violation of federal law that is complained of herein.

23        95.    Plaintiffs will fairly and adequately protect the interests of the members

24    of the Class and have retained counsel competent and experienced in class and

25    securities litigation.

26        96.    Common questions of law and fact exist as to all members of the Class

27    and predominate over any questions solely affecting individual members of the

28    Class.  Among the questions of law and fact common to the Class are:

- 25 -

1    (a)    whether Defendants violated the 1933 Act;

2    (b)    whether statements made by Defendants to the investing public

3  in the Registration Statement misrepresented material facts about the business,

4  operations, and risks of investing in Torrid; and

5    (c)    to what extent the members of the Class have sustained damages

6  and the proper measure of damages.

7    97.    A class action is superior to all other available methods for the fair and

8  efficient adjudication of this controversy as joinder of all members is impracticable.

9  Furthermore, as the damages suffered by individual Class members may be

10  relatively small, the expense and burden of individual litigation make it impossible

11  for members of the Class to individually redress the wrongs done to them.  There

12  will be no difficulty in the management of this action as a class action.

13  **VI.    COUNTS**

14  **COUNT I**

15  **Violations of §11 of the Securities Act (Against All Defendants)**

16    98.    Plaintiffs incorporate ¶¶1-97 as though fully set forth herein.

17    99.    By reason of the conduct herein alleged, each defendant named in this

18  Count violated §11 of the 1933 Act.

19    100.    For all the reasons set forth above in ¶¶40-47, 56-62, 68-69, 77, 82, the

20  Registration Statement contained untrue statements of material fact and omitted

21  material facts necessary to make the statements made therein not false or misleading.

22    101.    On July 1, 2021, Torrid conducted its IPO pursuant to SEC Form S-1

23  which Torrid filed publicly with the SEC on June 7, 2021 and, after several

24  amendments, was declared effective on or about June 30, 2021.

25    102.    Plaintiffs purchased Torrid common stock pursuant and/or traceable to

26  the Registration Statement.

27

28

- 26 -

4878-3939-4968.v1

103.   Torrid is the registrant for the IPO.  As issuer of the common stock, Torrid is strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

104.   In the exercise of reasonable care, each of the Defendants named herein, should have known of the misstatements and omissions contained in the Registration Statement as set forth above at ¶¶64-67, 70-72.

105.   Each of the Individual Defendants either signed and/or was involved in preparing the Registration Statement.

106.   None of the Individual Defendants conducted a reasonable investigation or possessed reasonable grounds to believe that the Registration Statement did not contain untrue statements of material fact or omit material facts necessary to make the statements made therein not false or misleading.

107.   The Underwriter Defendants served as underwriters of the IPO.  The Underwriter Defendants did not conduct a reasonable investigation or possess reasonable grounds to believe that the Registration Statement did not contain untrue statements of material fact or omit material facts necessary to make the statements made therein not false or misleading.

108.   Plaintiffs and the other members of the Class who purchased Torrid common stock pursuant or traceable to the Registration Statement sustained substantial damages in connection therewith.

109.   Less than one year has elapsed since Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based.  Less than three years elapsed between the time that the common stock upon which this Count is brought were offered to the public and the time this action was commenced.

## COUNT II

### Violation of §12(a)(2) of the Securities Act (Against All Defendants)

110.   Plaintiffs incorporate ¶¶1-109 as though fully set forth herein.

4878-3939-4968.v1

111.   This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77*l*(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Torrid common stock in and pursuant to the IPO and who were damaged thereby.

112.   By reason of the conduct alleged herein, the Defendants violated §12(a)(2) of the Securities Act.  The Registration Statement, and the Prospectus incorporated therein, and oral communications made by Defendants in connection with the IPO contained untrue statements of material fact, and omitted material facts necessary to make the statements made therein not misleading as detailed above at ¶¶64-67, 70-72.

113.   Each of the Defendants offered or sold Torrid common stock by means of the Registration Statement and the Prospectus incorporated therein.

114.   Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Registration Statement and the Prospectus incorporated therein at the time it acquired the Company's shares.

115.   Class members who hold such common stock have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the Defendants named herein.  Class members who have sold their shares of common stock seek damages to the extent permitted by law.

### COUNT III

**Violations of §15 of the Securities Act (Against the Individual Defendants and Sycamore Defendants)**

116.   Plaintiffs incorporate ¶¶1-115 as though fully set forth herein.

117.   By reason of the conduct alleged herein, the Individual Defendants and the Sycamore Defendants violated §15 of the Securities Act.  Each of the Individual Defendants and Sycamore Defendants was a control person of Torrid by virtue of his or her position as an owner, director and/or senior officer of Torrid.

- 28 -

4878-3939-4968.v1

118.   The Individual Defendants and the Sycamore Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or were major shareholders of Torrid.

119.   As detailed in ¶29, Sycamore is Torrid's largest shareholder and controlled Torrid at the time of the IPO.  Sycamore possessed control over Torrid and the Individual Defendants by and through its holdings in Torrid common stock, which Sycamore held through the Sycamore Entities.  The Sycamore Defendants individually and collectively possessed control over Torrid and the Individual Defendants.

120.   Each of the Individual Defendants and Sycamore Defendants was a participant in the violations of §§11 and 12(a)(2) of the 1933 Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process by which the IPO was completed.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.   Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representative and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.   Declaring that Defendants are liable pursuant to the Securities Act;

D.   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants jointly and generally for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, together with interest thereon;

E.   Awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees, and other costs and disbursements;

- 29 -

4878-3939-4968.v1

1    F.    Awarding rescission or a rescissory measure of damages; and

2    G.    Awarding Plaintiffs and other members of the Class injunctive and

3    other equitable relief, including rescission, as appropriate, in addition to any other

4    relief that is just and proper under the circumstances.

5    **VIII. JURY DEMAND**

6    Plaintiffs hereby demand a trial by jury.

7    DATED:  December 22, 2023                ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
8                                                          LAURIE L. LARGENT
                                                            STEPHEN JOHNSON
9

10                                                        s/ LAURIE L. LARGENT

11                                                        LAURIE L. LARGENT

12                                                        655 West Broadway, Suite 1900
                                                            San Diego, CA  92101
13                                                        Telephone:  619/231-1058
                                                            619/231-7423 (fax)
14                                                        llargent@rgrdlaw.com
                                                            sjohnson@rgrdlaw.com
15
                                                            Lead Counsel for Lead Plaintiff
16
                                                            VANOVERBEKE, MICHAUD
17                                                           & TIMMONY, P.C.
                                                            THOMAS C. MICHAUD
18                                                        79 Alfred Street
                                                            Detroit, MI  48201
19                                                        Telephone:  313/578-1200
                                                            313/578-1201 (fax)
20                                                        tmichaud@vmtlaw.com

21                                                        Additional Counsel for Lead Plaintiff

22

23

24

25

26

27

28

- 30 -

4878-3939-4968.v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEVI & KORSINSKY LLP
SHANNON L. HOPKINS (admitted *pro
hac vice*)
GREGORY M. POTREPKA (admitted
*pro hac vice*)
DAVID JAYNES
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: 203/9924523
shopkins@zlk.com
gpotreka@zlk.com
djaynes@zlk.com

Attorneys for Plaintiff Erika Schroth

4878-3939-4968.v1