# EXHIBIT D

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE JOSEPHINE L. STATON, U.S. DISTRICT JUDGE**

SANDRA WASWICK,                              )
                                             )
                    Plaintiff,               )
                                             )
     v.                                      )          Case No.
                                             )   CV 22-8375 JLS (ASx)
TORRID HOLDINGS, INC., et al.,               )
                                             )
                    Defendants.              )
_____)

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**MOTIONS HEARING**
**FRIDAY, NOVEMBER 3, 2023**
**10:31 A.M.**
**LOS ANGELES, CALIFORNIA**

_____

**MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA  90012
(213) 894-2305

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM:**

    ROBBINS, GELLER, RUDMAN & DOWD, LLP
    BY:  LAURIE L. LARGENT
    BY:  STEPHEN JOHNSON
         Attorneys at Law
    655 West Broadway, Suite 1900
    San Diego, California  92101
    (619) 231-1058

**FOR THE PLAINTIFF ERIKA SCHROTH:**

    LEVI & KORSINSKY, LLP
    BY:  SHANNON L. HOPKINS
         Attorney at Law
    1111 Summer Street, Suite 403
    Stamford, Connecticut  06905
    (203) 992-4523

**FOR THE DEFENDANTS TORRID HOLDINGS, INC., SYCAMORE ENTITIES, and INDIVIDUAL DEFENDANTS:**

    KIRKLAND & ELLIS, LLP
    BY:  AUSTIN C. NORRIS
         Attorney at Law
    2049 Century Park East, Suite 3700
    Los Angeles, California  90067
    (310) 680-8184

    KIRKLAND & ELLIS, LLP
    BY:  MARK C. HOLSCHER
         Attorney at Law
    555 South Flower Street, Suite 3700
    Los Angeles, California  90071
    (213) 680-8400

///

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL, CONTINUED:**


**FOR THE DEFENDANT MORGAN STANLEY & CO., LLC:**

    ORRICK, HERRINGTON & SUTCLIFFE, LLP
    BY:  ALEXANDER K. TALARIDES
         Attorney at Law
    405 Howard Street
    San Francisco, California  94105
    (415) 773-5700

**UNITED STATES DISTRICT COURT**

4

FRIDAY, NOVEMBER 3, 2023; 10:31 A.M.

LOS ANGELES, CALIFORNIA

-oOo-

THE COURTROOM DEPUTY:  Calling CV 22-8375 JLS, Sandra Waswick versus Torrid Holdings, Inc., et al.

Counsel, please state your appearances.

MS. LARGENT:  Good morning, Your Honor. Laurie Largent with Robbins, Geller, Rudman & Dowd for the City of Warren Police and Fire Retirement System.  And I have with me Stephen Johnson also from Robbins Geller.

MR. JOHNSON:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. HOPKINS:  Good morning, Your Honor. Shannon Hopkins with Levi & Korsinsky for the plaintiffs.

THE COURT:  Good morning.

MR. NORRIS:  Good morning, Your Honor. Austin Norris, Kirkland & Ellis, for Torrid, Sycamore entities, as well as the individual defendants.

THE COURT:  Good morning.

MR. HOLSCHER:  Good morning, Your Honor.  Also here with Austin Norris, Mark Holscher from Kirkland & Ellis for the defendant.

MR. TALARIDES:  Good morning, Your Honor. Alex Talarides of Orrick, Herrington & Sutcliffe here on behalf of underwriter defendants.

**UNITED STATES DISTRICT COURT**

THE COURT:  All right.  Good morning to all of you. And we're here on the defendants', plural, motion to dismiss. So because it is defendants' motion, why don't I hear from you first.  So whoever wishes to go first.

MR. NORRIS:  Should we go to the podium, Your Honor?

THE COURT:  The lectern, yes, please.

MR. NORRIS:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. NORRIS:  I know the briefing was thorough.  I won't belabor the points that were made in the papers, but I do want to emphasize a few points and perhaps put a new angle on some points that were made in the briefing that I do think are relevant and could be helpful for the Court.

The first point, Your Honor, is that, although it's a lengthy Complaint -- I think there's something like 270 paragraphs -- really the whole case comes down to a small handful of paragraphs that make allegations from two confidential witnesses.  This is paragraphs 34 to 41 of the First Amended Complaint.  And they're labeled as CW1 and CW2.

So both of these confidential witnesses, Your Honor, are, as they allege, relatively low-level employees at Torrid's distribution center in Ohio.  They don't work at headquarters. They don't allege any contact with any of the defendants.  They don't allege any contact, conversations, knowledge, anything, related to any of Torrid's officers, directors, or management.

UNITED STATES DISTRICT COURT

6

And really the Court can just focus on these seven paragraphs and grant the motion to dismiss because there's really nothing there.

So to frame this, Your Honor, the First Amended Complaint challenges more than 50 sets of statements that are made over the course of a year and a half.  The IPO, July 1, 2021, and the end of the class period, December 8th, 2022.  That's a year and a half.  And everybody agrees that the class period spans a period of incredible market volatility in the United States, perhaps unprecedented and worldwide because it occurred during the COVID pandemic.

So during this period, you have the Delta wave, the Omicron wave, you have factory closures, you have stay-at-home orders, supply chain issues, international lockdowns, all of which were extensively reported on.  And everybody knows that we lived through it.

But the point is that this is a dynamic time for companies and perhaps especially companies in the retail industry.

So there are a number of forces affecting Torrid during the class period.  And that's why it's especially important here to know what are the factual allegations that plaintiffs are relying upon from these confidential witnesses and what is the time period that they're alleging that these things occurred?

**UNITED STATES DISTRICT COURT**

Because the Court needs to map the potential misrepresentations -- again, a year and a half -- on to specific facts that happened contemporaneously with the out -- alleged misstatements.  That's the Ninth Circuit standard.  That's what's required to allege securities fraud.

But the allegations that they rely upon just don't allow that to happen because they're hopelessly vague.

So the first point, Your Honor, one could accept everything that these confidential witnesses say is true.  Let's just give them the benefit of the doubt.  And none of it contradicts anything that the company said.

They're making vague allegations to references of shipping delays, to backlogs, to time -- taking a long time to process things in the distribution center.  Again, they don't give any specifics on what those issues are or whether they're material or how big they were.

THE COURT:  Let me jump in with a question here.

MR. NORRIS:  Yes, Your Honor.

THE COURT:  There's one area.  I know you've read *Rivian* because you cited to it a number of times.  And they ended up surviving with essentially one claim, if you looked at the second order on the motion.

So let me direct you to one particular alleged false or misleading statement and that is that the registration statement provides that, "If the distribution facilities" --

**UNITED STATES DISTRICT COURT**

and I'm quoting -- "serving our business were to encounter difficulties, we could face shortages of inventory in our stores, delayed shipments to our e-commerce customers, and harm to our reputation."

And the plaintiffs allege in paragraph 35 that that had already essentially happened, that in the months leading up to the IPO, order backlogs were so severe that millions of customer orders remained unfulfilled.

So how is that not adequately pleaded as a false or a misleading statement because Torrid was representing as a possibility a problem that had, in fact, already materialized?

So that's the -- that's the area that I would like you to focus on.

MR. NORRIS:  Thank you, Your Honor.  Appreciate that.

So, again, this is why it's so important to focus on what are the actual allegations in the Complaint.  Okay?  So paragraph 35, we have -- in the months leading up to the IPO -- again, no specifics on what months, how long before the IPO, et cetera, so set that aside -- Torrid had been late in receiving merchandise orders from its manufacturers and suppliers, in some cases up to three months after scheduled deliveries.  Okay.  So that's -- that's it for that sentence.

Now, there's no specificity supplied here, Your Honor, regarding what manufacturers, what suppliers, how

many orders there were, how that led to a backlog.  Really, there's no conception in the Complaint whether this was material or whether it was a one-time blip.  It could be one supplier, it could be one manufacturer for all we know from the Complaint.

Now, why is that important?  It's important, Your Honor, because the securities laws and the Ninth Circuit precedent is very clear that there is no obligation to disclose any and all material information to investors.  This is the *Weston Family v. Twitter* case where the Court very clearly says the securities laws do not require realtime business updates or complete disclosure of all material information whenever a company speaks on a particular topic.

They also say, "Put another way, companies do not have an obligation to offer an instantaneous update of every internal development, especially when it involves the oft tortuous path of product development."  The same could be said here with regard to the shipping and sale of products.

So we have no specificity regarding what these alleged issues were in the months leading up to the IPO.

And then later in 35, they shift focus, Your Honor.  They say, "CW1 also reported that, before the IPO, inventory flow into the distribution center was a constant problem" -- this is the language that Your Honor just quoted --

THE COURT:  Right.

**UNITED STATES DISTRICT COURT**

MR. NORRIS:  -- "and created increasingly growing customer order backlogs to the point that millions of customer orders remained unfulfilled because of the delayed shipments and not enough human resources at the distribution center."

Your Honor, "before the IPO" is not a specific time period.  The company was founded in 2001.  It IPO'd on July 1, 2021.  That's a 20-year period of time.  And there's no specificity in this paragraph to tell us when they are alleging that these issues occurred.

Now, let's just say that they did allege it with specificity.  Even though they don't, for the sake of argument, let's say they did.

In *Rivian*, Your Honor, there was an argument made based on five CW statements with very detailed knowledge of issues affecting the company, specific conversations alleged with members of management, a meeting with the CFO, firing a consultant, forming a group to focus on cost issues.  And the key there was that there was this years-long alleged issue that was known to everybody internally at management at *Rivian*, allegedly, but not disclosed to the market.

And on the basis of that claim, this Court found that perhaps they could have disclosed more when they gave their risk disclosures.

Your Honor, this is a completely different issue.  And I want to focus the Court specifically on language in the

*Rivian* case.

This is from the second *Rivian* order.  And what the Court says is, "What plaintiffs allege was concealed from investors is not a garden-variety adverse event but a major obstacle to profitability unique to *Rivian*."  Not a garden-variety adverse event, a major obstacle.

Remember, there was this concealed issue allegedly that everybody at the company knew the company could never be profitable.

THE COURT:  Yes.  I remember the facts.

MR. NORRIS:  Thank you, Your Honor.

Worlds away from what we're talking about here. We're talking about a retail company that's doing everything it can to get orders to customers in the middle of an unprecedented pandemic.

Are we really going to say that a retail company has an obligation under the federal securities laws to disclose to investors a two-month delay in shipping, again, of an unknown quantity, a three-month delay in shipping, again, unknown what that merchandise was, whether they already had it in inventory, how it affected the company, et cetera?

You can't impose that obligation under the *Weston Family* case.

Now, another distinction from *Rivian*.  Your Honor, the registration statement here doesn't stop with potential

risks.  Now, there are robust potential risks disclosed.  And -- but there's also disclosures of actual facts that were affecting the company at the time.  So just focusing on the registration statement.

And as Your Honor knows, we need to consider in this analysis everything that is in the statement, everything that's incorporated therein because the Supreme Court has made clear that investors read the whole document.  They don't just read the sections that plaintiffs want us to focus on, they focus on the hedges, disclaimers, and apparently conflicting information.  It's all considered together.

So what did the company tell investors?  "The COVID-19 outbreak has the potential to cause disruption in our supply chain and may adversely impact economic conditions.  Our business is dependent upon our ability to identify and respond to changes in customer preferences.  Our failure to identify and react appropriately could lead to excess or insufficient amounts of inventory markdowns and write-offs."

Specific risk disclosures relating to the manufacturing facilities.  "We do not own or operate any manufacturing facilities and, therefore, depend on third parties for the manufacture of all our merchandise.  The inability of a manufacturer to ship goods on time and/or specifications could negatively impact our business."

Okay.  Those are the potential risks.  But the

company didn't stop there, Your Honor.  Remember, this is the pandemic.  Everyday investors are reading news reports about supply chain issues, port closures.  Investors come to the table with all of that in context.  But notwithstanding that, there were specific disclosures in the registration statement.

"The global crisis resulting from the spread of COVID-19 has disrupted and continues to significantly disrupt local, regional, and global economics and businesses in the United States and internationally.  Our operations and financial performance have been affected by" -- not "could be affected by" -- "have been affected by and may continue to be affected by the COVID-19 pandemic, specifically as to suppliers and manufacturers.  The COVID-19 pandemic has caused general business disruption worldwide.  The operations of our suppliers and manufacturers and behaviors of customers have, likewise, been altered."

Let me say that again.  "The operations of our suppliers and manufacturers and behaviors of our customers have, likewise, been altered" and COVID has already had an effect on the global economy, adverse effect.

There's multiple other disclosures that go into the effects of COVID, Your Honor.  But the company didn't just stop there.  It also further disclosed what the actual inventory was.

There's a specific section of the registration

14

statement in the consolidated financials that has a line item for inventory.  And it doesn't just give current inventory.  It gives inventory today and it also gives inventory over a period a year before.  So investors can rely upon that information to track what the inventory is over time.

Now, beyond that, Your Honor, there's some --

THE COURT:  Tell me how -- and I noted that you did that, and you put that in your papers.

Tell me how that is -- fixes the problem, how that is a disclosure that, when one is looking at the totality of the circumstances or the totality of the disclosures in the registration statement, it would sort of either clarify or add to the information that the investors received which says -- which was more tentative in nature, the statement that I read earlier, that if the distribution facilities were to encounter difficulties, we could face shortages of our inventory.  How does that looking at the inventory figures affect that statement?

MR. NORRIS:  So the claim in the Complaint, Your Honor, is that this delay in shipping, this abandonment of the data-driven low-risk model -- again, there's no facts to support either of those, but let's just say that they've proven that up -- led to a buildup of excess inventory, which was a problem for the company because it needed to engage in promotions and flash sales to move that inventory.  Okay?  So

**UNITED STATES DISTRICT COURT**

it all routes through what the inventory is.

And these are the disclosures to investors of the actual inventory levels, not just in present day, today, a year before, and then again every quarter.  They can track it over time.

Now, Your Honor, one thing specifically, if you look at the First Amended Complaint, paragraphs -- I believe it's 147 and 157.  The plaintiffs quote statements from Torrid's executives that distinguish between inventory and inventory-in-transit, two numbers.  Inventory, inventory-in-transit.

Now, why is that significant?  It's significant, Your Honor, because the registration statement and every quarterly statement discloses both numbers.  There's capital "I" Inventory, that's the total inventory; there's a subset of inventory called inventory-in-transit.

And what is inventory-in-transit?  There's -- there's allegations in the Complaint that there wasn't a disclosure that there was this delay between ordering products from manufacturers and getting processed into the distribution center.  And they say unprocessed inventory, unprocessed inventory.  That's what exactly inventory-in-transit is, it's an order that's been made from a manufacturer that is on its way to the distribution center and hasn't been received into the distribution center yet.

And, Your Honor, I have the cites for you as to where that's disclosed in all of the filings, if it would be helpful for Your Honor.

THE COURT:  It would be.

MR. NORRIS:  Just one second.

Okay.  Inventory, Your Honor, capital "I" Inventory, this is the overall inventory number:  Exhibit 3, registration statement at F10; Exhibit 4, the Q2 2021 10Q at page 5; Exhibit 5, the Q3 2021 10Q at page 5; Exhibit 6, the fiscal year 2021 Form 10K at page 55; Exhibit 19, the Q1 2022 Form 10Q at page 5; and Exhibit 21, the Q2 2022 Form 10Q at page 5.  The whole class period.

And investors can track over time --

THE COURT:  I can't believe my court reporter actually got all of that.

MR. NORRIS:  Oh.  Sorry.

THE COURT:  You're fine?  Okay.

MR. NORRIS:  But please do let me know if I'm talking too fast.  I don't mean to.

And, again, there's no dispute that all of this was disclosed to investors, Your Honor.  There's also no dispute that any of it was inaccurate.  In fact, the plaintiffs admit in their briefing that the figures were true and correct.

And actually, they're quoted in the Complaint at paragraph 71.  So just a sidebar, they're actually relying on

these disclosures to attempt to make out their claim that there was this glut of inventory.

Inventory-in-transit.  Exhibit 3, registration statement at F29; Exhibit 4, Q2 2021 10Q at page 13; Exhibit 5, Q3 2021 10Q at page 13; Exhibit 6, fiscal year 2021, Form 10K, at page 71; Exhibit 19, Q1 2022, Form 10Q, at page 12; and Exhibit 21, Q2 2022, Form 10Q, at page 12.

Those are all of the inventory-in-transit numbers. Again, orders that Torrid has made to a manufacturing facility that has not yet been processed into the distribution center. If investors are interested in that information, it's set out in the registration statement.  It's also set out in every quarterly filing with the SEC.  Why is that important?

What do the cases say about when a company makes inventory disclosures?

I know there was a lot of case law cited in the briefing.  I want to focus the Court on one particular case because I do think it's dispositive of this issue and the whole case.  And that case is *Belodoff v. Netlist*.  That's 2009, Westlaw 1293690, and that's a Central District of California case from 2009.

THE COURT:  That's fine.  But when you tell me that -- the first thing it tells me is it's not dispositive because you're giving me another District Court case.  But, okay, it may be relevant.  I will listen.

MR. NORRIS:  Understood, Your Honor.

A Court assessing the same allegations that were made here and finding that they don't state claims under the Securities Act.  So I want to read the allegations that were made in *Belodoff*, Your Honor.  And tell me if these sound familiar.

"The plaintiffs alleged that the company represented that it was a," quote, "'agile company in tune with the needs of its own clients and could quickly respond to customer orders' and that it scheduled production based on purchase order commitments and anticipated orders and disclosed that the company had a flexible manufacturing system and the capability to sell excess quantities of product to mitigate inventory risks," same theory that was alleged here.

But what were the facts that the plaintiffs alleged that the company didn't disclose?  They said that these representations were misleading, Your Honor, because the company failed to disclose that it was, quote, "actually employing a risky business model of procuring large amounts of component inventory and prebuilding memory modules ahead of customer orders or reasonably anticipated customer demand and that the company had excessive amounts of component inventory and memory modules at its customer hubs leading up to and at the time of the IPO."

Your Honor, the Court held in *Belodoff*, because the

defendant clearly delineated the levels of inventory at and leading up the IPO -- again, just like Torrid did here -- there was no claim under the securities laws.

And the Court said, quote, "The Court cannot see how the defendant was obliged to label that inventory excessive or why a reasonable investor could not have made such an assumption on its own because it was disclosed.  And plaintiffs cite no authority indicating that Netlist needed to provide a more detailed account of its inventory in order to make the disclosures not misleading."

The same could be said of this case, Your Honor.  There's no case that plaintiffs cite in the briefing that says Torrid was obligated to make some kind of super disclosure of its inventory levels.  Again, actual inventory was disclosed, inventory the year before was disclosed, inventory-in-transit was disclosed.

And it's not like this was a secret.  If you look at the course of the earnings calls in the Complaint, Your Honor, there's robust discussion about these numbers with investors every quarter.  Nobody was hiding from it.  Nobody was concealing it.  The executives who are defendants in this case who are being alleged of fraud openly engaged with equity analysts on these calls and said, look, inventory's either too high or too low.  The sales pace in 2021 was unprecedented.  The concern in 2021 was actually that they didn't have enough

**UNITED STATES DISTRICT COURT**

inventory from these earnings calls because they needed to meet all this demand.

But, again, back and forth with investors, using the numbers that were disclosed to investors, there was no secret about that.

And, again, the facts, the risk disclosures, the actual impact of COVID all disclosed to investors in the registration statement as if they needed any more disclosure, Your Honor.  I'm sure everybody can remember in this room watching the news during this period of time, every single night, story after story after story about port closures, supply chain issues, other issues affecting the companies that are in this space.

Given all of that information, a reasonable investor comes to the table with all of that in mind, they understand the statements in context.

THE COURT:  All right.  So you've -- I think you've answered my question on that particular statement fully.  So anything else you wanted to highlight before I turn to the plaintiffs?

Well, if there's anything else that anyone on the defense side wants to raise.

MR. TALARIDES:  Your Honor, there's a lot of overlap in the claims here.

THE COURT:  I saw -- I mean, you have a joinder as

well; right?

MR. TALARIDES:  Unless Your Honor has any specific question regarding Reg S-K, I'm happy to --

THE COURT:  No, I don't.  All right.

MR. NORRIS:  Does Your Honor have any other specific questions -- there's a lot of territory to cover -- scienter, lost causation, I'm happy to address those.

THE COURT:  No.  I'd prefer to turn to the -- the plaintiffs at this point.

MR. NORRIS:  Okay.

THE COURT:  Thank you.

MR. NORRIS:  Thank you, Your Honor.

THE COURT:  You've covered everything I needed.

MR. NORRIS:  Thank you, Your Honor.

MS. LARGENT:  Good morning, Your Honor. Laurie Largent with Robbins Geller for the lead plaintiff in this case.

I -- I would like to address some of the issues that were raised by Mr. Norris, unless the Court has some specific questions that you would like me to -- to answer beforehand.

THE COURT:  No.  I mean, I specifically want you to focus on what you think the misrepresentations are, the factual -- you know, false or misleading statements or omissions.  I mean, we have to start there.

And I pointed out, I thought, perhaps the best one

you had to hear what the defense had to say.  So if you think you have other strong -- if you think you have a response to what the defense just said, give me that.  And if you think you have other strong misleading statements or omissions involving factual statements or omissions as opposed to puffery or why something that at least looks in the Court's view to be --

MS. LARGENT:  Okay.

THE COURT:  -- nonactionable puffery are actually statements of fact, I'll let you be heard.

MS. LARGENT:  Okay.  Thank you.  Understood.

So I will start -- I'll probably integrate the argument a little bit to address both Mr. Norris's comments as well as focus the Court on what we think our best statements are in this case.

Initially I think -- excuse me.  It's so dry.

THE COURT:  No, please, get some water.

MS. LARGENT:  These Santa Anas get to me.

I think the Court identified the problem with most of the disclosures in this case and that's their yet-to-be-realized language when the allegations that we have are that there were some serious inventory management issues going on before the class period, which is before the IPO.

So I know that defendants have put forth a chart that identified a lot of the alleged disclosures, and I just want to touch base on a couple of them.

UNITED STATES DISTRICT COURT

The one that Mr. Norris referenced initially was that the global crisis resulting from the spread of COVID had disrupted and continues to significantly disrupt local, regional, global economics and businesses in the United States and internationally.  And while that's a general statement and it was understood probably by everybody, um, there was no direct reference to how the COVID crisis was impacting the company.

So, again, while it doesn't have any, um -- yet to, um --

THE COURT:  But isn't inventory something that's very fluid?  I mean, again, perhaps to the point that was made by -- by defense counsel, *Rivian*, by contrast, if you've read that case because that was just a recent one that the Court dealt with, there were very specific cost factors that weren't going to change.  They weren't fluid.  There was nothing, at least in the Court's view, that was contingent about them, et cetera.

Inventory is fluid, month by month.  It changes.  Why isn't a general statement, especially during a period of a pandemic, why isn't a general statement that this pandemic and supply chain issues and all that are affecting all businesses' inventories?  Why isn't that enough in conjunction with specific inventory numbers over time?  Why isn't that enough to put any investor on notice that, hey, this is an

inventory-driven business.  They're telling us that supply chain issues and -- and the pandemic will affect that.  Why isn't that enough?  What more specifically do you think they should have said?

MS. LARGENT:  Your Honor, I think that you need to -- that we need to look at the statements that defendants made with respect to the inventory processes that they had in place at the time of the registration statement, at the time of the IPO.  I mean, this -- this industry is basically the apparel industry; right?  It's the fashion industry.  It demands changes on a -- very frequently.

So inventory, which was Torrid's main business, is key here.  It's not just inventory flowing, but it's the way they were managing the inventory.

At the time of the IPO, defendants made pretty affirmative claims that the company had the flexibility to respond quickly to the latest sales trends and make adjustments to their current offerings.  They said we utilize a read-and-react testing approach with shallow initial buys to iterate our new product offering, thus minimizing fashion and inventory risks, and that the company had rigorous discipline around monitoring inventory and the item level assortment planning that it had, meaning that it was doing a very detailed analysis of its purchasing decisions and how its inventory balanced with the demand.

**UNITED STATES DISTRICT COURT**

Our allegations are that, um, at the time of the IPO, those processes were no longer in place. They weren't being implemented. And they couldn't because of the delays, the shipment delays that were occurring, the long lead times.

So this isn't just a story about fluid inventory from quarter to quarter. It's a story about the abandonment of processes that the registration statement touted for a company that inventory is its key product.

Um, so I think that that would -- that differentiates this case from just a typical, you know, inventory fluidity case.

When you look at -- I'd like to go over the allegations -- I think that the merchandising model statements -- and maybe it's best to address the puffery issue on those. Um, I think that an investor reading these statements could have reasonably believed that Torrid had a robust and disciplined inventory management process in place that was designed to minimize risk.

And so the question is: Are these statements connected to an objectively measurable standard? And as I just read to you, I think that they all are because they're saying that with the read-and-react testing approach, which basically is buying small amounts of product, testing it to see how customers like it, and then building more product, um, minimizes inventory risk. So that's an objective standard

right there.

The company said it also had a rigorous discipline around inventory performance by establishing clear guidelines on in-season product performance.

THE COURT:  Okay.  And the facts showing falsity of those statements, that those were false statements of fact?

MS. LARGENT:  So the facts that we have for that, Your Honor -- and I'll address a temporal issue as well -- is, first, we have Defendant Harper's December 8, 2022, admission that Torrid had lost discipline around inventory planning over the pandemic period.  So we have that as being essentially early 2020, which is before the IPO.  And that's a pretty important fact that defendants underplay.

Harper made this admission in response to analysts' inquiries about what the company was doing to be more consistent with its inventory balance.  And she conceded that they had not been in the past because they weren't able to implement the same processes that the company touted in the registration statement.

She specifically said that the merchandising planning processes had been lost over the pandemic time period and that the company was now, as of December 8, 2022, more than a year and a half after the IPO, reinstating the read-and-react process and chase model, which were the same disciplined approaches defendants had spoke about in the registration

statement.

We also have the fact that Muñoz, who was the CEO prior to Harper, admitted that these same issues had initially caused the company to withdraw its prior IPO in 2019, that there was a lack of discipline around how inventory was acquired.

And when you -- you square these two admissions up, they're essentially the same, which the Court can draw a reasonable inference that, by the time of the IPO, which was July 2021, there was no inventory management processes in place as defendants represented in the registration statement.

Next, we have the CW --

THE COURT:  So you think that's sufficient to say there was -- that the -- those facts show that there was no inventory management process in place?

MS. LARGENT:  I think it's sufficient along with the CW allegations that interlock with the inventory management issues that Harper and Muñoz talked about.  I think when you look at all of that together, it supports the falsity of the merchandising model statements and the registration statement.

So, then, what we have there with the CWs is we have CW-1, who worked directly at the distribution center.  Both of the CWs worked directly at the distribution center.  That's the hub.  That's where the inventory is.

And CW-1 worked at the distribution center, worked

at Torrid from April 2019, so before the IPO, to March 2022 till before the end of our class period.  And he confirms that inventory shipment delays and that flow of the inventory at the distribution center was a constant problem in the months leading up to the IPO.

Does he specify a specific date?  No.  But I -- I believe that that -- I think that the temporal precision that defendants are demanding is not required at the pleadings stage, even under the heightened pleading standard.  I mean, we do have -- in the months leading up to, I don't -- I don't know that the heightened pleading standard requires more than that when it's coupled also, too, with the admission by both Harper and Muñoz about the inventory management issues.

We also have CW-1 reporting that it was taking up to three months for shipments to arrive at the distribution center and then another two to three months to process the inventory and fill the backlogged orders.

THE COURT:  Explain how that's not shown, as defense alleges, through the inventory and inventory-in-transit disclosures.

MS. LARGENT:  I'd like to focus on what the registration statement -- what we're talking about is inventory for purposes of the registration statements -- registration statement statements, is we're talking about what was the condition at the time of the IPO.  Right?

And our allegations are -- and the registration statement does not have a complete history of the in-transit inventory prior to the company going public.  Most of what was reported on in-transit and balance inventory is after the IPO, which -- because the company is required to report after that.

So what the allegations are is up to the time of the IPO is you have this inventory coming in, sitting in process in the parking lot of the distribution center.  And I think that you can see this from Chart 71, which is -- chart -- in paragraph 71 of the Complaint, where you see inventory -- excuse me.  Let me get to that.

You see inventory after the first full quarter, after the IPO, jumping almost 40 percent.  And every quarter thereafter, it increases.

So that -- that squares up with the allegations that we have that the inventory was coming -- before the IPO, the inventory was coming into the distribution center.  Because of the lack of resources, they weren't able to process it.  And then as they were able to process it, it hits the inventory balance and the inventory increases 40 percent.

So that's consistent with CW-1 and CW-2's reports because CW-2 also confirms that the inventory levels rose right after the IPO because delayed deliveries were starting to be processed.

So we think that those are the facts that support --

**UNITED STATES DISTRICT COURT**

and this is probably the biggest point of contention in the briefing, it seems to be, that what -- what was happening at the time of the IPO and are there enough facts to support that inventory was being built up before the time of the IPO and that defendants had basically abandoned their inventory management processes.

And we submit that, based on collectively these facts -- we have the Harper admission, we have the Muñoz admission, and we have the CW allegations and we have the chart in paragraph 71 -- that when you look at those allegations collectively together, I think the Court can draw a reasonable inference that the inventory problems existed at the time of the IPO, thereby making the registration statements concerning the merchandising model false and misleading.

THE COURT:  All right.  Thank you.

And I'll give defense just a couple of minutes.

MS. LARGENT:  May I address one other pleading standard issue, Your Honor?

THE COURT:  Certainly.

MS. LARGENT:  Um, I understand that the Court has had at least two cases recently where -- one of them being *Rivian* and the other being *loanDepot* where you've had both a Section 11 and a Section 10 case.  And so I know that you're aware of the pleadings standards for Section 10 cases.

And defendants are also challenging whether Rule 8

should apply to the claims against the underwriters because I think the case that they're relying on, the *Rubke versus Capitol Bancorp*, is not on point here.  And *Rubke versus Capitol Bancorp* basically says that, if you have both a Section 11 and a 10(b) claim and a common -- a common fraud, that the heightened pleading standard of 9(b) would apply to the Section 11 claim.

But in *Rubke*, all of the defendants were named in both the Section 11 and the Section 10(b) claims.  That is not the case here.  Here, only Section 11 claims are -- are alleged against the underwriters.  And the allegations against the underwriters are that they didn't conduct a reasonable investigation with regard to the claims made in the registration statement.

There are no claims against the underwriters that they published false and misleading statements or engaged in a unified course of fraudulent conduct in issuing false and misleading statements.

So what we would offer is that the better analysis under the facts here is that the Rule 8(a) pleadings standard applies to Section 11 claims, at least to the claims against the underwriters, which is how, um, other District Courts in the Ninth Circuit have dealt with the issue.

And we cite to the *In re: Countrywide Financial Securities Litigation* case from the Central District of

**UNITED STATES DISTRICT COURT**

California, 2008, as an example of that.

THE COURT:  Thank you.

MS. LARGENT:  Thank you.

MR. NORRIS:  Thank you, Your Honor.  Just a few points in response.

So the first is that, if you look at what was actually said about the data-driven model read-and-react testing, it smacks of puffery.  We're talking here about using data to make decisions, doing our best to manage inventory risk, taking a -- a data-driven approach with a speed model.  I mean, these are not concrete representations.  These are business puffery where Torrid is essentially describing its general approach to managing inventory, just like any other retail company would in this space.

Now, I think Your Honor was right to focus on:  What are the facts supporting that this was false?  What are the facts supporting that this was abandoned?  All they have, Your Honor -- which wasn't even alleged in the Complaint, but we can set that aside for a moment -- in their briefing, they point to this third quarter 2022 statement from Ms. Harper.

Ms. Harper doesn't say anything about the data-driven model.  She doesn't say we abandoned it.  She says -- she references other practices, like something called the chase model, which, again, is not something that's alleged in the Complaint.  And she says we lost some discipline over

the pandemic time period.  That's it.

What kind of discipline?  She doesn't say.  When during the pandemic?  She doesn't say.  Could be before the IPO, could be after.  There's no way to map that onto the facts.  And, again, there's nothing even about the data-driven model referenced in her statement.

If that were true, Your Honor, that the company abandoned its data-driven model, one would expect the CWs to say that in the Complaint, but they don't.  There's nothing that the CWs say about abandoning the model.  In fact, they say that the company relied on data, tracked on inventory -- tracked inventory on a daily basis, made reports to management and headquarters, all throughout the class period.

Again, plaintiffs are relying on that to show scienter, but it's dispositive of this argument that they somehow abandoned their approach to using data.  The plaintiffs admit that data was closely tracked and circulated within the company throughout the whole class period.

To this point about the inventory disclosures. Your Honor, if you look at paragraph 71, which, again, is plaintiffs' incorporation and reliance on the numbers that were actually disclosed by Torrid to investors, there was some mention that it didn't extend to the pre-IPO period.  That's not true.  The chart starts at the second quarter of 2020, one year before the IPO, and runs through the third quarter of

2022.

And what you see from the chart is actually that inventory goes down at the time of the IPO in second quarter 2021.  It doesn't go up.  It goes down.

Your Honor, the same is true of inventory-in-transit.  And there was also some mention --

THE COURT:  Wait.  Let me just stop you for a second.

You said the chart starts when?

MR. NORRIS:  The second quarter of 2020.

THE COURT:  So the chart that I have attached -- or incorporated into paragraph 71, is that a -- a subset of the information?

MR. NORRIS:  It is a subset of the information.  For example, it doesn't include inventory-in-transit.

THE COURT:  Well, it starts in third quarter 2021 is what I'm pointing out.

MR. NORRIS:  Um, there may be two charts there.  If you turn to the next page also in paragraph 71 --

THE COURT:  Oh.  Okay.  I see.

MR. NORRIS:  Okay.

THE COURT:  Thank you.

MR. NORRIS:  Okay.  And so inventory actually dips in second quarter of 2021, which is the time period of the IPO.

And there was an argument by counsel that investors

couldn't track this over time, but that's not true because the registration statement doesn't just disclose present figures, as I discussed this morning, it also includes data on prior figures.  That's true for inventory.  It's also true of inventory-in-transit.

Now, Your Honor, to this theory that inventory-in-transit was somehow ballooning at the time of the IPO, again, that's not backed up by the data either.  That was disclosed to investors.

The second quarter 2021, Form 10Q, Exhibit 4 at page 13, there's a disclosure of inventory-in-transit as of January 30th, 2021.  That's six months before the IPO.  It's 21,749.  And then right next to it is the inventory-in-transit as of July 31st, 2021, the same month of the IPO.  And it actually goes down.  It's 21,020.

No challenge in the Complaint that says those were misreported.  Again, plaintiffs admit that they were true.

Um, just another point, Your Honor, to -- to the chart on paragraph 71.  There's -- there's this notion that flows through the Complaint that we were somehow concealing this inventory number even though it was disclosed to Wall Street because it was such a bad thing for the company that was going to cause flash sales and gut our business.

But if you look at profits, Your Honor, they're actually increasing in the time period leading up to the IPO.

It goes from 124 to 144 to 149 as of the time of the IPO. Again, completely inconsistent with this notion that the company was, um, in dire straits financially and, again, no challenge to the actual numbers in the data disclosed to investors in the Complaint.

There was an argument by counsel that inventory went up after the IPO. Again, we're focusing right now on the pre-IPO time period. And there's no allegation that inventory was up before then. In fact, as I just explained to the Court, it actually went down right before the IPO.

Unless Your Honor has questions about anything.

THE COURT: I don't think I have any further questions. The matter will be taken under submission -- oh, you have something else?

MR. NORRIS: I do want to allow Mr. --

THE COURT: Rule 8, 9(b)?

MR. NORRIS: Yes, Your Honor.

MR. TALARIDES: Very briefly, Your Honor.

MR. NORRIS: And if Your Honor is interested in anything, scienter, loss causation, I'm happy to address that as well, but I understand.

THE COURT: I'm not interested at this point. If that changes, I'll bring you all back.

MR. NORRIS: Thank you, Your Honor.

MR. TALARIDES: Thank you, Your Honor, and I'll be

very brief.

I'm just going to point out that *Rubke*, the Ninth Circuit case that counsel cited, the distinguishing factor is not who is being sued, who's the defendant under the '33 Act or the '34 Act.  Here, all the defendants are sued under the '33 Act as well, underwriters and the company defendants as well.

But the standard is whether there's a uniform course of fraudulent conduct.  And *Rubke* says that if the same underlying factual allegations that support the '34 Act claim are the same ones that support the '33 Act claim, then we can assume that the claim sounds in fraud and Rule 9(b) applies.  And that's *Rubke* at --

THE COURT:  1161, perhaps?

MR. TALARIDES:  Wow.  Yes.

And here, I'll just give one -- there's many examples in the Complaint, but I'll just give one example here.

If you just compare paragraph 82 of the Complaint, it describes the alleged facts that render the challenged statements false under the '33 Act of the registration statement and then compare paragraph 82 with paragraph 139, describes the exact same alleged facts that form the basis of the '34 Act claims.

THE COURT:  All right.

MR. TALARIDES:  Thank you, Your Honor.

38

THE COURT:  Thank you.  And don't wow me.  Wow my clerk.

All right.  The matter will be taken under submission.  The Court's ruling will be posted on the docket.

THE COURTROOM DEPUTY:  All rise.  This court stands in recess.

(Proceedings concluded at 11:25 a.m.)

**UNITED STATES DISTRICT COURT**

39

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS 10TH DAY OF NOVEMBER, 2023.

/S/ MYRA L. PONCE
_____
MYRA L. PONCE, CSR NO. 11544, CRR, RDR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**