UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HON. JUDGE JOSEPHINE L. STATON, JUDGE PRESIDING

SANDRA WASWICK,                          )
                                         )
                    Plaintiff,           )
                                         )
         vs.                             ) NO. 22-CV-08375-JLS
                                         )
TORRID HOLDINGS, INC., et al.,           )
                                         )
                    Defendants.          )
_____  )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Friday, June 21, 2024

LISA M. GONZALEZ, CSR No. 5920, CCRR
csrlisag2@gmail.com

APPEARANCES:


FOR THE PLAINTIFF:     ROBBINS, GELLER, RUDMAN & DOWD
                       BY:  LAURIE L. LARGENT
                       655 West Broadway, Suite 1900
                       San Diego, California 92101
                       619-231-1058

                       LEVI & KORSINSKY LLP
                       BY:  DAVID C. JAYNES, ESQ.
                       445 South Figueroa Street
                       31st Floor
                       Los Angeles, California  90071
                       213-985-7290


FOR THE DEFENDANTS:    KIRKLAND AND ELLIS LLP
                       BY:  AUSTIN C. NORRIS, ESQ.
                       and EDWARD S. HILLENBRAND, ESQ.
                       2049 Century Park East, 37th Floor
                       Los Angeles, CA 90067
                       213-680-8184

                       BY:  MARK C. HOLSCHER, ESQ.
                       555 South Flower Street
                       Suite 3700
                       Los Angeles, CA 90071
                       213-680-8400


FOR THE UNDERWRITER DEFENDANTS:

                       ORRICK, HERRINGTON & SUTCLIFFE
                       BY:  ALEXANDER K. TALARIDES, ESQ.
                       THE ORRICK BUILDING
                       405 South Howard Street
                       San Francisco, California  94105
                       415-773-5700

Los Angeles, California; Friday, June 21, 2024;

10:30 a.m.

-o0o-

THE CLERK:  Calling Item Number 2 on the calendar, CV 22-08375-JLS, Sandra Waswick versus Torrid Holdings, Incorporated, et al.

Counsel, state your appearances.

MS. LARGENT:  Good morning, Your Honor. Laurie Largent with Robbins, Geller, Rudman and Dowd for the lead plaintiff City of Warren Police and Fire Retirement System.

THE COURT:  Good morning.

MR. JAYNES:  David Jaynes, Your Honor, with the plaintiffs, as well --

THE COURT:  Good morning.

MR. JAYNES:  -- from the firm of Levi and Korsinksy.

MR. NORRIS:  Good morning, Your Honor. Austin Norris, Kirkland and Ellis, for the Torrid and Sycamore defendants.

THE COURT:  Good morning.

MR. HOLSCHER:  Good morning, Your Honor. Mark Holscher, also with Kirkland and Ellis for the defendants.

MR. HILLENBRAND:  Good morning, Your Honor.

Edward Hillenbrand, Kirkland and Ellis, with the Torrid and Sycamore defendants.

MR. TALARIDES:  Good morning, Your Honor. Alexander Talarides of Orrick, Herrington and Sutcliffe on behalf of the underwriter defendants.

THE COURT:  All right.  Good morning to all of you.

We are here on the defendants' motion to dismiss the amended complaint.  And because the court granted the defendants last motion to dismiss -- and this is an amendment that seeks to cure the deficiencies that the court identified before -- I think it's probably easier to start with the plaintiffs, so that plaintiffs can address -- plaintiff can address what she believes is the cure, in terms of the amendments to the complaint.

MS. LARGENT:  Thank you, your Honor.

Again, Laurie Largent for the plaintiffs.

In terms of what we've done with respect to the amended complaint, I think, as the court can see, we have paired the complaint down quite a bit.  We eliminated the Securities Exchange Act claims, and now the case is solely based on 1933 Act claims for strict liability and failure to exercise reasonable care.

We've eliminated any statements -- so any statements outside of the registration statement have been

eliminated, and the case focuses on the registration statement.

We've eliminated the statements regarding the merchandising model that the court found not actionable for two reasons:  One for puffery; and one because there wasn't a plausible basis for falsity.  So we eliminated those statements.

And, then, we also had statements concerning Torrid's distribution center and allegations that the risk disclosures were misleading in connection with those statements, and we've also eliminated those statements, as well.  So --

THE COURT:  Eight statements remaining.

MS. LARGENT:  Yes.  Out of 44 that we had previously.  So, again, we significantly paired down -- the complaint, we think, is a more -- focused on the issue of the shipment delays in this case, and the impact that they were having on the company at the time of the IPO.

So, to start, I'd like to first say that the Rule 8 pleading standards apply here now that we only have the 1933 Act claims.  Again, the claims are based on strict liability and a failure to exercise reasonable care.  There's nothing in the complaint that would make this a fraud case.

Our prior complaint did allege fraud, but this

complaint supersedes that complaint, and those fraud allegations do not carry over.

Second, we've pled two theories of liability. First, is that defendants are liable for the seven misleading statements in the registration statement that we've alleged; and also that they had an affirmative duty of disclosure under Item 303.

With regard to the misleading statements, no one is saying that defendants had a duty to disclose every piece of information that was going on internally at Torrid prior to the IPO.  That's not the law.  But defendants do have a legal obligation to make the statements in the registration statement not misleading.

Here, the company took it upon itself to talk about how it was able to accelerate product replenishment cycles and quickly replenish and refresh inventory in its registration statement, even in the face of COVID, which had -- which had supply chain -- which caused severe supply chains (sic) for everyone.

With regard to Item 303, even if the court found that the statements in the registration statement are not actionable, the complaint can still be upheld independently for an Item 303 violation.

The case of Sundaram Freshworks -- versus Freshworks, which we cite in opposition, is an example of

that.  That's a case under the Northern District of California that was decided in 2023.

Here, the basis of the complaint is we've alleged a pattern of delays, beginning in 2020, due to L.A. Port congestion and factory closures of Torrid's manufacturers in Asia.  And then we allege that the delays worsened significantly in May 2021, with the emergence of the Delta variant.

So it's the trend of the worsening delays that we allege was required to be disclosed before the IPO.  We've alleged the historic inventory in transit data, showing that this trend was worsening before the IPO; and we've alleged the impact on operations in the form of stockouts, missed sales and missed new product launches.

We've also alleged that the impact was not business as usual for Torrid.  Torrid launched products, new products, every few weeks.  So a three-week delay that started in May 2021 caused the company to miss crucial selling windows.

We also allege other conditions that were happening at the time of the IPO that were exacerbating the impact of the delays and essentially crippling the company to get any inventory.

When you're a company like Torrid that relies on constant inventory flow to do business, several weeks' delay

8

are critical problems for business operations.

Your Honor, there's no magic time frame for a trend under 303, and that is one of the items that defendants dispute is that there was a trend sufficiently alleged or plausibly alleged in the complaint.  But the cases are clear that there is no formula, no magic formula, for a trend.  Defendants say two months is not enough, and we've cited several cases that have found the opposite.

The delays started prior to the IPO.  They started -- we allege that they started at least six months or more prior to the IPO, but the conditions at Torrid significantly changed in May 2021, when those delays worsened.  They altered the company's ability to get inventory.  They worsened in time frame.

THE COURT:  So tell me what -- clearly, you think May is very significant.  So tell me your facts that support that.

MS. LARGENT:  Well, Your Honor, we've alleged in the complaint that one of the metrics that -- internal metrics, which also the company reported, that shows whether inventory is delayed, is inventory in transit.

So in the registration statement, the company reported its financial statements up to the first-quarter of 2021.  And then during the IPO period, which was the end of first quarter 2021, to the end of the second quarter 2021,

there's no public information on what's happening in that quarter. But what we see is that during that time, the in-transit inventory was increasing, which would give knowledge to management that the delays were also increasing.

We allege that, under the facts here, it's plausible that the delays were an observed persistent condition that was impacting the business operations before the IPO.

And we also -- defendants also point to Torrid's financial performance saying that improved through the IPO, and that, therefore, there's no basis for an Item 303. But, Your Honor, if you look at page 8 of defendants' motion, there's a chart showing that revenue growth through the IPO was really flat. So sales were not growing through the IPO, which supports a plausible inference that delays and lower inventory were already being impacted at the time of the IPO.

And, in contrast, in the quarter before the IPO, which was the quarter that was reported in the registration statement, Torrid had year-over-year sales growth of 108 percent. So 108 percent compared to flat sales growth is a significant change.

Then, just four months after the IPO, quarter-over-quarter sales growth was negative 8 percent

because of the delays.

With regard to the statute of limitation's argument, I think it's a premature issue at this stage of the case.

For example, there are factual questions when the specific elements of plaintiff's claim accrued and whether the disclosures were sufficient to supply plaintiff with the information necessary to plead a Section 11 case. So I don't think we can say, at this point, that the claim is time-barred as a matter of law.

We argue that the full extent of the misleading statements and omissions were not known until December 2021, and the initial complaint was filed in November of 2022. So the claims, in our belief, are not time-barred.

That's all I have, Your Honor. If there are any questions, I can answer.

THE COURT: Not right now. I'm simply going to give the defendants an opportunity to respond.

MS. LARGENT: Thank you.

MR. NORRIS: Thank you, Your Honor.

Austin Norris, Kirkland and Ellis.

I'll start with the alleged misrepresentations, Your Honor.

What we see is that plaintiffs have really alleged the same set of misstatements that they alleged in the prior

complaint.

There are two new risk disclosure statements that they added.  Those fail for the exact same reasons Your Honor went over in the order, that we're talking about shipping delays and supply-chain disruptions.  And, as in Noah Educational, when investors read risk disclosures like that, they don't assume that the company is warranting there have never been supply-chain disruptions or shipping delays. So those fail as a matter of law.

They haven't added any new basis for falsity in the complaint, Your Honor, to impeach those alleged statements that Your Honor already found were either puffery or had not alleged to be false.

THE COURT:  So let's distinguish between statements that may be puffery and others that may be actionable if they were -- and the question is falsity; right?

So, Statements 1 through 3 talk essentially about flexibility to respond; flexibility to react.  They do seem quite similar to the court as statements that have already found to be puffery.

Same may be true of the latter statements, but -- later on, but Statements 4 and 5 regarding improving speed and flexibility and shortening our development cycle by two weeks, along with maybe Statement 5, accelerating product

12

replenishment cycles, improved inventory turnover and drive higher margin sales.

Assume that the court would say those may be actionable if false, tell me how it is that there's been no showing of falsity.

MR. NORRIS:  Yes, Your Honor.

So focusing on Statement 4, for example, the bolded and italicized section of the statement that plaintiffs focus on in the complaint is:  To improve the speed and flexibility of our supply chain, including shortening our development cycle by two weeks.

Now, this statement was identical to the statement alleged in the First-amended Complaint at paragraph 87, and it was one of the statements that was evaluated by the court previously and dismissed.

And if you look at the statement in context, this is a statement about the company's response to the COVID-19 Pandemic.

And setting aside the speed and flexibility, which Your Honor has already noted is puffery, if we focus on shortening our development cycle, there's no allegations in the complaint that relate to the development cycle.  We're talking here about product development.  The testing of products, gathering data from consumers and incorporating those into the company's sales.

If you look at, I believe it's 65 or 66-A through G, there's a list of reasons for falsity.  Your Honor noted in the last order that focusing on the misstatements and lining them up against the bases for falsity, there's a fundamental mismatch here because they're not tying the allegations of falsity to the alleged misstatements.  The same is true in this complaint.  There is not a bullet in that section that says anything about the development cycle.  So, no, they have not alleged falsity as to that statement.

If we focus on Statement 5, Your Honor, enhanced supply chain flexibility:  We have developed internal processes that we refer to our speed model, including prepositioning fabrics with our third-party factory partners to accelerate product replenishment cycles, improve inventory turnover and drive higher margins and sales.

So what is this statement addressing?  The sentence starts with:  "We have developed internal processes that we refer to as our speed model," and the statement is describing features of the speed model.

And, again, if you look at the bases for falsity in the complaint, there's no allegation anywhere that the company did anything with its speed model; that it abandoned it, that the speed model was affected in any way.  This reminds me, Your Honor, of the first order, when they were focusing on this alleged abandonment of the data-driven

merchandising model.

And what Your Honor said was:  Let's just focus on that allegation and see what they've alleged, that that piece of the statement is false.

Where's the evidence that they abandoned the data-driven merchandising model?  And there was none.  They pointed to this statement later in the period.  It didn't say anything like that.  There's even less here.  I searched last night for "speed model" in the complaint.  There's one reference, and it's in this statement.  There's nothing said in the bases for falsity about the speed model.  And, again, this is just describing features of the speed model.

Another point I want to layer in here, Your Honor. When Your Honor evaluated statements similar to this in the prior complaint -- and Statement 5, again, that was alleged at First-amended Complaint, paragraph 80 -- that was also a statement that was in the prior complaint that Your Honor evaluated.

When you evaluated statements similar to this in the prior complaint, what the court found was the company wasn't warranting or guaranteeing that it would never be affected by shipment delays or supply-chain disruptions, and reasonable investors don't assume that that's what the company is doing because, of course, they're familiar with custom and practice, they watch the news, they know about

15

COVID.  They're not assuming that a statement like using a speed model is a guarantee that the company is immune from the Pandemic.

And Your Honor said:  Torrid's statements about its data-driven model -- I would posit, Your Honor, the same is true of the speed model -- never promised that Torrid's approach would entirely eliminate inventory risk or render the company immune to supply-chain issues.  The statement simply described Torrid's efforts to minimize those risks.  That's the Order at page 10.  Same exact is true of Statement 5.

And if you layer on top of that, Your Honor, all the disclosures in the registration statement -- I could walk through all of them.  They're identified in our motion -- there are statements of potential risks and also actual impacts of COVID.

So the investors who pick up the registration statement, not only do they know about COVID, of course, and supply-chain disruptions because it's on the news every night, but they're being told repeatedly, over and over again, in the registration statement:  We may be affected by COVID.  Our business operations have been affected by COVID; and if something happens in the future, like a new variant, i.e., Delta, which plaintiffs allege cause this delay to start in May 2021, we can't tell you what's going to happen.

16

The future is uncertain.  We may be affected by supply-chain disruptions and so may our suppliers and manufacturers.

And investors were specifically told in the registration statement that the activities of those manufacturers and suppliers had already been impacted by COVID.

Does that answer Your Honor's question?

THE COURT:  It does.  If you can move onto the argument that plaintiff made about the Regulation S-K claim.

MR. NORRIS:  Yes, Your Honor.

So there are several reasons why the 303 Claim here fails.  It overlaps, to some extent, with the misstatements, but there are also unique arguments as to Regulation 303.

So, first of all, plaintiffs are very vague in the complaint, and Your Honor picked up on this with your question:  When did this issue start?  Well, they say it is sometime in May 2021.  As far as I can tell, Your Honor, the only support for that is the fact that after the IPO, the company disclosed that inventory in transit had gone up a minimal amount.  Two percent disclosed on September 8th.  There's no evidence as to what that number was as of the July 1 IPO.  The complaint's completely absent on that, silent on that.

And, in fact, there's a chart at paragraph 54 of

the complaint that says:  Well, it was at this level as of May 1, and this level as of July 31st, so let's just take out a ruler and draw a straight line between those dots and infer what it was as of July 1st.  There's no basis for that at all.

It is entirely plausible that all of the delay happened after July 1 IPO and was disclosed as of July 31st, when the company made its 2Q disclosure.

So the first point is that there's no allegation or evidence as to what the levels were actually as of July 1 IPO.

The second argument, Your Honor, is that there's no trend.

So, the cases tell us -- Your Honor focused on Noah in your last order.  A similar argument was made in Noah, that there was these two months of alleged rising material costs.  And what the court said in Noah was:  We're not going to call that a trend because it could just be an isolated event.  In fact, the plaintiff's allegations in Noah suggested that it was an isolated event.

And, Your Honor, the same allegations here suggest that it was an isolated event.  At paragraph 48 of the complaint, plaintiffs describe the shipping delays as a discrete incredibly rare, indeed, once in a generation, confluence of adverse events caused by the Delta variant.

This wasn't a trend that was going to last forever.  It was late-breaking, allegedly, caused by the Delta variant.  And when investors look at the registration statement, they track the inventory, they track the inventory in transit, and what you see is the numbers go up, down, up, down, up, down.  They cycle over time, just as Your Honor noted in your prior order, that shifting inventory, supply-chain disruptions are a part of everyday life for businesses like Torrid.  And the same was true here.

So, no trend -- and plaintiffs don't allege the facts necessary to establish a trend here.

There's also no evidence of management knowledge of any of this.  If you look at the 303 cases that plaintiffs like to rely upon, what you see, over and over again, are multiple confidential witnesses, sometimes up to 16.  I believe that was the Facebook case.  There are several others that they cite in their papers.

Your Honor may remember there were two CWs referenced in the prior complaint.  They're gone now.  They're nowhere mentioned in this complaint, and there's no evidence of any management meetings, of any disclosures to management, of any disclosures that management made to the market to indicate knowledge.  And without that kind of evidence, you cannot establish that management knew that this was going to affect the company's financials to allege

19

a 303 Claim.

So they point to this inventory in-transit number, and they say that's the evidence of knowledge. Well, a couple things. Number one, a 1 percent increase as of the July 1 IPO, Your Honor, that's not an increase sufficient to warrant the sort of extraordinary out-of-quarter disclosure or sufficient to establish a 303 violation.

And what the cases say, whether you look at Noah, whether you look at Robinhood, they refer to the necessity of an extreme deviation from historical performance. Robinhood says it must be exceptional, extraordinary.

And why is that?

THE COURT: You think that is why we're getting the language about what happened in May?

MR. NORRIS: It might be. It might be, Your Honor, but if you look at the data, a 1 percent increase as of the July 1 IPO, that is nowhere near an extraordinary deviation because the historical numbers show, again, that it went from 8 percent as of the end of fiscal year 2020, it went up to 17 percent in the next quarter, it came down to 14 percent as of the IPO. And now they're alleging it went up 1 or 2 percent as of the next quarter.

So the deviation that they're pointing to, and they're claiming is extreme or extraordinary, is actually perfectly in line with historical performance. There's no

material deviation.  There's much less an extreme or extraordinary deviation that would require the company to effectively supersede SEC regulations that do not require this kind of reporting.  They give companies 45 days to vet the financial statements.  And the reasons for that are you want them to be accurate.

If we had rushed to market, as they're alleging we should have, and told investors day-to-day, minute-to-minute disclosures, there would be a claim that we did it too soon, and that we put inaccurate information out to the market.  And that would be a much bigger problem than we're talking about here.

The other thing to layer on top of this, Your Honor, the cases, including the Ninth Circuit decision in Steckman, Steckman v. Hart Brewing is you need to also look at the company's financial performance over this period.

Now, Robinhood says the cases that have found this sort of out-of-quarter disclosure, there's declines in multiple financial metrics.

What are the declines in the financial metrics alleged here?

Well, if you look at the company's financial performance, there are none.  Because in the quarter of the IPO disclosed on September 8, 2021, the company's financial

metrics improved in every relevant category.  Revenue went up.  They said revenue was flat.  It didn't.  That's not true.  It actually went up.  Gross profit increased; gross margin increased; net income almost tripled and EBITDA increased as well.

So if you look at the Ninth Circuit decision in Steckman, Your Honor, what the Ninth Circuit said was, if you have increasing financial performance, and when the results are disclosed to the market, the stock price actually goes up.  And that's what happened here.  September 8th, 2021, we disclosed the financial metrics to the market.  The stock price increased by 32 percent in a single day.  That's the market reaction.

And the Ninth Circuit said in Steckman:  We cannot imagine, under any reasonable imaginable standard, that management would have a duty to disclose that to the market under 303.  Ninth Circuit decision binding on all fours.

And, then, finally, Your Honor, the market knowledge point.  Torrid disclosed to the market that there would be variation.  They disclosed that COVID had actually impacted the company.  And investors come to the table with understandings of customs and practices, and they know that inventory is not frozen.  They know that the company is not immune from supply-chain disruptions and shipping issues.  And, in fact, plaintiffs admit at paragraph 43 of the

22

complaint that the market knew about these issues.

If Your Honor doesn't have any more questions about 303, I'm happy to move on.

THE COURT:  I don't have any further questions on that.

What else would you like to --

MR. NORRIS:  Just one last point on the Rule 8, Rule 9 point, Your Honor.

THE COURT:  Is it dispositive here?

MR. NORRIS:  It fails under either rule for sure. So, the only point I would make is I don't think we have to ignore the origins of the complaint.  The word "fraud" may not appear in the complaint anymore, but it clearly comes from a story of fraud.  That was the prior complaint. They're still alleging knowing misrepresentations.  They're still alleging that those knowing misrepresentations were made to promote and profit off of the IPO.  So we would argue Rule 9b applies, but the case fails under either standard.

THE COURT:  Thank you.

MR. NORRIS:  Thank you, Your Honor.

THE COURT:  Any response?  I'll give you a few minutes if you'd like.

MS. LARGENT:  Yes, just briefly, Your Honor.

I believe many of the issues that were addressed

23

by Mr. Norris have been briefed, too, so we would also submit to the court that we have those in the opposition, but one thing I do want to point out that I think it is important, and it's the Noah case.  Because the Noah case was part of the court's basis for the initial order granting the motion to dismiss.

The Noah case looked at two theories of liability similar to what we have here.  The theory of liability for misleading statements in the registration statement and Item 303 violations.  There's nothing in the Noah opinion that says there has to be an extreme deviation with respect to Item 303.  That's just not the law.

What Noah said was there needed to be an extreme deviation because what was at issue were financial metrics that wouldn't have been finalized until the end of the quarter.  That's --

THE COURT:  What do you think you need to show?

MS. LARGENT:  For Item 303, a trend is required --

THE COURT:  So tell me what facts you've alleged to show -- what is your definition of "a trend," and what are the facts that you've used to show it?

MS. LARGENT:  Your Honor, the definition of a trend is the observation of a pattern or condition that would cause the company to believe that there was a reasonable likelihood that it would have a material impact

on the company's financial performance or business operations.

THE COURT:  Why doesn't "material deviation" sort of fit directly within that definition?

MS. LARGENT:  Well, I think there is a difference here between "extreme" and "material."  That's what my focus is on, Your Honor.  The extreme standard, which to me in language is above a material standard, and I think that is what defendants have been arguing.

THE COURT:  He used the "material" when he --

MS. LARGENT:  Yes.  And it's materiality for Item 303.  It's not an extreme departure.

THE COURT:  So tell me -- describe the facts that support a material deviation in terms.

MS. LARGENT:  It's not a material deviation, it's a material likelihood that the business operations are going to be impacted by the trend.  So here what we have alleged is that we have -- we have alleged that the in transmit was increasing, so we have the trend there, and then we also allege --

THE COURT:  So any increase is a trend?

MS. LARGENT:  I'm sorry?

THE COURT:  Any increase is a trend?

MS. LARGENT:  Not any increase, Your Honor, but here --

THE COURT:  What would a trend be?  What is it you've shown that you think is a trend?  Give me specifics, not just an increase.

MS. LARGENT:  Here we have a history of delays. We've alleged that the delays were occurring before May 2021 they were impacting the company's business.

Then, as of May 2021, those delays became more severe.  And, in fact, just four months after the IPO, the company did disclose the very thing that we're saying should have been disclosed at the time of the IPO.

What they said was that during the third-quarter of fiscal '21 -- and we allege it should have been disclosed before the IPO -- global supply-chain distribution caused significant product delays resulting in limited product availability to our customers.  Increased port congestion and COVID 19-related factory disclosures, most notably in Asia-Pacific region where we source a significant amount of our product, impacted our results of operations.

Our allegations are that that information was knowable at the time of the IPO for the reason that management could see that in-transit trends were increasing in the two months before the IPO; and for all of the impact that those delays were having at the time of the IPO, as alleged in paragraph 68.

THE COURT:  All right.  So anything else you wish

26

to address?

MS. LARGENT:  No, that's it, Your Honor.

THE COURT:  So, let me ask you.  If the Court were to disagree and find that you have failed to state any claim here, what would you rely upon for me to give you leave to amend?  What could you amend to say that you haven't said in your complaint?

MS. LARGENT:  I would need to see the order, and the basis for the order, Your Honor.

THE COURT:  Well, essentially, I've ordered it before and -- I've issued an order before explaining why the claims were deficient.  To the extent I think they're deficient for the same reason, I'm just wondering if you have any material facts or any other facts that you could allege that you haven't in the --

MS. LARGENT:  As I stand here, no; but we are continuing our investigation, so I can't answer that question definitively.

THE COURT:  All right.  All right.  Thank you.

The court is going to take the matter under submission.

MS. LARGENT:  Thank you, Your Honor.

THE COURT:  And the ruling will be posted on the docket.

MR. NORRIS:  Thank you, Your Honor.

THE COURT:  Thank you.

(Proceedings concluded at 11:03 a.m.)

28

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  July 9, 2024

                              Lisa M. Gonzalez
                    /s/_____

                    Lisa M. Gonzalez, U.S. Court Reporter
                    CSR No. 5920